UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
DOUGLAS J. HORN and CINDY HARP-HORN,

                Plaintiffs,

           -against-

MEDICAL MARIJUANA, INC.,
DIXIE ELIXIRS AND EDIBLES,
RED DICE HOLDINGS, LLC, and
DIXIE BOTANICALS,

                Defendants,
-----------------------------------------------------------------X

Civil Action No:
15-cv-701 FPG/MJR

**PLAINTIFFS' STATEMENT
PURSUANT TO L.R. 56(a)(1)**

       Plaintiffs, DOUGLAS J. HORN, by their attorneys, KUPILLAS, UNGER &
BENJAMIN, LLP. by Jeffrey Benjamin, Esq., submit this Statement pursuant to Local Civil
Rule 56(a)(1) as to material facts to which there are no genuine issues to be tried. Specifically,
Plaintiffs move hereunder for summary judgment as to liability under their statutory causes of
action, i.e. New York General Business Law Art 22-A, §349 ("Deceptive Practices Act" or GBL
§349"), and GBL §350 for false advertising, and the federal Racketeer Influenced and Corrupt
Organizations Act ("RICO") 18 U.S.C. §1962(a)-(d),

       1.     Plaintiffs have been a husband and wife team of over-the-road truckers since
1998. They drive across the United States hauling various loads such as expedited food,
pharmaceuticals and liquid chemicals. (Horn Affidavit Paragraph 4).

       2.     On February 24, 2012, Plaintiff Douglas Horn was involved in a serious work-
related semi-truck accident in which he suffered severe shoulder and back injuries. Over the
months following the accident, he submitted to physical therapy and took various pain
medications in an attempt to mitigate the trauma of the accident. However, those methods did not
work. (Horn Affid. Para 5).

3.     In September, 2012, Plaintiffs observed a magazine at a book store in Texas where they had stopped. (Horn Affid. Para 6).

4.     Annexed hereto as Exhibit "1" is a copy of the first page of the "High Times" magazine and the advertisement page (Page 42) for the Dixie Elixir Dew Drops Tincture product in question.

5.     In this magazine advertisement on Page 42, Defendants' represent:

   a)  ". . . .new product line called Dixie X, which contains 0% THC . . .";

   b)  " the non-psychoactive products . . ."

6.     After review of that magazine, Plaintiffs continued to research the product and found You Tube videos by the CEO of the Company, "Tripp Keber." (Horn Affid. Para 9).

7.     The YouTube videos dated August 8 and August 23, 2012 they viewed can be found at:

   a.     https://youtu.be/Urlwtw_xQ48

   b.     https://youtu.be/yDjIGXS58ds

   c.     https://youtu.be/k42_Kpp13mk

8.     In these videos, Defendants' CEO states continuously that the products are "THC-free", there was "no THC" and it had "0% THC."

9.     Plaintiffs further investigated the product by reviewing the Frequently Asked Questions ("FAQs") on the Company website. Annexed hereto as Exhibit "2" on page 2, were the FAQs the Company published back in September, 2012. In those, Defendants' specifically state:

**"What is the difference between CBD from hemp and CBD from medical cannabis?"** (bold in the original).

"While the two plants are botanically related, _our hemp contains no THC_ and numerous medical studies have shown CBD to have significant potential health benefits from a variety of ailments ranging from epilepsy to pain management.

Medical cannabis contains THC and may provide relief from various ailments, however, with a psychotropic effect." Emphasis added.

10.     Defendants' Dixie's answers to their FAQs changed dramatically over the years. Annexed hereto as Exhibit "3" is the April 8, 2015 FAQ by Defendants stating the following:

**"Does Cannibidiol (CBD) and other natural hemp based constituents show up on a drug test?"** (bold in the original).

"Most workplace drug screens and tests target delta9-tetrahydrocannabinol (THC) and do not detect the presence of Cannabidiol (CBD) *or other legal natural hemp based constituents*. However, studies have shown that eating hemp foods and oils *can cause confirmed positive results* when screening urine and blood specimens. Accordingly, if you are subject to any form of drug testing, *we recommend (as does the United States Military) that you DO-NOT ingest our products*, and consult with your healthcare, drug screening/testing company or employer." Emphasis added.

11.     As regularly required by his employer, Plaintiff Douglas Horn was subject to random drug testing (urine) over the years. Plaintiff passed these tests without incident over the 14 years he was a trucker. (Horn Affid. Para 15).

12.     Douglas Horn did not, and has no employment or criminal history of smoking marijuana. (Horn Affid. Para 18).

13.     On September 17, 2012, Plaintiff ordered the Defendants' "Dixie X CBD Dew Drops 500mg Tincture. Annexed hereto as Exhibit "4" is a copy of the paid invoice for this product. He then ingested it as directed. (Horn Affid. Para 20).

14.     On October 9, 2012, as he had regularly done over the 14 years prior, Plaintiff Douglas Horn submitted to a required, random, urine drug test screening. Annexed hereto as Exhibit "5" is the confirmatory Report dated October 11, 2012. Plaintiff was confirmed for a positive test result for "marijuana metabolite" with a result of 29 ng/ml well over the cutoff concentration limit.

15.     Almost immediately thereafter, Plaintiff was terminated from his career as a trucker, and referred to required drug education courses through a Substance Abuse Professional Evaluation program ("SAP"). (Horn Affid. Para 22).

