1             UNITED STATES DISTRICT COURT

2            WESTERN DISTRICT OF NEW YORK

3        ------------------------------------------------

4   **DOUGLAS J. HORN and CINDY HARP-HORN,**

5             Plaintiffs,

6    -vs-            Civil Action No.: 15-cv-701-FPG

7   **MEDICAL MARIJUANA, INC., DIXIE ELIXIRS AND**
    **EDIBLES, RED DICE HOLDINGS, LLC, and DIXIE**
8   **BOTANICALS,**

9             Defendants.
    ------------------------------------------------
10             Examination Before Trial of

11   **DOUGLAS J. HORN**, held before Marissa A.

12   Ashcroft, Notary Public, at MURA & STORM,

13   PLLC, 930 Rand Building, 14 Lafayette Square,

14   Buffalo, New York, on May 8th, 2017 at 10:17

15   a.m., pursuant to notice.

16

17

18

19

20

21

22

23

1          **A P P E A R A N C E S**

2     APPEARING FOR THE PLAINTIFF:

3                    **HOUSH LAW OFFICES, PLLC**
                   **BY: FRANK HOUSH, ESQ. and**
4                      **ELIZABETH TOMMANEY, ESQ.,**
                   70 Niagara Street
5                  Buffalo, New York 14202
                   (716) 362-1128

6

7     APPEARING FOR THE DEFENDANT, MEDICAL
      MARIJUANA, INC. and RED DICE HOLDINGS, LLC:

8                    **MURA & STORM, PLLC**
                   **BY: ERIC T. BORON, ESQ.,**
9                  930 Rand Building,
                   14 Lafayette Square
10                 Buffalo, New York 14203
                   (716) 855-2800

11

12    APPEARING FOR THE DEFENDANT, DIXIE ELIXIRS AND
      EDIBLES and DIXIE BOTANICALS:

13                   **MESSNER REEVES LLP**
                   **BY: JEAN-CLAUDE MAZZOLA, ESQ.**
14                     **and WENDY J. LINDSTROM, ESQ.,**
                   805 Third Avenue,
15                 18th Floor
                   New York, New York 10022
16                 (646) 663-1860

17

18    **ALSO PRESENT:** Cindy Sue Harp-Horn

19

20

21

22

23

───── **DEPAOLO-CROSBY REPORTING SERVICES, INC.** ─────
170 Franklin Street, Suite 601, Buffalo, New York  14202
                        716-853-5544

**W I T N E S S E S**

| WITNESS | EXAMINATION | PAGE |
|---|---|---|
| Douglas J. Horn | By Mr. Boron | 5 |
| | By Mr. Mazzola | 251 |

**E X H I B I T S**

| EXHIBIT | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 1 | Amended Notice of Examination Before Trial | 5 |
| Exhibit 2 | Complaint and Jury Demand | 5 |
| Exhibit 3 | Enterprise Application For Employment | 5 |
| Exhibit 4 | Statement to Enterprise | 53 |
| Exhibit 5 | Enterprise Transportation Company Position Description Dated 3/18/02 | 57 |
| Exhibit 6 | Illegal and unauthorized Items at operational facilities document dated 3/18/02 | 61 |
| Exhibit 7 | Acknowledgement of receipt Dated 3/18/02 | 64 |
| Exhibit 8 | Enterprise Transportation Company Acknowledgement Of receipt dated 5/13/02 | 68 |
| Exhibit 9 | Enterprise Transportation Houston, Texas Training Delivered by Employer dated 5/17/02 | 72 |
| Exhibit 10 | Acknowledgement of receipt Dated 4/17/03 | 80 |
| Exhibit 11 | Enterprise Products Company and DOT Drug and | 82 |

**DEPAOLO-CROSBY REPORTING SERVICES, INC.**
170 Franklin Street, Suite 601, Buffalo, New York  14202
716-853-5544

1                              Alcohol Policy Summary

2        Exhibit 12        Personnel Action Request    89
                           Dated 8/18/11
3
         Exhibit 13        Enterprise DOT Reportable  100
4                          Dated March 22, 2012

5        Exhibit 14        Workers' Comp Doctor Form  116

6        Exhibit 15        Personnel Action Request   126
                           Dated 10/17/22
7
         Exhibit 16        Form 8879 dated 2011       143
8
         Exhibit 17        Form 8879 dated 2012       143
9
         Exhibit 18        Form 1040 dated 2013       143
10
         Exhibit 19        Form 1065 dated 2013       143
11
         Exhibit 20        Form 1040 dated 2014       143
12
         Exhibit 21        Form 1040 dated 2015       143
13
         Exhibit 22        Form 1040 dated 2016       143
14
         Exhibit 23        Medical Marijuana          203
15                         High Times Article

16       Exhibit 24        Medical Marijuana High     211
                           Times Magazine
17
         Exhibit 25        Three pages of print-outs 219
18                         Of pictures

19       Exhibit 26        Drug and Alcohol Plan      254
                           Enterprise Products Company
20
         Exhibit 27        Invoice and Packing Slip   270
21                         Dated September 17, 2012

22

23

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1          The following were marked for identification:

2     Exhibit 1          Amended Notice of
                         Examination Before Trial
3
      Exhibit 2          Complaint and Jury Demand
4
      Exhibit 3          Enterprise Application
5                        For Employment

6

7                   D O U G L A S  J.  H O R N

8     195 Parker Road, Lockwood, New York 14859,

9     having been first duly sworn, was examined and

10    testified as follows:

11

12               EXAMINATION BY MR. BORON:

13

14  Q. Mr. Horn, my name is Eric Boron.  I'm an

15     attorney with the law firm of Mura & Storm.  I

16     represent two of the defendants.  I represent

17     Medical Marijuana, Incorporated and I

18     represent Red Dice Holdings, LLC.  There are

19     other lawyers for other defendants in this

20     room.

21          I'm going to start with the questioning

22     and -- so let me go over a couple ground rules

23     with you.  If I ask you a question you don't

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1      understand, will you let me know?

2   A. Okay.

3   Q. You have to say yes or no.

4   A. Yes.

5   Q. Okay.  Do you understand that you're going to

6      have to answer every question orally with

7      words rather than head nods or shoulder

8      shrugs?

9   A. Yes.

10  Q. Okay.  Have you ever been deposed before?

11  A. No.

12  Q. Have you ever given sworn testimony in court

13     before?

14  A. No.

15  Q. Well, let me go over a couple other things

16     that will help us in the long run.  Please let

17     me get to the end of every question I ask

18     before you begin to answer.  It seems simple,

19     but oftentimes you'll find that you're going

20     to know where I'm going with a question before

21     I get to the end of it and you're going to

22     want to start answering.  Don't do that, wait

23     until I get to the end of the question before

─── DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ───

1       you start answering, okay?

2   A.  Yes.

3   Q.  I will do the same for you.  I will wait for

4       you to get to the end of your answer before I

5       start asking the next question; acceptable to

6       you?

7   A.  Yes.

8   Q.  Okay.  Have you consumed any drugs of a

9       prescription or nonprescription nature in the

10      last 12 hours?

11  A.  Yes, I have.

12  Q.  Okay.  Prescription or nonprescription?

13  A.  Prescription.

14  Q.  What drugs did you consume in the last 12

15      hours that were prescription drugs?

16  A.  Lisinopril.

17  Q.  What's the name of it?

18  A.  Lisinopril.

19          **MR. HOUSH:**  Is it Lisinopril?

20          **THE WITNESS:**  Yeah, Lisinopril or

21      something like that.  L-I -- I don't even know

22      how to spell it.

23          **MR. HOUSH:**  L-I-S-I-N-O-P-R-I-L.

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1        Hypertension medication.  I'm not going to
2        testify anymore, I'll shut up.  That's it.
3   **BY MR. BORON:**
4   Q. Who prescribed the Lisinopril?
5   A. Dr. Choi.
6   Q. Dr. Choi?
7   A. Mm-hmm.
8   Q. How do you spell his last name?
9   A. C-H-O-I.
10  Q. Is Dr. Choi your primary care physician?
11  A. Yes, he is.
12  Q. How long has he been your primary care
13     physician?
14  A. At least 10 years.
15  Q. Where is he located?
16  A. Vestal, New York.
17  Q. Does he have offices elsewhere other than
18     Vestal?
19  A. Not that I know of.
20  Q. Is Dr. Choi also your wife's primary care
21     physician?
22  A. Yeah.
23  Q. Are there other prescription drugs that you

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1       took in the last 12 hours?

2    A. Hydrocodone.

3    Q. What dosage of either of those drugs did you

4       take in the last 24 hours?

5    A. Of the hydrocodone?

6    Q. Yeah.

7    A. They're 5/325s, I believe.

8    Q. One pill?

9    A. Yeah.

10    Q. And the other drug?

11    A. One pill.

12    Q. What's the dosage on that?

13    A. I'm not sure.

14    Q. At the present time are you -- do you have

15       prescription for any other drugs besides those

16       two from Dr. Choi?

17    A. No.

18    Q. Did you take any nonprescription drugs in the

19       last 24 hours?

20    A. Vitamins.

21    Q. Did you consume any alcohol in the last 12

22       hours?

23    A. No.

─── DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ───

```
 1      Q.  Did you take any nonprescription drugs besides

 2          vitamins in the last 24 hours?

 3      A.  No.

 4      Q.  Do either of the prescription drugs that you

 5          took in the last 24 hours affect your

 6          long-term or short-term memory?

 7      A.  No.

 8      Q.  Have you ever been treated for long-term or

 9          short-term memory loss?

10      A.  No.

11      Q.  I'm showing you what's marked as Exhibit 1 for

12          this deposition.  Frank.

13              MR. HOUSH:  Sir.

14              MR. BORON:  This is your pile.

15              MR. HOUSH:  All right.  Thank you.

16              MR. MAZZOLA:  It's the Notice of

17          Deposition?

18              MR. BORON:  Yes, for Mr. -- that's

19          probably on the top of that pile.

20              MR. HOUSH:  I'll share with you, Cindy,

21          so we always -- we have copies of everything

22          they're showing him.

23              BY MR. BORON:
```

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    Q. Have you seen a copy of Exhibit 1, Mr. Horn,
2       before?
3    A. No.
4    Q. No.  Are you here in response to a Notice of
5       Deposition requiring you be here for the
6       purpose of this lawsuit?
7    A. Can you rephrase that?
8    Q. Why are you here this morning, sir?
9    A. Because of the product that I took.
10   Q. Are you --
11   A. Got me fired.
12   Q. Are you -- did your attorney ask you to be
13      here?
14   A. Yes.
15   Q. Are you prepared to give testimony about the
16      facts related to your lawsuit against my
17      clients?
18   A. Yes.
19   Q. Did you prepare for this deposition in any
20      way?
21   A. Not really.
22   Q. Did you review any documents to prepare for
23      the deposition?

─── DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ───

1      A. Not recently, no.

2      Q. Have you reviewed the documents that were

3         produced by your former employer, Enterprise?

4      A. I went over just a few of them.  There was

5         like a thousand pages and I was on the road,

6         so not really, no.

7      Q. Have you reviewed the documents that were

8         produced in response to a subpoena in this

9         lawsuit by MEDTOX?

10     A. No.

11     Q. Did you bring the product that you -- that you

12        took --

13     A. No.

14     Q. -- in October 2012?

15     A. No, I did not.

16     Q. Do you have the bottle?

17     A. At home.

18     Q. Is there anything inside that bottle?

19     A. Very little.

20     Q. There's something in it?

21     A. Yes, about this much of the bottle.

22     Q. Okay.

23              MR. HOUSH:  That was on my advice, Eric.

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

```
 1          He was concerned about the legality that he
 2          could -- he could not transport it legally and
 3          that if he was stopped he might be subject to
 4          law enforcement.  He had a similar concern
 5          about shipping it to me, so based on those
 6          concerns I --
 7                MR. BORON:  How is he going to get it to
 8          court?
 9                MR. HOUSH:  That's a good question.  I
10          don't know.
11          BY MR. BORON:
12       Q. Okay.  All right.  I'm showing you what's
13          marked as Exhibit Number 2 for today's
14          deposition, sir.  For the record, Exhibit 2 is
15          a copy of the complaint in this lawsuit.  Did
16          you -- do you have any involvement in drafting
17          the complaint?
18       A. Yes.
19       Q. Yes.  What was your involvement?
20       A. Just stating the facts of the product.
21       Q. Did you, yourself, draft any specific portion
22          of the complaint?
23       A. I'd have to go over it again to see.
```

—— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ——

1    Q. Did you ever read through the whole complaint?

2    A. A long time ago, yeah.

3    Q. You read through it word for word at one

4       point?

5    A. Yeah, at one point.

6    Q. Okay.  When was that?

7    A. When it was first given to me I would imagine.

8    Q. Was it given to you by somebody else that

9       drafted it?

10    A. Well, Jeffrey Benjamin e-mailed it to us to

11       begin with and that's when we went over it.

12    Q. Have you had any other attorneys besides

13       Mr. Benjamin or Mr. Housh in this lawsuit?

14    A. No.

15    Q. Have you been advised by any other attorneys

16       besides Mr. Benjamin --

17    A. No.

18    Q. -- and Mr. Housh in this lawsuit?

19    A. No.

20         MR. HOUSH:  Just so we're clear,

21    Ms. Tommaney is present in the room.

22    A. Well, yeah.

23    Q. Let me get some background facts about you,

—— **DEPAOLO-CROSBY REPORTING SERVICES, INC.** ——

─ DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ─

1         sir.  What's your full name?

2    A. Douglas James Horn.

3    Q. Have you ever gone by any other names?

4    A. When I was a minor, yeah.  Last name was

5         Chavez, C-H-A-V-E-Z.

6              MR. MAZZOLA:  Same first names?

7    Q. So your last name was Chavez?

8    A. As a minor, yeah.

9    Q. Until what year?

10   A. Until I was about 15.  It wasn't legally my

11        name, that's the name I went by.

12   Q. Has your legal name ever changed?

13   A. No.

14   Q. Why did you go by the last name of Chavez?

15   A. That's who my mom was married to.

16   Q. Was that last name of Chavez used at school

17        for you?

18   A. Yeah.

19   Q. Is your mom still alive?

20   A. Yes.

21   Q. Where does she reside today?

22   A. In Hacienda Heights, California.

23   Q. And what's her name?

─DOUGLAS J. HORN - BY MR. BORON - 05/08/17─

1 A. Betty Chavez.

2 Q. Is that Betty as in Elizabeth Chavez?

3 A. Just Betty.

4 Q. Just Betty.  Who is the gentleman that she was

5   married to?

6 A. Mike.

7 Q. Is he still alive?

8 A. Yes, he is.

9 Q. Was Mike Chavez your biological father?

10 A. No.

11 Q. Who was your biological father?

12 A. Douglas Horn.

13 Q. Is he still alive?

14 A. Yes, he is.

15 Q. Where does he reside?

16 A. Imboden, Arkansas.

17 Q. What's his address?

18 A. I'm not sure what it is offhand.

19 Q. B-O-W-D-E-N?

20 A. Yes, Imboden, I-M-B.

21 Q. Do you have your cell phone with you?

22 A. Yeah.

23 Q. Is his number on your cell phone?

─ DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ─

1       A. His address is.  Do you remember --

2               MR. HOUSH:  You can't talk to anybody

3           else.

4               THE WITNESS:  Oh.

5               MR. HOUSH:  At least while we're on the

6           record.

7               THE WITNESS:  I don't have his actual

8           address stored.

9           BY MR. BORON:

10      Q. Phone number?

11      A. I have his phone number.

12      Q. Thank you.

13      A. (870) 869-2705.

14      Q. While you have that phone out do you have John

15          Frezzo's phone number in there?

16      A. No, I don't.

17      Q. Where is John Frezzo living?

18      A. In Kansas, I believe.

19      Q. When was the last time you spoke with John

20          Frezzo?

21      A. I haven't spoke to John Frezzo in quite some

22          time.

23      Q. Well, have you spoken to him in the last year?

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    A. Not on the phone, maybe through Facebook.

2    Q. Have you spoken to John Frezzo about this

3       lawsuit?

4    A. Not recently, no.

5    Q. Have you ever spoken with John Frezzo about

6       this lawsuit?

7    A. Just when we got fired I told him that I was

8       going to be taking it to court.

9    Q. How long was he your supervisor?

10   A. About six years.

11   Q. Did you know John Frezzo before you started

12      working at Enterprise?

13   A. No.

14   Q. Where did you go to high school?

15   A. Sequoia High School.

16   Q. What municipality is that in?

17   A. Tulare County.  Tulare County.

18   Q. How do you spell that?

19   A. T-U-L-A-R-E.

20   Q. It's in California?

21   A. Yeah.

22   Q. What name were you going by when you entered

23      high school?

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    A. When I entered high school?

2    Q. Yes.

3    A. That would have been 9th grade that would have

4       been under Chavez.

5    Q. So were you known as Douglas James Chavez at

6       that point in time?

7    A. In the 9th grade, yeah.  I went to a different

8       school.

9    Q. So in 9th grade you were --

10   A. Yes, in 9th grade I lived with my mother and

11      went to school there with her and then 10th

12      grade I moved with my dad -- my biological dad

13      and then went to school in Sequoia.

14   Q. What was the high school you went to 9th

15      grade?

16   A. Baldwin Park.

17   Q. Did you have to go through a legal procedure

18      to get your last name changed?

19   A. My name was never legally changed, it was just

20      basically she used Chavez and got away with

21      it.

22   Q. Okay.  Is Baldwin Park School also in Tulare

23      County?

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1      A. No, that's in Orange County, I believe.

2      Q. Did you ever get arrested in California?

3      A. As a minor.

4      Q. What were you charged with when you got

5         arrested in California?

6      A. As a minor?  GTA.

7      Q. What's GTA?

8      A. Grand theft auto.

9      Q. You can see I'm not much of a gamer.  What

10        happened to those charges of grand theft auto?

11     A. They pretty much got dropped and I agreed to

12        move in with my dad at that point.

13     Q. Did you get convicted of any crime?

14     A. No.

15     Q. In California?

16     A. No.

17     Q. Ever convicted of a crime in New York State?

18     A. No.

19     Q. Ever convicted of a crime anywhere?

20     A. No.

21     Q. When you moved in with your biological dad,

22        what was he doing for a living?

23     A. He was disabled.

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    Q. Your date of birth, sir?

2    A. 4/29/65.

3    Q. Where were you born?

4    A. Walla Walla, Washington.

5    Q. How long did you live in Washington?

6    A. I'm not sure.

7    Q. When were you last a resident of California?

8    A. Back in 1998.

9    Q. Did you know your wife Cindy at that point in

10      time?

11   A. Yes.

12   Q. Yes.  Were you married at that point in time?

13   A. Yes.

14   Q. When did you get married?

15   A. 1990.

16   Q. How many times have you been married, sir?

17   A. Twice.

18   Q. When did you first get married?

19   A. 1983.

20   Q. Is your first wife -- is your first wife still

21      alive?

22   A. To my knowledge, yeah.

23   Q. What's her name?

—— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ——

1    A. Candy and I'm not sure of her last name.

2    Q. Did she take your last name when she married

3       you?

4    A. She did.

5    Q. She was known as Candy Horn?

6    A. Mm-hmm.

7          **MR. HOUSH:** You have to say yes or no,

8       Doug.

9          **THE WITNESS:** Yes.

10         **MR. HOUSH:** The only reason for that is

11      she can't take down a --

12   Q. Thanks, Frank.  Your Social Security number,

13      sir?

14   A. ████████8636 -- 8636.

15   Q. Candy's maiden name was?

16   A. Johnson.

17   Q. When's the last time you spoke to her?

18   A. It's been years.  I have no -- I couldn't tell

19      you when.

20   Q. Have you spoken to her since 1990?

21   A. Since 1990, yeah.

22   Q. Since 2000?

23   A. That would probably be the time I talked to

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1          her last, around in that area.

2     Q. Has she remarried?

3     A. I have no idea.

4     Q. At the time you last spoke to her what was she

5          doing for a living?

6     A. Painting ducks.

7     Q. Is she an artist?

8     A. No, I don't know what she is.

9     Q. Did she have employment?

10    A. Yes.

11    Q. With who?

12    A. That's what she told me.  I have no idea.  I

13         didn't ask.

14    Q. Okay.  Do you currently have a Facebook

15         account, sir?

16    A. Yes, I do.

17    Q. What's your username?

18    A. James Horn.

19    Q. Do you have more than one account or just one

20         with Facebook?

21    A. Just the one.

22    Q. How long have you had that account?

23    A. Since 2010.

—————— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ——————

1    Q. Always with the same username, James Horn?

2    A. It might have been under Douglas Horn at one

3       time and then I changed it to James because

4       most people know me by James.

5    Q. Did you ever allow anyone to post on Facebook

6       as if they were you?

7    A. No.

8    Q. Do you currently have a Twitter account?

9    A. No.

10   Q. Have you ever had a Twitter account?

11   A. I signed up for it, never used it.

12   Q. When did you sign up for it?

13   A. I -- a couple years ago maybe.

14   Q. When you say "never used it," you mean

15      literally never posted one thing to Twitter?

16   A. Never posted anything.

17   Q. Do you currently have a YouTube account?

18   A. Yep.

19   Q. What's your YouTube username?

20   A. I'm not sure.  I think Driving Force.

21   Q. Just one YouTube account or more than one?

22   A. I might have another name, but I don't use it.

23      I don't post things on YouTube I just watch

——— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ———

1          things on YouTube.

2     Q.  Have you ever posted anything on YouTube?

3     A.  No.

4     Q.  Have you ever commented on anything that was

5          posted by somebody else to YouTube?

6     A.  I commented on a few things, sure.

7     Q.  Have you ever allowed anyone to post to

8          YouTube as if they were you?

9     A.  No.

10    Q.  Do you use any other social media sites that I

11         haven't named?

12    A.  No.

13    Q.  After you started this lawsuit against my

14         client, did you delete any posts you had made

15         to Facebook?

16    A.  Nope.

17    Q.  Have you ever deleted a post you made to

18         Facebook?

19    A.  I have.

20    Q.  What were the circumstances for deleting a

21         post to Facebook?

22    A.  Fake news.

23    Q.  What do you mean by "fake news"?

1    A. Posting a news article that wasn't true.

2    Q. You were the poster of a news article that

3       wasn't true?

4    A. No, I reposted it and then did some research

5       and found out it wasn't true so then I deleted

6       it.

7    Q. We just had an example there of you starting

8       to answer before I got to the end of a

9       question.  It makes it super hard on Marissa.

10   A. Gotcha.

11   Q. Okay.  Who's your current employer, sir?

12   A. ICX.

13           **MR. MAZZOLA:**  How do you spell that?

14   Q. Three letters, I-C-X?

15   A. ICX, yeah.  It stands for Interstate Carrier

16      Express.

17   Q. What's ICX's freight line?

18   A. I don't know.

19   Q. You don't know.  What's Gully Transportation?

20   A. That's part of ICX.  It's like two companies,

21      mother company.

22   Q. Which is the mother company --

23   A. Gully.

─ DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ─

1      Q. -- ICX or Gully?

2      A. Gully.

3      Q. G-U-L-L-Y?

4      A. Yes.

5      Q. Where does ICX have its headquarters?

6      A. New Jersey, Willingboro -- Willingboro.

7      Q. Can you spell that?

8      A. W-I-L-L-I-N-G-B-O-R-O.

9      Q. What do you do for ICX?

10     A. I drive.

11     Q. When did you start working for ICX?

12     A. In November, I think 4th of 2015.

13     Q. Before November 4th, 2015 had you ever worked

14        for either ICX or Gully?

15     A. No.

16     Q. Have you been a driver since November 4th,

17        2015 for ICX?

18     A. Yeah.

19     Q. Continuous?  There hasn't been any break of

20        employment?

21     A. No.

22     Q. Since November 4th, 2015 have you driven for

23        any other company?

─ DEPAOLO-CROSBY REPORTING SERVICES, INC. ─
170 Franklin Street, Suite 601, Buffalo, New York  14202
716-853-5544

—DOUGLAS J. HORN - BY MR. BORON - 05/08/17—

1   A. Just ICX.

2   Q. Who do you get paid by, ICX or Gully?

3   A. I believe ICX.

4   Q. Did you have to make an application with ICX

5      to get the job?

6   A. Somewhat, yeah.

7   Q. What do you mean by "somewhat"?

8   A. I know we did a lot of talking on the phone

9      until I met him in person.

10  Q. Did you fill out an application form with ICX?

11  A. Yeah, we had to fill out an app.

12  Q. Was that an online form that you filled out or

13     a paper form that you mailed back?

14  A. No, it was a paper form.

15  Q. You signed the application form before you

16     mailed it in?

17  A. Yeah.

18  Q. Did you keep a copy of it?

19  A. No.

20  Q. You didn't keep a copy of the application form

21     you sent in?

22  A. No.

23          MR. HOUSH:  Object to form.

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

```
 1      Q.  At the time that you applied for the position
 2          with ICX did you know anybody in the company?
 3      A.  No.
 4      Q.  How did you come to find out that ICX was
 5          looking for drivers?
 6      A.  A mutual friend.
 7      Q.  Who's that mutual friend?
 8      A.  Augie Piani.
 9      Q.  Can you spell that for us?
10      A.  Augie, A-U-G-I-E and Piani is P-I-A-N-I.
11      Q.  Is Augie Piani affiliated or associated with
12          ICX?
13      A.  No, he was associated with them years ago when
14          they were another company.
15      Q.  Is Augie Piani a driver himself?
16      A.  Yes, he is.
17      Q.  Did you ever work with Augie Piani at another
18          company?
19      A.  Yes, I did.
20      Q.  Which company was that?
21      A.  KL Harring.
22      Q.  When did you work at KL Harring?
23      A.  We started in November 24th of 2014, I believe
```

─── DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ───

```
 1          and then to April of 2015.  I may be wrong on

 2          those years.

 3     Q.  You may be wrong on the years?

 4     A.  Yeah.  I'd have to flip through it.

 5     Q.  Did you bring any records with you that you

 6          can refer to to refresh your memory?

 7     A.  No.

 8     Q.  Well, which years are you wrong on?

 9     A.  '13, '14.

10     Q.  Are we talking about your whole testimony

11          or --

12     A.  No.

13     Q.  -- just what you said in the last answer?

14     A.  No, KL Harring.

15          MR. HOUSH:  Object to form.

16     A.  KL Harring.

17     Q.  Okay.  We'll go back to that in a few minutes.

18          Okay.  Let me ask you a few more questions

19          about ICX.  What kind of driving do you do for

20          ICX?

21     A.  Truck driving.

22     Q.  Is it driving --

23     A.  General freight.
```

─── **DEPAOLO-CROSBY REPORTING SERVICES, INC.** ───
170 Franklin Street, Suite 601, Buffalo, New York  14202
716-853-5544

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

```
1     Q. -- across the country?

2     A. Yeah, open road.

3     Q. What are you transporting?

4     A. Various refrigeration products to auto parts

5        to some HazMat occasionally.

6     Q. Did you meet with somebody from ICX before you

7        started to drive with them?

8     A. I met with the regional manager, yeah.

9     Q. Who is that?

10    A. Gary Wagner.

11    Q. Does he work in that Willingboro, New Jersey

12       office?

13    A. Yes, he is.

14    Q. When you say you met with him, was this a

15       face-to-face --

16    A. Yes, it was.

17    Q. -- person-to-person meeting?

18    A. Yep.

19    Q. When did that happen?

20    A. As far as specific date, I'm not sure.  A

21       couple of months before I got hired.

22    Q. Was it an interview?

23    A. Pretty much, yeah.
```

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    Q. Did you take a road test with --

2    A. No.

3    Q. -- ICX?

4    A. No.

5    Q. Is there anybody else that was part of that

6       meeting between you and Gary Wagner?

7    A. Just my wife Cindy.

8    Q. Okay.  Did the two of you apply together as a

9       team to ICX?

10   A. That's correct.

11   Q. Before you started working for ICX did you

12      have to take a drug test?

13   A. Yes, I did.

14   Q. Where was that drug test administered?

15   A. There in New Jersey, Willingboro.

16   Q. At their offices?

17   A. No, at, I believe it's Kosaka[sic].  I believe

18      that's the name.  It's like a Quest

19      Diagnostics.

20   Q. Okay.

21   A. Except I think it's Kosaka.

22   Q. Was Cindy drug tested at Kosaka, as well?

23   A. Yes.

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    Q. How long did you meet with Gary Wagner?

2    A. Just for about an hour.

3    Q. Just one meeting or more than one meeting?

4    A. Just one meeting.

5    Q. What was the purpose of that meeting with Gary

6       Wagner?

7    A. To see if we were going to be a good fit.

8    Q. Did he ask you why you had stopped working for

9       Enterprise?

10   A. Yep.

11   Q. What did you tell him?

12   A. I told him I was terminated taking an

13      over-the-counter product.

14           MR. HOUSH:  There's water over there.

15           MR. BORON:  Just so you guys know, we

16      can take a break at any time.  This is not an

17      endurance test.  I don't want to put somebody

18      through some difficult situation.  We can take

19      breaks to get drinks of water, coffee, go to

20      the lav, whatever you need.  Frank, do you

21      mind if I keep going?

22           MR. HOUSH:  No, it's up to my clients.

23      If they need a break they'll tell us.

```
1              MR. BORON:  Okay.
2              MR. HOUSH:  Do you want any water,
3         Counsel?
4              MR. MAZZOLA:  No, thank you.
5              MS. LINDSTROM:  No, thank you.
6         BY MR. BORON:
7    Q. Who's your supervisor today at ICX?
8    A. Gary Wagner.
9    Q. When was the first time you told Gary Wagner
10        about this lawsuit?
11   A. The lawsuit?
12   Q. Mm-hmm.
13   A. I think on our hire date because I told him
14        I'd probably need time off.
15   Q. During the interview you had, the one hour
16        interview you didn't tell him about the
17        lawsuit?
18   A. No.
19   Q. What's Gary Wagner's phone number?
20   A. I have to look it up.
21   Q. Thanks.
22   A. (609) 422-5971.
23   Q. Let's go over your compensation package that
```

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1          you have with ICX right now.  You do receive

2          compensation for driving for them?

3     A. Yes.

4     Q. Okay.  How are you compensated?

5     A. We're paid by mile.

6     Q. You mean by mile driven?

7     A. Yes.

8     Q. What's the rate?

9     A. 55.75 per mile, 55 cents and three quarters.

10    Q. Does that rate vary based on what you're

11         transporting?

12    A. No.

13    Q. You could be transporting HazMat or auto

14         parts?

15    A. Correct.

16    Q. Okay.  Was that your starting mileage rate

17         when you started at ICX?

18    A. It was 55.5.

19    Q. When did it go up?

20    A. Just last December.

21    Q. What other benefits do you receive from

22         working at ICX besides that mileage rate?

23    A. They pay hourly after two -- two hours, 12.75

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1         per driver.

2    Q. So your route has to be longer than two hours

3         to get that hourly rate?

4    A. That's wait time, unloading and loading.

5    Q. It is per driver, right?

6    A. The 12.75 is.  The 55 and a half is split per

7         driver.

8    Q. ICX provides the trucks that you drive?

9    A. Yes.

10   Q. Have you ever owned your own truck --

11   A. No.

12   Q. -- for work?  If the wait time is less than

13        two hours you don't receive that 12.75 per

14        driver?

15   A. Correct.

16   Q. What about your travel expenses, are you

17        compensated by ICX for travel expenses?

18   A. No.

19   Q. Do you have a fringe benefit package from ICX?

20   A. No, as far as like 401(k)s.

21   Q. Do you have any life insurance with ICX?

22   A. I believe so.

23   Q. How much?

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    A. I believe it's 30,000.

2    Q. Did you get a signing bonus when you started

3       with ICX?

4    A. No.

5    Q. Did you receive any bonuses from ICX since you

6       worked at the place?

7    A. No.

8    Q. Do you get paid vacation from ICX?

9    A. Yes.

10   Q. How much?

11   A. One week.  I'm not sure of the pay.

12   Q. Do you receive a Christmas bonus from ICX?

13   A. No.

14   Q. Is there a 401(k) plan or some kind of a

15      retirement savings plan?

16   A. There is one, we're not enrolled in it yet.

17   Q. How does the retirement savings plan work?

18   A. I'm not sure.

19   Q. Are you doing loading or unloading of trucks?

20   A. No.

21   Q. Does Cindy do loading or unloading of trucks

22      with ICX?

23   A. No.

```
 1     Q. Did you have to do loading or unloading in any
 2        place you worked in the past?
 3     A. Occasionally with a pallet jack moving stuff
 4        off.  And with ICX there's maybe one or two
 5        stops where I have to pull a pallet of.  It's
 6        not really unloading.
 7     Q. Do you have to wear a company outfit or
 8        uniform when you drive for ICX?
 9     A. We do, yes.
10     Q. They provide it?
11     A. Yes.
12     Q. What kind of clothing does ICX provide you
13        with?
14     A. Just a standard uniform.
15     Q. Okay.  Winter gear?
16     A. No.
17     Q. Do you get that from ICX?
18     A. No.
19     Q. No.  Do you get driving gloves from ICX?
20     A. Nope.
21     Q. Sunglasses?
22     A. Nope.
23     Q. Do you get profit sharing from ICX?
```

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    A. No.

2    Q. How about health insurance?

3    A. Yeah.

4    Q. How does your health insurance benefit work at

5       ICX?

6    A. I'm not sure.

7    Q. Does that include dental insurance?

8    A. I don't think so, but I'm not sure.

9    Q. Are you sure?

10   A. I don't know.

11   Q. You just don't know?

12   A. Yeah, I don't know.

13   Q. How about eyeglasses, do you have eyeglasses

14      through the insurance?

15   A. I don't think so.

16   Q. When you applied at ICX did you have to

17      disclose any accidents that you had had with

18      prior trucking?

19   A. They pretty much do a search on that, so if

20      there is anything there they'll find it.

21   Q. On the application form itself --

22   A. Yeah, we had to disclose it.

23   Q. You did, okay.  Did you have to disclose the

---
DOUGLAS J. HORN - BY MR. BORON - 05/08/17
---

1        results of any drug tests?

2    A.  No.

3    Q.  Since your employment was terminated at

4        Enterprise, how many places have you applied

5        at for work?

6    A.  Over 50 I know that.  I didn't keep count.  I

7        didn't keep a list.

8    Q.  What makes you say over 50?

9    A.  Because there's over 50 that I can -- I mean,

10       I can name you 25 right off the top of my

11       head.

12   Q.  Why don't you do that.

13   A.  Okay.  We got Indian Transport, J.B. Hunt,

14       U.S. Xpress, Celadon, Swift, Continental

15       Carbonics, Genox, Keenan, Trimac, Snyder,

16       Transport Services, Leonard's Express, RGB,

17       who else?  Oakley, two R & Rs, there's two

18       different companies named R & R, one is R & R

19       Transport and I think the other one is R & R

20       Incorporated.  I forget the other name.

21       Horizon.

22   Q.  Verizon or Horizon?

23   A.  Horizon.  Do you want me to keep going on?  I

---
**DEPAOLO-CROSBY REPORTING SERVICES, INC.**
---

─── DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ───

1        can think of more it's just --

2    Q. You said you had 25 off the top of your head.

3    A. Well.

4    Q. 17 so far.

5    A. I can probably come up with them.

6    Q. Let's go to a few follow-up questions.

7    A. Okay.

8    Q. So you applied at these various places since

9        you lost your position at Enterprise, correct?

10   A. Correct.

11   Q. All right.  And what -- when you were -- got a

12       result back, right, from the place you had

13       applied for, would it come in the form of a

14       letter saying that they weren't going to hire

15       you or a phone call or e-mail?

16   A. A lot of it was done on the telephone because,

17       number one, you have to find out company

18       policy and so if company policy says that if

19       you've ever had a dirty random they won't have

20       you, so I would call and find out their

21       policies to see if I would even be able to put

22       an application in and if it was no, I would

23       find out, well, how many years does that last.

—— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ——

1    Some have three-year, five-year, or indefinite
2    not hire, so it was all done with a phone
3    call.  A lot of places that I applied for I
4    never got -- you don't get denial letters or
5    anything like that.  I mean, I've -- I've
6    gotten --
7         MR. HOUSH:  Have some water.  You're
8    doing great.  Deep breath, have some water.
9    Q.  Are you done with your answer, sir?
10   A.  Well, a lot of times when you apply there is
11       no denial letter.
12   Q.  So you don't know -- in those situations you
13       don't know why it is --
14   A.  Nope.
15   Q.  -- you didn't get a job?
16   A.  That's correct.
17   Q.  When you did get some kind of denial letter
18       would the denial letter say why you didn't get
19       the job?
20   A.  Not specifically, no.
21   Q.  Do you have any letters?
22   A.  I have a couple.
23   Q.  Have you saved any letters on denial --

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1            MR. HOUSH:  Object to form.

2     A.  I submitted some letters in this case.  The

3         couple that I did get, yes.

4     Q.  Did you get any letter from any perspective

5         employer saying that they wouldn't hire you

6         because of your drug test incident with

7         Enterprise?

8     A.  Not specifically, no.

9     Q.  When did you start at Enterprise?

10    A.  2001 March.

11    Q.  I'm showing you what's marked as Exhibit 3,

12        sir.

13    A.  Okay.

14            MR. BORON:  That's not it, though,

15        Frank.  I'm going to give you a copy, all

16        right?

17            MR. HOUSH:  All right.

18            MR. BORON:  This packet is where I have

19        specific copies of specific things.

20            MR. HOUSH:  All right.

21            THE WITNESS:  2002, I'm wrong on the

22        date.

23            BY MR. BORON:

—— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ——

1    Q. Okay.  So looking at Exhibit 3 refreshes your

2       memory and you see it's 2002 that you started

3       at Enterprise?

4    A. Yep.

5    Q. Well, flip -- let me say, first of all for the

6       record, this is a photocopy of four pages and

7       the first page says Enterprise in the upper

8       left-hand corner, correct?

9    A. Yeah.

10   Q. Okay.  And there's a heading on the first page

11      that says Application For Employment, correct?

12   A. Yes.

13   Q. And in the upper right-hand corner date of

14      application is marked in as 3/4/02; do you see

15      that?

16   A. Yes.

17   Q. Is that your handwriting on the first page?

18   A. To my knowledge, yeah.

19   Q. Okay.  And then flipping to the last page, the

20      signature.  It says Applicant Signature.  Is

21      that your signature on the last page of

22      Exhibit 3?

23   A. Yes.

—————DOUGLAS J. HORN - BY MR. BORON - 05/08/17—————

1    Q.  Okay.  Do you recall filling this application

2        form out?

3    A.  Barely.

4    Q.  Is your signature on the last page of

5        Exhibit 3 certified that all the answers that

6        were made by you in the application were true

7        and complete to the best of your knowledge?

8    A.  Yes.

9    Q.  Did you consent when you signed the

10       application form to taking a physical

11       examination, drug streen -- drug screen and

12       such future physical examinations and drug

13       screens as may be required by Enterprise?

14   A.  Yes.

15   Q.  And you understood that?

16   A.  Yes.

17   Q.  Okay.  Did you also understand when you signed

18       the application that your employment with

19       Enterprise may be terminated with or without

20       cause and with or without notice at any time

21       at the option of Enterprise?

22   A.  Yep.

23   Q.  Okay.  The second page of this Exhibit 3 lists

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1      employment for the last 10 years --

2      information for employment for the past 10

3      years; do you see that?

4    A. Yes.

5    Q. Did you fill this information in?

6    A. Yes.

7    Q. Okay.  Did you start driving in California?

8    A. Define "driving".  You mean truck?

9    Q. Yeah.

10   A. Or just driving for a living?

11   Q. Driving truck.

12   A. No, I did not.  I went to school there.

13   Q. Where were you living when you first started

14      driving a truck for a living?

15   A. California.

16   Q. What year was that?

17   A. That was in 1998.

18   Q. So your first job driving for -- for somebody

19      was Marten Transport?

20   A. Correct.

21   Q. Okay.  And after Marten Transport you worked

22      at Relco Systems?

23   A. Correct.

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    Q. When you started with Marten Transport you
2       were living in California?
3    A. Yes.
4    Q. Did Cindy start with you at the same time with
5       Marten Transport?
6    A. No.
7    Q. You started as a single driver?
8    A. I started as a solo and then got to be a
9       certified trainer so I could train her.
10   Q. Okay.  And that was all with Marten?
11   A. Yes.
12   Q. Between 1998 and 2001?
13   A. Mm-hmm.
14   Q. Were you living in California then?
15   A. Yes.
16   Q. Were you living in California during those
17      years?
18   A. We moved out of California in 1998.
19   Q. Okay.  Where did you move to?
20   A. New York.
21   Q. Your Lockwood address that you gave us this
22      morning?
23   A. No.

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    Q.  How many places have you lived in New York?

2    A.  Three.

3    Q.  Three places, okay.  Before you lived at 195

4        Parker Road, where did you live in New York

5        State?

6    A.  1778 Union Center Main Highway, Endicott, New

7        York.

8    Q.  Before you lived on the Union Center Main

9        Highway property, where did you live?

10   A.  622 Edson Road, Number 85 and that was in

11       Endicott as well.

12   Q.  Were you renting at the Edson Road?

13   A.  No.

14   Q.  You owned it?

15   A.  Yes.

16   Q.  Was it a mobile home lot?

17   A.  Yes, it was.

18   Q.  Do you still own the mobile home today?

19   A.  Nope.

20   Q.  How long has it been since you lived in a

21       mobile home?

22   A.  About 16 years roughly.

23   Q.  You live in a single-family home today?

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

```
 1    A.  Yes.
 2    Q.  Do you own that home?
 3    A.  Yes.
 4    Q.  When did you purchase it?
 5    A.  2006.
 6    Q.  Is there a mortgage on the home today?
 7    A.  Yes, there is.
 8    Q.  Was there a mortgage on the home in October
 9        2012?
10    A.  Yes.
11    Q.  When you were terminated from Enterprise?
12    A.  Yes.
13    Q.  Have you ever been late on your mortgage
14        payment?
15    A.  No.
16    Q.  When you lived on Union Center Main Highway in
17        Endicott were you renting or owning?
18    A.  Owning.
19    Q.  You had your mobile home there?
20    A.  No, that was a house.
21    Q.  That was a house.  Who else lives with you
22        today?
23    A.  Just Cindy.
```

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    Q. At the time you were terminated from
2       Enterprise in October 2012 who was living at
3       your house?
4    A. I had a daughter Elizabeth.
5    Q. Where's Elizabeth living today?
6    A. On her own.
7    Q. Does she live in --
8    A. Owego.
9    Q. New York State?
10   A. Yeah, Owego.
11   Q. What's her address?
12   A. I don't know her address.
13   Q. Is Elizabeth your youngest child?
14   A. Yes.
15   Q. How many children do you have?
16   A. Five.
17   Q. All daughters?
18   A. Yes.
19   Q. You have a daughter named Erica?
20   A. Yes.
21   Q. Where does she live today?
22   A. Denver, Colorado.
23   Q. Is her last name Nava?

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1     A. Yes.

2     Q. What's the street address for Erica's address?

3     A. I don't know it.

4     Q. In October 2012 when you got terminated from

5        Enterprise was Erica living in New York State?

6     A. Yes.

7     Q. Where was she living at that point in time?

8        Endicott?

9     A. No, I'm thinking Binghamton.

10    Q. What does Erica do for a living?

11    A. She works for Lockheed Martin.

12    Q. What's the last year that Erica was living

13       with you, residing in the same house?

14    A. Jeez, probably 2006 roughly.

15    Q. You have a daughter named Nicole?

16    A. Yes.

17    Q. Where is she living today?

18    A. I'm not sure.

19    Q. In New York State?

20    A. Pennsylvania usually.

21    Q. How long since she lived with you at your

22       residence?

23    A. 11 years ago would be 2006, so Erica would

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1               have moved out about 2008 then.

2       Q. What does Nicole do for a living?

3       A. I'm not sure.

4       Q. When you were a trainer at Marten, what were

5               you doing, like what was your training work?

6       A. Well, I went through a course to train Cindy

7               after being a solo driver for six months so

8               they put me through a course in Wisconsin

9               about skid pad-type training, so that I could

10              train Cindy when she came on.

11      Q. Skid pad has to do with loading and unloading?

12      A. No, skid pad has to -- it's basically a big

13              wet concrete slab they get wet and they lock

14              the truck up and you got to deal with it.

15              Basically skills tests and --

16      Q. Did you train anyone else at Marten besides

17              Cindy?

18      A. No.

19      Q. When you trained Cindy for Marten did you have

20              to teach her about the company employment

21              policies?

22      A. No, they usually did that in orientation those

23              things are covered.

─── DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ───

1    Q. Mm-hmm.  How long did you work for Enterprise?

2    A. About 10 and a half years.

3    Q. Was that continuous?

4    A. Yes.

5    Q. There never was a time that you stopped

6       working for Enterprise in those 10 and a half

7       years?

8    A. Nope.

9    Q. Would you mind marking this for us?

10

11      The following was marked for identification:

12      Exhibit 4        Statement to Enterprise

13

14      **BY MR. BORON:**

15   Q. Okay, sir.  I'm showing you what's marked as

16      Exhibit 4 for today's deposition.  For the

17      record it's a single-page document.  In the

18      bottom right-hand corner it says ENT with the

19      number 9.  Have you seen a copy of this

20      before, sir?

21   A. No.

22   Q. No.  Is that your signature at the bottom of

23      the page?

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    A. Yes, it is.

2    Q. Okay.  Did you review the document before you

3       signed it?

4    A. Yeah.

5    Q. Okay.  Going across the top there's reference

6       to what looks like your wife's name; do you

7       see that?

8    A. Okay.

9    Q. And there's a phone number there, do you

10      recognize that phone number?

11   A. That looks like an Enterprise number.

12   Q. It looks like an Enterprise number to you?

13      607 --

14   A. Oh, no, no, no.  No, I don't recognize that

15      number.

16   Q. Okay.  Do you know who the Laura person is

17      that this was being sent to the attention of?

18   A. Yes.

19   Q. Who's that?

20   A. The secretary at Enterprise.

21   Q. What's Laura's last name?

22   A. I don't remember.

23   Q. Why was this document prepared and signed by

—DOUGLAS J. HORN - BY MR. BORON - 05/08/17—

1        you?

2    A.  Because when they hire you they look at DAC

3        services to look at, say, accidents on your

4        history and Marten claimed that the little

5        flimsy guard thing that I hit was an accident

6        and they wanted me to basically put in writing

7        and basically describe it because it was that

8        and a deer that I hit they classified as an

9        accident as well.

10   Q.  When you say "DAC," is that an acronym for

11       something?

12   A.  Yeah, they don't use it anymore now.  It's --

13       Jesus Christ, CSA, I know that.  It's a

14       different form now.  It's called something

15       different now.

16   Q.  Well, was it D-A-K or D-A-C that you referred

17       to?

18   A.  D-A-C.

19   Q.  D-A-C?

20   A.  Yeah.

21   Q.  And that's a database that contains records of

22       drivers' histories?

23   A.  It's for companies to upload the drivers'

—— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ——

1          histories, yeah.

2     Q.   Is it a database that only had information

3          about accidents or did it have information

4          about other things related to the driver, like

5          their drug test results?

6     A.   I would imagine it has that as well.

7     Q.   And what's the equivalent of DAC today?

8     A.   I'm not sure of the name today.  I think it's

9          just CSA.  I think they call it CSA.

10    Q.   So Enterprise was asking you to explain things

11         on your DAC report?

12    A.   Yep.

13    Q.   When you applied at ICX was a CSA report run

14         on you?

15    A.   Yeah.

16    Q.   Did you have to explain the accident in North

17         Dakota in 2012?

18    A.   Yeah, I already explained it to them.

19    Q.   Okay.  But that showed up on the report?

20    A.   Yeah.

21    Q.   Did you see the report?

22    A.   No, I don't see the reports.

23    Q.   Okay.  Did you have to prepare a document like

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1          this for ICX at the time of your application

2          about the information on your CSA report?

3      A.  No.

4

5          The following was marked for identification:

6          Exhibit 5          Enterprise Transportation
                              Company Position Description
7                             dated 3/18/02

8

9                     (Recess taken)

10

11         **BY MR. BORON:**

12     Q.  Okay.  We're back on the record after a break.

13         Because you haven't done depositions before

14         I'm going to remind you every time we come

15         back you won't be sworn in again, you're just

16         on your sworn testimony and it continues on

17         through every break, if we take a lunch break,

18         et cetera, every time you return please remind

19         yourself you're under oath to give accurate

20         and true testimony; do you understand that?

21     A.  I do.

22     Q.  Okay.  So we left off, I was asking you about

23         your applications with -- your application to

1    work at Enterprise in 2002.  So I'm going to
2    show you Exhibit 5, sir.  Exhibit 5 is the --
3    for the record is a one-page document.  At the
4    top of the document it says Enterprise
5    Transportation Company Position Description,
6    correct?
7    A.  Yes.
8    Q.  And on the bottom right-hand corner it says
9    ENT 8, correct?
10   A.  Yes.
11   Q.  Does your signature appear on this form?
12   A.  Yes, it does.
13   Q.  Okay.  What is this form besides the position
14   description what were you signifying when you
15   signed this form?
16   A.  That we could do the job that's described
17   above.
18   Q.  Do you see in the position requirement section
19   there's one, two, three, four, five?
20   A.  Yes.
21   Q.  Number four says familiar with and comply with
22   Enterprise Transportation Company employee
23   operating, safety and environment procedures

—— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ——

1          and standards.  Do you see that?

2     A. Yes.

3     Q. Okay.  So at the point in time you signed this

4          were you certifying that you were familiar

5          with those standards?

6     A. Yes.

7     Q. At this point in time had you been trained in

8          some way by Enterprise already?

9     A. I believe so.

10    Q. Did they --

11    A. They did put us through training.  I'm not

12         sure exactly when our release date was.

13    Q. Where did the training occur?

14    A. In Parsippany.

15    Q. Who was the person that put the training on?

16    A. His name was John, another John.  Reddy --

17         John Reddy.

18    Q. Okay.  He's the person who signed above your

19         signature?

20    A. I guess so, yep.

21    Q. Was his title terminal manager at that point

22         in time?

23    A. Yes, he was.

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    Q. Okay.  At the terminal, there was a manager
2       and then there was the person who managed you,
3       correct, John Frezzo?
4    A. No.
5    Q. No.
6    A. Two different terminal managers, two separate
7       times.  Basically when we started with
8       Enterprise John Reddy was the terminal manager
9       for about five years and then John Frezzo took
10      over.
11   Q. Okay.  So was John Reddy the person that hired
12      you?
13   A. Yes.
14   Q. Had you known John Reddy before you applied to
15      Enterprise?
16   A. No.
17   Q. Does John Reddy still work at Enterprise?
18   A. No.
19   Q. Where does he work?
20   A. He's retired.
21   Q. Have you spoken to him since he retired?
22   A. No.
23   Q. When did he retire?

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1      A. A couple years ago.

2

3         The following was marked for identification:

4         Exhibit 6          Illegal and unauthorized
                              items at operational
5                             facilities document dated
                              3/18/02
6

7         **BY MR. BORON:**

8      Q. Mr. Horn, showing you what's been marked as

9         Exhibit 6 for this deposition.

10             **MR. MAZZOLA:**  Are you moving off of 5?

11     Q. Yes.  For the record, Exhibit 6 is also a

12        one-page exhibit.  Does Exhibit 6 also have

13        your signature at the bottom?

14     A. Yes, it does.

15     Q. What's the date next to your signature at the

16        bottom?

17     A. 3/18/2002.

18     Q. Okay.  Can you look back at Exhibit 5 and tell

19        me the date of the signature on Exhibit 5?

20     A. 3/18/2002.

21     Q. Okay.  Same date.  Is it your memory that

22        these forms were provided to you and you

23        signed them on the same date, March 18, 2002?

--------- DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ---------

1    A. Yes.

2    Q. Okay.  Did you review this document before you

3       signed it?

4    A. At the time, yeah.

5    Q. You have -- did you have any trouble reading

6       or understanding what was in the document?

7    A. Not to my knowledge, no.

8    Q. Okay.  I'm going to count down from the top of

9       the document, one, two, three, four, five, to

10      the sixth paragraph.  Do you see where the

11      sixth paragraph begins Off the Job?

12   A. Okay.

13   Q. Do you see those words?

14   A. Yep.

15   Q. You do, okay.  So there's reference to off the

16      job illegal drug use in that paragraph,

17      correct?

18   A. Correct.

19   Q. And it says it could be caused for

20      disciplinary action up to and including

21      discharge, correct?

22   A. Correct.

23   Q. Did you understand that from the point in time

—— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ——

1        that you signed this document to be the case

2        throughout your entire period of employment at

3        Enterprise?

4    A. Correct.

5    Q. That off the job illegal drug use would be

6        caused for disciplinary action, including

7        discharge?

8    A. Yes.

9    Q. Did that policy of the company ever change

10       during the time you worked there for the 10

11       and a half years?

12   A. No.

13   Q. You see two photographs below that where the

14       second sentence states, as an employee, you

15       have a responsibility to determine whether or

16       not the use of illegal prescription may

17       present a safety risk at work?

18   A. Correct.

19   Q. Okay.  Did you ever consult with a physician

20       regarding the product that you purchased from

21       Dixie and took in October of 2012?

22   A. No.

23   Q. Did you consult with anybody about whether

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1       that was illegal -- a legal product for you to

2       take?

3   A.  No.  I did research on YouTube and on the

4       Internet.

5   Q.  When you signed the certification of

6       Exhibit 6, it says I have read and understand

7       this policy, doesn't it?

8   A.  Yep.

9   Q.  Just above your signature, okay.  And you

10      don't deny that, correct?

11  A.  Correct.

12

13      The following was marked for identification:

14      Exhibit 7          Acknowledgement of receipt
                           dated 3/18/02

15

16      **BY MR. BORON:**

17  Q.  Before we go on to Exhibit 7 I just want to

18      ask you a question about friendships that you

19      made with folks that work for Enterprise.  Do

20      you still have friends that work at Enterprise

21      as you sit here today?

22  A.  No.

23  Q.  Okay.  Showing you Exhibit 7.  Exhibit 7 for

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1           the record is another one-page exhibit, bottom

2           right-hand corner says ENT 201.  Do you see

3           that?

4      A. Yes.

5      Q. Okay.  Form is labelled Acknowledge of

6           Receipt, correct?

7      A. Correct.

8      Q. Does your signature appear on this form as

9           well?

10     A. Yes.

11     Q. With that same March 18, 2002 date that we saw

12          on Exhibits 5 and 6?

13     A. Correct.

14     Q. Okay.  You were signing all these forms on the

15          same day?

16     A. Yes.

17     Q. This was part of your training with

18          Enterprise?

19     A. I believe it was part of our initial

20          acceptance.

21     Q. Okay.  And this signature acknowledges receipt

22          of the driver's safety rules, policies, and

23          procedures?

1      A. Correct.

2      Q. What did that consist of, the driver's safety

3         rules, policies, and procedures?

4      A. Pretty much just obey all laws and --

5      Q. Well, were you given a handbook or a manual or

6         something like that?

7      A. We have the Federal Motor Carrier Safety Book.

8         I mean, it's got tons of codes in there, you

9         know, basically.

10     Q. Tell me about that book that you just

11        described.

12     A. It basically has all the laws in it in

13        sections.

14     Q. All the laws that would apply to truck

15        drivers?

16     A. Yes.

17     Q. Okay.  Including the drugging -- drug testing

18        laws?

19     A. Yeah, they're in there.

20     Q. The laws that describe what kind of substances

21        you're prohibited from putting in or using

22        with your body?

23     A. I would imagine.

—DOUGLAS J. HORN - BY MR. BORON - 05/08/17—

1    Q. Okay.  Including marijuana or THC, correct?

2    A. I don't know if it's listed that way in there,

3        but yeah, illegal substances.  Yeah.

4    Q. Okay.  Were you responsible as a driver at

5        Enterprise to know what was in the driver

6        safety rules, policies, and procedures?

7    A. Pretty much, yeah.

8    Q. Okay.  There's a reference about five lines --

9        it is five lines down in that acknowledgment

10       to drug and alcohol, what does that refer to?

11    A. Drug and alcohol.

12    Q. Well, do you remember a specific policy that

13       that referred to or specific regulation or

14       rule?

15    A. I don't remember specific regulation or rule,

16       you know, just kind of a blanket cause, you

17       know, you're not supposed to drink while you

18       drive and do drugs.  I mean --

19    Q. Do you see the name that's signed below yours?

20    A. Yep.

21    Q. Laura Delaney?

22    A. Delaney, yep.

23    Q. Is that the last name of the secretary at

─ DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ─

1       Enterprise that you had sent some other

2       paperwork to?

3   A. Yes.

4   Q. Okay.  Have you had any contact or

5       correspondence with Laura Delaney since you

6       left Enterprise?

7   A. No.

8   Q. Do you know where she works today?

9   A. No.

10

11      The following was marked for identification:

12      Exhibit 8          Enterprise Transportation
                           Company Acknowledgement of
13                         Receipt dated 5/13/02

14

15      **BY MR. BORON:**

16   Q. Showing you what's been marked as Exhibit 8

17      for today's deposition.  For the record,

18      Exhibit 8 is another single-page document.  In

19      the bottom right-hand corner it says ENT 176,

20      correct?

21   A. Correct.

22   Q. Very top of the page says Enterprise

23      Transportation Company, correct?

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    A. Correct.

2    Q. And this is a -- an acknowledgment that you

3       signed; is that correct?

4    A. Yes.

5    Q. Okay.  Your signature appears in the bottom.

6       It says I, Douglas Horn, acknowledge receipt

7       of the Company Driver's Orientation Manual on

8       5/13/02, correct?

9    A. Correct.

10   Q. All right.  Do you see item number 19 on the

11      list?

12   A. Yes.

13   Q. It says employee physical and drug testing pay

14      policy.

15   A. Okay.

16   Q. What was that policy all about?

17   A. I'm assuming that we had to pay for our own

18      physicals.  I have no idea.

19   Q. How did it work at Enterprise when you had to

20      do random drug tests?

21   A. They would just tell us we had a random drug

22      test and we would go around the corner and

23      drug test.

—DOUGLAS J. HORN - BY MR. BORON - 05/08/17—

1    Q. What do you mean "right around the corner"?

2    A. Well, wherever we were we would go to a local

3       place.

4    Q. Okay.  Would they pay you for your time that

5       was spent while the drug test was being done?

6    A. I think if it was over two hours, yeah.

7    Q. Is that part of the drug testing pay policy?

8    A. That would make more sense, yeah.

9    Q. Okay.  How would you be notified about the

10      fact that you had to have a test done?

11   A. They'd call us or if we came in a terminal

12      they'd tell us we were selected for a random.

13   Q. Okay.  Did you have a time limit that you had

14      to give your sample by?

15   A. Yes.

16   Q. Was it always a urine sample?

17   A. Yes.

18   Q. Did they ever take hair sample?

19   A. No.

20   Q. What was the time limit for giving the urine

21      sample?

22   A. I think you had to do it within two hours.

23   Q. When you say you think you had to do it?

——DOUGLAS J. HORN - BY MR. BORON - 05/08/17——

1   A. Well, it's Federal law.

2   Q. Your understanding is that Federal law is once

3      you're notified you have --

4   A. Yeah, you have two hours and you have to be

5      drug tested otherwise it's considered as a

6      fail.

7   Q. Okay.  And are there any exceptions to that?

8      In other words, if you can't get to a place

9      within two hours?

10  A. Yeah, there are exceptions.

11  Q. Okay.  Were any of your urine tests that were

12     done while you worked at Enterprise done right

13     at the New Jersey facility?

14  A. Not at the terminal, but there were places

15     around the corner from New Jersey that --

16     yeah.

17  Q. Okay.  Where was the test administered that

18     you failed in 2012?

19  A. That was in Philadelphia, I believe, or

20     outside of Pittsburgh, excuse me.

21  Q. You were in Pennsylvania at the time you gave

22     it --

23  A. Yeah.

--- DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ---

1    Q. The sample?

2    A. Yeah, I was at the Coraopolis terminal.

3    Q. Is that another terminal owned by Enterprise?

4    A. Correct.

5    Q. Were all of your drug tests with Enterprise --

6       were you notified about all of the drug tests

7       that you had with Enterprise when you were at

8       a terminal?

9    A. Yeah, or right before we got there.

10   Q. Okay.  Besides the drug test from 2012 that

11      was done in Pennsylvania, were all the other

12      drug tests done in New Jersey?

13   A. I couldn't say.  No, I've done some in Texas.

14   Q. With Enterprise?

15   A. Yeah.  Because we have terminals there.

16

17      The following was marked for identification:

18      Exhibit 9        Enterprise Transportation
                          Company Houston, Texas
19                        Training Delivered by
                          Employer dated 5/17/02
20

21      **BY MR. BORON:**

22   Q. Was the terminal owned by Enterprise that you

23      operated out of, the terminal Avenel,

```
 1        A-V-E-N-E-L, New Jersey?
 2    A. Yes.
 3    Q. Okay.  Did you ever operate out of another
 4        terminal while you worked at Enterprise?
 5    A. No.
 6    Q. So that would be -- we could call that a home
 7        base; is that a good way to describe?
 8    A. Pretty much, yeah.  I mean, we worked out of
 9        other terminals, but we were assigned to
10        Avenel.
11    Q. Okay.  And that's where John Frezzo worked?
12    A. Yes.
13    Q. That's where the other John who was your
14        previous supervisor worked?
15    A. Correct.
16    Q. Okay.  And did there come a point in time when
17        Keenan purchased that terminal from
18        Enterprise?
19    A. After I was terminated.
20    Q. Okay.  That was after you no longer worked at
21        Enterprise?
22    A. Yes.
23    Q. Okay.  Did you apply at Keenan?
```

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    A. Yes, I did.

2    Q. When they took over?

3    A. Yes, I did.

4    Q. Okay.  What year was that?

5    A. 2013.

6    Q. Okay.  Did you fill out an application for

7       Keenan?

8    A. Yes, I did.

9    Q. Do you still have a copy of the application

10      you filled out to Keenan?

11   A. I don't think so.

12   Q. Did you get a written reply from Keenan to

13      your application?

14   A. No.

15   Q. Did John Frezzo continue on and work for

16      Keenan after they bought the terminal?

17   A. Yes, he did.

18   Q. Okay.

19   A. He's the one that suggested I put the

20      application in.

21   Q. Mm-hmm.  Was his job with Keenan the same as

22      it was with Enterprise?

23   A. It was.

───── DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ─────

1    Q.  Okay.  I'm showing you what's marked as

2        Exhibit 9 for today's deposition.  Unlike the

3        last four exhibits, Exhibit 9 is made up of

4        four pages, correct -- four pages stapled

5        together?

6    A.  Correct.

7    Q.  Okay.  In the bottom right-hand corner of

8        those four pages we see references to page

9        numbers ENT 178 through ENT 181, correct?

10   A.  Correct.

11   Q.  All right.  So at the top of the first page

12       there's a reference to Enterprise

13       Transportation Company and Training.  That was

14       delivered by the employer, this training that

15       you attended?

16   A.  Yes.

17   Q.  Did you go to Cincinnati, Ohio for the

18       training?

19   A.  Yes.

20   Q.  And Cindy went with you, as well?

21   A.  Correct.

22   Q.  She participated in the same training you did?

23   A.  Yes.

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    Q. Okay.  How long did the training last?

2    A. Cincinnati was pretty much orientation class

3       and then we went back to Parsippany at that

4       time and then went on-the-job training with a

5       trainer.

6    Q. How long were you in Cincinnati for training?

7    A. I think about four days.

8    Q. Okay.  Do you see there's an agenda on the

9       first page of Exhibit 9?

10   A. Correct.

11   Q. It seems to indicate a week long agenda?

12   A. Yep.

13   Q. On Wednesday, May 15, 2002 was there 60

14      minutes of DOT drug and alcohol awareness

15      training?

16   A. Yes.

17   Q. What was the nature of that training?

18   A. Just videos regarding the rules and laws

19      governing alcohol.

20   Q. Were those rules and laws that you were

21      already familiar as -- familiar with as a

22      trucker?

23   A. Yeah, they're pretty much the same thing they

1      make you watch over and over.

2   Q. Mm-hmm.  Was there any lecture component to

3      the drug and alcohol awareness training?

4   A. There was a safety manager there that gave

5      commentary and did the whole orientation,

6      yeah.

7   Q. Okay.  Turning to the third page of the

8      exhibit, which is ENT 180, your signature

9      appears on this page, correct?

10  A. Correct.

11  Q. What were you certifying when you signed this

12     page?

13  A. Substance abuse training.

14  Q. What do you mean by that, you're certifying

15     that you received the substance abuse

16     training?

17  A. Correct.

18  Q. Do you recognize the name of the person who

19     signed below your signature on that page?

20  A. Yes, I do.

21  Q. Who is that person?

22  A. That's John McConiville, safety manager.

23  Q. With Enterprise?

─── DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ───

1       A. Mm-hmm.

2       Q. Okay.  Have you spoken with John McConiville

3          about this lawsuit?

4       A. No.

5       Q. Turning to the last page of Exhibit 9, another

6          page that has your signature, correct?

7       A. Correct.

8       Q. Did you write your name above your signature

9          as well?

10      A. Yes, I did.

11      Q. Okay.  Did your employee number ever change at

12         Enterprise, the 10063 employee number that's

13         filled in the box there?

14      A. No, it never changed.

15      Q. Okay.  Did you sign this form on May 17th,

16         2002?

17      A. Yes.

18      Q. What were you acknowledging when you signed

19         the form?

20      A. That we had gotten and received the drug and

21         alcohol policies, orientation.

22      Q. Well, specifically the acknowledgement says

23         that if -- the policies and procedures have

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1          been explained to you?

2     A. Correct.

3     Q. Did that happen during the training?

4     A. Yep.

5     Q. Okay.  It says I have received and have read a

6          copy of the policy.  Did you do that?

7     A. Correct.

8     Q. It says I understand the policy and agree to

9          all the requirements obtained within; is that

10         a true statement?

11    A. Yes.

12    Q. It says I understand the compliance with the

13         drug and alcohol misuse in Enterprise's

14         Transportation Company policy and procedure.

15         There's a condition of employment with the

16         policy.  I understand that a disciplinary

17         action up to and including termination will be

18         taken if I'm found in violation of the policy.

19    A. Correct.

20    Q. You understood all that?

21    A. Yep.

22    Q. Did you understand that through all the entire

23         10 and a half years you worked at Enterprise?

—— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ——

1      A. Yes.

2

3         The following was marked for identification:

4         Exhibit 10       Acknowledgement of receipt
                           dated 4/17/03

5

6      **BY MR. BORON:**

7      Q. Mr. Horn, I'm showing you what's been marked

8         as Exhibit 10 for today's deposition.  For the

9         record, Exhibit 10 is a single page, correct?

10     A. Correct.

11     Q. At the bottom right-hand corner it says ENT

12        167, correct?

13     A. Yes.

14     Q. Your signature appears on this page?

15     A. Yes.

16     Q. Is that your signature, sir?

17     A. Yes, it is.

18     Q. Okay.  You notice the date next to your

19        signature is not in the year 2002 this time,

20        it's 2003, correct?

21     A. Correct.

22     Q. All right.  What were you acknowledging when

23        you signed this form?

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    A. Some kind of disciplinary policy and
2       procedure.
3    Q. Why were you being given a disciplinary policy
4       and procedure on that date?
5    A. Probably recertification.
6    Q. Were you in any sort of trouble or having any
7       problem with your job at that point in time?
8    A. No.
9    Q. So this would be more of a routine training
10      that you went through more than likely?
11   A. Yeah.
12   Q. Okay.
13   A. I'm not sure what it is.
14   Q. Okay.  What was the disciplinary policy and
15      procedure?  In other words, physically was it
16      a manual?  A set of papers?
17   A. It just was -- if this was some kind of
18      recertification it more likely was a video --
19      short video that you've watched and then
20      basically sign that you watched it.
21   Q. It says that you're acknowledging receipt of a
22      disciplinary policy or procedure.  Do you
23      recall there being a written disciplinary

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1        policy and procedure?

2    A. There could have been a test with it as well.

3        Usually there is.

4    Q. But do you recall there being a disciplinary

5        policy and procedure at Enterprise that you

6        were given?

7    A. Not in 2003.  I don't remember any of this.

8    Q. Whose signature is below yours?

9    A. Looks like John Reddy.

10   Q. John Reddy, your supervisor at the time?

11   A. Correct.

12   Q. Do you have any reason to deny that you

13       received the disciplinary policy and

14       procedures which detail the disciplinary

15       action that will or could be taken for failure

16       to follow established company policies and

17       procedures?

18   A. No.

19

20       The following was marked for identification:

21       Exhibit 11        Enterprise Products Company
                            and DOT Drug and Alcohol
22                          Policy Summary

23

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1           BY MR. BORON:

2       Q. Showing you Exhibit 11 for this deposition,

3           sir.  For the record, Exhibit 11 consists of

4           two pages stapled together.  In the bottom

5           right-hand corner they say ENT 469 and ENT

6           470, correct?

7       A. Correct.

8       Q. And these two pages have a label in the upper

9           right-hand corner that say company DOT Drug

10          and Alcohol Policy Summary, correct?

11      A. Correct.

12      Q. And this is from Enterprise, your former

13          employer?

14      A. Correct.

15      Q. And you were given a copy of this drug -- I'm

16          sorry, Company and DOT Drug and Alcohol Policy

17          Summary?

18      A. I'm sure I did, yes.

19      Q. Okay.  Does this look familiar to you?

20      A. Not really, no.

21      Q. You see on the form on the first page of

22          Exhibit 11 where it says -- there's a heading

23          that says Prescription Medication,

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1        over-the-counter and then (OTC) products?

2     A.  Correct.

3     Q.  Okay.  Do you see the reference to employees

4        are expected to review warning labels and

5        report such use of all medications to each of

6        their medical practitioners so each can make a

7        good faith judgement that the used substance

8        is either prescribed or authorized dosage is

9        consistent with the safe performance of their

10        duties; do you see that?

11     A.  Yes.

12     Q.  And did you understand that to be part of the

13        policy of Enterprise with respect to drug and

14        alcohol?

15     A.  Yeah.

16     Q.  What was your own personal practice with

17        respect to reviewing warning labels on drugs,

18        whether they were prescribed or

19        over-the-counter before taking them?

20     A.  Well, I would go by the warning.

21     Q.  So your standard operating procedure was to

22        review the label?

23     A.  Pretty much, yeah.

—— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ——

1    Q. And would you contact your doctor if you

2       didn't understand something on the label?

3    A. Yes, it happened.  Yeah.

4    Q. Did that ever happened?

5    A. No.

6    Q. You understood everything on every label for

7       everything you were prescribed or took an

8       over-the-counter product?

9    A. Pretty much, yeah.

10   Q. Okay.  Do you see down below in the left-hand

11      corner of the first page of Exhibit 11?

12   A. Correct.

13   Q. Prohibited substances, there's a label that

14      says DOT and first prohibited substance listed

15      there is marijuana?

16   A. Correct.

17   Q. And then just up to the top right-hand column

18      of the first page which is still ENT 469 it

19      says N/DOT, marijuana's listed there as well?

20   A. Correct.

21   Q. Okay.  That's for the non-DOT policy of

22      Enterprise as oppose to the DOT's own policy,

23      correct?

─────── DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ───────

 1     A. Okay.

 2     Q. Well, is it correct?

 3     A. Yes.  Yes.

 4     Q. Yes.  Do you see in that list of non-DOT

 5        there's more than marijuana listed.  It says

 6        any mood or mind altering substances and then

 7        in parenthesis it says (herbal, synthetic,

 8        manufactured)?

 9     A. Okay.  Yeah, I see it.

10     Q. Okay.  Do you deny that that was part of

11        Enterprise's policy with respect to drugs and

12        alcohol?

13     A. No, that's their policy.

14     Q. Okay.  Did you understand that throughout the

15        time you worked at Enterprise that the company

16        reserves the right to test for more drugs at

17        lower threshold levels and take lower levels

18        than required by DOT?

19     A. Correct.

20     Q. I'm directing your attention now to the second

21        page of Exhibit 11 in the bottom right-hand

22        corner.  This is ENT -- page ENT 470.  Do you

23        see where it says contact information?

—— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ——

1      A. Correct.

2      Q. And there is a drug and alcohol

3         compliance/designated employer representative

4         listed there, a person listed as Shana Vaught?

5      A. Okay.  I see it.

6      Q. In 2012 in October when you took the Dixie

7         product, was Shana Vaught the drug and alcohol

8         compliance designated employer representative?

9      A. I don't know.

10     Q. Was there a drug and alcohol compliance

11        designated employer representative at that

12        time?

13     A. I don't know.

14     Q. Did you ever refuse to submit to a drug test?

15     A. No.

16     Q. In your entire lifetime?

17     A. In my entire life, no.

18     Q. Okay.  And how many drug tests did you provide

19        or participate in while you worked at

20        Enterprise?

21     A. I'm not sure.

22     Q. Was it less than 10?

23     A. Yeah, I would say so.

─ DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ─

1    Q. So over 10 and a half years you were being

2       tested on average less than one year?

3    A. Yeah, about.  Yeah.

4    Q. Okay.  And were you also tested for drugs at

5       prior employers like Marten?

6    A. Yes.

7    Q. Did they test more frequently than Enterprise

8       or at about the same rate?

9    A. I don't recall honestly.

10   Q. Okay.  Have you gone through drug testing for

11      ICX?

12   A. Yes.

13   Q. Random drug testing?

14   A. Yes.

15   Q. Unannounced drug testing?

16   A. Yes.

17   Q. How many times?

18   A. Just once.

19   Q. Once.  What was the result of that test?

20   A. It was negative.

21   Q. Okay.

22   A. Otherwise I'd be terminated.

23

1          The following was marked for identification:

2          Exhibit 12          Personnel Action Request
                                dated 8/18/11

3

4          **BY MR. BORON:**

5     Q. Did there come a point in 2010 while you were

6          employed at Enterprise that you applied for a

7          different position within the company?

8     A. I believe I did, yes.

9     Q. Okay.  What kind of position was that?

10    A. The crude oil division, Texas.

11    Q. You were going to be a driver for crude oil

12         division if you got the position, correct?

13    A. Correct.

14    Q. But you did not get the position, correct?

15    A. Correct.

16    Q. Did you interview for this position?

17    A. No.

18    Q. Did you fill out paperwork and submit it

19         in-house for the position?

20    A. Yes, I did.

21    Q. Were you given a reason why you were not hired

22         for that position?

23    A. No.

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    Q. Before 2010 had you made any other
2       applications within the company -- you know,
3       in-house applications for other positions?
4    A. No.
5    Q. Was this the one and only application you ever
6       made as an employee of Enterprise in house for
7       different types of a job?
8    A. That was pretty much the only time.  I think
9       we may have submitted the app twice on two
10      different occasions, but I'm not sure.
11   Q. The app for the same job?
12   A. Crude oil driver, yep.
13   Q. And was an application submitted for Cindy at
14      the same time?
15   A. Yes.
16   Q. So you both got turned down in 2010?
17   A. We never got a response.
18   Q. Never got a response?
19   A. Yep.
20   Q. Do you remember any particular person at
21      Enterprise that you interacted with with
22      respect to that application?
23   A. It was all done online so there was no

─── DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ───

1           interaction with anybody.

2      Q. Okay.  Did your supervisor -- was your

3           supervisor John Frezzo at that point in time?

4      A. He was our -- yes.

5      Q. Did he recommend you for that position?

6      A. No.

7      Q. Did he have any involvement in trying to help

8           you get that position?

9      A. No.

10     Q. Did you list him as a reference when you made

11          that application?

12     A. I might have.

13     Q. You don't recall?

14     A. Yeah, I don't recall.

15     Q. I'm showing you what's marked as Exhibit 12

16          for today's deposition.  For the record,

17          Exhibit 12's also a single page.  In the

18          bottom right-hand corner it says ENT 3; do you

19          see that?

20     A. Yes, I do.

21     Q. Okay.  At the top of the page it says

22          Personnel Action Request; do you see that?

23     A. Yes.

—— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ——

```
 1      Q. In the upper right-hand corner there's a box
 2         that's been checked that says termination; do
 3         you see that?
 4      A. Yes.
 5      Q. And then there's an effective date that says
 6         August 18th, 2011; do you see that?
 7      A. Yes.
 8      Q. And your name appears in the employee's name
 9         box, correct?
10      A. Correct.
11      Q. Is this your handwriting on this form?
12      A. No.
13      Q. No.  Do you recognize the handwriting on the
14         form?
15      A. It looks like John Frezzo's.
16      Q. Okay.  Do you know why John filled this form
17         out?
18      A. Yes, we were on vacation and decided to go
19         work for another company local, but 24 hours
20         later it didn't work out, so we withdrew our
21         termination.
22      Q. What was the other company that you were going
23         to start working at?
```

DEPAOLO-CROSBY REPORTING SERVICES, INC.
170 Franklin Street, Suite 601, Buffalo, New York  14202
716-853-5544

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    A. It was called Struble.

2    Q. Can you spell that?

3    A. S-T-R-U-B-L-E.

4    Q. Did you get hired by Struble?

5    A. We did.

6    Q. Is this before or after they did a drug test

7       at Struble?

8    A. You have to do a pre-employment drug test

9       before you get hired.

10   Q. Okay.  Did you do a pre-employment drug test

11      at Struble?

12   A. Yes.

13   Q. And after that drug test result came back you

14      got hired by Struble?

15   A. Correct.

16   Q. Did you do any work for Struble?

17   A. We did, half a day.

18   Q. When you say Struble was local, what do you

19      mean by "local"?

20   A. About 20 minutes from where we live they were

21      in the gas fields doing sand for natural gas.

22   Q. Do you have any records related to your

23      application to Struble?

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    A. No.

2    Q. Do you have any records related to what your

3       compensation packet would have been with

4       Struble?

5    A. No.

6    Q. What's your recollection of what your

7       compensation package would have been with

8       Struble?

9    A. Well, they kind of lied to us, that's why it

10      didn't work out.  Because they told us we

11      would make X amount of dollars per load and it

12      wasn't even half of what they said, so that's

13      why we left.

14   Q. How did you find out it was half of what they

15      said?

16   A. Talking to the other drivers.

17   Q. When you say "other drivers," are you

18      referring to other drivers at Struble?

19   A. Struble drivers and then I called the owner to

20      confirm it.

21   Q. What was the owner's name?

22   A. I don't remember.  His last name was Struble.

23   Q. Did you get a W-2 from Struble that year?

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1       A. I'm sure I did, yes.

2       Q. So they paid you for the half day of work?

3       A. Yes.

4       Q. Did they pay you for anything else?

5       A. No.

6       Q. No signing bonus?

7       A. No.

8       Q. Have you ever heard of a truck driver getting

9          a signing bonus?

10      A. Yes.

11      Q. Did you ever receive a signing bonus when you

12         started with a place?

13      A. With Enterprise.

14      Q. I thought I asked you earlier if you got a

15         signing bonus with Enterprise?

16      A. Yeah.

17            MR. HOUSH:  Object to form.

18      A. I guess we did, yeah.

19      Q. You did?

20      A. I believe so.  Yeah, we did.

21      Q. I could be wrong, too.  I might have been

22         asking about ICX.

23            MR. HOUSH:  Object to form.

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    A. Right.  Those are the things I don't think

2       about too often, so it's like --

3    Q. Now you had to contact Enterprise when you

4       were going to start with Struble and let

5       Enterprise know you were resigning, correct?

6    A. Yeah, we contacted John Frezzo and let him

7       know.

8    Q. Okay.  And at the time you resigned was there

9       any counter offer made by Enterprise?

10   A. No.

11   Q. Did Enterprise offer any kind of financial

12      kick to try to keep you?

13   A. Not at that time, no.

14   Q. Did you have to fill out any application to

15      get your job back at Enterprise?

16   A. No.

17   Q. Did you sign anything with respect to your --

18      your resignation at Enterprise in 2011?

19   A. No.

20   Q. You just verbally told your boss, John Frezzo,

21      what was happening?

22   A. Yeah.

23   Q. Okay.  Is there any communication between you

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1           and John Frezzo through e-mail about what was

2           happening?

3    A.  No.

4    Q.  Did you and anybody else at Enterprise e-mail

5           each other about the resignation?

6    A.  No.

7    Q.  Was the resignation put in for Cindy, as well?

8    A.  Yes.

9    Q.  Besides the -- the half a day that you worked

10          for Struble, did you apply at any point in

11          time during 2011 to any other trucking

12          companies?

13   A.  No.

14   Q.  And did Cindy put an application into any

15          trucking companies in 2011 besides Struble?

16   A.  No.  You asked if they sweetened the pot,

17          actually when we got back that's when we got

18          into crude oil with Enterprise, that's when

19          we --

20   Q.  Let me ask you the questions and then you can

21          provide the answers.

22   A.  Okay.  All right.

23   Q.  We're going to need to take a break because I

───── DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ─────

1           need to get a couple copies made.

2                   MR. HOUSH:  Do you want to break for

3           lunch?

4                   MR. BORON:  What time is it?

5                   MR. HOUSH:  It's 10 after 12.

6                   MR. BORON:  Well, it's up to everybody.

7           We're certainly going to have to take a lunch

8           break, that's for sure.

9                   MR. HOUSH:  I put the question to the

10          floor.

11                  MR. BORON:  What do you guys think?

12                  MS. LINDSTROM:  It's totally up to you.

13                  THE WITNESS:  Doesn't matter to me

14          either way.

15                  MR. BORON:  I mean, my preference would

16          be to go on and try to get to 1 o'clock or so.

17                  THE WITNESS:  Yeah.

18                  MR. BORON:  All right.  While we're

19          still fresh.

20                  MR. HOUSH:  Okay.

21

22                      (Recess taken)

23

───── **DEPAOLO-CROSBY REPORTING SERVICES, INC.** ─────

1      **BY MR. BORON:**

2    Q. Okay.  Mr. Horn -- there came a point in time

3       in February of 2012 where you were driving for

4       Enterprise and had an accident?

5    A. Yes.

6    Q. Okay.  And that was a one-vehicle accident?

7    A. Initially, yes.

8    Q. Okay.  Tell me what you mean by "initially."

9    A. Well, after we had fell over another truck had

10      hit us, a pickup truck went over the

11      embankment and did the same thing I did.

12    Q. You were already off the road at that point?

13    A. Yes.

14    Q. On the side?

15    A. I was down in the ditch.

16    Q. Down in the ditch.  Your car was already on

17      its side?

18    A. Correct.

19    Q. Okay.  Where were you coming from and going to

20      on that trip?

21    A. I was going to Liberty, Montana, that was

22      about four miles up the road and I was coming

23      from Lake Charles, Louisiana.

—— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ——

1     Q. Okay.  Cindy was with you in the truck at the

2        time of the incident?

3     A. Yes.

4     Q. Okay.  Was the accident an accident that had

5        to be reported to the DOT by Enterprise?

6     A. Yes.

7     Q. Yes.  Are there certain kinds of accidents

8        that occur with trucks that don't have to be

9        reported to the DOT?

10    A. Yes.

11    Q. What's the difference?

12    A. I think if it has to be towed, if there's an

13       injury, those all have to be DOT reported,

14       fatality definitely.

15    Q. All right.

16

17       The following was marked for identification:

18       Exhibit 13        Enterprise DOT Reportable
                            dated March 22, 2012
19

20       **BY MR. BORON:**

21    Q. Mr. Horn, I'm showing you what's marked as

22       Exhibit 13 for today's deposition.  Exhibit

23       13, I got an extra copy if somebody wants to

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1           see an extra copy of Exhibit 13.

2               For the record, Exhibit 13 consists of

3           five pages stapled together.  First page is

4           a -- starts at ENT 109 and then the pages are

5           consecutively numbered through --

6               **MR. MAZZOLA:**  They're not.

7    Q. Well, first four pages, ENT 112 and then the

8           last page is ENT 124.  Do you see that,

9           Mr. Horn?

10   A. Yes, I do.

11   Q. First page is signed by somebody named Nolan

12          Everett with the label of director of safety.

13          Is he somebody who worked at Enterprise?

14   A. Yes.

15   Q. Okay.  Did you talk to Nolan Everett about the

16          accident?

17   A. No, I talked to John McConiville.  He was our

18          regional manager.

19   Q. Okay.  Was Nolan Everett higher in the

20          organization than John?

21   A. Yes.

22   Q. Right.  Okay.  Was there an investigation done

23          by Enterprise into the accident?

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    A. Yes.

2    Q. Was there a committee that examined what had

3       happened during the accident?

4    A. So I was told, yes.

5    Q. Okay.  And the committee made a decision about

6       whether the accident was preventible or not

7       preventible?

8    A. Correct.

9    Q. And were you told by the committee that they

10      were preventible?

11   A. Well, they both -- I heard two different

12      things on that.

13   Q. Had you ever seen the copy of the report that

14      went to the DOT about the accident?

15   A. No, I haven't.

16   Q. Have you seen your own records, like your CSA

17      records regarding the accident?

18   A. No.

19   Q. Do you have any reason to doubt that

20      Enterprise reported to the DOT that the

21      accident was preventible?

22   A. My argument with them that if it was

23      preventative you have to tell me how.

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1      Q. But here's the question:  Do you have any
2         reason to doubt that Enterprise reported to
3         the DOT after investigating the accident that
4         it was preventable?
5      A. No.
6      Q. You have no reason to doubt that?
7      A. Yeah.
8      Q. We try to get the record as clear as possible.
9      A. Right.
10     Q. That's why I'm following up with these kinds
11        of questions.  You provided on the second page
12        some information about your recollection of
13        what happened at the accident, correct?
14     A. Correct.
15     Q. Okay.  Do you know whether that -- what you
16        wrote, your explanation of the accident, was
17        considered by the committee at Enterprise?
18     A. I'm sure it was.
19     Q. And then there was the supervisor report, the
20        third page of this exhibit.  Have you ever
21        seen a copy of this supervisor's report?
22     A. No.
23     Q. Did you talk with John Frezzo about the

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1           accident after it had occurred?

2     A. Yes, I did.

3     Q. Did you tell him what had happened?

4     A. Yes.

5     Q. Do you see where there's a reference on the

6           third page of the exhibit where it says James

7           has a million mile award in safety?

8     A. Yes.

9     Q. What is that?

10    A. That's you've done a million miles with no

11          incident.

12    Q. A million miles in your career or a million

13          miles for Enterprise?

14    A. A million miles for Enterprise.

15    Q. Do you have some document or record, plaque,

16          something like that?

17    A. Yes.

18    Q. You do?

19    A. Yes.

20    Q. All right.  Is it at home?

21    A. Yes.

22    Q. Okay.  Does Cindy also have a million mile

23          award in safety?

1      A. She does.

2      Q. Were there any equipment defects that caused

3         the accident?

4      A. No.

5      Q. Was your truck run off the road?

6      A. It was not run off the road, no.

7      Q. Okay.  It slid off the road?

8      A. Yeah, it was uncontrollable.

9      Q. Okay.  Did you have to go through periodic

10        training through Enterprise for driving?

11     A. No.

12     Q. No.  Did you ever receive training under the

13        Smith System?

14     A. Yeah.

15     Q. With Enterprise?

16     A. Yeah.  That type, yes.

17     Q. Okay.  And was that something that had to be

18        renewed from time to time?

19     A. They did the Smith System and I think they did

20        a goal system, so.

21     Q. And, again, you watch videos in a room?

22     A. Yeah, you watch videos, then there's some

23        questions.

—— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ——

1    Q. Then there's some commentary, fill out a form,
2       answer some questions?
3    A. Correct.
4    Q. Have you had similar training at ICX?
5    A. No.
6    Q. You have not had Smith training at ICX?
7    A. No.
8    Q. Did you have to have hazardous material at
9       ICX?
10   A. You had to have recertification every two to
11      four years -- company recertification, yes.
12   Q. And who would do the recertification, the
13      person that ran the training program and
14      signed the certifications?
15   A. Usually the general manager.
16   Q. Okay.  Is it always the same person that did
17      the hazardous material training?
18   A. Usually, yeah.
19   Q. Who was that?
20   A. John Frezzo.
21   Q. How many other people would get the training
22      the same time you were getting it?
23   A. We basically did it when we came in, so we

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1           pretty much did it, just me and Cindy.

2    Q.  Just you and Cindy would watch the video?

3    A.  Yeah, there wasn't a scheduled class or

4           anything, just when you came into the

5           terminal, take a half hour, hour, whatever it

6           took.

7    Q.  And then John would sign a form saying you

8           were recertified?

9    A.  Correct.

10   Q.  The fact of your accident in North Dakota

11          makes you somewhat less interesting to a

12          perspective new employer as oppose to somebody

13          who has never had a wreck, correct?

14   A.  Some.

15   Q.  Okay.  You got injured in that accident in

16          North Dakota, correct?

17   A.  Yes.

18   Q.  And Cindy got injured as well?

19   A.  Yes.

20   Q.  Okay.  So what was injured, what part of your

21          body?  Let's start with that.

22   A.  My lower back and my shoulder.

23   Q.  Okay.  Had you had problems with your lower

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1          back before this accident occurred?

2     A. Yes.

3     Q. And by "this accident" I'm talking about the

4          North Dakota, February 24, 2012.

5     A. Correct.

6     Q. You had some problems with your back before?

7     A. Yes.

8     Q. You were diagnosed with degenerative disc

9          disease?

10    A. I don't know if that's what it was.  I had

11         some problems, issues going on there.  I had

12         several issues.

13    Q. Had you been treated for back pain before the

14         accident?

15    A. Yes.

16    Q. Did you have a -- like a special back doctor

17         or was your primary care doctor the person

18         that treated you for your back pain?

19    A. I had a special back doctor.

20    Q. Who was that?

21    A. I had actually two that would have been --

22         Jeez, I can't remember his name.  I don't

23         remember his name at the moment.

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    Q. Was it a doctor in New York State or in
2       Pennsylvania?
3    A. New York.
4    Q. New York.  Somewhere in the Tri-Cities area?
5    A. Yeah, in Binghamton, New York.
6    Q. It was a male doctor?
7    A. Yes.
8    Q. When's the last time you saw this doctor for
9       your back?
10   A. Right before we went back to work after the
11      accident.
12   Q. Okay.  Well, let's take it from the time of
13      the accident.  Who's -- who's -- who treated
14      your back first?  Was there an emergency
15      department that treated your back somewhere?
16   A. Correct.
17   Q. At a hospital?
18   A. Well, they did an MRI.
19   Q. Okay.  So you went to an emergency department
20      first?
21   A. Yes.
22   Q. That's in North Dakota, correct?
23   A. I'm not sure if it was North Dakota or Montana

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1        because we were right there by the line.

2    Q. Okay.  Were you admitted to a hospital?

3    A. No.

4    Q. Did you get a shot of anything while you were

5        in the --

6    A. Yep.

7    Q. -- ER?  Demerol?

8    A. I believe so.

9    Q. And then you had the first visit with your

10       back doctor, would that be the next time your

11       back was treated?

12   A. We went to the Workman's Comp doctor.

13   Q. That's down in Sayre, Pennsylvania?

14   A. Pennsylvania, yes.

15   Q. What's that doctor's name?

16   A. Dr. Smith.

17   Q. Female?

18   A. Yes.

19   Q. How many times did you see Dr. Smith, the

20       Workers' Comp doctor?

21   A. I'm not sure.  At least four times.

22   Q. Was Dr. Smith prescribing you any pain

23       medication?

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1      A.  No.

2      Q.  Dr. Smith just evaluated you each time you

3          went, was that the purpose of seeing

4          Dr. Smith?

5      A.  Yeah, she recommended us for physical therapy.

6      Q.  Did you go to physical therapy?

7      A.  Yes, I did.

8      Q.  Was that also down in Sayre, Pennsylvania?

9      A.  Yes.

10     Q.  How long were you doing physical therapy?

11     A.  A few weeks.  I don't know exactly how long.

12     Q.  Were you prescribed any pain medication by any

13         doctor?

14     A.  Yes.

15     Q.  After the accident?

16     A.  Yes.

17     Q.  Yes.  Who was prescribing pain medication for

18         you?

19     A.  Dr. Choi.

20     Q.  Is that the back doctor from Binghamton?

21     A.  No.

22     Q.  No, okay.  Dr. Choi is your --

23     A.  Primary.

─── DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ───

1    Q. -- primary care physician?  How soon after

2         your accident did you see Dr. Choi?

3    A. As soon as we got home after the -- after I

4         saw the Workman's Comp doctor.

5    Q. Do you recall the pain medication you were

6         prescribed initially by Dr. Choi?

7    A. Yes.

8    Q. What was that?

9    A. Hydrocodone.

10   Q. Hydrocodone?

11   A. Mm-hmm.

12   Q. Anything else?

13   A. He gave me prednisone.

14   Q. Was Dr. Choi aware that you were a trucker?

15   A. Yes.

16   Q. Had you had any conversations with Dr. Choi in

17        the past about the drug test that you had to

18        take periodically, random testing that was

19        done?

20   A. Yep.

21   Q. Was there ever any discussion about

22        hydrocodone and whether that could be a

23        problem for you with drug testing?

---

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    A. No.

2    Q. No.  Did you ever ask Dr. Choi about any

3       particular either prescription or

4       nonprescription drugs that you took that you

5       were concerned about for drug test results?

6    A. Yeah, I asked him as far as taking it at work

7       and with the company and all that, the work I

8       do.

9    Q. When did you have that kind of a conversation

10      with him?

11   A. When he first prescribed it for me and I don't

12      know when that was.  It's been a while.

13   Q. Before the accident you're talking about?

14   A. Before the accident, yes.

15   Q. Okay.  After the accident did you have a

16      further conversation with Dr. Choi about drug

17      testing you would have to take eventually?

18   A. Yeah, he said it would be fine.

19   Q. He said what you prescribed him -- what he

20      prescribed for you wouldn't be a problem for

21      your drug testing going forward?

22   A. Right.

23   Q. By the time you had the positive test in

---

1          October 2012, were you off the hydrocodone or
2          were you still taking it?
3      A.  I was taking it off and on at night.
4      Q.  Were you having trouble sleeping without
5          taking it?
6      A.  I was having shoulder pain so that's why I
7          bought the product and that's why I went to
8          the product because the hydrocodone wasn't
9          allowing me to sleep with the pain.
10     Q.  Were you still taking prednisone at the time
11         you tested positive in October 2012?
12     A.  I don't think at that time, no.  I was taking
13         it off and on.
14     Q.  Was Dr. Choi just prescribing pain medication
15         for you without seeing you or did you have to
16         go into his office to see him to get the
17         prescriptions?
18     A.  I usually went in and saw him.
19     Q.  In other words, he wouldn't write you a
20         prescription just by talking to you on the
21         phone or if you were requesting it in some way
22         that wasn't face-to-face?
23     A.  No, I had to go in to talk to him.

1    Q.  Okay.  Was his office allowed to prescribe

2        medication for you without him being there?

3        In other words, just a nurse sees you and

4        gives you the prescription?

5    A.  Not that I know of.

6    Q.  Okay.  How many times did you see Dr. Choi

7        after the accident before the positive drug

8        test?

9    A.  At least two to three times.

10   Q.  And when you saw Dr. Choi in those two or

11       three visits after the accident, but before

12       the positive drug test you were telling him

13       what parts of your body were in pain?

14   A.  My shoulder.

15   Q.  Right or left shoulder?

16   A.  Right shoulder.

17   Q.  Were you affording any other pain in your body

18       to Dr. Choi?

19   A.  Just my low back.

20   Q.  Low back, lumbar region?

21   A.  Low back, yeah.

22   Q.  And would Dr. Choi or a nurse ask you to rate

23       your pain on a 0 to 10 scale when you would go

—— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ——

1      visit?

2    A. Yes.

3    Q. And so you would say my pain's at a 7 today or

4       a 9?

5    A. Correct.

6    Q. Okay.  And did Dr. Choi tell you that if you

7       had a further problem, new problem that you

8       should get in touch with him and let you

9       know -- let him know?

10   A. Yeah.

11   Q. Yes, he did.  Did you consult with Dr. Choi

12      about the product that you bought from Dixie?

13   A. No.

14

15      The following was marked for identification:

16      Exhibit 14      Worker's Comp Doctor Form

17

18      **BY MR. BORON:**

19   Q. Mr. Horn, showing you what's marked as

20      Exhibit 14 for today's deposition.  For the

21      record, it's a two page exhibit, correct?

22   A. Correct.

23   Q. The pages are numbered in the bottom

1      right-hand corner, ENT 551 and ENT 552,

2      correct?

3   A. Correct.

4   Q. Okay.  In this two-page document on the first

5      page there's a heading that says History of

6      Present Illness; do you see that?

7   A. Where at?

8   Q. The heading right there that says -- sorry

9      about the small print -- History of Present

10     Illness.

11  A. Yep.

12  Q. Okay.  So there's a description of the

13     accident at first -- the first part of the

14     History of Present Illness describes the

15     accident, correct?

16  A. Yes.

17  Q. Okay.  Do you see farther down about five

18     lines from the bottom of that history of

19     present illness?

20  A. Yes.

21  Q. It says, he states he has degenerative disc

22     disease, two herniated discs and spinal

23     stenosis.  Were you aware that you had two

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1              herniated discs --

2     A. Yes.

3     Q. -- at the time you were reporting this to a

4         doctor?

5     A. Yes.

6     Q. How long had you had herniated discs?

7     A. Since 2007 I think.

8     Q. Did they ever resolve or do you still have

9         them today?

10    A. I've been through decompression, that's

11        usually how I spend my vacations at

12        Christmastime, this five-week decompression

13        program, and then that would alleviate a lot.

14    Q. Okay.  Is it -- do you have any reason to

15        deny --

16    A. No.

17    Q. -- that you have degenerative disc disease and

18        you've been dealing with two herniated discs?

19    A. No.

20    Q. No, okay.  You see the next heading labelled,

21        it says Past Medical History?

22    A. Correct.

23    Q. Okay.  And then it says -- there's one, two,

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1         three, four different types of things
2         described there?
3    A. Correct.
4    Q. Number one says Hepatitis C, correct?
5    A. Correct.
6    Q. Number two says degenerative disc disease,
7         number three says disc herniation in the
8         lumbar spine and four says spinal stenosis?
9    A. Correct.
10   Q. So how long have you had Hepatitis C?
11   A. I don't have it anymore.  I've been treated
12        for it.
13   Q. When did you get treated for Hepatitis C?
14   A. The end of last year.
15   Q. That would be the end of 2016?
16   A. Correct.
17   Q. Okay.  How long did you have Hepatitis C
18        before it was treated?
19   A. Not sure, just a couple years I would imagine.
20        About five, six years.
21   Q. In the report here we do have a date, okay,
22        toward the top it says date 3/7/2012, in other
23        words, March 7, 2012; do you see that up here

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1          where I'm pointing with my pen?

2    A. Correct.

3    Q. It's up near where your name is?

4    A. Yeah.

5    Q. Would that be the date that you had been

6          reporting this past medical history?

7    A. I would imagine, yes.

8    Q. Okay.  So you had Hepatitis C as of that date?

9    A. As of that date, yeah.

10   Q. Okay.  Was it untreated at that point?

11   A. They had treatments, I wasn't willing to go

12         with them.

13   Q. Okay.  How long before March 7, 2012 did you

14         have Hepatitis C?  Or another way to ask it:

15         When were you first diagnosed?

16   A. You know, I'm not sure when I first tested.

17         I'm really not sure.

18   Q. How did you find out you had Hepatitis C?

19   A. The doctor tested for it.  I had been

20         previously tested two years before that and I

21         didn't have it, so how I got it I'm still

22         unclear.

23   Q. Okay.  Was that first test -- first positive

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1           test for Hepatitis C before the year 2000?

2     A.  No.

3     Q.  Was it before the year 2005?

4     A.  No.

5     Q.  Was it before the year 2010?

6     A.  Yeah.

7     Q.  Sometime between 2005 and 2010?

8     A.  Yeah.

9     Q.  Who was it that diagnosed you with

10          Hepatitis C?

11    A.  I don't remember the doctor's name.  It was

12          with Guthrie and it was down in Ithaca.

13    Q.  Did Dr. Choi refer you to Guthrie for this

14          test?

15    A.  No.

16    Q.  Was Dr. Choi your primary care physician at

17          the time that you were diagnosed with

18          Hepatitis C?

19    A.  Yes.

20    Q.  Did you report the symptoms to Dr. Choi before

21          you got tested by Guthrie?

22    A.  I didn't have any symptoms.

23    Q.  You didn't have any symptoms?

1    A. No.

2    Q. How did it show up?  How did you find out?

3    A. They did a blood test and tested for that.

4    Q. Was it a blood test that was part of just a

5       yearly physical or something like that?

6    A. Correct.

7    Q. And was the physical being done by Dr. Choi?

8    A. No, it was a different doctor.  I don't

9       remember his name.  I only saw him that one

10      time.

11   Q. Was it a physical you had to take for work as

12      part of your certification to work as a

13      trucker?

14   A. No.

15   Q. Was it a DOT physical?

16   A. No, it was for my back.  I was looking for a

17      back doctor.

18   Q. Did any doctor ever tell you how you

19      contracted Hep C?

20   A. They say how you can, I don't know how I did.

21   Q. Does your wife Cindy also have Hepatitis C?

22   A. Yes.

23   Q. When was she diagnosed as having Hepatitis C?

———— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ————

1    A. I don't know.

2    Q. Has she been treated for it?

3    A. No.

4    Q. Did any doctor -- any doctor ever tell you

5       that it affected your liver functions?

6    A. Yes.

7    Q. In what way?

8    A. Just that it gives you a fatty liver and can

9       cause cirrhosis and --

10   Q. Okay.

11   A. Basically it can kill you.

12   Q. You see in the lowest part of the first page

13      where the heading says Family History?

14   A. Yeah.

15   Q. It says pertinent for father having Hepatitis

16      C?

17   A. Correct.

18   Q. How were you aware that your father had

19      Hepatitis C?

20   A. He called me, that's why I was tested before

21      because we had tattoos done from the same

22      person and he found out that he had Hepatitis

23      C, so he told me I should probably go get

─── DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ───

1            tested as well and when I did it was negative.

2       Q. What year was that?

3       A. I'm not sure.  2006, around that area.  I'm

4            not sure of the date and time.

5       Q. And was the -- did you get the tattoos at the

6            same year, 2006?

7       A. No, we got them 20 years prior, 30 years

8            prior.

9       Q. Okay.  So at the time you got the tattoo from

10           20 years, 30 years earlier you had no reason

11           to think you had Hepatitis C, correct?

12      A. Correct.

13      Q. You had no blood tests done in those 20 to 30

14           years?

15      A. I didn't really need to have blood tests done

16           in those 20, 30 years.

17      Q. Well, did you have blood tests done over those

18           20, 30 years?

19      A. Not that I know of.

20      Q. No blood tests in 20 to 30 years?

21      A. Not that I know of.

22      Q. Did you have any surgeries in those years?

23      A. No.

1    Q. Did you have any physicals?

2    A. Just regular physicals, no blood work.

3    Q. No blood work for physicals?

4    A. No.

5    Q. At the time of the accident in North Dakota

6       February 24th, 2012 were you suffering from

7       heart burn?

8    A. I might have been.  I don't know.

9    Q. I mean, were you taking a medication for --

10   A. Yeah, actually I was.

11   Q. -- a problem with your esophagus?

12   A. Yeah, I forgot about that.

13   Q. Is that Protonix?

14   A. Yes.

15   Q. Are you still taking that today?

16   A. No.

17   Q. No.  How long were you taking Protonix?

18   A. Several years.

19   Q. Okay.  At the time of your positive drug test

20      in October 2012 were you taking Protonix?

21   A. I was probably taking it, but I only took it

22      once every two weeks, whenever I needed it.

23      Whenever I ate spicy foods.

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    Q. Okay.  Do you have a recollection of the last

2       time you took it before you provided the urine

3       sample that tested positive?

4    A. No.

5    Q. Do you have any awareness that Cindy has past

6       medical history of past kidney infection?

7    A. Yes.

8    Q. Yes, okay.  Has that been treated?

9    A. Has it been treated?

10   Q. Right.

11   A. No, she just watches what she eats.

12   Q. Okay.  When was she diagnosed as having

13      chronic kidney infection?

14   A. About 25 years ago.

15   Q. Before she met you or after you?

16   A. Right when we met.

17   Q. Okay.

18

19      The following was marked for identification:

20      Exhibit 15        Personnel Action Request
                            dated 10/17/12

21

22      **BY MR. BORON:**

23   Q. Mr. Horn, showing you what's marked for

**DEPAOLO-CROSBY REPORTING SERVICES, INC.**
170 Franklin Street, Suite 601, Buffalo, New York  14202
716-853-5544

1   today's deposition as Exhibit 15.  For the

2   record, it's a single page.  In the bottom

3   right-hand corner it says ENT 2, the number 2,

4   do you see that?

5  A. Correct.

6  Q. Okay.  This is a copy of a personnel action

7   request.  In the upper right-hand corner

8   there's a box that's checked that says

9   termination; do you see that?

10  A. Yes.

11  Q. In the -- toward the bottom of the form

12   there's a section labelled comments regarding

13   any of the above actions and it says violation

14   of company policy and then it says Douglas

15   used 10 PTO days?

16  A. Yes.

17  Q. Do you see that?

18  A. Yes.

19  Q. Okay.  You were terminated in October of 2012

20   from your employment at Enterprise, correct?

21  A. Correct.

22  Q. Did you receive a letter or any other written

23   document telling you that you were terminated?

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    A. No, I had conversations with the head of
2       safety and John Frezzo as well and they told
3       me that Friday when I was notified of the
4       dirty random.
5    Q. Who is the head of safety?
6    A. That would have been Nolan Everett.
7    Q. Was it a face-to-face conversation you had had
8       with Nolan Everett?
9    A. No.
10   Q. And was it a face-to-face conversation you had
11      with John Frezzo about why you were being
12      terminated?
13   A. Not at that time, no.  When I got back to the
14      terminal I had a face-to-face with John Frezzo
15      because we were in Texas when they told me I
16      was terminated.
17   Q. Okay.  Did either of them bring up the issue
18      of the wreck in February of 2012?
19   A. No.
20   Q. Were you provided any specific reason why you
21      were being terminated when you talked to these
22      two gentlemen?
23   A. That I had a dirty random.

1    Q. And who brought that issue up?

2    A. I actually called them up because I was

3       notified by the MRO on Friday -- on that

4       Friday and it was the weekend, so I called up

5       Nolan Everett and asked him -- told him what

6       had happened and he pretty much said that's

7       it.

8    Q. What do you mean pretty much that's it?

9    A. That's the end of the game here.  You know, he

10      told me that they would get back to me and he

11      would go through the terminal manager and

12      that's when the terminal manager called me

13      back and said they wanted me out of the truck,

14      they wanted me to find my own way home, they

15      wanted Cindy to take the load on by herself up

16      to Oregon and that's when that conversation

17      started.

18   Q. Okay.  Did Cindy take the load on to Oregon?

19   A. No.  No.

20   Q. No.  Did the two of you drive the truck back

21      to New Jersey?

22   A. She drove the truck back to New Jersey, I sat

23      as a passenger.

—— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ——

1    Q.  Okay.  And that happened on Friday, which

2        would have been, what, October 11th of 2012 or

3        October 12th of 2012?

4    A.  October 11th, something like that.  I'm not

5        sure.  I'd have to look at a calendar.

6    Q.  Okay.  How long was your phone conference with

7        the director of safety?

8    A.  Just a few minutes.

9    Q.  Less than five minutes?

10   A.  About that.

11   Q.  Okay.  Did you record that phone conversation?

12   A.  No.

13   Q.  Did you ever speak to the director of safety

14       after that phone conversation?

15   A.  Not that I remember, no.

16   Q.  Let me ask some questions about the urine test

17       itself.  Where were you and Cindy when you got

18       notified that you had to provide a urine test?

19   A.  In Coraopolis, Pennsylvania.

20   Q.  So that's near --

21   A.  Pittsburgh.

22   Q.  That's in the State of Pennsylvania, correct?

23   A.  Yes.

─── DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ───

1    Q. And it's near -- or it is the place where

2       there is a terminal for Enterprise?

3    A. Yes.

4    Q. All right.  And the notification came to you

5       through how?  A text message on your phone?

6    A. No, they called and asked where we were and we

7       were like an hour out and they said we had to

8       go to our test, so not to leave the yard

9       because usually we drop and hook.

10    Q. So you're an hour away from the terminal at

11       that point?

12    A. Mm-hmm.

13    Q. And it's just the two of you in the truck?

14    A. Yep.

15    Q. And did you have anything with you that had to

16       be turned in to the terminal when you arrived?

17    A. No -- well, just paperwork.

18    Q. Log sheets?

19    A. We didn't turn them in there.

20    Q. No.  Were you keeping written logs at that

21       point in time?

22    A. Yes.

23    Q. Yes, okay.  Were you east, west, north, south

─── **DEPAOLO-CROSBY REPORTING SERVICES, INC.** ───

170 Franklin Street, Suite 601, Buffalo, New York  14202

716-853-5544

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1            of the terminal at the time you got the phone

2            call?

3       A. We were west of the terminal.

4       Q. West of the terminal.  And after you got the

5            phone call what did you do?

6       A. We went in, dropped the trailer and went and

7            got drug tested.

8       Q. How long had it been since you had had a

9            random drug test at Enterprise before that?

10      A. I'm not sure.

11      Q. More than a year?

12      A. I'm not sure.

13      Q. Okay.  What did you have in the truck with you

14           at the point in time you got that phone call

15           in terms of food or drink?

16      A. Didn't have any food in the truck.

17      Q. Okay.

18      A. Drinks, probably a water.

19      Q. Okay.  Did you stop and get any food or drink

20           before you went to the drug test?

21      A. No.

22      Q. Did you drink any of the water that was in the

23           truck before you went to the drug test?

1    A.  Probably, yeah.

2    Q.  Did you have a standard operating procedure

3        that you would follow when you would get

4        contacted and you were told to go somewhere

5        and get the test done in terms of getting

6        ready for it?

7    A.  No.

8    Q.  No.  Would you try to do any exercising before

9        the urine sample was provided?

10    A.  No.

11    Q.  No.  Try to flush anything out of your system

12        by drinking more fluid before the test was

13        administered?

14    A.  No.

15    Q.  No.  Did you take any clean urine samples with

16        you to tests and turn in clean urine samples

17        in place of your own?

18    A.  No.

19    Q.  No.  Did you ever hear of another trucker

20        doing that?

21    A.  I've heard of people doing that.

22    Q.  Okay.  Do you know how they do it?

23    A.  Nope.

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    Q. Did anybody ever explain to you how to do it?

2    A. Nope.

3    Q. No.  What was the name of the place you went

4       to to have the test done?

5    A. I don't recall.

6    Q. Okay.  And when you arrived at that facility

7       was there a period of time you had to wait or

8       did they immediately take you to a place to

9       provide the urine specimen?

10   A. They usually take you in within the next 15

11      minutes usually.

12   Q. Okay.  Does somebody observe you putting the

13      urine into a container?

14   A. No.

15   Q. Okay.  You go into the room by yourself?

16   A. Correct.

17   Q. And do they give you specific instructions on

18      like how to do the process?

19   A. Just on how much to fill the cup up.

20   Q. Just to fill it up to a certain line?

21   A. Correct.

22   Q. Do they tell you they want you to have some

23      urine flow before you start filling the cup?

———— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ————

1    A. No.

2    Q. Or you just start filling it right way?

3    A. They don't give you instructions.  They just

4        say fill it that much and that's it.

5    Q. Okay.  So you're alone, you provide the urine

6        into the cup and you hand it to somebody at

7        the facility?

8    A. Correct.

9    Q. Is there paperwork for you to sign at that

10       point?

11   A. Yes.

12   Q. Okay.  Did you watch the person at the

13       facility handle your urine specimen at the

14       time you gave it to them?

15   A. Yes, I did.

16   Q. Until the time you left, correct?

17   A. Correct.

18   Q. After that you have no idea what happened to

19       your urine specimen from personal knowledge?

20   A. No.

21   Q. Was there ever a point in time where that

22       urine specimen went to a different room than

23       you were in as you were filling out the

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1        paperwork?

2    A. No.

3    Q. Was it always right there when you are filling

4        out the paperwork?

5    A. Yes.

6    Q. How does it work?  Does the specimen container

7        get attached to a document and then you sign

8        the document?

9    A. I sign the document and then I sign the seal

10        on the specimen itself, I seal it, and then I

11        have to initial it.

12    Q. Are you the person that seals it or somebody

13        from the facility seals it?

14    A. They seal it.

15    Q. They seal it.  And that's done in your

16        presence or outside of your presence?

17    A. That's done in my presence.

18    Q. Okay.  And how large was this container?

19    A. Two containers about that tall, that big

20        around.

21    Q. And you filled two?

22    A. I filled one container, they filled the

23        separate containers.  I fill up one cup, they

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1          take it over, they let me watch it, they do

2          it, they seal it, they say initial here, sign

3          the paperwork.

4     Q. For the record we'll have to describe your

5          hand motions and so forth.

6     A. Gotcha.

7     Q. So you fill up a container?

8     A. Yep.

9     Q. And then they get the -- they get two empty

10         containers?

11    A. Correct.

12    Q. All right.  And then they are the ones

13         handling the container that has your urine and

14         pouring it into the two empty containers?

15    A. Correct.

16    Q. Okay.  And what happens to the container that

17         you initially filled yourself?

18    A. That's empty then discarded.

19    Q. Okay.  It's not given back to you?

20    A. No.

21    Q. Okay.  And after you sign -- you sign two

22         different containers then?

23    A. I initial both containers that they seal.

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

```
1      Q. You initial them?

2      A. Correct.

3      Q. Okay.  Have you ever seen photocopies of your

4         initials on containers for that particular

5         specimen?

6      A. No.

7      Q. No.  Did Cindy also go through testing at the

8         same facility at the same time?

9      A. No.

10     Q. No.  Were you the only one that was required

11        to do a testing on that day?

12     A. That's what random usually is, yeah.

13     Q. Okay.  Was Cindy there at the facility or did

14        you go by yourself?

15     A. She was with me.

16     Q. Okay.  And when you provided the urine was she

17        in the same room as you or in a different room

18        when you're putting the urine in a specimen

19        cup?

20     A. She waited outside in the truck.

21     Q. She never came inside the building?

22     A. She never came inside the building.

23     Q. Okay.  Do you remember the people's names that
```

─ DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ─

1         you interacted with at that testing facility?

2    A. No.

3    Q. Okay.  So then in total how long were you

4         inside the facility building where you

5         provided the urine sample?  Less than an hour?

6    A. Oh, yeah.

7    Q. Less than a half hour?

8    A. Right about that, a half hour.

9    Q. Okay.  And after you left the facility the

10        next thing you heard about the urine test was

11        when you got contacted by somebody about the

12        result of it?

13   A. I got contacted by the MRO in Kansas or

14        Kentucky that said I did a dirty random.

15   Q. MRO stands for medical review officer?

16   A. Correct.

17   Q. Is that somebody that works for the DOT?

18   A. They were working for the lab.

19   Q. For the lab?

20   A. Right.

21   Q. Okay.  Were the test results going to be

22        reported to the DOT?

23   A. I would imagine, yeah.

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    Q. Okay.  So this wasn't just an Enterprise test,
2       this was a DOT test as well?
3    A. Yes.
4    Q. Okay.  And what were you told when you were
5       contacted about the urine test by the MRO?
6    A. That I did a dirty and that I was going to
7       basically not be able to drive unless I went
8       through a substance abuse program.
9    Q. When you say did a dirty?
10   A. Did a dirty --
11   Q. What does that mean?
12   A. A dirty random test.
13   Q. What does a dirty random test mean?
14   A. A dirty urine test sample.
15   Q. Okay.  Did the MRO tell you that your urine
16      had tested positive for THC?
17   A. Correct.
18   Q. He did tell you that when the first contact
19      was made?
20   A. Yes.
21   Q. Okay.  Were you sent anything by that MRO in
22      writing about your results of the test?
23   A. No.

—DOUGLAS J. HORN - BY MR. BORON - 05/08/17—

1    Q. You just got this information over the phone?

2    A. Correct.  And I had the option since there's

3       two specimens, the second specimen is for

4       confirmation and if I wanted to pay for the

5       confirmation to have it retested that I could

6       do that, that I had that option so I went for

7       that option.

8    Q. Okay.  And then you got contacted about that

9       second test?

10   A. Correct.

11   Q. By the same MRO?

12   A. No, a different facility all together in a

13      different state.

14   Q. Okay.  So the MRO that had told you of the

15      dirty random test result didn't contact you

16      about the second test?

17   A. No, that was done with another lab.

18   Q. Okay.  So somebody from that lab contacted you

19      to tell you the result of that?

20   A. Yeah, I believe.

21   Q. How long did it take you to find out the

22      result of the second test?

23   A. I think I found out that following Tuesday and

1          I believe it was the MRO that I talked to that
2          told me I did the second dirty as well.
3     Q.  Okay.  Now while you were waiting for that
4          second set or the second sample container to
5          be tested, did you get your own test done that
6          you -- that you set up yourself?
7     A.  Yes, I did.
8     Q.  With MEDTOX?
9     A.  Yes.
10    Q.  Okay.  So how did you know how to go about
11         doing that test?  Did you call up MEDTOX on
12         the phone or follow some instructions online?
13    A.  Yeah, I called them up and asked them if they
14         can do a test because, number one, I was in
15         disbelief that I tested positive for THC and I
16         told Cindy she should probably get tested as
17         well because if I had THC in my system then
18         there's a possibility that she might too
19         somehow and so I went and I did two drug tests
20         at, I guess it was MEDTOX is what you said it
21         was.
22    Q.  MEDTOX is the name of the place.
23    A.  Is that the name of the place?  Yeah, I don't

——— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ———

1         even know the name of the place.  Yeah, I had

2         a 10 panel quick test done and then a five

3         panel DOT test done.

4    Q.  Why were you concerned that Cindy might also

5         have an issue of possibly testing positive?

6    A.  Because I had no idea that I had THC in my

7         system so I didn't know how I got it in there.

8    Q.  This would be a great spot for a lunch break?

9              **MR. MAZZOLA:**  Yep.

10

11              (Recess taken)

12

13         The following were marked for identification:

14         Exhibit 16      Form 8879 dated 2011

15         Exhibit 17      Form 8879 dated 2012

16         Exhibit 18      Form 1040 dated 2013

17         Exhibit 19      Form 1065 dated 2013

18         Exhibit 20      Form 1040 dated 2014

19         Exhibit 21      Form 1040 dated 2015

20         Exhibit 22      Form 1040 dated 2016

21

22         **BY MR. BORON:**

23    Q.  Mr. Horn, we are back on the record after a

1          lunch break.  I remind you that you continue

2          to be under oath.  Did you discuss your

3          answers of the morning with your attorney

4          while you went to lunch?

5     A.  Not really.

6     Q.  Did you get any direction from your attorney

7          with respect to how to testify going forward?

8     A.  No.

9     Q.  Okay.  I'm going to be changing gears for a

10         bit of time here and go through some financial

11         information that's been provided to us, okay?

12    A.  Okay.

13    Q.  Mostly in the form of tax returns so I'm going

14         to show you Exhibit 16, all right, for

15         starters.  Exhibit 16 for the record is a

16         photocopy of a number of pages, more than I am

17         able to count, I think it may be 20, but I

18         believe it reflects your 2011 tax return

19         information for both Federal and state.

20              In 2011 were you having CPAs called

21         Mondorf & Fenwick prepare your income tax

22         reports?

23    A.  Yes.

——— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ———

1    Q.  Okay.  A person named John Mondorf, did he

2        assist you with these 2011 tax returns?

3    A.  I did not deal with him, I dealt with a lady

4        there.

5    Q.  Okay.  And just briefly can you tell us what

6        the process was to get your income tax returns

7        done by a CPA in 2011 or for the 2011 tax

8        returns?

9    A.  Just things we thought were expenses and our

10       W-2 forms and --

11    Q. So you gave him all your W-2s for the year?

12    A. Yeah.

13    Q. Okay.  Did you give him receipts as well?

14    A. On some things, yes.

15    Q. Did the CPA ask you to summarize travel

16       expenses in some way aside from receipts?

17    A. Right, yes.

18    Q. Okay.  Did you, like, hand write out a list of

19       here's all the places we stayed, hotels we

20       paid?

21    A. That type of thing, yeah.

22    Q. Okay.  All right.  The second page of this

23       exhibit is the first page of your Form 1040

—— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ——

1          for the tax year 2011; do you see that?

2     A. Okay.  All right.

3     Q. You guys filed a joint tax return for 2011

4          with the U.S. Government?

5     A. Yes.

6     Q. Okay.  And was that your -- your custom every

7          year, you filed joint tax returns?

8     A. Yes.

9     Q. All right.  At the point in the time for the

10          2011 returns Elizabeth Horn, was she living

11          with you still?

12     A. Yes.

13     Q. Is that why you listed her as a dependant?

14     A. Yes.

15     Q. Okay.  Did you have any other kids living with

16          you in 2011?

17     A. I don't think so.

18     Q. Were you renting space at your house to

19          anybody else to, you know, live in a bedroom

20          or anything like that?

21     A. No.

22     Q. Okay.  And how about in 2012, same situation?

23     A. Yeah.

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    Q. The three of you, was it you, Cindy and

2       Elizabeth living at the Parker Road house?

3    A. Yes.

4    Q. Was Elizabeth in college in 2011, 2012?

5    A. I'm not sure.  I don't know.

6    Q. Did she graduate from a college?

7    A. She did.

8    Q. What college?

9    A. She did an online college with -- oh, God.  I

10      can't remember the name.  Ashworth.

11   Q. Ashworth?

12   A. Ashworth, yeah.  The Ashworth College.

13   Q. Okay.  Was she working at the time she was

14      living with you in 2011?

15   A. I believe so.

16   Q. Were you charging her room and board?

17   A. No.

18   Q. All right.  If you flip to the third page of

19      Exhibit 16 -- is that what we're on,

20      Exhibit 16?  That's the itemized deductions,

21      Schedule A, for the 2011 Federal tax return,

22      correct?

23   A. Okay.

1    Q.  I just want to make sure we're on the same

2        page, looking at the same page together.

3    A.  Okay.  I'm one off.  Okay.  There we go.

4    Q.  All right.  I want to direct your attention

5        down to the job expenses and certain

6        miscellaneous deductions section, starts at

7        line 21.

8    A.  Yes.

9    Q.  It says that there's unreimbursed employee

10       expenses at 32,324.

11   A.  Okay.

12   Q.  There's also a reference to see Statement 1.

13       I had some trouble finding Statement 1.  Do

14       you have any -- the only information I see in

15       terms of Statement 1 is towards the back; do

16       you see that page right there?

17   A.  Okay.

18   Q.  It talks about state, local, and foreign

19       general sales taxes.  Here's my question

20       anyways:  Where is there a record, if there is

21       one, in the tax returns of your unreimbursed

22       employee expenses besides the number total?

23   A.  Where is it?

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    Q. Yeah.

2    A. I don't know.  You'd have to talk to my CPA.

3    Q. Okay.

4    A. We are allowed to have $59 a day in meals

5       reimbursement at the end of the year, so

6       depending on how many days I was out on the

7       road, each person deducts $59 a day, so -- I

8       mean, if you're wondering why that number is

9       so high that's probably why.

10   Q. That's your understanding of how the tax code

11      works?

12   A. Yeah.

13   Q. Your CPA told you that or --

14   A. No, I've known that for some time.

15   Q. Okay.  Why did you stop using Mondorf taxes

16      after 2012?

17   A. The tax lady was let go so I followed her.

18   Q. Okay.  There's interest income listed on line

19      8 $39.  And if you go look at Schedule B of

20      this return it makes reference to Bank of

21      America.  Is that where your mortgage is?

22   A. I believe so.

23   Q. This is in 2011 we're talking about.

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    A.  I believe so.

2    Q.  Okay.  You're not 100 percent sure?

3    A.  No, I don't take care of that.  Ask Cindy.

4    Q.  Okay.  Would it be accurate when it comes to

5        the income taxes Cindy might be a little more

6        knowledgeable about how the records were kept

7        and turned over to the CPA than you?

8    A.  Yep.

9    Q.  Okay.  Was part of the deduction that was

10       taken for your employee business expenses a

11       deduction for cell phone -- cell phone use?

12   A.  Yes.

13   Q.  Paying a monthly bill to have cell phone?

14   A.  Right.

15   Q.  Did you both have your own cell phone or just

16       one cell phone?

17   A.  We both had our own phone.

18   Q.  You both had your own.  And did you both take

19       your cell phone in the truck with you when you

20       were out driving?

21   A.  Yes.

22   Q.  Okay.  Back in 2011 were they smart phones at

23       that time?

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    A. Pretty much.

2    Q. Like you could access the Internet?

3    A. Yeah.

4    Q. Okay.  There is a component of your 2011

5       return says you're taking a deduction for

6       Internet fees as well?

7    A. Yes.

8    Q. Okay.  Now in terms of coverage while you're

9       on the road in 2011 would you be able to

10      access the Internet anywhere and any time

11      because of the way the trucks were put

12      together?

13   A. Yes.

14   Q. Okay.  So it didn't matter how far away you

15      were from a cell tower, for example?

16   A. No.  There were spots where you didn't have

17      any service in any area, just very little.

18   Q. You had wifi in the trucks?

19   A. No, not wifi in the trucks, just the cell

20      phone service.

21   Q. Okay.

22   A. We had satellites in the truck where the

23      company could communicate with us and they

—— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ——

1            tracked us.

2    Q.  Would you look again at that second page of

3         the exhibit, which is again the first page of

4         the Form 1040 on line 7 for wages, salaries,

5         tips, etc. it says $140,117, right?

6    A.  Correct.

7    Q.  So what does that number reflect, the joint

8         wages, salaries, and tips for both yourself

9         and Cindy?

10   A.  Yes.

11   Q.  Is that all income that you received from

12        Enterprise?

13   A.  Correct.

14   Q.  Did you have any other employer in 2011?

15   A.  No.

16   Q.  Had you started up the Horn's Transport LLC by

17        that point in time?

18   A.  No.

19   Q.  I'm going to show you what's been marked as

20        Exhibit 17, sir.  Exhibit 17 for the record is

21        a copy of various income tax records related

22        to tax year 2012, so now we're one year later

23        in time in this exhibit.  And 2012 also

1    happened to be the year that you had the wreck

2    in February, correct?

3  A. Correct.

4  Q. And then you had the termination of your job

5    from Enterprise in October, correct?

6  A. Correct.

7  Q. All right.  So my first question for 2012

8    income tax returns is there was a Louisiana

9    tax return filed.  Why was there a Louisiana

10    tax return filed in 2012?

11  A. I'm not sure.

12  Q. Okay.  It was a small amount of income listed

13    on there, $20,360 Louisiana income; does that

14    ring a bell at all?

15  A. Uh-uh.

16  Q. Okay.  When you suffered those injuries that

17    you described earlier in the wreck, that put

18    you out of work in 2012?

19  A. Yes.

20  Q. And did you receive Workers' Compensation?

21  A. Yes.

22  Q. While you were -- when you received or while

23    you received Workers' Compensation you were

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1          not working, correct?

2     A.  Correct.

3     Q.  Okay.  So did Enterprise continue to pay you

4          something even though you weren't working

5          aside from the Workers' Compensation?

6     A.  No.

7     Q.  No.  At what point did you start working in

8          2017 after -- I'm sorry, 2012 after the wreck?

9     A.  I believe it was May 15th.

10    Q.  So you were off a little shy of three months?

11    A.  I think so, yes.

12    Q.  When you went back to work in the middle of

13         May 2012 was that back to full-time driving

14         again?

15    A.  Yes.

16    Q.  Okay.  Was Cindy off during the same time

17         period?

18    A.  Yes.

19    Q.  The two of you started working again together

20         as a team in mid-May of 2012?

21    A.  Correct.

22    Q.  Okay.  And at that point in time were you on

23         any restrictions?

--- DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ---

1    A. No.

2    Q. You were completely cleared by doctors to go

3       ahead and start driving again like you had

4       been before the wreck?

5    A. Correct.

6    Q. Were you on any medication that was prescribed

7       by a doctor when you started working in May of

8       2012?

9    A. Hydrocodone.

10   Q. Is that the only prescription that you were

11      being given other than, let's forget about

12      like the heart burn medication, hydrocodone?

13   A. Yeah, I think that was it.

14   Q. You were off the prednisone already at that

15      point in time?

16   A. Yeah.

17   Q. Okay.  Were you taking the hydrocodone

18      continuously then from the time you started

19      working in mid-May of 2012 right through the

20      time you got terminated by Enterprise?

21   A. No.  No.  Not regularly, no.

22   Q. Okay.  When did you start -- when did the

23      process begin where you started to not take

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

```
 1        hydrocodone regularly?
 2    A. How did it start, the process?
 3    Q. Yeah.  Was it in June?  Was it in July?
 4        August?  September?
 5    A. Actually it was in May.  I went and had my
 6        nerves burnt right before I went back to work
 7        and that doctor's name was Dr. Seybold so --
 8    Q. Okay.  Where did that process take place?  In
 9        New York State?
10    A. Yeah, in Binghamton.
11    Q. Why was that procedure done?  What was the
12        point of it?
13    A. To burn the nerves that were giving me pain in
14        my back.
15    Q. So it didn't have anything to do with your
16        shoulder?
17    A. Uh-uh.
18    Q. Is that the first time you ever had nerves
19        burnt?
20    A. No.
21    Q. Were there previous times you had nerves burnt
22        that didn't deal with your back problem?
23    A. No, they always dealt with my back.
```

——— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ———

1    Q. Always dealt with the back, okay.  What kind
2       of relief did you get from your back pain from
3       this getting done?
4    A. Sometimes I got relief, sometimes I didn't.
5       It depended on what nerves he hit.
6    Q. So that was done in May of 2012?
7    A. Yes.
8    Q. Did you have your nerves burnt any time
9       between that May instance and testing positive
10      in October?
11   A. No.
12   Q. So you and Cindy are back to work as a team,
13      it's May of 2012, you're driving all the same
14      routes you had been given in the past?
15   A. Yes.
16   Q. Okay.  No change in your job duties at that
17      point in time?
18   A. No.
19   Q. Before you started driving in -- before you
20      began driving again in May 2012, did you have
21      to go through any drug testing at that point
22      in time?
23   A. I don't remember now.

────── DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ──────

1    Q. Okay.  Did you have to pass a road test to
2       start driving again?
3    A. No.
4    Q. No.  Just had to get the okay from the doctor?
5    A. Yes.
6    Q. And was that from the Workers' Comp doctor
7       that you were getting the okay or?
8    A. Yes.
9    Q. Or primary care physician?
10   A. Workers' Comp.
11   Q. Workers' Comp doctor.  Since you got that okay
12      from Workers' Comp doctor and went back to
13      work, did you then get examined again by the
14      Workers' Comp doctor at any point in time?
15   A. No.
16   Q. No.  Did you have -- in 2012 once you started
17      working again did you have regular routes that
18      you drove, like you'd have the same assignment
19      over and over and over?
20   A. No.
21   Q. No.  Did you have some assignments that would
22      be repeat assignments?
23   A. Sometimes, yes.

1    Q. Sometimes, okay.  Was the standard operating
2       procedure that you did most of the daytime
3       driving and Cindy did most of the nighttime
4       driving?
5    A. Correct.
6    Q. Did you ever have a device in the truck in
7       2012 that -- that was recording where you --
8       how far you had driven, each of you and how
9       much time you had had?
10   A. There was satellite tracking on the vehicle.
11      I don't know as far as the extent of
12      recording, it did not record who drove when,
13      no.
14   Q. Okay.  Was there a record kept of who drove
15      when --
16   A. Logs, yes.
17   Q. -- in 2012?  Handwritten logs?
18   A. Yep.
19   Q. Were they forms that you filled in the blanks
20      that Enterprise gave you?
21   A. Yes.
22   Q. Okay.  And did you have to turn your log
23      sheets into the terminal when you would get

——— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ———

1      back to the terminal?

2   A. Yes.

3   Q. All right.  What did Enterprise do with your

4      log sheets after you got them turned into the

5      terminal?

6   A. They would go over them, make sure we weren't

7      in violation.  If they were in violation we

8      would either have to sign off on them and then

9      they would store them.

10  Q. By violation you mean somebody drove too many

11     hours in a row without rest?

12  A. Correct.

13  Q. Something like that?

14  A. Yeah.

15  Q. Okay.  Did they also -- those logs, were they

16     utilized by Enterprise to determine how much

17     to compensate you for the driving?

18  A. No.

19  Q. How did Enterprise know how far you had driven

20     or how to compensate you by mile?

21  A. By the dispatch that we did.

22  Q. Dispatch would just map out a route for you to

23     take?

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    A. Dispatch would give us a pickup and delivery

2       and judge the mileage by that and we would

3       fill out the trip sheet of the trips that we

4       did and they would pay us according to that.

5    Q. If you had to deviate from their route, could

6       you get paid more money, like you had to take

7       a detour because of highway construction?

8    A. Only under, say, approval.

9    Q. Pre-approval?

10   A. Yeah, pre-approval.

11   Q. In the summer months of 2012, June, July and

12      August, let's focus on those three months,

13      were you still feeling pain from injuries that

14      you suffered in the accident in February?

15   A. I believe so.  In my shoulder.

16   Q. What kind of pain were you experiencing in

17      your shoulder?

18   A. A sharp stabbing.

19   Q. Was there an injury that was diagnosed by a

20      doctor as a result of the February 2012 wreck

21      for your shoulder?

22   A. Not really, no.  It was just pretty bruised

23      up.

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1   Q. Any bones broken in the shoulder area in that
2      accident?
3   A. No.
4   Q. Any ligaments torn or tenants torn?
5   A. Not that I'm aware of.  Nobody did any X-rays
6      or anything like that.  It was more focussed
7      on my back.
8   Q. Okay.
9   A. My shoulder didn't bother me too much then, it
10     bothered me when I went back to work.
11  Q. Okay.  And in those three summer months, June,
12     July, and August of 2012, which -- which
13     injury was bothering you more, your right
14     shoulder or your lower back?
15  A. My shoulder.
16  Q. Did your primary care physician treat your
17     shoulder in 2012?
18  A. I went and saw him on it, yeah.
19  Q. What's his name again?
20  A. Dr. Choi.
21        MR. MAZZOLA:  How do you spell that?  Is
22     it C-H-O-I?
23  A. O-I, yeah.

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    Q. So you saw Dr. Choi in the Summer of 2012
2       about your right shoulder?
3    A. Yes.
4    Q. Just one visit or more than one visit?
5    A. I believe I went and saw him twice.
6    Q. Did Dr. Choi prescribe any pain medication for
7       you on either of those visits?
8    A. Yeah, he did.
9    Q. What kind of medication?
10   A. Hydrocodone.
11   Q. Oh, hydrocodone.  Where were you getting those
12      prescriptions filled?
13   A. There in Vestal.
14   Q. Do you remember which particular pharmacy?
15   A. I didn't really pick a particular one.
16      Whatever one I was going shopping at.
17      Sometimes at Costco or at Rite Aid.
18   Q. Mm-hmm.  Was -- was -- were you filling
19      prescriptions in Vestal because that's where
20      Dr. Choi's office was?
21   A. Not particularly because of that, just
22      wherever I had to go shopping.
23   Q. Okay.  Is that kind of your go-to place to go

1          shopping from where you live?

2     A.  No, not necessarily because I'm right in the

3          middle of three cities so I have three choices

4          to go to Ithaca, Elmira or Binghamton.

5          They're all about the same distance.

6     Q.  How far is Dr. Choi's office from the SUNY

7          Binghamton's campus?

8     A.  I don't think it's that far.  About five

9          miles.

10    Q.  Did Dr. Choi do any X-rays of your shoulder?

11    A.  No.

12    Q.  No.  Did he prescribe any physical therapy for

13         your shoulder?

14    A.  No.

15    Q.  Did Dr. Choi give you any advice or

16         recommendations about how you could make your

17         shoulder pain go away or get better?

18    A.  Yeah.

19    Q.  Strength training?

20    A.  With heat or cold compresses.

21    Q.  Did you try heat or cold compresses on your

22         shoulder?

23    A.  Yes, I did.

—— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ——

1    Q. Is that something you were doing daily?

2    A. No, not daily, no.

3    Q. No.  Did it work?  Did it help?

4    A. Not really.

5    Q. Did you ever try acupuncture on your shoulder?

6    A. Not my shoulder, no.

7    Q. Did you ever try acupuncture on your back?

8    A. Yes, I did.

9    Q. When was the last time you had an acupuncture

10      treatment on your back?

11   A. It's been a long time.  2009, maybe.  I don't

12      remember, it's been a while.

13   Q. Even though you don't remember the exact date,

14      would you be certain that the last time you

15      had acupuncture was before the wreck?

16   A. Oh, yeah.

17   Q. Okay.  Besides heat or cold compresses and the

18      hydrocodone, did Dr. Choi give you any other

19      recommendations or suggestions about how to

20      deal with the pain in your right shoulder?

21   A. Not that I remember, no.

22   Q. Can we look again at that Exhibit 17?  I want

23      to direct your attention to -- it's the 2012

1      returns.  On the second page of the exhibit,

2      which is the first page of your 10 -- Form

3      1040 line 17 -- no, is it 17?  No, it's 16A.

4      Line 16A there's a reference to a rollover of

5      71,185?

6              MR. MAZZOLA:  What page you on?

7              MR. BORON:  The second page of the

8      exhibit, which is the first page of 1040.

9              MR. MAZZOLA:  16A.

10         BY MR. BORON:

11     Q. Yeah.  Where it says rollover.

12     A. Second page.

13     Q. On the line that says pensions and annuities?

14     A. Yes, correct.

15     Q. And the word rollover is typed in there as

16         well?

17     A. Correct.

18     Q. So what does that reflect, the 74,185?  Did

19         you do something with the money you had in

20         your retirement savings account?

21     A. I'm not sure if that was in 2012 or 2013, so

22         you would have to talk to Cindy on that, maybe

23         she might know.  I have no idea.

———— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ————

1    Q.  Okay.  We'll be able to ask you some

2        questions, Cindy, later.

3            I'm showing you what's marked as

4        Exhibit 18 for today's deposition, Mr. Horn.

5        This is a set of records that I understand

6        reflect income tax information for you and

7        your wife for the tax year 2013.  It's a

8        little thicker than the previous two years'

9        packages, but that's because there's a return

10       in here for the Horn's Transport LLC.  So I'm

11       going to start there.

12           2013 is the year after you were terminated

13       at Enterprise.  Did you and your wife start a

14       business in 2013 called Horn's Transport LLC?

15   A.  Yes.

16   Q.  What kind of a business was Horn's Transport

17       LLC?

18   A.  Transporting RVs.

19   Q.  Were there any members of the LLC besides

20       yourself and Cindy?

21   A.  No.

22   Q.  And if we want to think of the Horn's

23       Transport LLC business in partnership terms,

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1       were you 50/50 owners?

2   A. Yes.

3   Q. You said that the nature of the business was

4       transporting RVs.  From where to where?

5   A. Usually out of Indiana to all over the United

6       States.

7   Q. How did you transport the RVs?

8   A. With a pick-up.

9   Q. Did the business purchase a pick-up to do this

10       transporting?

11   A. Me and Cindy purchased it, yeah.

12   Q. Okay.  This was a pick-up you did not own

13       before the business started?

14   A. Correct.

15   Q. All right.  And what kind of a pick-up was it?

16   A. It was a 2012 Dodge Ram 3500 four-wheel drive.

17   Q. Was it new or used when you purchased it?

18   A. It was new.

19   Q. Did you have to have anything added to the

20       back of the pick-up to tow?

21   A. Yes.

22   Q. All right.  Did the dealership that you bought

23       the pick-up at add that on for you before you

—DOUGLAS J. HORN - BY MR. BORON - 05/08/17—

1        took it away?

2    A. Yes, he did.

3    Q. Do you still own that 2002 Dodge Ram today?

4    A. No.

5    Q. Did you sell it?

6    A. Yes.

7    Q. When did you sell it?

8    A. Back in October.

9    Q. How much did you sell it for?

10   A. Like 35,000, around that.

11   Q. When you say "back in October," you mean 2016,

12       right?

13   A. Correct.

14   Q. You sold it for about 35,000?

15   A. Yep.

16   Q. Was it an arm's length transaction?  In other

17       words, you didn't sell it to somebody in the

18       family or give somebody a deal on it?

19   A. No.  I guess I sold it for 30.

20   Q. 30?

21   A. Yeah.

22   Q. How much did you buy it for in 2012?

23   A. It was almost 70.

1     Q. How much?

2     A. Almost 70.

3     Q. Where did you purchase it?

4     A. Up in -- God, I can't remember the name --

5        Penn Yan.

6     Q. What was the name of the dealership?

7     A. I'm not sure.  It was the Dodge dealer there

8        in Penn Yan.  Friendly, I believe it was.

9     Q. Penn Yan up towards the Finger Lakes?

10    A. Yes.

11    Q. Okay.  Franky was the name of the dealer?

12    A. Friendly, yes.

13    Q. Oh, Friendly.

14    A. Friendly.

15    Q. Do you still have the paperwork associated

16       with either the purchase or the sale?

17    A. I believe so.

18    Q. Both?

19    A. I believe so.

20    Q. In 2013 that exhibit shows that the state tax

21       returns are filed for Louisiana and North

22       Dakota, do you recall why?

23    A. We were briefly out of North Dakota.

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1              Louisiana I'm not sure on.

2     Q. When you say you worked briefly out of North

3         Dakota, what does that mean?

4     A. Well, we worked with a trucking company after

5         the RV.  The RV only lasted a few months and

6         then we got back into a semi in August of

7         2013.

8     Q. When you say you got back into a semi, now

9         you're driving truck again as a team?

10    A. Correct.

11    Q. Like you had been for Enterprise?

12    A. Basically, yes.

13    Q. Okay.  Was that for S&S Transport, KL Harring

14        Transportation or Kuhnle Brothers?

15    A. That was S&S.

16    Q. S&S.

17            MR. MAZZOLA:  When was that?  What

18        month?

19    Q. August of 2013.  How did it come about that

20        you got a job with S&S Transport?

21    A. Through another driver that I had met on the

22        road.

23    Q. This other driver told you that S&S was

—— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ——

1        looking for drivers?

2    A. They said they would probably hire me with my

3        circumstances, yeah.

4    Q. How long did you work for S&S Transport?

5    A. About three weeks.

6    Q. Why did you only work there three weeks?

7    A. Too low pay, not enough miles.

8    Q. Did you have another job you went to when you

9        left S&S Transport?

10   A. Correct.

11   Q. We'll go back to the transporting RVs first.

12       How long did that business last?

13   A. Just a few months up until like August.  We

14       started in May -- May 1st.

15   Q. Did you transport any RVs in 2014, the next

16       tax year?

17   A. No.

18   Q. Okay.  From S&S Transport you went to where?

19       Kuhnle?

20   A. Kuhnle.

21   Q. Kuhnle?

22   A. Kuhnle.

23   Q. K-U-H-N-L-E, Kuhnle Brothers.

---

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1           **MR. MAZZOLA:**   K-U-H-N-L-E-E?

2      Q. No, there's only one E at the end.  You worked

3         at Kuhnle for how long?

4      A. About a month.

5      Q. How did you find out about that job?

6      A. I called on it.

7      Q. Why did you only work there a month?

8      A. Pay wasn't like they said.  We were paid on

9         percentage, so what we were being paid was

10        pretty low rate.

11     Q. When you say paid on percentage, you're

12        talking about per mile driven?

13     A. 22 percent of the load, what the load paid the

14        company, we got 22 percent.

15     Q. So that's a different pay formula than you had

16        at Enterprise?

17     A. Correct.

18     Q. Why did you stop working at Kuhnle?

19     A. I got another job.

20     Q. Were you working as a team with Cindy at

21        Kuhnle?

22     A. Yes.

23     Q. Is that when you started working for KL

---

**DEPAOLO-CROSBY REPORTING SERVICES, INC.**
170 Franklin Street, Suite 601, Buffalo, New York  14202
716-853-5544

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1        Harring?

2    A.  After Kuhnle, yes.

3    Q.  Harring is H-A-R-R-I-N-G?

4    A.  Correct.

5    Q.  This is all still in 2013?

6    A.  Yes.

7    Q.  How long did you work for KL Harring?

8    A.  About six months.

9    Q.  Same -- was it the same kind of work, you're

10        driving as a team the two of you?

11   A.  KL Harring was a little different.  They did

12        high security freight and you were required to

13        stop where they told you to stop.

14   Q.  Okay.  And is that something that you

15        preferred not to do?

16   A.  Yeah, I don't like being told when I have to

17        go to the bathroom I can only go to that

18        certain spot which is six hours away and then

19        when it came for home time we had a

20        disagreement on home time, that's why I quit.

21   Q.  You had to do what?

22   A.  We had a disagreement on home time which is

23        why I quit.

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    Q. Did the disagreement have to do with you

2       wanted to have a little more home time than

3       they were allowing?

4    A. No, I put in my home time six weeks before and

5       five days before it was time to go home --

6       actually four days before it was time to go

7       home they told me I couldn't go home for

8       another two weeks.

9    Q. Okay.  So did you end up resigning from KL

10      Harring?

11   A. Yes.

12   Q. Because of those issues?

13   A. Yes.

14   Q. Did you have another job lined up at the time

15      you resigned from KL Harring?

16   A. No, I didn't.

17   Q. After KL Harring Transportation what was your

18      next job?  Grandview?

19   A. Green Valley.

20   Q. Green Valley, okay.  How long were you out of

21      work between KL Harring and Green Valley?

22   A. I think about three months.

23   Q. At the time you resigned from KL Harring had

───── DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ─────

1          you contacted Green Valley already and gotten

2          a job lined up?

3     A.  No.

4     Q.  Did you apply for unemployment when you were

5          off of work between KL Harring and Green

6          Valley?

7     A.  No.

8     Q.  Why not?

9     A.  Didn't think I was eligible.

10    Q.  Why didn't you think you were eligible?

11    A.  Because I quit.

12    Q.  Okay.  So how long did you work at Green

13         Valley?

14    A.  About three weeks there.

15    Q.  Were you doing the same kind of work, you and

16         Cindy together driving as a team?

17    A.  Correct.

18    Q.  Yes, okay.  And after three weeks did you quit

19         that job, too?

20    A.  Yes.

21    Q.  Did you have another job lined up to go to at

22         that point in time?

23    A.  No.

––––– DOUGLAS J. HORN - BY MR. BORON - 05/08/17 –––––

1     Q. Is Green Valley also called Grandview
2        Incorporated?
3     A. No.
4     Q. That's a different trucking company?
5     A. Yes.
6     Q. Is that the next place you went to work?
7     A. Yes.
8     Q. How long were you off of work between Green
9        Valley and Grandview Enterprises?
10    A. I don't remember.
11    Q. More than three months?
12    A. No.
13    Q. More than a month?
14    A. Like maybe two months.
15    Q. Grandview Enterprises Incorporated, how long
16       did you work there?
17    A. Almost a year.
18    Q. Where was the terminal you were working out of
19       for Grandview?
20    A. Vancouver, Washington.
21    Q. Were you and Cindy driving as a team for
22       Grandview?
23    A. Yes.

—— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ——

```
1     Q. You started with Grandview in 2014 and went
2        into 2015 with them?
3     A. Yes.
4     Q. Yes.  Why did you leave Grandview Enterprises?
5     A. Better pay.
6     Q. This time you had a job lined up when you left
7        Grandview?
8     A. Yes.
9     Q. And that job was with Vensure?
10    A. With what?
11    Q. Vensure, V-E-N-S-U-R-E?
12    A. Never worked for Vensure.
13    Q. No.  Did you ever hear of Vensure HR
14       Incorporated?
15    A. No.
16    Q. Well, maybe that's how you got paid for Green
17       Valley.
18            MR. HOUSH:  Object to form.
19    A. We went to ICX after Grandview.
20    Q. Okay.  You left Grandview and you went to ICX?
21    A. Correct.
22    Q. Any gap in employment between Grandview and
23       ICX?
```

—— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ——

1    A. No.

2    Q. When did you start at ICX?  November of 2015?

3    A. Correct.

4    Q. Did you start at Grandview in November 2015 --

5       I'm sorry, 2014?

6    A. Yes.

7    Q. Okay.  When you -- to get the job at Grandview

8       did you have to fill out an application form?

9    A. Yes.

10   Q. Yes.  Do you still have a copy of that

11      application form that you filled out for

12      Grandview?

13   A. No.

14   Q. No.  Was it a paper form that you signed and

15      sent in?

16   A. More than likely, yeah.

17   Q. As oppose to an online fill in the blanks and

18      push a button and it goes to the company?

19   A. Usually on paper, we usually faxed it.

20   Q. Okay.  While you were at Grandview did you

21      have a compensation package?

22   A. We had medical.

23   Q. Medical coverage?

——— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ———

```
 1     A. Yes.
 2     Q. Was that provided entirely by the company or
 3        did you have to pay some money out of your pay
 4        to cover it?
 5     A. That was provided by the company.
 6     Q. Did you have life insurance when you were at
 7        Grandview --
 8     A. Nope.
 9     Q. -- paid for by the company?
10     A. I don't believe so.
11     Q. Did you have paid vacation while you were at
12        Grandview?
13     A. No.
14     Q. What were you paid per mile when you drove?
15     A. 46 cents a mile.
16     Q. Between the time that you left Enterprise --
17        well, I should say between the time you were
18        terminated by Enterprise and today, have
19        you -- have you purchased new cell phone
20        equipment?
21     A. Yes, I have.
22     Q. Yes.  More than one new cell phone in that
23        time period?
```

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    A. Yeah.

2    Q. More than three new cell phones in that time

3       period?

4    A. No.

5    Q. Between one and three?

6    A. No.

7    Q. Do you know how many exactly?

8    A. Probably three.

9    Q. Okay.  Do you have a smartphone today as you

10      sit here?

11   A. Yes.

12   Q. Okay.  When did you get a smartphone?

13   A. When they first came out.

14   Q. Okay.  That would be before you stopped

15      working at Enterprise?

16   A. Yes.

17   Q. All right.  I'm showing you what's marked as

18      Exhibit 19 for today's deposition.  Exhibit 19

19      is -- is also from tax year 2013, but it's

20      just the income tax returns for Horn's

21      Transport LLC.  Do you see the -- the page

22      that's labelled Form 1065 in the upper

23      left-hand corner?  It should be the first page

─────── DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ───────

1        of the exhibit.  In the upper left-hand corner

2        it should say Form 1065.

3    A. Yep, gotcha.

4    Q. So on line 7 of that same page there's a

5        dollar amount in there, it's $34,000 and

6        something.

7    A. Okay.

8    Q. What does that number reflect?  The payments

9        that you were receiving for transporting the

10       RVs?

11   A. Yes.

12   Q. Was there any other income that -- that the

13       Horn's Transport LLC received besides

14       compensation for transporting RVs?

15   A. No.

16   Q. In order to purchase the Dodge Ram truck, did

17       you -- where did you take the money from?  Did

18       you have it in savings?

19   A. I bought it on credit.

20   Q. You bought it on credit.  Did you make any

21       down payment on that truck?

22   A. I did.

23   Q. How much?

---

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

---

1     A.  I'm not sure.

2     Q.  Okay.

3     A.  I know it's under five grand.  About five

4         grand.

5     Q.  Did you pay off the truck loan at this point?

6     A.  Yes.

7     Q.  Was it paid off before you sold the truck or

8         only after you sold the truck?

9     A.  After we sold the truck.

10    Q.  Okay.  And to pay off the truck loan was the

11        sales price of the truck enough to pay off the

12        truck loan?

13    A.  Yes.

14    Q.  May I see that for a moment?  There's a line

15        numbered 16 on the first page of Exhibit 19

16        that's labelled depreciation and it says

17        $43,000 and change.  Is that depreciation on

18        your truck that you bought for the business?

19    A.  You'd have to talk to my tax lady.  I don't

20        know.

21    Q.  You don't know, okay.  All right.  I'm showing

22        you what's been marked for this deposition as

23        Exhibit 20.  These are photocopies of pages

---

**DEPAOLO-CROSBY REPORTING SERVICES, INC.**
170 Franklin Street, Suite 601, Buffalo, New York  14202
716-853-5544

1           from your 2014 income tax returns and at the

2           back of that exhibit, the third last page

3           is -- is a photocopy of some W-2s.  The W-2s

4           are from an entity named Vensure I think is

5           the name of it.  The name I was asking you

6           about earlier, but you didn't recognize.  Do

7           you see where it says Vensure, V-E-N-S-U-R-E,

8           HR?

9    A. Yeah.

10   Q. Do you see the address of Mason, Arizona?

11          Does that ring a bell for you?

12   A. Not at all.

13   Q. No.  What's the dollar amount that's shown on

14          the W-2 for Vensure for line 7 wages?

15   A. Line 7?

16   Q. No, on the W-2 there will be a box.  I guess

17          it will be box 1.

18   A. Box 1 is 2300 -- 2337.92.

19   Q. Okay.  As you sit here today you just don't

20          know what that refers to?

21   A. No.

22   Q. Okay.  All right.  I'm going to pass on to you

23          two exhibits here, 21 and 22.  Just a couple

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1          quick questions about those.

2              For the record, Exhibit 21 is a photocopy

3          of income tax records related to tax year 2015

4          and then Exhibit 22 is some income tax records

5          from tax year 2016.  In the line 7 wages for

6          the 2015 Form 1040 there's an amount of

7          129,254.  Is that the sum total of the wages

8          that you and Cindy were paid by Grandview and

9          ICX in 2015?

10    A.  Correct.

11    Q.  Okay.  In 2016 same question about line 7,

12          there's a number that's 156,196, right?

13    A.  Correct.

14    Q.  But that would reflect just your pay from ICX

15          for 2016, correct?

16    A.  Correct.

17    Q.  You didn't work for anyone else besides ICX in

18          2016?

19    A.  Correct.

20    Q.  Okay.  Do you have any reason to believe that

21          there's any -- any mistakes that were made on

22          your tax returns for any of these years that

23          we've looked at, 2011, '12, '13, '14, '15, or

1       '16?

2    A. No.

3    Q. Were you ever audited on any of those tax

4       returns by either the IRS or some other taxing

5       authority?

6    A. Not those years, no.

7    Q. Were you ever late making payments on taxes

8       that were owed for any of those years?

9    A. No.

10   Q. Did you ever ask for any extension of time to

11      file an income tax return in any of those

12      years?

13   A. No.

14   Q. Do you also pay property taxes -- real

15      property taxes in Lockwood, New York?

16   A. Yes.

17   Q. Okay.  When -- when your retirement savings

18      was -- was taken out of Enterprise after you

19      were terminated, what did you do with the

20      money?

21   A. Put it in the bank.

22   Q. You had an account, I think it was with

23      Fidelity, right, when you were with

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1          Enterprise?

2    A.  Correct.

3    Q.  Okay.  So you put it into a savings account?

4    A.  Yeah, we did.

5    Q.  Were there taxes paid on the money that was

6          taken out of the Fidelity account?

7    A.  We paid the initial taxes, yes.

8    Q.  Okay.  And then you kept the money in a

9          savings account?

10   A.  Yep.

11   Q.  Do you still have it today in a savings

12         account?

13   A.  No.

14   Q.  Where -- what happened to that money?

15   A.  Life went through it.

16   Q.  Did you use some of it to buy the truck?

17   A.  Yeah, that was part of the down payment.

18   Q.  Okay.  Before you said, I think, you couldn't

19         remember exactly how much down payment you put

20         down.  Was it more than 10 percent?

21   A.  No.

22   Q.  Less than 10?

23   A.  I believe it was less than 10.  I'm not quite

1    sure because there were so many numbers thrown
2    around.
3    Q. Right.  Did you start the LLC -- the Horn's
4    Transport LLC by yourself or did you hire a
5    lawyer to do that for you?
6    A. No, we had a lawyer.
7    Q. How much did you pay the lawyer to start the
8    LLC?
9    A. I don't know.
10   Q. Less than $5,000?
11   A. I would assume so.
12   Q. Well, I don't want you to assume.  Do you know
13   if it was less than 5,000?
14   A. Well, yeah, I'm sure it was less than 5,000
15   because I wouldn't pay 5,000 for an LLC.  It's
16   not a hard process.
17   Q. Okay.  What's the name of that lawyer?
18   A. I don't know.
19   Q. Okay.  On your 2016 tax return there's a W-2
20   from ICX.  It should be at the back.  This is
21   the second last page of Exhibit 22, for the
22   record, I'm showing you.
23   A. Okay.

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    Q. A photocopy of a W-2 for yourself and for your

2       wife as well.  I know the copy is real grainy.

3    A. Yeah.

4    Q. But there's a box called box 14.  Do you see

5       box 14 on each of your respective W-2s from

6       ICX?

7    A. Yeah, I can't really make out -- yeah, I think

8       I see 14.

9    Q. It's the big one in the middle.

10   A. Correct, yep.

11   Q. And it says SEC 125 in that box?

12   A. Yep.

13   Q. And there's also a dollar amount, $1,617.50?

14   A. Correct.

15   Q. Is that money that's being put into a

16      retirement savings account?

17   A. Not that I know of.

18   Q. Do you know what that reflects, Section 125?

19   A. I don't know what that is.

20   Q. Okay.  Are you okay?  Do you need a break?

21   A. No, I'm good.

22            MR. HOUSH:  It's awfully hot.  I don't

23      know if there's anything you can do about

1          that.

2                MR. BORON:  Off the record.

3

4          (Discussion held off the record)

5

6      BY MR. BORON:

7    Q. All right.  Now I want to turn your attention

8       back if you would.  We're going to go way back

9       to one of these first exhibits which is your

10      complaint in this action.

11   A. Okay.

12   Q. And I need you to go to page 3 of the

13      complaint.

14                MS. LINDSTROM:  Maybe we should open the

15      door?

16                MR. BORON:  Well --

17                MR. HOUSH:  If it's not loud out there

18      that's fine with me.

19                MR. BORON:  If it's all right with you

20      guys.  Does it matter to you?  There's people

21      that come by and some work for our firm and

22      some people don't work for our firm, but if

23      you don't mind other people possibly

————— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 —————

1      overhearing.

2          MR. HOUSH:  No, this is all -- I don't

3      think there's anything that's going to --

4      BY MR. BORON:

5   Q. Okay.  Did you find page 3 of the complaint

6      and then paragraph 12 on that page?

7   A. Okay.

8   Q. Okay.  So your complaint alleges that after

9      your February 24, 2012 vehicle accident you

10     took anti-inflammatory and other medication.

11     Do you see that allegation?

12  A. Correct.

13  Q. Okay.  So is the anti-inflammatory medication

14     that you took the hydrocodone?

15  A. Prednisone.

16  Q. Prednisone?

17  A. Yeah, that's basically a steroid and I'm not

18     sure if he had me on Relafen or not.

19  Q. Did you take Relafen after the accident?

20  A. I don't know if I took it after the accident.

21     I know I had it at one time, but I don't know

22     if I took it after.

23  Q. And when you say "he," you're talking about

—— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ——

1        Dr. Choi?

2    A. Yeah.

3    Q. Do you know how to spell Relafen?

4    A. It was actually called something else, but

5        that was the actual name for it was Relafen.

6        He just gave me the generic so it was called

7        something else.

8    Q. Okay.  In any event, that allegation that we

9        were just looking at together in your

10       complaint of paragraph 12 says that you not

11       only took anti-inflammatory medication, but

12       you took other medication?

13   A. Right.

14   Q. So what was the other medication you were

15       taking?

16   A. The hydrocodone.

17   Q. Okay.  Is there any other medication besides

18       the prednisone or the hydrocodone that you

19       were taking?

20   A. No.

21   Q. At any point in time after the wreck right up

22       until the positive drug test?

23   A. Just Motrin.

---

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

---

1    Q. You took Motrin as well?

2    A. Yeah, I took Motrin.

3    Q. Okay.  What about Tylenol?

4    A. Not so much.

5    Q. Did you take some Tylenol after the wreck?

6    A. I did.

7    Q. You took some Motrin as well?

8    A. Yeah, because that's what the Workers' Comp

9       doctor told me to do was take Motrin.

10   Q. Okay.  Did you take any other over-the-counter

11      pain relievers of that type?

12   A. No.

13   Q. Were you ever prescribed Percocet after the

14      wreck?

15   A. I don't believe so, no.

16   Q. You testified earlier that there came a point

17      in time when you stopped taking the

18      hydrocodone on a regular basis.  You would

19      just take it as needed --

20   A. Correct.

21   Q. -- is that correct?

22   A. Correct.

23   Q. Okay.  So did you check with Dr. Choi whether

---

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1          it was okay to just take it on an as-needed

2          basis going forward?

3     A.  I did.

4     Q.  All right.  And what did he tell you?

5     A.  He told me I should probably take it on a

6          regular basis.

7     Q.  Did he forbid you from using it only on an

8          as-needed basis?

9     A.  No.

10    Q.  Okay.  Did you talk with him about whether

11         there would be possible ramifications for

12         random drug testing if you started to take a

13         medication in intervals that he hadn't

14         prescribed?

15    A.  We had discussed about taking the hydrocodone

16         at work, yeah, and he said that I would be

17         fine.

18    Q.  Were you taking the hydrocodone and using the

19         hydrocodone while you were driving your truck?

20    A.  No.

21              MR. MAZZOLA:  Can you read back the last

22         question and answer?

23              MR. BORON:  Last or two questions ago?

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1        MR. MAZZOLA:  The one -- go back two.

2

3        (Record read back by reporter)

4

5        MR. MAZZOLA:  Thank you.

6    BY MR. BORON:

7    Q. Did you make Dr. Choi aware that -- that you

8       were having continuing pain in your right

9       shoulder?

10   A. Yes, I did.

11   Q. Okay.  Is that why you saw him more than once

12      that Summer of 2012?

13   A. Yeah.

14   Q. Did he tell you -- did he say to you let me

15      know if the pain gets worse?

16   A. I don't recall.

17   Q. Did he ever refer you to a surgeon?

18   A. No.

19   Q. Did he discuss with you what the next step in

20      treatment could be if -- if the pain pills

21      that he was prescribing for you weren't doing

22      the job?

23   A. My understanding is that it was basically

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1          inflammation that would go away eventually.

2     Q. Okay.  Did he ever tell you to ice your

3          shoulder?

4     A. Yes.

5     Q. Did you ice your shoulder?

6     A. I did, but it didn't do any good so it wasn't

7          something I did regularly.

8     Q. Okay.  When was the last time you saw Dr. Choi

9          before you tested positive?

10    A. I saw him last week.

11    Q. No, the last time before you tested positive?

12    A. Oh, the last time before I tested positive.

13         Oh, probably about a month, I believe.

14    Q. Did he ever -- did he ever refuse to prescribe

15         a medication that you were asking for?

16    A. I never asked him for any medication, that's

17         what he gave me.

18    Q. Okay.  After you tested positive did you

19         contact Dr. Choi to let him know that that had

20         occurred?

21    A. Yes, I did.  I went and saw him.

22    Q. How soon did you contact him and tell him you

23         tested positive?

---

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    A. As soon as I got home.  I actually had him do

2       another drug test.

3    Q. You had him do another drug test?

4    A. Yeah.

5    Q. In his office?

6    A. Yeah.

7    Q. Okay.  Is that the urine sample that was sent

8       to MEDTOX?

9    A. I don't know.

10   Q. You don't know.  What did Dr. Choi tell you

11      the result of the drug test that he did?

12   A. He told me it was unnecessary for me to do

13      that and my line of thinking was wrong, but he

14      did it anyway.

15   Q. Okay.  Did he tell you what the result of that

16      test was?

17   A. No.  I know it was negative.

18   Q. You said you know it was negative?

19   A. Well, if it was positive he would have told

20      me, I'm sure.

21   Q. Did he give you some written report about

22      the -- that drug test?

23   A. Just my normal, you know, exit papers.

---

1    Q. And was it a urine test only?

2    A. Yeah.

3    Q. So because Dr. Choi never said to you that the

4       test he administered to you was positive you

5       just assumed it was negative?

6    A. I knew it was negative because I didn't

7       have --

8    Q. How did you know it was negative?

9    A. Because I just had a drug test four days

10      before that and I didn't have THC in my

11      system.

12   Q. Which drug test was that?

13   A. The one that -- in Texas.

14   Q. The one that you sent --

15   A. The one that I went down --

16   Q. Through the mail to MEDTOX?

17   A. No, the drug test that we did when we got

18      notified that we had a dirty random we went

19      down and drug tested at our own expense, me

20      and Cindy, and then we drove home.

21   Q. Okay.  Let's start with -- let's start with

22      the dirty test that -- you provided urine in

23      Pennsylvania for that test, correct?

─── DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ───

1    A. Correct.

2    Q. And that is on October 9th, 2012?

3    A. I believe so, yes.

4    Q. And when you say you and Cindy drove down, did

5       you start driving on October 9th down to

6       Texas?

7    A. We did not get notified until, I think, two

8       days later that we did a dirty random and we

9       were in Texas at the time.

10   Q. Okay.  So you supplied the urine for the test

11      in Pennsylvania?

12   A. Pennsylvania.

13   Q. On the 9th?

14   A. Correct.

15   Q. And then you -- were you given a new load --

16   A. We were given a new load and we were on our

17      way -- we actually went down -- I believe we

18      picked up a load from Pittsburgh to Texas and

19      then we were going from Lake Charles to

20      Portland, Oregon.

21   Q. On October 11th, two days after you had

22      supplied the urine for a drug test, you're

23      told through a phone call that it was a dirty

---

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1           sample?

2      A.   Correct, that I had THC in my system.   Unless

3           I was on Marinol and had a prescription for it

4           that basically I'd have to go do the SAT

5           program.

6      Q.   What's Marinol?

7      A.   I guess synthetic marijuana.

8      Q.   Did you ever take Marinol in your life?

9      A.   Never.

10     Q.   Does Marinol go by other names too?

11     A.   I wouldn't know.

12     Q.   Okay.   So on October 11th you get the phone

13          call and that same day did you supply another

14          urine sample?

15     A.   When I got the call that we had done a dirty

16          random, talked to the company the very next

17          morning because it was 6 o'clock at night,

18          very next morning me and Cindy went down to

19          the nearest drug test facility and did drug

20          tests.

21     Q.   How much did you pay to get those drug tests

22          done?

23     A.   I don't remember.

---

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1     Q. Was it more than $100 each?

2     A. Yeah, I believe so.

3     Q. Was it more than $500 each?

4     A. No.

5     Q. How do you know that test came back negative?

6     A. Because I got the results.

7     Q. So that's why you say Dr. Choi's test was the

8        third one that you had endured in about a

9        week's time?

10    A. Yeah.

11    Q. Two of them came back negative, Dr. Choi's

12       test came back negative and the one where you

13       supplied the urine in Texas came back

14       negative?

15    A. Yeah, I did two tests there so it was actually

16       three.

17    Q. You did two tests in Texas?

18    A. I did an instant test and then I did a DOT

19       test.

20    Q. Okay.  The instant test --

21    A. Yes.

22    Q. -- in Texas was just like going to the

23       drugstore and buying something and --

—— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ——

```
 1    A.  I think it's a little more sophisticated than
 2        that, but yeah, basically.
 3    Q.  You read your own test results?
 4    A.  No, they administered the test.
 5    Q.  Oh, okay.  So two separate urine samples?
 6    A.  Correct.
 7    Q.  Did Cindy go through two sets of urine tests
 8        in Texas?
 9    A.  No, she just did a DOT.
10    Q.  She just did a DOT.  What was the result of
11        Cindy's DOT test?
12    A.  Negative.
13    Q.  Were the results of your tests for urine you
14        supplied in Texas sent to Enterprise?
15    A.  Yes, we did.  I sent them.
16    Q.  You sent them?
17    A.  Yeah.
18    Q.  Okay.  As soon as you got them you passed them
19        on to Enterprise?
20    A.  Yes.
21    Q.  What was the reaction of Enterprise?
22    A.  Well, my terminal manager, I faxed it to him
23        and he said he would pass it along to Nolan,
```

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

```
 1        but they basically said a dirty random is a
 2        dirty random.
 3   Q. Do you know if it got passed on to random --
 4        to Nolan, your second test?
 5   A. I was told.
 6   Q. Okay.  And John Frezzo's the one that told you
 7        that?
 8   A. Yeah.
 9
10        The following was marked for identification:
11        Exhibit 23        Photocopy of High Times
                            Medical Marijuana Article
12
13        BY MR. BORON:
14   Q. I'm showing you, Mr. Horn, what's been marked
15        as Exhibit 23 for today's deposition.  For the
16        record, it's two pages stapled together.  The
17        front page is a photocopy of a cover to a
18        magazine, second page is an article from a
19        magazine.  Would you agree with that?
20   A. Yes.
21   Q. And the magazine we're talking about is High
22        Times?
23   A. Yes.
```

1    Q. Okay.  Were you a subscriber at any point in

2       time to High Times magazine?

3    A. Nope.

4    Q. Did you ever have this particular issue, which

5       is the Fall 2012 issue of High Times?

6    A. I purchased that, yes.

7    Q. You purchased it?

8    A. Mm-hmm.

9    Q. Where did you purchase it?

10   A. At a bookstore, Barnes & Noble in Texas.

11   Q. In Texas.  When did you purchase it?

12   A. I'm not sure.

13   Q. Purchased it before your dirty random?

14   A. No, before.

15   Q. Does a log test show that you were in Texas

16      before your dirty random?

17   A. Oh, I'm sure.  I don't personally have one,

18      no.

19   Q. Where was the Barnes & Noble in Texas?

20   A. In Freeport, Texas there's a bookstore, it

21      might not have been Barnes & Noble.

22   Q. And it wasn't Cindy that bought it, it was you

23      that bought the magazine?

--- DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ---

1    A. Well, we were together, so.

2    Q. Oh, you were together, okay.  So it was a

3       joint decision to purchase the magazine?

4    A. Yeah.

5    Q. Do you have a receipt for purchasing the

6       magazine?

7    A. Nope.

8    Q. Did you purchase it with cash or a credit

9       card?

10   A. I don't remember.

11          MR. BORON:  Frank, they're going to

12      produce their credit card statements, right?

13      We asked for the credit card statements.

14          MR. HOUSH:  I understand.  Yeah, there's

15      no reason to believe that that's not going to

16      happen.

17          MR. BORON:  Okay.  I'm sorry to do this,

18      but I need to reserve the right to redepose

19      them on their credit card statements when I

20      get them.

21          MR. HOUSH:  I understand.

22      BY MR. BORON:

23   Q. Yep.  Okay.  Was this the first time you had

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1        ever purchased a High Times magazine?

2     A. Yep.

3     Q. The very first time in your life?

4     A. Yep.

5     Q. Did you even know such a magazine existed

6        before you purchased it?

7     A. I heard about it.

8     Q. Heard about it by who?

9     A. Not any particular person, I just heard about

10       it.

11    Q. Somebody recommend that you buy this magazine?

12    A. No.

13    Q. What led you to buy it?

14    A. The ad inside there for Dixie X.

15    Q. You're referring to this ad that's on page 42?

16    A. Correct.

17    Q. That's what made you decide to buy the

18       magazine?

19    A. Yeah.

20    Q. Had you read through the first 41 pages and

21       then you got to page 42 and that made you buy

22       the magazine?

23    A. We flipped through it, yeah.

1    Q. Okay.  Why is it that you were flipping
2       through the magazine?
3    A. It was on a table actually and Cindy's mom has
4       cancer so we thought that, you know, we'd see
5       if there was anything in there because of the
6       marijuana/cancer thing.
7    Q. Did this headline on the cover that says
8       Medical Marijuana, is that what caught your
9       attention?
10   A. Correct.
11   Q. In terms of wanting to look at what's in the
12      magazine?
13   A. Correct.
14   Q. Cindy's mom had had cancer for how long?
15   A. She had just been diagnosed.
16   Q. She had just been diagnosed?
17   A. Yep.
18   Q. What state was Cindy's mom living in at that
19      time?
20   A. California.
21   Q. Had Cindy's mom suggested that -- that maybe
22      medical marijuana might help her condition?
23   A. No.

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    Q. At that point in time was Cindy's mom going

2       through treatment for her cancer?

3    A. Not at that particular time, no.

4    Q. No.  And what kind of cancer was it?

5    A. Breast cancer.

6    Q. When did Cindy's mom get diagnosed with breast

7       cancer?

8    A. I don't remember.

9    Q. Was it in 2012?

10   A. Yes.

11   Q. When did Cindy's mom tell you that she had

12      been diagnosed with cancer?

13   A. It wasn't long before this, before we bought

14      that so I couldn't tell you a specific date.

15   Q. By "it wasn't long," do you mean less than a

16      month?

17   A. Yeah, about a month.

18   Q. And you bought this in October of 2012?

19   A. Bought this?

20   Q. Yeah.

21   A. I'm not sure when I bought it exactly.

22   Q. You have no record of when you bought it?

23   A. No.

---DOUGLAS J. HORN - BY MR. BORON - 05/08/17---

1    Q. And no memory of when you bought it?

2    A. Not really, no.

3    Q. So you could have bought it after the dirty

4       random?

5    A. No, because I wasn't in Texas after the dirty

6       random.

7    Q. I thought you were there giving urine?

8    A. Well, I gave urine and then went straight

9       home.  That's a higher place in Texas.  Texas

10      is a pretty big state.

11   Q. What city were you in when you gave the urine?

12   A. I can't remember the name of it.  It's almost

13      like Dumont.

14           MR. MAZZOLA:  Dumas, it's on the thing.

15   Q. How far is that from Freeport?

16   A. Quite a ways.

17   Q. Is it on the way back to New York State?

18   A. Nope.

19   Q. To Freeport?

20   A. No.

21   Q. Okay.  So at the time that you purchased the

22      magazine your concern was to find out whether

23      the magazine had information about medical

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1        marijuana that might treat her -- Cindy's

2        mom's pain that she was dealing with for

3        cancer?

4    A. Correct.

5    Q. Did you take the magazine home with you or

6        leave it at the bookstore?

7    A. We purchased it.

8    Q. Did you retain the magazine?

9    A. That's -- yeah.

10   Q. Do you still have the magazine today?

11   A. Yeah.

12   Q. You have the original magazine?

13   A. Yes.

14   Q. Did you bring it with you?

15   A. I think it's in -- yeah.

16   Q. Can we see it?

17   A. Sure.

18        MR. HOUSH:  So the record's clear, my

19        client is handing Mr. Boron the original of

20        the exhibit.

21        MR. MAZZOLA:  He said there were two.

22        MR. BORON:  Are there two copies of it

23        in there?

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1          MS. HORN:  No, I have a different one in
2     here.  I don't think so.
3          MR. BORON:  Okay.  That's a different
4     addition?
5          MR. MAZZOLA:  Yeah.
6          MR. HOUSH:  They're going to take
7     everything that you -- just put that back in
8     your thing.
9          Just so the record is clear, my client had
10    a separate and unrelated copy of High Times
11    that opposing counsel is now taking.
12          MR. BORON:  I think this would be a
13    super time for a break.
14          MR. HOUSH:  Great.
15
16                (Recess taken)
17
18    The following was marked for identification:
19    Exhibit 24        High Times Medical Marijuana
20                      Magazine
21    BY MR. BORON:
22  Q. We're back on the record after a break.
23    Mr. Horn, you continue to be under oath.  I'm

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

```
1          showing you what's been marked as Exhibit 24
2          for this deposition.  Would you agree with me
3          for the record this is a -- this is the actual
4          High Times magazine from which photocopies
5          that we were looking at on Exhibit 23 were
6          taken?
7     A. Correct.
8     Q. Okay.  And for the record, this is the same
9          High Times magazine that you were testifying
10         earlier just before the break about having
11         purchased at a bookstore in Texas?
12    A. Correct.
13    Q. All right.  You and your wife Cindy were
14         together at the time the magazine was
15         purchased, correct?
16    A. Correct.
17    Q. All right.  Did you do some reading of the
18         magazine inside the bookstore or did you just
19         purchase it and bring it out of the bookstore
20         and read it?
21    A. We were inside the bookstore.
22    Q. How long were you in the bookstore?
23    A. For a little while.
```

—— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ——

1      Q. Were you reading other magazines or just

2         focussed on this one?

3      A. We were reading other books and stuff.

4      Q. Okay.  If you did purchase it with a credit

5         card -- I know you said you don't remember

6         whether you did or didn't.  What kind of

7         credit cards did you have in 2012?  Visa?

8         MasterCard?  Do you remember what credit

9         cards?

10     A. It probably would have been a Visa.

11     Q. Visa?

12     A. Yeah.

13     Q. Discover?  Visa?

14     A. It wouldn't have been Discover.  I don't like

15        using Discover.

16     Q. Okay.  Did you have more than one credit card

17        in your name in 2012?

18     A. Yeah, I had several.

19     Q. You had several?

20     A. Yeah, I had several.

21     Q. Were they all Visas?

22     A. No.

23     Q. Some MasterCard?

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

```
 1      A. Correct.

 2      Q. You had a Discover card as well?

 3      A. Correct.

 4      Q. Okay.  That's all in 2012, right?  Do you have

 5         your wallet with you?  Do you have the same

 6         cards today?

 7      A. No, I've kind of changed cards.  I use a

 8         MasterCard right now strictly because it gives

 9         me pronounced -- for tax reasons.

10      Q. Okay.  Did you pay -- back in 2012 were you in

11         the habit of paying with a debit card from a

12         bank?

13      A. I believe so.

14      Q. Yeah.  Which bank is that?

15      A. The bank I bank with.

16      Q. Which bank were you banking with in 2012?

17      A. Visions.

18      Q. Visions Bank?

19      A. Correct.

20      Q. Same today?

21      A. Yes.

22      Q. There's been no change?

23      A. No.
```

1    Q. Do you have bank accounts at any other banks

2       besides Visions in 2012?

3    A. No.

4    Q. Just for the record, there's just a couple

5       things I want to make sure we do get on the

6       record.  In the bottom right-hand corner the

7       cover of Exhibit 24 it says Fall 2012,

8       correct?

9    A. Correct.

10    Q. With a number 11 --

11    A. Correct.

12    Q. -- after that.  And then there's a price

13       USA 5.99?

14    A. Correct.

15    Q. Is that what you paid for the magazine, 5.99,

16       to the best of your knowledge?

17    A. I don't know.

18    Q. You don't know, okay.  What -- what articles

19       did you review in that magazine?

20    A. I just kind of skimmed through it.

21    Q. Were you just looking at the pictures or were

22       you reading articles?

23    A. I was just looking at articles and what the

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1          magazine was about.

2     Q. Had anybody recommended to you that you buy

3          this magazine?

4     A. No.

5     Q. Did you do all the skimming that you were

6          doing inside the bookstore?

7     A. Yes.

8     Q. Okay.  And then once you purchased it and left

9          the bookstore was that -- was that the last

10         time you had looked at the magazine?

11    A. Pretty much.

12    Q. Did you show that magazine to anyone besides

13         lawyers?

14    A. No.

15    Q. Share anything in the magazine with Cindy's

16         mom?

17    A. No.

18    Q. Talk to Cindy's mom about anything you saw in

19         the magazine?

20    A. No.

21    Q. How about your daughters, did you share

22         anything about the information in the magazine

23         with your daughters?

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    A. No.

2    Q. Did you give it to them to read.  Did they

3       have any interest in reading it?

4    A. Nope.

5    Q. To your knowledge, has anybody besides you and

6       Cindy read any of the articles inside this

7       magazine?

8    A. Just me and her.

9    Q. Okay.  Take a look with me if you would at

10      page 39 of Exhibit 24.  It's Exhibit 24,

11      right?  And then the page before is 38, right;

12      would you agree?

13   A. Yeah.

14   Q. And page 38 is the start of an article

15      entitled High & Healthy by Elise McDonough?

16   A. Okay, correct.

17   Q. You would agree with that?

18   A. Yes.

19   Q. And then there's an article she wrote?

20   A. Correct.

21   Q. Okay.  Did you read that article?

22   A. No.

23   Q. You didn't read her article?

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1      A. No.

2      Q. Which articles in the magazine did you read?

3      A. Like I said, I skimmed through it.

4      Q. Do you have a recollection of reading any

5         article?

6      A. Just the -- this one.

7      Q. Does this say High & Healthy at the top of

8         page 42?

9      A. It does.

10     Q. Does it say High & Healthy at the top of the

11        page for the Elise McDonough article?

12     A. Correct.

13     Q. Does it say High & Healthy at the top of page

14        40 which is a portion of Elise McDonough's

15        article?

16     A. Correct.

17     Q. Were you interested in any of the recipes that

18        are listed in her article?

19     A. No.

20     Q. Did you review any of the recipes that are

21        listed in her article?

22     A. No.

23     Q. Have you or Cindy ever prepared the food

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1      according to those recipes that are listed in

2      that article?

3  A. No.

4  Q. Did you buy this magazine to review ads for

5      masking products for dirty tests?

6  A. Nope.

7  Q. You guys didn't bring the bottle, right?

8  A. Nope.

9  Q. Okay.

10

11     The following was marked for identification:

12     Exhibit 25     Three-pages of colored
                           photocopies of photographs

13

14  **BY MR. BORON:**

15  Q. I noticed when you brought this magazine out

16      on to the table it came out of a box that's

17      over on your side of the table.  What else is

18      in the box?

19  A. Bad copies of e-mails that you guys asked for.

20  Q. Okay.  Okay.  Copies of documents and records

21      that you already turned over to us?

22  A. Correct.

23  Q. Okay.  But there was a second magazine in

—DOUGLAS J. HORN - BY MR. BORON - 05/08/17—

1        there as well, correct?

2    A. Yeah.

3    Q. Are there --

4    A. Well, there's one other one.  It's on cameras.

5    Q. Okay.

6          MR. MAZZOLA:  What was that answer?

7    Q. There's another magazine on cameras in their

8        box.  Why did you bring the three magazines?

9    A. It's been in that box for quite a few years.

10       That's just the way it was.

11   Q. It just randomly happened that all three of

12       those magazines were in that box?

13         MR. HOUSH:  Object to form.

14   A. No, that's where I put them.

15   Q. Okay.  Why did you put them in that box?

16   A. For safekeeping.

17   Q. Why was there safekeeping involved in the

18       camera magazine?

19   A. That just got thrown in there.

20   Q. How about this Best of High Times magazine?

21   A. That was in there probably for a reason that I

22       don't remember.

23   Q. Do you have any other boxes at home with

—— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ——

1          information related to this case?  Records?

2          Documents?

3     A.  We have some scattered around, but you've

4          basically gotten everything.  I have a lot of

5          misprinted things that didn't print out right.

6     Q.  Do you have other e-mails that were exchanged

7          between yourself and Mr. Benjamin prior to the

8          lawsuit being commenced?

9     A.  No.

10    Q.  Did you exchange e-mails with Mr. Benjamin

11         before the lawsuit was commenced?

12    A.  Nope.

13    Q.  Did you meet him face-to-face before the

14         lawsuit was commenced?

15    A.  Correct.

16    Q.  Was that in his office?

17    A.  Yes.

18    Q.  In New York State?

19    A.  Yes.

20    Q.  Just one meeting with him?

21    A.  Yes.

22         **MR. HOUSH:**  Object to form.

23         **MR. BORON:**  Okay.

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1          MR. HOUSH:  We're getting perilously

2     close to the privilege issue.

3          MR. BORON:  What kind of privilege?

4          MR. HOUSH:  Attorney-client privilege.

5          MR. BORON:  I think that's been waived.

6          MR. HOUSH:  How so?

7          MR. BORON:  There's been production of

8     e-mails between Mr. Benjamin and Mr. Horn.

9          MR. HOUSH:  Well, that's the nature of

10     my objection.  Whether there's a waiver or not

11     if you're going to start asking what he

12     discussed with his attorney we're going to

13     have a problem.

14     BY MR. BORON:

15     Q. Haven't got there yet, Frank.  Okay.  Did you

16        show this magazine to Mr. Benjamin?

17     A. Yes, I did.

18     Q. Have you shown it to anyone else besides an

19        attorney?

20     A. Nope.

21     Q. No one in your family?

22     A. Nope.

23     Q. Show it to Dr. Choi?

---

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1     A. No.

2     Q. Did you show it to the MDO?

3     A. What's the MDO?

4     Q. Dr. Ping.  Oh, MRO?

5     A. No, I don't believe so.

6     Q. Mm-hmm.  Did you send copies of the magazine

7        to any testing lab?

8     A. Not copies of the magazine, no.

9     Q. Copies of pages of the magazine?

10    A. No.

11    Q. No.

12          MR. MAZZOLA:  Did you mark that magazine

13       as an exhibit?

14          MR. BORON:  This one's marked.

15          MR. MAZZOLA:  You did, okay.

16    BY MR. BORON:

17    Q. It's Exhibit 24.  I am showing you what's

18       marked as Exhibit 25, Mr. Horn.  For the

19       record, Exhibit 25 consists of three

20       photographs stapled together.  They appear to

21       be photographs of a product of Dixie X.  Would

22       you agree that there's three photographs

23       stapled together that make up Exhibit 25?

---

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

 1      A. Correct.

 2      Q. Who took these photographs?

 3      A. I did.

 4      Q. When did you take them?

 5      A. Last week.

 6      Q. Where was the product when you photographed

 7         it?

 8      A. At home.

 9      Q. On the kitchen table?

10      A. Pretty much.

11      Q. Well, was it a kitchen table?

12      A. Countertop.

13      Q. Countertop, okay.  Would you look with me at

14         the second page.  Over here on this side of

15         the picture, the right side of the picture of

16         the second page it looks like there was at

17         some point some kind of a -- something was

18         affixed or pasted to it?

19      A. Correct.

20      Q. What was that?

21      A. That was a batch number.

22      Q. A batch number?

23      A. Yes.

—— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ——

1    Q. And do you still have the batch number?

2    A. I do not.

3    Q. What happened to it?

4    A. It got lost in the truck.

5    Q. Which truck?

6    A. The semi before when I got terminated because

7       I called Dixie X and they wanted the badge

8       number and it was like two pieces of paper on

9       here, gave them the batch number and then we

10      misplaced the label.

11   Q. Did that happen the day that you found out

12      that you had a dirty random sample?

13   A. Correct.

14   Q. How long has that batch label been lost?

15      Since that very day?

16   A. Since that day.

17   Q. You didn't purposely throw it out, did you?

18   A. No.

19   Q. Did you take a picture of it before it was

20      lost?

21   A. No, I didn't.

22   Q. Did you write down any information that was on

23      the batch label before you --

─DOUGLAS J. HORN - BY MR. BORON - 05/08/17─

1    A. I did and misplaced the paper.

2    Q. Well, while we're looking at this second page,

3       might as well go through a couple questions

4       here.  You see where there's a heading on the

5       label, the second page of the exhibit that

6       says dosage.

7    A. Correct.

8    Q. It says place below the tongue for fast,

9       effective relief.  Do you see that?

10   A. Yep.

11   Q. Is that the way you administered the dosage to

12      yourself?

13   A. Correct.

14   Q. And there's no direction on how much dosage to

15      use on any particular usage?

16   A. Correct.

17   Q. So how did you determine how much to use?

18   A. By the eye dropper.

19   Q. Okay.  So the top unscrewed and there was an

20      eye dropper attached to it?

21   A. Yes.

22   Q. Did you fill the eye dropper to the top?

23   A. Yes.

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1   Q. And then you placed what was the entirety of

2      the eye dropper under your tongue?

3   A. Correct.

4   Q. What was the first day you did that?

5   A. I couldn't tell you.  About 10 days before I

6      got fired, maybe 12.

7   Q. Had the first day that you took a dose, was

8      that the same day that it arrived in the mail?

9   A. No.

10  Q. How long was it before you took a dose?

11  A. It was at the house for at least a couple of

12     weeks that I know of.

13  Q. Was the product ordered by Cindy or you?

14  A. I believe it was by Cindy.

15  Q. And had Cindy already used the product before

16     you began to use it?

17  A. No, Cindy didn't use it.

18  Q. Cindy never used the product?

19  A. She tasted it and tried it.

20  Q. Was she the first one that tasted it and tried

21     it?

22  A. No.

23  Q. When you say it was at the house for a couple

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1          of weeks, are you -- are you just guessing at

2          that or do you have a definite memory it was

3          at the house for a couple of weeks?

4     A.  It was at the house for a couple of weeks.  I

5          had my daughter bring it to me because I

6          didn't have the hours to run and so she met me

7          in Pennsylvania.

8     Q.  Which daughter brought it to you?

9     A.  Elizabeth.

10    Q.  That was the one that was living with you at

11         the time?

12    A.  Correct.

13    Q.  And did she bring you to the terminal in

14         Pennsylvania?

15    A.  No, she brought it to a truck stop in

16         Pennsylvania.

17    Q.  Had it been opened prior to that point in time

18         when you got it at the truck stop in

19         Pennsylvania?

20    A.  No.

21    Q.  Are you sure about that?

22    A.  Positive.

23    Q.  And why are you sure about that?

————— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 —————

 1      A. Because it's my mail and it was a package.

 2      Q. But was there tamper -- tampered proof cap on

 3         the bottle?

 4      A. It was sealed.

 5      Q. It was sealed?

 6      A. Correct.

 7      Q. So the first time you unscrewed it did you

 8         find a cover that had to be torn off?

 9      A. Yeah, there was a seal on the box, it was

10         sealed and this product had a plastic

11         cellophane on it.

12      Q. So when your daughter brought it to you in

13         Pennsylvania, was it still in the box it had

14         been mailed in?

15      A. Correct.

16      Q. That box had never been opened?

17      A. That's correct.

18      Q. Where was the box stored?

19      A. I don't know.  More than likely on the

20         countertop.

21      Q. When the box arrived in the mail, were you --

22         two of you out on the road?

23      A. Correct.

—— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ——

1    Q. So was Elizabeth the only person living at the

2       house at that point in time?

3    A. Correct.

4    Q. Did Elizabeth have any friends over during the

5       time that you were on the road before you had

6       taken a dose?

7    A. No.

8    Q. How do you know that?

9    A. Because Elizabeth doesn't have friends.  She's

10      a hermit.

11   Q. Okay.  Did Elizabeth take a dosage of the

12      product?

13   A. No.

14   Q. Was there ever any intention of Elizabeth

15      trying the product?

16   A. No.

17   Q. Why not?

18   A. What for?

19   Q. Well, what was the product purchased for?

20   A. For my inflammation.

21   Q. Did you ask Cindy to purchase it for you?

22   A. Yeah, me and Cindy saw that and agreed that we

23      would try it.

—— DEPAOLO-CROSBY REPORTING SERVICES, INC. ——

170 Franklin Street, Suite 601, Buffalo, New York  14202

716-853-5544

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    Q. Okay.  So were you actually sitting in your
2       truck the first time you took a dose of this?
3    A. Yeah.
4    Q. And after you took the dose did you have any
5       reaction to it?
6    A. No.
7    Q. Did it change how your body felt in any way?
8    A. Not that I know of, no.
9    Q. Was that the time that Cindy tried the product
10      too at that point in time?
11   A. I don't remember when she tried it.
12   Q. Okay.  Where were you when you took the
13      product?  You were in your truck in
14      Pennsylvania?
15   A. More than likely, yeah.
16   Q. On your way where?
17   A. I don't remember.
18   Q. You weren't on your way home though?
19   A. No.
20   Q. You were going to do a delivery?
21   A. Correct.
22   Q. How did Elizabeth get out to where you were?
23      Did she drive herself?

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

```
1      A. Yes.

2      Q. Did she own her own car at the time?

3      A. Yes.

4      Q. Did she bring you anything besides the

5         product?

6      A. No.

7      Q. Did she bring you any food to eat?

8      A. No.

9      Q. Any Dixie edible products?

10     A. No.

11     Q. Do you know what a Dixie edible product is?

12     A. I do.

13     Q. Have you ever eaten any of the Dixie edible

14        products?

15     A. No.

16     Q. Have you ever tasted any of the Dixie edible

17        products?

18     A. No.

19     Q. Did you read the information on the label

20        before you took it?

21     A. I did.

22     Q. All of it?

23     A. Yeah.
```

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    Q. That includes the information on the label
2       that shows on the third page picture of
3       Exhibit 24?
4    A. I read that, yeah.
5    Q. Is there a Bates Number on that?
6           **MR. BORON:**  No.
7           **MR. MAZZOLA:**  No.
8    Q. Sticking with that second page of the exhibit,
9       the page that has a picture of the label that
10      has the heading Dosage, do you see where it
11      says this product was tested via HPLC?
12   A. Correct.
13   Q. Do you know what HPLC stands for?
14   A. I have no idea.
15   Q. You took a product that you had no idea what
16      the tests were that were done on it?
17          **MR. HOUSH:**  Object to form.
18   A. Yeah.
19   Q. You didn't understand anything about the test
20      that was done?
21          **MR. HOUSH:**  Object to form.
22   A. I don't know what HPLC is, no.
23   Q. And you didn't know anything about the testing

—— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ——

1          of this product before you took it, correct?

2               MR. HOUSH:   Object to form.

3     A. That it had zero percent THC.

4     Q. Did you review any testing results of the

5          product before you took it?

6     A. There weren't any offered.

7     Q. Do you see where the label continues on and

8          forms the consumer that it's manufactured

9          without any regulatory oversight for health

10         safety or ethicacy?

11    A. Correct.

12    Q. All right.  And did that concern you in any

13         way knowing that you were subject to random

14         drug tests?

15    A. No, I took that as a -- like what vitamins say

16         that the FDA doesn't -- whatever vitamins say

17         on it.  They have a statement on there.

18    Q. On the picture of the third page of

19         Exhibit 24, a picture of another section of

20         the labelling with reference to cannabinoids?

21    A. Correct.

22    Q. And CBD?

23    A. Correct.

1    Q. Does cannabinoids indicate to you that this

2        product is coming from -- from a cannabis

3        plant from?

4    A. A medicinal plant like it says.

5    Q. What does the CBD acronym mean to you?

6    A. Cannabinoid.

7    Q. Okay.  Did you know something about

8        cannabinoids at the point in time you were

9        taking the product?

10   A. I read an article --

11   Q. At the time you were taking the product?

12   A. Before I took the product.  That it helped the

13       DNA in your cells.

14   Q. Which article is that?

15   A. I don't know if I produced that or not.

16   Q. I don't remember that being produced.

17   A. Okay.  I had problems with my printer because

18       I was going to print it before I got here and

19       that was the only paper I did not print.

20   Q. Is it an article from a magazine?

21   A. It was online.

22   Q. Is that an article from High Times magazine

23       online?

1    A. No, I don't think so.

2    Q. When did you read that article?

3    A. Before I bought the product.

4    Q. Before you bought it?

5    A. Yep.

6    Q. Did you print off the article?

7    A. I did and I thought I submitted that to

8       Jeffrey, but I guess not.

9    Q. Was there a print date on when you printed the

10      article?

11   A. I'm sure there was.

12   Q. Is it before or after your dirty random

13      sample?

14   A. It was probably after because I didn't get to

15      print it beforehand.

16   Q. Do you have the ability to print it tonight?

17   A. I have it in an e-mail.  Yeah, I can actually

18      send it to somebody if they want to print it.

19         MR. HOUSH:  Sent it to me.  Do not send

20      it to anybody else, otherwise you'd be waiving

21      attorney-client privilege.

22   Q. Do you see the continuation of the information

23      on the label on the dosage section that says

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1      there may be health risks associated with the
2      consumption of the product?
3   A. Yeah.
4   Q. What health risks were there that may be
5      associated with this product?
6   A. I wouldn't know.
7   Q. You didn't research what health risks might be
8      associated with the consumption of the
9      product?
10  A. Uh-uh.
11  Q. Even though you knew that you could be tested
12     at any point in time after taking the product
13     for THC, correct?
14  A. Correct.
15  Q. Did you ask Dr. Choi about the product?
16  A. No.
17  Q. Did you ask anyone who knew anything about the
18     product what was in it?
19  A. No.
20  Q. Was this product recommended to you by
21     anybody --
22  A. No.
23  Q. -- that had taken it before you?  You never

─ DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ─

1        talked to anybody that had taken it before

2        you?

3    A. Nope.

4    Q. Do you see the reference lower on the page

5        that we're looking at where it says that this

6        product is intended for use solely by the

7        patient to whom it was sold?

8    A. Okay.

9    Q. Were you somebody's patient at that time?

10   A. No.

11   Q. Were you being provided this product by a

12       doctor?

13   A. No.

14   Q. Is this product prescribed to you?

15   A. Nope.

16   Q. Is this a medical marijuana product?

17   A. I thought it was a hemp product.

18   Q. Looking at the next page, the ingredients

19       list.  Do you see there's a list of

20       ingredients?

21   A. Correct.

22   Q. What is hemp whole plant extract?

23   A. I'm not a plant specialist so I would guess

─────────── DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ───────────

1          that it's from the hemp plant.

2     Q.  So you took a product you were just guessing

3          at what the ingredients were --

4               MR. HOUSH:  Object to form.

5     Q.  -- when you're subject to random drug tests?

6               MR. HOUSH:  Object to form.

7     A.  No, I actually went by Tripp Keber's testimony

8          on YouTube where he said this was a dietary

9          supplement and that everybody could take it

10         and it had zero percent THC.

11    Q.  You call this testimony.  Was this before a

12         court?

13    A.  Yes, before I bought the product.

14    Q.  The testimony was before a court that you saw

15         on YouTube?

16    A.  He went on a radio shoot and was promoting

17         Dixie X.  He said it was going to be in Whole

18         Foods by the end of the year nationwide.

19    Q.  Did you listen to this radio broadcast?

20    A.  Yes, we did.

21    Q.  When was that?

22    A.  I can't tell you the specific date.  It was

23         probably in the beginning of September maybe.

---

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    Q. September 2012?

2    A. Correct.

3    Q. Where were you when you listened to this

4       YouTube?

5    A. I don't remember.

6    Q. Were you at home?

7    A. I don't remember.

8    Q. Was Cindy watching the YouTube video at the

9       same time you were?

10   A. Correct.

11   Q. Was there anyone else watching it besides the

12      two of you?

13   A. No.

14   Q. Does anyone besides the two of you that knows

15      when you bought this Medical Marijuana -- I'm

16      sorry, this High Times Magazine that was

17      marked as Exhibit 24?

18   A. No.

19   Q. Anyone besides the two of you knows that you

20      two watched the YouTube video that you're

21      describing?

22   A. No.

23   Q. The photograph which is the third page of

---

**DEPAOLO-CROSBY REPORTING SERVICES, INC.**

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1          Exhibit 25 has a phone number at the bottom,
2          part of the phone number is cut off.  Have you
3          ever called that phone number?
4      A. Yeah.
5      Q. When did you call?
6      A. Probably the day I got fired.
7      Q. Did you call the phone number before you took
8          the product?
9      A. No.
10     Q. Did you think to call the phone number to ask
11         what hemp whole plant extract was?
12     A. No.
13     Q. Did you think to call the phone number to ask
14         what health risks that might be associated
15         with consumption of the product?
16     A. Nope.
17     Q. Did you think to call the phone number when
18         the product label warned you that it was
19         manufactured without any regulatory oversight
20         for health safety or ethicacy?
21     A. Nope.
22     Q. You said there's some -- some amount of the
23         product that remains in the bottle today?

––––––– DOUGLAS J. HORN - BY MR. BORON - 05/08/17 –––––––

1    A. Correct.

2    Q. And it's at your home?

3    A. Correct.

4    Q. Where has it been stored all these years?

5    A. In the cupboard.

6    Q. Cupboard.  Is an outside wall behind it or

7       inside wall behind it?

8    A. What do you mean outside, inside wall?

9    Q. Is the back of the cupboard up against an

10      outside wall of the house or is it a cupboard

11      that is not against an outside wall of the

12      house?

13   A. An outside wall of the house?

14   Q. Yeah.

15   A. Like is the outside on the other side of the

16      cupboard?

17   Q. Yeah.

18   A. Is that what you're saying?

19   Q. Yep.

20   A. Oh, I guess it is to the outside of the house.

21   Q. How come you never took the remainder for

22      testing?

23   A. Because after I had a new unopened specimen

—DOUGLAS J. HORN - BY MR. BORON - 05/08/17—

1          tested they told me not to send them anymore.

2     Q. Who told you that?

3     A. EMSL labs.

4     Q. When you found out that you had tested

5          positive for THC at that point in time you

6          only had the one bottle that was partially

7          used, correct?

8     A. Correct, it was almost all used.

9     Q. It was almost all used at that point?

10    A. Yeah.

11    Q. You're motioning with your fingers, that

12         doesn't translate to our record.

13    A. Yeah, it was probably about maybe an eighth of

14         the bottle left.

15    Q. Okay.  Has anything been added to that bottle

16         since it's been opened?

17    A. No.

18    Q. Has anything been taken out of the bottle

19         besides the product itself?

20    A. Just the product.

21    Q. Did the product have a cinnamon flavor to it?

22    A. Yes, it did.

23    Q. Did anybody ever tell you that the remainder

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

```
 1        of that bottle would not be able to be tested
 2        for THC?
 3    A.  No.
 4    Q.  Did you ask anybody if it could be tested for
 5        THC?
 6    A.  No.
 7    Q.  Okay.  So at some point in time then after you
 8        tested positive for THC you ordered another
 9        bottle of the same product?
10    A.  Correct.
11    Q.  Did you personally order that one as oppose to
12        Cindy having ordered the other one?
13    A.  No, I had my daughter order it.
14    Q.  Which daughter was that?  Erica?
15    A.  Nicole.
16    Q.  Nicole.  Why didn't you have Elizabeth order
17        it?
18    A.  Don't know why.
19    Q.  So Nicole put the order in for the second
20        bottle?
21    A.  Correct.
22    Q.  Did you ever order any additional bottles of
23        the Dixie X product?
```

---

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1      A. I'm not sure if I did.

2      Q. Did Nicole bring you the second bottle?

3      A. Correct.

4      Q. The one that you asked her to order?

5      A. Correct.

6      Q. You reimbursed her for the cost of the

7         product?

8      A. Correct.

9      Q. What did you do with the second bottle?

10     A. I sent it into the lab.

11     Q. Did you open it?

12     A. Nope.

13     Q. Did you take any labels off of it?

14     A. Nope.

15     Q. You sent the box --

16     A. I sent the box --

17     Q. -- completely unopened?

18     A. Yep, put it in an envelope and sent it to the

19        lab.

20     Q. You sent it through the U.S. Mail?

21     A. I'm not sure how I sent it.

22     Q. But it mailed in some way rather than

23        hand-delivered?

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1   A. Correct.

2   Q. Did you ever get a report from the EMSL lab?

3   A. Yes.

4   Q. A written report?

5   A. Yes.

6   Q. Have you produced that written report?

7   A. Yes.

8   Q. How many pages long was it?

9   A. Just one.

10  Q. One-page long report?

11  A. I just had them test it for THC and that's

12     what they gave me the result.

13  Q. Did you also order additional Dixie X

14     products?

15  A. I may have had my daughter.

16  Q. This is after you tested positive?

17  A. Yes.

18  Q. What else did you order from Dixie X products?

19  A. The SAV and the -- I think they called them

20     scripts.  They were pill form.

21  Q. Was that your decision to order those products

22     or did an attorney tell you to order them?

23  A. No, I decided to order those.

--- DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ---

1    Q. And you ordered those because you wanted to
2       make a case against Dixie?
3    A. I was going to have them tested.
4    Q. These other products?
5    A. Yeah.
6    Q. You had no interest in consuming them
7       yourself?
8    A. No.
9    Q. You just wanted them to get tested?
10   A. Correct.
11   Q. Did you think that would help build your case
12      against Dixie?
13   A. Yep.
14   Q. Did you send those products out for testing?
15   A. Nobody wanted them.  The EMSL Labs told me not
16      to send them anymore product and then I
17      contacted another lab which I don't remember
18      the name of in California and they didn't want
19      it either after I explained my situation.
20      They were afraid it would mess things up with
21      their lab.
22   Q. We're talking about the other products besides
23      this one --

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    A. Correct.

2    Q. -- right?

3    A. Correct.

4    Q. So where are those products today?

5    A. In my cupboard.

6    Q. Did you see the product that you ordered from

7       Dixie X that is depicted in Exhibit 25

8       advertised on the television?

9    A. No.

10   Q. Did you see it advertised or did you -- did

11      you experience listening to an ad about it on

12      the radio?

13   A. Not on the radio, no.

14   Q. Was it advertised on a billboard that you saw?

15   A. Nope.

16   Q. Were there any door-to-door solicitors that

17      came by and told you about the product?

18   A. No.

19   Q. Did you receive a solicitation about the

20      product through the U.S. Mail?

21   A. No.

22   Q. After you tested positive you did some

23      research about the product online?

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1   A. I didn't really do any research, just that --
2      you know, nothing that I didn't do before I
3      took it.
4   Q. You did no research about the product after
5      you tested positive?
6   A. Well, I didn't really do any research
7      afterwards, no, except for looking at the
8      website where they changed the -- the facts in
9      question or frequently asked questions on
10     Dixie X and that they pulled their line of
11     explaining drug tasks and stuff like that.
12  Q. Did you purchase the product for pain relief
13     in your shoulder?
14  A. Correct.
15  Q. Okay.  Do these labels indicate that they
16     provide pain relief to people that take the
17     product?
18  A. Not that label, no.
19         MR. MAZZOLA:  What time are we going
20     until?  Are we finishing at 5 or?
21         MR. BORON:  Yeah, we'll finish at 5.
22         MR. MAZZOLA:  Then what will I do with
23     my questions?

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1        MR. BORON:  That's a good question.  Do
2    you want to take a short break and talk about
3    that?
4        MR. MAZZOLA:  Yeah.
5
6                (Recess taken)
7
8    BY MR. BORON:
9    Q. We're back on the record after a break.  You
10       continue to be under oath, Mr. Horn.  You
11       testified about looking at a YouTube video.
12       Did you look at it on your own computer?
13    A. Yes.
14    Q. Was this your smartphone or a different
15       computer system?
16    A. I'm not sure.
17    Q. Do you have a home computer?
18    A. I do.
19    Q. What kind of computer?  Mac?
20    A. I have several.
21    Q. You have several, okay?
22    A. I have Mac, Alien.
23    Q. Do you have any of the computers still today

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/08/17

1          as we sit here today that you had in your

2          house in 2012?

3     A. Yes.

4     Q. The same hard drives?

5     A. Yep.

6     Q. Have those hard drives been wiped and cleaned?

7     A. One of them might have.

8     Q. Since 2012?

9     A. Yep.

10    Q. Did you ask any of your daughters to do

11         research after you had tested positive?

12    A. No.

13    Q. Ask anybody else to do research for you on

14         your behalf after you tested positive?

15    A. No.

16    Q. I'm going to say I'm done with Mr. Horn for

17         now.  I reserve my right to -- to ask him

18         questions related to issues that Dixie counsel

19         raises in any questioning.

20

21               EXAMINATION BY MR. MAZZOLA:

22

23    Q. All right.  Good afternoon, Mr. Horn.  My name

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/08/17

1          is JC Mazzola, I'm an attorney and I represent

2          Dixie Elixirs.  I understand we have to finish

3          in about 20 minutes; is that correct, Madame

4          Court Reporter, because we have to be out of

5          here at 5, so if I don't finish I direct at

6          your counsel is it okay if we come back and

7          bring him in tomorrow morning?

8              MR. HOUSH:  You have seven hours.

9          They're both going to be here tomorrow morning

10         too, so I'm not going to try to make things

11         difficult.

12     Q.  Great.  Give me a moment.  All right.  When

13         you went to work at ICX, I think your

14         testimony earlier was that you told your new

15         employer that you were fired by -- and is

16         it --

17     A.  Enterprise.

18     Q.  Enterprise because you failed a drug test; is

19         that correct?

20     A.  Correct.

21     Q.  Did you tell them what kind of drug was

22         involved?

23     A.  Yes.

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/08/17

1    Q. Did you tell them it was marijuana?

2    A. I told them it was THC.

3    Q. THC.  And you've been making a distinction

4       between marijuana and THC.  Why do you make

5       that distinction?  You have to answer out

6       loud.

7    A. I don't know why I make that decision.

8       Because it seems like two different things

9       honestly.

10   Q. Okay.  Why do you think that?

11   A. Marijuana is something you smoke.

12   Q. Did someone ever tell you there is a

13      distinction between THC and marijuana?

14   A. Did someone ever what?

15   Q. Did someone ever tell you there's a difference

16      between THC and marijuana?

17   A. No.

18   Q. In terms of DOT laws, regulations and

19      requirements is there a difference?

20   A. Not that I --

21             **MR. HOUSH:**  Object to form.

22   Q. As you know?

23   A. Not that I know.

1    Q.  When you went to work for Enterprise you

2        acknowledge on the paperwork -- and you're

3        familiar with the DOT rules and regulations;

4        isn't that correct?

5    A.  Right.

6    Q.  And those DOT rules and regulations they

7        relate to drug testing; is that correct?

8    A.  Correct.

9    Q.  We're going to mark this document, we'll call

10       it Exhibit 26.

11

12       The following was marked for identification:

13       Exhibit 26        Enterprise Products Company
                            Drug and Alcohol Plan
14

15       **BY MR. MAZZOLA:**

16   Q.  Put that in front of you.  Do you have a copy

17       for --

18           **MS. LINDSTROM:**  I don't know if we have

19       another copy -- oh, yeah we do.

20           **MR. BORON:**  I have a copy.

21           **MS. LINDSTROM:**  Do you want it?  I have

22       it here.

23           **BY MR. MAZZOLA:**

1    Q. Give it to counsel.  Have you ever seen that

2        document before, Mr. Horn?

3    A. I don't remember seeing this type of document,

4        no.

5    Q. Okay.  It does say Enterprise Company on it;

6        do you see that?

7    A. Yes.

8    Q. If you go to the back and you see where it

9        says ENT 943 on the bottom?

10   A. On the very back?

11   Q. Yeah.  On the very bottom over there.

12   A. Oh, yeah.

13   Q. That's an indication that we got that from

14       Enterprise.

15          **MR. HOUSH:**  Object to form.

16   Q. Okay.  And if you look at the back of it there

17       will be a place for a signature; do you see

18       that?  It's on page ENT 972; do you see that?

19   A. Correct.

20   Q. Okay.  And you see the original date of -- now

21       let's go to the first page of that.  Do you

22       see that -- now on that signature page your

23       signature is not on that, correct?

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/08/17

1    A. Correct.

2    Q. But do you have any reason to believe that

3       you've never seen this document before?  I'm

4       holding up what we're calling Exhibit 26.

5    A. Yeah, I don't remember this.

6    Q. You don't remember ever seeing this?

7    A. Uh-uh.  This says Enterprise Products.

8    Q. Yeah.  What's the difference?

9    A. Enterprise Transportation was a different

10      division than Enterprise Products.

11   Q. What's the difference as you know it?

12   A. That's more refinery work.

13   Q. Okay.

14   A. Like natural gas.

15   Q. Okay.  So is your testimony maybe that you

16      never saw this document?

17   A. It could be, yeah.  I don't remember this.

18   Q. Okay.  I'll take it back then.  Let's look

19      at -- let's look at Exhibit 5.  So are you

20      telling me you didn't see Exhibit 26, which is

21      right in front of you?

22   A. Yeah.

23   Q. All right.  Now I've put back before you what

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/08/17

1     we've called Exhibit 25; do you see that?

2          **MR. BORON:**   You mean Exhibit 5.

3     Q. Exhibit 5, right?

4     A. Correct.

5     Q. Now you do acknowledge seeing that; is that

6        correct?

7     A. Correct.

8     Q. And if you look at that do you see where it

9        says position requirements?  The very first

10       one; do you see that?

11    A. Correct.

12    Q. On that it says that you acknowledge, you're

13       familiar with the Title 49 of the code of

14       Federal Regulations; do you see that?

15    A. Yes.

16    Q. And you also indicate that you're familiar

17       with U.S. Department of Transportation Federal

18       Highway Administration parts 383; do you see

19       that?

20    A. Yep.

21    Q. And 387, 390 through 399; do you see that?

22    A. Yes, I do.

23    Q. And you also indicate that you're familiar

1       with -- if you go to paragraph 2; do you see

2       that?

3   A. Yes.

4   Q. You indicate that you're familiar with CFR

5       Chapter 1, Subchapter B, Parts 117-179 and

6       380-397.  Do you see that?

7   A. Correct.

8   Q. Now do you know that those legal provisions

9       that I've just read off to you that they

10      relate to controlled substance and alcohol use

11      in connection with operation of a truck and

12      DOT regulations; do you understand that to be

13      the case?

14   A. I don't know those specific things at the

15      moment, no.

16   Q. Okay.  But you did -- but you did affirm that

17      you were familiar with those; isn't that

18      correct?

19   A. Correct.  Correct.

20   Q. So I presume at the time you were familiar

21      with them, correct?

22   A. Correct.

23   Q. And so before you signed this and before you

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/08/17

1           took the job at Enterprise you made certain

2           that you were familiar with these; is that

3           correct?

4       A.  Correct.

5       Q.  So what I was getting at earlier is I'm trying

6           to understand why you kept making this

7           distinction between THC and marijuana?

8       A.  Well, because the THC that I took was in hemp,

9           not marijuana.

10      Q.  Well, you do know that the use of marijuana is

11          in violation of the DOT regulations; isn't

12          that correct?

13      A.  Correct.  Correct.

14      Q.  Okay.  Let's look at -- let me ask you this

15          question:  Why would you take -- because you

16          know that your employer had a zero tolerance;

17          is that correct?

18      A.  Correct.

19      Q.  And you know that all the employers in this

20          industry have a zero tolerance; is that

21          correct?

22      A.  Correct.

23      Q.  So you drop dirty, you get fired, right?

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/08/17

1    A. Correct.

2    Q. You know that they test for -- you know that

3       they're testing for marijuana, cocaine,

4       opiates and the like?

5    A. Correct.

6    Q. Okay.  Why would you take something that you

7       learned about in a magazine about marijuana?

8    A. Well, we saw that and then, like I said, we

9       saw the video.

10   Q. Okay.

11   A. And there was actually a couple videos Dixie X

12      saying everybody can take it, it had no THC,

13      so why wouldn't I?

14   Q. But why does THC matter to you because it

15      doesn't say anywhere on the Enterprise Drug

16      and Alcohol Policy that you can't take

17      something -- that THC is prohibited?  Do you

18      want to look at it with me?

19   A. No, I get what you're saying.

20   Q. No, let's look at it.  It's Exhibit 11.

21            **MR. HOUSH:**  Object to form.

22   Q. Let's look at that together, Exhibit 11.

23   A. Okay.

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/08/17

1    Q. So why would it matter if it's a THC issue?

2    A. Because THC is what gets you high to my

3       understanding.

4    Q. Okay.  But it doesn't say anywhere on the

5       Enterprise thing that you can't take THC, it

6       says you can't take marijuana?

7    A. Correct, marijuana contains THC.

8    Q. Okay.  So you were doing this analysis in your

9       mind that because something is -- you

10      understood it didn't have THC it was safe to

11      take and would not be in violation of both

12      Enterprise's requirements and DOT regulations,

13      right?

14   A. Correct.

15   Q. Okay.  That was your understanding, right?

16   A. That's my understanding.

17   Q. And so what I'm trying to understand is then

18      that product that we're talking about is a

19      product that you first learned about in a

20      magazine called?

21   A. High Times.

22   Q. High Times, right?

23   A. Correct.

1    Q. And it says Medical Marijuana on the top of

2       it, right?

3    A. Correct.

4    Q. And it has the little picture with a marijuana

5       leaf, right?

6    A. Correct.

7    Q. And it says on the cover Inside Cannabis

8       Farmers Market?

9    A. Correct.

10    Q. It says the word cannabis on this front page,

11       doesn't it?

12    A. Yep.

13    Q. So with all of that, why would you take

14       something which on its very packaging uses the

15       word cannabinoids?

16          **MR. HOUSH:**  Object to form.

17    Q. Why would you use that?

18          **MR. HOUSH:**  Object to form.

19    A. Because to my understanding that hemp has the

20       same cannabinoids as marijuana, but does not

21       get you high.

22    Q. Okay.

23    A. Okay.  And you -- you know, through all the

1          advertisements that they extracted the THC and

2          everything out of the hemp, that's why I took

3          it.

4     Q.   Okay.  Did you think it was -- you know, if

5          your livelihood was dependent upon this, do

6          you think it was a smart thing for you to do

7          to go buy something that you see referenced in

8          the magazine with the name marijuana in the

9          title?  Do you think that was a smart thing to

10         do?

11              MR. HOUSH:  Object to form.

12    A.   I don't think it was a dumb thing to do

13         because it said CBD for everyone.

14    Q.   Okay.  Where did it say that?

15    A.   On the ad for Dixie X.

16    Q.   That's in the magazine, right?

17    A.   Correct.

18    Q.   That's the one we looked at earlier; is that

19         correct?

20    A.   Correct.

21    Q.   That was the ad where --

22    A.   Yeah, it's titled CBD For Everyone.

23    Q.   That's under where High & Healthy, right?

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/08/17

1    A. Correct.

2    Q. When they say high, what do they mean by that?

3    A. I guess high.

4    Q. High like what?  High on drugs?

5    A. High on drugs I would imagine.

6    Q. Okay.  So we know this is true because you

7       said it earlier, before you purchased the

8       Elixir you had seen it referenced in that High

9       Times marijuana magazine; is that correct?

10          MR. HOUSH:  Object to form.

11   A. Correct.

12   Q. Is that correct?

13   A. Correct.

14          MR. HOUSH:  Object to form.

15   Q. Had you ever seen this Elixir referenced

16      anywhere before you saw it referenced in that

17      High Times magazine?

18   A. No.

19   Q. So the first time you ever knew there was a

20      product out there called Dixie Elixir was when

21      you saw it in this magazine, this Exhibit 24;

22      is that correct?

23          MR. HOUSH:  Object to form.

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/08/17

1    A. Correct.

2    Q. Okay.  Prior to you picking up that magazine,

3       did anyone in your family ever say to you hey,

4       you've got this pain, maybe you should try

5       using a marijuana-based product?

6    A. No.

7    Q. Did anyone in your family prior to you picking

8       up that magazine for the first time say hey,

9       you got this pain, maybe you should try a

10      hemp-based product?

11   A. No.

12   Q. Okay.  Did anyone in your family -- now listen

13      carefully, I'm talking about your family now,

14      okay?

15          MR. HOUSH:  Object to form.

16   Q. Did anyone in your family say hey, you got

17      this pain, maybe you should use a cannabinoid

18      product?

19   A. No.

20   Q. Okay.  Now we're going to go same set of

21      questions, but we're going to talk about other

22      people.  So we asked earlier about your

23      family, your wife, your mother-in-law and

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/08/17

1              everyone else.  Now we're talking about the

2              whole world.  Anyone in the whole world ever

3              say to you hey -- James they call you, right?

4       A.  Yeah.

5       Q.  James, you got this problem, maybe you should

6              go try a marijuana-based product; anyone say

7              that to you?

8       A.  Nope.

9       Q.  Prior to seeing it the first time in this,

10             Exhibit 24?

11      A.  No.

12      Q.  Okay, no one.  What about, same question, did

13             they say you should try hemp-based product?

14      A.  No.

15      Q.  Or a cannabis -- cannabinoid-based product?

16      A.  No.

17      Q.  So why is it that you opened up that magazine

18             for the first time in Dallas sometime before

19             September 2012?

20      A.  Why did I open it?

21      Q.  Yeah.

22      A.  It was on the table when we were having

23             coffee.

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/08/17

1    Q. Were there other magazines to look at?

2         MR. HOUSH:  Object to form.

3    A. Oh, there were.

4    Q. Okay.  There wasn't like a car magazine, a

5       photograph magazine?

6    A. Not at the table that we were sitting down at.

7    Q. It was just that magazine?

8    A. Correct.

9    Q. Okay.  So you opened it up?

10   A. Yep.

11   Q. And what drew you to the -- the article?  What

12      drew you to that article?

13   A. Just the CBD for everything -- for everyone.

14   Q. But why I just asked you --

15        MR. HOUSH:  Object to form.  If you let

16      him finish his answer.

17   A. I don't really have an answer why.

18   Q. Let me ask the same series of questions I

19      asked before.  If you recall I was asking you

20      about marijuana?

21   A. Correct.

22   Q. Hemp, cannabinoids.  So prior to you opening

23      up that magazine for the first time ever in

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/08/17

1          your life, which was the first time ever in

2          your life you knew about this Dixie Elixir

3          product, did anyone ever say to you hey,

4          James, maybe you should try a CBD-type product

5          for your back and shoulder?

6     A.  No.

7     Q.  No one?

8     A.  No.

9     Q.  No one in the family --

10    A.  I never heard of CBD before I read that there.

11    Q.  So why that article?

12    A.  I don't know why.

13    Q.  Okay.  You just happened to read that article?

14          **MR. HOUSH:**  Object to form.

15    A.  Just CBD --

16    Q.  And other than that article, okay, now we're

17          talking about prior to you purchasing this

18          product, okay, the Dixie Elixir, did you see

19          any other articles about the Dixie Elixir in

20          print?

21    A.  Prior too this?

22    Q.  Yes.

23    A.  No.

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/08/17

1    Q. Okay.  And then prior to you purchasing it,

2       did you see anything?

3    A. Prior to me purchasing?

4    Q. Yeah.

5    A. I went online and --

6    Q. Okay.  Let me look at the timeline right over

7       here.  You didn't actually purchase it, Cindy

8       actually made the purchase, right?

9    A. Correct.

10   Q. And -- and Cindy made that purchase sometime

11      in September?

12   A. September 19th.

13   Q. 2000 -- you recall September 19th?

14   A. September 19th.

15   Q. 2012?

16   A. Correct.

17   Q. How is it that you recall that date?

18   A. Because I just pulled the receipt up.

19   Q. Just now?

20   A. Just last week.

21   Q. Why did Cindy buy it?

22   A. No particular reason.

23   Q. Why didn't you buy it?

—DOUGLAS J. HORN - BY MR. MAZZOLA - 05/08/17—

1            **MR. HOUSH:**  Object to form.

2       A.  I don't have an answer for that.  Sometimes

3           she buys stuff, sometimes I buy stuff.

4       Q.  Was your credit card overdrawn or something?

5            **MR. HOUSH:**  Object to form.

6       A.  No.

7       Q.  Did Cindy ever use the product?

8       A.  She tried it once.

9

10          The following was marked for identification:

11          Exhibit 27        Invoice and Packing Slip
                               dated September 17, 2012

12

13          **BY MR. MAZZOLA:**

14      Q.  I'm going to make a compiled exhibit over

15          here, I'm going to hand you over, Mr. Horn,

16          what we'll call Exhibit 27.  That's a

17          composite exhibit, it's a two-page document.

18          It contains a packing slip and an invoice; do

19          you see that document?

20      A.  Yes.

21      Q.  Does that confirm for you and me that that's

22          the day that your wife purchased the Dixie

23          Elixir?

1    A. Correct.

2    Q. Okay.  But you don't know why it was that your

3       wife purchased it for you?

4          MR. HOUSH:  Object to form.

5    A. No particular reason why.

6    Q. So I was asking now -- so prior to that

7       purchase occurring we know that you learned

8       about the Dixie Elixir in this magazine,

9       right?

10         MR. HOUSH:  Object to form.

11   A. Mm-hmm.

12   Q. Did you see anything after this magazine,

13      which was the first time you saw it, and the

14      date of the purchase --

15         MR. HOUSH:  Object to form.

16   Q. -- about the Dixie Elixir?  Anything?  In any

17      sort of media format?

18         MR. HOUSH:  Object to form.

19   A. We went to their website.

20   Q. All right.  We're going to talk about that.

21      Anything else?

22   A. We looked at the article on MJMA.

23   Q. Okay.  Anything else?

1    A.  Just a few articles that we read about, Red

2        Dice Holdings and MJMA being a non-THC

3        company.

4    Q.  MJMA, what's that mean?

5    A.  I don't know what that's for, Medical

6        Marijuana.

7    Q.  .com?

8    A.  Yeah, that's what kept coming up when we did

9        research for Dixie X and Red Dice.

10    Q.  Okay.  So MJMA.com?

11    A.  Yes, I guess that's what it is.

12    Q.  So is that an online magazine, is it an

13        online --

14    A.  No, there were articles about MJMA when we

15        would search for Dixie X.

16    Q.  Okay.  And where would you see those articles?

17    A.  Online.

18    Q.  Okay.  So you would go on the Internet after

19        you purchased this magazine, you and Cindy --

20        was Cindy with you when you did this?

21    A.  Yep.

22    Q.  Okay.  So the two of you would go on the

23        Internet if you were at home or in a Starbucks

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/08/17

1           someplace, but you were on your computer,

2           right?

3       A.  Correct.

4       Q.  And so the two of you went on the Internet and

5           you searched for this product --

6       A.  Correct.

7       Q.  -- Dixie Elixir?  Okay.  And in doing that you

8           came across -- you're calling them articles;

9           is that what you said they are?

10      A.  Correct.

11      Q.  Okay.  So when you say "article," what does

12          that mean to you?

13      A.  Just a -- like a news article.

14      Q.  Okay.  Someone was writing --

15      A.  Someone was reporting.

16      Q.  Say that again.

17      A.  Someone was reporting.

18      Q.  Someone was reporting on Dixie Elixir; is that

19          correct?

20      A.  Correct.

21      Q.  And someone was reporting on like a review,

22          maybe?

23      A.  Correct.

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/08/17

1    Q. But it was something that was produced by

2       something other than Dixie Elixir; is that

3       correct?

4    A. Correct.

5    Q. And what did -- what did those articles tell

6       you?

7    A. That they were just basically a new company

8       and this Dixie X was coming out and that MJMA

9       was a non-THC company.  I mean, they made sure

10      they stressed that.

11   Q. And when you say they made sure they

12      stressed --

13   A. The article did, yes.

14   Q. The article did and the person who wrote the

15      article, correct?

16   A. Yes, when they described MJMA they say a

17      non-THC company.

18   Q. So the "they" is the person who wrote the

19      article; is that correct?

20   A. Correct.

21   Q. So the they is not Dixie Elixir?

22   A. No.  No.

23   Q. Is that correct?

1        A. Correct.

2        Q. The "they" is not Red Dice; is that correct?

3        A. Correct.

4        Q. The "they" is not Medical Marijuana, Inc.; is

5           that correct?

6        A. Correct.

7        Q. And the "they" is not Dixie Botanicals; is

8           that correct?

9        A. Correct.

10       Q. So the "they" is someone else?

11       A. Correct.

12       Q. So those are the articles you're talking

13          about, right?

14       A. That's some of them.

15       Q. That is correct?

16       A. That's correct.

17       Q. That's one of the articles or a couple of the

18          articles?

19       A. There were a couple of articles there.

20       Q. And were all those articles the same in style,

21          tenor, and tone?

22       A. Pretty much, yeah.

23       Q. And so all those articles that you're

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/08/17

1           referring to, the "they" is not Dixie Elixir?

2                MR. HOUSH:   Object to form.

3       Q. He can answer the question.  Dixie Elixir; is

4           that correct?

5       A. Correct.

6       Q. The "they" is not Medical Marijuana; is that

7           correct?

8       A. Not on those specific articles, correct.

9       Q. And the "they" is not Red Dice?

10      A. Correct.

11      Q. And the "they" is not --

12               MR. HOUSH:   Object to form.

13      Q. -- Dixie Botanicals?

14               MR. HOUSH:   Object to form.

15      Q. -- is that correct?

16               MR. HOUSH:   Object to form.

17      Q. Right?  Correct?

18      A. Correct, on those articles.

19      Q. So those are the articles?

20               MR. HOUSH:   It's 5 o'clock.

21      Q. Okay.  I'm going to finish up this line of

22          questioning.  Is that okay with you, Marissa?

23          So we've got this article, correct?

1    A. Correct.

2    Q. In Exhibit 24.  We got the articles we just

3       talked about?

4    A. Correct.

5    Q. All right.  Now our timeline is the first day

6       you ever saw this in Exhibit 24 and the day

7       you purchased it, so that's my timeline I'm

8       working with, you understand that, right?

9    A. Right.  Right.

10   Q. So we got the article in Exhibit 24, right?

11      Is that correct?

12   A. Correct.

13   Q. You saw that?

14   A. Right.

15   Q. Then we got the articles that you saw on the

16      Internet; is that correct?

17   A. Yes.

18   Q. What else did you see?

19   A. We went to Dixie's website.

20   Q. You went to Dixie's website, okay.  And what

21      did you see on Dixie's website?

22   A. That they said that they followed all

23      controlled substance laws.

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/08/17

1    Q. Okay.  Who is "they"?

2    A. Dixie X.

3    Q. That Dixie the company said this?

4    A. Correct.

5    Q. Okay.  They said what?

6    A. That they followed all Federal controlled

7       substance laws.

8    Q. What else did they say?

9    A. That it had no THC.

10   Q. It said no THC?

11   A. Yep.

12   Q. Okay.  Anything else?

13   A. There was other things there, but that's all

14      that I was looking for.

15   Q. Okay.

16        MR. HOUSH:  So how long are we going

17      past 5?

18        MR. MAZZOLA:  Well, seeing that it's

19      only 30 seconds.

20        MR. HOUSH:  Well, you said -- we made a

21      big thing about stopping right at 5 and you

22      said you were going to finish with this line

23      of questioning.

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/08/17

1          MR. MAZZOLA:  You know, seeing that it's

2     35 seconds past 5 I'm going to have to

3     guesstimate about nine minutes to 10 minutes

4     past 5.

5          MR. HOUSH:  All right.  Well, then I

6     need to make a call.

7          MR. MAZZOLA:  Okay.

8

9               (Recess taken)

10

11         MR. MAZZOLA:  We're back on the record.

12    I will be finished in about five to 10

13    minutes, but we'll come back on tomorrow; is

14    that correct?

15         MR. HOUSH:  I mean, you have seven

16    hours.

17         MR. MAZZOLA:  Okay.

18         MR. HOUSH:  So, you know.

19         MR. MAZZOLA:  So we're back on the

20    record --

21         MR. BORON:  Marissa's computer -- if

22    we're worried about the seven hours her

23    computer will show.

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/08/17

1          MR. HOUSH:  I'm not trying to suggest

2      otherwise.

3          MR. BORON:  No, I don't think we're near

4      seven hours.

5          MR. HOUSH:  I'm not trying to suggest

6      otherwise.  I'm just saying they're both going

7      to be here tomorrow, you have seven hours.

8      BY MR. MAZZOLA:

9    Q. Okay.  We're back on the record.  Mr. Horn,

10      you understand we're back on the record and

11      it's the same rules apply that Mr. Boron gave

12      you that you're still under oath; you

13      understand that, correct?

14    A. Correct.

15    Q. You also understand that even though you take

16      breaks you're not allowed to talk about your

17      testimony with anyone; you understand that?

18    A. Correct.

19    Q. So I will presume that there were no

20      conversations during this break with anyone

21      about your testimony; is that correct?

22    A. Correct.

23    Q. Okay.  So we were talking earlier about how

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/08/17

1          you went on the Dixie website; is that

2          correct?

3     A.  Correct.

4     Q.  And the time period we're talking about,

5          again, is from when you first discovered this

6          Elixir even existed to the date that you

7          purchased it or your wife purchased it; is

8          that correct?

9     A.  Right.

10    Q.  I don't care about what happened the day

11         after -- well, I don't care what happened

12         after the day you dropped dirty, I'm just

13         talking about that timeline, okay, from the

14         date you first discovered it to the date your

15         wife purchased it, okay?

16    A.  Okay.

17    Q.  You went on the Dixie website; is that

18         correct?

19    A.  Correct.

20    Q.  And you saw that "they," being Dixie, said

21         that they comply with all Federal controlled

22         substance laws; is that correct?

23    A.  Correct.

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/08/17

1    Q. Do you know what those Federal controlled
2       substance laws were?
3    A. No.
4    Q. Okay.  Did you bother to look at them?
5    A. No.
6    Q. Okay.  And that the product contained in your
7       quote was no THC; is that correct?
8    A. Correct.
9    Q. Okay.  Did you look at anything else on that
10      website?
11   A. Dixie X's?
12   Q. Yes.
13   A. Just the four products that they had for sale.
14   Q. Okay.  And you read about those four products?
15   A. Correct.
16   Q. Okay.  Was there anything else that you can
17      recall seeing on that website that prompted
18      you purchase the Dixie Elixir?
19   A. No.
20   Q. Just those two things, no THC and they comply
21      with all Federal controlled substance laws; is
22      that correct?
23   A. Correct.

Q. Anything else?
A. Not that I can recall, no.
Q. Okay. Did you print off those screenshots from the website when you looked at them?
A. I did.
Q. At that -- simultaneously -- or not simultaneously, contemporaneously? Did you do it then?
A. No.
Q. Okay. When did you print those screens?
A. The day I got fired.
Q. Okay. So that would be October 12, 13?
A. Correct.
Q. Okay. But before making the purchase and before using the Elixir for the first time did you print off those screens?
A. No.
Q. Okay. Did someone ever tell you that you could take a marijuana-based product safely and not be in violation of DOT regulations if it contained no THC? Did anyone ever tell you that?
A. No.

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/08/17

1    Q.  Okay.  Did anyone ever tell you, ever, before
2         you purchased it and before you used it that
3         you could take a hemp-based product that
4         contained no THC and not be in violation of
5         DOT regs?
6    A.  We've taken other hemp products.
7    Q.  Who's "we"?
8    A.  Me and Cindy.
9    Q.  Okay.  When did you do that?
10   A.  We've taken them, say, over the years.
11   Q.  Okay.  When?
12   A.  I don't remember what dates.
13   Q.  Okay.  We're going to get to that in a second,
14        but before -- between the time you first
15        learned of this product and the time you
16        purchased it and first used it, during that
17        time period, did anyone say hey, you know
18        what, James, you can use a hemp-based product
19        if it doesn't contain THC and not violate DOT
20        regs?
21            **MR. HOUSH:**  Object to form.
22   Q.  During that time period did anyone tell you
23        that?

──── DOUGLAS J. HORN - BY MR. MAZZOLA - 05/08/17 ────

1    A. No.

2    Q. During your whole life -- whole life --

3       scratch that.

4          Did anything on the website -- Dixie's

5       website say you can take a marijuana-based

6       product if it does not contain THC and not

7       violate DOT regs?

8    A. It didn't say anything about DOT, no.

9    Q. Did it say anything about taking a marijuana

10      hemp-based product without THC and not

11      being -- not being in violation DOT regs?

12         **MR. HOUSH:**  Object to form.

13   A. Not on DOT, no.

14   Q. Okay.  Why do you say not on DOT?  Did it say

15      something similar regarding something else?

16   A. Well, when they said that it followed Federal

17      controlled substance laws I assume that that's

18      what that means, that, you know, there's

19      controlled substances, you know, you either

20      have to have a prescription or it's illegal,

21      so that was pretty much a blanket statement.

22   Q. Okay.  That's what you understood it?

23   A. That's the way I understood it.

--- DOUGLAS J. HORN - BY MR. MAZZOLA - 05/08/17 ---

1    Q. On that Dixie website was there anything that

2       led you to believe that you could take their

3       product and not violate a drug testing

4       regulation?

5    A. Did I what now?

6    Q. Was there anything -- Madame Court Reporter,

7       will you read that back?

8

9            (Record read back by reporter)

10

11           **THE WITNESS:**  With a zero percent THC, I

12      was under that impression, yes.

13      **BY MR. MAZZOLA:**

14   Q. Did they say you can take this product and you

15      won't be in violation of a drug testing

16      regulation?

17           **MR. HOUSH:**  Object to form.

18   A. No.

19   Q. What's the answer?

20   A. They did not say that on the website.

21   Q. Okay.  All it said was zero THC in your words,

22      right?

23   A. That's what it said on the website.

1   Q. But it didn't say sleep easy, you can take

2       this and you can take any drug test and pass;

3       did it say that?

4              MR. HOUSH:   Object to form.

5   A. No.

6   Q. Did it say on the website don't worry, you can

7       take this and operate heavy machinery; did it

8       say that?

9   A. No.

10  Q. Okay.  Did it say aircraft pilots of the

11      world, don't worry, you can take this and fly

12      aircrafts all over North America; did it say

13      that?

14  A. No.

15  Q. Did it say truck drivers of America, don't

16      worry about it, you can take this product and

17      beat DOT regulations; did it say it?

18  A. Uh-uh.

19  Q. No?

20  A. No.

21  Q. Okay.  We were talking about -- let's --

22      before we go on to the other hemp products I

23      want to understand something else now.  So you

1      learned about our -- the Dixie Elixir products

2      in this magazine called Marijuana, right?

3      **MR. BORON:**  High Times.

4  Q. High Times.  High Times Marijuana, Exhibit 24,

5      right?  Right; is that correct?

6  A. Right.

7  Q. You then went on the Internet and you read

8      articles about the Dixie Elixir product; is

9      that correct?

10  A. Correct.

11  Q. Okay.  This is between the time you first

12      learned of it and the time you first bought it

13      and then used it; is that correct?

14  A. Correct.

15  Q. Okay.  And then we also just learned that

16      you've also went to the Dixie website?

17  A. Correct.

18  Q. And you researched the product; is that

19      correct?

20  A. Yep.

21  Q. Okay.  Other than those three things, reading

22      about it in the magazine entitled Marijuana,

23      learning -- reading about it on articles on

1          the Internet, and reading about it on the

2          Dixie website, did you do any other research

3          about this product before purchasing it and

4          taking it?

5     A. Just the YouTube video.

6     Q. Okay.  We'll talk about that, the YouTube

7          video.  Anything else?

8     A. And they directed you to the MJMA website.

9     Q. Okay.  Anything else?

10    A. That's pretty much it.

11    Q. Okay.  The YouTube video, what was the YouTube

12         video?

13    A. It was an interview with Tripp Keber.

14    Q. Okay.

15    A. Promoting Dixie X.

16    Q. When did you see that video?

17    A. I don't remember what date.

18    Q. But during this period of time, right?

19    A. It was before we purchased it, yeah.

20    Q. And after you first learned about the product

21         in this magazine called Marijuana, right?

22    A. Correct.  Correct.

23         **MR. HOUSH:**  I had -- I had made an

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/08/17

1    appointment for 5:30 when earlier we said we

2    were leaving at 5.

3         MR. MAZZOLA:  Okay.

4         MR. HOUSH:  So if we're going to be

5    continuing to go on and on, I tried to reach

6    my -- the person I was supposed to meet at

7    5:30 and they weren't available.

8         MR. MAZZOLA:  Okay.  Where's your

9    appointment?

10        MR. HOUSH:  128 Genesee, Counsel.  I can

11   give you her cell phone number if you would

12   like to try to reach her?

13        MR. MAZZOLA:  Okay.  I'll be done in six

14   minutes and then I'll reserve to continue for

15   tomorrow then.

16        MR. HOUSH:  You said that -- all right,

17   whatever.

18   BY MR. MAZZOLA:

19   Q.  I did say that eight minutes ago, that's

20       correct.

21            Let's talk about the YouTube video.  You

22       watched this video?

23   A.  Correct.

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/08/17

1     Q. Who did you watch it with?

2     A. Cindy.

3     Q. Anyone else watch it with you?

4     A. No.

5     Q. Did you make a copy of the YouTube video?

6     A. No.

7     Q. Did you take a screenshot video?

8     A. No.

9     Q. Did the YouTube video contain a date on it?

10    A. I'm not sure.

11    Q. A date stamp?

12    A. I don't know.

13    Q. What was the sum and substance of the YouTube

14       video?

15    A. Dixie X and the four products that they sold.

16    Q. Okay.

17    A. That it was a dietary supplement made from

18       hemp and it was going to be in Whole Foods and

19       that if you wanted to know what hemp would

20       help, it would help inflammation and pain and

21       you could go to MJMA's website and read more

22       information on the benefits of hemp.

23    Q. Okay.  On that YouTube video did Tripp Keber

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/08/17

1          say that it had zero THC in it?

2     A. I believe so, yes.

3     Q. Okay.  Do you know so?

4     A. It's been a long time, so -- but I was under

5          the impression yes.

6     Q. Okay.  Did Tripp Keber say -- was anyone else

7          talking in the video?

8     A. Just the interviewer and Tripp Keber.

9     Q. Okay.  Did Tripp Keber say hey, truck drivers

10         of America, you can purchase our product and

11         you will beat DOT regulations testing; did it

12         say that?

13    A. Nope.

14    Q. Did anyone -- did Tripp Keber say hey, truck

15         drivers of America, purchase our product use

16         it for pain, don't worry you don't be in

17         violation of any DOT regulations; did he say

18         that?

19    A. No, but it was implied.

20    Q. Okay.  But did he say that?

21    A. No.

22    Q. So why do you say it was implied?

23    A. He said everybody could take it, it's like a

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/08/17

1        dietary supplement.

2    Q. Did he say people that operate heavy machinery

3        can take it?

4            MR. HOUSH:   Object to form.

5    Q. Did he say that?

6    A. No.

7    Q. Did he say airplane pilots can take it?

8    A. No.

9    Q. Did he say people subject to drug testing can

10       take it?

11           MR. HOUSH:   Object to form.

12   A. No.

13   Q. Did he say that?

14   A. No.

15   Q. Did he say military people can say that?

16           MR. HOUSH:   Object to form.

17   A. No.

18   Q. Okay.  He just said everybody can take it,

19       that's what you remember, right?

20   A. Yes, it's a dietary supplement and usually

21       pilots can take dietary supplements and heavy

22       machinery operators.

23   Q. Okay.  But he didn't say you could; is that

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/08/17

1        correct?

2              MR. HOUSH:   Object to form.

3     Q. Is that correct?

4              MR. HOUSH:   Object to form.

5     Q. You can answer.  Is that correct?

6     A. Did he say what?

7     Q. He didn't say that heavy machine operators

8        could take this product?

9     A. He didn't say that.

10    Q. Okay.  He didn't say truck drivers could take

11       this product; is that correct?

12    A. Well, I would think that with everybody can

13       take it that would be a blanket statement.

14    Q. You know what, just answer the question.

15             MR. HOUSH:   I'm going to ask you to not

16       talk to my client that way.

17    Q. Just answer the question please.

18    A. I was under the impression that everybody

19       could take it no matter what.

20    Q. Could the court reporter read back the last

21       question?

22

23             (Record read back by reporter)

1

2        **BY MR. MAZZOLA:**

3    Q. He didn't say truck drivers could take that

4       product; isn't that correct?

5    A. No, not that I know of.

6    Q. Okay.  So in the video they referred you to

7       the MJMA.com website.  Did you go to that

8       website?

9    A. Yeah, I did.

10   Q. And what did you see on that website?

11   A. It was a little confusing, but it talked about

12      how hemp helped inflammation and pain.

13   Q. Anything else?

14   A. That was about all I was looking for.

15   Q. Did it say anything -- did it make any

16      representations regarding the product that you

17      purchased?

18   A. No, I don't recall.  No.

19   Q. Okay.  Do you understand that MJMA was an

20      acronym for Medical Marijuana?

21   A. Yeah.

22   Q. Okay.  So when you went to the website you

23      knew that it was a marijuana-based business;

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/08/17

1           is that correct?

2       A.  No, I always thought they weren't.

3       Q.  I just asked you did you understand MJMA to

4           make reference to Medical Marijuana, you said

5           yes?

6       A.  Correct, but what I've read that they're a

7           non-THC company.

8       Q.  Okay.  Why does that matter to you?

9               MR. HOUSH:  Object to form.

10      Q.  You can answer that.

11      A.  I don't know why it matters to me.

12      Q.  Okay.  Is THC what makes it marijuana?

13      A.  No, THC is what was in the hemp that they

14          extracted.

15      Q.  Okay.  Let's talk about hemp.

16              MR. HOUSH:  Okay.  So we're going to

17          continue on?  It's 20 after 5.

18      Q.  All right.  We will continue tomorrow.  I just

19          want to get these questions on the record.

20              You talked about you and your wife have

21          taken other hemp products over the years; is

22          that correct?

23      A.  Correct.

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/08/17

1    Q. What other hemp products have you and your
2       wife taken?
3    A. Hemp milk.
4    Q. Hemp milk.  Why?
5    A. Why not?
6    Q. Okay.  What else?
7    A. Hemp shampoo.
8    Q. Okay.  What else?
9    A. That's about all -- I don't know if we took
10      seeds or not.  I know we though about it.
11      Hemp hearts.
12   Q. Hemp hearts?
13   A. Mm-hmm.
14   Q. Okay.  What else?
15   A. That's all I can remember.
16   Q. And for how long a period have you taken these
17      hemp -- used these hemp products, over what
18      time period?
19   A. These are a while back.
20   Q. How far back?
21   A. I don't remember.
22   Q. In 2012 were you taking those products?
23   A. No.

1    Q. Okay.  2011?

2    A. Possibly, yeah.

3    Q. 2010?

4    A. Possibly.

5    Q. Okay.  Anything else?  Any other hemp

6       products?

7    A. Not that I can remember, no.

8    Q. Okay.  So hemp hearts, hemp seeds possibly,

9       right?  Right?

10   A. Possibly.

11   Q. Okay.  Hemp shampoo?

12   A. Right.

13   Q. And hemp milk?

14   A. Yep.

15   Q. Okay.  What turned you on to taking hemp

16      products?

17   A. It's suppose to be help -- healthy.

18   Q. Healthy, okay.  All right.  We'll finish up

19      tomorrow.  You're still under oath, so just so

20      the records clear while you're still under

21      oath that means you can't talk to anyone about

22      your testimony, even your wife or your lawyer.

23   A. Okay.

1      Q. No one, okay?

2            MR. BORON:  Thanks, folks.  See you

3      tomorrow.

4

5            (Deposition adjourned at 5:21 p.m.)

6                  * * * * * *

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1        STATE OF NEW YORK)

2                    )  ss.

3        COUNTY OF ERIE    )

4

5

6         I, MARISSA A. ASHCROFT, Notary Public, in and
          for the County of Erie, State of New York, do
7         hereby certify:

8          That the witness whose testimony appears
           hereinbefore was, before the commencement of
9          their testimony, duly sworn to testify the
           truth, the whole truth and nothing but the
10         truth; that said testimony was taken pursuant
           to notice at the time and place as herein set
11         forth; that said testimony was taken down by
           me and thereafter transcribed into
12         typewriting, and I hereby certify the
           foregoing testimony is a full, true and
13         correct transcription of my shorthand notes so
           taken.

14

15         I further certify that I am neither counsel
           for nor related to any party to said action,
16         nor in anyway interested in the outcome
           thereof.

17

18         IN WITNESS WHEREOF, I have hereunto
           subscribed my name and affixed my seal this
19         8th day of May, 2017.

20

                    *Marissa A. Ashcroft*
                    ---------------------
22         MARISSA A. ASHCROFT, Notary Public

23

## $

**$1,617.50** [1] - 189:13
**$100** [1] - 201:1
**$140,117** [1] - 152:5
**$20,360** [1] - 153:13
**$34,000** [1] - 182:5
**$39** [1] - 149:19
**$43,000** [1] - 183:17
**$5,000** [1] - 188:10
**$500** [1] - 201:3
**$59** [2] - 149:4, 149:7

## '

**'12** [1] - 185:23
**'13** [2] - 30:9, 185:23
**'14** [2] - 30:9, 185:23
**'15** [1] - 185:23
**'16** [1] - 186:1

## 0

**0** [1] - 115:23

## 1

**1** [11] - 3:6, 5:2, 10:11,
  11:1, 98:16, 148:12,
  148:13, 148:15,
  184:17, 184:18,
  258:5
**10** [24] - 3:21, 8:14,
  46:1, 46:2, 53:2,
  53:6, 63:10, 79:23,
  80:4, 80:8, 80:9,
  87:22, 88:1, 98:5,
  115:23, 127:15,
  143:2, 166:2,
  187:20, 187:22,
  187:23, 227:5,
  279:3, 279:12
**10/17/12** [1] - 126:20
**10/17/22** [1] - 4:6
**100** [2] - 4:3, 150:2
**10022** [1] - 2:15
**10063** [1] - 78:12
**1040** [13] - 4:9, 4:11,
  4:12, 4:13, 143:16,
  143:18, 143:19,
  143:20, 145:23,
  152:4, 166:3, 166:8,
  185:6
**1065** [4] - 4:10,
  143:17, 181:22,
  182:2
**109** [1] - 101:4
**10:17** [1] - 1:14
**10th** [1] - 19:11
**11** [11] - 3:23, 51:23,

82:21, 83:2, 83:3,
  83:22, 85:11, 86:21,
  215:10, 260:20,
  260:22
**112** [1] - 101:7
**116** [1] - 4:5
**117-179** [1] - 258:5
**11th** [4] - 130:2, 130:4,
  199:21, 200:12
**12** [12] - 4:2, 7:10,
  7:14, 9:1, 9:21, 89:2,
  91:15, 98:5, 191:6,
  192:10, 227:6,
  283:12
**12's** [1] - 91:17
**12.75** [3] - 35:23, 36:6,
  36:13
**124** [1] - 101:8
**125** [2] - 189:11,
  189:18
**126** [1] - 4:6
**128** [1] - 290:10
**129,254** [1] - 185:7
**12th** [1] - 130:3
**13** [7] - 4:3, 100:18,
  100:22, 100:23,
  101:1, 101:2, 283:12
**14** [8] - 1:13, 2:9, 4:5,
  116:16, 116:20,
  189:4, 189:5, 189:8
**14202** [1] - 2:5
**14203** [1] - 2:10
**143** [7] - 4:7, 4:8, 4:9,
  4:10, 4:11, 4:12,
  4:13
**14859** [1] - 5:8
**15** [6] - 4:6, 15:10,
  76:13, 126:20,
  127:1, 134:10
**15-cv-701-FPG** [1] -
  1:6
**156,196** [1] - 185:12
**15th** [1] - 154:9
**16** [8] - 4:7, 48:22,
  143:14, 144:14,
  144:15, 147:19,
  147:20, 183:15
**167** [1] - 80:12
**16A** [3] - 166:3, 166:4,
  166:9
**17** [10] - 4:8, 4:21,
  41:4, 143:15,
  152:20, 165:22,
  166:3, 270:11
**176** [1] - 68:19
**1778** [1] - 48:6
**178** [1] - 75:9
**17th** [1] - 78:15
**18** [5] - 4:9, 61:23,
  65:11, 143:16, 167:4

**180** [1] - 77:8
**181** [1] - 75:9
**18th** [2] - 2:15, 92:6
**19** [6] - 4:10, 69:10,
  143:17, 181:18,
  183:15
**195** [2] - 5:8, 48:3
**1983** [1] - 21:19
**1990** [3] - 21:15,
  22:20, 22:21
**1998** [4] - 21:8, 46:17,
  47:12, 47:18
**19th** [3] - 269:12,
  269:13, 269:14
**1st** [1] - 172:14

## 2

**2** [7] - 3:7, 5:3, 13:13,
  13:14, 127:3, 258:1
**20** [13] - 4:11, 93:20,
  124:7, 124:10,
  124:13, 124:16,
  124:18, 124:20,
  143:18, 144:17,
  183:23, 252:3,
  296:17
**2000** [3] - 22:22,
  121:1, 269:13
**2001** [2] - 43:10, 47:12
**2002** [9] - 43:21, 44:2,
  58:1, 61:23, 65:11,
  76:13, 78:16, 80:19,
  169:3
**2003** [2] - 80:20, 82:7
**2005** [2] - 121:3, 121:7
**2006** [5] - 49:5, 51:14,
  51:23, 124:3, 124:6
**2007** [1] - 118:7
**2008** [1] - 52:1
**2009** [1] - 165:11
**201** [1] - 65:2
**2010** [7] - 23:23, 89:5,
  90:1, 90:16, 121:5,
  121:7, 298:3
**2011** [25] - 4:7, 92:6,
  96:18, 97:11, 97:15,
  143:14, 144:18,
  144:20, 145:2,
  145:7, 146:1, 146:3,
  146:10, 146:16,
  147:4, 147:14,
  147:21, 149:23,
  150:22, 151:4,
  151:9, 152:14,
  185:23, 298:1
**2012** [74] - 4:4, 4:8,
  4:21, 12:14, 49:9,
  50:2, 51:4, 56:17,
  63:21, 71:18, 72:10,

87:6, 99:3, 100:18,
  108:4, 114:1,
  114:11, 119:23,
  120:13, 125:6,
  125:20, 127:19,
  128:18, 130:2,
  130:3, 143:15,
  146:22, 147:4,
  149:16, 152:22,
  152:23, 153:7,
  153:10, 153:18,
  154:8, 154:13,
  154:20, 155:8,
  155:19, 157:6,
  157:13, 157:20,
  158:16, 159:7,
  159:17, 161:11,
  161:20, 162:12,
  162:17, 163:1,
  165:23, 166:21,
  168:16, 169:22,
  191:9, 195:12,
  199:2, 204:5, 208:9,
  208:18, 213:7,
  213:17, 214:4,
  214:10, 214:16,
  215:2, 215:7, 240:1,
  251:2, 251:8,
  266:19, 269:15,
  270:11, 297:22
**2013** [14] - 4:9, 4:10,
  74:5, 143:16,
  143:17, 166:21,
  167:7, 167:12,
  167:14, 170:20,
  171:7, 171:19,
  174:5, 181:19
**2014** [7] - 4:11, 29:23,
  143:18, 172:15,
  178:1, 179:5, 184:1
**2015** [13] - 4:12, 27:12,
  27:13, 27:17, 27:22,
  30:1, 143:19, 178:2,
  179:2, 179:4, 185:3,
  185:6, 185:9
**2016** [9] - 4:13,
  119:15, 143:20,
  169:11, 185:5,
  185:11, 185:15,
  185:18, 188:19
**2017** [3] - 1:14, 154:8,
  300:19
**203** [1] - 4:14
**21** [5] - 4:12, 143:19,
  148:7, 184:23, 185:2
**211** [1] - 4:16
**219** [1] - 4:17
**22** [9] - 4:4, 4:13,
  100:18, 143:20,
  173:13, 173:14,

184:23, 185:4,
  188:21
**23** [4] - 4:14, 203:11,
  203:15, 212:5
**2300** [1] - 184:18
**2337.92** [1] - 184:18
**24** [23] - 4:16, 9:4,
  9:19, 10:2, 10:5,
  92:19, 108:4, 191:9,
  211:19, 212:1,
  215:7, 217:10,
  223:17, 233:3,
  234:19, 240:17,
  264:21, 266:10,
  277:2, 277:6,
  277:10, 288:4
**24th** [2] - 29:23, 125:6
**25** [11] - 4:17, 40:10,
  41:2, 126:14,
  219:12, 223:18,
  223:19, 223:23,
  241:1, 248:7, 257:1
**251** [1] - 3:3
**254** [1] - 4:19
**26** [5] - 4:19, 254:10,
  254:13, 256:4,
  256:20
**27** [3] - 4:20, 270:11,
  270:16
**270** [1] - 4:20

## 3

**3** [10] - 3:8, 5:4, 43:11,
  44:1, 44:22, 45:5,
  45:23, 91:18,
  190:12, 191:5
**3/18/02** [6] - 3:12,
  3:14, 3:16, 57:7,
  61:5, 64:14
**3/18/2002** [2] - 61:17,
  61:20
**3/4/02** [1] - 44:14
**3/7/2012** [1] - 119:22
**30** [9] - 124:7, 124:10,
  124:13, 124:16,
  124:18, 124:20,
  169:19, 169:20,
  278:19
**30,000** [1] - 37:1
**32,324** [1] - 148:10
**35** [1] - 279:2
**35,000** [2] - 169:10,
  169:14
**3500** [1] - 168:16
**362-1128** [1] - 2:5
**38** [2] - 217:11, 217:14
**380-397** [1] - 258:6
**383** [1] - 257:18
**387** [1] - 257:21

**39** [1] - 217:10
**390** [1] - 257:21
**399** [1] - 257:21

## 4

**4** [3] - 3:10, 53:12, 53:16
**4/17/03** [2] - 3:22, 80:4
**4/29/65** [1] - 21:2
**40** [1] - 218:14
**401(k** [1] - 37:14
**401(k)s** [1] - 36:20
**41** [1] - 206:20
**42** [3] - 206:15, 206:21, 218:8
**422-5971** [1] - 34:22
**46** [1] - 180:15
**469** [2] - 83:5, 85:18
**470** [2] - 83:6, 86:22
**49** [1] - 257:13
**4th** [4] - 27:12, 27:13, 27:16, 27:22

## 5

**5** [25] - 3:2, 3:6, 3:7, 3:8, 3:11, 57:6, 58:2, 61:10, 61:18, 61:19, 65:12, 249:20, 249:21, 252:5, 256:19, 257:2, 257:3, 276:20, 278:17, 278:21, 279:2, 279:4, 290:2, 296:17
**5,000** [3] - 188:13, 188:14, 188:15
**5.99** [2] - 215:13, 215:15
**5/13/02** [3] - 3:18, 68:13, 69:8
**5/17/02** [2] - 3:20, 72:19
**5/325s** [1] - 9:7
**50** [3] - 40:6, 40:8, 40:9
**50/50** [1] - 168:1
**53** [1] - 3:10
**55** [2] - 35:9, 36:6
**55.5** [1] - 35:18
**55.75** [1] - 35:9
**551** [1] - 117:1
**552** [1] - 117:1
**57** [1] - 3:11
**5:21** [1] - 299:5
**5:30** [2] - 290:1, 290:7

## 6

**6** [8] - 3:13, 61:4, 61:9, 61:11, 61:12, 64:6, 65:12, 200:17
**60** [1] - 76:13
**607** [1] - 54:13
**609** [1] - 34:22
**61** [1] - 3:13
**622** [1] - 48:10
**64** [1] - 3:15
**646** [1] - 2:16
**663-1860** [1] - 2:16
**68** [1] - 3:17

## 7

**7** [14] - 3:15, 64:14, 64:17, 64:23, 116:3, 119:23, 120:13, 152:4, 182:4, 184:14, 184:15, 185:5, 185:11
**70** [3] - 2:4, 169:23, 170:2
**71,185** [1] - 166:5
**716** [2] - 2:5, 2:10
**72** [1] - 3:19
**74,185** [1] - 166:18

## 8

**8** [6] - 3:17, 58:9, 68:12, 68:16, 68:18, 149:19
**8/18/11** [2] - 4:2, 89:2
**80** [1] - 3:21
**805** [1] - 2:14
**82** [1] - 3:23
**85** [1] - 48:10
**855-2800** [1] - 2:10
**8636** [2] - 22:14
**869-2705** [1] - 17:13
**870** [1] - 17:13
**8879** [4] - 4:7, 4:8, 143:14, 143:15
**89** [1] - 4:2
**8th** [2] - 1:14, 300:19

## 9

**9** [8] - 3:19, 53:19, 72:18, 75:2, 75:3, 76:9, 78:5, 116:4
**930** [2] - 1:13, 2:9
**943** [1] - 255:9
**972** [1] - 255:18
**9th** [8] - 19:3, 19:7, 19:9, 19:10, 19:14, 199:2, 199:5, 199:13

## A

**a.m** [1] - 1:15
**ability** [1] - 236:16
**able** [6] - 41:21, 140:7, 144:17, 151:9, 167:1, 244:1
**abuse** [3] - 77:13, 77:15, 140:8
**acceptable** [1] - 7:5
**acceptance** [1] - 65:20
**access** [2] - 151:2, 151:10
**accident** [41] - 55:5, 55:9, 56:16, 99:4, 99:6, 100:4, 101:16, 101:23, 102:3, 102:6, 102:14, 102:17, 102:21, 103:3, 103:13, 103:16, 104:1, 105:3, 107:10, 107:15, 108:1, 108:3, 108:14, 109:11, 109:13, 111:15, 112:2, 113:13, 113:14, 113:15, 115:7, 115:11, 117:13, 117:15, 125:5, 161:14, 162:2, 191:9, 191:19, 191:20
**accidents** [4] - 39:17, 55:3, 56:3, 100:7
**according** [2] - 161:4, 219:1
**account** [14] - 23:15, 23:19, 23:22, 24:8, 24:10, 24:17, 24:21, 166:20, 186:22, 187:3, 187:6, 187:9, 187:12, 189:16
**accounts** [1] - 215:1
**accurate** [2] - 57:19, 150:4
**Acknowledge** [1] - 65:5
**acknowledge** [4] - 69:6, 254:2, 257:5, 257:12
**Acknowledgement** [6] - 3:15, 3:17, 3:21, 64:14, 68:12, 80:4
**acknowledgement** [1] - 78:22
**acknowledges** [1] - 65:21
**acknowledging** [3] - 78:18, 80:22, 81:21

**acknowledgment** [2] - 67:9, 69:2
**acronym** [3] - 55:10, 235:5, 295:20
**Action** [6] - 1:6, 4:2, 4:6, 89:2, 91:22, 126:20
**action** [7] - 62:20, 63:6, 79:17, 82:15, 127:6, 190:10, 300:15
**actions** [1] - 127:13
**actual** [3] - 17:7, 192:5, 212:3
**acupuncture** [4] - 165:5, 165:7, 165:9, 165:15
**ad** [5] - 206:14, 206:15, 248:11, 263:15, 263:21
**add** [1] - 168:23
**added** [2] - 168:19, 243:15
**addition** [1] - 211:4
**additional** [2] - 244:22, 246:13
**address** [9] - 16:17, 17:1, 17:8, 47:21, 50:11, 50:12, 51:2, 184:10
**adjourned** [1] - 299:5
**administered** [6] - 32:14, 71:17, 133:13, 198:4, 202:4, 226:11
**Administration** [1] - 257:18
**admitted** [1] - 110:2
**ads** [1] - 219:4
**advertised** [3] - 248:8, 248:10, 248:14
**advertisements** [1] - 263:1
**advice** [2] - 12:23, 164:15
**advised** [1] - 14:15
**affect** [1] - 10:5
**affected** [1] - 123:5
**affiliated** [1] - 29:11
**affirm** [1] - 258:16
**affixed** [2] - 224:18, 300:18
**affording** [1] - 115:17
**afraid** [1] - 247:20
**afternoon** [1] - 251:23
**afterwards** [1] - 249:7
**agenda** [2] - 76:8, 76:11
**ago** [8] - 14:2, 24:13, 29:13, 51:23, 61:1,

**126:14, 194:23, 290:19**
**agree** [6] - 79:8, 203:19, 212:2, 217:12, 217:17, 223:22
**agreed** [2] - 20:11, 230:22
**ahead** [1] - 155:3
**Aid** [1] - 163:17
**aircraft** [1] - 287:10
**aircrafts** [1] - 287:12
**airplane** [1] - 293:7
**alcohol** [14] - 9:21, 67:10, 67:11, 76:14, 76:19, 77:3, 78:21, 79:13, 84:14, 86:12, 87:2, 87:7, 87:10, 258:10
**Alcohol** [7] - 4:1, 4:19, 82:21, 83:10, 83:16, 254:13, 260:16
**Alien** [1] - 250:22
**alive** [4] - 15:19, 16:7, 16:13, 21:21
**allegation** [2] - 191:11, 192:8
**alleges** [1] - 191:8
**alleviate** [1] - 118:13
**allow** [1] - 24:5
**allowed** [4] - 25:7, 115:1, 149:4, 280:16
**allowing** [2] - 114:9, 175:3
**almost** [6] - 169:23, 170:2, 177:17, 209:12, 243:8, 243:9
**alone** [1] - 135:5
**ALSO** [1] - 2:17
**altering** [1] - 86:6
**Amended** [2] - 3:6, 5:2
**America** [5] - 149:21, 287:12, 287:15, 292:10, 292:15
**amount** [7] - 94:11, 153:12, 182:5, 184:13, 185:6, 189:13, 241:22
**analysis** [1] - 261:8
**AND** [2] - 1:7, 2:11
**annuities** [1] - 166:13
**answer** [19] - 6:6, 6:18, 7:4, 26:8, 30:13, 42:9, 106:2, 194:22, 220:6, 253:5, 267:16, 267:17, 270:2, 276:3, 286:19, 294:5, 294:14, 294:17, 296:10

**answering** [2] - 6:22, 7:1
**answers** [3] - 45:5, 97:21, 144:3
**anti** [3] - 191:10, 191:13, 192:11
**anti-inflammatory** [3] - 191:10, 191:13, 192:11
**anyway** [2] - 197:14, 300:16
**anyways** [1] - 148:20
**app** [3] - 28:11, 90:9, 90:11
**appear** [3] - 58:11, 65:8, 223:20
**APPEARING** [3] - 2:2, 2:6, 2:11
**Applicant** [1] - 44:20
**application** [26] - 28:4, 28:10, 28:15, 28:20, 39:21, 41:22, 44:14, 45:1, 45:6, 45:10, 45:18, 57:1, 57:23, 74:6, 74:9, 74:13, 74:20, 90:5, 90:13, 90:22, 91:11, 93:23, 96:14, 97:14, 179:8, 179:11
**Application** [3] - 3:8, 5:4, 44:11
**applications** [3] - 57:23, 90:2, 90:3
**applied** [9] - 29:1, 39:16, 40:4, 41:8, 41:13, 42:3, 56:13, 60:14, 89:6
**apply** [7] - 32:8, 42:10, 66:14, 73:23, 97:10, 176:4, 280:11
**appointment** [2] - 290:1, 290:9
**approval** [3] - 161:8, 161:9, 161:10
**April** [1] - 30:1
**area** [5] - 23:1, 109:4, 124:3, 151:17, 162:1
**argument** [1] - 102:22
**Arizona** [1] - 184:10
**Arkansas** [1] - 16:16
**arm's** [1] - 169:16
**arrested** [2] - 20:2, 20:5
**arrived** [4] - 131:16, 134:6, 227:8, 229:21
**Article** [2] - 4:15, 203:11
**article** [34] - 26:1, 26:2, 203:18, 217:14, 217:19,

217:21, 217:23, 218:5, 218:11, 218:15, 218:18, 218:21, 219:2, 235:10, 235:14, 235:20, 235:22, 236:2, 236:6, 236:10, 267:11, 267:12, 268:11, 268:13, 268:16, 271:22, 273:11, 273:13, 274:13, 274:14, 274:15, 274:19, 276:23, 277:10
**articles** [24] - 215:18, 215:22, 215:23, 217:6, 218:2, 268:19, 272:1, 272:14, 272:16, 273:8, 274:5, 275:12, 275:17, 275:18, 275:19, 275:20, 275:23, 276:8, 276:18, 276:19, 277:2, 277:15, 288:8, 288:23
**artist** [1] - 23:7
**as-needed** [2] - 194:1, 194:8
**Ashcroft** [1] - 1:12
**ASHCROFT** [2] - 300:5, 300:22
**Ashworth** [4] - 147:10, 147:11, 147:12
**aside** [2] - 145:16, 154:5
**assigned** [1] - 73:9
**assignment** [1] - 158:18
**assignments** [2] - 158:21, 158:22
**assist** [1] - 145:2
**associated** [7] - 29:11, 29:13, 170:15, 237:1, 237:5, 237:8, 241:14
**assume** [3] - 188:11, 188:12, 285:17
**assumed** [1] - 198:5
**assuming** [1] - 69:17
**ate** [1] - 125:23
**attached** [2] - 136:7, 226:20
**attended** [1] - 75:15
**attention** [6] - 54:17, 86:20, 148:4, 165:23, 190:7, 207:9
**attorney** [10] - 5:15,

11:12, 144:3, 144:6, 222:4, 222:12, 222:19, 236:21, 246:22, 252:1
**attorney-client** [2] - 222:4, 236:21
**attorneys** [2] - 14:12, 14:15
**audited** [1] - 186:3
**Augie** [5] - 29:8, 29:10, 29:11, 29:15, 29:17
**AUGIE** [1] - 29:10
**August** [7] - 92:6, 156:4, 161:12, 162:12, 171:6, 171:19, 172:13
**authority** [1] - 186:5
**authorized** [1] - 84:8
**auto** [4] - 20:8, 20:10, 31:4, 35:13
**available** [1] - 290:7
**Avenel** [2] - 72:23, 73:10
**AVENEL** [1] - 73:1
**Avenue** [1] - 2:14
**average** [1] - 88:2
**award** [2] - 104:7, 104:23
**aware** [5] - 112:14, 117:23, 123:18, 162:5, 195:7
**awareness** [3] - 76:14, 77:3, 126:5
**awfully** [1] - 189:22

**B**

**background** [1] - 14:23
**bad** [1] - 219:19
**badge** [1] - 225:7
**Baldwin** [2] - 19:16, 19:22
**bank** [7] - 186:21, 214:12, 214:14, 214:15, 214:16, 215:1
**Bank** [2] - 149:20, 214:18
**banking** [1] - 214:16
**banks** [1] - 215:1
**barely** [1] - 45:3
**Barnes** [3] - 204:10, 204:19, 204:21
**base** [1] - 73:7
**based** [13] - 13:5, 35:10, 265:5, 265:10, 266:6, 266:13, 266:15,

283:19, 284:3, 284:18, 285:5, 285:10, 295:23
**basis** [4] - 193:18, 194:2, 194:6, 194:8
**batch** [6] - 224:21, 224:22, 225:1, 225:9, 225:14, 225:23
**Bates** [1] - 233:5
**bathroom** [1] - 174:17
**beat** [2] - 287:17, 292:11
**bedroom** [1] - 146:19
**beforehand** [1] - 236:15
**began** [2] - 157:20, 227:16
**begin** [3] - 6:18, 14:11, 155:23
**beginning** [1] - 239:23
**begins** [1] - 62:11
**behalf** [1] - 251:14
**behind** [2] - 242:6, 242:7
**bell** [2] - 153:14, 184:11
**below** [6] - 63:13, 67:19, 77:19, 82:8, 85:10, 226:8
**benefit** [2] - 36:19, 39:4
**benefits** [2] - 35:21, 291:22
**Benjamin** [7] - 14:10, 14:13, 14:16, 221:7, 221:10, 222:8, 222:16
**Best** [1] - 220:20
**best** [2] - 45:7, 215:16
**better** [2] - 164:17, 178:5
**Betty** [4] - 16:1, 16:2, 16:3, 16:4
**between** [20] - 32:6, 47:12, 96:23, 121:7, 157:9, 175:21, 176:5, 177:8, 178:22, 180:16, 180:17, 181:5, 221:7, 222:8, 253:4, 253:13, 253:16, 259:7, 284:14, 288:11
**big** [5] - 52:12, 136:19, 189:9, 209:10, 278:21
**bill** [1] - 150:13
**billboard** [1] - 248:14
**Binghamton** [5] -

51:9, 109:5, 111:20, 156:10, 164:4
**Binghamton's** [1] - 164:7
**biological** [4] - 16:9, 16:11, 19:12, 20:21
**birth** [1] - 21:1
**bit** [1] - 144:10
**blanket** [3] - 67:16, 285:21, 294:13
**blanks** [2] - 159:19, 179:17
**blood** [8] - 122:3, 122:4, 124:13, 124:15, 124:17, 124:20, 125:2, 125:3
**board** [1] - 147:16
**body** [6] - 66:22, 107:21, 115:13, 115:17, 231:7
**bones** [1] - 162:1
**bonus** [6] - 37:2, 37:12, 95:6, 95:9, 95:11, 95:15
**bonuses** [1] - 37:5
**Book** [1] - 66:7
**book** [1] - 66:10
**books** [1] - 213:3
**bookstore** [10] - 204:10, 204:20, 210:6, 212:11, 212:18, 212:19, 212:21, 212:22, 216:6, 216:9
**born** [1] - 21:3
**BORON** [69] - 2:8, 5:12, 8:3, 10:14, 10:18, 10:23, 13:7, 13:11, 17:9, 33:15, 34:1, 34:6, 43:14, 43:18, 43:23, 53:14, 57:11, 61:7, 64:16, 68:15, 72:21, 80:6, 83:1, 89:4, 98:4, 98:6, 98:11, 98:15, 98:18, 99:1, 100:20, 116:18, 126:22, 143:22, 166:7, 166:10, 190:2, 190:6, 190:16, 190:19, 191:4, 194:23, 195:6, 203:13, 205:11, 205:17, 205:22, 210:22, 211:3, 211:12, 211:21, 219:14, 221:23, 222:3, 222:5, 222:7, 222:14, 223:14, 223:16, 233:6,

249:21, 250:1,
250:8, 254:20,
257:2, 279:21,
280:3, 288:3, 299:2
**boron** [2] - 210:19,
280:11
**Boron** [2] - 3:2, 5:14
**boss** [1] - 96:20
**BOTANICALS** [2] -
1:8, 2:12
**Botanicals** [2] - 275:7,
276:13
**bother** [2] - 162:9,
282:4
**bothered** [1] - 162:10
**bothering** [1] - 162:13
**bottle** [15] - 12:16,
12:18, 12:21, 219:7,
229:3, 241:23,
243:6, 243:14,
243:15, 243:18,
244:1, 244:9,
244:20, 245:2, 245:9
**bottles** [1] - 244:22
**bottom** [21] - 53:18,
53:22, 58:8, 61:13,
61:16, 65:1, 68:19,
69:5, 75:7, 80:11,
83:4, 86:21, 91:18,
116:23, 117:18,
127:2, 127:11,
215:6, 241:1, 255:9,
255:11
**bought** [21] - 74:16,
114:7, 116:12,
168:22, 182:19,
182:20, 183:18,
204:22, 204:23,
208:13, 208:18,
208:19, 208:21,
208:22, 209:1,
209:3, 236:3, 236:4,
239:13, 240:15,
288:12
**BOWDEN** [1] - 16:19
**box** [24] - 78:13, 92:1,
92:9, 127:8, 184:16,
184:17, 184:18,
189:4, 189:5,
189:11, 219:16,
219:18, 220:8,
220:9, 220:12,
220:15, 229:9,
229:13, 229:16,
229:18, 229:21,
245:15, 245:16
**boxes** [1] - 220:23
**break** [18] - 27:19,
33:16, 33:23, 57:12,
57:17, 97:23, 98:2,

98:8, 143:8, 144:1,
189:20, 211:13,
211:22, 212:10,
250:2, 250:9, 280:20
**breaks** [2] - 33:19,
280:16
**breast** [2] - 208:5,
208:6
**breath** [1] - 42:8
**briefly** [3] - 145:5,
170:23, 171:2
**bring** [13] - 12:11,
30:5, 128:17,
210:14, 212:19,
219:7, 220:8, 228:5,
228:13, 232:4,
232:7, 245:2, 252:7
**broadcast** [1] - 239:19
**broken** [1] - 162:1
**Brothers** [2] - 171:14,
172:23
**brought** [5] - 129:1,
219:15, 228:8,
228:15, 229:12
**bruised** [1] - 161:22
**Buffalo** [3] - 1:14, 2:5,
2:10
**build** [1] - 247:11
**building** [3] - 138:21,
138:22, 139:4
**Building** [2] - 1:13, 2:9
**burn** [3] - 125:7,
155:12, 156:13
**burnt** [4] - 156:6,
156:19, 156:21,
157:8
**business** [10] -
150:10, 167:14,
167:16, 167:23,
168:3, 168:9,
168:13, 172:12,
183:18, 295:23
**button** [1] - 179:18
**buy** [12] - 169:22,
187:16, 206:11,
206:13, 206:17,
206:21, 216:2,
219:4, 263:7,
269:21, 269:23,
270:3
**buying** [1] - 201:23
**buys** [1] - 270:3
**BY** [43] - 2:3, 2:8, 2:13,
5:12, 8:3, 10:23,
13:11, 17:9, 34:6,
43:23, 53:14, 57:11,
61:7, 64:16, 68:15,
72:21, 80:6, 83:1,
89:4, 99:1, 100:20,
116:18, 126:22,

143:22, 166:10,
190:6, 191:4, 195:6,
203:13, 205:22,
211:21, 219:14,
222:14, 223:16,
250:8, 251:21,
254:15, 254:23,
270:13, 280:8,
286:13, 290:18,
295:2

# C

**C-H-A-V-E-Z** [1] - 15:5
**C-H-O-I** [1] - 8:9
**calendar** [1] - 130:5
**California** [14] - 15:22,
18:20, 20:2, 20:5,
20:15, 21:7, 46:7,
46:15, 47:2, 47:14,
47:16, 47:18,
207:20, 247:18
**camera** [1] - 220:18
**cameras** [2] - 220:4,
220:7
**campus** [1] - 164:7
**cancer** [8] - 207:4,
207:14, 208:2,
208:4, 208:5, 208:7,
208:12, 210:3
**candy** [1] - 22:1
**Candy** [1] - 22:5
**candy's** [1] - 22:15
**cannabinoid** [3] -
235:6, 265:17,
266:15
**cannabinoid-based**
[1] - 266:15
**cannabinoids** [6] -
234:20, 235:1,
235:8, 262:15,
262:20, 267:22
**Cannabis** [1] - 262:7
**cannabis** [3] - 235:2,
262:10, 266:15
**cap** [1] - 229:2
**car** [3] - 99:16, 232:2,
267:4
**Carbonics** [1] - 40:15
**card** [9] - 205:9,
205:12, 205:13,
205:19, 213:5,
213:16, 214:2,
214:11, 270:4
**cards** [4] - 213:7,
213:9, 214:6, 214:7
**care** [11] - 8:10, 8:12,
8:20, 108:17, 112:1,
121:16, 150:3,
158:9, 162:16,

281:10, 281:11
**career** [1] - 104:12
**carefully** [1] - 265:13
**Carrier** [2] - 26:15,
66:7
**case** [6] - 43:2, 63:1,
221:1, 247:2,
247:11, 258:13
**cash** [1] - 205:8
**caught** [1] - 207:8
**caused** [2] - 62:19,
63:6, 105:2
**CBD** [8] - 234:22,
235:5, 263:13,
263:22, 267:13,
268:4, 268:10,
268:15
**CBD-type** [1] - 268:4
**Celadon** [1] - 40:14
**cell** [14] - 16:21, 16:23,
150:11, 150:13,
150:15, 150:16,
150:19, 151:15,
151:19, 180:19,
180:22, 181:2,
290:11
**cellophane** [1] -
229:11
**cells** [1] - 235:13
**Center** [3] - 48:6, 48:8,
49:16
**cents** [2] - 35:9,
180:15
**certain** [6] - 100:7,
134:20, 148:5,
165:14, 174:18,
259:1
**certainly** [1] - 98:7
**certification** [2] - 64:5,
122:12
**certifications** [1] -
106:14
**certified** [2] - 45:5,
47:9
**certify** [3] - 300:6,
300:12, 300:15
**certifying** [3] - 59:4,
77:11, 77:14
**cetera** [1] - 57:18
**CFR** [1] - 258:4
**change** [6] - 63:9,
78:11, 157:16,
183:17, 214:22,
231:7
**changed** [7] - 15:12,
19:18, 19:19, 24:3,
78:14, 214:7, 249:8
**changing** [1] - 144:9
**Chapter** [1] - 258:5
**charged** [1] - 20:4

**charges** [1] - 20:10
**charging** [1] - 147:16
**Charles** [2] - 99:23,
199:19
**Chavez** [10] - 15:5,
15:7, 15:14, 15:16,
16:1, 16:2, 16:9,
19:4, 19:5, 19:20
**check** [1] - 193:23
**checked** [2] - 92:2,
127:8
**child** [1] - 50:13
**children** [1] - 50:15
**CHOI** [1] - 162:22
**Choi** [39] - 8:5, 8:6,
8:10, 8:20, 9:16,
111:19, 111:22,
112:2, 112:6,
112:14, 112:16,
113:2, 113:16,
114:14, 115:6,
115:10, 115:18,
115:22, 116:6,
116:11, 121:13,
121:16, 121:20,
122:7, 162:20,
163:1, 163:6,
164:10, 164:15,
165:18, 192:1,
193:23, 195:7,
196:8, 196:19,
197:10, 198:3,
222:23, 237:15
**Choi's** [4] - 163:20,
164:6, 201:7, 201:11
**choices** [1] - 164:3
**Christ** [1] - 55:13
**Christmas** [1] - 37:12
**Christmastime** [1] -
118:12
**chronic** [1] - 126:13
**Cincinnati** [3] - 75:17,
76:2, 76:6
**Cindy** [71] - 2:17,
10:20, 21:9, 32:7,
32:22, 37:21, 47:4,
49:23, 52:6, 52:10,
52:17, 52:19, 75:20,
90:13, 97:7, 97:14,
100:1, 104:22,
107:1, 107:2,
107:18, 122:21,
126:5, 129:15,
129:18, 130:17,
138:7, 138:13,
142:16, 143:4,
147:1, 150:3, 150:5,
152:9, 154:16,
157:12, 159:3,
166:22, 167:2,

167:20, 168:11,
173:20, 176:16,
177:21, 185:8,
198:20, 199:4,
200:18, 202:7,
204:22, 212:13,
217:6, 218:23,
227:13, 227:14,
227:15, 227:17,
227:18, 230:21,
230:22, 231:9,
240:8, 244:12,
269:7, 269:10,
269:21, 270:7,
272:19, 272:20,
284:8, 291:2
**CINDY** [1] - 1:4
**Cindy's** [11] - 202:11,
207:3, 207:14,
207:18, 207:21,
208:1, 208:6,
208:11, 210:1,
216:15, 216:18
**cinnamon** [1] - 243:21
**circumstances** [2] -
25:20, 172:3
**cirrhosis** [1] - 123:9
**cities** [1] - 164:3
**Cities** [1] - 109:4
**city** [1] - 209:11
**Civil** [1] - 1:6
**claimed** [1] - 55:4
**class** [2] - 76:2, 107:3
**classified** [1] - 55:8
**CLAUDE** [1] - 2:13
**clean** [2] - 133:15,
133:16
**cleaned** [1] - 251:6
**clear** [5] - 14:20,
103:8, 210:18,
211:9, 298:20
**cleared** [1] - 155:2
**client** [6] - 25:14,
210:19, 211:9,
222:4, 236:21,
294:16
**clients** [2] - 11:17,
33:22
**close** [1] - 222:2
**clothing** [1] - 38:12
**cocaine** [1] - 260:3
**code** [2] - 149:10,
257:13
**codes** [1] - 66:8
**coffee** [2] - 33:19,
266:23
**cold** [3] - 164:20,
164:21, 165:17
**college** [4] - 147:4,
147:6, 147:8, 147:9

**College** [1] - 147:12
**Colorado** [1] - 50:22
**colored** [1] - 219:12
**column** [1] - 85:17
**com** [1] - 272:7
**coming** [5] - 99:19,
99:22, 235:2, 272:8,
274:8
**commenced** [3] -
221:8, 221:11,
221:14
**commencement** [1] -
300:8
**commentary** [2] -
77:5, 106:1
**commented** [2] - 25:4,
25:6
**comments** [1] -
127:12
**committee** [4] - 102:2,
102:5, 102:9, 103:17
**communicate** [1] -
151:23
**communication** [1] -
96:23
**Comp** [11] - 4:5,
110:12, 110:20,
112:4, 116:16,
158:6, 158:10,
158:11, 158:12,
158:14, 193:8
**companies** [5] -
26:20, 40:18, 55:23,
97:12, 97:15
**Company** [17] - 3:11,
3:17, 3:23, 4:19,
57:6, 58:5, 58:22,
68:12, 68:23, 69:7,
72:18, 75:13, 79:14,
82:21, 83:16,
254:13, 255:5
**company** [37] - 26:21,
26:22, 27:23, 29:2,
29:14, 29:18, 29:20,
38:7, 41:17, 41:18,
52:20, 63:9, 82:16,
83:9, 86:15, 89:7,
90:2, 92:19, 92:22,
106:11, 113:7,
127:14, 151:23,
171:4, 173:14,
177:4, 179:18,
180:2, 180:5, 180:9,
200:16, 272:3,
274:7, 274:9,
274:17, 278:3, 296:7
**compensate** [2] -
160:17, 160:20
**compensated** [2] -
35:4, 36:17

**Compensation** [3] -
153:20, 153:23,
154:5
**compensation** [6] -
34:23, 35:2, 94:3,
94:7, 179:21, 182:14
**compiled** [1] - 270:14
**complaint** [9] - 13:15,
13:17, 13:22, 14:1,
190:10, 190:13,
191:5, 191:8, 192:10
**Complaint** [2] - 3:7,
5:3
**complete** [1] - 45:7
**completely** [2] -
155:2, 245:17
**compliance** [3] -
79:12, 87:8, 87:10
**compliance/
designated** [1] - 87:3
**comply** [3] - 58:21,
281:21, 282:20
**component** [2] - 77:2,
151:4
**composite** [1] -
270:17
**compresses** [3] -
164:20, 164:21,
165:17
**computer** [7] - 250:12,
250:15, 250:17,
250:19, 273:1,
279:21, 279:23
**computers** [1] -
250:23
**concern** [3] - 13:4,
209:22, 234:12
**concerned** [3] - 13:1,
113:5, 143:4
**concerns** [1] - 13:6
**concrete** [1] - 52:13
**condition** [2] - 79:15,
207:22
**conference** [1] - 130:6
**confirm** [2] - 94:20,
270:21
**confirmation** [2] -
141:4, 141:5
**confusing** [1] - 295:11
**connection** [1] -
258:11
**consecutively** [1] -
101:5
**consent** [1] - 45:9
**considered** [2] - 71:5,
103:17
**consist** [1] - 66:2
**consistent** [1] - 84:9
**consists** [3] - 83:3,
101:2, 223:19

**construction** [1] -
161:7
**consult** [3] - 63:19,
63:23, 116:11
**consume** [2] - 7:14,
9:21
**consumed** [1] - 7:8
**consumer** [1] - 234:8
**consuming** [1] - 247:6
**consumption** [3] -
237:2, 237:8, 241:15
**contact** [8] - 68:4,
85:1, 86:23, 96:3,
140:18, 141:15,
196:19, 196:22
**contacted** [9] - 96:6,
133:4, 139:11,
139:13, 140:5,
141:8, 141:18,
176:1, 247:17
**contain** [3] - 284:19,
285:6, 291:9
**contained** [3] - 282:6,
283:21, 284:4
**container** [8] - 134:13,
136:6, 136:18,
136:22, 137:7,
137:13, 137:16,
142:4
**containers** [7] -
136:19, 136:23,
137:10, 137:14,
137:22, 137:23,
138:4
**contains** [3] - 55:21,
261:7, 270:18
**contemporaneously**
[1] - 283:7
**Continental** [1] -
40:14
**continuation** [1] -
236:22
**continue** [8] - 74:15,
144:1, 154:3,
211:23, 250:10,
290:14, 296:17,
296:18
**continues** [2] - 57:16,
234:7
**continuing** [2] - 195:8,
290:5
**continuous** [2] -
27:19, 53:3
**continuously** [1] -
155:18
**contracted** [1] -
122:19
**controlled** [8] -
258:10, 277:23,
278:6, 281:21,

282:1, 282:21,
285:17, 285:19
**conversation** [7] -
113:9, 113:16,
128:7, 128:10,
129:16, 130:11,
130:14
**conversations** [3] -
112:16, 128:1,
280:20
**convicted** [3] - 20:13,
20:17, 20:19
**copies** [9] - 10:21,
43:19, 98:1, 210:22,
219:19, 219:20,
223:6, 223:8, 223:9
**copy** [22] - 11:1,
13:15, 28:18, 28:20,
43:15, 53:19, 74:9,
79:6, 83:15, 100:23,
101:1, 102:13,
103:21, 127:6,
152:21, 179:10,
189:2, 211:10,
254:16, 254:19,
254:20, 291:5
**Coraopolis** [2] - 72:2,
130:19
**corner** [23] - 44:8,
44:13, 53:18, 58:8,
65:2, 68:19, 69:22,
70:1, 71:15, 75:7,
80:11, 83:5, 83:9,
85:11, 86:22, 91:18,
92:1, 117:1, 127:3,
127:7, 181:23,
182:1, 215:6
**correct** [349] - 32:10,
35:15, 36:15, 41:9,
41:10, 42:16, 44:8,
44:11, 46:20, 46:23,
58:6, 58:9, 60:3,
62:17, 62:18, 62:21,
62:22, 63:4, 63:18,
64:10, 64:11, 65:6,
65:7, 65:13, 66:1,
67:1, 68:20, 68:21,
68:23, 69:1, 69:3,
69:8, 69:9, 72:4,
73:15, 75:4, 75:6,
75:9, 75:10, 75:21,
76:10, 77:9, 77:10,
77:17, 78:6, 78:7,
79:2, 79:7, 79:19,
80:9, 80:10, 80:12,
80:20, 80:21, 82:11,
83:6, 83:7, 83:10,
83:11, 83:14, 84:2,
85:12, 85:16, 85:20,
85:23, 86:2, 86:19,

87:1, 89:12, 89:13,
89:14, 89:15, 92:9,
92:10, 93:15, 96:5,
99:18, 102:8,
103:13, 103:14,
106:3, 107:9,
107:13, 107:16,
108:5, 109:16,
109:22, 116:5,
116:21, 116:22,
117:2, 117:3,
117:15, 118:22,
119:3, 119:4, 119:5,
119:9, 119:16,
120:2, 122:6,
123:17, 124:11,
124:12, 127:5,
127:20, 127:21,
130:22, 134:16,
134:21, 135:8,
135:16, 135:17,
137:11, 137:15,
138:2, 139:16,
140:17, 141:2,
141:10, 147:22,
152:6, 152:13,
153:2, 153:3, 153:5,
153:6, 154:1, 154:2,
154:21, 155:5,
159:5, 160:12,
166:14, 166:17,
168:14, 169:13,
171:10, 172:10,
173:17, 174:4,
176:17, 178:21,
179:3, 185:10,
185:13, 185:15,
185:16, 185:19,
187:2, 189:10,
189:14, 191:12,
193:20, 193:21,
193:22, 198:23,
199:1, 199:14,
200:2, 202:6,
206:16, 207:10,
207:13, 210:4,
212:7, 212:12,
212:15, 212:16,
214:1, 214:3,
214:19, 215:8,
215:9, 215:11,
215:14, 217:16,
217:20, 218:12,
218:16, 219:22,
220:1, 221:15,
224:1, 224:19,
225:13, 226:7,
226:13, 226:16,
227:3, 228:12,
229:6, 229:15,
229:17, 229:23,

230:3, 231:21,
233:12, 234:1,
234:11, 234:21,
234:23, 237:13,
237:14, 238:21,
240:2, 240:10,
242:1, 242:3, 243:7,
243:8, 244:10,
244:21, 245:3,
245:5, 245:8, 246:1,
247:10, 248:1,
248:3, 249:14,
252:3, 252:19,
252:20, 254:4,
254:7, 254:8,
255:19, 255:23,
256:1, 257:4, 257:6,
257:7, 257:11,
258:7, 258:18,
258:19, 258:21,
258:22, 259:3,
259:4, 259:12,
259:13, 259:17,
259:18, 259:21,
259:22, 260:1,
260:5, 261:7,
261:14, 261:23,
262:3, 262:6, 262:9,
263:17, 263:19,
263:20, 264:1,
264:9, 264:11,
264:12, 264:13,
264:22, 265:1,
267:8, 267:21,
269:9, 269:16,
271:1, 273:3, 273:6,
273:10, 273:19,
273:20, 273:23,
274:3, 274:4,
274:15, 274:19,
274:20, 274:23,
275:1, 275:2, 275:3,
275:5, 275:6, 275:8,
275:9, 275:11,
275:15, 275:16,
276:4, 276:5, 276:7,
276:8, 276:10,
276:15, 276:17,
276:18, 276:23,
277:1, 277:4,
277:11, 277:12,
277:16, 278:4,
279:14, 280:13,
280:14, 280:18,
280:21, 280:22,
281:2, 281:3, 281:8,
281:18, 281:19,
281:22, 281:23,
282:7, 282:8,
282:15, 282:22,
282:23, 283:13,

288:5, 288:9,
288:10, 288:13,
288:14, 288:17,
288:19, 289:22,
290:20, 290:23,
294:1, 294:3, 294:5,
294:11, 295:4,
296:1, 296:6,
296:22, 296:23,
300:13
**correspondence** [1] -
68:5
**cost** [1] - 245:6
**Costco** [1] - 163:17
**counsel** [5] - 211:11,
251:18, 252:6,
255:1, 300:15
**Counsel** [2] - 34:3,
290:10
**count** [3] - 40:6, 62:8,
144:17
**counter** [6] - 33:13,
84:1, 84:19, 85:8,
96:9, 193:10
**countertop** [3] -
224:12, 224:13,
229:20
**country** [1] - 31:1
**County** [5] - 18:17,
19:23, 20:1, 300:6
**COUNTY** [1] - 300:3
**couple** [19] - 5:22,
6:15, 24:13, 31:21,
42:22, 43:3, 61:1,
98:1, 119:19,
184:23, 215:4,
226:3, 227:11,
227:23, 228:3,
228:4, 260:11,
275:17, 275:19
**course** [2] - 52:6, 52:8
**Court** [2] - 252:4,
286:6
**court** [6] - 6:12, 13:8,
18:8, 239:12,
239:14, 294:20
**COURT** [1] - 1:1
**cover** [6] - 180:4,
203:17, 207:7,
215:7, 229:8, 262:7
**coverage** [2] - 151:8,
179:23
**covered** [1] - 52:23
**CPA** [5] - 145:7,
145:15, 149:2,
149:13, 150:7
**CPAs** [1] - 144:20
**credit** [11] - 182:19,
182:20, 205:8,
205:12, 205:13,

205:19, 213:4,
213:7, 213:8,
213:16, 270:4
**crime** [3] - 20:13,
20:17, 20:19
**crude** [4] - 89:10,
89:11, 90:12, 97:18
**CSA** [6] - 55:13, 56:9,
56:13, 57:2, 102:16
**cup** [5] - 134:19,
134:23, 135:6,
136:23, 138:19
**cupboard** [6] - 242:5,
242:6, 242:9,
242:10, 242:16,
248:5
**current** [1] - 26:11
**custom** [1] - 146:6
**cut** [1] - 241:2

# D

**D-A-C** [1] - 55:18
**DAC** [6] - 55:2, 55:10,
55:16, 55:19, 56:7,
56:11
**dad** [4] - 19:12, 20:12,
20:21
**daily** [2] - 165:1, 165:2
**DAK** [1] - 55:16
**Dakota** [10] - 56:17,
107:10, 107:16,
108:4, 109:22,
109:23, 125:5,
170:22, 170:23,
171:3
**Dallas** [1] - 266:18
**database** [2] - 55:21,
56:2
**date** [33] - 21:1, 31:20,
34:13, 43:22, 44:13,
59:12, 61:15, 61:19,
61:21, 61:23, 65:11,
80:18, 81:4, 92:5,
119:21, 119:22,
120:5, 120:8, 120:9,
124:4, 165:13,
208:14, 236:9,
239:22, 255:20,
269:17, 271:14,
281:6, 281:14,
289:17, 291:9,
291:11
**dated** [34] - 3:12, 3:14,
3:16, 3:18, 3:20,
3:22, 4:2, 4:4, 4:6,
4:7, 4:8, 4:9, 4:10,
4:11, 4:12, 4:13,
4:21, 57:7, 61:5,
64:14, 68:13, 72:19,

80:4, 89:2, 100:18,
126:20, 143:14,
143:15, 143:16,
143:17, 143:18,
143:19, 143:20,
270:11
**dates** [1] - 284:12
**daughter** [9] - 50:4,
50:19, 51:15, 228:5,
228:8, 229:12,
244:13, 244:14,
246:15
**daughters** [4] - 50:17,
216:21, 216:23,
251:10
**days** [9] - 76:7,
127:15, 149:6,
175:5, 175:6, 198:9,
199:8, 199:21, 227:5
**daytime** [1] - 159:2
**deal** [5] - 52:14, 145:3,
156:22, 165:20,
169:18
**dealer** [2] - 170:7,
170:11
**dealership** [2] -
168:22, 170:6
**dealing** [2] - 118:18,
210:2
**dealt** [3] - 145:3,
156:23, 157:1
**debit** [1] - 214:11
**December** [1] - 35:20
**decide** [1] - 206:17
**decided** [2] - 92:18,
246:23
**decision** [4] - 102:5,
205:3, 246:21, 253:7
**decompression** [2] -
118:10, 118:12
**deduction** [3] - 150:9,
150:11, 151:5
**deductions** [2] -
147:20, 148:6
**deducts** [1] - 149:7
**deep** [1] - 42:8
**deer** [1] - 55:8
**defects** [1] - 105:2
**DEFENDANT** [2] - 2:6,
2:11
**Defendants** [1] - 1:9
**defendants** [2] - 5:16,
5:19
**define** [1] - 46:8
**definite** [1] - 228:2
**definitely** [1] - 100:14
**degenerative** [4] -
108:8, 117:21,
118:17, 119:6
**Delaney** [3] - 67:21,

67:22, 68:5
**delete** [1] - 25:14
**deleted** [2] - 25:17, 26:5
**deleting** [1] - 25:20
**delivered** [2] - 75:14, 245:23
**Delivered** [2] - 3:20, 72:19
**delivery** [2] - 161:1, 231:20
**Demand** [2] - 3:7, 5:3
**Demerol** [1] - 110:7
**denial** [5] - 42:4, 42:11, 42:17, 42:18, 42:23
**dental** [1] - 39:7
**Denver** [1] - 50:22
**deny** [4] - 64:10, 82:12, 86:10, 118:15
**Department** [1] - 257:17
**department** [2] - 109:15, 109:19
**dependant** [1] - 146:13
**depended** [1] - 157:5
**dependent** [1] - 263:5
**depicted** [1] - 248:7
**deposed** [1] - 6:10
**deposition** [19] - 10:12, 11:19, 11:23, 13:14, 53:16, 61:9, 68:17, 75:2, 80:8, 83:2, 91:16, 100:22, 116:20, 127:1, 167:4, 181:18, 183:22, 203:15, 212:2
**Deposition** [3] - 10:17, 11:5, 299:5
**depositions** [1] - 57:13
**depreciation** [2] - 183:16, 183:17
**describe** [4] - 55:7, 66:20, 73:7, 137:4
**described** [5] - 58:16, 66:11, 119:2, 153:17, 274:16
**describes** [1] - 117:14
**describing** [1] - 240:21
**Description** [3] - 3:11, 57:6, 58:5
**DESCRIPTION** [1] - 3:5
**description** [2] - 58:14, 117:12
**designated** [2] - 87:8,

87:11
**detail** [1] - 82:14
**determine** [3] - 63:15, 160:16, 226:17
**detour** [1] - 161:7
**deviate** [1] - 161:5
**device** [1] - 159:6
**diagnosed** [11] - 108:8, 120:15, 121:9, 121:17, 122:23, 126:12, 161:19, 207:15, 207:16, 208:6, 208:12
**Diagnostics** [1] - 32:19
**Dice** [5] - 5:18, 272:2, 272:9, 275:2, 276:9
**DICE** [2] - 1:7, 2:7
**dietary** [5] - 239:8, 291:17, 293:1, 293:20, 293:21
**difference** [5] - 100:11, 253:15, 253:19, 256:8, 256:11
**different** [24] - 19:7, 40:18, 55:14, 55:15, 60:6, 89:7, 90:7, 90:10, 102:11, 119:1, 122:8, 135:22, 137:22, 138:17, 141:12, 141:13, 173:15, 174:11, 177:4, 211:1, 211:3, 250:14, 253:8, 256:9
**difficult** [2] - 33:18, 252:11
**direct** [3] - 148:4, 165:23, 252:5
**directed** [1] - 289:8
**directing** [1] - 86:20
**direction** [2] - 144:6, 226:14
**director** [3] - 101:12, 130:7, 130:13
**dirty** [28] - 41:19, 128:4, 128:23, 139:14, 140:6, 140:9, 140:10, 140:12, 140:13, 140:14, 141:15, 142:2, 198:18, 198:22, 199:8, 199:23, 200:15, 203:1, 203:2, 204:13, 204:16, 209:3, 209:5, 219:5, 225:12, 236:12,

259:23, 281:12
**disabled** [1] - 20:23
**disagreement** [3] - 174:20, 174:22, 175:1
**disbelief** [1] - 142:15
**disc** [5] - 108:8, 117:21, 118:17, 119:6, 119:7
**discarded** [1] - 137:18
**discharge** [2] - 62:21, 63:7
**disciplinary** [11] - 62:20, 63:6, 79:16, 81:1, 81:3, 81:14, 81:22, 81:23, 82:4, 82:13, 82:14
**disclose** [3] - 39:17, 39:22, 39:23
**discover** [1] - 213:13
**Discover** [3] - 213:14, 213:15, 214:2
**discovered** [2] - 281:5, 281:14
**discs** [4] - 117:22, 118:1, 118:6, 118:18
**discuss** [2] - 144:2, 195:19
**discussed** [2] - 194:15, 222:12
**discussion** [1] - 112:21
**Discussion** [1] - 190:4
**disease** [4] - 108:9, 117:22, 118:17, 119:6
**dispatch** [3] - 160:21, 160:22, 161:1
**distance** [1] - 164:5
**distinction** [4] - 253:3, 253:5, 253:13, 259:7
**DISTRICT** [2] - 1:1, 1:2
**ditch** [2] - 99:15, 99:16
**division** [3] - 89:10, 89:12, 256:10
**Dixie** [54] - 63:21, 87:6, 116:12, 206:14, 223:21, 225:7, 232:9, 232:11, 232:13, 232:16, 239:17, 244:23, 246:13, 246:18, 247:2, 247:12, 248:7, 249:10, 251:18, 252:2, 260:11, 263:15, 264:20, 268:2, 268:18, 268:19, 270:22,

271:8, 271:16, 272:9, 272:15, 273:7, 273:18, 274:2, 274:8, 274:21, 275:7, 276:1, 276:3, 276:13, 278:2, 278:3, 281:1, 281:17, 281:20, 282:11, 282:18, 286:1, 288:1, 288:8, 288:16, 289:2, 289:15, 291:15
**DIXIE** [4] - 1:7, 1:7, 2:11, 2:12
**Dixie's** [4] - 277:19, 277:20, 277:21, 285:4
**DNA** [1] - 235:13
**doctor** [29] - 85:1, 108:16, 108:17, 108:19, 109:1, 109:6, 109:8, 110:10, 110:12, 110:20, 111:13, 111:20, 112:4, 118:4, 120:19, 122:8, 122:17, 122:18, 123:4, 155:7, 158:4, 158:6, 158:11, 158:12, 158:14, 161:20, 193:9, 238:12
**Doctor** [2] - 4:5, 116:16
**doctor's** [3] - 110:15, 121:11, 156:7
**doctors** [1] - 155:2
**document** [26] - 3:14, 53:17, 54:2, 54:23, 56:23, 58:3, 58:4, 61:5, 62:2, 62:6, 62:9, 63:1, 68:18, 104:15, 117:4, 127:23, 136:7, 136:8, 136:9, 254:9, 255:2, 255:3, 256:3, 256:16, 270:17, 270:19
**documents** [5] - 11:22, 12:2, 12:7, 219:20, 221:2
**Dodge** [4] - 168:16, 169:3, 170:7, 182:16
**dollar** [3] - 182:5, 184:13, 189:13
**dollars** [1] - 94:11
**done** [38] - 41:16, 42:2, 42:9, 57:13, 70:5, 70:10, 71:12,

72:11, 72:12, 72:13, 90:23, 101:22, 104:10, 112:19, 122:7, 123:21, 124:13, 124:15, 124:17, 133:5, 134:4, 136:15, 136:17, 141:17, 142:5, 143:2, 143:3, 145:7, 156:11, 157:3, 157:6, 200:15, 200:22, 233:16, 233:20, 251:16, 290:13
**door** [3] - 190:15, 248:16
**door-to-door** [1] - 248:16
**Dosage** [1] - 233:10
**dosage** [8] - 9:3, 9:12, 84:8, 226:6, 226:11, 226:14, 230:11, 236:23
**dose** [5] - 227:7, 227:10, 230:6, 231:2, 231:4
**DOT** [43] - 3:23, 4:3, 76:14, 82:21, 83:9, 83:16, 85:14, 85:21, 86:4, 86:18, 100:5, 100:9, 100:13, 100:18, 102:14, 102:20, 103:3, 122:15, 139:17, 139:22, 140:2, 143:3, 201:18, 202:9, 202:10, 202:11, 253:18, 254:3, 254:6, 258:12, 259:11, 261:12, 283:20, 284:5, 284:19, 285:7, 285:8, 285:11, 285:13, 285:14, 287:17, 292:11, 292:17
**DOT's** [1] - 85:22
**doubt** [3] - 102:19, 103:2, 103:6
**Doug** [1] - 22:8
**DOUGLAS** [2] - 1:4, 1:11
**Douglas** [7] - 3:2, 15:2, 16:12, 19:5, 24:2, 69:6, 127:14
**down** [25] - 22:11, 62:8, 67:9, 85:10, 90:16, 99:15, 99:16, 110:13, 111:8, 117:17, 121:12,

148:5, 182:21,
187:17, 187:19,
187:20, 198:15,
198:19, 199:4,
199:5, 199:17,
200:18, 225:22,
267:6, 300:11
**Dr** [50] - 8:5, 8:6, 8:10,
8:20, 9:16, 110:16,
110:19, 110:22,
111:2, 111:4,
111:19, 111:22,
112:2, 112:6,
112:14, 112:16,
113:2, 113:16,
114:14, 115:6,
115:10, 115:18,
115:22, 116:6,
116:11, 121:13,
121:16, 121:20,
122:7, 156:7,
162:20, 163:1,
163:6, 163:20,
164:6, 164:10,
164:15, 165:18,
192:1, 193:23,
195:7, 196:8,
196:19, 197:10,
198:3, 201:7,
201:11, 222:23,
223:4, 237:15
**draft** [1] - 13:21
**drafted** [1] - 14:9
**drafting** [1] - 13:16
**drew** [2] - 267:11,
267:12
**drink** [4] - 67:17,
132:15, 132:19,
132:22
**drinking** [1] - 133:12
**drinks** [2] - 33:19,
132:18
**drive** [9] - 27:10, 31:7,
36:8, 38:8, 67:18,
129:20, 140:7,
168:16, 231:23
**driven** [5] - 27:22,
35:6, 159:8, 160:19,
173:12
**driver** [16] - 27:16,
29:15, 36:1, 36:5,
36:7, 36:14, 47:7,
52:7, 56:4, 67:4,
67:5, 89:11, 90:12,
95:8, 171:21, 171:23
**driver's** [2] - 65:22,
66:2
**Driver's** [1] - 69:7
**drivers** [12] - 29:5,
66:15, 94:16, 94:17,

94:18, 94:19, 172:1,
287:15, 292:9,
292:15, 294:10,
295:3
**drivers'** [2] - 55:22,
55:23
**drives** [2] - 251:4,
251:6
**driving** [28] - 30:19,
30:21, 30:22, 35:2,
38:19, 46:7, 46:10,
46:11, 46:14, 46:18,
99:3, 105:10,
150:20, 154:13,
155:3, 157:13,
157:19, 157:20,
158:2, 159:3, 159:4,
160:17, 171:9,
174:10, 176:16,
177:21, 194:19,
199:5
**Driving** [1] - 24:20
**driving"** [1] - 46:8
**drop** [2] - 131:9,
259:23
**dropped** [3] - 20:11,
132:6, 281:12
**dropper** [4] - 226:18,
226:20, 226:22,
227:2
**drove** [8] - 129:22,
158:18, 159:12,
159:14, 160:10,
180:14, 198:20,
199:4
**Drug** [7] - 3:23, 4:19,
82:21, 83:9, 83:16,
254:13, 260:15
**drug** [82] - 9:10, 32:12,
32:14, 32:22, 40:1,
43:6, 45:11, 45:12,
56:5, 62:16, 63:5,
66:17, 67:10, 67:11,
69:13, 69:20, 69:21,
69:23, 70:5, 70:7,
71:5, 72:5, 72:6,
72:10, 72:12, 76:14,
77:3, 78:20, 79:13,
83:15, 84:13, 87:2,
87:7, 87:10, 87:14,
87:18, 88:10, 88:13,
88:15, 93:6, 93:8,
93:10, 93:13,
112:17, 112:23,
113:5, 113:16,
113:21, 115:7,
115:12, 125:19,
132:7, 132:9,
132:20, 132:23,
142:19, 157:21,

192:22, 194:12,
197:2, 197:3,
197:11, 197:22,
198:9, 198:12,
198:17, 198:19,
199:22, 200:19,
200:21, 234:14,
239:5, 249:11,
252:18, 252:21,
254:7, 286:3,
286:15, 287:2, 293:9
**drugging** [1] - 66:17
**drugs** [17] - 7:8, 7:14,
7:15, 8:23, 9:3, 9:15,
9:18, 10:1, 10:4,
67:18, 84:17, 86:11,
86:16, 88:4, 113:4,
264:4, 264:5
**drugstore** [1] - 201:23
**ducks** [1] - 23:6
**duly** [2] - 5:9, 300:9
**Dumas** [1] - 209:14
**dumb** [1] - 263:12
**Dumont** [1] - 209:13
**during** [13] - 34:15,
47:16, 63:10, 79:3,
97:11, 102:3,
154:16, 230:4,
280:20, 284:16,
284:22, 285:2,
289:18
**duties** [2] - 84:10,
157:16

## E

**e-mail** [4] - 41:15,
97:1, 97:4, 236:17
**e-mailed** [1] - 14:10
**e-mails** [4] - 219:19,
221:6, 221:10, 222:8
**east** [1] - 131:23
**easy** [1] - 287:1
**eat** [1] - 232:7
**eaten** [1] - 232:13
**eats** [1] - 126:11
**edible** [4] - 232:9,
232:11, 232:13,
232:16
**EDIBLES** [1] - 1:7,
2:12
**Edson** [2] - 48:10,
48:12
**effective** [2] - 92:5,
226:9
**eight** [1] - 290:19
**eighth** [1] - 243:13
**either** [13] - 9:3, 10:4,
27:14, 84:8, 98:14,
113:3, 128:17,

160:8, 163:7,
170:16, 186:4,
247:19, 285:19
**eligible** [2] - 176:9,
176:10
**Elise** [3] - 217:15,
218:11, 218:14
**Elixir** [20] - 264:8,
264:15, 264:20,
268:2, 268:18,
268:19, 270:23,
271:8, 271:16,
273:7, 273:18,
274:2, 274:21,
276:1, 276:3, 281:6,
282:18, 283:15,
288:1, 288:8
**Elixirs** [1] - 252:2
**ELIXIRS** [2] - 1:7, 2:11
**ELIZABETH** [1] - 2:4
**Elizabeth** [15] - 16:2,
50:4, 50:5, 50:13,
146:10, 147:2,
147:4, 228:9, 230:1,
230:4, 230:9,
230:11, 230:14,
231:22, 244:16
**Elmira** [1] - 164:4
**elsewhere** [1] - 8:17
**embankment** [1] -
99:11
**emergency** [2] -
109:14, 109:19
**employed** [1] - 89:6
**employee** [9] - 58:22,
63:14, 69:13, 78:11,
78:12, 90:6, 148:9,
148:22, 150:10
**employee's** [1] - 92:8
**employees** [1] - 84:3
**employer** [12] - 12:3,
26:11, 43:5, 75:14,
83:13, 87:3, 87:8,
87:11, 107:12,
152:14, 252:15,
259:16
**Employer** [2] - 3:20,
72:19
**employers** [2] - 88:5,
259:19
**Employment** [3] - 3:9,
5:5, 44:11
**employment** [13] -
23:9, 27:20, 40:3,
45:18, 46:1, 46:2,
52:20, 63:2, 79:15,
93:8, 93:10, 127:20,
178:22
**empty** [3] - 137:9,
137:14, 137:18

**EMSL** [3] - 243:3,
246:2, 247:15
**end** [12] - 6:17, 6:21,
6:23, 7:4, 26:8,
119:14, 119:15,
129:9, 149:5, 173:2,
175:9, 239:18
**Endicott** [4] - 48:6,
48:11, 49:17, 51:8
**endurance** [1] - 33:17
**endured** [1] - 201:8
**enforcement** [1] - 13:4
**enrolled** [1] - 37:16
**ENT** [22] - 53:18, 58:9,
65:2, 68:19, 75:9,
77:8, 80:11, 83:5,
85:18, 86:22, 91:18,
101:4, 101:7, 101:8,
117:1, 127:3, 255:9,
255:18
**entered** [2] - 18:22,
19:1
**Enterprise** [132] - 3:8,
3:10, 3:11, 3:17,
3:19, 3:23, 4:3, 4:19,
5:4, 12:3, 18:12,
33:9, 40:4, 41:9,
43:7, 43:9, 44:3,
44:7, 45:13, 45:19,
45:21, 49:11, 50:2,
51:5, 53:1, 53:6,
53:12, 54:11, 54:12,
54:20, 56:10, 57:6,
58:1, 58:4, 58:22,
59:8, 60:8, 60:15,
60:17, 63:3, 64:19,
64:20, 65:18, 67:5,
68:1, 68:6, 68:12,
68:22, 69:19, 71:12,
72:5, 72:15, 72:7,
72:14, 72:18, 72:22,
73:4, 73:18, 73:21,
74:22, 75:12, 77:23,
78:12, 79:23, 82:5,
82:21, 83:12, 84:13,
85:22, 86:15, 87:20,
88:7, 89:6, 90:6,
90:21, 95:13, 95:15,
96:3, 96:5, 96:9,
96:11, 96:15, 96:18,
97:4, 97:18, 99:4,
100:5, 100:18,
101:13, 101:23,
102:20, 103:2,
103:17, 104:13,
104:14, 105:10,
105:15, 127:20,
131:2, 132:9, 140:1,
152:12, 153:5,
154:3, 155:20,

159:20, 160:3,
160:16, 160:19,
167:13, 171:11,
173:16, 180:16,
180:18, 181:15,
186:18, 187:1,
202:14, 202:19,
202:21, 252:17,
252:18, 254:1,
254:13, 255:5,
255:14, 256:7,
256:9, 256:10,
259:1, 260:15, 261:5
**Enterprise's** [3] -
79:13, 86:11, 261:12
**Enterprises** [3] -
177:9, 177:15, 178:4
**entire** [4] - 63:2,
79:22, 87:16, 87:17
**entirely** [1] - 180:2
**entirety** [1] - 227:1
**entitled** [2] - 217:15,
288:22
**entity** [1] - 184:4
**envelope** [1] - 245:18
**environment** [1] -
58:23
**equipment** [2] - 105:2,
180:20
**equivalent** [1] - 56:7
**ER** [1] - 110:7
**Eric** [2] - 5:14, 12:23
**ERIC** [1] - 2:8
**Erica** [6] - 50:19, 51:5,
51:10, 51:12, 51:23,
244:14
**Erica's** [1] - 51:2
**ERIE** [1] - 300:3
**Erie** [1] - 300:6
**esophagus** [1] -
125:11
**ESQ** [5] - 2:3, 2:4, 2:8,
2:13, 2:14
**established** [1] -
82:16
**et** [1] - 57:18
**etc** [1] - 152:5
**ethicacy** [2] - 234:10,
241:20
**evaluated** [1] - 111:2
**event** [1] - 192:8
**eventually** [2] -
113:17, 196:1
**Everett** [6] - 101:12,
101:15, 101:19,
128:6, 128:8, 129:5
**exact** [1] - 165:13
**exactly** [5] - 59:12,
111:11, 181:7,
187:19, 208:21

**EXAMINATION** [3] -
3:1, 5:12, 251:21
**Examination** [3] -
1:10, 3:6, 5:2
**examination** [1] -
45:11
**examinations** [1] -
45:12
**examined** [3] - 5:9,
102:2, 158:13
**example** [2] - 26:7,
151:15
**except** [2] - 32:21,
249:7
**exceptions** [2] - 71:7,
71:10
**exchange** [1] - 221:10
**exchanged** [1] - 221:6
**excuse** [1] - 71:20
**exercising** [1] - 133:8
**exhibit** [20] - 61:12,
65:1, 77:8, 103:20,
104:6, 116:21,
145:23, 152:3,
152:23, 166:1,
166:8, 170:20,
182:1, 184:2,
210:20, 223:13,
226:5, 233:8,
270:14, 270:17
**EXHIBIT** [1] - 3:5
**Exhibit** [142] - 3:6, 3:7,
3:8, 3:10, 3:11, 3:13,
3:15, 3:17, 3:19,
3:21, 3:23, 4:2, 4:3,
4:5, 4:6, 4:7, 4:8,
4:9, 4:10, 4:11, 4:12,
4:13, 4:14, 4:16,
4:17, 4:19, 4:20, 5:2,
5:3, 5:4, 10:11, 11:1,
13:13, 13:14, 43:11,
44:1, 44:22, 45:5,
45:23, 53:12, 53:16,
57:6, 58:2, 61:4,
61:9, 61:11, 61:12,
61:18, 61:19, 64:6,
64:14, 64:17, 64:23,
68:12, 68:16, 68:18,
72:18, 75:2, 75:3,
76:9, 78:5, 80:4,
80:8, 80:9, 82:21,
83:2, 83:3, 83:22,
85:11, 86:21, 89:2,
91:15, 91:17,
100:18, 100:22,
101:1, 101:2,
116:16, 116:20,
126:20, 127:1,
143:14, 143:15,
143:16, 143:17,

143:18, 143:19,
143:20, 144:14,
144:15, 147:19,
147:20, 152:20,
165:22, 167:4,
181:18, 183:15,
183:23, 185:2,
185:4, 188:21,
203:11, 203:15,
211:19, 212:1,
212:5, 215:7,
217:10, 219:12,
223:17, 223:18,
223:19, 223:23,
233:3, 234:19,
240:17, 241:1,
248:7, 254:10,
254:13, 256:4,
256:19, 256:20,
257:1, 257:2, 257:3,
260:20, 260:22,
264:21, 266:10,
270:11, 270:16,
277:2, 277:6,
277:10, 288:4
**Exhibits** [1] - 65:12
**exhibits** [3] - 75:3,
184:23, 190:9
**existed** [2] - 206:5,
281:6
**exit** [1] - 197:23
**expected** [1] - 84:4
**expense** [1] - 198:19
**expenses** [8] - 36:16,
36:17, 145:9,
145:16, 148:5,
148:10, 148:22,
150:10
**experience** [1] -
248:11
**experiencing** [1] -
161:16
**explain** [3] - 56:10,
56:16, 134:1
**explained** [3] - 56:18,
79:1, 247:19
**explaining** [1] -
249:11
**explanation** [1] -
103:16
**Express** [2] - 26:16,
40:16
**extension** [1] - 186:10
**extent** [1] - 159:11
**extra** [2] - 100:23,
101:1
**extract** [2] - 238:22,
241:11
**extracted** [2] - 263:1,
296:14

**eye** [4] - 226:18,
226:20, 226:22,
227:2
**eyeglasses** [2] - 39:13

# F

**face** [2] - 31:15,
114:22, 128:7,
128:10, 128:14,
221:13
**face-to-face** [6] -
31:15, 114:22,
128:7, 128:10,
128:14, 221:13
**Facebook** [7] - 18:1,
23:14, 23:20, 24:5,
25:15, 25:18, 25:21
**facilities** [2] - 3:14,
61:5
**facility** [12] - 71:13,
134:6, 135:7,
135:13, 136:13,
138:8, 138:13,
139:1, 139:4, 139:9,
141:12, 200:19
**fact** [2] - 70:10, 107:10
**facts** [4] - 11:16,
13:20, 14:23, 249:8
**fail** [1] - 71:6
**failed** [2] - 71:18,
252:18
**failure** [1] - 82:15
**faith** [1] - 84:7
**fake** [2] - 25:22, 25:23
**Fall** [2] - 204:5, 215:7
**familiar** [13] - 58:21,
59:4, 76:21, 83:19,
254:3, 257:13,
257:16, 257:23,
258:4, 258:17,
258:20, 259:2
**family** [10] - 48:23,
169:18, 222:21,
265:3, 265:7,
265:12, 265:13,
265:16, 265:23,
268:9
**Family** [1] - 123:13
**far** [12] - 31:20, 36:20,
41:4, 113:6, 151:14,
159:8, 159:11,
160:19, 164:6,
164:8, 209:15,
297:20
**Farmers** [1] - 262:8
**fast** [1] - 226:8
**fatality** [1] - 100:14
**father** [4] - 16:9,
16:11, 123:15,

123:18
**fatty** [1] - 123:8
**faxed** [2] - 179:19,
202:22
**FDA** [1] - 234:16
**February** [8] - 99:3,
108:4, 125:6,
128:18, 153:2,
161:14, 161:20,
191:9
**Federal** [12] - 66:7,
71:1, 71:2, 144:19,
147:21, 257:14,
257:17, 278:6,
281:21, 282:1,
282:21, 285:16
**fees** [1] - 151:6
**fell** [1] - 99:9
**felt** [1] - 231:7
**female** [1] - 110:17
**Fenwick** [1] - 144:21
**few** [11] - 12:4, 25:6,
30:17, 30:18, 41:6,
111:11, 130:8,
171:5, 172:13,
220:9, 272:1
**Fidelity** [2] - 186:23,
187:6
**fields** [1] - 93:21
**file** [1] - 186:11
**filed** [5] - 146:3, 146:7,
153:9, 153:10,
170:21
**fill** [16] - 28:10, 28:11,
46:5, 74:6, 89:18,
96:14, 106:1,
134:19, 134:20,
135:4, 136:23,
137:7, 161:3, 179:8,
179:17, 226:22
**filled** [11] - 28:12,
74:10, 78:13, 92:16,
136:21, 136:22,
137:17, 159:19,
163:12, 179:11
**filling** [6] - 45:1,
134:23, 135:2,
135:23, 136:3,
163:18
**financial** [2] - 96:11,
144:10
**fine** [3] - 113:18,
190:18, 194:17
**Finger** [1] - 170:9
**fingers** [1] - 243:11
**finish** [7] - 249:21,
252:2, 252:5,
267:16, 276:21,
278:22, 298:18
**finished** [1] - 279:12

finishing [1] - 249:20
fired [7] - 11:11, 18:7, 227:6, 241:6, 252:15, 259:23, 283:11
firm [3] - 5:15, 190:21, 190:22
first [73] - 5:9, 14:7, 15:6, 21:18, 21:20, 34:9, 44:5, 44:7, 44:10, 44:17, 46:13, 46:18, 75:11, 76:9, 83:21, 85:11, 85:14, 85:18, 101:3, 101:7, 101:11, 109:14, 109:20, 110:9, 113:11, 117:4, 117:13, 120:15, 120:16, 120:23, 123:12, 140:18, 145:23, 152:3, 153:7, 156:18, 166:2, 166:8, 172:11, 181:13, 181:23, 183:15, 190:9, 205:23, 206:3, 206:20, 227:4, 227:7, 227:20, 229:7, 231:2, 255:21, 257:9, 261:19, 264:19, 265:8, 266:9, 266:18, 267:23, 268:1, 271:13, 277:5, 281:5, 281:14, 283:15, 284:14, 284:16, 288:11, 288:12, 289:20
fit [1] - 33:7
five [18] - 42:1, 50:16, 58:19, 60:9, 62:9, 67:8, 67:9, 101:3, 117:17, 118:12, 119:20, 130:9, 143:2, 164:8, 175:5, 183:3, 279:12
five-week [1] - 118:12
five-year [1] - 42:1
flavor [1] - 243:21
flimsy [1] - 55:5
flip [3] - 30:4, 44:5, 147:18
flipped [1] - 206:23
flipping [2] - 44:19, 207:1
Floor [1] - 2:15
floor [1] - 98:10
flow [1] - 134:23
fluid [1] - 133:12

flush [1] - 133:11
fly [1] - 287:11
focus [1] - 161:12
focussed [2] - 162:6, 213:2
folks [2] - 64:19, 299:2
follow [4] - 41:6, 82:16, 133:3, 142:12
follow-up [1] - 41:6
followed [4] - 149:17, 277:22, 278:6, 285:16
following [21] - 5:1, 53:11, 57:5, 61:3, 64:13, 68:11, 72:17, 80:3, 82:20, 89:1, 100:17, 103:10, 116:15, 126:19, 141:23, 143:13, 203:10, 211:18, 219:11, 254:12, 270:10
follows [1] - 5:10
food [5] - 132:15, 132:16, 132:19, 218:23, 232:7
foods [1] - 125:23
Foods [2] - 239:18, 291:18
FOR [3] - 2:2, 2:6, 2:11
forbid [1] - 194:7
Force [1] - 24:20
foregoing [1] - 300:12
foreign [1] - 148:18
forget [2] - 40:20, 155:11
forgot [1] - 125:12
form [77] - 28:10, 28:12, 28:13, 28:14, 28:15, 28:20, 28:23, 30:15, 39:21, 41:13, 43:1, 45:2, 45:10, 55:14, 58:11, 58:13, 58:15, 65:5, 65:8, 78:15, 78:19, 80:23, 83:21, 92:11, 92:14, 92:16, 95:17, 95:23, 106:1, 107:7, 127:11, 144:13, 178:18, 179:8, 179:11, 179:14, 220:13, 221:22, 233:17, 233:21, 234:2, 239:4, 239:6, 246:20, 253:21, 255:15, 260:21, 262:16, 262:18, 263:11, 264:10, 264:14, 264:23,

265:15, 267:2, 267:15, 268:14, 270:1, 270:5, 271:4, 271:10, 271:15, 271:18, 276:2, 276:12, 276:14, 276:16, 284:21, 285:12, 286:17, 287:4, 293:4, 293:11, 293:16, 294:2, 294:4, 296:9
Form [22] - 4:5, 4:7, 4:8, 4:9, 4:10, 4:11, 4:12, 4:13, 116:16, 143:14, 143:15, 143:16, 143:17, 143:18, 143:19, 143:20, 145:23, 152:4, 166:2, 181:22, 182:2, 185:6
format [1] - 271:17
former [2] - 12:3, 83:12
forms [5] - 61:22, 65:14, 145:10, 159:19, 234:8
formula [1] - 173:15
forth [2] - 137:5, 300:11
forward [3] - 113:21, 144:7, 194:2
four [21] - 44:6, 58:19, 58:21, 62:9, 75:3, 75:4, 75:8, 76:7, 99:22, 101:7, 106:11, 110:21, 119:1, 119:8, 168:16, 175:6, 198:9, 282:13, 282:14, 291:15
four-wheel [1] - 168:16
frank [3] - 10:12, 33:20, 205:11
FRANK [1] - 2:3
Frank [3] - 22:12, 43:15, 222:15
franky [1] - 170:11
Freeport [3] - 204:20, 209:15, 209:19
freight [3] - 26:17, 30:23, 174:12
frequently [2] - 88:7, 249:9
fresh [1] - 98:19
Frezzo [19] - 17:17, 17:20, 17:21, 18:2, 18:5, 18:11, 60:3, 60:9, 73:11, 74:15, 91:3, 96:6, 96:20,

97:1, 103:23, 106:20, 128:2, 128:11, 128:14
Frezzo's [3] - 17:15, 92:15, 203:6
Friday [4] - 128:3, 129:3, 129:4, 130:1
friend [2] - 29:6, 29:7
friendly [3] - 170:8, 170:12, 170:14
Friendly [1] - 170:13
friends [3] - 64:20, 230:4, 230:9
friendships [1] - 64:18
fringe [1] - 36:19
front [4] - 203:17, 254:16, 256:21, 262:10
full [3] - 15:1, 154:13, 300:12
full-time [1] - 154:13
functions [1] - 123:5
future [1] - 45:12

## G

game [1] - 129:9
gamer [1] - 20:9
gap [1] - 178:22
Gary [7] - 31:10, 32:6, 33:1, 33:5, 34:8, 34:9, 34:19
gas [3] - 93:21, 256:14
gear [1] - 38:15
gears [1] - 144:9
general [3] - 30:23, 106:15, 148:19
generic [1] - 192:6
Genesee [1] - 290:10
Genox [1] - 40:15
gentleman [1] - 16:4
gentlemen [1] - 128:22
given [13] - 6:12, 14:7, 14:8, 66:5, 81:3, 82:6, 83:15, 89:21, 137:19, 155:11, 157:14, 199:15, 199:16
gloves [1] - 38:19
go-to [1] - 163:23
goal [1] - 105:20
God [2] - 147:9, 170:4
gotcha [2] - 26:10, 137:6, 182:3
governing [1] - 76:19
Government [1] - 146:4
grade [6] - 19:3, 19:7, 19:9, 19:10, 19:12,

19:15
graduate [1] - 147:6
grainy [1] - 189:2
grand [4] - 20:8, 20:10, 183:3, 183:4
Grandview [19] - 175:18, 177:1, 177:9, 177:15, 177:19, 177:22, 178:1, 178:4, 178:7, 178:19, 178:20, 178:22, 179:4, 179:7, 179:12, 179:20, 180:7, 180:12, 185:8
great [4] - 42:8, 143:8, 211:14, 252:12
Green [2] - 175:19, 175:20, 175:21, 176:1, 176:5, 176:12, 177:1, 177:8, 178:16
ground [1] - 5:22
GTA [2] - 20:6, 20:7
guard [1] - 55:5
guess [11] - 59:20, 95:18, 142:20, 169:19, 184:16, 200:7, 236:8, 238:23, 242:20, 264:3, 272:11
guessing [2] - 228:1, 239:2
guesstimate [1] - 279:3
Gully [4] - 26:19, 27:1, 27:14, 28:2
gully [2] - 26:23, 27:2
GULLY [1] - 27:3
Guthrie [3] - 121:12, 121:13, 121:21
guys [6] - 33:15, 98:11, 146:3, 190:20, 219:7, 219:19

## H

habit [1] - 214:11
Hacienda [1] - 15:22
hair [1] - 70:18
half [14] - 36:6, 53:2, 53:6, 63:11, 79:23, 88:1, 93:17, 94:12, 94:14, 95:2, 97:9, 107:5, 139:7, 139:8
hand [26] - 44:8, 44:13, 53:18, 58:8, 65:2, 68:19, 75:7, 80:11, 83:5, 83:9,

85:10, 85:17, 86:21, 91:18, 92:1, 117:1, 127:3, 127:7, 135:6, 137:5, 145:18, 181:23, 182:1, 215:6, 245:23, 270:15
**hand-delivered** [1] - 245:23
**handbook** [1] - 66:5
**handing** [1] - 210:19
**handle** [1] - 135:13
**handling** [1] - 137:13
**handwriting** [3] - 44:17, 92:11, 92:13
**handwritten** [1] - 159:17
**hard** [4] - 26:9, 188:16, 251:4, 251:6
**HARP** [1] - 1:4
**Harp** [1] - 2:17
**HARP-HORN** [1] - 1:4
**Harp-Horn** [1] - 2:17
**HARRING** [1] - 174:3
**Harring** [15] - 29:21, 29:22, 30:14, 30:16, 171:13, 174:1, 174:3, 174:7, 174:11, 175:10, 175:15, 175:17, 175:21, 175:23, 176:5
**hazardous** [2] - 106:8, 106:17
**HazMat** [2] - 31:5, 35:13
**head** [5] - 6:7, 40:11, 41:2, 128:1, 128:5
**heading** [8] - 44:10, 83:22, 117:5, 117:8, 118:20, 123:13, 226:4, 233:10
**headline** [1] - 207:7
**headquarters** [1] - 27:5
**health** [8] - 39:2, 39:4, 234:9, 237:1, 237:4, 237:7, 241:14, 241:20
**healthy** [2] - 298:17, 298:18
**Healthy** [5] - 217:15, 218:7, 218:10, 218:13, 263:23
**hear** [2] - 133:19, 178:13
**heard** [8] - 95:8, 102:11, 133:21, 139:10, 206:7, 206:8, 206:9, 268:10

**heart** [2] - 125:7, 155:12
**hearts** [3] - 297:11, 297:12, 298:8
**heat** [3] - 164:20, 164:21, 165:17
**heavy** [4] - 287:7, 293:2, 293:21, 294:7
**Heights** [1] - 15:22
**held** [2] - 1:11, 190:4
**help** [8] - 6:16, 91:7, 165:3, 207:22, 247:11, 291:20, 298:17
**helped** [2] - 235:12, 295:12
**hemp** [36] - 238:17, 238:22, 239:1, 241:11, 259:8, 262:19, 263:2, 265:10, 266:13, 267:22, 284:3, 284:6, 284:18, 285:10, 287:22, 291:18, 291:19, 291:22, 295:12, 296:13, 296:15, 296:21, 297:1, 297:3, 297:4, 297:7, 297:11, 297:12, 297:17, 298:5, 298:8, 298:11, 298:13, 298:15
**hemp-based** [5] - 265:10, 266:13, 284:3, 284:18, 285:10
**Hep** [1] - 122:19
**Hepatitis** [16] - 119:4, 119:10, 119:13, 119:17, 120:8, 120:14, 120:18, 121:1, 121:10, 121:18, 122:21, 122:23, 123:15, 123:19, 123:22, 124:11
**herbal** [1] - 86:7
**hereby** [2] - 300:6, 300:12
**herein** [1] - 300:10
**hereinbefore** [1] - 300:8
**hereunto** [1] - 300:18
**hermit** [1] - 230:10
**herniated** [4] - 117:22, 118:1, 118:6, 118:18
**herniation** [1] - 119:7
**herself** [2] - 129:15, 231:23

**High** [26] - 4:15, 4:16, 18:15, 203:11, 203:21, 204:2, 204:5, 206:1, 211:10, 211:19, 212:4, 212:9, 217:15, 218:7, 218:10, 218:13, 220:20, 235:22, 240:16, 261:21, 263:23, 264:8, 264:17, 288:3, 288:4
**high** [14] - 18:14, 18:23, 19:1, 19:14, 149:9, 174:12, 261:2, 261:22, 262:21, 264:2, 264:3, 264:4, 264:5
**higher** [2] - 101:19, 209:9
**Highway** [4] - 48:6, 48:9, 49:16, 257:18
**highway** [1] - 161:7
**himself** [1] - 29:15
**hire** [7] - 34:13, 41:14, 42:2, 43:5, 55:2, 172:2, 188:4
**hired** [6] - 31:21, 60:11, 89:21, 93:4, 93:9, 93:14
**histories** [2] - 55:22, 56:1
**History** [5] - 117:5, 117:9, 117:14, 118:21, 123:13
**history** [4] - 55:4, 117:18, 120:6, 126:6
**hit** [4] - 55:5, 55:8, 99:10, 157:5
**hmm** [15] - 8:7, 22:6, 34:12, 47:13, 53:1, 74:21, 77:2, 78:1, 112:11, 131:12, 163:18, 204:8, 223:6, 271:11, 297:13
**holding** [1] - 256:4
**Holdings** [2] - 5:18, 272:2
**HOLDINGS** [2] - 1:7, 2:7
**home** [32] - 12:17, 48:16, 48:18, 48:21, 48:23, 49:2, 49:6, 49:8, 49:19, 73:6, 104:20, 112:3, 129:14, 174:19, 174:20, 174:22, 175:2, 175:4, 175:5, 175:7, 197:1,

198:20, 209:9, 210:5, 220:23, 224:8, 231:18, 240:6, 242:2, 250:17, 272:23
**honestly** [2] - 88:9, 253:9
**hook** [1] - 131:9
**Horizon** [3] - 40:21, 40:22, 40:23
**Horn** [10] - 2:17, 3:2, 15:2, 16:12, 22:5, 23:18, 24:1, 24:2, 69:6, 146:10
**horn** [21] - 5:14, 11:1, 61:8, 80:7, 99:2, 100:21, 101:9, 116:19, 126:23, 143:23, 167:4, 203:14, 211:23, 222:8, 223:18, 250:10, 251:16, 251:23, 255:2, 270:15, 280:9
**HORN** [4] - 1:4, 1:11, 211:1
**Horn's** [8] - 152:16, 167:10, 167:14, 167:16, 167:22, 181:20, 182:13, 188:3
**hospital** [2] - 109:17, 110:2
**hot** [1] - 189:22
**hotels** [1] - 145:19
**hour** [9] - 33:2, 34:15, 107:5, 131:7, 131:10, 139:5, 139:7, 139:8
**hourly** [2] - 35:23, 36:3
**hours** [24] - 7:10, 7:15, 9:1, 9:4, 9:19, 9:22, 10:2, 10:5, 35:23, 36:2, 36:13, 70:6, 70:22, 71:4, 71:9, 92:19, 160:11, 174:18, 228:6, 252:8, 279:16, 279:22, 280:4, 280:7
**house** [19] - 49:20, 49:21, 50:3, 51:13, 89:19, 90:3, 90:6, 146:18, 147:2, 227:11, 227:23, 228:3, 228:4, 230:2, 242:10, 242:12, 242:13, 242:20, 251:2
**HOUSH** [98] - 2:3, 2:3,

7:19, 7:23, 10:13, 10:15, 10:20, 12:23, 13:9, 14:20, 17:2, 17:5, 22:7, 22:10, 28:23, 30:15, 33:14, 33:22, 34:2, 42:7, 43:1, 43:17, 43:20, 95:17, 95:23, 98:2, 98:5, 98:9, 98:20, 178:18, 189:22, 190:17, 191:2, 205:14, 205:21, 210:18, 211:6, 211:14, 220:13, 221:22, 222:1, 222:4, 222:6, 222:9, 233:17, 233:21, 234:2, 236:19, 239:4, 239:6, 252:8, 253:21, 255:15, 260:21, 262:16, 262:18, 263:11, 264:10, 264:14, 264:23, 265:15, 267:2, 267:15, 268:14, 270:1, 270:5, 271:4, 271:10, 271:15, 271:18, 276:2, 276:12, 276:14, 276:16, 276:20, 278:16, 278:20, 279:5, 279:15, 279:18, 280:1, 280:5, 284:21, 285:12, 286:17, 287:4, 289:23, 290:4, 290:10, 290:16, 293:4, 293:11, 293:16, 294:2, 294:4, 294:15, 296:9, 296:16
**Housh** [2] - 14:13, 14:18
**Houston** [2] - 3:19, 72:18
**HPLC** [3] - 233:11, 233:13, 233:22
**HR** [2] - 178:13, 184:8
**Hunt** [1] - 40:13
**hydrocodone** [21] - 9:2, 9:5, 112:9, 112:10, 112:22, 114:1, 114:18, 155:9, 155:12, 155:17, 156:1, 163:10, 163:11, 165:18, 191:14, 192:16, 192:18, 193:18,

194:15, 194:18, 194:19
**hypertension** [1] - 8:1

## I

**I-M-B** [1] - 16:20
**ice** [2] - 196:2, 196:5
**ICX** [62] - 26:12, 26:14, 26:15, 26:20, 27:1, 27:5, 27:9, 27:11, 27:14, 27:17, 28:1, 28:2, 28:3, 28:4, 28:10, 29:2, 29:4, 29:12, 30:19, 30:20, 31:6, 32:3, 32:9, 32:11, 34:7, 35:1, 35:17, 35:22, 36:8, 36:17, 36:19, 36:21, 37:3, 37:5, 37:8, 37:12, 37:22, 38:4, 38:8, 38:12, 38:17, 38:19, 38:23, 39:5, 39:16, 56:13, 57:1, 88:11, 95:22, 106:4, 106:6, 106:9, 178:19, 178:20, 178:23, 179:2, 185:9, 185:14, 185:17, 188:20, 189:6, 252:13
**ICX's** [1] - 26:17
**idea** [8] - 23:3, 23:12, 69:18, 135:18, 143:6, 166:23, 233:14, 233:15
**identification** [19] - 5:1, 53:11, 57:5, 61:3, 64:13, 68:11, 72:17, 80:3, 82:20, 89:1, 100:17, 116:15, 126:19, 143:13, 203:10, 211:18, 219:11, 254:12, 270:10
**illegal** [6] - 62:16, 63:5, 63:16, 64:1, 67:3, 285:20
**Illegal** [2] - 3:13, 61:4
**Illness** [3] - 117:6, 117:10, 117:14
**illness** [1] - 117:19
**imagine** [7] - 14:7, 56:6, 66:23, 119:19, 120:7, 139:23, 264:5
**Imboden** [2] - 16:16, 16:20
**immediately** [1] - 134:8
**implied** [2] - 292:19,

292:22
**impression** [3] - 286:12, 292:5, 294:18
**IN** [1] - 300:18
**in-house** [2] - 89:19, 90:3
**Inc** [1] - 275:4
**INC** [2] - 1:7, 2:7
**incident** [3] - 43:6, 100:2, 104:11
**include** [1] - 39:7
**includes** [1] - 233:1
**including** [5] - 62:20, 63:6, 66:17, 67:1, 79:17
**income** [16] - 144:21, 145:6, 149:18, 150:5, 152:11, 152:21, 153:8, 153:12, 153:13, 167:6, 181:20, 182:12, 184:1, 185:3, 185:4, 186:11
**Incorporated** [5] - 5:17, 40:20, 177:2, 177:15, 178:14
**indefinite** [1] - 42:1
**Indian** [1] - 40:13
**Indiana** [1] - 168:5
**indicate** [6] - 76:11, 235:1, 249:15, 257:16, 257:23, 258:4
**indication** [1] - 255:13
**industry** [1] - 259:20
**infection** [2] - 126:6, 126:13
**inflammation** [4] - 196:1, 230:20, 291:20, 295:12
**inflammatory** [3] - 191:10, 191:13, 192:11
**information** [20] - 46:2, 46:5, 56:2, 56:3, 57:2, 86:23, 103:12, 141:1, 144:11, 144:19, 148:14, 167:6, 209:23, 216:22, 221:1, 225:22, 232:19, 233:1, 236:22, 291:22
**ingredients** [3] - 238:18, 238:20, 239:3
**initial** [6] - 65:19, 136:11, 137:2, 137:23, 138:1, 187:7

**initials** [1] - 138:4
**injured** [3] - 107:15, 107:18, 107:20
**injuries** [2] - 153:16, 161:13
**injury** [3] - 100:13, 161:19, 162:13
**Inside** [1] - 262:7
**inside** [11] - 12:18, 138:21, 138:22, 139:4, 206:14, 212:18, 212:21, 216:6, 217:6, 242:7, 242:8
**instance** [1] - 157:9
**instant** [2] - 201:18, 201:20
**instructions** [3] - 134:17, 135:3, 142:12
**insurance** [6] - 36:21, 39:2, 39:4, 39:7, 39:14, 180:6
**intended** [1] - 238:6
**intention** [1] - 230:14
**interacted** [2] - 90:21, 139:1
**interaction** [1] - 91:1
**interest** [3] - 149:18, 217:3, 247:6
**interested** [2] - 218:17, 300:16
**interesting** [1] - 107:11
**Internet** [10] - 64:4, 151:2, 151:6, 151:10, 272:18, 272:23, 273:4, 277:16, 288:7, 289:1
**Interstate** [1] - 26:15
**intervals** [1] - 194:13
**interview** [5] - 31:22, 34:15, 34:16, 89:16, 289:13
**interviewer** [1] - 292:8
**investigating** [1] - 103:3
**investigation** [1] - 101:22
**Invoice** [2] - 4:20, 270:11
**invoice** [1] - 270:18
**involved** [2] - 220:17, 252:22
**involvement** [3] - 13:16, 13:19, 91:7
**IRS** [1] - 186:4
**issue** [7] - 128:17, 129:1, 143:5, 204:4, 204:5, 222:2, 261:1

**issues** [4] - 108:11, 108:12, 175:12, 251:18
**item** [1] - 69:10
**itemized** [1] - 147:20
**items** [2] - 3:13, 61:4
**Ithaca** [2] - 121:12, 164:4
**itself** [4] - 39:21, 130:17, 136:10, 243:19

## J

**J.B** [1] - 40:13
**jack** [1] - 38:3
**James** [11] - 15:2, 19:5, 23:18, 24:1, 24:3, 24:4, 104:6, 266:3, 266:5, 268:4, 284:18
**JC** [1] - 252:1
**JEAN** [1] - 2:13
**JEAN-CLAUDE** [1] - 2:13
**Jeez** [2] - 51:14, 108:22
**Jeffrey** [2] - 14:10, 236:8
**Jersey** [9] - 27:6, 31:11, 32:15, 71:13, 71:15, 72:12, 73:1, 129:21, 129:22
**Jesus** [1] - 55:13
**Job** [1] - 62:11
**job** [30] - 28:5, 42:15, 42:19, 46:18, 58:16, 62:16, 63:5, 74:21, 76:4, 81:7, 90:7, 90:11, 96:15, 148:5, 153:4, 157:16, 171:20, 172:8, 173:5, 173:19, 175:14, 175:18, 176:2, 176:19, 176:21, 178:6, 178:9, 179:7, 195:22, 259:1
**John** [39] - 17:14, 17:17, 17:19, 17:21, 18:2, 18:5, 18:11, 59:16, 59:17, 60:3, 60:8, 60:9, 60:11, 60:14, 60:17, 73:11, 73:13, 74:15, 77:22, 78:2, 82:9, 82:10, 91:3, 92:15, 92:16, 96:6, 96:20, 97:1, 101:17, 101:20, 103:23, 106:20,

107:7, 128:2, 128:11, 128:14, 145:1, 203:6
**Johnson** [2] - 22:16
**joint** [4] - 146:3, 146:7, 152:7, 205:3
**judge** [1] - 161:2
**judgement** [1] - 84:7
**July** [3] - 156:3, 161:11, 162:12
**June** [3] - 156:3, 161:11, 162:11
**Jury** [2] - 3:7, 5:3

## K

**Kansas** [2] - 17:18, 139:13
**Keber** [6] - 289:13, 291:23, 292:6, 292:8, 292:9, 292:14
**Keber's** [1] - 239:7
**Keenan** [8] - 40:15, 73:17, 73:23, 74:7, 74:10, 74:12, 74:16, 74:21
**keep** [7] - 28:18, 28:20, 33:21, 40:6, 40:7, 40:23, 96:12
**keeping** [1] - 131:20
**Kentucky** [1] - 139:14
**kept** [5] - 150:6, 159:14, 187:8, 259:6, 272:8
**kick** [1] - 96:12
**kidney** [2] - 126:6, 126:13
**kids** [1] - 146:15
**kill** [1] - 123:11
**kind** [28] - 30:19, 37:14, 38:12, 42:17, 66:20, 67:16, 81:1, 81:17, 89:9, 94:9, 96:11, 113:9, 157:1, 161:16, 163:9, 163:23, 167:16, 168:15, 174:9, 176:15, 208:4, 213:6, 214:7, 215:20, 222:3, 224:17, 250:19, 252:21
**kinds** [2] - 100:7, 103:10
**kitchen** [2] - 224:9, 224:11
**KL** [14] - 29:21, 29:22, 30:14, 30:16, 171:13, 173:23, 174:7, 174:11,

175:9, 175:15, 175:17, 175:21, 175:23, 176:5
**knowing** [1] - 234:13
**knowledge** [7] - 21:22, 44:18, 45:7, 62:7, 135:19, 215:16, 217:5
**knowledgeable** [1] - 150:6
**known** [4] - 19:5, 22:5, 60:14, 149:14
**knows** [2] - 240:14, 240:19
**Kosaka** [2] - 32:21, 32:22
**Kosaka[sic]** [1] - 32:17
**Kuhnle** [10] - 171:14, 172:19, 172:20, 172:21, 172:22, 172:23, 173:3, 173:18, 173:21, 174:2
**KUHNLE** [1] - 172:23
**KUHNLEE** [1] - 173:1

## L

**L-I-S-I-N-O-P-R-I-L** [1] - 7:23
**lab** [10] - 139:18, 139:19, 141:17, 141:18, 223:7, 245:10, 245:19, 246:2, 247:17, 247:21
**label** [17] - 83:8, 84:22, 85:2, 85:6, 85:13, 101:12, 225:10, 225:14, 225:23, 226:5, 232:19, 233:1, 233:9, 234:7, 236:23, 241:18, 249:18
**labelled** [5] - 65:5, 118:20, 127:12, 181:22, 183:16
**labelling** [1] - 234:20
**labels** [4] - 84:4, 84:17, 245:13, 249:15
**Labs** [1] - 247:15
**labs** [1] - 243:3
**lady** [3] - 145:3, 149:17, 183:19
**Lafayette** [2] - 1:13, 2:9
**Lake** [2] - 99:23,

199:19
**Lakes** [1] - 170:9
**large** [1] - 136:18
**last** [56] - 7:10, 7:14, 8:8, 9:1, 9:4, 9:19, 9:21, 10:2, 10:5, 15:4, 15:7, 15:14, 15:16, 17:19, 17:23, 19:18, 21:7, 22:1, 22:2, 22:17, 23:1, 23:4, 30:13, 35:20, 41:23, 44:19, 44:21, 45:4, 46:1, 50:23, 51:12, 54:21, 67:23, 75:3, 76:1, 78:5, 94:22, 101:8, 109:8, 119:14, 126:1, 165:9, 165:14, 172:12, 184:2, 188:21, 194:21, 194:23, 196:8, 196:10, 196:11, 196:12, 216:9, 224:5, 269:20, 294:20
**lasted** [1] - 171:5
**late** [2] - 49:13, 186:7
**Laura** [3] - 54:16, 67:21, 68:5
**Laura's** [1] - 54:21
**lav** [1] - 33:20
**LAW** [1] - 2:3
**law** [5] - 5:15, 13:4, 71:1, 71:2, 265:23
**laws** [14] - 66:4, 66:12, 66:14, 66:18, 66:20, 76:18, 76:20, 253:18, 277:23, 278:7, 281:22, 282:2, 282:21, 285:17
**lawsuit** [16] - 11:6, 11:16, 12:9, 13:15, 14:13, 14:18, 18:3, 18:6, 25:13, 34:10, 34:11, 34:17, 78:3, 221:8, 221:11, 221:14
**lawyer** [5] - 188:5, 188:6, 188:7, 188:17, 298:22
**lawyers** [2] - 5:19, 216:13
**leaf** [1] - 262:5
**learned** [8] - 260:7, 261:19, 271:7, 284:15, 288:1, 288:12, 288:15, 289:20
**learning** [1] - 288:23

**least** [5] - 8:14, 17:5, 110:21, 115:9, 227:11
**leave** [3] - 131:8, 178:4, 210:6
**leaving** [1] - 290:2
**lecture** [1] - 77:2
**led** [2] - 206:13, 286:2
**left** [16] - 44:8, 57:22, 68:6, 85:10, 94:13, 115:15, 135:16, 139:9, 172:9, 178:6, 178:20, 180:16, 181:23, 182:1, 216:8, 243:14
**left-hand** [4] - 44:8, 85:10, 181:23, 182:1
**legal** [4] - 15:12, 19:17, 64:1, 258:8
**legality** [1] - 13:1
**legally** [3] - 13:2, 15:10, 19:19
**length** [1] - 169:16
**Leonard's** [1] - 40:16
**less** [13] - 36:12, 87:22, 88:2, 107:11, 130:9, 139:5, 139:7, 187:22, 187:23, 188:10, 188:13, 188:14, 208:15
**letter** [6] - 41:14, 42:11, 42:17, 42:18, 43:4, 127:22
**letters** [5] - 26:14, 42:4, 42:21, 42:23, 43:2
**levels** [2] - 86:17
**LI** [1] - 7:21
**Liberty** [1] - 99:21
**lied** [1] - 94:9
**life** [10] - 36:21, 87:17, 180:6, 187:15, 200:8, 206:3, 268:1, 268:2, 285:2
**lifetime** [1] - 87:16
**ligaments** [1] - 162:4
**likely** [5] - 81:10, 81:18, 179:16, 229:19, 231:15
**limit** [2] - 70:13, 70:20
**LINDSTROM** [6] - 2:14, 34:5, 98:12, 190:14, 254:18, 254:21
**line** [19] - 26:17, 110:1, 134:20, 148:7, 149:18, 152:4, 166:3, 166:4, 166:13, 182:4, 183:14, 184:14,

184:15, 185:5, 185:11, 197:13, 249:10, 276:21, 278:22
**lined** [4] - 175:14, 176:2, 176:21, 178:6
**lines** [3] - 67:8, 67:9, 117:18
**Lisinopril** [5] - 7:16, 7:18, 7:19, 7:20, 8:4
**list** [7] - 40:7, 69:11, 86:4, 91:10, 145:18, 238:19
**listed** [12] - 67:2, 85:14, 85:19, 86:5, 87:4, 146:13, 149:18, 153:12, 218:18, 218:21, 219:1
**listen** [2] - 239:19, 265:12
**listened** [1] - 240:3
**listening** [1] - 248:11
**lists** [1] - 45:23
**literally** [1] - 24:15
**live** [9] - 21:5, 48:4, 48:9, 48:23, 50:7, 50:21, 93:20, 146:19, 164:1
**lived** [7] - 19:10, 48:1, 48:3, 48:8, 48:20, 49:16, 51:21
**livelihood** [1] - 263:5
**liver** [2] - 123:5, 123:8
**lives** [1] - 49:21
**living** [24] - 17:17, 20:22, 23:5, 46:10, 46:13, 46:14, 47:2, 47:14, 47:16, 50:2, 50:5, 51:5, 51:7, 51:10, 51:12, 51:17, 52:2, 146:10, 146:15, 147:2, 147:14, 207:18, 228:10, 230:1
**LLC** [15] - 1:7, 2:7, 5:18, 152:16, 167:10, 167:14, 167:17, 167:19, 167:23, 181:21, 182:13, 188:3, 188:4, 188:8, 188:15
**LLP** [1] - 2:13
**load** [8] - 94:11, 129:15, 129:18, 173:13, 199:15, 199:16, 199:18
**loading** [5] - 36:4, 37:19, 37:21, 38:1, 52:11

**loan** [3] - 183:5, 183:10, 183:12
**local** [5] - 70:2, 92:19, 93:18, 93:19, 148:18
**located** [1] - 8:15
**lock** [1] - 52:13
**Lockheed** [1] - 51:11
**Lockwood** [3] - 5:8, 47:21, 186:15
**log** [4] - 131:18, 159:22, 160:4, 204:15
**logs** [4] - 131:20, 159:16, 159:17, 160:15
**long-term** [2] - 10:6, 10:8
**look** [25] - 34:20, 55:2, 55:3, 61:18, 83:19, 130:5, 149:19, 152:2, 165:22, 207:11, 217:9, 224:13, 250:12, 255:16, 256:18, 256:19, 257:8, 259:14, 260:18, 260:20, 260:22, 267:1, 269:6, 282:4, 282:9
**looked** [5] - 185:23, 216:10, 263:18, 271:22, 283:4
**looking** [16] - 29:5, 44:1, 122:16, 148:2, 172:1, 192:9, 212:5, 215:21, 215:23, 226:2, 238:5, 238:18, 249:7, 250:11, 278:14, 295:14
**looks** [6] - 54:6, 54:11, 54:12, 82:9, 92:15, 224:16
**loss** [1] - 10:9
**lost** [4] - 41:9, 225:4, 225:14, 225:20
**loud** [2] - 190:17, 253:6
**Louisiana** [6] - 99:23, 153:8, 153:9, 153:13, 170:21, 171:1
**low** [5] - 115:19, 115:20, 115:21, 172:7, 173:10
**lower** [6] - 86:17, 107:22, 107:23, 162:14, 238:4
**lowest** [1] - 123:12
**lumbar** [2] - 115:20,

119:8
**lunch** [6] - 57:17,
98:3, 98:7, 143:8,
144:1, 144:4

**M**

**Mac** [2] - 250:19,
250:22
**machine** [1] - 294:7
**machinery** [3] - 287:7,
293:2, 293:22
**Madame** [2] - 252:3,
286:6
**magazine** [69] -
203:18, 203:19,
203:21, 204:2,
204:23, 205:3,
205:6, 206:1, 206:5,
206:11, 206:18,
206:22, 207:2,
207:12, 209:22,
209:23, 210:5,
210:8, 210:10,
210:12, 212:4,
212:9, 212:14,
212:18, 215:15,
215:19, 216:1,
216:3, 216:10,
216:12, 216:15,
216:19, 216:22,
217:7, 218:2, 219:4,
219:15, 219:23,
220:7, 220:18,
220:20, 222:16,
223:6, 223:8, 223:9,
223:12, 235:20,
235:22, 260:7,
261:20, 263:8,
263:16, 264:9,
264:17, 264:21,
265:2, 265:8,
266:17, 267:4,
267:5, 267:7,
267:23, 271:8,
271:12, 272:12,
272:19, 288:2,
288:22, 289:21
**Magazine** [3] - 4:16,
211:19, 240:16
**magazines** [4] - 213:1,
220:8, 220:12, 267:1
**maiden** [1] - 22:15
**Mail** [2] - 245:20,
248:20
**mail** [8] - 41:15, 97:1,
97:4, 198:16, 227:8,
229:1, 229:21,
236:17
**mailed** [5] - 14:10,

28:13, 28:16,
229:14, 245:22
**mails** [4] - 219:19,
221:6, 221:10, 222:8
**Main** [3] - 48:6, 48:8,
49:16
**male** [1] - 109:6
**managed** [1] - 60:2
**manager** [11] - 31:8,
59:21, 60:1, 60:8,
77:4, 77:22, 101:18,
106:15, 129:11,
129:12, 202:22
**managers** [1] - 60:6
**manual** [2] - 66:5,
81:16
**Manual** [1] - 69:7
**manufactured** [3] -
86:8, 234:8, 241:19
**map** [1] - 160:22
**March** [7] - 4:4, 43:10,
61:23, 65:11,
100:18, 119:23,
120:13
**Marijuana** [17] - 4:14,
4:16, 5:17, 203:11,
207:8, 211:19,
240:15, 262:1,
272:6, 275:4, 276:6,
288:2, 288:4,
288:22, 289:21,
295:20, 296:4
**marijuana** [31] - 67:1,
85:15, 86:5, 200:7,
207:22, 210:1,
238:16, 253:1,
253:4, 253:11,
253:13, 253:16,
259:7, 259:9,
259:10, 260:3,
260:7, 261:6, 261:7,
262:4, 262:20,
263:8, 264:9, 265:5,
266:6, 267:20,
283:19, 285:5,
285:9, 295:23,
296:12
**MARIJUANA** [2] - 1:7,
2:7
**marijuana's** [1] -
85:19
**marijuana-based** [5] -
265:5, 266:6,
283:19, 285:5,
295:23
**marijuana/cancer** [1] -
207:6
**Marinol** [4] - 200:3,
200:6, 200:8, 200:10
**Marissa** [3] - 1:11,

26:9, 276:22
**MARISSA** [2] - 300:5,
300:22
**Marissa's** [1] - 279:21
**mark** [2] - 223:12,
254:9
**marked** [41] - 5:1,
10:11, 13:13, 43:11,
44:14, 53:11, 53:15,
57:5, 61:3, 61:8,
64:13, 68:11, 68:16,
72:17, 75:1, 80:3,
80:7, 82:20, 89:1,
91:15, 100:17,
100:21, 116:15,
116:19, 126:19,
126:23, 143:13,
152:19, 167:3,
181:17, 183:22,
203:10, 203:14,
211:18, 212:1,
219:11, 223:14,
223:18, 240:17,
254:12, 270:10
**Market** [1] - 262:8
**marking** [1] - 53:9
**married** [7] - 15:15,
16:5, 21:12, 21:14,
21:16, 21:18, 22:2
**Marten** [10] - 46:19,
46:21, 47:1, 47:5,
47:10, 52:4, 52:16,
52:19, 55:4, 88:5
**Martin** [1] - 51:11
**masking** [1] - 219:5
**Mason** [1] - 184:10
**MasterCard** [3] -
213:8, 213:23, 214:8
**material** [2] - 106:8,
106:17
**matter** [7] - 98:13,
151:14, 190:20,
260:14, 261:1,
294:19, 296:8
**matters** [1] - 296:11
**MAZZOLA** [43] - 2:13,
10:16, 15:6, 26:13,
34:4, 61:10, 101:6,
143:9, 162:21,
166:6, 166:9,
171:17, 173:1,
194:21, 195:1,
195:5, 209:14,
210:21, 211:5,
220:6, 223:12,
223:15, 233:7,
249:19, 249:22,
250:4, 251:21,
254:15, 254:23,
270:13, 278:18,

279:1, 279:7,
279:11, 279:17,
279:19, 280:8,
286:13, 290:3,
290:8, 290:13,
290:18, 295:2
**Mazzola** [2] - 3:3,
252:1
**McConiville** [3] -
77:22, 78:2, 101:17
**McDonough** [2] -
217:15, 218:11
**McDonough's** [1] -
218:14
**MDO** [2] - 223:2, 223:3
**meals** [1] - 149:4
**mean** [32] - 24:14,
25:23, 28:7, 35:6,
40:9, 42:5, 46:8,
66:8, 67:18, 70:1,
73:8, 77:14, 93:19,
98:15, 99:8, 125:9,
129:8, 140:11,
140:13, 149:8,
160:10, 169:11,
171:3, 208:15,
235:5, 242:8, 257:2,
264:2, 272:4,
273:12, 274:9,
279:15
**means** [2] - 285:18,
298:21
**media** [2] - 25:10,
271:17
**Medical** [14] - 4:14,
4:16, 5:17, 118:21,
203:11, 207:8,
211:19, 240:15,
262:1, 272:5, 275:4,
276:6, 295:20, 296:4
**medical** [9] - 84:6,
120:6, 126:6,
139:15, 179:22,
179:23, 207:22,
209:23, 238:16
**MEDICAL** [2] - 1:7, 2:6
**medication** [21] - 8:1,
110:23, 111:12,
111:17, 112:5,
114:14, 115:2,
125:9, 155:6,
155:12, 163:6,
163:9, 191:10,
191:13, 192:11,
192:12, 192:14,
192:17, 194:13,
196:15, 196:16
**Medication** [1] - 83:23
**medications** [1] - 84:5
**medicinal** [1] - 235:4

**MEDTOX** [7] - 12:9,
142:8, 142:11,
142:20, 142:22,
197:8, 198:16
**meet** [4] - 31:6, 33:1,
221:13, 290:6
**meeting** [7] - 31:17,
32:6, 33:3, 33:4,
33:5, 221:20
**members** [1] - 167:19
**memory** [7] - 10:6,
10:9, 30:6, 44:2,
61:21, 209:1, 228:2
**mess** [1] - 247:20
**message** [1] - 131:5
**MESSNER** [1] - 2:13
**met** [7] - 28:9, 31:8,
31:14, 126:15,
126:16, 171:21,
228:6
**mid** [2] - 154:20,
155:19
**mid-May** [2] - 154:20,
155:19
**middle** [3] - 154:12,
164:3, 189:9
**might** [17] - 13:3, 24:2,
24:22, 91:12, 95:21,
125:8, 142:18,
143:4, 150:5,
166:23, 204:21,
207:22, 210:1,
226:3, 237:7,
241:14, 251:7
**Mike** [2] - 16:6, 16:9
**mile** [9] - 35:5, 35:6,
35:9, 104:7, 104:22,
160:20, 173:12,
180:14, 180:15
**mileage** [3] - 35:16,
35:22, 161:2
**miles** [7] - 99:22,
104:10, 104:12,
104:13, 104:14,
164:9, 172:7
**military** [1] - 293:15
**milk** [3] - 297:3, 297:4,
298:13
**million** [6] - 104:7,
104:10, 104:12,
104:14, 104:22
**mind** [5] - 33:21, 53:9,
86:6, 190:23, 261:9
**minor** [4] - 15:4, 15:8,
20:3, 20:6
**minutes** [12] - 30:17,
76:14, 93:20, 130:8,
130:9, 134:11,
252:3, 279:3,
279:13, 290:14,

290:19
**miscellaneous** [1] - 148:6
**misplaced** [2] - 225:10, 226:1
**misprinted** [1] - 221:5
**mistakes** [1] - 185:21
**misuse** [1] - 79:13
**MJMA** [9] - 271:22, 272:2, 272:4, 272:14, 274:8, 274:16, 289:8, 295:19, 296:3
**MJMA's** [1] - 291:21
**MJMA.com** [2] - 272:10, 295:7
**mobile** [4] - 48:16, 48:18, 48:21, 49:19
**mom** [11] - 15:15, 15:19, 207:3, 207:14, 207:18, 207:21, 208:1, 208:6, 208:11, 216:16, 216:18
**mom's** [1] - 210:2
**moment** [4] - 108:23, 183:14, 252:12, 258:15
**Mondorf** [3] - 144:21, 145:1, 149:15
**money** [9] - 161:6, 166:19, 180:3, 182:17, 186:20, 187:5, 187:8, 187:14, 189:15
**Montana** [2] - 99:21, 109:23
**month** [7] - 171:18, 173:4, 173:7, 177:13, 196:13, 208:16, 208:17
**monthly** [1] - 150:13
**months** [12] - 31:21, 52:7, 154:10, 161:11, 161:12, 162:11, 171:5, 172:13, 174:8, 175:22, 177:11, 177:14
**mood** [1] - 86:6
**morning** [7] - 11:8, 47:22, 144:3, 200:17, 200:18, 252:7, 252:9
**mortgage** [4] - 49:6, 49:8, 49:13, 149:21
**most** [3] - 24:4, 159:2, 159:3
**mostly** [1] - 144:13
**mother** [4] - 19:10,

26:21, 26:22, 265:23
**mother-in-law** [1] - 265:23
**motioning** [1] - 243:11
**motions** [1] - 137:5
**Motor** [1] - 66:7
**Motrin** [5] - 192:23, 193:1, 193:2, 193:7, 193:9
**move** [2] - 20:12, 47:19
**moved** [4] - 19:12, 20:21, 47:18, 52:1
**moving** [2] - 38:3, 61:10
**MR** [206] - 5:12, 7:19, 7:23, 8:3, 10:13, 10:14, 10:15, 10:16, 10:18, 10:20, 10:23, 12:23, 13:7, 13:9, 13:11, 14:20, 15:6, 17:2, 17:5, 17:9, 22:7, 22:10, 26:13, 28:23, 30:15, 33:14, 33:15, 33:22, 34:1, 34:2, 34:4, 34:6, 42:7, 43:1, 43:14, 43:17, 43:18, 43:20, 43:23, 53:14, 57:11, 61:7, 61:10, 64:16, 68:15, 72:21, 80:6, 83:1, 89:4, 95:17, 95:23, 98:2, 98:4, 98:5, 98:6, 98:9, 98:11, 98:15, 98:18, 98:20, 99:1, 100:20, 101:6, 116:18, 126:22, 143:9, 143:22, 162:21, 166:6, 166:7, 166:9, 166:10, 171:17, 173:1, 178:18, 189:22, 190:2, 190:6, 190:16, 190:17, 190:19, 191:2, 191:4, 194:21, 194:23, 195:1, 195:5, 195:6, 203:13, 205:11, 205:14, 205:17, 205:21, 205:22, 209:14, 210:18, 210:21, 210:22, 211:3, 211:5, 211:6, 211:12, 211:14, 211:21, 219:14, 220:6, 220:13, 221:22, 221:23, 222:1, 222:3, 222:4, 222:5, 222:6, 222:7,

222:9, 222:14, 223:12, 223:14, 223:15, 223:16, 233:6, 233:7, 233:17, 233:21, 234:2, 236:19, 239:4, 239:6, 249:19, 249:21, 249:22, 250:1, 250:4, 250:8, 251:21, 252:8, 253:21, 254:15, 254:20, 254:23, 255:15, 257:2, 260:21, 262:16, 262:18, 263:11, 264:10, 264:14, 264:23, 265:15, 267:2, 267:15, 268:14, 270:1, 270:5, 270:13, 271:4, 271:10, 271:15, 271:18, 276:2, 276:12, 276:14, 276:16, 276:20, 278:16, 278:18, 278:20, 279:1, 279:5, 279:7, 279:11, 279:15, 279:17, 279:18, 279:19, 279:21, 280:1, 280:3, 280:5, 280:8, 284:21, 285:12, 286:13, 286:17, 287:4, 288:3, 289:23, 290:3, 290:4, 290:8, 290:10, 290:13, 290:16, 290:18, 293:4, 293:11, 293:16, 294:2, 294:4, 294:15, 295:2, 296:9, 296:16, 299:2
**MRI** [1] - 109:18
**MRO** [10] - 129:3, 139:13, 139:15, 140:5, 140:15, 140:21, 141:11, 141:14, 142:1, 223:4
**MS** [6] - 34:5, 98:12, 190:14, 211:1, 254:18, 254:21
**municipality** [1] - 18:16
**Mura** [1] - 5:15
**MURA** [2] - 1:12, 2:8
**mutual** [2] - 29:6, 29:7

# N

**N/DOT** [1] - 85:19
**name** [62] - 5:14, 7:17, 8:8, 15:1, 15:4, 15:7, 15:11, 15:12, 15:14, 15:16, 15:23, 18:22, 19:18, 19:19, 21:23, 22:1, 22:2, 22:15, 24:22, 32:18, 40:10, 40:20, 50:23, 54:6, 54:21, 56:8, 59:16, 67:19, 67:23, 77:18, 78:8, 92:8, 94:21, 94:22, 108:22, 108:23, 110:15, 120:3, 121:11, 122:9, 134:3, 142:22, 142:23, 143:1, 147:10, 156:7, 162:19, 170:4, 170:6, 170:11, 184:5, 188:17, 192:5, 209:12, 213:17, 247:18, 251:23, 263:8, 300:18
**named** [7] - 25:11, 40:18, 50:19, 51:15, 101:11, 145:1, 184:4
**names** [4] - 15:3, 15:6, 138:23, 200:10
**nationwide** [1] - 239:18
**natural** [2] - 93:21, 256:14
**nature** [4] - 7:9, 76:17, 168:3, 222:9
**Nava** [1] - 50:23
**near** [4] - 120:3, 130:20, 131:1, 280:3
**nearest** [1] - 200:19
**necessarily** [1] - 164:2
**need** [10] - 33:20, 33:23, 34:14, 97:23, 98:1, 124:15, 189:20, 190:12, 205:18, 279:6
**needed** [4] - 125:22, 193:19, 194:1, 194:8
**negative** [12] - 88:20, 124:1, 197:17, 197:18, 198:5, 198:6, 198:8, 201:5, 201:11, 201:12, 201:14, 202:12
**nerves** [6] - 156:6, 156:13, 156:18, 156:21, 157:5, 157:8
**never** [24] - 19:19,

24:11, 24:14, 24:15, 24:16, 42:4, 53:5, 78:14, 90:17, 90:18, 107:13, 138:21, 138:22, 178:12, 196:16, 198:3, 200:9, 227:18, 229:16, 237:23, 242:21, 256:3, 256:16, 268:10
**NEW** [2] - 1:2, 300:1
**new** [12] - 107:12, 116:7, 168:17, 168:18, 180:19, 180:22, 181:2, 199:15, 199:16, 242:23, 252:14, 274:7
**New** [33] - 1:14, 2:5, 2:10, 2:15, 5:8, 8:16, 20:17, 27:6, 31:11, 32:15, 47:20, 48:1, 48:4, 48:6, 50:9, 51:5, 51:19, 71:13, 71:15, 72:12, 73:1, 109:1, 109:3, 109:4, 109:5, 129:21, 129:22, 156:9, 186:15, 209:17, 221:18, 300:6
**news** [5] - 25:22, 25:23, 26:1, 26:2, 273:13
**next** [14] - 7:5, 61:15, 80:18, 110:10, 118:20, 134:10, 139:10, 172:15, 175:18, 177:6, 195:19, 200:16, 200:18, 238:18
**Niagara** [1] - 2:4
**Nicole** [6] - 51:15, 52:2, 244:15, 244:16, 244:19, 245:2
**night** [2] - 114:3, 200:17
**nighttime** [1] - 159:3
**nine** [1] - 279:3
**Noble** [3] - 204:10, 204:19, 204:21
**nobody** [2] - 162:5, 247:15
**Nolan** [8] - 101:11, 101:15, 101:19, 128:6, 128:8, 129:5, 202:23, 203:4
**non** [6] - 85:21, 86:4, 272:2, 274:9, 274:17, 296:7

non-DOT [2] - 85:21,
86:4
non-THC [4] - 272:2,
274:9, 274:17, 296:7
nonprescription [5] -
7:9, 7:12, 9:18, 10:1,
113:4
normal [1] - 197:23
North [11] - 56:16,
107:10, 107:16,
108:4, 109:22,
109:23, 125:5,
170:21, 170:23,
171:2, 287:12
north [1] - 131:23
Notary [3] - 1:12,
300:5, 300:22
notes [1] - 300:13
nothing [2] - 249:2,
300:9
notice [4] - 1:15,
45:20, 80:18, 300:10
Notice [4] - 3:6, 5:2,
10:16, 11:4
noticed [1] - 219:15
notification [1] - 131:4
notified [8] - 70:9,
71:3, 72:6, 128:3,
129:3, 130:18,
198:18, 199:7
November [7] - 27:12,
27:13, 27:16, 27:22,
29:23, 179:2, 179:4
Number [4] - 13:13,
48:10, 58:21, 233:5
number [41] - 16:23,
17:10, 17:11, 17:15,
22:12, 34:19, 41:17,
53:19, 54:9, 54:10,
54:11, 54:12, 54:15,
69:10, 78:11, 78:12,
119:4, 119:6, 119:7,
127:3, 142:14,
144:16, 148:22,
149:8, 152:7, 182:8,
185:12, 215:10,
224:21, 224:22,
225:1, 225:8, 225:9,
241:1, 241:2, 241:3,
241:7, 241:10,
241:13, 241:17,
290:11
numbered [3] - 101:5,
116:23, 183:15
numbers [2] - 75:9,
188:1
nurse [2] - 115:3,
115:22

**O**

o'clock [3] - 98:16,
200:17, 276:20
oakley [1] - 40:17
oath [7] - 57:19,
144:2, 211:23,
250:10, 280:12,
298:19, 298:21
obey [1] - 66:4
object [46] - 28:23,
30:15, 43:1, 95:17,
95:23, 178:18,
220:13, 221:22,
233:17, 233:21,
234:2, 239:4, 239:6,
253:21, 255:15,
260:21, 262:16,
262:18, 263:11,
264:10, 264:14,
264:23, 265:15,
267:2, 267:15,
268:14, 270:1,
270:5, 271:4,
271:10, 271:15,
271:18, 276:2,
276:12, 276:14,
276:16, 284:21,
285:12, 286:17,
287:4, 293:4,
293:11, 293:16,
294:2, 294:4, 296:9
objection [1] - 222:10
observe [1] - 134:12
obtained [1] - 79:9
occasionally [2] -
31:5, 38:3
occasions [1] - 90:10
occur [2] - 59:13,
100:8
occurred [3] - 104:1,
108:1, 196:20
occurring [1] - 271:7
October [23] - 12:14,
49:8, 50:2, 51:4,
63:21, 87:6, 114:1,
114:11, 125:20,
127:19, 130:2,
130:3, 130:4, 153:5,
157:10, 169:8,
169:11, 199:2,
199:5, 199:21,
200:12, 208:18,
283:12
OF [3] - 1:2, 300:1,
300:3
offer [2] - 96:9, 96:11
offered [1] - 234:6
offhand [1] - 16:18
office [7] - 31:12,

114:16, 115:1,
163:20, 164:6,
197:5, 221:16
officer [1] - 139:15
offices [2] - 8:17,
32:16
OFFICES [1] - 2:3
often [1] - 96:2
oftentimes [1] - 6:19
Ohio [1] - 75:17
OI [1] - 162:23
oil [4] - 89:10, 89:11,
90:12, 97:18
on-the-job [1] - 76:4
once [8] - 71:2, 88:18,
88:19, 125:22,
158:16, 195:11,
216:8, 270:8
one [84] - 9:8, 9:11,
14:3, 14:5, 23:19,
23:21, 24:2, 24:15,
24:21, 33:3, 33:4,
34:15, 37:11, 37:16,
38:4, 40:18, 40:19,
41:17, 58:3, 58:19,
61:12, 62:9, 65:1,
74:19, 88:2, 90:5,
99:6, 118:23, 119:4,
122:9, 136:22,
136:23, 138:10,
142:14, 148:3,
148:21, 150:16,
152:22, 163:4,
163:15, 163:16,
173:2, 180:22,
181:5, 189:9, 190:9,
191:21, 195:1,
198:13, 198:14,
198:15, 201:8,
201:12, 203:6,
204:17, 211:1,
213:2, 213:16,
218:6, 220:4,
221:20, 222:21,
227:20, 228:10,
243:6, 244:11,
244:12, 245:4,
246:9, 246:10,
247:23, 251:7,
257:10, 263:18,
266:12, 268:7,
268:9, 275:17, 299:1
one's [1] - 223:14
one-page [4] - 58:3,
61:12, 65:1, 246:10
one-vehicle [1] - 99:6
ones [1] - 137:12
online [12] - 28:12,
90:23, 142:12,
147:9, 179:17,

235:21, 235:23,
248:23, 269:5,
272:12, 272:13,
272:17
open [4] - 31:2,
190:14, 245:11,
266:20
opened [5] - 228:17,
229:16, 243:16,
266:17, 267:9
opening [1] - 267:22
operate [3] - 73:3,
287:7, 293:2
operated [1] - 72:23
operating [4] - 58:23,
84:21, 133:2, 159:1
operation [1] - 258:11
operational [2] - 3:13,
61:4
operators [2] - 293:22,
294:7
opiates [1] - 260:4
oppose [5] - 85:22,
107:12, 179:17,
244:11
opposing [1] - 211:11
option [4] - 45:21,
141:2, 141:6, 141:7
orally [1] - 6:6
Orange [1] - 20:1
order [12] - 182:16,
244:11, 244:13,
244:16, 244:19,
244:22, 245:4,
246:13, 246:18,
246:21, 246:22,
246:23
ordered [5] - 227:13,
244:8, 244:12,
247:1, 248:6
Oregon [3] - 129:16,
129:18, 199:20
organization [1] -
101:20
orientation [4] -
52:22, 76:2, 77:5,
78:21
Orientation [1] - 69:7
original [3] - 210:12,
210:19, 255:20
OTC [1] - 84:1
otherwise [5] - 71:5,
88:22, 236:20,
280:2, 280:6
outcome [1] - 300:16
outfit [1] - 38:7
outs [1] - 4:17
outside [10] - 71:20,
136:16, 138:20,
242:6, 242:8,

242:10, 242:11,
242:13, 242:15,
242:20
over-the-counter [5] -
33:13, 84:1, 84:19,
85:8, 193:10
overdrawn [1] - 270:4
overhearing [1] -
191:1
oversight [2] - 234:9,
241:19
owed [1] - 186:8
Owego [2] - 50:8,
50:10
own [21] - 36:10,
48:18, 49:2, 50:6,
69:17, 84:16, 85:22,
102:16, 129:14,
133:17, 142:5,
150:15, 150:17,
150:18, 168:12,
169:3, 198:19,
202:3, 232:2, 250:12
owned [4] - 36:10,
48:14, 72:3, 72:22
owner [1] - 94:19
owner's [1] - 94:21
owners [1] - 168:1
owning [2] - 49:17,
49:18

**P**

P-I-A-N-I [1] - 29:10
p.m [1] - 299:5
package [5] - 34:23,
36:19, 94:7, 179:21,
229:1
packages [1] - 167:9
packaging [1] -
262:14
packet [2] - 43:18,
94:3
Packing [2] - 4:20,
270:11
packing [1] - 270:18
pad [3] - 52:9, 52:11,
52:12
pad-type [1] - 52:9
PAGE [2] - 3:1, 3:5
page [93] - 44:7,
44:10, 44:17, 44:19,
44:21, 45:4, 45:23,
53:17, 53:23, 58:3,
61:12, 65:1, 68:18,
68:22, 75:8, 75:11,
76:9, 77:7, 77:9,
77:12, 77:19, 78:5,
78:6, 80:9, 80:14,
83:21, 85:11, 85:18,

86:21, 86:22, 91:17, 91:21, 101:3, 101:8, 101:11, 103:11, 103:20, 104:6, 116:21, 117:4, 117:5, 123:12, 127:2, 145:22, 145:23, 147:18, 148:2, 148:16, 152:2, 152:3, 166:1, 166:2, 166:6, 166:7, 166:8, 166:12, 181:21, 181:23, 182:4, 183:15, 184:2, 188:21, 190:12, 191:5, 191:6, 203:17, 203:18, 206:15, 206:21, 217:10, 217:11, 217:14, 218:8, 218:11, 218:13, 224:14, 224:16, 226:2, 226:5, 233:2, 233:8, 233:9, 234:18, 238:4, 238:18, 240:23, 246:10, 255:18, 255:21, 255:22, 262:10, 270:17

**pages** [19] - 4:17, 12:5, 44:6, 75:4, 75:8, 83:4, 83:8, 101:3, 101:4, 101:7, 116:23, 144:16, 183:23, 203:16, 206:20, 219:12, 223:9, 246:8

**paid** [19] - 28:2, 35:5, 37:8, 95:2, 145:20, 161:6, 173:8, 173:9, 173:11, 173:13, 178:16, 180:9, 180:11, 180:14, 183:7, 185:8, 187:5, 187:7, 215:15

**pain** [32] - 108:13, 108:18, 110:22, 111:12, 111:17, 112:5, 114:6, 114:9, 114:14, 115:13, 115:17, 115:23, 156:13, 157:2, 161:13, 161:16, 163:6, 164:17, 165:20, 193:11, 195:8, 195:15, 195:20, 210:2, 249:12, 249:16, 265:4, 265:9, 265:17, 291:20,

292:16, 295:12
**pain's** [1] - 116:3
**painting** [1] - 23:6
**pallet** [2] - 38:3, 38:5
**panel** [2] - 143:2, 143:3
**paper** [7] - 28:13, 28:14, 179:14, 179:19, 225:8, 226:1, 235:19
**papers** [2] - 81:16, 197:23
**paperwork** [9] - 68:2, 89:18, 131:17, 135:9, 136:1, 136:4, 137:3, 170:15, 254:2
**paragraph** [6] - 62:10, 62:11, 62:16, 191:6, 192:10, 258:1
**parenthesis** [1] - 86:7
**Park** [2] - 19:16, 19:22
**Parker** [3] - 5:8, 48:4, 147:2
**Parsippany** [2] - 59:14, 76:3
**part** [15] - 26:20, 32:5, 65:17, 65:19, 70:7, 84:12, 86:10, 107:20, 117:13, 122:4, 122:12, 123:12, 150:9, 187:17, 241:2
**partially** [1] - 243:6
**participate** [1] - 87:19
**participated** [1] - 75:22
**particular** [11] - 90:20, 113:3, 138:4, 163:14, 163:15, 204:4, 206:9, 208:3, 226:15, 269:22, 271:5
**particularly** [1] - 163:21
**partnership** [1] - 167:23
**Parts** [1] - 258:5
**parts** [4] - 31:4, 35:14, 115:13, 257:18
**party** [1] - 300:15
**pass** [4] - 158:1, 184:22, 202:23, 287:2
**passed** [2] - 202:18, 203:3
**passenger** [1] - 129:23
**Past** [1] - 118:21
**past** [10] - 38:2, 46:2, 112:17, 120:6,

126:5, 126:6, 157:14, 278:17, 279:2, 279:4
**pasted** [1] - 224:18
**patient** [2] - 238:7, 238:9
**pay** [25] - 35:23, 37:11, 69:13, 69:17, 70:4, 70:7, 95:4, 141:4, 154:3, 161:4, 172:7, 173:8, 173:15, 178:5, 180:3, 183:5, 183:10, 183:11, 185:14, 186:14, 188:7, 188:15, 200:21, 214:10
**paying** [2] - 150:13, 214:11
**payment** [4] - 49:14, 182:21, 187:17, 187:19
**payments** [2] - 182:8, 186:7
**pen** [1] - 120:1
**Penn** [3] - 170:5, 170:8, 170:9
**Pennsylvania** [18] - 51:20, 71:21, 72:11, 109:2, 110:13, 110:14, 111:8, 130:19, 130:22, 198:23, 199:11, 199:12, 228:7, 228:14, 228:16, 228:19, 229:13, 231:14
**pensions** [1] - 166:13
**people** [11] - 24:4, 106:21, 133:21, 190:20, 190:22, 190:23, 249:16, 265:22, 293:2, 293:9, 293:15
**people's** [1] - 138:23
**per** [8] - 35:9, 36:1, 36:5, 36:6, 36:13, 94:11, 173:12, 180:14
**percent** [7] - 150:2, 173:13, 173:14, 187:20, 234:3, 239:10, 286:11
**percentage** [2] - 173:9, 173:11
**Percocet** [1] - 193:13
**performance** [1] - 84:9
**perilously** [1] - 222:1
**period** [11] - 63:2,

134:7, 154:17, 180:23, 181:3, 281:4, 284:17, 284:22, 289:18, 297:16, 297:18
**periodic** [1] - 105:9
**periodically** [1] - 112:18
**person** [25] - 28:9, 31:17, 54:16, 59:15, 59:18, 60:2, 60:11, 77:18, 77:21, 87:4, 90:20, 106:13, 106:16, 108:17, 123:22, 135:12, 136:12, 145:1, 149:7, 206:9, 230:1, 274:14, 274:18, 290:6
**person-to-person** [1] - 31:17
**personal** [2] - 84:16, 135:19
**personally** [2] - 204:17, 244:11
**personnel** [1] - 127:6
**Personnel** [5] - 4:2, 4:6, 89:2, 91:22, 126:20
**perspective** [2] - 43:4, 107:12
**pertinent** [1] - 123:15
**pharmacy** [1] - 163:14
**Philadelphia** [1] - 71:19
**phone** [43] - 16:21, 16:23, 17:10, 17:11, 17:14, 17:15, 18:1, 28:8, 34:19, 41:15, 42:2, 54:9, 54:10, 114:21, 130:6, 130:11, 130:14, 131:5, 132:1, 132:5, 132:14, 141:1, 142:12, 150:11, 150:13, 150:15, 150:16, 150:17, 150:19, 151:20, 180:19, 180:22, 199:23, 200:12, 241:1, 241:2, 241:3, 241:7, 241:10, 241:13, 241:17, 290:11
**phones** [2] - 150:22, 181:2
**photocopies** [4] - 138:3, 183:23, 212:4, 219:12
**Photocopy** [1] -

203:11
**photocopy** [6] - 44:6, 144:16, 184:3, 185:2, 189:1, 203:17
**photograph** [2] - 240:23, 267:5
**photographed** [1] - 224:6
**photographs** [6] - 63:13, 219:12, 223:20, 223:21, 223:22, 224:2
**physical** [11] - 45:10, 45:12, 69:13, 111:5, 111:6, 111:10, 122:5, 122:7, 122:11, 122:15, 164:12
**physically** [1] - 81:15
**physicals** [4] - 69:18, 125:1, 125:2, 125:3
**physician** [8] - 8:10, 8:13, 8:21, 63:19, 112:1, 121:16, 158:9, 162:16
**Piani** [5] - 29:8, 29:10, 29:11, 29:15, 29:17
**pick** [7] - 163:15, 168:8, 168:9, 168:12, 168:15, 168:20, 168:23
**pick-up** [6] - 168:8, 168:9, 168:12, 168:15, 168:20, 168:23
**picked** [1] - 199:18
**picking** [2] - 265:2, 265:7
**pickup** [2] - 99:10, 161:1
**picture** [8] - 224:15, 225:19, 233:2, 233:9, 234:18, 234:19, 262:4
**pictures** [2] - 4:18, 215:21
**pieces** [1] - 225:8
**pile** [4] - 10:14, 10:19
**pill** [3] - 9:8, 9:11, 246:20
**pills** [1] - 195:20
**pilots** [3] - 287:10, 293:7, 293:21
**ping** [1] - 223:4
**Pittsburgh** [3] - 71:20, 130:21, 199:18
**place** [20] - 37:6, 38:2, 41:12, 70:3, 71:8, 95:12, 131:1, 133:17, 134:3,

134:8, 142:22,
142:23, 143:1,
156:8, 163:23,
177:6, 209:9, 226:8,
255:17, 300:10
**placed** [1] - 227:1
**places** [7] - 40:4, 41:8,
42:3, 48:1, 48:3,
71:14, 145:19
**PLAINTIFF** [1] - 2:2
**Plaintiffs** [1] - 1:5
**Plan** [2] - 4:19, 254:13
**plan** [3] - 37:14, 37:15,
37:17
**plant** [6] - 235:3,
235:4, 238:22,
238:23, 239:1,
241:11
**plaque** [1] - 104:15
**plastic** [1] - 229:10
**PLLC** [3] - 1:13, 2:3,
2:8
**point** [48] - 14:4, 14:5,
19:6, 20:12, 21:9,
21:12, 51:7, 59:3,
59:7, 59:21, 62:23,
73:16, 81:7, 89:5,
91:3, 97:10, 99:2,
99:12, 120:10,
131:11, 131:21,
132:14, 135:10,
135:21, 146:9,
152:17, 154:7,
154:22, 155:15,
156:12, 157:17,
157:21, 158:14,
176:22, 183:5,
192:21, 193:16,
204:1, 208:1,
224:17, 228:17,
230:2, 231:10,
235:8, 237:12,
243:5, 243:9, 244:7
**pointing** [1] - 120:1
**policies** [8] - 41:21,
52:21, 65:22, 66:3,
67:6, 78:21, 78:23,
82:16
**Policy** [5] - 4:1, 82:22,
83:10, 83:16, 260:16
**policy** [21] - 41:18,
63:9, 64:7, 67:12,
69:14, 69:16, 70:7,
79:6, 79:8, 79:14,
79:16, 79:18, 81:1,
81:3, 81:14, 81:22,
82:1, 82:5, 82:13,
84:13, 85:21, 85:22,
86:11, 86:13, 127:14
**portion** [2] - 13:21,

218:14
**Portland** [1] - 199:20
**position** [14] - 29:1,
41:9, 58:13, 58:18,
89:7, 89:9, 89:12,
89:14, 89:16, 89:19,
89:22, 91:5, 91:8,
257:9
**Position** [3] - 3:11,
57:6, 58:5
**positions** [1] - 90:3
**positive** [27] - 113:23,
114:11, 115:7,
115:12, 120:23,
125:19, 126:3,
140:16, 142:15,
143:5, 157:9,
192:22, 196:9,
196:11, 196:12,
196:18, 196:23,
197:19, 198:4,
228:22, 243:5,
244:8, 246:16,
248:22, 249:5,
251:11, 251:14
**possibility** [1] -
142:18
**possible** [2] - 103:8,
194:11
**possibly** [6] - 143:5,
190:23, 298:2,
298:4, 298:8, 298:10
**post** [5] - 24:5, 24:23,
25:7, 25:17, 25:21
**posted** [4] - 24:15,
24:16, 25:2, 25:5
**poster** [1] - 26:2
**posting** [1] - 26:1
**posts** [1] - 25:14
**pot** [1] - 97:16
**pouring** [1] - 137:14
**practice** [1] - 84:16
**practitioners** [1] -
84:6
**pre** [4] - 93:8, 93:10,
161:9, 161:10
**pre-approval** [2] -
161:9, 161:10
**pre-employment** [2] -
93:8, 93:10
**prednisone** [6] -
112:13, 114:10,
155:14, 191:15,
191:16, 192:18
**preference** [1] - 98:15
**preferred** [1] - 174:15
**prepare** [4] - 11:19,
11:22, 56:23, 144:21
**prepared** [3] - 11:15,
54:23, 218:23

**prescribe** [4] - 115:1,
163:6, 164:12,
196:14
**prescribed** [13] - 8:4,
84:8, 84:18, 85:7,
111:12, 112:6,
113:11, 113:19,
113:20, 155:6,
193:13, 194:14,
238:14
**prescribing** [4] -
110:22, 111:17,
114:14, 195:21
**Prescription** [1] -
83:23
**prescription** [14] - 7:9,
7:12, 7:13, 7:15,
8:23, 9:15, 10:4,
63:16, 113:3,
114:20, 115:4,
155:10, 200:3,
285:20
**prescriptions** [3] -
114:17, 163:12,
163:19
**presence** [3] - 136:16,
136:17
**present** [4] - 9:14,
14:21, 63:17, 117:19
**Present** [3] - 117:6,
117:9, 117:14
**PRESENT** [1] - 2:17
**presume** [2] - 258:20,
280:19
**pretty** [23] - 20:11,
31:23, 39:19, 66:4,
67:7, 73:8, 76:2,
76:23, 84:23, 85:9,
90:8, 107:1, 129:6,
129:8, 151:1,
161:22, 173:10,
209:10, 216:11,
224:10, 275:22,
285:21, 289:10
**preventable** [1] -
103:4
**preventative** [1] -
102:23
**preventible** [4] -
102:6, 102:7,
102:10, 102:21
**previous** [3] - 73:14,
156:21, 167:8
**previously** [1] -
120:20
**price** [2] - 183:11,
215:12
**primary** [9] - 8:10,
8:12, 8:20, 108:17,
111:23, 112:1,

121:16, 158:9,
162:16
**print** [14] - 4:17, 117:9,
221:5, 235:18,
235:19, 236:6,
236:9, 236:15,
236:16, 236:18,
268:20, 283:3,
283:10, 283:16
**print-outs** [1] - 4:17
**printed** [1] - 236:9
**printer** [1] - 235:17
**privilege** [4] - 222:2,
222:3, 222:4, 236:21
**problem** [9] - 81:7,
112:23, 113:20,
116:7, 125:11,
156:22, 222:13,
266:5
**problems** [4] - 107:23,
108:6, 108:11,
235:17
**procedure** [12] -
19:17, 79:14, 81:2,
81:4, 81:15, 81:22,
82:1, 82:5, 84:21,
133:2, 156:11, 159:2
**procedures** [7] -
58:23, 65:23, 66:3,
67:6, 78:23, 82:14,
82:17
**process** [6] - 134:18,
145:6, 155:23,
156:2, 156:8, 188:16
**produce** [1] - 205:12
**produced** [6] - 12:3,
12:8, 235:15,
235:16, 246:6, 274:1
**product** [99] - 11:9,
12:11, 13:20, 33:13,
63:20, 64:1, 85:8,
87:7, 114:7, 114:8,
116:12, 223:21,
224:6, 227:13,
227:15, 227:18,
229:10, 230:12,
230:15, 230:19,
231:9, 231:13,
232:5, 232:11,
233:11, 233:15,
234:1, 234:5, 235:2,
235:9, 235:11,
235:12, 236:3,
237:2, 237:5, 237:9,
237:12, 237:15,
237:18, 237:20,
238:6, 238:11,
238:14, 238:16,
238:17, 239:2,
239:13, 241:8,

241:15, 241:18,
241:23, 243:19,
243:20, 243:21,
244:9, 244:23,
245:7, 247:16,
248:6, 248:17,
248:20, 248:23,
249:4, 249:12,
249:17, 261:18,
261:19, 264:20,
265:5, 265:10,
265:18, 266:6,
266:13, 266:15,
268:3, 268:4,
268:18, 270:7,
273:5, 282:6,
283:19, 284:3,
284:15, 284:18,
285:6, 285:10,
286:3, 286:14,
287:16, 288:8,
288:18, 289:3,
289:20, 292:10,
292:15, 294:8,
294:11, 295:4,
295:16
**production** [1] - 222:7
**Products** [6] - 3:23,
4:19, 82:21, 254:13,
256:7, 256:10
**products** [25] - 31:4,
84:1, 219:5, 232:9,
232:14, 232:17,
246:14, 246:18,
246:21, 247:4,
247:14, 247:22,
248:4, 282:13,
282:14, 284:6,
287:22, 288:1,
291:15, 296:21,
297:1, 297:17,
297:22, 298:6,
298:16
**profit** [1] - 38:23
**program** [4] - 106:13,
118:13, 140:8, 200:5
**prohibited** [4] - 66:21,
85:13, 85:14, 260:17
**promoting** [2] -
239:16, 289:15
**prompted** [1] - 282:17
**pronounced** [1] -
214:9
**proof** [1] - 229:2
**property** [3] - 48:9,
186:14, 186:15
**Protonix** [3] - 125:13,
125:17, 125:20
**provide** [8] - 38:10,
38:12, 87:18, 97:21,

130:18, 134:9, 135:5, 249:16
**provided** [12] - 61:22, 103:11, 126:2, 128:20, 133:9, 138:16, 139:5, 144:11, 180:2, 180:5, 198:22, 238:11
**provides** [1] - 36:8
**provisions** [1] - 258:8
**PTO** [1] - 127:15
**Public** [3] - 1:12, 300:5, 300:22
**pull** [1] - 38:5
**pulled** [2] - 249:10, 269:18
**purchase** [22] - 49:4, 168:9, 170:3, 170:16, 182:16, 204:9, 204:11, 205:3, 205:8, 212:19, 213:4, 230:21, 249:12, 269:7, 269:8, 269:10, 271:7, 271:14, 282:18, 283:14, 292:10, 292:15
**purchased** [28] - 63:20, 73:17, 168:11, 168:17, 180:19, 204:6, 204:7, 204:13, 206:1, 206:6, 209:21, 210:7, 212:11, 212:15, 216:8, 230:19, 264:7, 270:22, 271:3, 272:19, 277:7, 281:7, 281:15, 284:2, 284:16, 289:19, 295:17
**purchasing** [5] - 205:5, 268:17, 269:1, 269:3, 289:3
**purpose** [3] - 11:6, 33:5, 111:3
**purposely** [1] - 225:17
**pursuant** [2] - 1:15, 300:10
**push** [1] - 179:18
**put** [24] - 33:17, 41:21, 52:8, 55:6, 59:11, 59:15, 74:19, 97:7, 97:14, 98:9, 151:11, 153:17, 175:4, 186:21, 187:3, 187:19, 189:15,

211:7, 220:14, 220:15, 244:19, 245:18, 254:16, 256:23
**putting** [3] - 66:21, 134:12, 138:18

### Q

**quarters** [1] - 35:9
**Quest** [1] - 32:18
**questioning** [4] - 5:21, 251:19, 276:22, 278:23
**questions** [17] - 30:18, 41:6, 97:20, 103:11, 105:23, 106:2, 130:16, 167:2, 185:1, 194:23, 226:3, 249:9, 249:23, 251:18, 265:21, 267:18, 296:19
**quick** [2] - 143:2, 185:1
**quit** [4] - 174:20, 174:23, 176:11, 176:18
**quite** [4] - 17:21, 187:23, 209:16, 220:9
**quote** [1] - 282:7

### R

**radio** [4] - 239:16, 239:19, 248:12, 248:13
**raises** [1] - 251:19
**Ram** [3] - 168:16, 169:3, 182:16
**ramifications** [1] - 194:11
**ran** [1] - 106:13
**Rand** [2] - 1:13, 2:9
**random** [29] - 41:19, 69:20, 69:21, 70:12, 88:13, 112:18, 128:4, 128:23, 132:9, 138:12, 139:14, 140:12, 140:13, 141:15, 194:12, 198:18, 199:8, 200:16, 203:1, 203:2, 203:3, 204:13, 204:16, 209:4, 209:6, 225:12, 234:13, 236:12, 239:5
**randomly** [1] - 220:11

**rate** [8] - 35:8, 35:10, 35:16, 35:22, 36:3, 88:8, 115:22, 173:10
**rather** [2] - 6:7, 245:22
**rays** [2] - 162:5, 164:10
**reach** [2] - 290:5, 290:12
**reaction** [2] - 202:21, 231:5
**read** [30] - 14:1, 14:3, 64:6, 79:5, 194:21, 195:3, 202:3, 206:20, 212:20, 217:2, 217:6, 217:21, 217:23, 218:2, 232:19, 233:4, 235:10, 236:2, 258:9, 268:10, 268:13, 272:1, 282:14, 286:7, 286:9, 288:7, 291:21, 294:20, 294:23, 296:6
**reading** [10] - 62:5, 212:17, 213:1, 213:3, 215:22, 217:3, 218:4, 288:21, 288:23, 289:1
**ready** [1] - 133:6
**real** [2] - 186:14, 189:2
**really** [15] - 11:21, 12:6, 38:6, 83:20, 120:17, 124:15, 144:5, 161:22, 163:15, 165:4, 189:7, 209:2, 249:1, 249:6, 267:17
**reason** [15] - 22:10, 82:12, 89:21, 102:19, 103:2, 103:6, 118:14, 124:10, 128:20, 185:20, 205:15, 220:21, 256:2, 269:22, 271:5
**reasons** [1] - 214:9
**receipt** [10] - 3:15, 3:18, 3:21, 64:14, 65:21, 69:6, 80:4, 81:21, 205:5, 269:18
**Receipt** [2] - 65:6, 68:13
**receipts** [2] - 145:13, 145:16
**receive** [10] - 35:1, 35:21, 36:13, 37:5, 37:12, 95:11, 105:12, 127:22,

153:20, 248:19
**received** [8] - 77:15, 78:20, 79:5, 82:13, 152:11, 153:22, 153:23, 182:13
**receiving** [1] - 182:9
**recently** [2] - 12:1, 18:4
**recertification** [5] - 81:5, 81:18, 106:10, 106:11, 106:12
**recertified** [1] - 107:8
**Recess** [6] - 57:9, 98:22, 143:11, 211:16, 250:6, 279:9
**recipes** [3] - 218:17, 218:20, 219:1
**recognize** [5] - 54:10, 54:14, 77:18, 92:13, 184:6
**recollection** [4] - 94:6, 103:12, 126:1, 218:4
**recommend** [2] - 91:5, 206:11
**recommendations** [2] - 164:16, 165:19
**recommended** [3] - 111:5, 216:2, 237:20
**record** [45] - 13:14, 17:6, 44:6, 53:17, 57:12, 58:3, 61:11, 65:1, 68:17, 80:9, 83:3, 91:16, 101:2, 103:8, 104:15, 116:21, 127:2, 130:11, 137:4, 143:23, 144:15, 148:20, 152:20, 159:12, 159:14, 185:2, 188:22, 190:2, 190:4, 203:16, 208:22, 211:9, 211:22, 212:3, 212:8, 215:4, 215:6, 223:19, 243:12, 250:9, 279:11, 279:20, 280:9, 280:10, 296:19
**Record** [2] - 195:3, 286:9, 294:23
**record's** [1] - 210:18
**recording** [2] - 159:7, 159:12
**records** [14] - 30:5, 55:21, 93:22, 94:2, 102:16, 102:17, 150:6, 152:21, 167:5, 185:3, 185:4, 219:20, 221:1,

298:20
**RED** [2] - 1:7, 2:7
**Red** [5] - 5:18, 272:1, 272:9, 275:2, 276:9
**Reddy** [8] - 59:16, 59:17, 60:8, 60:11, 60:14, 60:17, 82:9, 82:10
**redepose** [1] - 205:18
**REEVES** [1] - 2:13
**refer** [4] - 36:9, 67:10, 121:13, 195:17
**reference** [13] - 54:5, 62:15, 67:8, 75:12, 84:3, 91:10, 104:5, 148:12, 149:20, 166:4, 234:20, 238:4, 296:4
**referenced** [4] - 263:7, 264:8, 264:15, 264:16
**references** [1] - 75:8
**referred** [3] - 55:16, 67:13, 295:6
**referring** [3] - 94:18, 206:15, 276:1
**refers** [1] - 184:20
**refinery** [1] - 256:12
**reflect** [5] - 152:7, 166:18, 167:6, 182:8, 185:14
**reflects** [2] - 144:18, 189:18
**refresh** [1] - 30:6
**refreshes** [1] - 44:1
**refrigeration** [1] - 31:4
**refuse** [2] - 87:14, 196:14
**regarding** [6] - 63:20, 76:18, 102:17, 127:12, 285:15, 295:16
**region** [1] - 115:20
**regional** [2] - 31:8, 101:18
**regs** [4] - 284:5, 284:20, 285:7, 285:11
**regular** [4] - 125:2, 158:17, 193:18, 194:6
**regularly** [3] - 155:21, 156:1, 196:7
**regulation** [4] - 67:13, 67:15, 286:4, 286:16
**regulations** [10] - 253:18, 254:3, 254:6, 258:12, 259:11, 261:12, 283:20, 287:17,

292:11, 292:17
**Regulations** [1] -
257:14
**regulatory** [2] - 234:9,
241:19
**reimbursed** [1] - 245:6
**reimbursement** [1] -
149:5
**Relafen** [4] - 191:18,
191:19, 192:3, 192:5
**relate** [2] - 254:7,
258:10
**related** [4] - 11:16,
56:4, 93:22, 94:2,
152:21, 185:3,
221:1, 251:18,
300:15
**Relco** [1] - 46:22
**release** [1] - 59:12
**relief** [5] - 157:2,
157:4, 226:9,
249:12, 249:16
**relievers** [1] - 193:11
**remainder** [2] -
242:21, 243:23
**remains** [1] - 241:23
**remarried** [1] - 23:2
**remember** [45] - 17:1,
54:22, 67:12, 67:15,
82:7, 90:20, 94:22,
108:22, 108:23,
121:11, 122:9,
130:15, 138:23,
147:10, 157:23,
163:14, 165:12,
165:13, 165:21,
170:4, 177:10,
187:19, 200:23,
205:10, 208:8,
209:12, 213:5,
213:8, 220:22,
231:11, 231:17,
235:16, 240:5,
240:7, 247:17,
255:3, 256:5, 256:6,
256:17, 284:12,
289:17, 293:19,
297:15, 297:21,
298:7
**remind** [1] - 57:14,
57:18, 144:1
**renewed** [1] - 105:18
**renting** [3] - 48:12,
49:17, 146:18
**repeat** [1] - 158:22
**rephrase** [1] - 11:7
**reply** [1] - 74:12
**report** [16] - 56:11,
56:13, 56:19, 56:21,
57:2, 84:5, 102:13,

103:19, 103:21,
119:21, 121:20,
197:21, 246:2,
246:4, 246:6, 246:10
**Reportable** [2] - 4:3,
100:18
**reported** [6] - 100:5,
100:9, 100:13,
102:20, 103:2,
139:22
**Reporter** [2] - 252:4,
286:6
**reporter** [4] - 195:3,
286:9, 294:20,
294:23
**reporting** [6] - 118:3,
120:6, 273:15,
273:17, 273:18,
273:21
**reports** [2] - 56:22,
144:22
**reposted** [1] - 26:4
**represent** [4] - 5:16,
5:18, 252:1
**representations** [1] -
295:16
**representative** [3] -
87:3, 87:8, 87:11
**request** [1] - 127:7
**Request** [5] - 4:2, 4:6,
89:2, 91:22, 126:20
**requesting** [1] -
114:21
**required** [4] - 45:13,
86:18, 138:10,
174:12
**requirement** [1] -
58:18
**requirements** [4] -
79:9, 253:19, 257:9,
261:12
**requiring** [1] - 11:5
**research** [11] - 26:4,
64:3, 237:7, 248:23,
249:1, 249:4, 249:6,
251:11, 251:13,
272:9, 289:2
**researched** [1] -
288:18
**reserve** [3] - 205:18,
251:17, 290:14
**reserves** [1] - 86:16
**reside** [2] - 15:21,
16:15
**residence** [1] - 51:22
**resident** [1] - 21:7
**residing** [1] - 51:13
**resignation** [3] -
96:18, 97:5, 97:7
**resigned** [3] - 96:8,

175:15, 175:23
**resigning** [2] - 96:5,
175:9
**resolve** [1] - 118:8
**respect** [6] - 84:13,
84:17, 86:11, 90:22,
96:17, 144:7
**respective** [1] - 189:5
**response** [4] - 11:4,
12:8, 90:17, 90:18
**responsibility** [1] -
63:15
**responsible** [1] - 67:4
**rest** [1] - 160:11
**restrictions** [1] -
154:23
**result** [12] - 41:12,
88:19, 93:13,
139:12, 141:15,
141:19, 141:22,
161:20, 197:11,
197:15, 202:10,
246:12
**results** [9] - 40:1,
56:5, 113:5, 139:21,
140:22, 201:6,
202:3, 202:13, 234:4
**retain** [1] - 210:8
**retested** [1] - 141:5
**retire** [1] - 60:23
**retired** [2] - 60:20,
60:21
**retirement** [5] - 37:15,
37:17, 166:20,
186:17, 189:16
**return** [11] - 57:18,
144:18, 146:3,
147:21, 149:20,
151:5, 153:9,
153:10, 167:9,
186:11, 188:19
**returns** [14] - 144:13,
145:2, 145:6, 145:8,
146:7, 146:10,
148:21, 153:8,
166:1, 170:21,
181:20, 184:1,
185:22, 186:4
**review** [11] - 11:22,
54:2, 62:2, 84:4,
84:22, 139:15,
215:19, 218:20,
219:4, 234:4, 273:21
**reviewed** [2] - 12:2,
12:7
**reviewing** [1] - 84:17
**RGB** [1] - 40:16
**right-hand** [17] -
44:13, 53:18, 58:8,
65:2, 68:19, 75:7,

80:11, 83:5, 83:9,
85:17, 86:21, 91:18,
92:1, 117:1, 127:3,
127:7, 215:6
**ring** [2] - 153:14,
184:11
**risk** [1] - 63:17
**risks** [4] - 237:1,
237:4, 237:7, 241:14
**Rite** [1] - 163:17
**Road** [5] - 5:8, 48:4,
48:10, 48:12, 147:2
**road** [14] - 12:5, 31:2,
32:1, 99:12, 99:22,
105:5, 105:6, 105:7,
149:7, 151:9, 158:1,
171:22, 229:22,
230:5
**rollover** [3] - 166:4,
166:11, 166:15
**room** [6] - 5:20, 14:21,
105:21, 134:15,
135:22, 138:17,
147:16
**roughly** [2] - 48:22,
51:14
**route** [3] - 36:2,
160:22, 161:5
**routes** [2] - 157:14,
158:17
**routine** [1] - 81:9
**row** [1] - 160:11
**Rs** [1] - 40:17
**rule** [2] - 67:14, 67:15
**rules** [9] - 5:22, 65:22,
66:3, 67:6, 76:18,
76:20, 254:3, 254:6,
280:11
**run** [5] - 6:16, 56:13,
105:5, 105:6, 228:6
**RV** [2] - 171:5
**RVs** [7] - 167:18,
168:4, 168:7,
172:11, 172:15,
182:10, 182:14

---

**S**

---

**S&S** [8] - 171:13,
171:15, 171:16,
171:20, 171:23,
172:4, 172:9, 172:18
**S-T-R-U-B-L-E** [1] -
93:3
**safe** [2] - 84:9, 261:10
**safekeeping** [2] -
220:16, 220:17
**safely** [1] - 283:19
**safety** [16] - 58:23,
63:17, 65:22, 66:2,

67:6, 77:4, 77:22,
101:12, 104:7,
104:23, 128:2,
128:5, 130:7,
130:13, 234:10,
241:20
**Safety** [1] - 66:7
**salaries** [2] - 152:4,
152:8
**sale** [2] - 170:16,
282:13
**sales** [2] - 148:19,
183:11
**sample** [15] - 70:14,
70:16, 70:18, 70:21,
72:1, 126:3, 133:9,
139:5, 140:14,
142:4, 197:7, 200:1,
200:14, 225:12,
236:13
**samples** [3] - 133:15,
133:16, 202:5
**sand** [1] - 93:21
**sat** [1] - 129:22
**SAT** [1] - 200:4
**satellite** [1] - 159:10
**satellites** [1] - 151:22
**SAV** [1] - 246:19
**saved** [1] - 42:23
**savings** [9] - 37:15,
37:17, 166:20,
182:18, 186:17,
187:3, 187:9,
187:11, 189:16
**saw** [27] - 65:11,
109:8, 112:4,
114:18, 115:10,
122:9, 162:18,
163:1, 163:5,
195:11, 196:8,
196:10, 196:21,
216:18, 230:22,
239:14, 248:14,
256:16, 260:8,
260:9, 264:16,
264:21, 271:13,
277:6, 277:13,
277:15, 281:20
**Sayre** [2] - 110:13,
111:8
**scale** [1] - 115:23
**scattered** [1] - 221:3
**Schedule** [2] - 147:21,
149:19
**scheduled** [1] - 107:3
**School** [2] - 18:15,
19:22
**school** [9] - 15:16,
18:14, 18:23, 19:1,
19:8, 19:11, 19:13,

19:14, 46:12
**scratch** [1] - 285:3
**screen** [1] - 45:11
**screens** [3] - 45:13, 283:10, 283:16
**screenshot** [1] - 291:7
**screenshots** [1] - 283:3
**scripts** [1] - 246:20
**seal** [8] - 136:9, 136:10, 136:14, 136:15, 137:2, 137:23, 229:9, 300:18
**sealed** [3] - 229:4, 229:5, 229:10
**seals** [2] - 136:12, 136:13
**search** [2] - 39:19, 272:15
**searched** [1] - 273:5
**SEC** [1] - 189:11
**second** [29] - 45:23, 63:14, 86:20, 103:11, 141:3, 141:9, 141:16, 141:22, 142:2, 142:4, 145:22, 152:2, 166:1, 166:7, 166:12, 188:21, 203:4, 203:18, 219:23, 224:14, 224:16, 226:2, 226:5, 233:8, 244:19, 245:2, 245:9, 284:13
**seconds** [2] - 278:19, 279:2
**secretary** [2] - 54:20, 67:23
**Section** [1] - 189:18
**section** [5] - 58:18, 127:12, 148:6, 234:19, 236:23
**sections** [1] - 66:13
**Security** [1] - 22:12
**security** [1] - 174:12
**see** [95] - 13:23, 20:9, 33:7, 41:21, 44:2, 44:14, 46:3, 54:7, 56:21, 56:22, 58:18, 59:1, 62:10, 62:13, 63:13, 65:2, 67:19, 69:10, 75:8, 76:8, 83:21, 84:3, 84:10, 85:10, 86:4, 86:9, 86:23, 87:5, 91:19, 91:22, 92:3, 92:6, 101:1, 101:8, 104:5, 110:19, 112:2,

114:16, 115:6, 117:6, 117:17, 118:20, 119:23, 123:12, 127:4, 127:9, 127:17, 146:1, 148:12, 148:14, 148:16, 181:21, 183:14, 184:7, 184:10, 189:4, 189:8, 191:11, 207:4, 210:16, 226:4, 226:9, 233:10, 234:7, 236:22, 238:4, 238:19, 248:6, 248:10, 255:6, 255:8, 255:17, 255:18, 255:20, 255:22, 256:20, 257:1, 257:8, 257:10, 257:14, 257:18, 257:21, 258:1, 258:6, 263:7, 268:18, 269:2, 270:19, 271:12, 272:16, 277:18, 277:21, 289:16, 295:10, 299:2
**seeds** [2] - 297:10, 298:8
**seeing** [9] - 111:3, 114:15, 255:3, 256:6, 257:5, 266:9, 278:18, 279:1, 282:17
**sees** [1] - 115:3
**selected** [1] - 70:12
**sell** [4] - 169:5, 169:7, 169:9, 169:17
**semi** [3] - 171:6, 171:8, 225:6
**send** [6] - 223:6, 236:18, 236:19, 243:1, 247:14, 247:16
**sense** [1] - 70:8
**sent** [17] - 28:21, 54:17, 68:1, 140:21, 179:15, 197:7, 198:14, 202:14, 202:15, 202:16, 236:19, 245:10, 245:15, 245:16, 245:18, 245:20, 245:21
**sentence** [1] - 63:14
**separate** [4] - 60:6, 136:23, 202:5, 211:10

**September** [10] - 4:21, 156:4, 239:23, 240:1, 266:19, 269:11, 269:12, 269:13, 269:14, 270:11
**Sequoia** [2] - 18:15, 19:13
**series** [1] - 267:18
**service** [2] - 151:17, 151:20
**Services** [1] - 40:16
**services** [1] - 55:3
**set** [6] - 81:16, 142:4, 142:6, 167:5, 265:20, 300:10
**sets** [1] - 202:7
**seven** [5] - 252:8, 279:15, 279:22, 280:4, 280:7
**several** [7] - 108:12, 125:18, 213:18, 213:19, 213:20, 250:20, 250:21
**Seybold** [1] - 156:7
**shampoo** [2] - 297:7, 298:11
**Shana** [2] - 87:4, 87:7
**share** [3] - 10:20, 216:15, 216:21
**sharing** [1] - 38:23
**sharp** [1] - 161:18
**sheet** [1] - 161:3
**sheets** [3] - 131:18, 159:23, 160:4
**shipping** [1] - 13:5
**shoot** [1] - 239:16
**shopping** [3] - 163:16, 163:22, 164:1
**short** [4] - 10:6, 10:9, 81:19, 250:2
**short-term** [2] - 10:6, 10:9
**shorthand** [1] - 300:13
**shot** [1] - 110:4
**shoulder** [28] - 6:7, 107:22, 114:6, 115:14, 115:15, 115:16, 156:16, 161:15, 161:17, 161:21, 162:1, 162:9, 162:14, 162:15, 162:17, 163:2, 164:10, 164:13, 164:17, 164:22, 165:5, 165:6, 165:20, 195:9, 196:3, 196:5, 249:13, 268:5

**show** [10] - 58:2, 122:2, 144:14, 152:19, 204:15, 216:12, 222:16, 222:23, 223:2, 279:23
**showed** [1] - 56:19
**showing** [22] - 10:11, 10:22, 13:12, 43:11, 53:15, 61:8, 64:23, 68:16, 75:1, 80:7, 83:2, 91:15, 100:21, 116:19, 126:23, 167:3, 181:17, 183:21, 188:22, 203:14, 212:1, 223:17
**shown** [2] - 184:13, 222:18
**shows** [2] - 170:20, 233:2
**shrugs** [1] - 6:8
**shut** [1] - 8:2
**shy** [1] - 154:10
**side** [6] - 99:14, 99:17, 219:17, 224:14, 224:15, 242:15
**sign** [13] - 24:12, 78:15, 81:20, 96:17, 107:7, 135:9, 136:7, 136:9, 137:2, 137:21, 160:8
**signature** [24] - 44:20, 44:21, 45:4, 53:22, 58:11, 59:19, 61:13, 61:15, 61:19, 64:9, 65:8, 65:21, 69:5, 77:8, 77:19, 78:6, 78:8, 80:14, 80:16, 80:19, 82:8, 255:17, 255:22, 255:23
**Signature** [1] - 44:20
**signed** [23] - 24:11, 28:15, 45:9, 45:17, 54:3, 54:23, 58:15, 59:3, 59:18, 61:23, 62:3, 63:1, 64:5, 67:19, 69:3, 77:11, 77:19, 78:18, 80:23, 101:11, 106:14, 179:14, 258:23
**signifying** [1] - 58:14
**signing** [6] - 37:2, 65:14, 95:6, 95:9, 95:11, 95:15
**similar** [3] - 13:4, 106:4, 285:15
**simple** [1] - 6:18
**simultaneously** [2] - 283:6, 283:7

**single** [7] - 47:7, 48:23, 53:17, 68:18, 80:9, 91:17, 127:2
**single-family** [1] - 48:23
**single-page** [2] - 53:17, 68:18
**sit** [4] - 64:21, 181:10, 184:19, 251:1
**sites** [1] - 25:10
**sitting** [2] - 231:1, 267:6
**situation** [3] - 33:18, 146:22, 247:19
**situations** [1] - 42:12
**six** [7] - 18:10, 52:7, 119:20, 174:8, 174:18, 175:4, 290:13
**sixth** [2] - 62:10, 62:11
**skid** [3] - 52:9, 52:11, 52:12
**skills** [1] - 52:15
**skimmed** [2] - 215:20, 218:3
**skimming** [1] - 216:5
**slab** [1] - 52:13
**sleep** [2] - 114:9, 287:1
**sleeping** [1] - 114:4
**slid** [1] - 105:7
**slip** [1] - 270:18
**Slip** [2] - 4:20, 270:11
**small** [2] - 117:9, 153:12
**smart** [3] - 150:22, 263:6, 263:9
**smartphone** [3] - 181:9, 181:12, 250:14
**Smith** [8] - 105:13, 105:19, 106:6, 110:16, 110:19, 110:22, 111:2, 111:4
**smoke** [1] - 253:11
**Snyder** [1] - 40:15
**Social** [1] - 22:12
**social** [1] - 25:10
**sold** [7] - 169:14, 169:19, 183:7, 183:8, 183:9, 238:7, 291:15
**solely** [1] - 238:6
**solicitation** [1] - 248:19
**solicitors** [1] - 248:16
**solo** [2] - 47:8, 52:7
**someone** [10] - 253:12, 253:14, 253:15, 273:14,

273:15, 273:17, 273:18, 273:21, 275:10, 283:18
**someplace** [1] - 273:1
**sometime** [3] - 121:7, 266:18, 269:10
**sometimes** [7] - 157:4, 158:23, 159:1, 163:17, 270:2, 270:3
**somewhat** [3] - 28:6, 28:7, 107:11
**somewhere** [3] - 109:4, 109:15, 133:4
**soon** [5] - 112:1, 112:3, 196:22, 197:1, 202:18
**sophisticated** [1] - 202:1
**sorry** [6] - 83:16, 117:8, 154:8, 179:5, 205:17, 240:16
**sort** [2] - 81:6, 271:17
**south** [1] - 131:23
**space** [1] - 146:18
**special** [2] - 108:16, 108:19
**specialist** [1] - 238:23
**specific** [13] - 13:21, 31:20, 43:19, 67:12, 67:13, 67:15, 128:20, 134:17, 208:14, 239:22, 258:14, 276:8
**specifically** [3] - 42:20, 43:8, 78:22
**specimen** [10] - 134:9, 135:13, 135:19, 135:22, 136:6, 136:10, 138:5, 138:18, 141:3, 242:23
**specimens** [1] - 141:3
**spell** [9] - 7:22, 8:8, 18:18, 26:13, 27:7, 29:9, 93:2, 162:21, 192:3
**spend** [1] - 118:11
**spent** [1] - 70:5
**spicy** [1] - 125:23
**spinal** [2] - 117:22, 119:8
**spine** [1] - 119:8
**split** [1] - 36:6
**spoken** [6] - 17:23, 18:2, 18:5, 22:20, 60:21, 78:2
**spot** [2] - 143:8, 174:18
**spots** [1] - 151:16

**Square** [2] - 1:13, 2:9
**ss** [1] - 300:2
**stabbing** [1] - 161:18
**stamp** [1] - 291:11
**standard** [4] - 38:14, 84:21, 133:2, 159:1
**standards** [2] - 59:1, 59:5
**stands** [3] - 26:15, 139:15, 233:13
**stapled** [6] - 75:4, 83:4, 101:3, 203:16, 223:20, 223:23
**Starbucks** [1] - 272:23
**start** [29] - 5:21, 6:22, 7:1, 7:5, 27:11, 43:9, 46:7, 47:4, 92:23, 96:4, 107:21, 134:23, 135:2, 154:7, 155:3, 155:22, 156:2, 158:2, 167:11, 167:13, 179:2, 179:4, 188:3, 188:7, 198:21, 199:5, 217:14, 222:11
**started** [27] - 18:11, 25:13, 29:23, 31:7, 32:11, 35:17, 37:2, 44:2, 46:13, 47:1, 47:7, 47:8, 60:7, 95:12, 129:17, 152:16, 154:19, 155:7, 155:18, 155:23, 157:19, 158:16, 168:13, 172:14, 173:23, 178:1, 194:12
**starters** [1] - 144:15
**starting** [2] - 26:7, 35:16
**starts** [2] - 101:4, 148:6
**state** [6] - 141:13, 144:19, 148:18, 170:20, 207:18, 209:10
**STATE** [1] - 300:1
**State** [11] - 20:17, 48:5, 50:9, 51:5, 51:19, 109:1, 130:22, 156:9, 209:17, 221:18, 300:6
**statement** [4] - 79:10, 234:17, 285:21, 294:13
**Statement** [5] - 3:10, 53:12, 148:12, 148:13, 148:15

**statements** [3] - 205:12, 205:13, 205:19
**States** [1] - 168:6
**states** [2] - 63:14, 117:21
**STATES** [1] - 1:1
**stating** [1] - 13:20
**stayed** [1] - 145:19
**stenosis** [2] - 117:23, 119:8
**step** [1] - 195:19
**steroid** [1] - 191:17
**sticking** [1] - 233:8
**still** [29] - 15:19, 16:7, 16:13, 21:20, 48:18, 60:17, 64:20, 74:9, 85:18, 98:19, 114:2, 114:10, 118:8, 120:21, 125:15, 146:11, 161:13, 169:3, 170:15, 174:5, 179:10, 187:11, 210:10, 225:1, 229:13, 250:23, 280:12, 298:19, 298:20
**stop** [7] - 132:19, 149:15, 173:18, 174:13, 228:15, 228:18
**stopped** [5] - 13:3, 33:8, 53:5, 181:14, 193:17
**stopping** [1] - 278:21
**stops** [1] - 38:5
**store** [1] - 160:9
**stored** [3] - 17:8, 229:18, 242:4
**Storm** [1] - 5:15
**STORM** [2] - 1:12, 2:8
**straight** [1] - 209:8
**streen** [1] - 45:11
**Street** [1] - 2:4
**street** [1] - 51:2
**strength** [1] - 164:19
**stressed** [2] - 274:10, 274:12
**strictly** [1] - 214:8
**Struble** [17] - 93:1, 93:4, 93:7, 93:11, 93:14, 93:16, 93:18, 93:23, 94:4, 94:8, 94:18, 94:19, 94:22, 94:23, 96:4, 97:10, 97:15
**stuff** [5] - 38:3, 213:3, 249:11, 270:3
**style** [1] - 275:20
**Subchapter** [1] -

258:5
**subject** [4] - 13:3, 234:13, 239:5, 293:9
**submit** [2] - 87:14, 89:18
**submitted** [4] - 43:2, 90:9, 90:13, 236:7
**subpoena** [1] - 12:8
**subscribed** [1] - 300:18
**subscriber** [1] - 204:1
**substance** [13] - 77:13, 77:15, 84:7, 85:14, 140:8, 258:10, 277:23, 278:7, 281:22, 282:2, 282:21, 285:17, 291:13
**substances** [5] - 66:20, 67:3, 85:13, 86:6, 285:19
**Sue** [1] - 2:17
**suffered** [2] - 153:16, 161:14
**suffering** [1] - 125:6
**suggest** [2] - 280:1, 280:5
**suggested** [2] - 74:19, 207:21
**suggestions** [1] - 165:19
**sum** [2] - 185:7, 291:13
**summarize** [1] - 145:15
**Summary** [4] - 4:1, 82:22, 83:10, 83:17
**summer** [2] - 161:11, 162:11
**Summer** [2] - 163:1, 195:12
**sunglasses** [1] - 38:21
**SUNY** [1] - 164:6
**super** [2] - 26:9, 211:13
**supervisor** [7] - 18:9, 34:7, 73:14, 82:10, 91:2, 91:3, 103:19
**supervisor's** [1] - 103:21
**supplement** [4] - 239:9, 291:17, 293:1, 293:20
**supplements** [1] - 293:21
**supplied** [4] - 199:10, 199:22, 201:13, 202:14
**supply** [1] - 200:13

**suppose** [1] - 298:17
**supposed** [2] - 67:17, 290:6
**surgeon** [1] - 195:17
**surgeries** [1] - 124:22
**sweetened** [1] - 97:16
**Swift** [1] - 40:14
**sworn** [5] - 5:9, 6:12, 57:15, 57:16, 300:9
**symptoms** [3] - 121:20, 121:22, 121:23
**synthetic** [2] - 86:7, 200:7
**System** [2] - 105:13, 105:19
**system** [7] - 105:20, 133:11, 142:17, 143:7, 198:11, 200:2, 250:15
**Systems** [1] - 46:22

---

## T

**T-U-L-A-R-E** [1] - 18:19
**table** [7] - 207:3, 219:16, 219:17, 224:9, 224:11, 266:22, 267:6
**talks** [1] - 148:18
**tall** [1] - 136:19
**tamper** [1] - 229:2
**tampered** [1] - 229:2
**tasks** [1] - 249:11
**tasted** [3] - 227:19, 227:20, 232:16
**tattoo** [1] - 124:9
**tattoos** [2] - 123:21, 124:5
**tax** [35] - 144:13, 144:18, 144:21, 145:2, 145:6, 145:7, 146:1, 146:3, 146:7, 147:21, 148:21, 149:10, 149:17, 152:21, 152:22, 153:8, 153:9, 153:10, 167:6, 167:7, 170:20, 172:16, 181:19, 181:20, 183:19, 184:1, 185:3, 185:4, 185:5, 185:22, 186:3, 186:11, 188:19, 214:9
**taxes** [8] - 148:19, 149:15, 150:5, 186:7, 186:14, 186:15, 187:5, 187:7

taxing [1] - 186:4
teach [1] - 52:20
team [8] - 32:9,
154:20, 157:12,
171:9, 173:20,
174:10, 176:16,
177:21
telephone [1] - 41:16
television [1] - 248:8
tenants [1] - 162:4
tenor [1] - 275:21
term [4] - 10:6, 10:8,
10:9
terminal [30] - 59:21,
60:1, 60:6, 60:8,
70:11, 71:14, 72:2,
72:3, 72:8, 72:22,
72:23, 73:4, 73:17,
74:16, 107:5,
128:14, 129:11,
129:12, 131:2,
131:10, 131:16,
132:1, 132:3, 132:4,
159:23, 160:1,
160:5, 177:18,
202:22, 228:13
terminals [2] - 72:15,
73:9
terminated [18] -
33:12, 40:3, 45:19,
49:11, 50:1, 51:4,
73:19, 88:22,
127:19, 127:23,
128:12, 128:16,
128:21, 155:20,
167:12, 180:18,
186:19, 225:6
termination [5] -
79:17, 92:2, 92:21,
127:9, 153:4
terms [7] - 132:15,
133:5, 148:15,
151:8, 167:23,
207:11, 253:18
test [92] - 32:1, 32:12,
32:14, 33:17, 43:6,
56:5, 69:22, 69:23,
70:5, 70:10, 71:17,
72:10, 82:2, 86:16,
87:14, 88:7, 88:19,
93:6, 93:8, 93:10,
93:13, 112:17,
113:5, 113:23,
115:8, 115:12,
120:23, 121:1,
121:14, 122:3,
122:4, 125:19,
130:16, 130:18,
131:8, 132:9,
132:20, 132:23,

133:5, 133:12,
134:4, 139:10,
139:21, 140:1,
140:2, 140:5,
140:12, 140:13,
140:14, 140:22,
141:9, 141:15,
141:16, 141:22,
142:5, 142:11,
142:14, 143:2,
143:3, 158:1,
192:22, 197:2,
197:3, 197:11,
197:16, 197:22,
198:1, 198:4, 198:9,
198:12, 198:17,
198:22, 198:23,
199:10, 199:22,
200:19, 201:5,
201:7, 201:12,
201:18, 201:19,
201:20, 202:3,
202:4, 202:11,
203:4, 204:15,
233:19, 246:11,
252:18, 260:2, 287:2
tested [38] - 32:22,
71:5, 88:2, 88:4,
114:11, 120:16,
120:19, 120:20,
121:21, 122:3,
123:20, 124:1,
126:3, 132:7,
140:16, 142:5,
142:15, 142:16,
196:9, 196:11,
196:12, 196:18,
196:23, 198:19,
233:11, 237:11,
243:1, 243:4, 244:1,
244:4, 244:8,
246:16, 247:3,
247:9, 248:22,
249:5, 251:11,
251:14
testified [3] - 5:10,
193:16, 250:11
testify [3] - 8:2, 144:7,
300:9
testifying [1] - 212:9
testimony [18] - 6:12,
11:15, 30:10, 57:16,
57:20, 239:7,
239:11, 239:14,
252:14, 256:15,
280:17, 280:21,
298:22, 300:8,
300:9, 300:10,
300:11, 300:12
testing [28] - 66:17,

69:13, 70:7, 88:10,
88:13, 88:15,
112:18, 112:23,
113:17, 113:21,
138:7, 138:11,
139:1, 143:5, 157:9,
157:21, 194:12,
223:7, 233:23,
234:4, 242:22,
247:14, 254:7,
260:3, 286:3,
286:15, 292:11,
293:9
tests [24] - 40:1,
52:15, 69:20, 71:11,
72:5, 72:6, 72:12,
87:18, 124:13,
124:15, 124:17,
124:20, 133:16,
142:19, 200:20,
200:21, 201:15,
201:17, 202:7,
202:13, 219:5,
233:16, 234:14,
239:5
Texas [23] - 3:19,
72:13, 72:18, 89:10,
128:15, 198:13,
199:6, 199:9,
199:18, 201:13,
201:17, 201:22,
202:8, 202:14,
204:10, 204:11,
204:15, 204:19,
204:20, 209:5,
209:9, 212:11
text [1] - 131:5
THC [49] - 67:1,
140:16, 142:15,
142:17, 143:6,
198:10, 200:2,
234:3, 237:13,
239:10, 243:5,
244:2, 244:5, 244:8,
246:11, 253:2,
253:3, 253:4,
253:13, 253:16,
259:7, 259:8,
260:12, 260:14,
260:17, 261:1,
261:2, 261:5, 261:7,
261:10, 263:1,
272:2, 274:9,
274:17, 278:9,
278:10, 282:7,
282:20, 283:21,
284:4, 284:19,
285:6, 285:10,
286:11, 286:21,
292:1, 296:7,
296:12, 296:13

THE [11] - 2:2, 2:6,
2:11, 7:20, 17:4,
17:7, 22:9, 43:21,
98:13, 98:17, 286:11
theft [2] - 20:8, 20:10
therapy [4] - 111:5,
111:6, 111:10,
164:12
thereafter [1] - 300:11
thereof [1] - 300:16
thicker [1] - 167:8
thinking [2] - 51:9,
197:13
third [9] - 77:7,
103:20, 104:6,
147:18, 184:2,
201:8, 233:2,
234:18, 240:23
Third [1] - 2:14
thousand [1] - 12:5
three [32] - 26:14,
35:9, 42:1, 48:2,
48:3, 58:19, 62:9,
115:9, 115:11,
119:1, 119:7, 147:1,
154:10, 161:12,
162:11, 164:3,
172:5, 172:6,
175:22, 176:14,
176:18, 177:11,
181:2, 181:5, 181:8,
201:16, 220:8,
220:11, 223:19,
223:22, 288:21
Three [2] - 4:17,
219:12
Three-pages [1] -
219:12
three-year [1] - 42:1
threshold [1] - 86:17
throughout [2] - 63:2,
86:14
throw [1] - 225:17
thrown [2] - 188:1,
220:19
timeline [4] - 269:6,
277:5, 277:7, 281:13
tips [2] - 152:5, 152:8
title [2] - 59:21, 263:9
Title [1] - 257:13
titled [1] - 263:22
today [28] - 15:21,
34:7, 48:18, 48:23,
49:6, 49:22, 50:5,
50:21, 51:17, 56:7,
56:8, 64:21, 68:8,
116:3, 118:9,
125:15, 169:3,
180:18, 181:9,
184:19, 187:11,

210:10, 214:6,
214:20, 241:23,
248:4, 250:23, 251:1
today's [12] - 13:13,
53:16, 68:17, 75:2,
80:8, 91:16, 100:22,
116:20, 127:1,
167:4, 181:18,
203:15
together [17] - 32:8,
75:5, 83:4, 101:3,
141:12, 148:2,
151:12, 154:19,
176:16, 192:9,
203:16, 205:1,
205:2, 212:14,
223:20, 223:23,
260:22
tolerance [2] - 259:16,
259:20
TOMMANEY [1] - 2:4
Tommaney [1] - 14:21
tomorrow [8] - 252:7,
252:9, 279:13,
280:7, 290:15,
296:18, 298:19,
299:3
tone [1] - 275:21
tongue [2] - 226:8,
227:2
tonight [1] - 236:16
tons [1] - 66:8
took [43] - 9:1, 10:5,
11:9, 12:12, 60:9,
63:21, 74:2, 85:7,
87:6, 107:6, 113:4,
125:21, 126:2,
169:1, 191:10,
191:14, 191:20,
191:22, 192:11,
192:12, 193:1,
193:2, 193:7, 224:2,
227:7, 227:10,
231:2, 231:4,
231:12, 232:20,
233:15, 234:1,
234:5, 234:15,
235:12, 239:2,
241:7, 242:21,
249:3, 259:1, 259:8,
263:2, 297:9
top [17] - 10:19, 40:10,
41:2, 54:5, 58:4,
62:8, 68:22, 75:11,
85:17, 91:21,
119:22, 218:7,
218:10, 218:13,
226:19, 226:22,
262:1
torn [3] - 162:4, 229:8

total [3] - 139:3,
148:22, 185:7
totally [1] - 98:12
touch [1] - 116:8
tow [1] - 168:20
toward [2] - 119:22,
127:11
towards [2] - 148:15,
170:9
towed [1] - 100:12
tower [1] - 151:15
tracked [1] - 152:1
tracking [1] - 159:10
trailer [1] - 132:6
train [4] - 47:9, 52:6,
52:10, 52:16
trained [2] - 52:19,
59:7
trainer [3] - 47:9, 52:4,
76:5
Training [3] - 3:19,
72:19, 75:13
training [27] - 52:5,
52:9, 59:11, 59:13,
59:15, 65:17, 75:14,
75:18, 75:22, 76:1,
76:4, 76:6, 76:15,
76:17, 77:3, 77:13,
77:16, 79:3, 81:9,
105:10, 105:12,
106:4, 106:6,
106:13, 106:17,
106:21, 164:19
transaction [1] -
169:16
transcribed [1] -
300:11
transcription [1] -
300:13
translate [1] - 243:12
Transport [20] - 40:13,
40:16, 40:19, 46:19,
46:21, 47:1, 47:5,
152:16, 167:10,
167:14, 167:16,
167:23, 171:13,
171:20, 172:4,
172:9, 172:18,
181:21, 182:13,
188:4
transport [3] - 13:2,
168:7, 172:15
Transportation [16] -
3:11, 3:17, 3:19,
26:19, 57:6, 58:5,
58:22, 68:12, 68:23,
72:18, 75:13, 79:14,
171:14, 175:17,
256:9, 257:17
transporting [9] -

31:3, 35:11, 35:13,
167:18, 168:4,
168:10, 172:11,
182:9, 182:14
travel [3] - 36:16,
36:17, 145:15
treat [2] - 162:16,
210:1
treated [12] - 10:8,
108:13, 108:18,
109:13, 109:15,
110:11, 119:11,
119:13, 119:18,
123:2, 126:8, 126:9
treatment [3] - 165:10,
195:20, 208:2
treatments [1] -
120:11
Tri [1] - 109:4
Tri-Cities [1] - 109:4
Trial [3] - 1:10, 3:6,
5:2
tried [6] - 227:19,
227:20, 231:9,
231:11, 270:8, 290:5
Trimac [1] - 40:15
trip [2] - 99:20, 161:3
Tripp [7] - 239:7,
289:13, 291:23,
292:6, 292:8, 292:9,
292:14
trips [1] - 161:3
trouble [4] - 62:5,
81:6, 114:4, 148:13
truck [48] - 30:21,
36:10, 46:8, 46:11,
46:14, 52:14, 66:14,
95:8, 99:9, 99:10,
100:1, 105:5,
129:13, 129:20,
129:22, 131:13,
132:13, 132:16,
132:23, 138:20,
150:19, 151:22,
159:6, 171:9,
182:16, 182:21,
183:5, 183:7, 183:8,
183:9, 183:10,
183:11, 183:12,
183:18, 187:16,
194:19, 225:4,
225:5, 228:15,
228:18, 231:2,
231:13, 258:11,
287:15, 292:9,
292:14, 294:10,
295:3
trucker [4] - 76:22,
112:14, 122:13,
133:19

trucking [5] - 39:18,
97:11, 97:15, 171:4,
177:4
trucks [7] - 36:8,
37:19, 37:21, 100:8,
151:11, 151:18,
151:19
true [8] - 26:1, 26:3,
26:5, 45:6, 57:20,
79:10, 264:6, 300:12
truth [3] - 300:9,
300:10
try [16] - 96:12, 98:16,
103:8, 133:8,
133:11, 164:21,
165:5, 165:7,
230:23, 252:10,
265:4, 265:9, 266:6,
266:13, 268:4,
290:12
trying [6] - 91:7,
230:15, 259:5,
261:17, 280:1, 280:5
Tuesday [1] - 141:23
Tulare [3] - 18:17,
19:22
turn [4] - 131:19,
133:16, 159:22,
190:7
turned [6] - 90:16,
131:16, 150:7,
160:4, 219:21,
298:15
turning [2] - 77:7, 78:5
twice [3] - 21:17, 90:9,
163:5
Twitter [3] - 24:8,
24:10, 24:15
two [76] - 5:16, 9:16,
26:20, 32:8, 35:23,
36:2, 36:13, 38:4,
40:17, 58:19, 60:6,
62:9, 63:13, 70:6,
70:22, 71:4, 71:9,
83:4, 83:8, 90:9,
102:11, 106:10,
108:21, 115:9,
115:10, 116:21,
117:4, 117:22,
117:23, 118:18,
118:23, 119:6,
120:20, 125:22,
128:22, 129:20,
131:13, 136:19,
136:21, 137:9,
137:14, 137:21,
141:3, 142:19,
154:19, 167:8,
174:10, 175:8,
177:14, 184:23,

194:23, 195:1,
199:7, 199:21,
201:11, 201:15,
201:17, 202:5,
202:7, 203:16,
210:21, 210:22,
225:8, 229:22,
240:12, 240:14,
240:19, 240:20,
253:8, 270:17,
272:22, 273:4,
282:20
two-page [2] - 117:4,
270:17
Tylenol [2] - 193:3,
193:5
type [6] - 52:9, 105:16,
145:21, 193:11,
255:3, 268:4
typed [1] - 166:15
types [2] - 90:7, 119:1
typewriting [1] -
300:12

## U

U.S [5] - 40:14, 146:4,
245:20, 248:20,
257:17
unannounced [1] -
88:15
unauthorized [2] -
3:13, 61:4
unclear [1] - 120:22
uncontrollable [1] -
105:8
under [17] - 19:4, 24:2,
57:19, 105:12,
144:2, 161:8, 183:3,
211:23, 227:2,
250:10, 263:23,
280:12, 286:12,
292:4, 294:18,
298:19, 298:20
understood [6] -
45:15, 79:20, 85:6,
261:10, 285:22,
285:23
unemployment [1] -
176:4
uniform [2] - 38:8,
38:14
Union [3] - 48:6, 48:8,
49:16
United [1] - 168:5
UNITED [1] - 1:1
unless [2] - 140:7,
200:2
unlike [1] - 75:2
unloading [6] - 36:4,

37:19, 37:21, 38:1,
38:6, 52:11
unnecessary [1] -
197:12
unopened [2] -
242:23, 245:17
unreimbursed [2] -
148:9, 148:21
unrelated [1] - 211:10
unscrewed [2] -
226:19, 229:7
untreated [1] - 120:10
up [64] - 8:2, 24:11,
24:12, 33:22, 34:20,
35:19, 41:5, 41:6,
52:14, 56:19, 62:20,
75:3, 79:17, 85:17,
98:6, 98:12, 99:22,
103:10, 119:23,
120:3, 122:2,
128:17, 129:1,
129:2, 129:4,
129:15, 134:19,
134:20, 136:23,
137:7, 142:6,
142:11, 142:13,
152:16, 161:23,
168:8, 168:9,
168:12, 168:15,
168:20, 168:23,
170:4, 170:9,
172:13, 175:9,
175:14, 176:2,
176:21, 178:6,
192:21, 199:18,
223:23, 242:9,
247:20, 256:4,
265:2, 265:8,
266:17, 267:9,
267:23, 269:18,
272:8, 276:21,
298:18
upload [1] - 55:23
upper [7] - 44:7,
44:13, 83:8, 92:1,
127:7, 181:22, 182:1
urine [37] - 70:16,
70:20, 71:11, 126:2,
130:16, 130:18,
133:9, 133:15,
133:16, 134:9,
134:13, 134:23,
135:5, 135:13,
135:19, 135:22,
137:13, 138:16,
138:18, 139:5,
139:10, 140:5,
140:14, 140:15,
197:7, 198:1,
198:22, 199:10,

199:22, 200:14,
201:13, 202:5,
202:7, 202:13,
209:7, 209:8, 209:11
**USA** [1] - 215:13
**usage** [1] - 226:15
**username** [3] - 23:17,
24:1, 24:19
**uses** [1] - 262:14
**utilized** [1] - 160:16

### V

**vacation** [3] - 37:8,
92:18, 180:11
**vacations** [1] - 118:11
**Valley** [4] - 175:19,
175:20, 175:21,
176:1, 176:6,
176:13, 177:1,
177:9, 178:17
**Vancouver** [1] -
177:20
**various** [3] - 31:4,
41:8, 152:21
**vary** [1] - 35:10
**Vaught** [2] - 87:4, 87:7
**vehicle** [3] - 99:6,
159:10, 191:9
**Vensure** [7] - 178:9,
178:11, 178:12,
178:13, 184:4,
184:7, 184:14
**VENSURE** [2] -
178:11, 184:7
**verbally** [1] - 96:20
**Verizon** [1] - 40:22
**Vestal** [4] - 8:16, 8:18,
163:13, 163:19
**via** [1] - 233:11
**video** [21] - 81:18,
81:19, 107:2, 240:8,
240:20, 250:11,
260:9, 289:5, 289:7,
289:11, 289:12,
289:16, 290:21,
290:22, 291:5,
291:7, 291:9,
291:14, 291:23,
292:7, 295:6
**videos** [4] - 76:18,
105:21, 105:22,
260:11
**violate** [1] - 284:19,
285:7, 286:3
**violation** [12] - 79:18,
127:13, 160:7,
160:10, 259:11,
261:11, 283:20,
284:4, 285:11,

286:15, 292:17
**Visa** [3] - 213:7,
213:10, 213:13
**visa** [1] - 213:11
**Visas** [1] - 213:21
**visions** [1] - 214:17
**Visions** [2] - 214:18,
215:2
**visit** [4] - 110:9, 116:1,
163:4
**visits** [2] - 115:11,
163:7
**vitamins** [4] - 9:20,
10:2, 234:15, 234:16
**vs** [1] - 1:6

### W

**W-2** [6] - 94:23,
145:10, 184:14,
184:16, 188:19,
189:1
**W-2s** [4] - 145:11,
184:3, 189:5
**W-I-L-L-I-N-G-B-O-R-
O** [1] - 27:8
**wages** [5] - 152:4,
152:8, 184:14,
185:5, 185:7
**Wagner** [6] - 31:10,
32:6, 33:1, 33:6,
34:8, 34:9
**Wagner's** [1] - 34:19
**wait** [5] - 6:22, 7:3,
36:4, 36:12, 134:7
**waited** [1] - 138:20
**waiting** [1] - 142:3
**waived** [1] - 222:5
**waiver** [1] - 222:10
**waiving** [1] - 236:20
**wall** [6] - 242:6, 242:7,
242:8, 242:10,
242:11, 242:13
**Walla** [1] - 21:4
**wallet** [1] - 214:5
**wants** [1] - 100:23
**warned** [1] - 241:18
**warning** [3] - 84:4,
84:17, 84:20
**Washington** [3] -
21:4, 21:5, 177:20
**watch** [9] - 24:23,
77:1, 105:21,
105:22, 107:2,
135:12, 137:1,
291:1, 291:3
**watched** [4] - 81:19,
81:20, 240:20,
290:22
**watches** [1] - 126:11

**watching** [2] - 240:8,
240:11
**water** [7] - 33:14,
33:19, 34:2, 42:7,
42:8, 132:18, 132:22
**ways** [1] - 209:16
**wear** [1] - 38:7
**website** [24] - 249:8,
271:19, 277:19,
277:20, 277:21,
281:1, 281:17,
282:10, 282:17,
283:4, 285:4, 285:5,
286:1, 286:20,
286:23, 287:6,
288:16, 289:2,
289:8, 291:21,
295:7, 295:8,
295:10, 295:22
**Wednesday** [1] -
76:13
**week** [6] - 37:11,
76:11, 118:12,
196:10, 224:5,
269:20
**week's** [1] - 201:9
**weekend** [1] - 129:4
**weeks** [12] - 111:11,
125:22, 172:5,
172:6, 175:4, 175:8,
176:14, 176:18,
227:12, 228:1,
228:3, 228:4
**WENDY** [1] - 2:14
**west** [3] - 131:23,
132:3, 132:4
**WESTERN** [1] - 1:2
**wet** [2] - 52:13
**wheel** [1] - 168:16
**WHEREOF** [1] -
300:18
**whole** [10] - 14:1,
30:10, 77:5, 238:22,
241:11, 266:2,
285:2, 300:9
**Whole** [2] - 239:17,
291:18
**wife** [17] - 21:9, 21:20,
32:7, 122:21, 167:7,
167:13, 189:2,
212:13, 265:23,
270:22, 271:3,
281:7, 281:15,
296:20, 297:2,
298:22
**wife's** [2] - 8:20, 54:6
**wifi** [2] - 151:18,
151:19
**willing** [1] - 120:11
**Willingboro** [4] - 27:6,

31:11, 32:15
**winter** [1] - 38:15
**wiped** [1] - 251:6
**Wisconsin** [1] - 52:8
**withdrew** [1] - 92:20
**witness** [1] - 300:8
**WITNESS** [10] - 3:1,
7:20, 17:4, 17:7,
22:9, 43:21, 98:13,
98:17, 286:11,
300:18
**wondering** [1] - 149:8
**word** [5] - 14:3,
166:15, 262:10,
262:15
**words** [9] - 6:7, 62:13,
71:8, 81:15, 114:19,
115:3, 119:23,
169:17, 286:21
**Worker's** [1] - 116:16
**Workers'** [11] - 4:5,
110:20, 153:20,
153:23, 154:5,
158:6, 158:10,
158:11, 158:12,
158:14, 193:8
**Workman's** [2] -
110:12, 112:4
**works** [4] - 51:11,
68:8, 139:17, 149:11
**world** [3] - 266:2,
287:11
**worried** [1] - 279:22
**worry** [4] - 287:6,
287:11, 287:16,
292:16
**worse** [1] - 195:15
**wreck** [11] - 107:13,
128:18, 153:1,
153:17, 154:8,
155:4, 161:20,
165:15, 192:21,
193:5, 193:14
**write** [4] - 78:8,
114:19, 145:18,
225:22
**writing** [3] - 55:6,
140:22, 273:14
**written** [7] - 74:12,
81:23, 127:22,
131:20, 197:21,
246:4, 246:6
**wrote** [4] - 103:16,
217:19, 274:14,
274:18

### X

**X's** [1] - 282:11
**X-rays** [2] - 162:5,

164:10
**Xpress** [1] - 40:14

### Y

**Yan** [3] - 170:5, 170:8,
170:9
**yard** [1] - 131:8
**year** [32] - 15:9, 17:23,
42:1, 46:16, 51:12,
74:4, 80:19, 88:2,
94:23, 119:14,
121:1, 121:3, 121:5,
124:2, 124:6,
132:11, 145:11,
146:1, 146:7, 149:5,
152:22, 153:1,
167:7, 167:12,
172:16, 177:17,
181:19, 185:3,
185:5, 239:18
**yearly** [1] - 122:5
**years** [44] - 8:14,
18:10, 22:18, 24:13,
29:13, 30:2, 30:3,
30:8, 41:23, 46:1,
46:3, 47:17, 48:22,
51:23, 53:2, 53:7,
60:9, 61:1, 63:11,
79:23, 88:1, 106:11,
119:19, 119:20,
120:20, 124:7,
124:10, 124:14,
124:16, 124:18,
124:20, 124:22,
125:18, 126:14,
185:22, 186:6,
186:8, 186:12,
220:9, 242:4,
284:10, 296:21
**years'** [1] - 167:8
**YORK** [2] - 1:2, 300:1
**York** [24] - 1:14, 2:5,
2:10, 2:15, 5:8, 8:16,
20:17, 47:20, 48:1,
48:4, 48:7, 50:9,
51:5, 51:19, 109:1,
109:3, 109:4, 109:5,
156:9, 186:15,
209:17, 221:18,
300:6
**youngest** [1] - 50:13
**yourself** [13] - 13:21,
57:19, 134:15,
137:17, 138:14,
142:6, 152:8,
167:20, 188:4,
189:1, 221:7,
226:12, 247:7
**YouTube** [24] - 24:17,

24:19, 24:21, 24:23, 25:1, 25:2, 25:5, 25:8, 64:3, 239:8, 239:15, 240:4, 240:8, 240:20, 250:11, 289:5, 289:6, 289:11, 290:21, 291:5, 291:9, 291:13, 291:23

**Z**

**zero** [7] - 234:3, 239:10, 259:16, 259:20, 286:11, 286:21, 292:1

1              UNITED STATES DISTRICT COURT

2              WESTERN DISTRICT OF NEW YORK

3     ------------------------------------------------

4     **DOUGLAS J. HORN and CINDY HARP-HORN,**

5              Plaintiffs,

6      -vs-           Civil Action No.: 15-cv-701-FPG

7     **MEDICAL MARIJUANA, INC., DIXIE ELIXIRS AND
      EDIBLES, RED DICE HOLDINGS, LLC, and DIXIE**

8     **BOTANICALS,**

9              Defendants.
      ------------------------------------------------

10                   Continuation of Examination Before

11    Trial of **DOUGLAS J. HORN,** held before Marissa

12    A. Ashcroft, Notary Public, at MURA & STORM,

13    PLLC, 930 Rand Building, 14 Lafayette Square,

14    Buffalo, New York, on May 9th, 2017 at 10:00

15    a.m., pursuant to notice.

16

17

18

19

20

21

22

23

1          **A P P E A R A N C E S**

2     APPEARING FOR THE PLAINTIFF:

3                    **HOUSH LAW OFFICES, PLLC**
                 **BY: FRANK HOUSH, ESQ.**
4                    70 Niagara Street
                 Buffalo, New York 14202
5                    (716) 362-1128

6     APPEARING FOR THE DEFENDANT, MEDICAL
      MARIJUANA, INC. and RED DICE HOLDINGS, LLC:
7
                     **MURA & STORM, PLLC**
8                    **BY: ERIC T. BORON, ESQ.,**
                 930 Rand Building,
9                    14 Lafayette Square
                 Buffalo, New York 14203
10                   (716) 855-2800

11    APPEARING FOR THE DEFENDANT, DIXIE ELIXIRS AND
      EDIBLES and DIXIE BOTANICALS:
12
                     **MESSNER REEVES LLP**
13                   **BY: JEAN-CLAUDE MAZZOLA, ESQ.**
                     **and WENDY J. LINDSTROM, ESQ.,**
14                   805 Third Avenue,
                 18th Floor
15                   New York, New York 10022
                 (646) 663-1860

16

17    **ALSO PRESENT:** Cindy Sue Harp-Horn

18

19

20

21

22

23

1                   **W I T N E S S E S**
       WITNESS              EXAMINATION              PAGE
2
       Douglas J. Horn   By Mr. Mazzola            304
3                        By Mr. Boron             346

4
                       **E X H I B I T S**
5      EXHIBIT               DESCRIPTION             PAGE

6      Exhibit 28        Motor Vehicle Crash        318
                         Worksheet
7
       Exhibit 29        E-mail dated 11/23/12      345
8
       Exhibit 30        Mike Choi, M.D. Doctor     345
9                        Review

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1           **D O U G L A S   J.   H O R N**

2           195 Parker Road Lockwood, New York 14859,

3           having been first duly sworn, was examined and

4           testified as follows:

5

6           **EXAMINATION BY MR. MAZZOLA:**

7

8    Q. Okay.  Good morning, Mr. Horn.  We're going to

9       finish up from where we were yesterday.  Just

10      to recap, I think we were talking yesterday

11      about independent research you did regarding

12      the Dixie Elixir product before you purchased

13      it and used it in October 2012; do you recall

14      that?

15   A. Yes.

16   Q. Okay.  And the last thing you were talking

17      about was watching a YouTube video which Tripp

18      Keber was talking; do you recall that?

19   A. Yeah.

20   Q. Okay.  What I was trying to understand

21      yesterday before we went on the break was

22      what -- or I guess the first thing is who

23      observed that video with you?

1    A. Me and Cindy.

2    Q. Okay.  And do you recall precisely when you

3       watched that video?

4    A. No.

5    Q. Okay.  You just know it was before you

6       purchased and used the product; is that

7       correct?

8    A. Correct.

9    Q. Other than you and Cindy, did you show that

10      video to anyone else?

11   A. No.

12   Q. Did anyone witness you and Cindy watching that

13      video before you purchased and used the

14      product?

15   A. No.

16   Q. Did you make a copy of that video?

17   A. No.

18   Q. Did you make a date stamp or screenshot of

19      that video?

20   A. No.

21   Q. What evidence or proof could you offer that

22      you observed that video before you purchased

23      and used the Dixie Elixir product?

1    A. Just that the video's still there.  I mean --

2    Q. I guess what I'm asking is:  What could you

3       offer to someone to prove that you observed it

4       when you said you observed it?

5    A. I don't know.

6    Q. Okay.  Other than your testimony?

7    A. Yeah.

8    Q. Is your -- do you still have the computer that

9       you watched it on?

10   A. I'm not sure what computer I watched it on.

11   Q. Okay.  Why do you say that?  How many

12      computers do you have?

13   A. Quite a few and a couple of iPads as well.

14   Q. Okay.  Okay.  Do you still have all those

15      iPads and computers?

16   A. Yeah, I believe so.

17   Q. So if I could look at all of those iPads and

18      computers and find the one that you watched

19      that video on, would I be able to find some

20      date on the computer proving when you watched

21      that video?

22   A. I'm not sure if you could or not.

23   Q. Okay.  But you still have the computers?

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/09/17

1    A. I do.
2    Q. Okay.  We were talking also before we went on
3       the break about hemp products that you've
4       used?
5    A. Correct?
6    Q. Do you recall that?
7    A. Yes.
8    Q. You said that you've taken hemp seed or hemp
9       heart?
10   A. Yeah, it's basically in a shake is what it
11      was.
12   Q. Okay.  Is there a difference between hemp seed
13      and hemp heart?
14   A. I don't know.
15   Q. Okay.  You said you've used hemp milk; is that
16      correct?
17   A. Correct.
18   Q. And hemp shampoo; is that correct?
19   A. Correct.
20   Q. Any other hemp-based products?
21   A. Not that I can think of, no.
22   Q. Did you use those products in, say, the -- the
23      month preceding your drug test?

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/09/17

1    A. No.

2    Q. When was the last time you used those products

3       before the drug test?

4    A. Probably about a year before I got fired.

5    Q. So a year before the drug test?

6    A. Yeah, at least.

7    Q. What prompted you to use those hemp products?

8    A. We used the hemp shake for weight loss.

9    Q. Okay.  And what about the hemp milk?

10   A. That was used in the shake.

11   Q. Okay.  And what about the hemp shampoo?

12   A. That was just something we tried one time.

13   Q. Okay.  How did you learn about these hemp

14      products?

15   A. They were in the grocery store.

16   Q. What prompted you to buy them?

17   A. Try something different.

18   Q. Did you do any research before you used them?

19   A. I didn't.

20   Q. Did your wife do any research before you used

21      them?

22   A. I believe she did, yes.

23   Q. After you dropped dirty I understand your wife

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/09/17

1       provided a sample to, I believe it was MEDTOX;
2       is that correct?
3   A.  I'm not sure.
4   Q.  Okay.  But when you went to that laboratory in
5       Texas?
6   A.  Correct.
7   Q.  I think it might have been Dumas, Texas?
8   A.  Yeah, I think so.
9   Q.  Your wife gave a sample there; is that
10      correct?
11  A.  Yes.
12  Q.  Why did your wife give a sample?
13  A.  To see if she had THC in her system.
14  Q.  But what would prompt her to do that?
15  A.  Because I had THC and I had no idea where it
16      came from.
17  Q.  Did you have any idea where it came from?
18  A.  No, I did not.
19  Q.  Your wife did use the Dixie Elixir product; is
20      that correct?
21  A.  She tried it once.
22  Q.  When you used the Dixie Elixir product for the
23      first time did you have any sort of reaction

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/09/17

1          to it?

2      A.  No.

3      Q.  Did you feel high?

4      A.  No.

5      Q.  Did you feel any sort of euphoria or anything

6          like that?

7      A.  No.

8      Q.  What did you feel?

9      A.  I didn't feel anything.

10     Q.  Okay.  You testified earlier that you used

11         marijuana when you were a kid; is that

12         correct?

13     A.  No.

14     Q.  I think you testified earlier that when you

15         were 15 you used marijuana?

16     A.  No.

17     Q.  We didn't ask you that question?

18     A.  No.

19     Q.  Okay.  Have you ever used marijuana?

20     A.  When I was younger.

21     Q.  Okay.  In the -- say, a year preceding your

22         drug test did you ever use any marijuana?

23     A.  No.

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/09/17

1    Q. Okay.  In the year preceding your drug test

2       did you ever ingest any marijuana products?

3    A. No.

4    Q. Nothing for a year?

5    A. Nope.

6    Q. Okay.  And have you ever been convicted of

7       driving while impaired?

8    A. No.

9    Q. And when I say that that includes intoxicated,

10      you know what I mean, right?

11   A. Right.

12   Q. What about in your home, I saw someplace that

13      you have five daughters; is that correct?

14   A. Correct.

15   Q. They're all grown now; is that correct?

16   A. Correct.

17   Q. So none of them live in the home with you?

18   A. No.

19   Q. In the year prior to you dropping dirty, who

20      lived in the home with you?

21   A. Just Elizabeth.

22   Q. Okay.  How old was Elizabeth then or how old

23      is she now?  We can do the math.

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/09/17

1    A. She's 28.

2    Q. Okay.  And Elizabeth is the one you described

3       as the hermit?

4    A. Yep.

5    Q. Okay.  Did Elizabeth ever smoke marijuana in

6       your home?

7    A. No.

8           MR. HOUSH:  Objection.  Object to form.

9    A. Not that I know of, no.

10   Q. Does Elizabeth use marijuana?

11   A. No.

12   Q. And you have another daughter, I believe

13      Nicole?

14   A. Correct.

15   Q. Okay.  How old is Nicole?

16   A. 31.

17   Q. Okay.  Where does she live?

18   A. In Pennsylvania.

19   Q. Does she smoke marijuana?

20   A. No.

21   Q. In the year preceding your -- you dropping

22      dirty, were you ever in the presence of anyone

23      smoking marijuana?

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/09/17

1    A. No.

2    Q. Do you smoke cigarettes?

3    A. No.

4    Q. Do you use any tobacco products?

5    A. No.

6    Q. Do you ever vape?

7    A. No.

8    Q. Do you ever use or smoke peyote?

9    A. No.

10   Q. Do you ever use any injectable drugs?

11   A. Nope.

12   Q. When you turned around to open the window I

13      saw something round in your pocket.  It looks

14      like it might be a tin of tobacco?

15   A. Correct.

16   Q. Is that a tin of tobacco?

17   A. No.

18   Q. Yesterday you talked a little bit about some

19      of the prescription drugs that Dr. Choi put

20      you on?

21   A. Correct.

22   Q. Did you discuss using those drugs and

23      operating a truck with him?

1      A. Yes, I did.

2      Q. And what did he tell you?

3      A. That I would be okay.

4      Q. Okay.  I recall seeing a note that you might

5         have written that said that you believed that

6         if you used the hydrocodeine --

7      A. Hydrocodone.

8      Q. Hydrocodone that you'd be in violation of your

9         company's regulations; is that correct?

10     A. Correct.

11     Q. Did you still use the hydrocodone?

12     A. Not while I was driving.

13     Q. Not while you were driving.  Did you ever

14        purchase any prescription drugs online?

15     A. Nope.

16     Q. When you dropped dirty were you taking any --

17        were you on a diet at the time you dropped

18        dirty?

19     A. I don't remember.

20     Q. And when was the last time you smoked or used

21        any marijuana?

22     A. I -- over 30 years.

23     Q. Okay.  Are you in favor of legalizing

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/09/17

1           marijuana?

2                    **MR. HOUSH:**  Object to form.

3      A. I really don't have an opinion on it.

4      Q. Okay.  Does your wife have an opinion on it?

5      A. I believe she does.

6                    **MR. HOUSH:**  Object to form.

7      Q. Do you know what it is?

8      A. No.

9      Q. What is your political stance on the use of

10          marijuana?

11                   **MR. HOUSH:**  Object to form.

12     A. I try to stay out of politics.

13     Q. You don't have any views as to nothing on

14          that?

15     A. No.

16                   **MR. HOUSH:**  Object to form.

17     Q. What's that?

18     A. No, I do not.

19     Q. Okay.  What about your wife?

20     A. Excuse me?

21     Q. What about your wife?

22     A. I can't speak for her.

23     Q. You don't know?

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/09/17

1    A. I don't know.

2    Q. When you were your own business -- scratch

3       that.

4          Other than this drug test where you

5       dropped dirty, have you ever failed any other

6       drug tests?

7    A. No.

8    Q. Before -- when you were hired at Enterprise,

9       part of the training involved substance abuse

10      training; do you recall that?

11   A. I don't recall it, but yeah, I know I did it.

12   Q. Did they talk to you during that -- that

13      process about the use of hemp or hemp-based

14      products?

15   A. About what?

16   Q. About the use of hemp or hemp-based products?

17   A. I don't remember hemp-based products, no.

18   Q. Okay.  Did they talk to you about use of

19      products containing cannabinoids?

20   A. No.

21   Q. Why do you say no so definitively?

22   A. Because I never heard that word back then.

23   Q. Okay.  When did you first hear that word?

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/09/17

1      A. When I looked at the ad.

2      Q. Okay.  In the North Dakota accident you made

3         reference to a pick-up truck being involved in

4         that; do you recall that?

5      A. Yes.

6      Q. We're going to get back to that in a second.

7         Did you discuss the use of the Dixie Elixir

8         with Dr. Choi?

9      A. After I got fired.

10     Q. Okay.  Why not beforehand?

11     A. Because I didn't see him before that.

12     Q. Did you discuss using any non -- or any

13        homeopathic remedies for your pain with

14        Dr. Choi?

15     A. No.

16     Q. Do you know what I mean when I say

17        homeopathic?

18     A. Correct.

19     Q. Regarding your diagnosis of Hepatitis C, can

20        you tell me what prompted you to get tested

21        for it?

22     A. I didn't get tested -- I did not initial the

23        test, they just basically did it through blood

1          work.  I was unaware of it.  That's when I was

2          diagnosed with it.  I had tested prior to that

3          at my request.

4     Q. You were tested for it?

5     A. Prior to having it, correct.

6     Q. Okay.  And that was because your father said

7          hey, you might have had a dirty needle --

8     A. Right.

9     Q. -- from those tattoos?

10    A. Yep.

11    Q. Where are your tattoos?  I can't see them on

12         your arms.

13    A. They're on my shoulder.

14    Q. What type of tattoos are they?

15    A. They don't say anything.

16    Q. What is it?

17    A. A skull.

18    Q. A skull.

19

20         The following was marked for identification:

21         Exhibit 28      Motor Vehicle Crash Worksheet

22

23         **BY MR. MAZZOLA:**

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/09/17

1    Q. This is what we marked as Exhibit 28.

2       That's the accident report that was done by

3       the police and this ties into the question I

4       just asked you about the pick-up truck.

5    A. Yeah.

6    Q. I didn't see a reference to the pick-up truck

7       on that accident report, do you know why that

8       is?

9    A. Because it was pretty much I was basically a

10      single accident and then he ran into me

11      afterwards.  There was also another truck

12      that -- semi-truck ran into the police car as

13      well.

14   Q. Okay.

15   A. So they just called it a single-vehicle

16      accident.

17   Q. Okay.  So in that accident a pick-up truck hit

18      you?

19   A. Afterwards, yeah.

20   Q. Okay.  And then another -- another truck hit a

21      cop car?

22   A. Yeah, while they were out --

23   Q. While they were cleaning it up?

1    A. Yep.

2    Q. Okay.  I have the pictures.  The pick-up truck

3       is not in the picture, do you know why that

4       is?

5    A. I have no idea.

6    Q. Was the pick-up truck drivable?

7    A. I believe so, yeah.

8    Q. Okay.  When the MRO called you to tell you

9       that you dropped dirty, at that time did you

10      have any idea where -- why you might have

11      dropped dirty?

12   A. No.

13   Q. When did you first suspect that you dropped

14      dirty because of the Dixie Elixir?

15   A. Oh, after -- before I took the drug test the

16      next day.

17   Q. So before you had the test in -- in Dumas,

18      Texas?

19   A. Right.

20   Q. Why what led you to --

21   A. Because that's the only thing because it's

22      hemp based.

23   Q. So is it something about it being hemp based

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/09/17

1          that it led you to believe it might have been

2          an issue?

3     A.  Well, hemp has very minute THC in it.

4     Q.  Okay.  So before you used the product you knew

5          that hemp-based products had --

6     A.  Correct.

7     Q.  -- as you just said very minute THC?

8     A.  Very minute, correct.  And that's why we made

9          sure that it had zero percent.

10    Q.  Okay.  So although you were aware before you

11         purchased the product that hemp-based products

12         had minute amounts of THC in it you still went

13         ahead and purchased it; is that correct?

14    A.  No, I made sure that that product had zero

15         percent before I purchased it.  I know that

16         hemp does contain very little THC, but it is

17         legal.

18    Q.  Okay.  So you understand that hemp-based

19         products before you purchased it?

20    A.  Correct.

21    Q.  Before you went on the Internet?

22    A.  Correct.

23    Q.  Before you listened to the video, before all

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/09/17

1          of that, after you first saw the product

2          reviewed in this marijuana magazine?

3     A.  Correct.

4     Q.  You knew that hemp-based products contained in

5          your words minute amounts of THC, correct?

6     A.  In raw form, yeah.

7     Q.  Okay.  Why do you say raw form?

8     A.  Because when it's on the shelf it doesn't

9          because it's legal.

10    Q.  Okay.  But you do know that hemp products

11         contain minute amounts of THC?

12    A.  Before they're processed.  No, not hemp

13         products, hemp itself.

14    Q.  Hemp itself, okay.  So although you knew that

15         hemp itself contains THC; is that correct?

16         Although you knew that; is that correct?

17    A.  Yeah.

18    Q.  And although you knew that and you knew that

19         the DOT regulations were a zero tolerance

20         policy you went ahead and purchased this

21         product; is that correct?

22    A.  That's why we did the research to make sure

23         there was zero THC.

1    Q. Okay.  You know that decaf coffee still

2       sometimes has a little bit of caffeine in it,

3       right?

4            MR. HOUSH:  Object to form.

5    A. Yes, I do.

6    Q. Okay.  And if your employer said, you know,

7       don't drink coffee, would you drink decaf

8       coffee?

9    A. I don't know.

10   Q. I mean, using your logic to get around the

11      caffeine or the THC would you have used decaf

12      coffee?

13           MR. HOUSH:  Object to form.

14   A. I said I don't know.

15   Q. Okay.  You were asked in connection with your

16      tax returns -- can I see the tax returns?

17      There was a question asked of you yesterday by

18      Mr. Boron regarding audits and I think you

19      said you had not been audited for any of these

20      years that we showed you.  Have you ever been

21      audited by the IRS?

22   A. Yes, I have.

23   Q. And when was that?

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/09/17

1    A. I don't know.  2008 maybe, guessing.

2    Q. Okay.  And what were the circumstances of that

3       audit?

4    A. We had bought a -- an energy drink business

5       for our daughters.

6    Q. Okay.  What do you mean an energy drink

7       business for your daughters?

8    A. It was a distribution.

9    Q. What kind of energy drink?

10   A. It's called Nitro 2 Go.

11   Q. What's Nitro 2 Go?

12   A. Energy drink.

13   Q. What's in it?

14   A. B vitamins, taurine like Red Bull.

15   Q. Which daughter?

16   A. Yolanda and Erica.

17   Q. What happened to that business?

18   A. It didn't do too well.

19   Q. Okay.  It's closed?

20   A. Yeah.

21   Q. Okay.  I'm going to put these tax returns in

22      front of you again, okay?  You have a claim

23      that you've suffered lost wages as a result of

1          this matter; is that correct?

2     A.  Yep.

3     Q.  Okay.  What was your total -- what was your

4          total income in 2011?

5     A.  140,156.

6     Q.  Okay.  And what was it in 2012?

7     A.  88,294.

8     Q.  2012 is the year you had the accident; is that

9          correct?

10    A.  Correct.

11    Q.  Okay.  Had you not been fired in 2012 would

12         your income have naturally gone down because

13         you were out of work on comp?

14    A.  Yeah.

15    Q.  Okay.

16    A.  Slightly, yeah.

17    Q.  Okay.  So about how many months in 2012 do you

18         blame our clients for you being out of work?

19    A.  November to December.

20    Q.  Okay.  Three months, right?

21    A.  Yeah.

22    Q.  Two months?

23    A.  October to November, December, yeah.

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/09/17

1    Q. Okay.  That's for 2012, right?

2    A. Correct.

3    Q. Okay.  What was your income in 2013?

4    A. It's like 34,392.

5    Q. Okay.  34 hundred -- thousand, right?

6    A. Yes.

7    Q. That was 2013, right?

8    A. Correct.

9    Q. What was it again in 2011?

10   A. 140,156.

11   Q. 140,156.  Did you get a raise for 2012?

12   A. Not that I'm aware of, no.

13   Q. Okay.  And what was it for 2014?

14   A. It looks like 63,164.

15   Q. And 2015?

16   A. 129,254.

17   Q. And 2016?  It was 156, right?

18   A. I have no idea.

19   Q. Yeah, take your time.

20   A. Here it is.  Yeah, 156,196.

21   Q. For 2017 has your work been limited or

22      hampered because of what happened with the

23      connection with the Dixie Elixir product?

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/09/17

1    A. No.

2    Q. Okay.  So no one said to you guys hey, Cindy

3       and James, you know, we're going to fire you

4       again because you took that Dixie Elixir

5       product and dropped dirty four years ago;

6       anyone say that to you?

7    A. No.

8    Q. Is it fair to say that you're making now in

9       2016 more than you were making in 2011?

10   A. No, I'm working harder.

11   Q. What do you mean working harder?

12   A. Because we get paid by the mile and I get paid

13      less by the mile with this company than I did

14      with Enterprise.

15   Q. What do you get paid per mile now?

16   A. 55.75.

17   Q. 55.75.  What did you get paid at Enterprise?

18   A. 64.

19   Q. How many miles did you do last year?

20   A. I'm not sure.

21   Q. How many miles did you do at your last full

22      year of Enterprise in 2011?

23   A. I'm not sure on that either.

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/09/17

1    Q. When you were at Enterprise in 2011 were you
2       doing all the miles that were available to you
3       or did you ever turn down miles?
4    A. There's been very few times where you had to
5       turn down miles.
6    Q. At Enterprise?
7    A. Only because of log violations.
8    Q. Okay.  And then at the new job, XC --
9    A. ICX.
10   Q. ICX, do you ever turn down miles?
11   A. No.
12   Q. So at Enterprise you never turned down miles;
13      is that correct?
14   A. Correct.
15   Q. And at ICX you've never turned down miles; is
16      that correct?
17   A. Correct.
18   Q. Okay.  Had the DOT regulations since 2011 and
19      today changed in any way?
20   A. No.
21   Q. In terms of how many miles you can do?
22   A. No.
23   Q. Not miles, hours, right?

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/09/17

1    A. Right.

2    Q. The amount of miles you do is a function of a

3       number of fact;; isn't that correct?

4    A. Yes.

5    Q. It's about the number of hours you can work in

6       a day, right?

7    A. Yeah.

8    Q. It's about what part of the country you're

9       driving in; is that correct?

10   A. Pretty much, yeah.

11   Q. Because if you're working the Northeast

12      corner, say, Boston to, say, Richmond you're

13      going to have a lot more traffic and less

14      miles, correct?

15   A. Correct.  Correct.

16   Q. Did the part -- have the parts of the country]

17      that you've driven in changed between 2011 and

18      2016?

19   A. Yeah, I would say so.

20   Q. Okay.  And in what respect?  Were you getting

21      routes with less traffic?

22   A. It was kind of a mixture.

23   Q. Okay.  Now it's kind of a mixture?

1    A. Yeah, I really can't say.  I mean --

2    Q. Now you said that in 2016 even though you made

3       more than you did in 2011 that's because you

4       had to work harder; is that correct?

5    A. Correct.

6    Q. How do you work harder when you're limited by

7       the amount of hours you can do by Federal

8       regulation?

9    A. With Enterprise we could request to get laid

10      over.

11   Q. Okay.

12   A. And this company it's pretty much work, work,

13      work.

14   Q. What does lay over mean?

15   A. We would lay over.

16   Q. Did they pay you to lay over?

17   A. Yes, they did.

18   Q. What does that mean?

19   A. They would pay us when we got laid over.

20   Q. And they would pay you how much?

21   A. Well, they paid us $150 a day per person.

22   Q. Okay.  So if you're just sitting around

23      waiting for another load they'll pay you?

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/09/17

1    A. Correct.

2    Q. So that's the difference, right?

3    A. There's a lot of variables.

4    Q. Well, you said you're working harder now?

5    A. Well, I can't go home when I want to with this

6       company and with Enterprise I went home a lot

7       more.

8    Q. Okay.  What else?

9    A. That's pretty much it.

10   Q. Okay.  So you're saying now you can't go home

11      as much as you could when you were with

12      Enterprise, right?

13   A. Right.

14   Q. But you are making more money; is that

15      correct?

16   A. Yeah, because I'm working more.

17   Q. Butt you can only drive as a driver it's 8

18      hours a day?

19   A. No, it's 11 hours a day.

20   Q. 11 hours.  You can only drive 11 hours a day,

21      right?

22   A. Correct.

23   Q. And your wife can only drive 11 hours a day;

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/09/17

1          is that correct?

2     A.  Correct.

3     Q.  So no matter where you are in America that

4          truck can only be run for 22 hours in a

5          24-hour period; is that correct?

6     A.  Correct.

7     Q.  And that was the same when you were at

8          Enterprise?

9     A.  Correct.

10    Q.  And at the new job you're getting as many

11         miles as you want; is that correct?

12    A.  No, I'd say as much as I want because there's

13         been times where I don't want miles.

14    Q.  Okay. And has there ever been times where you

15         do want miles?

16    A.  Excuse me?

17    Q.  Has there ever been times when you do want

18         miles when you can't get them?

19    A.  Correct, yes.

20    Q.  So between Enterprise and the new job tell me

21         what -- what's the problem with the new job?

22    A.  Just home time.

23    Q.  Home time?

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/09/17

1    A.  That's a big thing.

2    Q.  Just home time?

3    A.  That's a lot of it.

4    Q.  Okay.  Anything else?

5    A.  Not that I can think of offhand.

6    Q.  Okay.  Just home time.  Okay.  But you do

7        admit you're making more than you were at

8        Enterprise?

9    A.  I'm making less per mile than what I made down

10       there.

11   Q.  You made more money in 2016 than in 2011?

12   A.  Because I didn't go home.

13   Q.  Okay.

14   A.  That's what I'm saying, because I didn't go

15       home.  I'd be going home a lot more.

16   Q.  Okay.  But that's your choice?

17   A.  What do you mean it's my choice?

18   Q.  It's your choice to do that?

19   A.  No, I don't have that choice.

20   Q.  Okay.

21   A.  To go home?  No.

22   Q.  It's your choice to do the miles at the new

23       job?

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/09/17

1    A. It's pretty much forced on us.  They give us a

2       dispatch, they want it there.

3    Q. Okay.  Have you tried to find another job that

4       pays more per mile?

5    A. Yes.

6    Q. Okay.  Have you been able to?

7    A. No.

8    Q. Why not?

9    A. I don't know why.

10   Q. Okay.  Has anyone said you can't have this job

11      that pays 72 cents a mile because you dropped

12      dirty four years ago?

13   A. Have I had that told to me recently?

14   Q. Yeah.

15   A. Not recently I haven't called anyone, no.

16   Q. Okay.  Is there any record now as far as

17      you're aware that perspective employers will

18      see that dirty drop?

19   A. Yeah, they'll see it because they go 10 years

20      back.

21   Q. Okay.  But they can hire you, though?

22   A. If it's on their policy, yeah.  It's all about

23      policy.

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/09/17

1   Q. So the company may have a policy that says
2       they can't hire you?
3   A. Correct.
4   Q. For 2017 to the best of your knowledge are you
5       doing the same amount of miles for this year
6       that you did in 2016?
7   A. I don't know.
8   Q. Okay.
9   A. I haven't looked.
10  Q. For 2017 to the best of your knowledge are you
11      on target to make around about the same income
12      you made in 2016?
13  A. We should.
14  Q. Okay.  Have you made a demand for money in
15      this case?
16  A. What do you mean?
17  Q. Have you asked for money from my clients and
18      Mr. Boron's clients?
19  A. Through my lawyer, yes.
20  Q. How much did you ask for?
21  A. To my lawyer?
22  Q. Yeah.
23  A. We set on 10,000,000.

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/09/17

1    Q. $10,000,000?

2    A. Yes.

3    Q. Why do you think you're entitled to

4       $10,000,000?

5    A. Because I'm limited on the jobs that I can

6       get.

7    Q. Okay.  Anything else?

8    A. And that was basically what we calculated for

9       lost wages.

10   Q. Okay.

11   A. If we were to get those jobs.

12   Q. Okay.

13   A. Because we had planned on either going into

14      crude oil and if that didn't work out we had

15      explosive permits for Canada and we were going

16      to be doing DOD work, that was kind of our

17      plan after Elizabeth moved out.

18   Q. Okay.  But you're making as much now or more

19      than you were in 2011; is that correct?

20   A. I make as much now, yeah.

21   Q. Okay.  Now what's crude oil?  Why's that

22      different?

23   A. It pays more.

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/09/17

1    Q. How much more by the mile?

2    A. It's not done by the mile, it's done by the

3       barrel.

4    Q. Okay.  So if you were driving crude oil, what

5       would you estimate that you and Cindy would

6       make?

7    A. About 120,000 each.

8    Q. And why are you not able to drive crude oil?

9    A. We were going to go into that with Enterprise.

10      We were starting to transition into that.

11   Q. We talked about that you made an application;;

12      isn't that correct?

13   A. Yeah, we were actually doing crude oil in

14      North Dakota with Enterprise Products and we

15      had an employee number that was assigned to

16      us.

17   Q. Okay.  But you said that they never -- they

18      never acted on your application?

19   A. Not on that application, no.

20   Q. Okay.  And they never acted on -- it was way

21      before you ever dropped dirty;; isn't that

22      correct?

23   A. They never acted on -- wait, can you say that

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/09/17

1          again?

2     Q.  They never acted on your application for crude

3          oil; isn't that correct?

4     A.  Correct, yeah.

5     Q.  Okay.  And the fact that they -- that was a

6          long time before you dropped dirty; isn't that

7          correct?

8     A.  It was like two years, yeah.

9     Q.  Okay.  So it wasn't as if you're dropping

10         dirty, say, oh, you know what, the Horns, we

11         can't let them drive crude oil they're

12         dropping dirty; isn't that correct?

13    A.  I don't understand what you're saying.

14    Q.  Your application to drive crude oil for

15         Enterprise was rejected at least two years

16         before you ever knew about this product?

17    A.  I don't know if it was rejected, I just didn't

18         get a response.

19    Q.  Okay.  That was at least two years before,

20         right?

21    A.  Correct.

22    Q.  Okay.  Now in terms of crude oil, have you

23         sought a job transporting crude oil since you

1          left Enterprise?

2     A.  Yes.

3     Q.  Okay.  And from whom?

4     A.  I don't remember the names.

5     Q.  Okay.  Do you have any rejection letters from

6          them?

7     A.  I believe I do.

8     Q.  Okay.  And does it say we're not going to hire

9          you because you dropped dirty on a drug test?

10    A.  I don't remember.

11    Q.  Okay.  Have you shared those letters with your

12         lawyer?

13    A.  If I had them, yes, I did.

14    Q.  Okay.  When was the last time you sought

15         employment to operate -- to drive crude oil?

16    A.  I'm not sure.

17    Q.  You said also something about explosives, what

18         was that about?

19    A.  Well, that was another option, we were going

20         to do Department of Defense work.

21    Q.  Okay.  Where?  In the United States?

22    A.  Yeah, and into Canada.

23    Q.  And what's the rate for that?

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/09/17

1      A. It varies and it depends on if you're a

2         company or owner operator.

3      Q. Okay.  Were you going to be an owner operator?

4      A. We were thinking about it, yeah.

5      Q. Why don't you do that now?

6      A. Because those companies won't hire me as a

7         company.

8      Q. Okay.  What about being an owner operator?

9      A. This company that I'm with or?

10     Q. No.  What about being an owner operator with

11        driving explosives for the Department of

12        Defense?

13     A. They won't hire me at all.

14     Q. Why not?

15     A. Because of the dirty urine.

16     Q. And that will stay there for 10 years?

17     A. They'll see it for 10 years, yeah.

18     Q. Okay.

19     A. And a lot of policies are that if you've ever

20        done a dirty random they will never hire you.

21     Q. Okay.  Have you -- have you sought employment

22        with a company that transports explosives for

23        the Department of Defense?

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/09/17

1    A. Yeah.

2    Q. Okay.  When did you do that -- have you sought

3       a job with a company that transports

4       explosives with the Department of Defense?

5    A. Yeah.

6    Q. When did you do that?

7    A. Off and on after we got fired.

8    Q. Okay.  And do you have any letters of

9       rejection from any of those companies?

10   A. No.

11   Q. So how do I know you sought a job with them?

12         MR. HOUSH:  Object to form.

13   A. Well, just with the company and their company

14      policy, I guess reaffirming with the company

15      and asking them what their policy is.

16   Q. Okay.  So if you gave me all the names of all

17      these companies that you sought jobs from?

18   A. Correct.

19   Q. I can call them up --

20   A. Right.

21   Q. -- and say hey, did James Horn ask for a job

22      and they would have a record of that, right?

23   A. I don't know if they would have a record of it

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/09/17

1          because it was all telephone.

2     Q. Okay.  Can we take five minutes?

3

4                    (Recess taken)

5

6               (Record read back by reporter)

7

8          BY MR. MAZZOLA:

9     Q. Okay.  I want to ask you back again -- going

10         back to the hemp products you said you were

11         using the hemp shakes when you were a diet; is

12         that correct?

13    A. Correct.

14    Q. I got to think over the past, you know, five

15         or six years you've gone on and off diets; is

16         that correct?

17    A. Correct.

18    Q. And when you go on a diet is your process to

19         use the hemp shake products?

20    A. Not regularly.

21    Q. Not regularly.  So that's not your standard

22         diet process?

23    A. No.

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/09/17

1     Q.  So it's not true that if you are on a diet
2         you're using a hemp-based product; is that
3         correct?
4     A.  Correct.
5     Q.  Okay.  Before you purchased those products did
6         you do any research on them to be sure you
7         wouldn't be in violation of DOT drug testing
8         regulations?
9     A.  I didn't personally, no.
10    Q.  Okay.  Did Cindy?
11    A.  I believe she did.
12    Q.  Okay.  I have a note over here that yesterday
13        I believe you said something along the lines
14        that someone told you that other products
15        might mess things up with the lab.  Do you
16        recall saying something like that?
17    A.  Yeah, I do.
18    Q.  And now it's coming back to me.  I think that
19        was in connection with you wanted to send
20        other Dixie products off to this testing lab?
21    A.  Correct.
22    Q.  Do you recall that?
23    A.  Yes.

1  Q. And the guy on the other end said he didn't
2     want any other products; is that correct?
3  A. Correct.
4  Q. And he said he didn't want them because it
5     might mess things up with the lab; is that
6     correct?
7  A. Correct.
8  Q. What did he mean by that?
9  A. I don't know what he meant.
10 Q. Do you have any idea what he meant by that?
11 A. That if it had THC that there may be paperwork
12    for them to fill out and stuff like that, I'm
13    assuming.
14 Q. After you dropped dirty and got fired, Cindy
15    quit; isn't that correct?
16 A. Yes.
17 Q. Why?
18 A. Because we're a team.
19 Q. Okay.  Could Cindy have continued to drive for
20    the remainder of the year?
21 A. She could have.
22 Q. After the wreck you got hurt and went out on
23    Workers' Comp; isn't that correct?

DOUGLAS J. HORN - BY MR. MAZZOLA - 05/09/17

1    A. Correct.

2    Q. Cindy didn't get hurt, did she?

3    A. Yes, she did.

4    Q. Did Cindy go out on Workers' Comp?

5    A. Yes, she did.

6    Q. So the reason Cindy quit was because you are a

7       team; is that correct?

8    A. That's correct.

9    Q. Even though she could have continued driving

10      for the company?

11           MR. HOUSH:  Object to form.

12   A. Could have.

13   Q. That's correct, right?

14   A. Correct.

15           MR. MAZZOLA:  Eric, I'm done.

16           MR. BORON:  Let's get this marked.

17      Where's that Exhibit Number?

18

19      The following was marked for identification:

20      Exhibit 29      E-mail dated 11/23/2012, two
                         pages
21
        Exhibit 30      Mike Choi, M.D. Doctor Review
22

23

--- DOUGLAS J. HORN - BY MR. BORON - 05/09/17 ---

1              **EXAMINATION BY MR. BORON:**

2

3      Q. Mr. Horn, showing you what's marked as Exhibit

4         29 for today's deposition.  It's a two-page

5         exhibit.  Did you type up what appears here in

6         this exhibit?  It starts, thank you for taking

7         the time to evaluate my situation.

8      A. Yes.

9      Q. Is this part of an e-mail that you sent

10        somebody?

11     A. Yes.

12     Q. There's a date in the upper right-hand corner,

13        November 23, 2012.  Do you see that date?  I

14        know all the print's small.

15     A. Okay.  Yeah.

16     Q. There's a reference to the e-mail being sent

17        from James Horn to ElizabethHorn@live.com?

18     A. Correct.

19     Q. Is all the text that we see underneath there

20        an e-mail that you sent to Elizabeth Horn?

21     A. Yeah.

22     Q. Is that your daughter?

23     A. Yes.

DOUGLAS J. HORN - BY MR. BORON - 05/09/17

1    Q. The one that lives in Colorado?

2    A. No, she lives in New York.

3    Q. New York State?

4    A. No, Owego.

5    Q. Oh, okay.  Owego.  And you wrote this e-mail

6       to her in November of 2012?

7    A. No, I actually wrote this for somebody else.

8    Q. Has something been copied and pasted and put

9       together in --

10   A. No.

11   Q. It doesn't represent what you sent to

12      Elizabeth?

13   A. No.

14   Q. No.  Why were you sending this to Elizabeth?

15   A. Probably to have her print it.

16   Q. Okay.  The third paragraph from the bottom of

17      the first page of the exhibit makes reference

18      to you sending for testing a bottle that had

19      100 milligrams in it; do you see that?

20   A. Yes.

21   Q. Okay.  So you sent a product to EMSL to be

22      tested, that was your testimony yesterday?

23   A. Correct.

DOUGLAS J. HORN - BY MR. BORON - 05/09/17

```
 1      Q. And is this the same thing that you mailed to
 2         EMSL that you're referring to in the e-mail?
 3      A. Wait, can you rephrase that?
 4      Q. Yesterday you testified that you sent an
 5         unopened bottle?
 6      A. Correct.
 7      Q. To EMSL for testing?
 8      A. Yes.
 9      Q. And here in this e-mail there's reference to
10         you sending out a bottle that's got 100
11         milligrams to a place to be tested?
12      A. Correct.
13      Q. Is that the same --
14      A. Yes.
15      Q. Same product that you were describing
16         yesterday?
17      A. Yes.
18      Q. Okay.  So you think that you tested dirty
19         because of a 500 milligram bottle, but you
20         sent a different quantity to be tested at an
21         EMSL Lab, correct?
22      A. Correct.
23      Q. Okay.  What else was different about that
```

1        sample that you sent to the EMSL Lab?

2            **MR. HOUSH:**  Object to form.

3    A. I don't know.  Just the milligrams.

4    Q. Do you know what the ingredients were of the

5        bottle?

6    A. It's supposed to be the same.

7    Q. Well, did you look at the label on the bottle?

8    A. I didn't look at that bottle.

9    Q. You never opened up that package?

10   A. No.

11   Q. So you don't know what was inside that

12       package?

13   A. No.

14   Q. In the second last paragraph on the first page

15       of this exhibit the last sentence says, I have

16       printouts on everything I have stated and can

17       have them faxed?

18   A. Correct.

19   Q. Do you have any printouts of any website

20       information from Dixie or any of the other

21       defendants in this lawsuit that predates the

22       date that you tested dirty?

23   A. I gave them to my lawyer, yes.

—— DOUGLAS J. HORN - BY MR. BORON - 05/09/17 ——

1    Q. Well, we haven't seen any printouts predating
2       the date of your sample.
3    A. As far as the articles that I researched?
4    Q. There's no --
5    A. Is that what you're talking about?
6    Q. There's no printout that's dated before the
7       date you tested dirty, they're all dated
8       afterward.
9    A. Correct.
10   Q. Okay.  So you printed all those things
11      afterwards, didn't you?
12   A. Yes.
13   Q. So what it says here in the e-mail is not
14      completely accurate.  You don't have printouts
15      showing that you did any research before you
16      consumed the product, correct?
17           MR. HOUSH:  Object to form.
18   A. I'm not sure if I printed out anything before
19      or not.  I don't remember.
20   Q. In the last paragraph of this same exhibit,
21      first page, you make a statement that says,
22      I'm not willing to do that or go through drug
23      rehab.  Do you see that?

—— DOUGLAS J. HORN - BY MR. BORON - 05/09/17 ——

1    A. Correct.

2    Q. What do you mean by not willing to go through

3       drug rehab?

4    A. Well, they wanted me to go through a SAT

5       program and at that time I felt it was kind of

6       an admission to doing drugs and I didn't do

7       drugs.

8    Q. How long did you wait to go through the drug

9       rehab program?

10   A. August of the next year.

11   Q. And did that delay your ability to get your

12      next job?

13   A. Did it delay my ability?

14   Q. Yes.

15   A. I could have done the rehab at any time.

16   Q. Does going through the rehab help your ability

17      to get a job after the dirty?

18   A. Correct.

19   Q. Was Dr. Kenneth Dennis the person that you

20      interacted with for your drug rehab?

21   A. Correct.

22   Q. Exhibit 30, would you take a look at that for

23      me, sir.  It's got a picture of a doctor, Mike

1    Choi, M.D., on the first page of the exhibit.

2    This is Exhibit 30.  Is this the Dr. Choi you

3    were referring to in your earlier testimony

4    yesterday?

5  A. Yes.

6  Q. Is Dr. Mike Choi affiliated in some way with a

7    medical group or medical treatment business

8    called Guthrie?

9  A. Yes.

10 Q. And Guthrie has offices both down in Sayre,

11    Pennsylvania and up in the Southern Tier of

12    New York State?

13 A. Correct.

14 Q. Okay.  Mr. Horn, at the time that you tested

15    positive for the THC were you taking

16    hydrocodone that had been prescribed by

17    Dr. Choi?

18 A. I had it prescribed, I hadn't taken any at the

19    time of the wreck.

20 Q. I'm not talking about the time of the wreck,

21    I'm talking about the 2012 urine test.

22 A. Oh, I'm not sure.

23 Q. You don't recall whether you did or did not?

DOUGLAS J. HORN - BY MR. BORON - 05/09/17

1    A. No, I did not.

2    Q. No.  Tell me whether you recall whether you

3       took it or not on either the day before or the

4       day of the test?

5    A. I didn't take it the day before or the day of

6       the test.

7    Q. Do you have any record that shows you didn't

8       take it on those days?

9           MR. HOUSH:  Object to form.

10   A. No.

11   Q. Were you in possession of hydrocodone pills on

12      those days?

13   A. I don't remember.

14   Q. Do you still have hydrocodone pills from

15      Dr. Choi?

16   A. Yes, I do.

17   Q. And what's the last date that he prescribed

18      hydrocodone for you?

19   A. Two years ago.

20   Q. Okay.  Has there ever been a period of time

21      between 2012 and 2017 where Dr. Choi was not

22      prescribing hydrocodone for you?

23   A. It's not like every month.

1    Q. Have you gotten a prescription in each of

2       those years at some point --

3    A. Yes.

4    Q. -- from Dr. Choi for hydrocodone?

5    A. Yes.

6    Q. And how do you fill those prescriptions?

7    A. At the pharmacy there locally.

8    Q. Do you order online?

9    A. No.

10   Q. Do you order your hydrocodone online?

11   A. No.

12   Q. You go to a pharmacy?

13   A. Correct.

14   Q. In Vestal?

15   A. In Sayre.

16   Q. Sayre.  Has that been the case for every year

17      between 2012 and 2017?

18   A. No.

19   Q. How did you fill your prescriptions for

20      hydrocodone in 2012?

21   A. I'm not sure.  Locally.

22   Q. Did you order your hydrocodone online at any

23      time?

DOUGLAS J. HORN - BY MR. BORON - 05/09/17

1    A. No.

2    Q. Any time in your life?

3    A. No.

4    Q. You made reference yesterday to the YouTube

5       video where you said that Tripp Keber was

6       talking about Dixie X products.  Do you

7       remember testifying about that?

8    A. Yes.

9    Q. Was it literally a video where you could watch

10      and see somebody talking to somebody else on

11      the video?

12   A. Correct.

13   Q. It was wasn't an audio only item, correct?

14   A. Correct.

15   Q. You're sure about that?

16   A. Yeah.

17   Q. 100 percent sure?

18   A. Yeah.

19   Q. How many times did you watch that video?

20   A. Just once.

21   Q. Just one time?

22   A. Yeah.

23   Q. You just don't know what date you watched it?

DOUGLAS J. HORN - BY MR. BORON - 05/09/17

1    A. No.

2    Q. And you're 100 percent sure you only watched

3       it one time?

4    A. Yep.

5           MR. BORON:  I don't have anything else.

6           MR. MAZZOLA:  We're done.

7

8           (Deposition concluded at 10:54 a.m.)

9                    *  *  *  *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

```
1        STATE OF NEW YORK)

2                    )  ss.

3        COUNTY OF ERIE   )

4

5

          I, MARISSA A. ASHCROFT, Notary Public, in and
6        for the County of Erie, State of New York, do
         hereby certify:
7

8         That the witness whose testimony appears
         hereinbefore was, before the commencement of
9        their testimony, duly sworn to testify the
         truth, the whole truth and nothing but the
10       truth; that said testimony was taken pursuant
         to notice at the time and place as herein set
11       forth; that said testimony was taken down by
         me and thereafter transcribed into
12       typewriting, and I hereby certify the
         foregoing testimony is a full, true and
13       correct transcription of my shorthand notes so
         taken.
14

15        I further certify that I am neither counsel
         for nor related to any party to said action,
16       nor in anyway interested in the outcome
         thereof.
17

18        IN WITNESS WHEREOF, I have hereunto
         subscribed my name and affixed my seal this
19       9th day of May, 2017.

20

              Marissa A. Ashcroft
         ----------------------
22        MARISSA A. ASHCROFT, Notary Public

23
```

## $

**$10,000,000** [2] - 36:1, 36:4
**$150** [1] - 30:21

## 1

**10** [3] - 34:19, 40:16, 40:17
**10,000,000** [1] - 35:23
**100** [4] - 47:19, 48:10, 55:17, 56:2
**10022** [1] - 2:15
**10:00** [1] - 1:14
**10:54** [1] - 56:8
**11** [4] - 31:19, 31:20, 31:23
**11/23/12** [1] - 3:7
**11/23/2012** [1] - 45:20
**120,000** [1] - 37:7
**129,254** [1] - 26:16
**14** [2] - 1:13, 2:9
**140,156** [3] - 25:5, 26:10, 26:11
**14202** [1] - 2:4
**14203** [1] - 2:9
**14859** [1] - 4:2
**15** [1] - 10:15
**15-cv-701-FPG** [1] - 1:6
**156** [1] - 26:17
**156,196** [1] - 26:20
**18** [1] - 3:6
**18th** [1] - 2:14
**195** [1] - 4:2

## 2

**2** [2] - 24:10, 24:11
**2008** [1] - 24:1
**2011** [10] - 25:4, 26:9, 27:9, 27:22, 28:1, 28:18, 29:17, 30:3, 33:11, 36:19
**2012** [13] - 4:13, 25:6, 25:8, 25:11, 25:17, 26:1, 26:11, 46:13, 47:6, 52:21, 53:21, 54:17, 54:20
**2013** [2] - 26:3, 26:7
**2014** [1] - 26:13
**2015** [1] - 26:15
**2016** [7] - 26:17, 27:9, 29:18, 30:2, 33:11, 35:6, 35:12
**2017** [7] - 1:14, 26:21, 35:4, 35:10, 53:21, 54:17, 57:19
**22** [1] - 32:4

## 3

**30** [5] - 3:8, 14:22, 45:21, 51:22, 52:2
**31** [1] - 12:16
**34** [1] - 26:5
**34,392** [1] - 26:4
**362-1128** [1] - 2:5

## 4

**4** [1] - 3:2
**45** [2] - 3:7, 3:8
**46** [1] - 3:3

## 5

**500** [1] - 48:19
**55.75** [2] - 27:16, 27:17

## 6

**63,164** [1] - 26:14
**64** [1] - 27:18
**646** [1] - 2:15
**663-1860** [1] - 2:15

## 7

**70** [1] - 2:4
**716** [2] - 2:5, 2:10
**72** [1] - 34:11

## 8

**8** [1] - 31:17
**805** [1] - 2:14
**855-2800** [1] - 2:10
**88,294** [1] - 25:7

## 9

**930** [2] - 1:13, 2:8
**9th** [2] - 1:14, 57:19

## A

**a.m** [2] - 1:15, 56:8
**ability** [3] - 51:11, 51:13, 51:16
**able** [3] - 6:19, 34:6, 37:8
**abuse** [1] - 16:9
**accident** [7] - 17:2, 19:2, 19:7, 19:10, 19:16, 19:17, 25:8
**accurate** [1] - 50:14
**acted** [4] - 37:18, 37:20, 37:23, 38:2
**Action** [1] - 1:6
**action** [1] - 57:15
**ad** [1] - 17:1
**admission** [1] - 51:6
**admit** [1] - 33:7
**affiliated** [1] - 52:6
**affixed** [1] - 57:18
**afterwards** [3] - 19:11, 19:19, 50:11
**ago** [3] - 27:5, 34:12, 53:19
**ahead** [2] - 21:13, 22:20
**ALSO** [1] - 2:17
**America** [1] - 32:3
**amount** [3] - 29:2, 30:7, 35:5
**amounts** [3] - 21:12, 22:5, 22:11
**AND** [2] - 1:7, 2:11
**anyway** [1] - 57:16
**APPEARING** [3] - 2:2, 2:6, 2:11
**application** [5] - 37:11, 37:18, 37:19, 38:2, 38:14
**arms** [1] - 18:12
**articles** [1] - 50:3
**Ashcroft** [1] - 1:12
**ASHCROFT** [2] - 57:5, 57:22
**assigned** [1] - 37:15
**assuming** [1] - 44:13
**audio** [1] - 55:13
**audit** [1] - 24:3
**audited** [2] - 23:19, 23:21
**audits** [1] - 23:18
**August** [1] - 51:10
**available** [1] - 28:2
**Avenue** [1] - 2:14
**aware** [3] - 21:10, 26:12, 34:17

## B

**barrel** [1] - 37:3
**based** [11] - 7:20, 16:13, 16:16, 16:17, 20:22, 20:23, 21:5, 21:11, 21:18, 22:4, 43:2
**beforehand** [1] - 17:10
**best** [2] - 35:4, 35:10
**between** [5] - 7:12, 29:17, 32:20, 53:21, 54:17
**big** [1] - 33:1
**bit** [2] - 13:18, 23:2
**blame** [1] - 25:18
**blood** [1] - 17:23
**BORON** [4] - 2:8, 45:16, 46:1, 56:5
**boron** [2] - 23:18
**Boron** [1] - 3:3
**boron's** [1] - 35:18
**Boston** [1] - 29:12
**BOTANICALS** [2] - 1:8, 2:11
**bottle** [4] - 47:18, 48:5, 48:10, 48:19, 49:5, 49:7, 49:8
**bottom** [1] - 47:16
**bought** [1] - 24:4
**break** [2] - 4:21, 7:3
**Buffalo** [3] - 1:14, 2:4, 2:9
**Building** [2] - 1:13, 2:8
**Bull** [1] - 24:14
**business** [5] - 16:2, 24:4, 24:7, 24:17, 52:7
**butt** [1] - 31:17
**buy** [1] - 8:16
**BY** [7] - 2:3, 2:8, 2:13, 4:6, 18:23, 42:8, 46:1

## C

**caffeine** [2] - 23:2, 23:11
**calculated** [1] - 36:8
**Canada** [2] - 36:15, 39:22
**cannabinoids** [1] - 16:19
**car** [2] - 19:12, 19:21
**case** [2] - 35:15, 54:16
**cents** [1] - 34:11
**certify** [3] - 57:6, 57:12, 57:15
**changed** [2] - 28:19, 29:17
**Choi** [12] - 3:8, 13:19, 17:8, 17:14, 45:21, 52:1, 52:2, 52:6, 52:17, 53:15, 53:21, 54:4
**choice** [5] - 33:16, 33:17, 33:18, 33:19, 33:22
**cigarettes** [1] - 13:2
**CINDY** [1] - 1:4
**Cindy** [12] - 2:17, 5:1, 5:9, 5:12, 27:2, 37:5, 43:10, 44:14, 44:19, 45:2, 45:4, 45:6
**circumstances** [1] - 24:2
**Civil** [1] - 1:6
**claim** [1] - 24:22
**CLAUDE** [1] - 2:13
**cleaning** [1] - 19:23
**clients** [2] - 25:18, 35:17, 35:18
**closed** [1] - 24:19
**coffee** [4] - 23:1, 23:7, 23:8, 23:12
**Colorado** [1] - 47:1
**coming** [1] - 43:18
**commencement** [1] - 57:8
**Comp** [2] - 44:23, 45:4
**comp** [1] - 25:13
**companies** [3] - 40:6, 41:9, 41:17
**company** [13] - 27:13, 30:12, 31:6, 35:1, 40:2, 40:7, 40:9, 40:22, 41:3, 41:13, 41:14, 45:10
**company's** [1] - 14:9
**completely** [1] - 50:4
**computer** [3] - 6:8, 6:10, 6:20
**computers** [4] - 6:12, 6:15, 6:18, 6:23
**concluded** [1] - 56:8
**connection** [3] - 23:15, 26:23, 43:19
**consumed** [1] - 50:16
**contain** [2] - 21:16, 22:11
**contained** [1] - 22:4
**containing** [1] - 16:19
**contains** [1] - 22:15
**continued** [2] - 44:19, 45:9
**convicted** [1] - 11:6
**cop** [1] - 19:21
**copied** [1] - 47:8
**copy** [1] - 5:16
**corner** [2] - 29:12, 46:12
**correct** [105] - 5:7, 5:8, 7:5, 7:16, 7:17, 7:18, 7:19, 9:2, 9:6, 9:10, 9:20, 10:12, 11:13, 11:14, 11:15, 11:16, 12:14, 13:15, 13:21, 14:9, 14:10, 17:18, 18:5, 21:6, 21:8,

21:13, 21:20, 21:22, 22:3, 22:5, 22:15, 22:16, 22:21, 25:1, 25:9, 25:10, 26:2, 26:8, 28:13, 28:14, 28:16, 28:17, 29:3, 29:9, 29:14, 29:15, 30:4, 30:5, 31:1, 31:15, 31:22, 32:1, 32:2, 32:5, 32:6, 32:9, 32:11, 32:19, 35:3, 36:19, 37:12, 37:22, 38:3, 38:4, 38:7, 38:12, 38:21, 41:18, 42:12, 42:13, 42:16, 42:17, 43:3, 43:4, 43:21, 44:2, 44:3, 44:6, 44:7, 44:15, 44:23, 45:1, 45:7, 45:8, 45:13, 45:14, 46:18, 47:23, 48:6, 48:12, 48:21, 48:22, 49:18, 50:9, 50:16, 51:1, 51:18, 51:21, 52:13, 54:13, 55:12, 55:13, 55:14, 57:13

**counsel** [1] - 57:15
**country** [2] - 29:8, 29:16
**COUNTY** [1] - 57:3
**County** [1] - 57:6
**couple** [1] - 6:13
**COURT** [1] - 1:1
**Crash** [2] - 3:6, 18:21
**crude** [1] - 36:14, 36:21, 37:4, 37:8, 37:13, 38:2, 38:11, 38:14, 38:22, 38:23, 39:15

## D

**Dakota** [2] - 17:2, 37:14
**date** [9] - 5:18, 6:20, 46:12, 46:13, 49:22, 50:2, 50:7, 53:17, 55:23
**dated** [4] - 3:7, 45:20, 50:6, 50:7
**daughter** [3] - 12:12, 24:15, 46:22
**daughters** [3] - 11:13, 24:5, 24:7
**days** [2] - 53:8, 53:12
**decaf** [2] - 23:1, 23:7, 23:11
**December** [2] - 25:19, 25:23

**DEFENDANT** [2] - 2:6, 2:11
**defendants** [1] - 49:21
**Defendants** [1] - 1:9
**Defense** [4] - 39:20, 40:12, 40:23, 41:4
**definitively** [1] - 16:21
**delay** [2] - 51:11, 51:13
**demand** [1] - 35:14
**Dennis** [1] - 51:19
**Department** [4] - 39:20, 40:11, 40:23, 41:4
**Deposition** [1] - 56:8
**deposition** [1] - 46:4
**described** [1] - 12:2
**describing** [1] - 48:15
**DESCRIPTION** [1] - 3:5
**diagnosed** [1] - 18:2
**diagnosis** [1] - 17:19
**DICE** [2] - 1:7, 2:6
**diet** [5] - 14:17, 42:11, 42:18, 42:22, 43:1
**diets** [1] - 42:15
**difference** [2] - 7:12, 31:2
**different** [4] - 8:17, 36:22, 48:20, 48:23
**dirty** [25] - 8:23, 11:19, 12:22, 14:16, 14:18, 16:5, 18:7, 20:9, 20:11, 20:14, 27:5, 34:12, 34:18, 37:21, 38:6, 38:10, 38:12, 39:9, 40:15, 40:20, 44:14, 48:18, 49:22, 50:7, 51:17
**discuss** [3] - 13:22, 17:7, 17:12
**dispatch** [1] - 34:2
**distribution** [1] - 24:8
**DISTRICT** [2] - 1:1, 1:2
**Dixie** [11] - 4:12, 5:23, 9:19, 9:22, 17:7, 20:14, 26:23, 27:4, 43:20, 49:20, 55:6
**DIXIE** [4] - 1:7, 1:7, 2:11, 2:11
**doctor** [1] - 51:23
**Doctor** [2] - 3:8, 45:21
**DOD** [1] - 36:16
**done** [7] - 19:2, 37:2, 40:20, 45:15, 51:15, 56:6
**DOT** [3] - 22:19, 28:18, 43:7
**DOUGLAS** [2] - 1:4, 1:11

**Douglas** [1] - 3:2
**down** [9] - 25:12, 28:3, 28:5, 28:10, 28:12, 28:15, 33:9, 52:10, 57:11
**Dr** [10] - 13:19, 17:8, 17:14, 51:19, 52:2, 52:6, 52:17, 53:15, 53:21, 54:4
**drink** [6] - 23:7, 24:4, 24:6, 24:9, 24:12
**drivable** [1] - 20:6
**drive** [8] - 31:17, 31:20, 31:23, 37:8, 38:11, 38:14, 39:15, 44:19
**driven** [1] - 29:17
**driver** [1] - 31:17
**driving** [7] - 11:7, 14:12, 14:13, 29:9, 37:4, 40:11, 45:9
**drop** [1] - 34:18
**dropped** [13] - 8:23, 14:16, 14:17, 16:5, 20:9, 20:11, 20:13, 27:5, 34:11, 37:21, 38:6, 39:9, 44:14
**dropping** [1] - 11:19, 12:21, 38:9, 38:12
**drug** [14] - 7:23, 8:3, 8:5, 10:22, 11:1, 16:4, 16:6, 20:15, 39:9, 43:7, 50:22, 51:3, 51:8, 51:20
**drugs** [6] - 13:10, 13:19, 13:22, 14:14, 51:6, 51:7
**duly** [2] - 4:3, 57:9
**Dumas** [2] - 9:7, 20:17
**during** [1] - 16:12

## E

**e-mail** [7] - 46:9, 46:16, 46:20, 47:5, 48:2, 48:9, 50:13
**E-mail** [2] - 3:7, 45:20
**EDIBLES** [1] - 1:7, 2:11
**either** [3] - 27:23, 36:13, 53:3
**Elixir** [8] - 4:12, 5:23, 9:19, 9:22, 17:7, 20:14, 26:23, 27:4
**ELIXIRS** [2] - 1:7, 2:11
**Elizabeth** [4] - 11:21, 11:22, 12:2, 12:5, 12:10, 36:17, 46:20, 47:12, 47:14
**ElizabethHorn@live.**

**com** [1] - 46:17
**employee** [1] - 37:15
**employer** [1] - 23:6
**employers** [1] - 34:17
**employment** [2] - 39:15, 40:21
**EMSL** [5] - 47:21, 48:2, 48:7, 48:21, 49:1
**end** [1] - 44:1
**energy** [4] - 24:4, 24:6, 24:9, 24:12
**Enterprise** [17] - 16:8, 27:14, 27:17, 27:22, 28:1, 28:6, 28:12, 30:9, 31:6, 31:12, 32:8, 32:20, 33:8, 37:9, 37:14, 38:15, 39:1
**entitled** [1] - 36:3
**Eric** [1] - 45:15
**ERIC** [1] - 2:8
**Erica** [1] - 24:16
**ERIE** [1] - 57:3
**Erie** [1] - 57:6
**ESQ** [4] - 2:3, 2:8, 2:13, 2:13
**estimate** [1] - 37:5
**euphoria** [1] - 10:5
**evaluate** [1] - 46:7
**evidence** [1] - 5:21
**EXAMINATION** [3] - 3:1, 4:6, 46:1
**Examination** [1] - 1:10
**examined** [1] - 4:3
**excuse** [2] - 15:20, 32:16
**exhibit** [6] - 46:5, 46:6, 47:17, 49:15, 50:20, 52:1
**EXHIBIT** [1] - 3:5
**Exhibit** [11] - 3:6, 3:7, 3:8, 18:21, 19:1, 45:17, 45:20, 45:21, 46:3, 51:22, 52:2
**explosive** [1] - 36:15
**explosives** [4] - 39:17, 40:11, 40:22, 41:4

## F

**fact** [2] - 29:3, 38:5
**failed** [1] - 16:5
**fair** [1] - 27:8
**far** [2] - 34:16, 50:3
**father** [1] - 18:6
**favor** [1] - 14:23
**faxed** [1] - 49:17
**Federal** [1] - 30:7
**felt** [1] - 51:5

**few** [2] - 6:13, 28:4
**fill** [3] - 44:12, 54:6, 54:19
**finish** [1] - 4:9
**fire** [1] - 27:3
**fired** [5] - 8:4, 17:9, 25:11, 41:7, 44:14
**first** [10] - 4:3, 4:22, 9:23, 16:23, 20:13, 22:1, 47:17, 49:14, 50:21, 52:1
**five** [3] - 11:13, 42:2, 42:14
**Floor** [1] - 2:14
**following** [2] - 18:20, 45:19
**follows** [1] - 4:4
**FOR** [3] - 2:2, 2:6, 2:11
**forced** [1] - 34:1
**foregoing** [1] - 57:12
**form** [14] - 12:8, 15:2, 15:6, 15:11, 15:16, 22:6, 22:7, 23:4, 23:13, 41:12, 45:11, 49:2, 50:17, 53:9
**forth** [1] - 57:11
**four** [2] - 27:5, 34:12
**FRANK** [1] - 2:3
**front** [1] - 24:22
**full** [2] - 27:21, 57:12
**function** [1] - 29:2

## G

**grocery** [1] - 8:15
**group** [1] - 52:7
**grown** [1] - 11:15
**guess** [3] - 4:22, 6:2, 41:14
**guessing** [1] - 24:1
**Guthrie** [2] - 52:8, 52:10
**guy** [1] - 44:1
**guys** [1] - 27:2

## H

**hampered** [1] - 26:22
**hand** [1] - 46:12
**harder** [5] - 27:10, 27:11, 30:4, 30:6, 31:4
**Harp** [1] - 2:17
**HARP** [1] - 1:4
**Harp-Horn** [1] - 2:17
**HARP-HORN** [1] - 1:4
**hear** [1] - 16:23
**heard** [1] - 16:22
**heart** [2] - 7:9, 7:13

held [1] - 1:11
help [1] - 51:16
hemp [35] - 7:3, 7:8, 7:12, 7:13, 7:15, 7:18, 7:20, 8:7, 8:8, 8:9, 8:11, 8:13, 16:13, 16:16, 16:17, 20:22, 20:23, 21:3, 21:5, 21:11, 21:16, 21:18, 22:4, 22:10, 22:12, 22:13, 22:14, 22:15, 42:10, 42:11, 42:19, 43:2
hemp-based [9] - 7:20, 16:13, 16:16, 16:17, 21:5, 21:11, 21:18, 22:4, 43:2
Hepatitis [1] - 17:19
hereby [2] - 57:6, 57:12
herein [1] - 57:10
hereinbefore [1] - 57:8
hereunto [1] - 57:18
hermit [1] - 12:3
high [1] - 10:3
hire [6] - 34:21, 35:2, 39:8, 40:6, 40:13, 40:20
hired [1] - 16:8
hit [2] - 19:17, 19:20
HOLDINGS [2] - 1:7, 2:6
home [15] - 11:12, 11:17, 11:20, 12:6, 31:5, 31:6, 31:10, 32:22, 32:23, 33:2, 33:6, 33:12, 33:15, 33:21
homeopathic [2] - 17:13, 17:17
Horn [5] - 2:17, 3:2, 41:21, 46:17, 46:20
HORN [3] - 1:4, 1:11
horn [3] - 4:8, 46:3, 52:14
Horns [1] - 38:10
hours [9] - 28:23, 29:5, 30:7, 31:18, 31:19, 31:20, 31:23, 32:4
HOUSH [14] - 2:3, 2:13, 12:8, 15:2, 15:6, 15:11, 15:16, 23:4, 23:13, 41:12, 45:11, 49:2, 50:17, 53:9
hundred [1] - 26:5
hurt [2] - 44:22, 45:2
hydrocodeine [1] - 14:6

hydrocodone [12] - 14:7, 14:8, 14:11, 52:16, 53:11, 53:14, 53:18, 53:22, 54:4, 54:10, 54:20, 54:22

**I**

ICX [3] - 28:9, 28:10, 28:15
idea [6] - 9:15, 9:17, 20:5, 20:10, 26:18, 44:10
identification [2] - 18:20, 45:19
impaired [1] - 11:7
IN [1] - 57:18
INC [2] - 1:7, 2:6
includes [1] - 11:9
income [4] - 25:4, 25:12, 26:3, 35:11
independent [1] - 4:11
information [1] - 49:20
ingest [1] - 11:2
ingredients [1] - 49:4
initial [1] - 17:22
injectable [1] - 13:10
inside [1] - 49:11
interacted [1] - 51:20
interested [1] - 57:16
Internet [1] - 21:21
intoxicated [1] - 11:9
involved [2] - 16:9, 17:3
iPads [3] - 6:13, 6:15, 6:17
IRS [1] - 23:21
issue [1] - 21:2
item [1] - 55:13
itself [2] - 22:13, 22:14, 22:15

**J**

James [3] - 27:3, 41:21, 46:17
JEAN [1] - 2:13
JEAN-CLAUDE [1] - 2:13
job [13] - 28:8, 32:10, 32:20, 32:21, 33:23, 34:3, 34:10, 38:23, 41:3, 41:11, 41:21, 51:12, 51:17
jobs [3] - 36:5, 36:11, 41:17

**K**

Keber [2] - 4:18, 55:5
Kenneth [1] - 51:19
kid [1] - 10:11
kind [5] - 24:9, 29:22, 29:23, 36:16, 51:5
knowledge [2] - 35:4, 35:10

**L**

lab [3] - 43:15, 43:20, 44:5
Lab [2] - 48:21, 49:1
label [1] - 49:7
laboratory [1] - 9:4
Lafayette [2] - 1:13, 2:9
laid [2] - 30:9, 30:19
last [10] - 4:16, 8:2, 14:20, 27:19, 27:21, 39:14, 49:14, 49:15, 50:20, 53:17
LAW [1] - 2:3
lawsuit [1] - 49:21
lawyer [4] - 35:19, 35:21, 39:12, 49:23
lay [3] - 30:14, 30:15, 30:16
learn [1] - 8:13
least [3] - 8:6, 38:15, 38:19
led [2] - 20:20, 21:1
left [1] - 39:1
legal [2] - 21:17, 22:9
legalizing [1] - 14:23
less [4] - 27:13, 29:13, 29:21, 33:9
letters [3] - 39:5, 39:11, 41:8
life [1] - 55:2
limited [3] - 26:21, 30:6, 36:5
LINDSTROM [1] - 2:13
lines [1] - 43:13
listened [1] - 21:23
literally [1] - 55:9
live [2] - 11:17, 12:17
lived [1] - 11:20
lives [2] - 47:1, 47:2
LLC [2] - 1:7, 2:6
LLP [1] - 2:12
load [1] - 30:23
locally [2] - 54:7, 54:21
Lockwood [1] - 4:2
log [1] - 28:7
logic [1] - 23:10

look [4] - 6:17, 49:7, 49:8, 51:22
looked [2] - 17:1, 35:9
looks [2] - 13:13, 26:14
loss [1] - 8:8
lost [2] - 24:23, 36:9

**M**

M.D [3] - 3:8, 45:21, 52:1
magazine [1] - 22:2
mail [9] - 3:7, 45:20, 46:9, 46:16, 46:20, 47:5, 48:2, 48:9, 50:13
mailed [1] - 48:1
MARIJUANA [2] - 1:7, 2:6
marijuana [13] - 10:11, 10:15, 10:19, 10:22, 11:2, 12:5, 12:10, 12:19, 12:23, 14:21, 15:1, 15:10, 22:2
MARISSA [2] - 57:5, 57:22
Marissa [1] - 1:11
marked [5] - 18:20, 19:1, 45:16, 45:19, 46:3
math [1] - 11:23
matter [2] - 25:1, 32:3
MAZZOLA [4] - 2:13, 4:6, 18:23, 42:8, 45:15, 56:6
Mazzola [1] - 3:2
mean [13] - 6:1, 11:10, 17:16, 23:10, 24:6, 27:11, 30:1, 30:14, 30:18, 33:17, 35:16, 44:8, 51:2
meant [2] - 44:9, 44:10
MEDICAL [2] - 1:7, 2:6
medical [2] - 52:7
MEDTOX [1] - 9:1
mess [2] - 43:15, 44:5
MESSNER [2] - 2:12
might [8] - 9:7, 13:14, 14:4, 18:7, 20:10, 21:1, 43:15, 44:5
Mike [4] - 3:8, 45:21, 51:23, 52:6
mile [8] - 27:12, 27:13, 27:15, 33:9, 34:4, 34:11, 37:1, 37:2
miles [18] - 27:19, 27:21, 28:2, 28:3, 28:5, 28:10, 28:12,

28:15, 28:21, 28:23, 29:2, 29:14, 32:11, 32:13, 32:15, 32:18, 33:22, 35:5
milk [2] - 7:15, 8:9
milligram [1] - 48:19
milligrams [3] - 47:19, 48:11, 49:3
minute [6] - 21:3, 21:7, 21:8, 21:12, 22:5, 22:11
minutes [1] - 42:2
mixture [2] - 29:22, 29:23
money [4] - 31:14, 33:11, 35:14, 35:17
month [2] - 7:23, 53:23
months [3] - 25:17, 25:20, 25:22
morning [1] - 4:8
Motor [2] - 3:6, 18:21
moved [1] - 36:17
MR [20] - 4:6, 12:8, 15:2, 15:6, 15:11, 15:16, 18:23, 23:4, 23:13, 41:12, 42:8, 45:11, 45:15, 45:16, 46:1, 49:2, 50:17, 53:9, 56:5, 56:6
MRO [1] - 20:8
MURA [2] - 1:12, 2:7

**N**

name [1] - 57:18
names [2] - 39:4, 41:16
naturally [1] - 25:12
needle [1] - 18:7
never [10] - 16:22, 28:12, 28:15, 37:17, 37:18, 37:20, 37:23, 38:2, 40:20, 49:9
new [5] - 28:8, 32:10, 32:20, 32:21, 33:22
NEW [2] - 1:2, 57:1
New [10] - 1:14, 2:4, 2:9, 2:15, 4:2, 47:2, 47:3, 52:12, 57:6
next [3] - 20:16, 51:10, 51:12
Niagara [1] - 2:4
Nicole [2] - 12:13, 12:15
Nitro [3] - 24:10, 24:11
non [1] - 17:12
none [1] - 11:17
North [2] - 17:2, 37:14
Northeast [1] - 29:11

**Notary** [3] - 1:12, 57:5, 57:22
**note** [2] - 14:4, 43:12
**notes** [1] - 57:13
**nothing** [3] - 11:4, 15:13, 57:9
**notice** [1] - 1:15, 57:10
**November** [4] - 25:19, 25:23, 46:13, 47:6
**Number** [1] - 45:17
**number** [3] - 29:3, 29:5, 37:15

# O

**object** [12] - 12:8, 15:2, 15:6, 15:11, 15:16, 23:4, 23:13, 41:12, 45:11, 49:2, 50:17, 53:9
**objection** [1] - 12:8
**observed** [4] - 4:23, 5:22, 6:3, 6:4
**October** [2] - 4:13, 25:23
**OF** [3] - 1:2, 57:1, 57:3
**offer** [2] - 5:21, 6:3
**offhand** [1] - 33:5
**OFFICES** [1] - 2:3
**offices** [1] - 52:10
**oil** [11] - 36:14, 36:21, 37:4, 37:8, 37:13, 38:3, 38:11, 38:14, 38:22, 38:23, 39:15
**old** [3] - 11:22, 12:15
**once** [2] - 9:21, 55:20
**one** [7] - 6:18, 8:12, 12:2, 27:2, 47:1, 55:21, 56:3
**online** [4] - 14:14, 54:8, 54:10, 54:22
**open** [1] - 13:12
**opened** [1] - 49:9
**operate** [1] - 39:15
**operating** [1] - 13:23
**operator** [4] - 40:2, 40:3, 40:8, 40:10
**opinion** [2] - 15:3, 15:4
**option** [1] - 39:19
**order** [3] - 54:8, 54:10, 54:22
**outcome** [1] - 57:16
**Owego** [2] - 47:4, 47:5
**own** [1] - 16:2
**owner** [4] - 40:2, 40:3, 40:8, 40:10

# P

**package** [2] - 49:9, 49:12
**PAGE** [2] - 3:1, 3:5
**page** [5] - 46:4, 47:17, 49:14, 50:21, 52:1
**pages** [1] - 45:20
**paid** [5] - 27:12, 27:15, 27:17, 30:21
**pain** [1] - 17:13
**paperwork** [1] - 44:11
**paragraph** [3] - 47:16, 49:14, 50:20
**Parker** [1] - 4:2
**part** [4] - 16:9, 29:8, 29:16, 46:9
**parts** [1] - 29:16
**party** [1] - 57:15
**past** [1] - 42:14
**pasted** [1] - 47:8
**pay** [4] - 30:16, 30:19, 30:20, 30:23
**pays** [3] - 34:4, 34:11, 36:23
**Pennsylvania** [2] - 12:18, 52:11
**per** [4] - 27:15, 30:21, 33:9, 34:4
**percent** [4] - 21:9, 21:15, 55:17, 56:2
**period** [2] - 32:5, 53:20
**permits** [1] - 36:15
**person** [2] - 30:21, 51:19
**personally** [1] - 43:9
**perspective** [1] - 34:17
**peyote** [1] - 13:8
**pharmacy** [2] - 54:7, 54:12
**pick** [6] - 17:3, 19:4, 19:6, 19:17, 20:2, 20:6
**pick-up** [6] - 17:3, 19:4, 19:6, 19:17, 20:2, 20:6
**picture** [2] - 20:3, 51:23
**pictures** [1] - 20:2
**pills** [2] - 53:11, 53:14
**place** [2] - 48:11, 57:10
**PLAINTIFF** [1] - 2:2
**Plaintiffs** [1] - 1:5
**plan** [1] - 36:17
**planned** [1] - 36:13
**PLLC** [3] - 1:13, 2:3, 2:7

**pocket** [1] - 13:13
**point** [1] - 54:2
**police** [2] - 19:3, 19:12
**policies** [1] - 40:19
**policy** [6] - 22:20, 34:22, 34:23, 35:1, 41:14, 41:15
**political** [1] - 15:9
**politics** [1] - 15:12
**positive** [1] - 52:15
**possession** [1] - 53:11
**preceding** [4] - 7:23, 10:21, 11:1, 12:21
**precisely** [1] - 5:2
**predates** [1] - 49:21
**predating** [1] - 50:1
**prescribed** [3] - 52:16, 52:18, 53:17
**prescribing** [1] - 53:22
**prescription** [3] - 13:19, 14:14, 54:1
**prescriptions** [2] - 54:6, 54:19
**presence** [1] - 12:22
**PRESENT** [1] - 2:17
**pretty** [5] - 19:9, 29:10, 30:12, 31:9, 34:1
**print** [1] - 47:15
**print's** [1] - 46:14
**printed** [2] - 50:10, 50:18
**printout** [1] - 50:6
**printouts** [4] - 49:16, 49:19, 50:1, 50:14
**problem** [1] - 32:21
**process** [3] - 16:13, 42:18, 42:22
**processed** [1] - 22:12
**product** [18] - 4:12, 5:6, 5:14, 5:23, 9:19, 9:22, 21:4, 21:11, 21:14, 22:1, 22:21, 26:23, 27:5, 38:16, 43:2, 47:21, 48:15, 50:16
**Products** [1] - 37:14
**products** [25] - 7:3, 7:20, 7:22, 8:2, 8:7, 8:14, 11:2, 13:4, 16:14, 16:16, 16:17, 16:19, 21:5, 21:11, 21:19, 22:4, 22:10, 22:13, 42:10, 43:9, 43:5, 43:14, 43:20, 44:2, 55:6
**program** [2] - 51:5, 51:9

**prompt** [1] - 9:14
**prompted** [3] - 8:7, 8:16, 17:20
**proof** [1] - 5:21
**prove** [1] - 6:3
**provided** [1] - 9:1
**proving** [1] - 6:20
**Public** [3] - 1:12, 57:5, 57:22
**purchase** [1] - 14:14
**purchased** [10] - 4:12, 5:6, 5:13, 5:22, 21:11, 21:13, 21:15, 21:19, 22:20, 43:5
**pursuant** [2] - 1:15, 57:10
**put** [3] - 13:19, 24:21, 47:8

# Q

**quantity** [1] - 48:20
**quit** [2] - 44:15, 45:6
**quite** [1] - 6:13

# R

**raise** [1] - 26:11
**ran** [2] - 19:10, 19:12
**Rand** [2] - 1:13, 2:8
**random** [1] - 40:20
**rate** [1] - 39:23
**raw** [2] - 22:6, 22:7
**reaction** [1] - 9:23
**read** [1] - 42:6
**reaffirming** [1] - 41:14
**really** [2] - 15:3, 30:1
**reason** [1] - 45:6
**recap** [1] - 4:10
**recently** [2] - 34:13, 34:15
**Recess** [1] - 42:4
**record** [4] - 34:16, 41:22, 41:23, 53:7
**Record** [1] - 42:6
**Red** [1] - 24:14
**RED** [2] - 1:7, 2:6
**REEVES** [1] - 2:12
**reference** [4] - 17:3, 19:6, 46:16, 47:17, 48:9, 55:4
**referring** [2] - 48:2, 52:3
**regarding** [3] - 4:11, 17:19, 23:18
**regularly** [2] - 42:20, 42:21
**regulation** [1] - 30:8
**regulations** [4] - 14:9, 22:19, 28:18, 43:8

**rehab** [6] - 50:23, 51:3, 51:9, 51:15, 51:16, 51:20
**rejected** [2] - 38:15, 38:17
**rejection** [2] - 39:5, 41:9
**related** [1] - 57:15
**remainder** [1] - 44:20
**remedies** [1] - 17:13
**remember** [7] - 14:19, 16:17, 39:4, 39:10, 50:19, 53:13, 55:7
**rephrase** [1] - 48:3
**report** [2] - 19:2, 19:7
**reporter** [1] - 42:6
**represent** [1] - 47:11
**request** [2] - 18:3, 30:9
**research** [6] - 4:11, 8:18, 8:20, 22:22, 43:6, 50:15
**researched** [1] - 50:3
**respect** [1] - 29:20
**response** [1] - 38:18
**result** [1] - 24:23
**returns** [3] - 23:16, 24:21
**Review** [2] - 3:9, 45:21
**reviewed** [1] - 22:2
**Richmond** [1] - 29:12
**right-hand** [1] - 46:12
**Road** [1] - 4:2
**round** [1] - 13:13
**routes** [1] - 29:21
**run** [1] - 32:4

# S

**sample** [5] - 9:1, 9:9, 9:12, 49:1, 50:2
**SAT** [1] - 51:4
**saw** [3] - 11:12, 13:13, 22:1
**Sayre** [3] - 52:10, 54:15, 54:16
**scratch** [1] - 16:2
**screenshot** [1] - 5:18
**seal** [1] - 57:18
**second** [2] - 17:6, 49:14
**see** [13] - 9:13, 17:11, 18:11, 19:6, 23:16, 34:18, 34:19, 40:17, 46:13, 46:19, 47:19, 50:23, 55:10
**seed** [2] - 7:8, 7:12
**seeing** [1] - 14:4
**semi** [1] - 19:12
**semi-truck** [1] - 19:12

send [1] - 43:19
sending [3] - 47:14, 47:18, 48:10
sent [8] - 46:9, 46:16, 46:20, 47:11, 47:21, 48:4, 48:20, 49:1
sentence [1] - 49:15
set [2] - 35:23, 57:10
shake [4] - 7:10, 8:8, 8:10, 42:19
shakes [1] - 42:11
shampoo [2] - 7:18, 8:11
shared [1] - 39:11
shelf [1] - 22:8
shorthand [1] - 57:13
shoulder [1] - 18:13
show [1] - 5:9
showed [1] - 23:20
showing [2] - 46:3, 50:15
shows [1] - 53:7
single [2] - 19:10, 19:15
single-vehicle [1] - 19:15
sitting [1] - 30:22
situation [1] - 46:7
six [1] - 42:15
skull [2] - 18:17, 18:18
slightly [1] - 25:16
small [1] - 46:14
smoke [4] - 12:5, 12:19, 13:2, 13:8
smoked [1] - 14:20
smoking [1] - 12:23
someone [2] - 6:3, 43:14
someplace [1] - 11:12
sometimes [1] - 23:2
sort [2] - 9:23, 10:5
sought [6] - 38:23, 39:14, 40:21, 41:2, 41:11, 41:17
Southern [1] - 52:11
Square [2] - 1:13, 2:9
ss [1] - 57:2
stamp [1] - 5:18
stance [1] - 15:9
standard [1] - 42:21
starting [1] - 37:10
starts [1] - 46:6
STATE [1] - 57:1
State [3] - 47:3, 52:12, 57:6
statement [1] - 50:21
States [1] - 39:21
STATES [1] - 1:1
stay [2] - 15:12, 40:16

still [8] - 6:1, 6:8, 6:14, 6:23, 14:11, 21:12, 23:1, 53:14
store [1] - 8:15
STORM [2] - 1:12, 2:7
Street [1] - 2:4
stuff [1] - 44:12
subscribed [1] - 57:18
substance [1] - 16:9
Sue [1] - 2:17
suffered [1] - 24:23
supposed [1] - 49:6
suspect [1] - 20:13
sworn [2] - 4:3, 57:9
system [1] - 9:13

## T

target [1] - 35:11
tattoos [3] - 18:9, 18:11, 18:14
taurine [1] - 24:14
tax [3] - 23:16, 24:21
team [2] - 44:18, 45:7
telephone [1] - 42:1
terms [2] - 28:21, 38:22
test [13] - 7:23, 8:3, 8:5, 10:22, 11:1, 16:4, 17:23, 20:15, 20:17, 39:9, 52:21, 53:4, 53:6
tested [11] - 17:20, 17:22, 18:2, 18:4, 47:22, 48:11, 48:18, 48:20, 49:22, 50:7, 52:14
testified [4] - 4:4, 10:10, 10:14, 48:4
testify [1] - 57:9
testifying [1] - 55:7
testimony [8] - 6:6, 47:22, 52:3, 57:8, 57:9, 57:10, 57:11, 57:12
testing [4] - 43:7, 43:20, 47:18, 48:7
tests [1] - 16:6
Texas [3] - 9:5, 9:7, 20:18
text [1] - 46:19
THC [13] - 9:13, 9:15, 21:3, 21:7, 21:12, 21:16, 22:5, 22:11, 22:15, 22:23, 23:11, 44:11, 52:15
THE [3] - 2:2, 2:6, 2:11
thereafter [1] - 57:11
thereof [1] - 57:16
thinking [1] - 40:4

third [1] - 47:16
Third [1] - 2:14
thousand [1] - 26:5
three [1] - 25:20
Tier [1] - 52:11
ties [1] - 19:3
tin [2] - 13:14, 13:16
tobacco [3] - 13:4, 13:14, 13:16
today [1] - 28:19
today's [1] - 46:4
together [1] - 47:9
tolerance [1] - 22:19
took [3] - 20:15, 27:4, 53:3
total [2] - 25:3, 25:4
traffic [2] - 29:13, 29:21
training [2] - 16:9, 16:10
transcribed [1] - 57:11
transcription [1] - 57:13
transition [1] - 37:10
transporting [1] - 38:23
transports [2] - 40:22, 41:3
treatment [1] - 52:7
Trial [1] - 1:10
tried [3] - 8:12, 9:21, 34:3
Tripp [2] - 4:17, 55:5
truck [11] - 13:23, 17:3, 19:4, 19:6, 19:11, 19:12, 19:17, 19:20, 20:2, 20:6, 32:4
true [2] - 43:1, 57:12
truth [3] - 57:9, 57:10
try [2] - 8:17, 15:10
trying [1] - 4:20
turn [3] - 28:3, 28:5, 28:10
turned [1] - 13:12
two [7] - 25:22, 38:8, 38:15, 38:19, 45:20, 46:4, 53:19
two-page [1] - 46:4
type [2] - 18:14, 46:5
typewriting [1] - 57:12

## U

unaware [1] - 18:1
underneath [1] - 46:19
UNITED [1] - 1:1
United [1] - 39:21

unopened [1] - 48:5
up [14] - 4:9, 17:3, 19:4, 19:6, 19:17, 19:23, 20:2, 20:6, 41:19, 43:15, 44:5, 46:5, 49:9, 52:11
upper [1] - 46:12
urine [2] - 40:15, 52:21

## V

vape [1] - 13:6
variables [1] - 31:3
varies [1] - 40:1
vehicle [1] - 19:15
Vehicle [2] - 3:6, 18:21
Vestal [1] - 54:14
video [15] - 4:17, 4:23, 5:3, 5:10, 5:13, 5:16, 5:19, 5:22, 6:19, 6:21, 21:23, 55:5, 55:9, 55:11, 55:19
video's [1] - 6:1
views [1] - 15:13
violation [2] - 14:8, 43:7
violations [1] - 28:7
vitamins [1] - 24:14
vs [1] - 1:6

## W

wages [2] - 24:23, 36:9
wait [3] - 37:23, 48:3, 51:8
waiting [1] - 30:23
watch [2] - 55:9, 55:19
watched [7] - 5:3, 6:9, 6:10, 6:18, 6:20, 55:23, 56:2
watching [2] - 4:17, 5:12
website [1] - 49:19
weight [1] - 8:8
WENDY [1] - 2:13
WESTERN [1] - 1:2
WHEREOF [1] - 57:18
whole [1] - 57:9
why's [1] - 36:21
wife [9] - 8:20, 8:23, 9:9, 9:12, 9:19, 15:4, 15:19, 15:21, 31:23
willing [2] - 50:22, 51:2
window [1] - 13:12
witness [2] - 5:12, 57:8

WITNESS [2] - 3:1, 57:18
word [2] - 16:22, 16:23
words [1] - 22:5
Workers' [2] - 44:23, 45:4
Worksheet [2] - 3:6, 18:21
wreck [3] - 44:22, 52:19, 52:20
written [1] - 14:5
wrote [2] - 47:5, 47:7

## X

XC [1] - 28:8

## Y

year [14] - 8:4, 8:5, 10:21, 11:1, 11:4, 11:19, 12:21, 25:8, 27:19, 27:22, 35:5, 44:20, 51:10, 54:16
years [13] - 14:22, 23:20, 27:5, 34:12, 34:19, 38:8, 38:15, 38:19, 40:16, 40:17, 42:15, 53:19, 54:2
yesterday [11] - 4:9, 4:10, 4:21, 13:18, 23:17, 43:12, 47:22, 48:4, 48:16, 52:4, 55:4
Yolanda [1] - 24:16
YORK [2] - 1:2, 57:1
York [10] - 1:14, 2:4, 2:9, 2:15, 4:2, 47:2, 47:3, 52:12, 57:6
younger [1] - 10:20
YouTube [2] - 4:17, 55:4

## Z

zero [4] - 21:9, 21:14, 22:19, 22:23