# Summary Judgment
# Exhibit C

1

1            UNITED STATES DISTRICT COURT

2            WESTERN DISTRICT OF NEW YORK

3    ------------------------------------------------

4    **DOUGLAS J. HORN and CINDY HARP-HORN,**

5          Plaintiffs,

6     -vs-         Civil Action No.: 15-cv-701-FPG

7    **MEDICAL MARIJUANA, INC., DIXIE ELIXIRS AND**
     **EDIBLES, RED DICE HOLDINGS, LLC, and DIXIE**

8    **BOTANICALS,**

9          Defendants.
    ------------------------------------------------

10          Examination Before Trial of

11   **DOUGLAS J. HORN,** held before Marissa A.

12   Ashcroft, Notary Public, at MURA & STORM,

13   PLLC, 930 Rand Building, 14 Lafayette Square,

14   Buffalo, New York, on May 8th, 2017 at 10:17

15   a.m., pursuant to notice.

16

17

18

19

20

21

22

23

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1       policy and procedure?

2   A.  There could have been a test with it as well.

3       Usually there is.

4   Q.  But do you recall there being a disciplinary

5       policy and procedure at Enterprise that you

6       were given?

7   A.  Not in 2003.  I don't remember any of this.

8   Q.  Whose signature is below yours?

9   A.  Looks like John Reddy.

10  Q.  John Reddy, your supervisor at the time?

11  A.  Correct.

12  Q.  Do you have any reason to deny that you

13      received the disciplinary policy and

14      procedures which detail the disciplinary

15      action that will or could be taken for failure

16      to follow established company policies and

17      procedures?

18  A.  No.

19

20      The following was marked for identification:

21      Exhibit 11          Enterprise Products Company
                            and DOT Drug and Alcohol
22                          Policy Summary

23

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1       **BY MR. BORON:**

2    Q.  Showing you Exhibit 11 for this deposition,

3        sir.  For the record, Exhibit 11 consists of

4        two pages stapled together.  In the bottom

5        right-hand corner they say ENT 469 and ENT

6        470, correct?

7    A.  Correct.

8    Q.  And these two pages have a label in the upper

9        right-hand corner that say company DOT Drug

10       and Alcohol Policy Summary, correct?

11   A.  Correct.

12   Q.  And this is from Enterprise, your former

13       employer?

14   A.  Correct.

15   Q.  And you were given a copy of this drug -- I'm

16       sorry, Company and DOT Drug and Alcohol Policy

17       Summary?

18   A.  I'm sure I did, yes.

19   Q.  Okay.  Does this look familiar to you?

20   A.  Not really, no.

21   Q.  You see on the form on the first page of

22       Exhibit 11 where it says -- there's a heading

23       that says Prescription Medication,

——— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ———

1        over-the-counter and then (OTC) products?

2    A. Correct.

3    Q. Okay.  Do you see the reference to employees

4        are expected to review warning labels and

5        report such use of all medications to each of

6        their medical practitioners so each can make a

7        good faith judgement that the used substance

8        is either prescribed or authorized dosage is

9        consistent with the safe performance of their

10       duties; do you see that?

11   A. Yes.

12   Q. And did you understand that to be part of the

13       policy of Enterprise with respect to drug and

14       alcohol?

15   A. Yeah.

16   Q. What was your own personal practice with

17       respect to reviewing warning labels on drugs,

18       whether they were prescribed or

19       over-the-counter before taking them?

20   A. Well, I would go by the warning.

21   Q. So your standard operating procedure was to

22       review the label?

23   A. Pretty much, yeah.

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    Q.  And would you contact your doctor if you
2        didn't understand something on the label?
3    A.  Yes, it happened.  Yeah.
4    Q.  Did that ever happened?
5    A.  No.
6    Q.  You understood everything on every label for
7        everything you were prescribed or took an
8        over-the-counter product?
9    A.  Pretty much, yeah.
10   Q.  Okay.  Do you see down below in the left-hand
11       corner of the first page of Exhibit 11?
12   A.  Correct.
13   Q.  Prohibited substances, there's a label that
14       says DOT and first prohibited substance listed
15       there is marijuana?
16   A.  Correct.
17   Q.  And then just up to the top right-hand column
18       of the first page which is still ENT 469 it
19       says N/DOT, marijuana's listed there as well?
20   A.  Correct.
21   Q.  Okay.  That's for the non-DOT policy of
22       Enterprise as oppose to the DOT's own policy,
23       correct?

