UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
DOUGLAS J. HORN and CINDY HARP-HORN,

                      Plaintiffs,

-against-

MEDICAL MARIJUANA, INC.,
DIXIE ELIXIRS AND EDIBLES,
RED DICE HOLDINGS, LLC, and
DIXIE BOTANICALS,

                      Defendants,
------------------------------------------------------------------X

Civil Action No:
15-cv-701 FPG/MJR

**PLAINTIFFS' STATEMENT
PURSUANT TO L.R. 56(a)(2)**

Plaintiffs, DOUGLAS J. HORN and CINDY HARP-HORN, by their attorneys, KUPILLAS, UNGER & BENJAMIN, LLP. by Jeffrey Benjamin, Esq., submit this Counter-Statement pursuant to Local Civil Rule 56(a)(2) as to material facts in opposition to Defendants' MEDICAL MARIJUANA, INC. and RED DICE HOLDINGS, LLC.'s (hereinafter "MMI/RDH") L.R. 56(a)(1) Statement in support of its FRCP 56 Motion for Summary Judgment.

**PLAINTIFFS' L.R. 56(a)(2) COUNTER-STATEMENT OF FACTS – MMI/RDH**

The Plaintiffs, Douglas J. Horn ("the Plaintiff") and Cindy Harp-Horn ("Cindy")("the Plaintiffs"), submit this Statement of Material Facts pursuant to Fed. R. Civ. P. 56(b)( and W.D.N.Y. L.R. 56(a)(2), in opposition to the Statement of Material Facts offered by the Defendants, MMI/RDH ("Defendants").

    3.     According to Operating Agreement between the Defendants in this action showing the relative legal status of the parties, MMI holds a majority 60% stake in co-defendant RED DICE HOLDINGS, LLC in part responsible for the sale and distribution

of the product at issue. RDH was also in the business of licensing, marketing, and managing the Dixie Elixirs as well as developing and distributing hemp and cannabis based products. (Exhibit "A", p.1).

5. According to the sworn allegations in a lawsuit between the Defendants in the Superior Court in California entitled *Dixie Holdings, LLC on behalf of Red Dice Holdings, LLC. v. Medical Marijuana, Inc.* showing the relative positions of the parties, RDH was formed by Dixie and MMI to license, market and manage the "Dixie Elixirs" brand and products, as well as develop and distribute. (Exhibit "B", p.1-2).

Moreover, according to MMI's June 30, 2012 filing with the SEC pursuant to Rule 15c2-(11)(a)(5), Tripp Keber was a common principal of both defendants RDH as well as co-defendant DIXIE. (Exhibit "C", p.25, 12, 16, 32).

6. Alleged testing on the product during its development and manufacture showed levels of any amount THC in violation of the federal Controlled Substances Act 21 U.S.C. 1308.11. (Graham Affidavit, Para. 6g-6m).

15. Cindy testified that she would have been working around a lot of men and be in isolation; there were no other women in Lake Charles, LA (*Id*. at 107: 13-16). Any offer of employment to Cindy to work alone was not viable and her decision not to take an offer was reasonable under the circumstances (Voie Affidavit. Para.7, 9-12).

16. Cindy testified that it "was either work in the crude oil division and put [her]self in harm's way or be unemployed." (*Id*. at 108: 5-6). The Plaintiffs unloaded chemicals (*Id*. at ln 19).

17.     According to publicly available documents as to the relative legal status of the parties, MMI holds a majority 60% stake in co-defendant RED DICE HOLDINGS, LLC responsible for the testing of the product at issue. (Exhibit "A").

18.     Alleged testing on the product during its development and manufacture showed levels of any amount THC in violation of the federal Controlled Substances Act 21 U.S.C. 1308.11. (Graham Affidavit, Para. 6g-6m).

19.     Defendants' own CannLabs Certificates of Analysis confirmed the presence of an amount of THC. (Exhibit "8").

20,     According to publicly available documents as to the relative legal status of the parties, Tripp Keber was a principal of both defendants RDH as well as co-defendant DIXIE. (Exhibit "C").

22.     According to publicly available documents as to the relative legal status of the parties, Tripp Keber was a principal of both defendants RDH as well as co-defendant DIXIE. (Exhibit "C").

24.     Before purchasing the product, the Plaintiffs relied on the magazine advertisement in the High Times magazine for the Dixie Elixir product; the You Tube videos containing statements as to THC by Dixie and Red Dice's principal, Tripp Keber; and the Frequently Asked questions maintained by Dixie promoting the product on their website at the time of Plaintiffs' purchase. (Plaintiff Affidavit 6-14).