16.     Upon the positive test, on October 18, 2012, Plaintiff ordered another (unopened) batch of the Dew Drops tincture for the purpose of having it tested at a lab. (Horn Affid. Para 23).

17.     On or around October 29, 2012, Plaintiff found the lab known as "EMSL Analytical, INC" for the purpose of confirming that the defendants' product he took contained THC. Annexed collectively hereto as Exhibit "6" are copies of the 1) the EMSL invoice to Plaintiff for this testing; 2) the Analysis confirming the Defendants' product had 170 ug/g of THC in it; and 3) EMSL's Chain of Custody document.

18.     The EMSL lab confirmed the Defendants' product contained THC contrary to all of Defendants' advertising and promotional materials. Exhibit "6."

19.     Annexed hereto as Exhibit "7" is the email Plaintiff received from the National Director at EMSL lab, Scott Van Etten. This email of November 8, 2012 states:

"Douglas,

Your report is attached. Since the _sample contained THC,_ I may not be able to return it to you as per our DEA registration. I am checking on that. I'll send you an email either way . . .. " (Emphasis Added).

and later that day at 3:27 p.m.

"Douglas

We can't return your sample."

20.     Annexed collectively hereto as Exhibit "8" are the Defendants' Certificates of Analysis that were produced to Defendants' expert witness Dr. Cindy Orser as a representative sampling of the testing Defendants allegedly conducted as to the product in question. Defendants' Certificates actually show the presence of an amount of .05% and .04% respectively of THC.

21.     Annexed hereto as Exhibit "9" are copies of the label on Defendants' tincture product that Plaintiff took and that which was tested, showing the absence of any reference to THC or Controlled Substances.

22.     Annexed hereto as Exhibit "10" is a copy of Dixie Elixirs and Edibles' (the "THC-infused products company") May 2, 2012 press release announcing their launch of the Dew Drops tincture product at issue, and their breaking new ground in the category of non-THC-infused products.

23.     Annexed hereto as Exhibit "11" is a copy of the Facebook post of Tamar Wise, former Chief Scientist at Defendant Medical Marijuana and Dixie Elixirs denouncing Defendants' products, stating "unfit for human consumption" and accusing Defendants a acting "criminal and dangerous."

24.     Defendants' Botanist expert Dr. Cindy Orser testified at her deposition on December 12, 2017. Relevant portions of her deposition transcript are annexed hereto as Exhibit "12." Dr. Orser stated the following:

a)  THC is "pretty amazing." (Orser Dep page 61: line 19);

b)  Dr. Orser is an advocate of keeping THC in formulated cannabis products. (Orser 61:25);

c)  THC is a key contributor to the effectiveness of cannabis. So removing THC from cannabis per se wouldn't make sense. (Orser 62:3-6);

d)  Dr. Orser did not know the allowable amount of THC in industrial hemp or raw plant prior to the 2014 Farm Bill; (Orser 97:6, 99:2);

e)  The Certificates of Analysis provided to Dr. Orser for her review do not correspond to the tincture product taken by Plaintiff. (Orser 153:14-18); those would have been useful. (Orser 153:19-22).

f)  Dr. Orser asked for the particular Certificates of Analysis but learned "they do not exist," and Defendants did not have them. (Orser 153:23-25; 154:2-10).

5

g) Dr. Orser did not even know if what was represented on her Certificates of Analysis were a representative sample of the product Plaintiff took. (Orser 157:9-12).

h) In 2012, the .3% threshold she used did not apply. (Orser 158:2-10).

i) Dr. Orser could not say that her testimony was a relevant as to the measure of THC content in the product Plaintiff took. (Orser 159:15-22);

j) Dr. Orser did not review or even ask for batch records for the product. (Orser 160:6-19);

k) Dr. Orser found it unusual that she was given Certificates for a different product. (Orser 161:11-14);

l) Dr. Orser acknowledged *a detectable amount of THC as noted in Defendants' Certificate of Analysis*. (Orser 167:16-25; 168:2). See also Exhibit "8" annexed hereto and noted above.

m) Dr. Orser was never provided the product by the Defendants. (Orser 176:9-11).

n) When Dr. Orser referenced a legal limit for THC of .3%, she was talking about for Colorado. (Orser 178:4-6); but she did not know of a federal maximum threshold for THC content in 2012. (Orser 178:14-17).

o) Dr. Orser opined that the product Mr. Horn took was never tested at all by Defendants. (Orser 189:18-25, 190:2-13).

p) Dr. Orser interpreted Defendants' FAQs to mean they knew there could be some THC, but they were now making efforts to have THC free products. (Orser 248:12-22).

25.     Plaintiff's expert economist calculated the present value as of August 23, 2017 of Plaintiffs' damages from the loss of income to be $836,544. Annexed hereto as Exhibit "14" is a copy of that report.

6

Dated: New York, New York
      August 29, 2018

                          KUPILLAS, UNGER & BENJAMIN, LLP.

                          *Jeffrey Benjamin*

                          By:    Jeffrey Benjamin, Esq.
                          Attorneys for Plaintiff
                          5 Penn Plaza, 23rd Floor
                          New York, NY 10001
                          (212) 655-9536