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    A.  Okay.

2    Q.  Well, is it correct?

3    A.  Yes.  Yes.

4    Q.  Yes.  Do you see in that list of non-DOT

5        there's more than marijuana listed.  It says

6        any mood or mind altering substances and then

7        in parenthesis it says (herbal, synthetic,

8        manufactured)?

9    A.  Okay.  Yeah, I see it.

10   Q.  Okay.  Do you deny that that was part of

11       Enterprise's policy with respect to drugs and

12       alcohol?

13   A.  No, that's their policy.

14   Q.  Okay.  Did you understand that throughout the

15       time you worked at Enterprise that the company

16       reserves the right to test for more drugs at

17       lower threshold levels and take lower levels

18       than required by DOT?

19   A.  Correct.

20   Q.  I'm directing your attention now to the second

21       page of Exhibit 11 in the bottom right-hand

22       corner.  This is ENT -- page ENT 470.  Do you

23       see where it says contact information?

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    A. Correct.

2    Q. And there is a drug and alcohol

3       compliance/designated employer representative

4       listed there, a person listed as Shana Vaught?

5    A. Okay.  I see it.

6    Q. In 2012 in October when you took the Dixie

7       product, was Shana Vaught the drug and alcohol

8       compliance designated employer representative?

9    A. I don't know.

10   Q. Was there a drug and alcohol compliance

11      designated employer representative at that

12      time?

13   A. I don't know.

14   Q. Did you ever refuse to submit to a drug test?

15   A. No.

16   Q. In your entire lifetime?

17   A. In my entire life, no.

18   Q. Okay.  And how many drug tests did you provide

19      or participate in while you worked at

20      Enterprise?

21   A. I'm not sure.

22   Q. Was it less than 10?

23   A. Yeah, I would say so.

1  Q. So over 10 and a half years you were being
2     tested on average less than one year?
3  A. Yeah, about.  Yeah.
4  Q. Okay.  And were you also tested for drugs at
5     prior employers like Marten?
6  A. Yes.
7  Q. Did they test more frequently than Enterprise
8     or at about the same rate?
9  A. I don't recall honestly.
10 Q. Okay.  Have you gone through drug testing for
11    ICX?
12 A. Yes.
13 Q. Random drug testing?
14 A. Yes.
15 Q. Unannounced drug testing?
16 A. Yes.
17 Q. How many times?
18 A. Just once.
19 Q. Once.  What was the result of that test?
20 A. It was negative.
21 Q. Okay.
22 A. Otherwise I'd be terminated.
23

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1          **MS. HORN:**  No, I have a different one in

2      here.  I don't think so.

3          **MR. BORON:**  Okay.  That's a different

4      addition?

5          **MR. MAZZOLA:**  Yeah.

6          **MR. HOUSH:**  They're going to take

7      everything that you -- just put that back in

8      your thing.

9      Just so the record is clear, my client had

10     a separate and unrelated copy of High Times

11     that opposing counsel is now taking.

12         **MR. BORON:**  I think this would be a

13     super time for a break.

14         **MR. HOUSH:**  Great.

15

16              (Recess taken)

17

18     The following was marked for identification:

19     Exhibit 24        High Times Medical Marijuana
                         Magazine
20

21     **BY MR. BORON:**

22  Q. We're back on the record after a break.

23     Mr. Horn, you continue to be under oath.  I'm

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1           showing you what's been marked as Exhibit 24

2           for this deposition.  Would you agree with me

3           for the record this is a -- this is the actual

4           High Times magazine from which photocopies

5           that we were looking at on Exhibit 23 were

6           taken?

7       A.  Correct.

8       Q.  Okay.  And for the record, this is the same

9           High Times magazine that you were testifying

10          earlier just before the break about having

11          purchased at a bookstore in Texas?

12      A.  Correct.

13      Q.  All right.  You and your wife Cindy were

14          together at the time the magazine was

15          purchased, correct?

16      A.  Correct.

17      Q.  All right.  Did you do some reading of the

18          magazine inside the bookstore or did you just

19          purchase it and bring it out of the bookstore

20          and read it?