26.     After taking the product from the bottle mailed to him from Defendants, on October 9, 2012, Plaintiff Douglas Horn submitted to a required, random, urine drug test screening. In the confirmatory Report dated October 11, 2012, Plaintiff was confirmed

for a positive test result for marijuana metabolite THC with a result of 29 ng/ml well over the cutoff concentration limit. Exhibit "5."

27. Plaintiffs disclosed four expert witnesses and their reports, namely, Forensic Toxicologist and Labeling expert Dr. Kenneth Graham, Ph.D.

## PLAINTIFFS' STATEMENT OF ADDITIONAL MATERIAL FACTS

1. Plaintiffs have been a husband and wife team of over-the-road truckers since 1998. They drive across the United States hauling various loads such as expedited food, pharmaceuticals and liquid chemicals. (Horn Affidavit Paragraph 4).

2. On February 24, 2012, Plaintiff Douglas Horn was involved in a serious work-related semi-truck accident in which he suffered severe shoulder and back injuries. Over the months following the accident, he submitted to physical therapy and took various pain medications in an attempt to mitigate the trauma of the accident. However, those methods did not work. (Horn Affid. Para 5).

3. In September, 2012, Plaintiffs observed a magazine at a book store in Texas where they had stopped. (Horn Affid. Para 6).

4. Annexed hereto as Exhibit "1" is a copy of the first page of the "High Times" magazine and the advertisement page (Page 42) for the Dixie Elixir Dew Drops Tincture product in question.

5. In this magazine advertisement on Page 42, Defendants' represent:

   a) ". . . .new product line called Dixie X, which contains 0% THC . . .";

   b) " the non-psychoactive products . . ."

6. After review of that magazine, Plaintiffs continued to research the product and found You Tube videos by the CEO of the Company, "Tripp Keber." (Horn Affid. Para 9).

7. The YouTube videos dated August 8 and August 23, 2012 they viewed can be found at:

4

      a.      https://youtu.be/Urlwtw_xQ48

      b.      https://youtu.be/yDjIGXS58ds

      c.      https://youtu.be/k42_Kpp13mk

8. In these videos, Defendants' CEO states continuously that the products are "THC-free", there was "no THC" and it had "0% THC."

9. Plaintiffs further investigated the product by reviewing the Frequently Asked Questions ("FAQs") on the Company website. Annexed hereto as Exhibit "2" on page 2, were the FAQs the Company published back in September, 2012. In those, Defendants' specifically state:

**"What is the difference between CBD from hemp and CBD from medical cannabis?"** (bold in the original).

> "While the two plants are botanically related, *our hemp contains no THC* and numerous medical studies have shown CBD to have significant potential health benefits from a variety of ailments ranging from epilepsy to pain management. Medical cannabis contains THC and may provide relief from various ailments, however, with a psychotropic effect." Emphasis added.

10. Defendants' Dixie's answers to their FAQs changed dramatically over the years. Annexed hereto as Exhibit "3" is the April 8, 2015 FAQ by Defendants stating the following:

**"Does Cannibidiol (CBD) and other natural hemp based constituents show up on a drug test?"** (bold in the original).

> "Most workplace drug screens and tests target delta9-tetrahydrocannabinol (THC) and do not detect the presence of Cannabidiol (CBD) *or other legal natural hemp based constituents*. However, studies have shown that eating hemp foods and oils *can cause confirmed positive results* when screening urine and blood specimens. Accordingly, if you are subject to any form of drug testing, *we recommend (as does the United States Military) that you DO-NOT ingest our products*, and consult with your healthcare, drug screening/testing company or employer." Emphasis added.

11. As regularly required by his employer, Plaintiff Douglas Horn was subject to random drug testing (urine) over the years. Plaintiff passed these tests without incident over the 14 years he was a trucker. (Horn Affid. Para 15).

12. Douglas Horn did not, and has no employment or criminal history of smoking marijuana. (Horn Affid. Para 18).

13. On September 17, 2012, Plaintiff ordered the Defendants' "Dixie X CBD Dew Drops 500mg Tincture. Annexed hereto as Exhibit "4" is a copy of the paid invoice for this product. He then ingested it as directed. (Horn Affid. Para 20).