21      A.  We were inside the bookstore.

22      Q.  How long were you in the bookstore?

23      A.  For a little while.

─ DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ─

1    Q. Do you have bank accounts at any other banks

2       besides Visions in 2012?

3    A. No.

4    Q. Just for the record, there's just a couple

5       things I want to make sure we do get on the

6       record.  In the bottom right-hand corner the

7       cover of Exhibit 24 it says Fall 2012,

8       correct?

9    A. Correct.

10    Q. With a number 11 --

11    A. Correct.

12    Q. -- after that.  And then there's a price

13       USA 5.99?

14    A. Correct.

15    Q. Is that what you paid for the magazine, 5.99,

16       to the best of your knowledge?

17    A. I don't know.

18    Q. You don't know, okay.  What -- what articles

19       did you review in that magazine?

20    A. I just kind of skimmed through it.

21    Q. Were you just looking at the pictures or were

22       you reading articles?

23    A. I was just looking at articles and what the

─ DEPAOLO-CROSBY REPORTING SERVICES, INC. ─

1         magazine was about.

2   Q. Had anybody recommended to you that you buy

3         this magazine?

4   A. No.

5   Q. Did you do all the skimming that you were

6         doing inside the bookstore?

7   A. Yes.

8   Q. Okay.  And then once you purchased it and left

9         the bookstore was that -- was that the last

10       time you had looked at the magazine?

11   A. Pretty much.

12   Q. Did you show that magazine to anyone besides

13       lawyers?

14   A. No.

15   Q. Share anything in the magazine with Cindy's

16       mom?

17   A. No.

18   Q. Talk to Cindy's mom about anything you saw in

19       the magazine?

20   A. No.

21   Q. How about your daughters, did you share

22       anything about the information in the magazine

23       with your daughters?

1    A. No.

2    Q. Did you give it to them to read.  Did they

3       have any interest in reading it?

4    A. Nope.

5    Q. To your knowledge, has anybody besides you and

6       Cindy read any of the articles inside this

7       magazine?

8    A. Just me and her.

9    Q. Okay.  Take a look with me if you would at

10      page 39 of Exhibit 24.  It's Exhibit 24,

11      right?  And then the page before is 38, right;

12      would you agree?

13    A. Yeah.

14    Q. And page 38 is the start of an article

15      entitled High & Healthy by Elise McDonough?

16    A. Okay, correct.

17    Q. You would agree with that?

18    A. Yes.

19    Q. And then there's an article she wrote?

20    A. Correct.

21    Q. Okay.  Did you read that article?

22    A. No.

23    Q. You didn't read her article?

1   A. No.

2   Q. Which articles in the magazine did you read?

3   A. Like I said, I skimmed through it.

4   Q. Do you have a recollection of reading any

5      article?

6   A. Just the -- this one.

7   Q. Does this say High & Healthy at the top of

8      page 42?

9   A. It does.

10  Q. Does it say High & Healthy at the top of the

11     page for the Elise McDonough article?

12  A. Correct.

13  Q. Does it say High & Healthy at the top of page

14     40 which is a portion of Elise McDonough's

15     article?

16  A. Correct.

17  Q. Were you interested in any of the recipes that

18     are listed in her article?

19  A. No.

20  Q. Did you review any of the recipes that are

21     listed in her article?

22  A. No.

23  Q. Have you or Cindy ever prepared the food

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1      according to those recipes that are listed in

2      that article?

3   A. No.

4   Q. Did you buy this magazine to review ads for

5      masking products for dirty tests?

6   A. Nope.

7   Q. You guys didn't bring the bottle, right?

8   A. Nope.

9   Q. Okay.

10

11     The following was marked for identification:

12     Exhibit 25          Three-pages of colored
                            photocopies of photographs

13

14  **BY MR. BORON:**

15  Q. I noticed when you brought this magazine out

16     on to the table it came out of a box that's

17     over on your side of the table.  What else is

18     in the box?

19  A. Bad copies of e-mails that you guys asked for.

20  Q. Okay.  Okay.  Copies of documents and records

21     that you already turned over to us?

22  A. Correct.

23  Q. Okay.  But there was a second magazine in

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    A.  I did and misplaced the paper.