14. On October 9, 2012, as he had regularly done over the 14 years prior, Plaintiff Douglas Horn submitted to a required, random, urine drug test screening. Annexed hereto as Exhibit "5" is the confirmatory Report dated October 11, 2012. Plaintiff was confirmed for a positive test result for "marijuana metabolite" with a result of 29 ng/ml well over the cutoff concentration limit.

15. Almost immediately thereafter, Plaintiff was terminated from his career as a trucker, and referred to required drug education courses through a Substance Abuse Professional Evaluation program ("SAP"). (Horn Affid. Para 22).

16. Upon the positive test, on October 18, 2012, Plaintiff ordered another (unopened) batch of the Dew Drops tincture for the purpose of having it tested at a lab. (Horn Affid. Para 23).

17. On or around October 29, 2012, Plaintiff found the lab known as "EMSL Analytical, INC" for the purpose of confirming that the defendants' product he took contained THC. Annexed collectively hereto as Exhibit "6" are copies of the 1) the EMSL invoice to Plaintiff for this testing; 2) the Analysis confirming the Defendants' product had 170 ug/g of THC in it; and 3) EMSL's Chain of Custody document.

18. The EMSL lab confirmed the Defendants' product contained THC contrary to all of Defendants' advertising and promotional materials. Exhibit "6."

19. Annexed hereto as Exhibit "7" is the email Plaintiff received from the National Director at EMSL lab, Scott Van Etten. This email of November 8, 2012 states:

"Douglas,

>Your report is attached. Since the *sample contained THC,* I may not be able to return it to you as per our DEA registration. I am checking on that. I'll send you an email either way . . .." (Emphasis Added).

>and later that day at 3:27 p.m.

>"Douglas

>We can't return your sample."

20.     Annexed collectively hereto as Exhibit "8" are the Defendants' Certificates of Analysis that were produced to Defendants' expert witness Dr. Cindy Orser as a representative sampling of the testing Defendants allegedly conducted as to the product in question. Defendants' Certificates actually show the presence of an amount of .05% and .04% respectively of THC.

21.     Annexed hereto as Exhibit "9" are copies of the label on Defendants' tincture product that Plaintiff took and that which was tested, showing the absence of any reference to THC or Controlled Substances.

22.     Annexed hereto as Exhibit "10" is a copy of Dixie Elixirs and Edibles' (the "THC-infused products company") May 2, 2012 press release announcing their launch of the Dew Drops tincture product at issue, and their breaking new ground in the category of non-THC-infused products.

23.     Annexed hereto as Exhibit "11" is a copy of the Facebook post of Tamar Wise, former Chief Scientist at Defendant Medical Marijuana and Dixie Elixirs denouncing Defendants' products, stating "unfit for human consumption" and accusing Defendants a acting "criminal and dangerous."

24.     Defendants' Botanist expert Dr. Cindy Orser testified at her deposition on December 12, 2017. Relevant portions of her deposition transcript are annexed hereto as Exhibit "12." Dr. Orser stated the following:

>a) THC is "pretty amazing." (Orser Dep page 61: line 19);

b) Dr. Orser is an advocate of keeping THC in formulated cannabis products. (Orser 61:25);

c) THC is a key contributor to the effectiveness of cannabis. So removing THC from cannabis per se wouldn't make sense. (Orser 62:3-6);

d) Dr. Orser did not know the allowable amount of THC in industrial hemp or raw plant prior to the 2014 Farm Bill; (Orser 97:6, 99:2);

e) The Certificates of Analysis provided to Dr. Orser for her review do not correspond to the tincture product taken by Plaintiff. (Orser 153:14-18); those would have been useful. (Orser 153:19-22).

f) Dr. Orser asked for the particular Certificates of Analysis but learned "they do not exist," and Defendants did not have them. (Orser 153:23-25; 154:2-10).

g) Dr. Orser did not even know if what was represented on her Certificates of Analysis were a representative sample of the product Plaintiff took. (Orser 157:9-12).

h) In 2012, the .3% threshold she used did not apply. (Orser 158:2-10).

i) Dr. Orser could not say that her testimony was a relevant as to the measure of THC content in the product Plaintiff took. (Orser 159:15-22);

j) Dr. Orser did not review or even ask for batch records for the product. (Orser 160:6-19);

k) Dr. Orser found it unusual that she was given Certificates for a different product. (Orser 161:11-14);

l) Dr. Orser acknowledged *a detectable amount of THC as noted in Defendants' Certificate of Analysis*. (Orser 167:16-25; 168:2). See also Exhibit "8" annexed hereto and noted above.

m) Dr. Orser was never provided the product by the Defendants. (Orser 176:9-11).

      n) When Dr. Orser referenced a legal limit for THC of .3%, she was talking about for Colorado. (Orser 178:4-6); but she did not know of a federal maximum threshold for THC content in 2012. (Orser 178:14-17).

      o) Dr. Orser opined that the product Mr. Horn took was never tested at all by Defendants. (Orser 189:18-25, 190:2-13).

      p) Dr. Orser interpreted Defendants' FAQs to mean they knew there could be some THC, but they were now making efforts to have THC free products. (Orser 248:12-22).