2    Q.  Well, while we're looking at this second page,

3        might as well go through a couple questions

4        here.  You see where there's a heading on the

5        label, the second page of the exhibit that

6        says dosage.

7    A.  Correct.

8    Q.  It says place below the tongue for fast,

9        effective relief.  Do you see that?

10   A.  Yep.

11   Q.  Is that the way you administered the dosage to

12       yourself?

13   A.  Correct.

14   Q.  And there's no direction on how much dosage to

15       use on any particular usage?

16   A.  Correct.

17   Q.  So how did you determine how much to use?

18   A.  By the eye dropper.

19   Q.  Okay.  So the top unscrewed and there was an

20       eye dropper attached to it?

21   A.  Yes.

22   Q.  Did you fill the eye dropper to the top?

23   A.  Yes.

—— DOUGLAS J. HORN - BY MR. BORON - 05/08/17 ——

1    Q. And then you placed what was the entirety of

2       the eye dropper under your tongue?

3    A. Correct.

4    Q. What was the first day you did that?

5    A. I couldn't tell you.  About 10 days before I

6       got fired, maybe 12.

7    Q. Had the first day that you took a dose, was

8       that the same day that it arrived in the mail?

9    A. No.

10   Q. How long was it before you took a dose?

11   A. It was at the house for at least a couple of

12      weeks that I know of.

13   Q. Was the product ordered by Cindy or you?

14   A. I believe it was by Cindy.

15   Q. And had Cindy already used the product before

16      you began to use it?

17   A. No, Cindy didn't use it.

18   Q. Cindy never used the product?

19   A. She tasted it and tried it.

20   Q. Was she the first one that tasted it and tried

21      it?

22   A. No.

23   Q. When you say it was at the house for a couple

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1        of weeks, are you -- are you just guessing at

2        that or do you have a definite memory it was

3        at the house for a couple of weeks?

4     A. It was at the house for a couple of weeks.  I

5        had my daughter bring it to me because I

6        didn't have the hours to run and so she met me

7        in Pennsylvania.

8     Q. Which daughter brought it to you?

9     A. Elizabeth.

10    Q. That was the one that was living with you at

11       the time?

12    A. Correct.

13    Q. And did she bring you to the terminal in

14       Pennsylvania?

15    A. No, she brought it to a truck stop in

16       Pennsylvania.

17    Q. Had it been opened prior to that point in time

18       when you got it at the truck stop in

19       Pennsylvania?

20    A. No.

21    Q. Are you sure about that?

22    A. Positive.

23    Q. And why are you sure about that?

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1    A. Because it's my mail and it was a package.

2    Q. But was there tamper -- tampered proof cap on

3       the bottle?

4    A. It was sealed.

5    Q. It was sealed?

6    A. Correct.

7    Q. So the first time you unscrewed it did you

8       find a cover that had to be torn off?

9    A. Yeah, there was a seal on the box, it was

10      sealed and this product had a plastic

11      cellophane on it.

12   Q. So when your daughter brought it to you in

13      Pennsylvania, was it still in the box it had

14      been mailed in?

15   A. Correct.

16   Q. That box had never been opened?

17   A. That's correct.

18   Q. Where was the box stored?

19   A. I don't know.  More than likely on the

20      countertop.

21   Q. When the box arrived in the mail, were you --

22      two of you out on the road?

23   A. Correct.

DOUGLAS J. HORN - BY MR. BORON - 05/08/17

1      A.  Correct.

2      Q.  -- right?

3      A.  Correct.

4      Q.  So where are those products today?

5      A.  In my cupboard.

6      Q.  Did you see the product that you ordered from

7          Dixie X that is depicted in Exhibit 25

8          advertised on the television?

9      A.  No.

10     Q.  Did you see it advertised or did you -- did

11         you experience listening to an ad about it on

12         the radio?

13     A.  Not on the radio, no.

14     Q.  Was it advertised on a billboard that you saw?

15     A.  Nope.

16     Q.  Were there any door-to-door solicitors that

17         came by and told you about the product?

18     A.  No.

19     Q.  Did you receive a solicitation about the

20         product through the U.S. Mail?

21     A.  No.

22     Q.  After you tested positive you did some

23         research about the product online?