25. Plaintiff's expert economist calculated the present value as of August 23, 2017 of Plaintiffs' damages from the loss of income to be $836,544. Annexed hereto as Exhibit "14" is a copy of that report.

26. Cindy testified that she never had any other employment from the date when she started to drive truck in 1999 except with her husband (Cindy Dep., 9: 14-19).

27. Cindy called the customer service number before purchasing the Product and asked if there was zero percent THC like it was specified on the website, and got confirmation that it was (*Id*. at 91: 8-14).

28. Cindy testified that the hemp product, that the Plaintiffs thought they purchased, "is not the same as marijuana" and "does not contain THC" (*Id*. at 143: 7-8).

29. She stated that she believed what the Defendants represented, that the Product contained zero percent THC and was hemp derived (*Id*. at lns 17-21).

30. As seen in the multiple media in which they advertised the product, the Defendants consistently represented that the products had "0% THC" that were "THC free" (Horn Affidavit at ¶17). After these "across the board" statements by the Defendants in the

magazine advertising, YouTube videos and FAQs, the Plaintiff thought he could take the product without jeopardizing the job (*Id.*).

31. The Plaintiff did not and has not smoked marijuana or been around it for the 14 years that he was a trucker and for the years prior thereto; and he has no employment history or criminal record showing any use of it (*Id.* at ¶18).

32. As an over-the-road trucker subject to random drug-test screenings, the Plaintiff was acutely aware that, in addition to being prohibited from smoking marijuana, he could not take any product with THC in it (*Id.* at ¶19). He was also aware that he was able to take products with Cannabinoids (CBD) in them (*Id.*). That is what he believed he was taking (*Id.*).

33. The Plaintiffs' expert, Dr. Kenneth Graham (Graham), is a Forensic Toxicologist with over twenty-five (25) years of experience in the field (Graham Aff., ¶1).

34. Graham was retained to evaluate the evidence and testimony involving the THC content of the product taken by the Plaintiff and the implications of it on a urine drug screen (*Id.* at ¶2). As a forensic toxicologist, he also opined on whether the product complied with federal statutes for controlled substances (*Id.*).

35. The presence of at least 170 ug/g (170/ppm) of tetrahydocannabinol (THC) measured by EMSL Analytical, Inc. (test date of November 6, 2012), in a Dixie X Elixir product containing a label quantity of 100 mg cannabidiol (CBD) significantly exceeded by 3.4-fold the 50 ppm THC concentration in hemp products used in experimental studies that demonstrated the ability of such products to produce a positive THC drug result (*Id.* at ¶6(b)).

36. The results provided in certificates of analysis (CoA) prepared by CannLabs, Inc. (test date of October 16, 2012), for a labeled 500 mg Dixie X Dew Drop product contended to represent the similar product originally purchased and consumed by the Plaintiffs indicates the

product contained 500 ug/g (500 ppm) THC, which significantly exceeded by 10-fold the 50 ppm THC concentration in hemp products used in experimental studies that demonstrated the ability of such products to produce a positive THC drug screen result (*Id*. at ¶6(c)).

37. Based on independent laboratory analysis and the certificate of analysis records provided by the Defendants, the product and similar Dixie products contained a measurable amount of THC (*Id*.a t ¶6(e)).  The product was asserted to have "0%" THC; public statements by the product's managing director proclaimed that the product "contains no THC" (*Id*.).  The claims were contradicted by measurable presence of THC in the products and represent false advertising under 15 U.S.C. 52 (*Id*.).

38. Since there was no evidence that indicated the Plaintiff has a history of either recreational or medicinal marijuana use, his exposure to THC from his daily use of the product for eight (8) days preceding his DOT urine sample collection on October 9, 2012, was the direct cause of his positive THC drug test result that led to his employment loss (*Id*. at ¶6(f)).

39. The product was launched in early 2012 and promoted as an imported industrial hemp-delivered wellness product and CBD-rich medicine containing either 100 mg or 500 mg of CBD and "0%" THC, suggesting that it was free of THC, the most psychoactive constituent contributing to the behavioral effects and toxicity of cannabis (*Id*. at ¶6(g)).

40. In 2012, federal law in the U.S. prohibited commercial farming of any variety of Cannabis Sativa, but allowed the importation and *industrial use of hemp* material if it maintained a THC content of less than 0.3% by weight (*Id*.).

41. The 0.3% limit <u>does not apply</u> to final product formulations [for human consumption] in which the presence of any amount of THC would render it a Schedule 1 controlled substance as described under 21 U.S.C. 1308.11 (*Id*.).

42. The Defendants have provided no applicable statute or citation or other reference to support the contention that the Dixie Elixir products complied with federal and state laws (*Id.*).

43. Despite a definition in many states of "CBD-only" product as having less than 0.3% or 0.5% THC, any product containing THC <u>*in any amount*</u> is considered marijuana and Schedule I controlled drug substance under 21 U.S.C. 1308.11 (*Id.*).

44. Though the product and similar Dixie products were derived from cannabis plant material that contained THC, the products would not be eligible for an exemption to a Schedule I classification under 21 U.S.C. 1308.35 since the products were formulated, marketed, and distributed for human consumption (*Id.*).

45. Despite recent decriminalization and compassionate medical use laws in some states, marijuana is not a benign drug and remains a Schedule I controlled substance under Federal law (*Id.* at ¶6(h)).

46. Since 170 ug/g (170 ppm) THC was measured by EMSL Analytical, Inc., in a Dixie H Elixir containing a labeled 100 mg CBD and 500 ug/g (500 ppm) THC was measured by CannLabs, Inc. in a Dixie X Dew Drop containing a labeled 500 mg CBD, those products and presumably similar Dixie products with differing lot numbers would be classified as Schedule I controlled substances under federal law (*Id.*).

47. Dixie Elixir company website content and public statements issued by the managing director of Dixie Elixirs and Edibles denote that Dixie X Elixirs are tested multiple times during the manufacturing process using both ISO17025 compliant testing facilities as well as cannabinoid testing facilities (*Id.* at ¶6(j)).

48.     If the product was testified for cannabinoid content during the manufacturing process as claimed, the results would have shown that the product contained a measurable quantity of THC, which would then classify the product as a DEA Schedule 1 substance under 21 U.S.C. 1308.35 (*Id.*).  Manufacturing process test results showing the presence of THC in the product formulation would signify that the advertising and public statements asserting that it contained no THC were false and may be unlawful under 15 U.S.C. 52 (*Id.*).

49.     If the formulation was not tested for cannabinoid content contrary to the Defendants would lack the knowledge to contend that their product contained no THC (*Id.*).

50.     As neither the Defendants nor the Plaintiffs were registered with the U.S. D.E.A., the distribution of a Schedule I substance such as Dixie X Elixir across state lines would be apparently unlawful under 21 U.S.C. 801-971 (*Id.* at ¶6(k)).  If the product was shipped through the domestic mail system, the distribution would seemingly be unlawful under 18 U.S.C. 1716 (*Id.*).  Additionally, the Defendants manufactured and distributed a controlled substance in violation of 21 U.S.C. 841 (*Id.*).

51.     As a Schedule I controlled substance under 21 U.S.C. 1308.35, the product was subject to specific packaging and labeling requirements under 21 U.S.C. 1302.03 (*Id.* at ¶6(l)).  Consequently, each commercial container of a controlled substance must contain a label providing definitive information of contents and bearing the symbol designating the schedule on which the product is listed (*Id.*).

52.     The product label for the product did not list THC as an ingredient or bear a symbol reflecting that it was a Schedule I controlled substance and, therefore, violated packaging and labeling requirements under federal law (*Id.*).  Without the required label content, the

Plaintiffs would not been able to make an informed decision about whether to use the Dixie X Elixir product (*Id*.).

53. In light of the foregoing, the claims that the product did not conflict with any federal law and that Medical Marijuana does not grow, sell, or distribute any substances that violate the law are false (*Id*. at ¶6(m)).

Dated: New York, New York
November 14, 2018

        KUPILLAS, UNGER & BENJAMIN, LLP.

        *Jeffrey Benjamin*

        By: Jeffrey Benjamin, Esq.
        Attorneys for Plaintiff
        5 Penn Plaza, 23rd Floor
        New York, NY 10001
        (212) 655-9536