# OPERATING AGREEMENT
## OF
## RED DICE HOLDINGS, LLC.

This **OPERATING AGREEMENT** dated as of the 5th day of April 2012 ("Effective Date"), by and between **Medical Marijuana Inc.,** an Oregon corporation ("MJNA Member") and **Dixie Holdings LLC, a/k/a Dixie Elixirs** (collectively herein, the "DIXIE Member").

## RECITAL

**WHEREAS,** MJNA is a company in the business of providing management, investment, consulting services and capital for legal hemp and cannabis based products and business; and

**WHEREAS,** DIXIE is a company that has licensing, trademarks, proprietary materials, formulations and services for certain legal hemp and cannabis based businesses and the related facilities and equipment to manufacture and distribute same; and

**WHEREAS,** MJNA Member and DIXIE Member desire to form an entity "Red Dice Holdings, LLC" ("Company") in which the parties will be the Members for the purposes set forth herein.

## ARTICLE 1
## DEFINITIONS AND INTERPRETATION

**1.1**   <u>Definitions</u>.  Where used in this Agreement, in addition to capitalized terms defined on first use herein, the following words or phrases shall have the meanings set forth below:

"Act" means the California Limited Liability Company Act, (Cal. Corp. Code §17050-1 ("Act"). By this Agreement, the Members enter into this Agreement in accordance with the laws of the State of California. The rights and obligations of the Members will be as stated in the applicable legislation of the Act, except as provided for herein.

"Affiliate" in relation to any Person means any Person that controls, is controlled by or is under common control with that Person. For the purposes of this definition, the term "control" means (i) beneficial and/or legal ownership of at least fifty percent (50%) or more of the outstanding voting securities of a company or other business organization with voting securities (or such percentage as required under any particular jurisdiction to confer controlling powers through ownership of voting securities broadly equivalent to the controlling powers attendant on ownership of at least fifty percent (50%) or more of outstanding voting securities in a United States corporation), (ii) a fifty percent (50%) or greater interest in the net assets or profits of a partnership or other business organization without voting securities.

"Agreement" means this Operating Agreement, together with the Exhibits attached hereto, each of which is hereby incorporated by reference herein, and any instrument amending this Agreement in accordance hereto.

"Asset Value" with respect to any Company asset means:



    (a)    The fair market value when contributed of any asset contributed to the Company by any Member;

    (b)    The fair market value on the date of distribution of any asset distributed by the Company to any Member as consideration for a capital interest in the Company;

    (c)    The fair market value of all Property at the time of the happening of any of the following events:  (A) the admission of a Member to, or the increase of a capital interest of an existing Member in, the Company in exchange for a Capital Contribution; or (B) the liquidation of the Company under Regulation Section 1.704-1(b)(2)(ii)(g); or

    (d)    The Basis of the asset in all other circumstances.

"Basis" with respect to an asset means the adjusted basis from time to time of such asset for federal income tax purposes.

"Books and Records" means all material communications between any Member or any of its Affiliates and governmental patent offices, the internal patent file and the invention disclosure documents of any Member or any of its Affiliates, or any such Affiliate's corporate intellectual property department, if any. Notwithstanding the foregoing or anything else contained in this Agreement.

"Capital Account" means an account to be maintained by the Company for each Member in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv).

"Capital Contributions" means, with respect to any Member, the fair market value of the money and the services, if any, and the initial fair market value of any Property (other than money or services) contributed to the Company by the Member.

"Code" shall mean the Internal Revenue Code of 1986 or corresponding provisions of subsequent superseding federal revenue laws.

"Confidential Information" means all information that would reasonably be regarded as of a confidential or commercially sensitive nature by the Party to which the information relates or the Party (or its relevant Affiliate) to whom the information belongs, including, without limitation, any matter relating to or arising in connection with this Agreement, the Transactions or the business or affairs of the Parties and their Affiliates.

"Effective Date" shall have the meaning set forth in the Preamble.

"Intellectual Property" shall include, but shall not be limited to all United States and foreign common law, registered and unregistered trademarks, trade names, trade dress, product specifications, copyrighted materials, patents, trade secrets, customer lists, and all rights associate therewith.

"Manager" initially means Vincent M. Keber, III, in his capacity as the Manager of the Company and such other Persons serving as managers of the Company from time to time.

"Management Committee" shall have the meaning set forth in Section 9.2



"Member" means a Person executing this Agreement from time to time during the existence of the Company as a member of the Company with a Membership Interest on the basis provided herein.

"Membership Interests" " means, subject to the specific rights, benefits, and obligations granted to Members in this Agreement, the interest of a Member in the Company, including without limitation rights to distributions (liquidating or otherwise), allocations, information and to consent to or approve matters pertaining to the Company and such other matters with respect to the Company as expressly provided herein.

"Party" or "Parties" means DIXIE Member or MJNA Member or, as the context requires or admits, both DIXIE Member and MJNA Member.

"Person" shall mean any individual or entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such Person where the context so permits.

"Proceeds" mean monetary proceeds or any other liquid asset of any kind received by the Company from any means whatsoever, before payment of any expenses, fees or charges of any kind.

"Profits" and "Losses" for any Fiscal Year or other period means an amount equal to the Company's taxable income or loss for such year or period determined in accordance with Code Section 703(a) and the Regulations thereunder with the following adjustments:

(a) All items of income, gain, loss and deduction of the Company required to be stated separately shall be included in taxable income or loss;

(b) Income of the Company exempt from federal income tax shall be treated as taxable income;

(c) expenditures of the Company described in Code Section 705(a)(2)(B) or treated as such expenditures under Regulation Section 1.704-1(b)(2)(iv)(i) shall be subtracted from taxable income;

(d) The difference between Basis and Asset Value shall be treated as gain or loss upon the happening of any event described in clauses (i), (ii) or (iii) of the definition of Asset Value;

(e) Gain or loss resulting from the disposition of Property on which gain or loss is recognized for federal income tax purposes shall be determined with reference to the Asset Value of such Property;

(f) Depreciation shall be determined in accordance with Treasury Regulations §1.704-1(b)(2)(iv)(g)(3) based upon Asset Value instead of as determined for federal income tax purposes; and

"Property" means all real and personal property, tangible and intangible, owned by the Company.



"Treasury Regulations" means the Treasury Regulations promulgated under or otherwise applicable to the Code.

## ARTICLE 2
## ORGANIZATION

**2.1** <u>Formation</u>. The Company has been/will be formed as a limited liability company under and pursuant to the provisions of the Act by the filing of the Articles of Organization with the Secretary of State of the State of California. The rights and liabilities of the Members shall be as provided under the Act, the Articles of Organization and this Agreement. Each Member hereby acknowledges that it has carefully reviewed the Articles of Organization and that each of the provisions of the Articles of Organization is acceptable to such Member.

**2.2** <u>Name</u>. The name of the Company is **Red Dice Holdings, LLC,** formation documents shall be attached as *Exhibit A.* which shall be formed and affixed within thirty (30) days from Effective date.

**2.3** <u>Term</u>. The Company shall exist perpetually unless otherwise specified in the Articles of Organization, or unless sooner terminated in accordance with this Agreement.

**2.4** <u>Purposes/Company Business</u>. The purposes of the Company are to engage in any activity and/or business for which limited liability companies may be formed under the Act (including the Company Business as defined in Section 2.1). The Company shall have all the powers necessary or convenient to affect any purpose for which it is formed, including all powers granted by the Act.

**2.5** <u>No State-Law Partnership</u>. No provision of this Agreement shall be deemed or construed to constitute the Company a partnership of the Members (including, without limitation, a limited partnership) for any purposes other than federal and state tax purposes, if any.

**2.6** <u>Assumed Names</u>. The Management Committee may cause the Company to do business under one or more assumed names.

**2.7** <u>Registered Agent; Principal Offices; Other Offices</u>. The statutory registered agent of the Company in the State of California shall be Michelle L. Sides, Esq., or such other Person or Persons as the Management Committee may designate from time to time in the manner provided by law. The address for the registered agent of the Company shall be 2665 Ariane Drive, Suite 207, San Diego, California 92117 until otherwise designated by the Management Committee. The principal office of the Company in the State of California, and shall initially shall be at 2665 Ariane Drive, Suite 207, San Diego, California 92117 or at such place within the state of California as the Management Committee may designate from time to time, and the Company shall maintain records there as required by the Act. The Company may have such other offices within the state of California as the Management Committee may designate from time to time.

## ARTICLE 3
## BUSINESS OF THE COMPANY

**3.1** <u>The Company Business</u>. The Company will provide management and consulting services as well as acquire future projects that will provide value and benefit to the Company and

each Member shall act in a manner consistent with the Company objectives (collectively the "Company Business"). More specific terms of business structuring and distributions are as follows:

**3.2    Guarantees.** No Member shall be required to provide guarantees from its affiliated entities and Persons as it pertains to acquiring the Project.

**3.3    Unrelated Business(es).** Neither Member shall have any ownership in the individual businesses, subsidiaries and/or affiliates of the other Member.

## ARTICLE 4
## CAPITAL CONTRIBUTIONS

**4.1    Capital Account Balances.** Upon execution of this Agreement the balance in each of the Members' Capital Accounts shall be as set forth on *Exhibit B.*

**4.2    Membership Interests.** Each of the Members shall have the Membership Interests specified on *Exhibit B.*

**4.3    Capital Contributions.** The Capital Contributions to the Company shall be contributed in cash, performance, property or other approved methods as by the Members as follows: a separate Capital Account shall be maintained for each Member. Neither Member shall withdraw any part of its Capital Account. Upon the demand of either Member, the Capital Accounts of the Members shall be maintained at all times in the proportions in which the Members share in the Profits and Losses of the Membership Interests.

**4.4    Profit and Losses.** The net Profits of the Company shall be divided proportionately between the Members and the net Losses shall be borne equally by them as per the Membership Interest percentage. A separate income account shall be maintained for each Member. Profits and Losses shall be charged or credited to the separate income account of each Member. If a Member has no credit balance in his income account, losses shall be charged to its capital account.

**4.5    Additional Capital Contributions.** Upon the unanimous consent of the Management Committee, each Member shall contribute its pro rata portion of all additional capital necessary to conduct the Company Business, as set forth expressly in the preliminary budget and each subsequent budget or as the Management Committee may otherwise agree is necessary ("Additional Capital Contributions"). Upon thirty (30) days written notice by the Management Committee of a demand for additional capital, each of the then-Members shall contribute, in proportion to their respective Membership Interests, such additional capital contributions to the Company as determined by the Management Committee.

**4.6    Interest.** Except as may be expressly set forth herein, no interest shall be paid by the Company on Capital Contributions or on balances in Members' Capital Accounts.

**4.7    Loans From Members.** Loans by a Member to the Company shall not be considered capital contributions. Unless otherwise agreed by all of the Members, if any Member shall advance funds to the Company, the making of such advances shall not result in any increase in the amount of the Capital Account of such Member. The amounts of any such advances shall be

a debt of the Company to such Member and shall be payable or collectible only out of the Company assets in accordance with the terms and conditions upon which such advances are made. The repayment of loans from a Member to the Company upon liquidation shall be subject to the order of priority provided in Section 9.4.

**4.8    Capital Accounts.**

(a) A separate Capital Account shall be maintained for each Member. The beginning Capital Accounts for the Members shall consist of the Total Value of their respective Initial Capital Contributions. In all other instances, the beginning Capital Account for a Member shall consist of the Total Value of property or services actually contributed by that Member to the capital of the Company; however the Member percentages shall not exceed the percentages identified on *Exhibit B.* without unanimous consent of the Members. The Capital Accounts of the Members shall be:

(i)  increased by:

(A)    the amount of the Member's cash or other contributions to the Company;

(B)    the initial Asset Value of Property contributed by the Member to the Company, net of liabilities secured by the Property that the Company is considered to assume under or take subject to in accordance with Code Section 752; and

(C)    the Member's distributive share of Profits and any items of income or gain allocated to the Member; and

(ii) decreased by:

(A)    cash or other distributions to the Member from the Company;

(B)    the Asset Value of Property distributed in kind to the Member, net of liabilities secured by the Property that the Member is deemed to assume under or take subject to in accordance with Code Section 752; and

(C)    the Member's distributive share of Losses and any items of loss or deduction allocated to the Member.

(b) The maintenance of Capital Accounts shall be subject to the following special rules:

(i) a Member's Capital Account shall not be credited for any Capital Contribution which the Member is obligated to make until the contribution is actually made or deemed to have been made;



(ii) if a Member transfers all or any portion of its Membership Interest in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Membership Interest;

(iii)if the Asset Value of Company assets are adjusted as provided in the definition of "Asset Value" above, the Capital Accounts of all Members shall be adjusted simultaneously to reflect the aggregate net adjustment which would have occurred if the Company recognized gain or loss equal to the amount of such aggregate net adjustment and such gain or loss was allocated to the Members in the manner required by Section 5 below;

(c) the provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulation Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with its provisions. To the extent that this Agreement is inconsistent with or incomplete with respect to the Treasury Regulations, the Capital Accounts of the Members shall be maintained in accordance with the Treasury Regulations.

### ARTICLE 5
### MEMBERS

**5.1**    **Members.**  The sole Members of the Company on the Effective Date are the MJNA Member and DIXIE Member.  The addresses of each Member are set forth on **Exhibit ___**. Beginning with the Effective Date, and for a period of one year there are no other Members of the Company and no other Person has any right to take part in the ownership of the Company unless approved in writing by all Members.

**5.2**    **Admission of Additional Members.**  Additional Members of the Company may be added only if: (a) except as provided in Section 5.5, the addition of any such proposed additional Member is approved unanimously in writing, prior to such admission, by all the then existing Members; (b) such proposed additional Member executes and delivers to the Company and each of the Members a counterpart of this Agreement and agrees to be bound by all of the terms and provisions hereof.

**5.3**    **Authority; Liability to Third Parties.**  Except as otherwise expressly provided herein, only MJNA Member and DIXIE Member has the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditures on behalf of the Company as per approved budget(s).  No Member has the authority or power to make any representation, warranty or create any liability for any other Member without such other Member's prior written consent, and the Company has no such authority or power with respect to any Member.  No Member shall be liable for the debts, obligations or liabilities of the Company, including under a judgment, decree or court order.

**5.4**    **Effect of Bankruptcy, Dissolution, Etc. of a Member.**  The bankruptcy, dissolution, liquidation, or termination of a Member shall not cause the termination or dissolution of the Company and the business of the Company shall continue.  Upon any such occurrence, the



trustee, receiver, executor, administrator, committee, guardian or conservator of such Member shall have all the rights of such Member for the purpose of settling or managing its estate or property, subject to satisfying conditions precedent to the admission of such assignee as a substitute Member. The transfer by such trustee, receiver, executor, administrator, committee, guardian or conservator of any Member Interest shall be subject to all of the restrictions, hereunder to which such transfer would have been subject if such transfer had been made by such bankrupt, dissolved, liquidated, or terminated Member.

**5.5** **Transfer of Membership Interests.** No Member shall, directly or indirectly, transfer any Membership Interest to any Person except with the written consent of all other Members.

**5.6** **Voluntary Termination.** The Membership may be dissolved at any time by the unanimous agreement of the Members, in which event the Members shall proceed with reasonable promptness to liquidate the business of the Membership. The Membership name shall be sold with the other assets of the business. The assets of the Membership business shall be used and distributed in the following order: (a) to pay or provide for the payment of all Membership liabilities and liquidating expenses and obligations; (b) to equalize the income accounts of the Members; (c) to discharge the balance of the income accounts of the Members; (d) to equalize the capital accounts of the Members; and (e) to discharge the balance of the capital accounts of the Members.

**5.7** **Matters Subject to Member Approval.** MJNA Member and DIXIE Member shall be the only Members with authority to act regarding any day to day decisions made, obligation incurred or power exercised by or on behalf of the Company as per approved budget(s). Unanimous Member Consent must be obtained with respect to any of the following:

> (a) Execute any and all documentation required to close any transaction without written approval or authorization.

> (b) the lease, license, transfer or encumbrance of all or substantially all of its assets;

> (c) any reorganization, merger, consolidation or similar transaction or series of related transactions involving the Company;

> (d) any voluntary liquidation or dissolution, other than as a result of the expiration or termination of this Agreement pursuant to the terms hereof;

> (e) any (i) admission in writing to its inability generally to pay its debts as they become due; (ii) general assignment, arrangement or composition with or for the benefit of its creditors; (iii) institution of a proceeding seeking a judgment of insolvency or bankruptcy or any other similar relief, or petition for the winding up or liquidation of the Company; or (iv) seeking or appointing of an administrator, receiver, conservator, trustee, custodian or other similar official for the Company or for all or substantially all of its assets;

> (f) any split, combination or reclassification of any Membership Interests;

(g) the declaration, setting aside or making of any distributions (whether in cash or property) to any Member, except for any payments with respect to debt owed to a Member or payments or distributions specifically required under this Agreement;

(h) except as expressly set forth in this Agreement, the issuance of any additional Membership Interests or other equity interests (including any interests convertible into or exercisable for equity interests) of the Company, or the admission of any Person as a Member of the Company;

(i) the expansion into lines of business or the conduct of any business other than the Company Business;

(j) entry by the Company or any of its subsidiaries into any joint ventures or partnerships or establishment of any subsidiaries;

(k) any action that would cause the Company to become a party to or bound by any agreement that, by its terms (i) directly or indirectly restricts or prevents the Company's performance of the Company Business, such as a non-compete or an exclusivity agreement or (ii) directly obligates any Member or any of its Affiliates to take or not take any action;

(l) any action that would cause the Company or any of its Subsidiaries to become subject to the registration or reporting requirements of the Securities Act, the Exchange Act or any similar securities laws of any other jurisdiction; the granting of any registration rights to any Person; or the listing of any securities on any securities exchange or over-the-counter trading system; or

(m) a change to the Company's name or amendment or modification of the Articles of Organization of the Company, this Agreement, including any change in the purposes of the Company.

**5.8     No Resignation of a Member.** No Member shall resign, withdraw, retire or otherwise take any action to effect any of the foregoing.

**5.9     Transactions with Members and their Affiliates.** The Company shall not enter into, amend, modify or subject to waiver of any provision of any transaction or contract, or series of related transactions and contracts, with any Member or any Affiliate of any Member, except as otherwise provided herein or with the approval of the Management Committee.

**5.10     Other Business.** The DIXIE Member may engage in or possess interests in other business ventures that are unconnected, unrelated and do not in any way compete with the Company which is further identified in the NonCompete Agreement(s) attached as *Exhibit C.*

**5.11     Meetings of Members.**

(a) Meetings of the Members may be called by Members holding among them at least 40% of the issued and outstanding Membership Interests by written notice thereof

(specifying the place and time of such meeting) that is delivered to each other Member at least six days prior to such meeting. Neither the business to be transacted at, nor the purpose of, such special meeting need be specified in the written notice (or waiver of notice) thereof. Unless otherwise expressly provided in this Agreement, at any meeting of the Members, a 75% of the outstanding Membership Interests represented either in person or by proxy, shall constitute a quorum. At all meetings of the Members at which a quorum of eligible Members is present, except as otherwise may be required by this Agreement, the affirmative vote of Members holding 75% of the eligible outstanding Membership Interests shall constitute the act of the Members. Each Member may, with respect to any vote, consent, or approval that it is entitled to grant pursuant to this Agreement, grant or withhold such vote, consent or approval in its sole discretion.

**5.12**   **Provisions Applicable to All Meetings.**

(a) Any meeting shall be held at the principal place of business of the Company, unless the notice of such meeting specifies a different place.

(b) Attendance in person or in the case of a Member which is not a natural person, by a principal or agent in person at a meeting shall constitute a waiver of notice of such meeting.

(c) A Member may vote at such meeting by a written proxy executed by that Member and delivered to another Member. A proxy shall be revocable unless it is stated to be irrevocable.

(d) No action may be taken by Members at a meeting or otherwise unless the right to take such action is (i) expressly provided for in this Agreement or (ii) required under the Act or other applicable law.

(e) Any action required or permitted to be taken at a meeting may be taken without a meeting, without prior notice and without a vote if a consent or consents in writing, setting forth the action so taken, is signed by the Members having not fewer than the minimum number of Membership Interests or votes that would be necessary to take the action at a meeting at which all Members entitled to vote on the action were present and voted; provided that, in the event the action by written consent is taken by less than all of the Members, the Manager shall promptly provide all Members with written notice of such action.

(f) Members may participate in and hold such meeting by means of conference telephone, video conference or similar communications equipment by means of which all Persons participating in the meeting can hear each other.

### ARTICLE 6
### ALLOCATIONS AND DISTRIBUTIONS

**6.1**   **Allocation of Income and Loss.**

(a)     Taxable income shall be allocated each fiscal year to the Members in accordance with their respective Membership Interests in the Company.

(b)     Losses shall be allocated to each of the Members in accordance with their respective Membership Interests in the Company.

(c)     To the extent required, allocations shall be made in accordance with Section 704(c) of the Code, and the amount of depreciation, gain or loss with respect to the Company's property shall be computed with reference to the Asset Value of the Property rather than its adjusted basis, but only to the extent required under applicable Treasury Regulations.

**6.2    Determination of Income and Loss.**  At the end of each fiscal year of the Company, income, gain, loss, deduction and credit (or items thereof) shall be determined for the accounting period then ending and shall be allocated to the Members as provided herein.

**6.3    Cash Distributions.**  The distributable cash of the Company shall be determined at least annually by the Management Committee, by the percentage set forth by *Exhibit B* herein. All distributions of cash or other assets of the Company shall be made and paid to the Members pro rata in accordance with such Members' Interests.

## ARTICLE 7.
## OWNERSHIP OF COMPANY PROPERTY

All Company Property transferred and/or acquired by the Company shall be owned by the Company as an entity; no Member or Manager, individually or collectively, shall have any ownership interest in such Company Property, or any portion thereof; and each Member's Membership Interest shall be personal property for all purposes.  At all times after the Closing Date, the Company shall hold title to all of the Company Property in the name of the Company and not in the name of any Member or Manager.  All Company Property shall be recorded as the property of the Company or one of its Subsidiaries on the books and records of the Company, irrespective of the name in which legal title to such Company Property is held.

## ARTICLE 8
## FISCAL MATTERS; BOOKS AND RECORDS

**8.1    Bank Accounts; Investments.**  Capital Contributions, revenues and any other Company funds shall be deposited by the Company in a bank account established in the name of the Company in furtherance of the purposes of the Company.  Funds deposited in the Company's bank accounts may be withdrawn only to be invested in furtherance of the Company's express and previously authorized purposes, to pay Company debts or obligations or to be distributed to the Members pursuant to this Agreement.

**8.2    Records Required by Act; Right of Inspection.**

(a)  Records Required.   During the term of the Company, the Management Committee, at the expense of the Company, shall maintain in the Company's principal office all records required to be kept pursuant to the Act, including a current list of the names, addresses and Membership Interests held by each of the



Agreement with Left Bank, LLC and shall be attached as *Exhibit E* which shall be affixed within thirty (30) days from the Effective Date.

(c) DIXIE Member shall provide standard legal indemnifications for all trademarks and/or licensing agreements transferred into the Company pursuant to an assignment agreement;

(d) DIXIE Member use its best efforts to acquire new licensing, trademarks and/or patents as determined and approved by the Company to be held in the Company name;

(e) Manager shall be responsible for the management of all sales, marketing, promotions and related matters for the Company. All media shall be approved in writing within three business days by both Members prior to any distribution of any kind; provided, however, a Member's failure to approve or disapprove such media within three business days shall be deemed the express such Members approval;

(f) DIXIE Member shall execute a NonCompete Agreement with the Company including, but not limited to its products, services, marketing, business plans, financials, investor relations and other Confidential Information as defined within said NonCompete Agreement. The NonCompete Agreement is attached as *Exhibit C.*

(g) DIXIE Member shall cause Vincent M. Keber, III and Charles Smith to both execute mutually agreed upon Employment contracts with the Company. Employment Agreements for Vincent M. Keber, III and Charles Smith are attached as *Exhibit F.*

(h) DIXIE Member shall provide the Company with an Exclusive Licensing Agreement for all products held by and/or to be acquired by the Company and licensed to Left Bank, LLC (or other entities to be identified in the future by the Management Committee) to be the sole manufacturer and distributor of said products. The Exclusive Licensing Agreement is attached as *Exhibit E.*

(i) Manager shall prepare monthly budget reports for the Company to be reviewed, modified and approved by the Members.

(j) Manager shall run the day to day operations of the Company.

(k) MJNA Member shall contribute 24,166,667 unrestricted shares of common stock of ("MJNA Shares") of Medical Marijuana, Inc., an Oregon corporation, valued at a price per share of $0.06 subject to the Company reaching certain milestones pursuant to that certain Funding Agreement dated as of the Effective Date ("the "Funding Agreement") attached as *Exhibit G.* MJNA does not guarantee that the cost per share to be $0.06 as valuation is determined upon liquidation. MJNA Member represents and warrants that the MJNA Shares shall be seasoned, free trading shares of common stock and the Company shall be



permitted to sell such MJNA Shares in the public market as provided for herein and contingent upon certain stated Milestones being achieved. MJNA Member further represents and warrants to the Company and DIXIE Member that the MJNA Shares contributed to the Company in exchange for Membership Interests of the Company are not deemed "control stock" as such term is defined under the SEC Regulations. The MJNA Shares, issued in the name of Red Dice Holdings, LLC, shall be placed in a mutually acceptable escrow account within fifteen (15) business days from the Effective Date.

(1).     The MJNA Shares, at the direction of the Management Committee, shall be sold and the Proceeds allocated as follows:

(A) At Closing, the Company shall sell Two Hundred Fifty Thousand Dollars ($250,000) (exclusive of broker's fees) in MJNA Shares and the Proceeds to the Company shall be tendered for payments as follows:
    (i) $50,000 to be released for DIXIE Member employee incentives;
    (ii) $150,000 for the payment of DIXIE Member investor debts;
    (iii) $50,000 for the payment of DIXIE Member short term account payables;

(B) At Milestone 1, which is contingent on Left Bank, LLC, on behalf of Pharmasphere, sourcing and obtaining required location and lease for the facility, signing a lease agreement for the facility and maintaining the required licensing, the Company shall sell Two Hundred Fifty Thousand Dollars ($250,000) (exclusive of broker's fees) in MJNA Shares and the Proceeds to the Company shall be tendered for payments as follows:
    (i) $50,000 to Vincent M. Keber, III
    (ii) $50,000 to Charles Smith
    (iii) $150,000 for the payment of DIXIE Member investor debts.

(C) At Milestone 2, which is contingent upon the successful integration of a new product offering (such as medicated chewing gum) or any other product currently controlled by MJNA Member, into the operations of the Company including defining the manufacturing, packaging and marketing requirements necessary for product launch, the Company shall sell One Hundred Thousand Dollars ($100,000) in MJNA Shares and the Proceeds to the Company shall be tendered for payments as follows:
    (i) $100,000 to DIXIE Member for the purpose of repaying debt to affiliated companies.



(D) The balance of Eight Hundred Fifty Thousand ($850,000) in MJNA Shares allocated herein, less all brokerage fees incurred from any liquidation of shares and based upon all contingencies stated in sections (n)(i), (n)(ii) and (n)(iii) being fulfilled, shall be used solely as working capital for operations of the Company including but not limited to operations, licensing, research/development and marketing as approved in writing by the Management Committee in the operations budget.

(l)   Upon the Closing, both Vincent M. Keber, III and Charles Smith shall each receive $100,000 worth of MJNA common stock warrants priced at $0.06 per share attached as *Exhibit H.*

(m) MJNA Member shall license the Company with the TerraSphere grow technology and shall provide management of said new equipment pursuant to a Licensing Agreement with MJNA which shall be affixed as *Exhibit I* within ninety (90) days from Effective Date. MJNA Member shall provide standard legal indemnifications for such license;

(n) MJNA Member shall assist in locating and performing due diligence on any new product lines and additional facilities and state licensed businesses within the industry that shall be approved by the Company.

(o) MJNA Member shall provide website management for the Company.

(p) Each approved Company project shall be identified, approved by the Management Committee. The Management Committee is required to approve all new acquisitions and product lines and all budgeting matters. An approved initial operational budget is attached as *Exhibit J* which shall be afffied within sixty (60) days from the Effective Date.

**9.2**   **Management Committee.** Except as otherwise expressly provided in this Agreement, the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, a Management Committee (the "Management Committee") as described herein.

**9.3**   **Management Committee Stale Mate.** In the event the Members are unable to be unanimous in any decision required to be unanimous, the Members shall mutually agree to designate an independent third party to be retained, and paid for by the Company, to provide the decision in the best interest of the Company. Both Members shall abide by the final decision of the independent third party.

**9.4**   **Composition of the Management Committee.** The Management Committee shall consist of two individuals. DIXIE Member and MJNA Member shall be entitled to appoint one individual to the Management Committee. Initially, the members of the Management Committee consist of Vincent M. Keber, III and Michael R. Llamas or Michael Mona II.



**9.5   General Powers of the Management Committee**.   Except for those actions expressly reserved for the Manager and Members (individually or as a group) as provided in this Agreement, no act shall be taken, sum expended, decision made, obligation incurred or power exercised by or on behalf of the Company with respect to any of the following without the written approval of the Management Committee and as per approved budget(s):

(a) the appointment or replacement of any officer of the Company;

(b) incur or amend any indebtedness on behalf of the Company;

(c) entry into, termination or amendment of any material contract, or any material election of rights or remedies or any other material decision or determination, or the granting of any material waivers or consents, under any material contract; for purposes of this Section 9.3(c) a material contract includes any contract which is reasonably expected to provide for the making of payments by the Company in any calendar year of greater than $50,000 (unless the payment for a particular contract in excess of such $50,000 threshold is expressly provided for in the Company's budget);

(d) termination or amendment of any material governmental approval, authorization, license or permit;

(e) institution, compromise or settlement of any material litigation or arbitration proceeding, or settlement of any insurance claim for an amount in excess of fifty thousand dollars ($50,000);

(f) except as expressly provided in the Company's budget, the creation, incurrence, or assumption of any indebtedness of the Company for borrowed money;

(g) distributions other than a distribution in connection with the dissolution and liquidation of the Company;

(h) approval of the Company's budgets;

(i) selection of the Company's accountants;

(j) creation or incurrence of any lien or encumbrance on any asset of the Company,

(k) any transfer or license of any of intellectual property rights of the Company;

(l) establishment of any reserves from Company funds, including reserves with respect to Company operations and reserves for the payment of Company obligations;

(m) the purchase or acquisition of any equity securities (or any securities convertible into or exercisable for any equity securities) of any Person;



(n) the purchase or acquisition, directly or indirectly, of any assets in a transaction or series of related transactions for consideration (including assumed liabilities and indebtedness) in excess of one hundred thousand dollars ($100,000); or

(o) entry into any contract or agreement to take any of the foregoing actions.

**9.6   Place of Meetings.**  Meetings of the Management Committee shall be held at the principal office of the Company as provided herein, or at such other place as may be designated by the Management Committee.  The individuals serving on the Management Committee may appoint from among themselves a chairperson to preside at meetings of the Management Committee. Any individual shall be permitted to attend any meeting of the Management Committee in person or by conference call pursuant to Section 9.14.

**9.7   Regular Meetings.**  The Management Committee shall meet at least quarterly.  No notice need be given of regular meetings that the Management Committee previously has designated a time and place for the meeting.

**9.8   Special Meetings.**  Special meetings of the Management Committee may be held at any time upon the request of at least one (1) of the members of the Management Committee.  A notice of any special meeting shall be sent to the last known address of each member at least seven (7)) days before the meeting.  Notice of the time, place and purpose of such meeting may be waived in writing before or after such meeting, and shall be equivalent to the giving of notice. Attendance of a member at such meeting shall also constitute a waiver of notice thereof, except where such member attends for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened.  Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Management Committee need be specified in the notice or waiver of notice of such meeting.  The members of the Management Committee shall cooperate and use their reasonable best efforts to schedule meetings at times and places that will maximize attendance.

**9.9   Quorum of and Action by the Management Committee.**  The presence, in person or by conference call, of at least two (2) members of the Management Committee shall constitute a quorum for the transaction of business at any meeting of the Management Committee constituting at least one (1) designated by MJNA Member and one (1) designated by DIXIE Member.  Each member shall be entitled to one vote.  Except as otherwise expressly provided in this Agreement, any action to be taken or approved by the Management Committee hereunder must be taken or approved by majority of the Management Committee and any action so taken or approved shall constitute the act of the Management Committee.

**9.10   No Compensation.**  The members of the Management Committee shall serve in such capacity without compensation by the Company.  The members of the Management Committee will be entitled to reimbursement from the Company for their out-of-pocket expenses incurred in attending any meeting.

**9.11   Resignation and Removal.**  Any member of the Management Committee may resign at any time by giving notice to the Company and the Member that designated such individual. Such resignation shall be made in writing and shall take effect upon the resignation date



designated in the notice, or if no such date is designated, upon the earlier of the receipt of such notice of resignation by the remaining members of the Management Committee or the time such individual is replaced by the Member that designated such individual. Any individual serving on the Management Committee by designation of a Member may be removed, either with or without cause, only upon the written request of such Member. Any such removal shall be effective upon the removal date designated in the request, or if no such date is designated, upon the receipt of such request by the Company and by such individual.

**9.12  Vacancies.**  Any vacancy occurring with respect to an individual serving on the Management Committee by designation of a Member shall be replaced by that Member pursuant to Section 9.3.

**9.13  Action by Written Consent.**  Any action that may be taken at a meeting of the Management Committee may be taken without a meeting if a consent in writing, setting forth the action to be taken, shall be signed by the Members. No notice shall be required in connection with the use of a written consent pursuant to this Section.

**9.14  Standard of Care.**  Every Person serving on the Management Committee shall discharge his or her duties as a Manager in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances.

**9.15  Conference Telephone Meetings.**  Meetings of the Management Committee may be held by means of conference telephone or similar communications equipment so long as all persons participating in the meeting can hear each other. Participation in a meeting by means of conference telephone shall constitute presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business at such meeting on the ground that the meeting is not lawfully called or convened.

**9.16  Employment of Others.**  The Management Committee shall be authorized to appoint, employ, or contract with, at the expense of the Company, any Person it may deem necessary or desirable for the transaction of the business of the Company as per approved budget.

**9.17  Indemnification.**  Notwithstanding the foregoing, the Company shall indemnify, save harmless and pay all judgments arising against the Management Committee and its members, directors, officers, employees and agents from any cost, expense, claim, liability or damage incurred by reason of such Person's relationship to the Company or any act performed or omitted to be performed by them in connection with this Article 9 or the business of the Company, including attorney's fees and costs incurred by them in connection with the defense of any action based on any such act or omission, which attorneys' fees and costs may be paid as incurred, including all such liabilities under any Federal or state securities act (including the Securities Act of 1933, as amended) as permitted by law, except that the Company shall have no indemnification obligation hereunder with respect to any act or omission of any Person that constitutes willful misconduct, gross negligence, or was outside the scope of such Person's authority under this Article 9. All judgments against the Company with respect to which any Person is entitled to indemnification may only be satisfied from the Company's assets. Any Person entitled to be indemnified hereunder shall also be entitled to recover its attorney's fees and costs of enforcing this indemnity from the Company's assets. This section shall survive

termination of the Agreement. Any suit and/or action filed relating to this Agreement against an action or inaction of MJNA Member shall be the sole financial responsibility to defend said action and/or claim of the MJNA Member and shall indemnify DIXIE Member of same. Any suit and/or action filed relating to this Agreement against an action or inaction of DIXIE Member shall be the sole financial responsibility to defend said action and/or claim of the DIXIE Member and shall indemnify MJNA Member of same.

## ARTICLE 10
### INFORMATION AND CONFIDENTIALITY

**10.1    Information.** In addition to the other rights specifically set forth in this Agreement, each Member is entitled to all information to which that Member is entitled to have access pursuant to the Act under the circumstances and subject to the conditions therein stated.

**10.2    Confidentiality.** Each Member acknowledges that, from time to time, it may receive information from or regarding the Company or the other Member that is confidential in nature. Each Member shall hold in strict confidence any confidential information it receives regarding the Company or the other Member and may not disclose it to any Person, except for disclosures (i) compelled by law (but the Member must notify the Management Committee promptly of any request for that information, before disclosing it if practicable), (ii) to advisers or representatives of the Member or Persons to which that Member's Interest may be transferred as permitted by this Agreement, but only if the recipients have agreed to be bound by the provisions of this Article, or (iii) of information that Member has also received from a source independent of the Company that the Member reasonably believes obtained the information without breach of confidentiality. The Members acknowledge that breach of the provisions of this Article may cause irreparable injury to the Company for which monetary damages are inadequate, difficult to compute, or both. Accordingly, the Members agree that the provisions of this Article may be enforced by specific performance.

## ARTICLE 11
### TERMINATION; WINDING UP

**11.1    Termination.** At any time after the date hereof, the Members may unanimously agree in writing to terminate this Agreement, without cost or penalty. The effective date of termination under this Section 11.1 shall be the date on which the Members unanimously agree in writing.

**11.2  Mandatory Offer to Sell.**

> (a) Purchase Event. For purposes of this Agreement, any one of the following events shall constitute a "Purchase Event":
>
> > (i) The insolvency of a Member or the making of an assignment for the benefit of creditors by the Member or the filing of a petition in bankruptcy by or against the Member, or the distribution or transfer of the Units, in whole or in part, to a spouse or third party by virtue of a decree of dissolution of the Member's marriage or other order of a court.



(ii) The commission of any act by a Member, directly or indirectly including through a third-party, which involves theft, embezzlement, fraud, or other act of moral turpitude or criminal act (exclusive of misdemeanors or infractions), committed against the Company, its clients, employees, shareholders or affiliates, or against any third-party if the Management Committee reasonably believes said acts will damage or adversely affect the Company and its operations.

**11.3  Purchase Price in Case of Insolvency or Wrongful Conduct.**  If the Purchase Event is an event set forth herein, the per price at which the Member Interest shall calculated as (.50) multiplied by the Company's average earnings before income taxes ("EBIT") over the 3 fiscal years immediately preceding the date of the Purchase Event (or the average EBIT for those fiscal years that the Company has been in existence if less than 3 fiscal years).  The average EBIT of the Company shall be computed by the then outside accountant for the Company based on generally accepted accounting principles.

**11.4  Purchase Price for Voluntary Termination – First Right of Refusal.**  If the Purchase Event is an event set forth herein, the per price at which the Member Interest shall calculated as (.75) multiplied by the Company's average earnings before income taxes ("EBIT") over the 5 fiscal years immediately preceding the date of the Purchase Event (or the average EBIT for those fiscal years that the Company has been in existence if less than 5 fiscal years).  The average EBIT of the Company shall be computed by the then accountant for the Company based on generally accepted accounting principles.

**11.5  Method and Time of Payment.**  The purchase price shall be paid to the selling Member under Section 11.3 and Section 11.4 is as follows: (i) as the Parties agree, or (ii) if they cannot agree, then at the option of the purchasing Member(s) or Company, over a period of thirty-six (36) months following the occurrence of any Purchase Event, with the principal unpaid balance accruing interest thereon at a rate of 6% per annum or such other interest rate as may be fixed by the Management Committee.  The purchaser shall have the right to prepay such amounts at any time without premium or interest penalty.

**11.6  Winding Up.**  If this Agreement is terminated and/or the Company is dissolved by a unanimous vote of the Members the Company's affairs shall be wound up as soon as reasonably practicable in the manner set forth below.  The Company shall continue to abide by any contracts or other agreements to which the Company is a party regarding the conduct of the ordinary business of the Company.

(a) Appointment of Liquidator.  The winding up of the Company's affairs shall be supervised by a liquidator.  The liquidator shall be appointed jointly by mutual agreement of the Members.  In the event the Members cannot agree upon the appointment of a liquidator, then the Members shall seek the appointment of a liquidator through a court of competent jurisdiction.  The liquidator to be established pursuant to these provisions shall have expertise in the area of real estate development.



(b) Powers of Liquidator. In winding up the affairs of the Company, the liquidator shall have full right and unlimited discretion, for and on behalf of the Company:

(i) to prosecute and defend civil, criminal or administrative suits;

(ii) to collect Company assets, including obligations owed to the Company;

(iii) to settle and close the Company's business;

(iv) to dispose of and convey all Company Property for cash, and in connection therewith to determine the time, manner and terms of any sale or sales of Company Property, having due regard for the activity and condition of the relevant market and general financial and economic conditions;

(v) to pay all reasonable selling costs and other expenses incurred in connection with the winding up of the proceeds of the disposition of Company Property;

(vi) to discharge the Company's known liabilities and, if necessary, to set up, for a period not to exceed five (5) years after the date of dissolution, such cash reserves as the liquidator may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company;

(vii) to distribute any remaining proceeds from the sale of Company Property to the Members;

(viii) to prepare, execute, acknowledge and file articles of dissolution under the Act and any other certificates, tax returns or instruments necessary or advisable under any applicable law to effect the winding up and termination of the Company; and

(ix) to exercise, without further authorization or consent of any of the parties hereto or their legal representatives or successors in interest, all of the powers conferred upon the Management Committee under the terms of this Agreement to the extent necessary or desirable in the good faith judgment of the liquidator to perform its duties and functions. The liquidator (if not a member of the Management Committee), while acting in such capacity on behalf of the Company, be entitled to the indemnification rights set forth herein.

**11.7 Compensation of Liquidator.** The liquidator appointed as provided herein shall be entitled to receive such reasonable compensation for its services as shall be agreed upon by the liquidator and all of the Members.

**11.8 Distribution of Company Property and Proceeds of Sale Thereof.**



(a) Order of Distribution. Upon completion of all desired sales of Company Property, and after payment of all selling costs and expenses, the liquidator shall distribute the proceeds of such sales, and the Company Property that is to be distributed in kind, to the following groups in the following order of priority:

(i) to the extent permitted by law, to satisfy Company liabilities to creditors, including Members who are creditors through loans or otherwise (other than for past due Company distributions) of the Company, whether by payment or establishment of reserves;

(ii) to satisfy Company obligations to Members to pay past due Company distributions;

(iii) to the Members, in accordance with the positive balances in their respective Capital Accounts; and

(iv) to the Members in accordance with their respective Interests.

(b) Insufficient Assets. The claims of each priority group specified above shall be satisfied in full before satisfying any claims of a lower priority group. If the assets available for disposition are insufficient to dispose of all of the claims of a priority group, the available assets shall be distributed in proportion to the amounts owed to each creditor or the respective Capital Account balances or Interests of each Member in such group.

**11.9  Final Audit**. Within a reasonable time following the completion of the liquidation, the liquidator shall supply to each of the Members a statement which shall set forth the assets and the liabilities of the Company as of the date of complete liquidation and each Member's pro rata portion of distributions.

**11.10  Deficit Capital Accounts**. Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that the deficit, if any, in the Capital Account of any Member results from or is attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to this Agreement to all Members in proportion to their respective Interests, upon dissolution of the Company such deficit shall not be an asset of the Company and such Member shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

## ARTICLE 12
## INDEMNIFICATION, INSURANCE

**12.1  Indemnification and Advance of Expenses**. The Company shall indemnify and/or advance expenses to a Person who was, is, or is threatened to be made a named defendant or respondent in a proceeding because the person (i) is or was a member of the Management Committee, a Member, officer, employee or agent of the Company, or (ii) is or was serving at the request of the Company as a manager, member, director, officer, partner, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic limited liability company,

corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan, or other enterprise, to the fullest extent provided by, and in accordance with the procedures set forth in any applicable laws.

**12.2   Insurance**. Subject to the Act, the Company may purchase and maintain officer and director insurance, or other insurance and/or arrangements on behalf of any Person who is or was a member of the Management Committee, a Member, employee, agent or other Person identified above in Section 12.1 against any liability asserted against him or incurred by him in such a capacity or arising out of his status as such a Person, whether or not the Company would otherwise have the power to indemnify him against that liability.

**12.3   Limit on Liability of Members**. The indemnification set forth in this Article 15 shall in no event cause the Members to incur any liability beyond their total Capital Contributions, nor shall it result in any liability of the Members to any third party.

## ARTICLE 13
## MICELLANEOUS PROVISIONS

**13.1   Entire Agreement**. This Agreement contains the entire agreement among the Members relating to the subject matter hereof, and all prior agreements relative hereto which are not contained herein are terminated.

**13.2   Governing Law**. This Agreement shall be governed by and construed in accordance with the local, internal laws of the State of California. In particular, this Agreement is intended to comply with the requirements of the Act and the Articles of Organization. In the event of a direct conflict between the provisions of this Agreement and the mandatory, non-waivable and/or non-modifiable provisions of the Act, or any provision of the Articles of Organization, then the Act, and the Articles of Organization, in that order of priority, will control.

**13.3   Mediation of Disputes**. The Members agree that any and all disputes concerning this agreement will first be subject to mediation prior to any party filing for arbitration or any other methods if dispute resolution. Should the parties not be able to settle this matter through mediation, they agree to arbitrate the subject dispute pursuant to Section 13.4.

**13.4   Arbitration of Disputes**. Any dispute or claim in law or equity between Members arising out of this Agreement shall be decided by neutral, binding arbitration and not by Court action, except as provided by California law for judicial review of arbitration proceedings. The arbitration shall be conducted in accordance with the rules of the California Civil Codes and Code of Civil Procedures.

**13.5   Successors and Assigns**. This Agreement shall be binding upon and shall inure to the benefit of the Members and their respective heirs, legal representatives, successors and assigns.

**13.6   Severability**. This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations. If any provision of this Agreement or the application thereof to any Person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, but the extent of such invalidity or unenforceability does not destroy the basis of the bargain among the Members as expressed

herein, the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law.

**13.7   Headings**.   The Article and Article headings appearing in this Agreement are for convenience of reference only and are not intended, to any extent or for any purpose, to limit or define the text of any Article.

**13.8   Construction**.   Whenever required by the context, as used in this Agreement, the singular number shall include the plural, and vice versa, and the gender of all words used shall include the masculine, feminine and the neuter.   Unless expressly stated herein, all references to Articles refer to articles of this Agreement, and all references to Exhibits are to schedules attached hereto, each of which is made a part hereof for all purposes.

**13.9   Offset**.   Whenever the Company is to pay any sum to any Member, any amounts that Member owes the Company may be deducted from that sum before payment.

**13.10   Effect of Waiver or Consent**.   A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company. Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

**13.11   Waiver of Certain Rights**.   Each Member irrevocably waives any right it may have to maintain any action for partition of the property of the Company.

**13.12   Counterparts and Binding Effect**.   This Agreement may be executed in one or more counterparts, each of which shall be an original, but all of which taken together shall constitute a single document.   This Agreement shall be binding upon each Member as evidenced by their signatures below.

**13.13   Attorney's Fees**.   If any Member becomes involved in litigation or proceedings arising out of or in connection with this Agreement, including, but not limited to, the interpretation or performance thereof, the court or tribunal in such litigation or proceeding, or in a separate suit, shall award attorney's fees to the prevailing party.   Unless judgment goes by default, the attorney fee award shall not be computed in accordance with any court schedule, but shall be such as to fully reimburse all attorney's fees actually incurred in good faith, regardless of the size of the judgment, it being the intention of the Members to fully compensate for all the attorney's fees paid or incurred in good faith by the prevailing party.

**13.14   Amendment of Agreement**.   This Agreement may be amended only in writing, in whole or in part, at any time only by the execution thereof by all of the Members.   No provision of this Agreement may be waived except by a writing signed by the party to be charged therewith.



**13.15** <u>Notices</u>. Notifications, as defined above, given under this Agreement shall be duly given to the appropriate addresses set forth below (or to such other addresses as a party may designate as to itself by notice to the other):

        If to MJNA MEMBER:

           Medical Marijuana, Inc.
           2665 Ariane Drive, Suite 207, San Diego, CA 9211'
           Tel:  209-207-9691;  Fax:  866-763-6414

        If to DIXIE MEMBER:

           Dixie Holdings, LLC
           Vincent M. Keber, III
           6701 East Stapleton Drive North, Denver, CO 80216
           Tel: _____    Fax: _____

      **IN WITNESS WHEREOF**, the Majority Interest Members of the Company have evidenced the adoption of this Agreement in accordance with the Act by their signatures below, such adoption to be effective as of the Effective Date first above written.

                MEMBERS:

                **Medical Marijuana, Inc.**

                Print Name: _____
                Its: _____

                **Dixie Holdings, LLC**

                By: _____
                Print Name: _____
                Its: _____

**Exhibits Attached**
Exhibit A – Red Dice Holdings, LLC Formation Documents
Exhibit B – Membership Interest
Exhibit C – Keber and Smith NonDisclosure / NonCompetes
Exhibit D – Dixie Member Inventory to be Transferred
Exhibit E – Exclusive Licensing Agreement with Left Bank, LLC
Exhibit F – Keber Employment Contract; Smith Consulting Agreement
Exhibit G – Licensing Agreement with MJNA for Terresphere Grow Technology
Exhibit H – Operating Budget

# EXHIBIT A

## NEW ENTITY FORMATION DOCUMENTS



# EXHIBIT B
## MEMBERSHIP INTEREST

| MEMBER | MEMBERSHIP INTEREST |
|---|---|
| Medical Marijuana, Inc.<br>2665 Ariane Drive, Suite 207<br>San Diego, CA 92117 | 60% |
| Dixie Holdings, LLC<br>6701 East Stapleton Drive North<br>Denver, CO 80216 | 40% |

# EXHIBIT C
## KEBER AND SMITH NONDISCLOSURE / NONCOMPETE'S

**Exhibit** $\mathcal{C}$

**Non-Disclosure, Non-Compete, Confidentiality Agreement**

Confidentiality and Nondisclosure Agreement (the "Agreement"), effective this ____ day of April 2012, by and among the undersigned Employee Vincent M. Keber III (the "Employee"), whose mailing address is 1301 Wazee St. Unit 2E, Denver CO 80204 and, Medical Marijuana, Inc., its affiliates and/or assigns, whose corporate mailing address is 2665 Ariane Drive Suite 207, San Diego, CA 92117(the "Company/Corporate").

**BACKGROUND INFORMATION**

The Company and its Affiliates (as defined herein) are engaged in the business of providing legal and cannabis based products, manufacturing, research/development and related businesses (collectively the "Business"). The Company wishes to employ the Employee in connection with the Company's Business and the Employee has agreed to become or continue to be so employed. Pursuant to such employment, the Employee has been and/or will be exposed to and has received or will receive confidential and proprietary information of the Company or relating to the Company's business or affairs as defined in Section I(a) below. The parties acknowledge and agree that the Trade Secrets and Other Confidential Information are valuable, special and unique assets of the Company and that the Trade Secrets and Other Confidential Information which the Employee has received and/or will receive would allow the Employee or a third party recipient of such information to unfairly and inequitably compete against the Company and to otherwise cause the Company significant and irreparable harm. Accordingly, in consideration of the mutual agreements contained herein, the parties agree as follows:

**OPERATIVE PROVISIONS**

I.      **Confidentiality.**

        a.      **Definition**: For purposes of this Agreement, collectively the terms "Trade Secrets and/or Confidential Information" shall mean information disclosed to Employee as a consequence of their employment relationship with the Company (and/or its subsidiaries or affiliates) and not generally known in their industry, whether tangible or intangible and whether written or oral, including but not limited to technical information, computer software, know-how, product information, concepts, operational processes, business and marketing plans/promotions, development, financial information, expansion plans, business policies and practices, customer, investor and/or vendor lists, manufacturing processes, designs, trade processes or secrets, industry research and information as to other business relationships of the Company and related matters.

        Employee shall not disclose, during or after the term of Employee's employment with the Company, all or any part of the Confidential Information to any person, corporation, other legal entity, or organization for any reason or purpose. In the event of Employee's breach or threatened breach of this section, the Company shall be entitled to a preliminary restraining order and an injunction to restrain and enjoin Employee from such disclosure. In addition to or in lieu of such action, the Company may pursue all other remedies available for such breach or threatened breach, including but not limited to the recovery of damages from Employee.

        b.      **Unauthorized Disclosure.** The Employee agrees that during the course of his/her employment with the Company and until the date ending four (4) years following termination the Employee will keep such Trade Secrets and Other Confidential Information confidential and will not disclose or furnish to any other person or, directly or indirectly, use for his/her own account or the account of any other person, any Trade Secrets and Other Confidential Information, no matter from where or in what manner he/she may have acquired such Trade Secrets and Other Confidential Information, and he shall retain all such Trade Secrets and Other Confidential Information in trust for the benefit of the Company, its Affiliates and the successors and assigns of any of them. This confidentiality covenant has no geographical or territorial restriction. Upon the termination of employment, the Employee promptly will supply to the Company all property, keys and Confidential Information which has been produced by, received by or otherwise submitted to the Employee in the course of his/her employment with the Company, including the period during and prior to the Employee's employment with the Company.

        c.      **Inventions.** The Employee agrees that any and all inventions, discoveries, improvements, processes, copyrights and trademarks made, developed, discovered or acquired by him during his/her employment by the Company solely or jointly with others or otherwise, which relate to the business of the Company, and all knowledge possessed by the Employee relating thereto (collectively, the "Inventions"), shall be fully and promptly disclosed to the Company's and shall be the sole and absolute property of the Company and the Company shall be the sole and absolute owner thereof.

      **2.**      **Prohibited and Competitive Activities.** The Employee and the Company recognize that due to the nature of the Employee's engagement by the Company, the Employee has had and will have access to Trade Secrets and Other Confidential Information. The Employee acknowledges that such Trade Secrets and Other Confidential Information has been and will be of central importance to the business of the Company and its Affiliates and that disclosure of it to, or its use by, others (including, without

limitation, the Employee (other than with respect to the Company's business and affairs) could cause substantial loss to the Company. The Employee accordingly agrees as follows:

a    **Prohibited Activities.**  The Employee will not, at any time during the course of Employee's employment and for the four (4) year period following the termination of Employee's employment: (i) directly or through one or more intermediaries, solicit for employment, employ or be involved with the employment of any person who, at the time of such solicitation, is employed by the Company or any Affiliate thereof; (ii) directly or indirectly, whether for his/her own account or for the account of any other person, solicit, divert or endeavor to entice away from the Company or any Affiliate, or otherwise engage in any activity intended to terminate, disrupt or interfere with, the Company's or any of its Affiliate's relationships with, customers, or otherwise adversely affect the Company's or any of its Affiliate's relationship with Customers or other business relationships of the Company or any Affiliate thereof; or (iii) publish or make any statement critical of the Company, or its Affiliates, or any of their respective Employees, agents, consultants or shareholders, or in any way adversely affect or otherwise malign the business or reputation of any of the foregoing persons being herein referred to as a **"Prohibited Activity"**); unless required to do so by law. Company shall not publish or make any statement critical of the Employee in any way that would adversely affect or otherwise malign his/her reputation.

b.    For a period of four (4) years after the termination of this Agreement, Employee shall not, within a radius of fifty (50) miles from the Company's present corporate headquarters or any of its facilities, directly or indirectly, own, manage, operate, control, be employed by, participate in, or be connected in any manner with the ownership, management, operation, or control similar to the type of business conducted by the Company at the time this Agreement terminates. In the event of Employee's actual or threatened breach of this restrictive covenant, the Company shall be entitled to a preliminary restraining order and injunction in order to restrain Employee from such breach. Nothing in this Agreement shall be construed to prohibit the Company from pursuing any other available remedies at law or in equity.

3    **Divisibility of Covenant Period.**  If any portion of the restrictive covenant contained in this Agreement is held to be unreasonable, arbitrary or against public policy, such covenant shall be considered divisible with the remaining provisions deemed effective and be specifically enforceable against the Employee.

4    **Enforcement.**  The parties understand and agree that the covenants set forth in this Agreement are essential elements of the Company's engagement of the Employee and that without the Employee's agreement to comply with such covenants, the Company would not have agreed to engage or to continue to engage the Employee, or to provide Employee with Trade Secrets and Other Confidential Information. Further, the Employee expressly acknowledges that the restrictions contained in this Agreement are reasonable in scope and are necessary to accomplish the mutual objectives of the parties and to protect the Company's legitimate interests in protecting their business. The Employee further acknowledges that any violation of the restrictions contained in this Agreement will cause significant and irreparable harm to the for which the Company Company's remedy is binding arbitration as defined in section 16 of "Employment Agreement. The Company shall also be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief, including but not limited to a temporary restraining order, a temporary or preliminary injunction or a permanent injunction, to enforce the provisions of this Agreement.

5.    **Intent of Parties.**  The covenants and agreements herein shall be construed as agreements independent of any other provision of Employee's employment.

6.    **Mandatory Disclosure.**  The Employee shall, in the event that he/she is requested or required (by oral question, interrogatory, request for information or documents, subpoena, investigative demand or similar process) to disclose any information supplied to the Employee in the course of his/her dealings with the Company, if he/she may lawfully required to do so.

7.    **Redelivery of Confidential Material.**  Upon the Company's request, and in any case upon the termination of Employee's employment, the Employee shall promptly deliver to the Company all written data containing, or reflecting any information about the Company, its shareholders, officers, directors, Employees, agents or consultants, (whether prepared by the Company or otherwise, and whether in the possession of the Employee or his/her representatives) and will not retain any copies, extracts or other reproductions in whole or in part of such data. The redelivery of such material shall not relieve the Employee of his/her obligation of confidentiality or of the other obligations imposed hereunder.

8.    **Miscellaneous Provisions.**

a.    **Notices.**  All notices, requests or other communications under this Agreement shall be in writing and shall be considered as properly given or made if hand delivered with a confirmation receipt obtained, mailed by the United States Postal Service from within the United States by certified mail, postage prepaid and return receipt requested, or sent by telecopier, and addressed to the location set forth in the preamble to this Agreement or to such other address or telecopier number as any party may have designated by like notice furnished to all other parties hereto. All notices shall be deemed effective when deposited in the U.S. Mails, delivered or transmitted via Telecopier.

{00876391 / 4}

b.    Entire Agreement. This Agreement supercedes and is in full substitution for any previous confidentiality, nondisclosure, or noncompete agreement previously signed by the Employee in contemplation of, or during his/her employment with the Company.

c.    Assignment.   This Agreement shall be assignable by the Company without the prior written consent of the Employee.

d.    Acknowledgments. The Employee acknowledges that he/she has been provided with a copy of this Agreement for review prior to signing it, that the Company hereby encourages the Employee to have this Agreement reviewed by his/her own attorney prior to signing it, that the Employee has signed the Agreement of his/her own free will, and that the Employee understands the purposes and effects of this Agreement.

e.    Headings. The headings of this Agreement are inserted for convenience and identification only, and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

f.    Application of California Law. This Agreement, and the application or interpretation thereof, shall be governed exclusively by its terms and by the laws of the State of California and venue residing in San Joaquin County.

g.    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original.

h.    Arbitration. Any controversies arising out of the terms of this Agreement or its interpretation shall be settled in San Francisco, California in accordance with the rules of the American Arbitration Association, and the judgment upon award may be entered in any court having jurisdiction thereof.

i.    Waiver. The waiver by the Company of a breach or threatened breach of this Agreement shall not be construed as a waiver of any subsequent breach by the Employee. The refusal or failure of the Company to enforce the restrictive covenants contained herein or contained in any other similar agreement against any other Employee, agent, or independent contractor of the Company, for any reason, shall not constitute a defense to the enforcement of this Agreement by the Company against the Employee, nor shall it give rise to any claim or cause of action by such Employee against the Company.

j..    Affiliate: The term "affiliate" when used in this Agreement shall mean any other person or entity that directly or indirectly controls, or is under common control with, or is controlled by the specified person or entity herein, or if a person, any member of the immediate family of such individual, or any entity formed on behalf of the Company and/or in which Michael R. Llamas has ownership of any nature. As used in this definition, "control" shall mean possession, directly or indirectly, of power to direct or cause the direction of management or policies and "immediate family" shall mean any parent, child, grandchild, spouse, or sibling.

k.    Company: The term "Company" as used herein, shall include the Company and any Affiliate of the Company, its shareholders, consultants, officers, directors, and subsidiaries.

In witness whereof, the parties have hereunto executed this Agreement.

Company

Medical Marijuana, Inc.

By: _____

Print Name: _____

Employee

_____

Vincent M. Keber III

Exhibit $C$

## Non-Disclosure, Non-Compete, Confidentiality Agreement

Confidentiality and Nondisclosure Agreement (the "Agreement"), effective this ____ day of April 2012, by and among the undersigned Employee Vincent M. Keber III (the "Employee"), whose mailing address is 1301 Wazee St. Unit 2E, Denver CO 80204 and, Red Dice Holdings, LLC, its affiliates and/or assigns, whose corporate mailing address is 2665 Ariane Drive Suite 207, San Diego, CA 92117(the "Company/Corporate").

### BACKGROUND INFORMATION

The Company and its Affiliates (as defined herein) are engaged in the business of providing legal and cannabis based products, manufacturing, research/development and related businesses (collectively the "Business"). The Company wishes to employ the Employee in connection with the Company's Business and the Employee has agreed to become or continue to be so employed. Pursuant to such employment, the Employee has been and/or will be exposed to and has received or will receive confidential and proprietary information of the Company or relating to the Company's business or affairs as defined in Section 1(a) below. The parties acknowledge and agree that the Trade Secrets and Other Confidential Information are valuable, special and unique assets of the Company and that the Trade Secrets and Other Confidential Information which the Employee has received and/or will receive would allow the Employee or a third party recipient of such information to unfairly and inequitably compete against the Company and to otherwise cause the Company significant and irreparable harm. Accordingly, in consideration of the mutual agreements contained herein, the parties agree as follows:

### OPERATIVE PROVISIONS

1. **Confidentiality.**

    a. **Definition**: For purposes of this Agreement, collectively the terms "Trade Secrets and/or Confidential Information" shall mean information disclosed to Employee as a consequence of their employment relationship with the Company (and/or its subsidiaries or affiliates) and not generally known in their industry, whether tangible or intangible and whether written or oral, including but not limited to technical information, computer software, know-how, product information, concepts, operational processes, business and marketing plans/promotions, development, financial information, expansion plans, business policies and practices, customer, investor and/or vendor lists, manufacturing processes, designs, trade processes or secrets, industry research and information as to other business relationships of the Company and related matters.

    Employee shall not disclose, during or after the term of Employee's employment with the Company, all or any part of the Confidential Information to any person, corporation, other legal entity, or organization for any reason or purpose. In the event of Employee's breach or threatened breach of this section, the Company shall be entitled to a preliminary restraining order and an injunction to restrain and enjoin Employee from such disclosure. In addition to or in lieu of such action, the Company may pursue all other remedies available for such breach or threatened breach, including but not limited to the recovery of damages from Employee.

    b. **Unauthorized Disclosure.** The Employee agrees that during the course of his/her employment with the Company and until the date ending four (4) years following termination the Employee will keep such Trade Secrets and Other Confidential Information confidential and will not disclose or furnish to any other person or, directly or indirectly, use for his/her own account or the account of any other person, any Trade Secrets and Other Confidential Information, no matter from where or in what manner he/she may have acquired such Trade Secrets and Other Confidential Information, and he shall retain all such Trade Secrets and Other Confidential Information in trust for the benefit of the Company, its Affiliates and the successors and assigns of any of them. This confidentiality covenant has no geographical or territorial restriction. Upon the termination of employment, the Employee promptly will supply to the Company all property, keys and Confidential Information which has been produced by, received by or otherwise submitted to the Employee in the course of his/her employment with the Company, including the period during and prior to the Employee's employment with the Company.

    c. **Inventions.** The Employee agrees that any and all inventions, discoveries, improvements, processes, copyrights and trademarks made, developed, discovered or acquired by him during his/her employment by the Company solely or jointly with others or otherwise, which relate to the business of the Company, and all knowledge possessed by the Employee relating thereto (collectively, the "Inventions"), shall be fully and promptly disclosed to the Company's and shall be the sole and absolute property of the Company and the Company shall be the sole and absolute owner thereof.

2. **Prohibited and Competitive Activities.** The Employee and the Company recognize that due to the nature of the

{00876391 / 4}

Employee's engagement by the Company, the Employee has had and will have access to Trade Secrets and Other Confidential Information. The Employee acknowledges that such Trade Secrets and Other Confidential Information has been and will be of central importance to the business of the Company and its Affiliates and that disclosure of it to, or its use by, others (including, without limitation, the Employee (other than with respect to the Company's business and affairs) could cause substantial loss to the Company. The Employee accordingly agrees as follows:

   a  **Prohibited Activities.** The Employee will not, at any time during the course of Employee's employment and for the four (4) year period following the termination of Employee's employment: (i) directly or through one or more intermediaries, solicit for employment, employ or be involved with the employment of any person who, at the time of such solicitation, is employed by the Company or any Affiliate thereof; (ii) directly or indirectly, whether for his/her own account or for the account of any other person, solicit, divert or endeavor to entice away from the Company or any Affiliate, or otherwise engage in any activity intended to terminate, disrupt or interfere with, the Company's or any of its Affiliate's relationships with, customers, or otherwise adversely affect the Company's or any of its Affiliate's relationship with Customers or other business relationships of the Company or any Affiliate thereof; or (iii) publish or make any statement critical of the Company, or its Affiliates, or any of their respective Employees, agents, consultants or shareholders, or in any way adversely affect or otherwise malign the business or reputation of any of the foregoing persons being herein referred to as a "Prohibited Activity"); unless required to do so by law. Company shall not publish or make any statement critical of the Employee in any way that would adversely affect or otherwise malign his/her reputation.

   b.  For a period of four (4) years after the termination of this Agreement, Employee shall not, within a radius of fifty (50) miles from the Company's present corporate headquarters or any of its facilities, directly or indirectly, own, manage, operate, control, be employed by, participate in, or be connected in any manner with the ownership, management, operation, or control similar to the type of business conducted by the Company at the time this Agreement terminates. In the event of Employee's actual or threatened breach of this restrictive covenant, the Company shall be entitled to a preliminary restraining order and injunction in order to restrain Employee from such breach. Nothing in this Agreement shall be construed to prohibit the Company from pursuing any other available remedies at law or in equity.

  3  **Divisibility of Covenant Period.** If any portion of the restrictive covenant contained in this Agreement is held to be unreasonable, arbitrary or against public policy, such covenant shall be considered divisible with the remaining provisions deemed effective and be specifically enforceable against the Employee.

  4  **Enforcement.** The parties understand and agree that the covenants set forth in this Agreement are essential elements of the Company's engagement of the Employee and that without the Employee's agreement to comply with such covenants; the Company would not have agreed to engage or to continue to engage the Employee, or to provide Employee with Trade Secrets and Other Confidential Information. Further, the Employee expressly acknowledges that the restrictions contained in this Agreement are reasonable in scope and are necessary to accomplish the mutual objectives of the parties and to protect the Company's legitimate interests in protecting their business. The Employee further acknowledges that any violation of the restrictions contained in this Agreement will cause significant and irreparable harm to the for which the Company Company's remedy is binding arbitration as defined in section 16 of "Employment Agreement. The Company shall also be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief, including but not limited to a temporary restraining order, a temporary or preliminary injunction or a permanent injunction, to enforce the provisions of this Agreement.

  5.  **Intent of Parties.** The covenants and agreements herein shall be construed as agreements independent of any other provision of Employee's employment.

  6.  **Mandatory Disclosure.** The Employee shall, in the event that he/she is requested or required (by oral question, interrogatory, request for information or documents, subpoena, investigative demand or similar process) to disclose any information supplied to the Employee in the course of his/her dealings with the Company, if he/she may lawfully required to do so.

  7.  **Redelivery of Confidential Material.** Upon the Company's request, and in any case upon the termination of Employee's employment, the Employee shall promptly deliver to the Company all written data containing, or reflecting any information about the Company, its shareholders, officers, directors, Employees, agents or consultants, (whether prepared by the Company or otherwise, and whether in the possession of the Employee or his/her representatives) and will not retain any copies, extracts or other reproductions in whole or in part of such data. The redelivery of such material shall not relieve the Employee of his/her obligation of confidentiality or of the other obligations imposed hereunder.

  8.  **Miscellaneous Provisions.**

  a.  **Notices.** All notices, requests or other communications under this Agreement shall be in writing and shall be considered as properly given or made if hand delivered with a confirmation receipt obtained, mailed by the United States Postal Service from within the United States by certified mail, postage prepaid and return receipt requested, or sent by telecopier, and

addressed to the location set forth in the preamble to this Agreement or to such other address or telecopier number as any party may have designated by like notice furnished to all other parties hereto. All notices shall be deemed effective when deposited in the U.S. Mails, delivered or transmitted via Telecopier.

b.      Entire Agreement. This Agreement supercedes and is in full substitution for any previous confidentiality, nondisclosure, or noncompete agreement previously signed by the Employee in contemplation of, or during his/her employment with the Company.

c.      Assignment.   This Agreement shall be assignable by the Company without the prior written consent of the Employee.

d.      Acknowledgments. The Employee acknowledges that he/she has been provided with a copy of this Agreement for review prior to signing it, that the Company hereby encourages the Employee to have this Agreement reviewed by his/her own attorney prior to signing it, that the Employee has signed the Agreement of his/her own free will, and that the Employee understands the purposes and effects of this Agreement.

e.      Headings. The headings of this Agreement are inserted for convenience and identification only, and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

f.      Application of California Law. This Agreement, and the application or interpretation thereof, shall be governed exclusively by its terms and by the laws of the State of California and venue residing in San Joaquin County.

g.      Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original.

h.      Arbitration. Any controversies arising out of the terms of this Agreement or its interpretation shall be settled in San Francisco, California in accordance with the rules of the American Arbitration Association, and the judgment upon award may be entered in any court having jurisdiction thereof.

i.      Waiver. The waiver by the Company of a breach or threatened breach of this Agreement shall not be construed as a waiver of any subsequent breach by the Employee. The refusal or failure of the Company to enforce the restrictive covenants contained herein or contained in any other similar agreement against any other Employee, agent, or independent contractor of the Company, for any reason, shall not constitute a defense to the enforcement of this Agreement by the Company against the Employee, nor shall it give rise to any claim or cause of action by such Employee against the Company.

j..     Affiliate:  The term "affiliate" when used in this Agreement shall mean any other person or entity that directly or indirectly controls, or is under common control with, or is controlled by the specified person or entity herein, or if a person, any member of the immediate family of such individual, or any entity formed on behalf of the Company and/or in which Michael R. Llamas has ownership of any nature. As used in this definition, "control" shall mean possession, directly or indirectly, of power to direct or cause the direction of management or policies and "immediate family" shall mean any parent, child, grandchild, spouse, or sibling.

k.      Company:  The term "Company" as used herein, shall include the Company and any Affiliate of the Company, its shareholders, consultants, officers, directors, and subsidiaries.

In witness whereof, the parties have hereunto executed this Agreement.

Company

Red Dice Holdings, LLC.

By:

Print Name: _____

Employee

_____
Vincent M. Keber III

Exhibit 

### Non-Disclosure, Non-Compete, Confidentiality Agreement

Confidentiality and Nondisclosure Agreement (the "Agreement"), effective this ____ day of April 2012, by and among the undersigned Consultant Charles K. Smith (the "Consultant"), whose mailing address is 108 Augusta Court, Fairhope AL 36532 and, **Medical Marijuana, Inc.**, its affiliates and/or assigns, whose corporate mailing address is 2665 Ariane Drive Suite 207, San Diego, CA 92117(the "**Company/Corporate**").

## BACKGROUND INFORMATION

The Company and its Affiliates (as defined herein) are engaged in the business of providing legal and cannabis based products, manufacturing, research/development and related businesses (collectively the "Business"). The Company wishes to employ the Consultant in connection with the Company's Business and the Consultant has agreed to become or continue to be so employed. Pursuant to such employment, the Consultant has been and/or will be exposed to and has received or will receive confidential and proprietary information of the Company or relating to the Company's business or affairs as defined in Section 1(a) below. The parties acknowledge and agree that the Trade Secrets and Other Confidential Information are valuable, special and unique assets of the Company and that the Trade Secrets and Other Confidential Information which the Consultant has received and/or will receive would allow the Consultant or a third party recipient of such information to unfairly and inequitably compete against the Company and to otherwise cause the Company significant and irreparable harm. Accordingly, in consideration of the mutual agreements contained herein, the parties agree as follows:

## OPERATIVE PROVISIONS

1.   **Confidentiality.**

a.   **Definition:** For purposes of this Agreement, collectively the terms "Trade Secrets and/or Confidential Information" shall mean information disclosed to Consultant as a consequence of their employment relationship with the Company (and/or its subsidiaries or affiliates) and not generally known in their industry, whether tangible or intangible and whether written or oral, including but not limited to technical information, computer software, know-how, product information, concepts, operational processes, business and marketing plans/promotions, development, financial information, expansion plans, business policies and practices, customer, investor and/or vendor lists, manufacturing processes, designs, trade processes or secrets, industry research and information as to other business relationships of the Company and related matters.

Consultant shall not disclose, during or after the term of Consultant's employment with the Company, all or any part of the Confidential Information to any person, corporation, other legal entity, or organization for any reason or purpose. In the event of Consultant's breach or threatened breach of this section, the Company shall be entitled to a preliminary restraining order and an injunction to restrain and enjoin Consultant from such disclosure. In addition to or in lieu of such action, the Company may pursue all other remedies available for such breach or threatened breach, including but not limited to the recovery of damages from Consultant.

b.   **Unauthorized Disclosure.** The Consultant agrees that during the course of his/her employment with the Cmnpany and until the date ending four (4) years following termination the Consultant will keep such Trade Secrets and Other Confidential Information confidential and will not disclose or furnish to any other person or, directly or indirectly, use for his/her own account or the account of any other person, any Trade Secrets and Other Confidential Information, no matter from where or in what manner he/she may have acquired such Trade Secrets and Other Confidential Information, and he shall retain all such Trade Secrets and Other Confidential Information in trust for the benefit of the Company, its Affiliates and the successors and assigns of any of them. This confidentiality covenant has no geographical or territorial restriction. Upon the termination of employment, the Consultant promptly will supply to the Company all property, keys and Confidential Information which has been produced by, received by or otherwise submitted to the Consultant in the course of his/her employment with the Company, including the period during and prior to the Consultant's employment with the Company.

c.   **Inventions.** The Consultant agrees that any and all inventions, discoveries, improvements, processes, copyrights and trademarks made, developed, discovered or acquired by him during his/her employment by the Company solely or jointly with others or otherwise, which relate to the business of the Company, and all knowledge possessed by the Consultant relating thereto (collectively, the "Inventions"), shall be fully and promptly disclosed to the Company's and shall be the sole and absolute property of the Company and the Company shall be the sole and absolute owner thereof.

2.   **Prohibited and Competitive Activities.** The Consultant and the Company recognize that due to the nature of the Consultant's engagement by the Company, the Consultant has had and will have access to Trade Secrets and Other Confidential Information. The Consultant acknowledges that such Trade Secrets and Other Confidential Information has been and will be of central

{00877605 / 1}

importance to the business of the Company and its Affiliates and that disclosure of it to, or its use by, others (including, without limitation, the Consultant (other than with respect to the Company's business and affairs) could cause substantial loss to the Company. The Consultant accordingly agrees as follows:

a.   **Prohibited Activities.**   The Consultant will not, at any time during the course of Consultant's employment and for the four (4) year period following the termination of Consultant's employment: (i) directly or through one or more intermediaries, solicit for employment, employ or be involved with the employment of any person who, at the time of such solicitation, is employed by the Company or any Affiliate thereof; (ii) directly or indirectly, whether for his/her own account or for the account of any other person, solicit, divert or endeavor to entice away from the Company or any Affiliate, or otherwise engage in any activity intended to terminate, disrupt or interfere with, the Company's or any of its Affiliate's relationships with, customers, or otherwise adversely affect the Company's or any of its Affiliate's relationship with Customers or other business relationships of the Company or any Affiliate thereof; or (iii) publish or make any statement critical of the Company, or its Affiliates, or any of their respective Consultants, agents, consultants or shareholders, or in any way adversely affect or otherwise malign the business or reputation of any of the foregoing persons being herein referred to as a **"Prohibited Activity"**); unless required to do so by law. Company shall not publish or make any statement critical of the Consultant in any way that would adversely affect or otherwise malign his/her reputation.

b.   For a period of four (4) years after the termination of this Agreement, Consultant shall not, within a radius of fifty (50) miles from the Company's present corporate headquarters or any of its facilities, directly or indirectly, own, manage, operate, control, be employed by, participate in, or be connected in any manner with the ownership, management, operation, or control similar to the type of business conducted by the Company at the time this Agreement terminates. In the event of Consultant's actual or threatened breach of this restrictive covenant, the Company shall he entitled to a preliminary restraining order and injunction in order to restrain Consultant from such breach. Nothing in this Agreement shall be construed to prohibit the Company from pursuing any other available remedies at law or in equity.

3     **Divisibility of Covenant Period.**   If any portion of the restrictive covenant contained in this Agreement is held to be unreasonable, arbitrary or against public policy, such covenant shall be considered divisible with the remaining provisions deemed effective and be specifically enforceable against the Consultant.

4     **Enforcement.**   The parties understand and agree that the covenants set forth in this Agreement are essential elements of the Company's engagement of the Consultant and that without the Consultant's agreement to comply with such covenants, the Company would not have agreed to engage or to continue to engage the Consultant, or to provide Consultant with Trade Secrets and Other Confidential Information. Further, the Consultant expressly acknowledges that the restrictions contained in this Agreement are reasonable in scope and are necessary to accomplish the mutual objectives of the parties and to protect the Company's legitimate interests in protecting their business. The Consultant further acknowledges that any violation of the restrictions contained in this Agreement will cause significant and irreparable harm to the for which the Company Company's remedy is binding arbitration as defined in section 16 of "Employment Agreement. The Company shall also be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief, including but not limited to a temporary restraining order, a temporary or preliminary injunction or a permanent injunction, to enforce the provisions of this Agreement.

5.   **Intent of Parties.**   The covenants and agreements herein shall be construed as agreements independent of any other provision of Consultant's employment.

6.   **Mandatory Disclosure.**   The Consultant shall, in the event that he/she is requested or required (by oral question, interrogatory, request for information or documents, subpoena, investigative demand or similar process) to disclose any information supplied to the Consultant in the course of his/her dealings with the Company, if he/she may lawfully required to do so.

7.   **Redelivery of Confidential Material.**   Upon the Company's request, and in any case upon the termination of Consultant's employment, the Consultant shall promptly deliver to the Company all written data containing, or reflecting any information about the Company, its shareholders, officers, directors, Consultants, agents or consultants, (whether prepared by the Company or otherwise, and whether in the possession of the Consultant or his/her representatives) and will not retain any copies, extracts or other reproductions in whole or in part of such data. The redelivery of such material shall not relieve the Consultant of his/her obligation of confidentiality or of the other obligations imposed hereunder.

8.   **Miscellaneous Provisions.**

a.   **Notices.**   All notices, requests or other communications under this Agreement shall be in writing and shall be considered as properly given or made if hand delivered with a confirmation receipt obtained, mailed hy the United States Postal Service from within the United States by certified mail, postage prepaid and return receipt requested, or sent by telecopier, and addressed to the location set forth in the preamble to this Agreement or to such other address or telecopier number as any party may have designated by like notice furnished to all other parties hereto. All notices shall be deemed effective when deposited in the U.S.

Mails, delivered or transmitted via Telecopier.

b.    <u>Entire Agreement</u>. This Agreement supercedes and is in full substitution for any previous confidentiality, nondisclosure, or noncompete agreement previously signed by the Consultant in contemplation of, or during his/her employment with the Company.

c.    <u>Assignment</u>.   This Agreement shall be assignable by the Company without the prior written consent of the Consultant.

d.    <u>Acknowledgments</u>. The Consultant acknowledges that he/she has been provided with a copy of this Agreement for review prior to signing it, that the Company hereby encourages the Consultant to have this Agreement reviewed by his/her own attorney prior to signing it, that the Consultant has signed the Agreement of his/her own free will, and that the Consultant understands the purposes and effects of this Agreement.

e.    <u>Headings</u>. The headings of this Agreement are inserted for convenience and identification only, and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

f.    <u>Application of California Law</u>. This Agreement, and the application or interpretation thereof, shall be governed exclusively by its terms and by the laws of the State of California and venue residing in San Joaquin County.

g.    <u>Counterparts</u>. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original.

h.    <u>Arbitration</u>. Any controversies arising out of the terms of this Agreement or its interpretation shall be settled in San Francisco, California in accordance with the rules of the American Arbitration Association, and the judgment upon award may be entered in any court having jurisdiction thereof.

i.    <u>Waiver</u>. The waiver by the Company of a breach or threatened breach of this Agreement shall not be construed as a waiver of any subsequent breach by the Consultant. The refusal or failure of the Company to enforce the restrictive covenants contained herein or contained in any other similar agreement against any other Consultant, agent, or independent contractor of the Company, for any reason, shall not constitute a defense to the enforcement of this Agreement by the Company against the Consultant, nor shall it give rise to any claim or cause of action by such Consultant against the Company.

j.    <u>Affiliate</u>: The term "affiliate" when used in this Agreement shall mean any other person or entity that directly or indirectly controls, or is under common control with, or is controlled by the specified person or entity herein, or if a person, any member of the immediate family of such individual, or any entity formed on behalf of the Company and/or in which Michael R. Llamas has ownership of any nature. As used in this definition, "<u>control</u>" shall mean possession, directly or indirectly, of power to direct or cause the direction of management or policies and "<u>immediate family</u>" shall mean any parent, child, grandchild, spouse, or sibling.

k.    <u>Company</u>: The term "Company" as used herein, shall include the Company and any Affiliate of the Company, its shareholders, consultants, officers, directors, and subsidiaries.

In witness whereof, the parties have hereunto executed this Agreement.

**Company**

<u>Medical Marijuana, Inc.</u>

By: _____

Print Name: _____

**Consultant** _____

_____

Charles K. Smith

Exhibit _C_

### Non-Disclosure, Non-Compete, Confidentiality Agreement

Confidentiality and Nondisclosure Agreement (the "Agreement"), effective this ____ day of April 2012, by and among the undersigned Consultant Charles K. Smith (the "Consultant"), whose mailing address is 108 Augusta Court, Fairhope AL 36532 and, Red Dice Holdings, LLC, its affiliates and/or assigns, whose corporate mailing address is 2665 Ariane Drive Suite 207, San Diego, CA 92117(the "Company/Corporate").

### BACKGROUND INFORMATION

The Company and its Affiliates (as defined herein) are engaged in the business of providing legal and cannabis based products, manufacturing, research/development and related businesses (collectively the "Business"). The Company wishes to employ the Consultant in connection with the Company's Business and the Consultant has agreed to become or continue to be so employed. Pursuant to such employment, the Consultant has been and/or will be exposed to and has received or will receive confidential and proprietary information of the Company or relating to the Company's business or affairs as defined in Section 1(a) below. The parties acknowledge and agree that the Trade Secrets and Other Confidential Information are valuable, special and unique assets of the Company and that the Trade Secrets and Other Confidential Information which the Consultant has received and/or will receive would allow the Consultant or a third party recipient of such information to unfairly and inequitably compete against the Company and to otherwise cause the Company significant and irreparable harm. Accordingly, in consideration of the mutual agreements contained herein, the parties agree as follows:

### OPERATIVE PROVISIONS

1.  **Confidentiality.**

    a.  **Definition:** For purposes of this Agreement, collectively the terms "Trade Secrets and/or Confidential Information" shall mean information disclosed to Consultant as a consequence of their employment relationship with the Company (and/or its subsidiaries or affiliates) and not generally known in their industry, whether tangible or intangible and whether written or oral, including but not limited to technical information, computer software, know-how, product information, concepts, operational processes, business and marketing plans/promotions, development, financial information, expansion plans, business policies and practices, customer, investor and/or vendor lists, manufacturing processes, designs, trade processes or secrets, industry research and information as to other business relationships of the Company and related matters.

    Consultant shall not disclose, during or after the term of Consultant's employment with the Company, all or any part of the Confidential Information to any person, corporation, other legal entity, or organization for any reason or purpose. In the event of Consultant's breach or threatened breach of this section, the Company shall be entitled to a preliminary restraining order and an injunction to restrain and enjoin Consultant from such disclosure. In addition to or in lieu of such action, the Company may pursue all other remedies available for such breach or threatened breach, including but not limited to the recovery of damages from Consultant.

    b.  **Unauthorized Disclosure.** The Consultant agrees that during the course of his/her employment with the Company and until the date ending four (4) years following termination the Consultant will keep such Trade Secrets and Other Confidential Information confidential and will not disclose or furnish to any other person or, directly or indirectly, use for his/her own account or the account of any other person, any Trade Secrets and Other Confidential Information, no matter from where or in what manner he/she may have acquired such Trade Secrets and Other Confidential Information, and he shall retain all such Trade Secrets and Other Confidential Information in trust for the benefit of the Company, its Affiliates and the successors and assigns of any of them. This confidentiality covenant has no geographical or territorial restriction. Upon the termination of employment, the Consultant promptly will supply to the Company all property, keys and Confidential Information which has been produced by, received by or otherwise submitted to the Consultant in the course of his/her employment with the Company, including the period during and prior to the Consultant's employment with the Company.

    c.  **Inventions.** The Consultant agrees that any and all inventions; discoveries, improvements, processes, copyrights and trademarks made, developed, discovered or acquired by him during his/her employment by the Company solely or jointly with others or otherwise, which relate to the business of the Company, and all knowledge possessed by the Consultant relating thereto (collectively, the "Inventions"), shall be fully and promptly disclosed to the Company's and shall be the sole and absolute property of the Company and the Company shall be the sole and absolute owner thereof.

2.     **Prohibited and Competitive Activities.** The Consultant and the Company recognize that due to the nature of the Consultant's engagement by the Company, the Consultant has had and will have access to Trade Secrets and Other Confidential Information. The Consultant acknowledges that such Trade Secrets and Other Confidential Information has been and will be of central importance to the business of the Company and its Affiliates and that disclosure of it to, or its use by, others (including, without limitation, the Consultant (other than with respect to the Company's business and affairs) could cause substantial loss to the Company. The Consultant accordingly agrees as follows:

a      **Prohibited Activities.** The Consultant will not, at any time during the course of Consultant's employment and for the four (4) year period following the termination of Consultant's employment: (i) directly or through one or more intermediaries, solicit for employment, employ or be involved with the employment of any person who, at the time of such solicitation, is employed by the Company or any Affiliate thereof; (ii) directly or indirectly, whether for his/her own account or for the account of any other person, solicit, divert or endeavor to entice away from the Company or any Affiliate, or otherwise engage in any activity intended to terminate, disrupt or interfere with, the Company's or any of its Affiliate's relationships with, customers, or otherwise adversely affect the Company's or any of its Affiliate's relationship with Customers or other business relationships of the Company or any Affiliate thereof; or (iii) publish or make any statement critical of the Company, or its Affiliates, or any of their respective Consultants, agents, consultants or shareholders, or in any way adversely affect or otherwise malign the business or reputation of any of the foregoing persons being herein referred to as a **"Prohibited Activity"**); unless required to do so by law. Company shall not publish or make any statement critical of the Consultant in any way that would adversely affect or otherwise malign his/her reputation.

b.      For a period of four (4) years after the termination of this Agreement, Consultant shall not, within a radius of fifty (50) miles from the Company's present corporate headquarters or any of its facilities, directly or indirectly, own, manage, operate, control, be employed by, participate in, or be connected in any manner with the ownership, management, operation, or control similar to the type of business conducted by the Company at the time this Agreement terminates. In the event of Consultant's actual or threatened breach of this restrictive covenant, the Company shall be entitled to a preliminary restraining order and injunction in order to restrain Consultant from such breach. Nothing in this Agreement shall be construed to prohibit the Company from pursuing any other available remedies at law or in equity.

3      **Divisibility of Covenant Period.** If any portion of the restrictive covenant contained in this Agreement is held to be unreasonable, arbitrary or against public policy, such covenant shall be considered divisible with the remaining provisions deemed effective and be specifically enforceable against the Consultant.

4      **Enforcement.** The parties understand and agree that the covenants set forth in this Agreement are essential elements of the Company's engagement of the Consultant and that without the Consultant's agreement to comply with such covenants; the Company would not have agreed to engage or to continue to engage the Consultant, or to provide Consultant with Trade Secrets and Other Confidential Information. Further, the Consultant expressly acknowledges that the restrictions contained in this Agreement are reasonable in scope and are necessary to accomplish the mutual objectives of the parties and to protect the Company's legitimate interests in protecting their business. The Consultant further acknowledges that any violation of the restrictions contained in this Agreement will cause significant and irreparable harm to the for which the Company Company's remedy is binding arbitration as defined in section 16 of "Employment Agreement. The Company shall also be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief, including but not limited to a temporary restraining order, a temporary or preliminary injunction or a permanent injunction, to enforce the provisions of this Agreement.

5.     **Intent of Parties.** The covenants and agreements herein shall be construed as agreements independent of any other provision of Consultant's employment.

6.     **Mandatory Disclosure.** The Consultant shall, in the event that he/she is requested or required (by oral question, interrogatory, request for information or documents, subpoena, investigative demand or similar process) to disclose any information supplied to the Consultant in the course of his/her dealings with the Company, if he/she may lawfully required to do so.

7.     **Redelivery of Confidential Material.** Upon the Company's request, and in any case upon the termination of Consultant's employment, the Consultant shall promptly deliver to the Company all written data containing, or reflecting any information about the Company, its shareholders, officers, directors, Consultants, agents or consultants, (whether prepared by the Company or otherwise, and whether in the possession of the Consultant or his/her representatives) and will not retain any copies, extracts or other reproductions in whole or in part of such data. The redelivery of such material shall not relieve the Consultant of his/her obligation of confidentiality or of the other obligations imposed hereunder.

8.     **Miscellaneous Provisions.**

a.     **Notices.** All notices, requests or other communications under this Agreement shall be in writing and shall be considered as properly given or made if hand delivered with a confirmation receipt obtained, mailed by the United States Postal

Service from within the United States by certified mail, postage prepaid and return receipt requested, or sent by telecopier, and addressed to the location set forth in the preamble to this Agreement or to such other address or telecopier number as any party may have designated by like notice furnished to all other parties hereto. All notices shall be deemed effective when deposited in the U.S. Mails, delivered or transmitted via Telecopier.

b.     Entire Agreement. This Agreement supercedes and is in full substitution for any previous confidentiality, nondisclosure, or noncompete agreement previously signed by the Consultant in contemplation of, or during his/her employment with the Company.

c.     Assignment. This Agreement shall be assignable by the Company without the prior written consent of the Consultant.

d.     Acknowledgments. The Consultant acknowledges that he/she has been provided with a copy of this Agreement for review prior to signing it, that the Company hereby encourages the Consultant to have this Agreement reviewed by his/her own attorney prior to signing it, that the Consultant has signed the Agreement of his/her own free will, and that the Consultant understands the purposes and effects of this Agreement.

e.     Headings. The headings of this Agreement are inserted for convenience and identification only, and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

f.     Application of California Law. This Agreement, and the application or interpretation thereof, shall be governed exclusively by its terms and by the laws of the State of California and venue residing in San Joaquin County.

g.     Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original.

h.     Arbitration. Any controversies arising out of the terms of this Agreement or its interpretation shall be settled in San Francisco, California in accordance with the rules of the American Arbitration Association, and the judgment upon award may be entered in any court having jurisdiction thereof.

i.     Waiver. The waiver by the Company of a breach or threatened breach of this Agreement shall not be construed as a waiver of any subsequent breach by the Consultant. The refusal or failure of the Company to enforce the restrictive covenants contained herein or contained in any other similar agreement against any other Consultant, agent, or independent contractor of the Company, for any reason, shall not constitute a defense to the enforcement of this Agreement by the Company against the Consultant, nor shall it give rise to any claim or cause of action by such Consultant against the Company.

j.     Affiliate: The term "affiliate" when used in this Agreement shall mean any other person or entity that directly or indirectly controls, or is under common control with, or is controlled by the specified person or entity herein, or if a person, any member of the immediate family of such individual, or any entity formed on behalf of the Company and/or in which Michael R. Llamas has ownership of any nature. As used in this definition, "control" shall mean possession, directly or indirectly, of power to direct or cause the direction of management or policies and "immediate family" shall mean any parent, child, grandchild, spouse, or sibling.

k.     Company: The term "Company" as used herein, shall include the Company and any Affiliate of the Company, its shareholders, consultants, officers, directors, and subsidiaries.

In witness whereof, the parties have hereunto executed this Agreement.

Company

Red Dice Holdings, LLC.

By: _____

Print Name: _____

Consultant _____

Charles K. Smith

# EXHIBIT D

## DIXIE MEMBER INVENTORY TO BE TRANSFERRED

## Capital Inventory

| Item Category | Item | Quantity in Stock |
|---|---|---|
| Appliance | Anvil food machine | 1 |
| Appliance | Black & Decker food processor | 1 |
| Appliance | Coffee heater/dispensers | 2 |
| Appliance | Convection heater | 2 |
| Appliance | Flash freezer | 1 |
| Appliance | Freezers | 3 |
| Appliance | Garland oven | 1 |
| Appliance | GE Double range top burner | 1 |
| Appliance | Ice cream maker | 1 |
| Appliance | Ice Machine | 1 |
| Appliance | McCains Carbonator | 1 |
| Appliance | Microwave | 2 |
| Appliance | Minifridge | 3 |
| Appliance | Otis Spunkmeyer oven | 1 |
| Appliance | Steamers (with trays) | 3 |
| Bottles and Caps | 1 dram Clear Glass Vial w/ Blk Cap | 0.5 Case |
| Bottles and Caps | 1/2 oz Doublewall Jar w/ Lid | 90 |
| Bottles and Caps | 1/4 oz Doublewall Jar w/ Lid | 170 |
| Bottles and Caps | 12 oz Bottles | 2.3 Pallet |
| Bottles and Caps | 2 Dram Clear Jar | 80 |
| Bottles and Caps | 2 oz Boston Round Green, Blue or Amber | 4.8 Case |
| Bottles and Caps | 2 oz Plastic Natural w/ Fliptop | 200 |
| Bottles and Caps | 4 oz Plastic Natural w/ Fliptop | 178.0 Pallet |
| Bottles and Caps | Amber Bottles, 1 oz. | 4.0 Case |
| Bottles and Caps | Caps for 2 oz Plastic Boston Rounds | 6000 |
| Bottles and Caps | Clear Bottles, 1 oz. | Case |
| Bottles and Caps | Eye Droppers | 0.2 Box |
| Bottles and Caps | Oxygen Barrier Crown Caps (Gold) | 1.0 Case |
| Bottles and Caps | Oxygen Barrier Crown Caps (Silver) | 3.0 Case |
| Bottles and Caps | Shrink Wrap Sleeves (1.5 x 1) | 0.7 Case |
| Bottles and Caps | Spritzers | 250 |
| Boxes | 24 CELL BEER PARTITION | 200 |
| Boxes | 4-Packs Boxes | 5.0 Case |
| Boxes | Cases for 24 Elixir Bottles | 900 |
| Boxes | Packing Boxes (10x10xS) | 5 |
| Boxes | Packing Boxes (10x5x5) | 5 |
| Boxes | Packing Boxes (10x8x6) | 15 |
| Boxes | Packing Boxes (12x8x6) | 15 |
| Boxes | Packing Boxes (12x9x4) | 15 |
| Boxes | Packing Boxes (16x10x6) | 15 |
| Boxes | Packing Boxes (B 3/4x6 3/8x3 3/8) | 15 |
| Colors | Orange Color (3946) | 0.8 Bottle |
| Colors | Red Color | 0.1 Bottle |
| Colors | Yellow Color | 0.8 Bottle |

Capital Inventory

| Item Category | Item | Quantity in Stock |
|---|---|---|
| Containers | 1 dram amber vials | 250 |
| Containers | 1 dram eye droppers | 340 |
| Containers | 1 dram vials with caps | 2000 |
| Containers | 1/2 gallon palstic jugs | 35 |
| Containers | 8 oz jars | 20 |
| Containers | Edibles packaging boxes | 1200 |
| Containers | Long eye droppers | 40 |
| Cooking Supplies | Baking dishes | 2 |
| Cooking Supplies | Baking gloves | 2 |
| Cooking Supplies | Baking trays (Large) | 18 |
| Cooking Supplies | Baking trays (Med) | 3 |
| Cooking Supplies | Baking trays (Small) | 1 |
| Cooking Supplies | Brownie trays | 3 |
| Cooking Supplies | Candy molds | 15 |
| Cooking Supplies | Cooking pots | 5 |
| Cooking Supplies | Cooking thermometers | 3 |
| Cooking Supplies | Cooling racks | 6 |
| Cooking Supplies | Crock pots | 5 |
| Cooking Supplies | Cutting board | 2 |
| Cooking Supplies | Hot pads | 2 |
| Cooking Supplies | Ladels | 5 |
| Cooking Supplies | Large knives | 2 |
| Cooking Supplies | Measuring cups | 8 |
| Cooking Supplies | Measuring spoons | 2 sets |
| Cooking Supplies | Mixing bowls (plastic) | 2 |
| Cooking Supplies | Mixing bowls (steel) | 7 |
| Cooking Supplies | Muffin tray | 1 |
| Cooking Supplies | Pans | 2 |
| Cooking Supplies | Pizza cutter | 1 |
| Cooking Supplies | Rolling pin | 1 |
| Cooking Supplies | Rubber grabbers | 2 |
| Cooking Supplies | Scoops | 9 |
| Cooking Supplies | Spatulas | 8 |
| Cooking Supplies | Square metal baking trays | 5 |
| Cooking Supplies | Stockpots | 9 |
| Cooking Supplies | Tongs | 3 |
| Cooking Supplies | Truffle molds | 25 |
| Cooking Supplies | Wax paper | 1 |
| Cooking Supplies | Wisks | 10 |
| Electrical | 800 watt surge protector | 1 |
| Elixir | Non-medicated elixirs | 7 cases |
| Extraction | 1/2 in dia hose | 5.5' |
| Extraction | 1/2 in dia plastic tubing | 3 ft |
| Extraction | 10 ml syringe | 1 |

**Capital Inventory**

| Item Category | Item | Quantity in Stock |
|---|---|---|
| Extraction | 2 gallon white buckets | 5 |
| Extraction | 2L Erlenmeyer flask | 2 |
| Extraction | 5 ml syringe | 3 |
| Extraction | 5-gallon exhaust containment vessel (styrofoam) | 1 |
| Extraction | 6 Qt ice holder pot | 1 |
| Extraction | Alcatel 2204A Series vacuum pump | 1 |
| Extraction | Beakers (100 to 1000 ml) | 10 |
| Extraction | Beakers (2000 ml) | 5 |
| Extraction | Bubble bags (20 gallon) | 1 set |
| Extraction | Bubble bags (5 gallon) | 1 set |
| Extraction | Can filter | 1 |
| Extraction | Centering rings | 2 |
| Extraction | Ceramic pore filters | 2 |
| Extraction | Charcoal containers | 2 |
| Extraction | Coffee filters | 200 |
| Extraction | Counter weights | 3 |
| Extraction | Exhaust container | 1 |
| Extraction | Extraction cone | 1 |
| Extraction | Flasks | 3 |
| Extraction | Funnel | 1 |
| Extraction | Lab Stand w/ 3-prong clamp & C-clamp | 1 |
| Extraction | Large distillation set-up | 1 |
| Extraction | Medium ceramic pore filter | 1 |
| Extraction | Microscope | 1 |
| Extraction | Neoprene gasket | 1 |
| Extraction | NWKF25 C-clamps | 4 |
| Extraction | NWKF25 fitting to hose-barb adapter | 2 |
| Extraction | Press | 1 |
| Extraction | Pyrex dishes | 3 |
| Extraction | Razor blade handles | 2 |
| Extraction | Recovered solvent container | 1 |
| Extraction | Scoopula | 1 |
| Extraction | Scraper | 4 |
| Extraction | Silicon scraper | 1 |
| Extraction | Stainless steel top plate w/ brass needle valve | 1 |
| Extraction | Stir rods | 2 |
| Extraction | Styrofoam insulating covers | 2 |
| Extraction | Teflon tape | 5 rolls |
| Extraction | Vacuum lubricant | 1/2 bottle |
| Extraction | Vacuum round bottom trap | 1 |
| Extraction | Vacuum sealer | 1 |
| Extraction | Vacuum vessel holder | |
| Extraction | Vacuum vessel top plate C-clamp | 1 |
| Extraction | Vacuum vessel w/ hose barb | |

## Capital Inventory

| Item Category | Item | Quantity in Stock |
|---|---|---|
| Extraction | Viton O-ring for top plate | 1 |
| Extraction | Wash bottles | 2 |
| Flavors | Dew Drop Flavor (Spearmint) | 0.6 Bottle |
| Flavors | Dew Drop Flavor (Vanilla) | 0.4 Bottle |
| Flavors | Dew Drop Flavor (Watermelon) | 0.3 Bottle |
| Flavors | Flavor - Cherry (380266) | 0.9 Bottle |
| Flavors | Flavor - Coffee Extract (341934) | 0.9 Bottle |
| Flavors | Flavor - Lemon Lime (307939) | 0.9 Bottle |
| Flavors | Flavor - Orange Tangerine (344876) | 0.9 Bottle |
| Flavors | Flavor - Watermelon (337867) | 0.9 Bottle |
| Flavors | Lemonade Concentrate | 1.0 Case |
| Flavors | Natural Red Hot Cinnamon 345468 | 0.5 Bottle |
| Flavors | Sweet Tea Concentrate | 4.0 Case |
| Flavors | Syrup, Blueberry | 2.0 Box |
| Flavors | Syrup, Grapefruit | 3.0 Box |
| Flavors | Syrup, Mandarin | 6.0 Box |
| Flavors | Syrup, Peach | 6.0 Box |
| Flavors | Syrup, Pomegranate | 2.0 Box |
| Flavors | Syrup, Red Currant | 4.0 Box |
| Flavors | Syrup, Sarsparilla | 5.0 Box |
| Flavors | Vanilla Crème 345469 | 0.9 Bottle |
| Flavors | Vanilla Extract (Rodelle) | 0.2 Bottle |
| Furnishings | Baking racks | 4 |
| Furnishings | Desk organizer | 1 |
| Furnishings | File Cabinets | 2 |
| Furnishings | Locking cabinets | 4 |
| Furnishings | Metal rolling table (30x30) | 4 |
| Furnishings | Metal rolling table (48x30) | 4 |
| Furnishings | Metal rolling table (90x30) | 6 |
| Furnishings | Plastic table set with four chairs | 1 |
| Furnishings | Rubber floor mats | 15 |
| Furnishings | Waste baskets | 5 |
| Furnishings | Water Coolers | 2 |
| Furnishings | White boards | 3 |
| Ice Cream | Ice Cream cup-spoon-lid sets | 2000 |
| Ice Cream | Ice cream supplies | 1 |
| Ingredient - Botanicals | Bees Wax Pastilles | 0.8 Bag |
| Ingredient - Botanicals | Bentonite (Clay) | 1.5 Bag |
| Ingredient - Botanicals | Castor Oil | 0.7 Drum |
| Ingredient - Botanicals | Cedarwood Himalayan India | 1.0 Bottle |
| Ingredient - Botanicals | Cocoa Butter Waffers | 1.0 Bag |
| Ingredient - Botanicals | Epsom Salts (Fine) | 3.5 Box |
| Ingredient - Botanicals | Eucalyptus Oil | 2.0 Bottle |
| Ingredient - Botanicals | Frankincense Olibanum Ethiopia | 0.3 Bottle |

**Capital Inventory**

| Item Category | Item | Quantity in Stock |
|---|---|---|
| Ingredient - Botanicals | Isopropyl Alcohol | 6.0 Bottle |
| Ingredient - Botanicals | Lavender Hungary | 1.3 Bottle |
| Ingredient - Botanicals | Lemon Oil | 0.8 Bottle |
| Ingredient - Botanicals | Lobelia | 0.8 Pack |
| Ingredient - Botanicals | Olive Oil Everyday Ex Virgin - #64755 Corto | 2.0 Bottle |
| Ingredient - Botanicals | Rosemary Camphor Type | 1.0 Bottle |
| Ingredient - Botanicals | Scotch Pine Bulgaria | 0.5 Bottle |
| Ingredient - Botanicals | Sea Salt | 3.5 Box |
| Ingredient - Edibles | Chocolate - French Vanilla Guittard 5640 | 0.5 Case |
| Ingredient - Edibles | Chocolate Chips (2000 ct) Guittard | 0.5 Box |
| Ingredient - Edibles | Coating Chocolate - A Peels 5790c | 0.5 Case |
| Ingredient - Edibles | Cocoa Powder Guittard Dutch Chocolate | 0.8 Bag |
| Ingredient - Edibles | Confectioners Sugar (powdered) | 0.9 Bag |
| Ingredient - Edibles | Corn Syrup | 0.7 Case |
| Ingredient - Edibles | Dry Powdered Milk (Organic Valley) | 2.5 Case |
| Ingredient - Edibles | Granulated Extra Fine Sugar | 5.0 Bag |
| Ingredient - Edibles | Heavy Cream | 0.8 Case |
| Ingredient - Edibles | Marshmellow (Mini Jet Puffed) | 2.5 Bag |
| Ingredient - Edibles | Rice Krispies | 1.0 Case |
| Ingredient - Edibles | Silicon Dioxide | 0.5 Bag |
| Ingredient - Edibles | Tapioca Syrup | 0.8 Pail |
| Ingredient - Edibles | Unsalted Butter | 0.9 Case |
| Ingredient - Edibles | Vegetable Oil | 0.5 Bottle |
| Ingredients | Grape flavoring | 1 gallon |
| Ingredients | Lemon juice | 1 bottle |
| Ingredients | Misc spices | 1 box |
| Ingredients | Mixed berry flavoring | 1 gallon |
| Ingredients | Peanut butter | 1 bucket |
| Ingredients - Misc | Agave Nectar | 0.4 Bottle |
| Ingredients - Misc | Caffeine | 1.0 Bag |
| Ingredients - Misc | Citric Acid | 0.5 Bag |
| Ingredients - Misc | Glycerin | 1.0 Drum |
| Ingredients - Misc | Hemp Oil (NUV 2100109) | 2.0 Bottle |
| Ingredients - Misc | Potassium Glucarate | 0.6 Drum |
| Ingredients - Misc | Sodium Benzoate | 0.8 Bag |
| Ingredients - Misc | Sodium Bicarbonate | 1.5 Box |
| Ingredients - Misc | TIC Gums Beverage 500 | 0.5 Bag |
| Ingredients - Misc | Water | 10.0 Bottle |
| Ingredients - Scrips | Ashwangandha Root | 1.0 Bag |
| Ingredients - Scrips | Capsules - Aqua-Aqua - Size 0 | 0.1 Bag |
| Ingredients - Scrips | Capsules - Aqua-White - Size 0 | 1.2 Bag |
| Ingredients - Scrips | Capsules - Orange-White - Size 0 | 1.2 Bag |
| Ingredients - Scrips | Conjugated Linoleic Acid | 0.6 Bag |
| Ingredients - Scrips | Eleuthero Root | 1.0 Bag |

## Capital Inventory

| Item Category | Item | Quantity in Stock |
|---|---|---|
| Ingredients - Scrips | Hop Flour | 1.0 Bag |
| Ingredients - Scrips | L-Theanine | 1.0 Bag |
| Ingredients - Scrips | Rice Starch | 1.0 Bag |
| Ingredients - Scrips | Tumeric Powder | 0.5 Bag |
| Ingredients - Scrips | White Willow Bark | 1.5 Bag |
| Labels | 1-In Diameter Labels | 2.0 Box |
| Labels | Bath Salts Labels (Medium) | 1125 |
| Labels | Bath Salts Labels (Sample) | 520 |
| Labels | Bath Salts Labels (Small) | 1000 |
| Labels | Compliance Label | 0.4 Case |
| Labels | Compliance Label (Large) | 0.8 Case |
| Labels | Dew Drop Labels, Watermelon (1 oz.) | 1000 |
| Labels | Dew Drop Labels, Natural (1 oz.) | 500 |
| Labels | Dew Drop Labels, Spearmint (1 oz.) | 1250 |
| Labels | Dew Drop Labels, Vanilla | 500 |
| Labels | Dixie Roll Label (Individual) | 3800 |
| Labels | Edibles Crispy Treat Labels | 700 |
| Labels | Edibles Dixie Roll Labels | 500 |
| Labels | Edibles Fruit Lozenge Labels | 800 |
| Labels | Edibles Ingredient Labels (3x4) | 0.7 Case |
| Labels | Edibles Truffles Labels | 300 |
| Labels | Elixir Labels - Lemonade | 1200 |
| Labels | Elixir Labels - Sweet Tea | 300 |
| Labels | Elixir Labels -Water (Mixed Berry) | 100 |
| Labels | Elixir Labels, Blueberry | 1700 |
| Labels | Elixir Labels, Grapefruit | 2750 |
| Labels | Elixir Labels, Mandarin | 2378 |
| Labels | Elixir Labels, Peach | 2470 |
| Labels | Elixir Labels, Pomegranate | 1600 |
| Labels | Elixir Labels, Red Currant | 1400 |
| Labels | Elixir Labels, Sarsparilla | 2378 |
| Labels | Label Ribbon (4inx1345ft Sato TR4085 Black) | 4.0 Roll |
| Labels | Massage Oil Labels 1 Dram | 0.4 Roll |
| Labels | Massage Oil Labels 2 oz. | 0.4 Roll |
| Labels | Massage Oil Labels 4 oz. | 0.7 Roll |
| Labels | Pain Salve Labels .25 oz (Side) | 2.1 Roll |
| Labels | Pain Salve Labels .25 oz (Top) | 2.0 Roll |
| Labels | Pain Salve Labels .5 oz (Side) | 1.5 Roll |
| Labels | Pain Salve Labels .5 oz (Top) | 0.8 Roll |
| Labels | Pain Salve Labels 1.33 oz (Side) | 1.6 Roll |
| Labels | Pain Salve Labels 1.33 oz (Top) | 1.2 Roll |
| Labels | Snake Oil Labels 1 oz. | 400 |
| Labels | Snake Oil Labels 2 oz. | 1300 |
| Labels | Tonic Label | 2000 |

**Capital Inventory**

| Item Category | Item | Quantity In Stock |
|---|---|---|
| Misc | 1 oz sample cups | 2000 |
| Misc | 2 oz. Sample Cups | 0.8 Case |
| Misc | Air filter machines | 2 |
| Misc | Charcoal | 0.2 Box |
| Misc | CO2, Small Canisters | 0.5 |
| Misc | Delicate Garmet Bag (Ex. Large) | 8 |
| Misc | Ethanol (Everclear) | 0.4 Case |
| Misc | Ethanol (Pure Deantured | 0.5 Case |
| Misc | Event banners | 1 |
| Misc | Filter Paper (9cm Fast) | 1.0 Box |
| Misc | Filter Paper (9cm Slow) | 1.0 Box |
| Misc | GLOVES - BLUE 3.5 MIL POWDER FREE NITRILE GLOBOX | 1.2 Case |
| Misc | Large metal wagon | 1 |
| Misc | Mason jars | 8 |
| Misc | Metal pails | 5 |
| Misc | New Wave Enviro Dairy Eastar Resin Bottle, 1-Gallon | 2.0 Case |
| Misc | Pallet Jack | 1 |
| Misc | Pallets | 10 |
| Misc | Pan Coating | 1.5 |
| Misc | Party supplies | 1 bin full |
| Misc | Plastic cups | 1750 |
| Misc | Plastic Wrap - 24 in | 0.5 Box |
| Misc | Propylene glycol | 55 gallons |
| Misc | Safety goggles | 5 |
| Misc | Syringes, 30 ml | 1.0 Box |
| Misc | Syringes, 60 ml | 2.0 Box |
| Misc | Ziplock Bags (Large) | 3.0 Box |
| Misc | Ziplock Bags (Small) | 4.0 Box |
| Packaging | 3x5 Heat Sealable Bags | 30.0 Pack |
| Packaging | 4" x 6" LDPE-Plain Opened Bags 2 mil | 300.0 Pack |
| Packaging | Bath Salts Bag (3 x 1.5 x 5) | 10.0 Pack |
| Packaging | Candy Jar for Dixie Rolls | 6 |
| Packaging | Dixie Roll Bags (8"x12") | 40 |
| Packaging | Dixie Rolls - Foil Wraps | 2.0 Pack |
| Packaging | Edible Boxes | 1.0 Case |
| Packaging | Ice Cream Cups | Case |
| Packaging | Massage Oil Information Cards | 0.3 Box |
| Packaging | Pain Salve Information Cards | 1.0 Box |
| Packaging | Pleated Cellophane Bag (2.5 x 1.25 x 5) | 0.8 Case |
| Packaging | Point of Sale Display Racks | 0.7 Case |
| Packaging | Poly tube on a roll 4 in 2 MIL  2150 ft | 0.1 Roll |
| Packaging | Scrips Information Cards | 0.7 Box |

**Capital Inventory**

| Item Category | Item | Quantity in Stock |
|---|---|---|
| Packaging | Shrink Wrap for Large Pain Salves | 1.0 Pack |
| Packaging | Shrink Wrap for Small Pain Salves | 1.0 Pack |
| Packaging | Shrinkwraps for Large Massage Oil Bottles | 0.4 Pack |
| Packaging | Shrinkwraps for Small Massage Oil Bottles | 0.3 Pack |
| Packaging | White Fluted Baking Cup 1 1/4" x 7/8" | 0.5 Case |
| Packing | 4-packs (plain) | 250 |
| Packing | 6-packs (plain) | 20 |
| Packing | Bubble Wrap (1/2") | 0.6 Roll |
| Packing | Bubble Wrap (1/4") | 3.0 Roll |
| Packing | Packaging Tape | 0.5 Box |
| Packing | Packing Peanuts | 1.0 Bag |
| Packing | Paper Bags (4 lb) | 5.0 Bag |
| Packing | Sleeve bags (blue) | 100 |
| R&D | Emulsifying wax | 5 lb |
| Safety | Fire extinguisher | 1 |
| Scales | Large digital scale | 1 |
| Storage | 12x12 Clear plastic carrying cases | 6 |
| Storage | Bins | 21 |
| Storage | Black kitchen storage bins | 4 |
| Storage | Large white plastic storage tray | 4 |
| Storage | Metal storage trunk (Rubbermaid) | 1 |
| Storage | Storage racks | 4 |
| Storage | Tote (blue) | 1 |
| Utilities and Tools | 300 capsule pill packers | 2 |
| Utilities and Tools | 3-way extension cord (Heavy duty) | 1 |
| Utilities and Tools | 4-way faucet splitter | 1 |
| Utilities and Tools | Acasi filler | 1 |
| Utilities and Tools | Air compressor | 1 |
| Utilities and Tools | Air compressor hoses | 2 |
| Utilities and Tools | Beverage tanks | 10 |
| Utilities and Tools | Bottle drying trees | 3 |
| Utilities and Tools | Bottle sanitizer | 1 |
| Utilities and Tools | Bottling machine (Applied Bottling) | 1 |
| Utilities and Tools | Buckets (5 gal) | 12 |
| Utilities and Tools | Cappers | 2 |
| Utilities and Tools | Category 5 cable | 1 box |
| Utilities and Tools | Chiller | 1 |
| Utilities and Tools | CO2 regulator | 1 |
| Utilities and Tools | CO2 tanks | 3 |
| Utilities and Tools | Coffee grinder | 2 |
| Utilities and Tools | Dollies | 2 |
| Utilities and Tools | Drink dispensing buckets | 6 |
| Utilities and Tools | Drink dispensing hoses | 5 |
| Utilities and Tools | Glass pill tampers | 2 |

## Capital Inventory

| Item Category | Item | Quantity in Stock |
|---|---|---|
| Utilities and Tools | Hash maker | 1 |
| Utilities and Tools | Heat sealers | 2 |
| Utilities and Tools | Ice scoop (1/2 cup) | 1 |
| Utilities and Tools | Immersion blender | 2 |
| Utilities and Tools | Ninja blender | 2 |
| Utilities and Tools | Paper cutter | 1 |
| Utilities and Tools | Pipe cleaner brush | 1 |
| Utilities and Tools | Power drill | 1 |
| Utilities and Tools | Riobi skill saw | 1 |
| Utilities and Tools | Rolling carts | 3 |
| Utilities and Tools | Rubber hoses | 3 |
| Utilities and Tools | Scale (large A/C) | 1 |
| Utilities and Tools | Scales (small battery powered) | 3 |
| Utilities and Tools | Storage tank | 1 |
| Utilities and Tools | Syrup dispensing hose | 1 |
| Utilities and Tools | Tool box full of tools | 1 |

## Dixie Intellectual Property Exhibit

| Item # | Property | Category | Location of Property |
|---|---|---|---|
| 1 | Bath Salts | Botanical | Dixie Recipe & COGS Manual |
| 2 | Massage Oil | Botanical | Dixie Recipe & COGS Manual |
| 3 | Pain Salve | Botanical | Dixie Recipe & COGS Manual |
| 4 | Snake Oil | Botanical | Dixie Recipe & COGS Manual |
| 5 | Chocolate Truffles | Edible | Dixie Recipe & COGS Manual |
| 6 | Crispy Rice Treats | Edible | Dixie Recipe & COGS Manual |
| 7 | Dixie Rolls | Edible | Dixie Recipe & COGS Manual |
| 8 | Lozenges (Café Flavors) | Edible | Dixie Recipe & COGS Manual |
| 9 | Lozenges (Fruit Flavored) | Edible | Dixie Recipe & COGS Manual |
| 10 | Blueberry Elixir (40 mg) | Elixir 40 | Dixie Recipe & COGS Manual |
| 11 | Grapefruit Elixir (40 mg) | Elixir 40 | Dixie Recipe & COGS Manual |
| 12 | Lemonade Elixir | Elixir 40 | Dixie Recipe & COGS Manual |
| 13 | Mandarin Elixir (40 mg) | Elixir 40 | Dixie Recipe & COGS Manual |
| 14 | Mixed Berry Water | Elixir 40 | Dixie Recipe & COGS Manual |
| 15 | Peach Elixir (40 mg) | Elixir 40 | Dixie Recipe & COGS Manual |
| 16 | Pomegranite Elixir (40 mg) | Elixir 40 | Dixie Recipe & COGS Manual |
| 17 | Red Currant Elixir (40 mg) | Elixir 40 | Dixie Recipe & COGS Manual |
| 18 | Sarsparilla Elixir (40 mg) | Elixir 40 | Dixie Recipe & COGS Manual |
| 19 | Sweet Tea Elixir | Elixir 40 | Dixie Recipe & COGS Manual |
| 20 | Blueberry Elixir (75 mg) | Elixir 75 | Dixie Recipe & COGS Manual |
| 21 | Grapefruit Elixir (75 mg) | Elixir 75 | Dixie Recipe & COGS Manual |
| 22 | Mandarin Elixir (75 mg) | Elixir 75 | Dixie Recipe & COGS Manual |
| 23 | Peach Elixir (75 mg) | Elixir 75 | Dixie Recipe & COGS Manual |
| 24 | Pomegranite Elixir (75 mg) | Elixir 75 | Dixie Recipe & COGS Manual |
| 25 | Red Currant Elixir (75 mg) | Elixir 75 | Dixie Recipe & COGS Manual |
| 26 | Sarsparilla Elixir (75 mg) | Elixir 75 | Dixie Recipe & COGS Manual |
| 27 | Cannabis Isopropyl Extract | Ingredient | Dixie Production Database |
| 28 | Cannabis Olive Oil | Ingredient | Dixie Production Database |
| 29 | Essential Oil Blend (Massage) | Ingredient | Dixie Production Database |
| 30 | Essential Oil Blend (Salve and Bath Salts) | Ingredient | Dixie Production Database |
| 31 | Essential Oil Blend (Snake Oil) | Ingredient | Dixie Production Database |
| 32 | Lobelia Extract | Ingredient | Dixie Production Database |
| 33 | Lobelia Extract (Reduced) | Ingredient | Dixie Production Database |
| 34 | Lobelia Olive Oil | Ingredient | Dixie Production Database |
| 35 | Tonic Chemical Mixture | Ingredient | Dixie Production Database |
| 36 | Scrips - Focus Formula | Scrips | Dixie Recipe & COGS Manual |
| 37 | Scrips - Pain Formula | Scrips | Dixie Recipe & COGS Manual |
| 38 | Scrips - Sleep Formula | Scrips | Dixie Recipe & COGS Manual |
| 39 | Hash Extract-Glass | Smoking Grade | Dixie Recipe & COGS Manual |
| 40 | Dew Drops - Natural | Tincture | Dixie Recipe & COGS Manual |
| 41 | Dew Drops - Spearmint | Tincture | Dixie Recipe & COGS Manual |
| 42 | Dew Drops - Vanilla | Tincture | Dixie Recipe & COGS Manual |
| 43 | Dew Drops - Watermelon | Tincture | Dixie Recipe & COGS Manual |
| 44 | Tonic - Mandarin | Tonic | Dixie Recipe & COGS Manual |
| 45 | Dixie Proprietary Marks & Logos | Marketing | Marketing Database |
| 46 | Website: www.dixieelixirs.com | Marketing | Marketing Database/Hosting |
| 47 | Dixie related web domains | Marketing | Marketing Database/Hosting |
| 48 | - dixietinctures.com | | |
| 49 | - dixiebotanicals.com | | |
| 50 | - dixiescripts.com | | |

# EXHIBIT E
## EXCLUSIVE LICENSING AGREEMENT WITH LEFT BANK, LLC

# EXHIBIT F
## KEBER EMPLOYMENT CONTRACT; SMITH CONSULTING AGREEMENT



## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (the "Agreement") is made this __ day of April 2012 (the "Effective Date"), by **RED DICE HOLDINGS, LLC,** (the "Company"), and **VINCENT M. KEBER, III,** a Colorado resident ("Executive") (the foregoing collectively, the "Parties" and each a "Party").

### R E C I T A L S

WHEREAS, On or about April ___ 2012, the Company retained Executive to serve on a full time basis as a senior officer in the capacity of **President**; and

WHEREAS, The Parties wish to memorialize formally the material terms and conditions applicable to Executive's employment position with the Company.

WHEREFORE, In furtherance of the foregoing events and objectives, and with full acknowledgement of and intent to be bound by the terms hereof, the Parties agree as follows:

### W I T N E S S E T H

**1.     Integration.**   The Parties expressly incorporate the foregoing Recitals as material terms of this Agreement, reflecting not only their intent and objectives but also the consideration to be exchanged by the Parties hereunder.

**2.     Employment; Nature of Relationship; Term.**   The Company hereby affirms its employment of Executive, and Executive hereby affirms his acceptance of employment from and for the Company, upon the terms and conditions of this Agreement.  The Parties expressly acknowledge that the relationship between them is and shall be that of employer-Executive for a period of one (1) year from the Effective Date (the "Initial Term"); provided, however, that the period of the Executive's employment pursuant to this Agreement shall be automatically extended for successive one-year periods thereafter (each, a "Renewal Term"), in each case unless either Party hereto provides the other Party hereto with written notice that such period shall not be so extended at least 90 days in advance of the expiration of the Initial Term or the then-current Renewal Term, as applicable (the Initial Term and any Renewal Term, collectively, the "Term").

**3.     Scope and Extent of Employment Duties.**   Executive shall serve as the Company's **President.** Executive shall devote his time and attention to the Company's business on a full time basis.  Executive may engage in any directorship, consulting project, or other active business engagements during the term of this Agreement, regardless of whether such activity is pursued for gain, profit or nonprofit; provided, however, such activities do not materially interfere with Executive's duties as President.  Executive may invest his assets, however, in other companies or ventures, provided that same does not require Executive's services in the operation of their affairs, and provided further that such companies or ventures (except for Left Bank, LLC) do not compete either directly or indirectly with the Company, its affiliates and/or assigns.

    3.1     **Roles and Responsibilities:**  Some of the Executive responsibilities include, but is not limited to, the following:

        **OVERVIEW:** To insure the profitable growth and mission of the Company is obtained to the best of Executive's ability.  The Executive must conduct himself in a professional manner at all times. Executive will also be appointed as the manager of the Company and will assume the responsibilities set forth in the Company's operating agreement.  To oversee all existing and future product development.

**Operations**:  Oversee the day to day operations of the Company.  Ensure that the goals of the Company are implemented as directed by the Management Committee (as defined in the Company's operating agreement).  Continually keep abreast of the industry and potential new product acquisitions for the Company.  Present all potential new products to the Management Committee along with requisite financials showing potential impact on the Company.

**Marketing**:  Manage all of the marketing activities of the Company and ensure that said activities are within the Company approved budgets and as approved by the Company.

**Communication with facility and Management Committee**: Will be responsible for keeping the Management Committee informed of important issues in Company. Prepare budgets and/or reports for the Management Committee as to each existing and new approved product.

**Recruiting/Staffing**: Work with management and other employees to source, screen and hire personnel. To recruit, select, train and monitor experienced qualified employees as needed. Executive shall consult with officers and managers on matters of employee retaliations, salary administration, terminations and employee grievances.

**Employee Relations**: Responsible for maintaining a positive, productive and safe workplace. Ability to connect with employees at all levels to create and maintain an open door environment that identifies issues early and allows management to address them. Will partner with the Management Committee to handle all performance management issues and for ensuring effective communication and adherence to corporate policies. Maintains a high degree of integrity and honesty in all business and personal affairs.

**Safety Programs**: Develop, monitor and review company safety programs.  Ensure timely meetings addressing safety concerns and training.

**Objectives**: Participate in the development and enhancement of corporate objectives, rewards philosophies, and strategic planning in relation to staffing and trends in human resource management.  Participate in and promote a team environment by working with management to accomplish corporate responsibilities and objectives. Continually monitor all aspects to improve workflow and production. Ensure that proper constructing and operations reports are prepared and communicated between departments and the Management Committee in a timely-manner. Develops long range as well as short range overall plans for the company with regard to volume and type of work desired, quality of work desired, future growth, etc. Responsible for the integration of all the above into an organized controlled smooth flowing system.

**Additional Responsibilities**: May be assigned by the Management Committee at any time, set forth in writing and provided to Executive.

4.     **Compensation.** The Company shall pay Executive the following compensation for all services rendered hereunder:

 (A)    ***Base Compensation.*** The Company shall pay Executive One Hundred Seventy Thousand US Dollars ($170,000.00) per year which shall commence upon the Company's receipt of funding, and will be payable according to the Company's customary payroll practices.

**(B)**   *Bonus.* There are no bonus' provided to Executive unless agreed to in writing by the Management Committee.

**(C)**   *Equity Grants.* There are no Grants provided to Executive unless agreed to in writing by the Management Committee.

**(D)**   *Participation in Employee Benefit Plans.* Except as expressly modified by this Agreement, the Executive shall be entitled to participate in all employee benefit plans or programs, and to receive all benefits, perquisites and emoluments, which are approved by the Management Committee and are generally made available by the Company to executive-level employees of the Company, to the extent permissible under the general terms and provisions of such plans or programs and in accordance with the provisions thereof.

**(E)**   *Employment Taxes.* All payments to Executive shall constitute wages and, as such, shall be subject to the withholding and remission of federal employment taxes, California unemployment compensation taxes, and all other applicable taxes.

**5.     Expenses.**   The Company shall reimburse Executive for all reasonable out-of-pocket expenses Executive incurred during the Term in connection with the performance of Executive's duties and obligations under this Agreement, according to the Company's reimbursement policies in effect from time to time and provided that Executive shall submit documentation which the Company deems reasonable with respect to such expenses.

**6.     Non-Disclosure of Information and Restrictive Covenant.** [See Exhibit ___ ]

**7.     Assignment.**   The Executive acknowledges that his services are unique and personal. Accordingly, the Executive may not assign his rights or delegate his duties or obligations under this Agreement. The Company's rights and obligations under this Agreement shall inure to the benefit of, and shall be binding upon, the Company's successors and assigns.

**8.     Notices.**   All notices, elections, offers, acceptances, and other communications hereunder shall be in writing and shall be delivered in person with written acknowledgment by the recipient of such delivery; by facsimile/telecopy with confirmation; by overnight delivery service with receipt and tracking number; or by United States Mail by way of certified or registered mail, return receipt requested, to the address provided by each Member to the Company or to the Company at its principal business address. A notice, election, offer, acceptance, or other communication shall be deemed to be received:   *(A)* if by personal delivery, on the date delivered with written acknowledgment by the recipient of such delivery;   *(B)* if by facsimile/telecopy, on the date confirmed by receipt / statement of the transmitting machine;   *(C)* if by overnight delivery service, on the date delivered; and   *(D)* if by United States Mail, on the date delivered with written acknowledgment on the return receipt.

**9.     Entire Agreement; Amendment; Severability; Headings; Gender References.** This Agreement, constitutes the entire understanding of the Parties hereto, explicitly superseding the confirmatory letter previously signed by the Parties and referenced in the Recitals above. No modifications, amendments, or other statements to this Agreement shall be binding on the Parties unless executed in writing and signed by the Party to be bound by such instrument.

If any provision of this Agreement is held invalid or unenforceable, such invalidity or unenforceability shall not affect the other provisions of this Agreement and, to that extent, the provisions of this Agreement are intended to be and shall be deemed to be severable.

{00876391 / 4}

Headings in this contract are for convenience and reference only and shall not be used to interpret or construe provisions hereunder.   All references in this Agreement shall be gender neutral, such that the masculine shall include the feminine and *vice versa,* and neutral references shall encompass both.   Where applicable, the singular shall include the plural and *vice versa.*

**10.   Non-Waiver.**   No delay or failure by either Party to exercise any right hereunder, and no partial or single exercise of such right, shall constitute a waiver of that or any other right, unless otherwise expressly provided herein.

**11.   Binding Agreement.**   This Agreement shall bind the executors, administrators, representatives, estates, heirs, beneficiaries, and other successors of the Parties.

**12.   Governing Law; Legal Fees.**   California law shall govern this Agreement and all questions arising hereunder.   Each Party hereto expressly and irrevocably waives trial by jury in any suit, action, or proceeding in relation to this Agreement.   In any suit, action, or proceeding to enforce, interpret, or challenge the enforceability of this Agreement, the prevailing Party in such suit, action, or proceeding shall be entitled to its reasonable attorneys' fees and all other costs of arbitration or other action, through all authorized appeals.

**13.   Execution.**   This Agreement may be executed in counterparts, and faxed signatures of this Agreement shall constitute an original instrument qualified for admission into evidence in any court or administrative proceeding, through all authorized appeals.

**14.   Indemnification.**   If the Executive is made a party, or is threatened to be made a party, to any suit or proceeding, whether civil, criminal, administrative, investigative, appellate or other by reason of the fact that he is or was a director, officer, employee, agent, manager, consultant or representative of the Company or any of its subsidiaries or is or was serving at the request of the Company or any of its subsidiaries, or in connection with her service hereunder, as a director, officer, member, employee, agent, manager, consultant or representative of any other entity, or if any claim is made, or is threatened to be made, that arises out of or relates to the Executive's service in any of the foregoing capacities, then the Executive shall promptly be indemnified and held harmless, and shall be entitled to prompt advancement of expenses, including without limitation attorneys' fees and other charges of counsel, in each case, to the fullest extent provided under applicable law, the Company's Operating Agreement, and the Company's officers' and directors' liability insurance policies.   The Company may obtain a directors and officers liability insurance policy covering Executive and to continue and maintain such policy.   The amount of coverage shall be reasonable in relation to Executive's position and responsibilities during the Term provided that the cost and availability of such insurance is reasonable within the marketplace.

**15.   Termination.**

(a)   Events of Termination.   This Agreement and Executive's employment hereunder shall terminate upon the occurrence of any one or more of the following events:

    i.   Death.   In the event of Executive's death, this Agreement and Executive's employment hereunder shall automatically terminate effective as of the date and time of death.

    ii.   Disability.   To the extent permitted by law, in the event of Executive's medically determined physical or mental disability that renders Executive substantially unable to perform Executive's material duties under this Agreement for a period of at least 90 consecutive days in any 12-month period or 120 non-consecutive days in any 12-month period, and which cannot be reasonably accommodated by the Company

without undue hardship ("Disability"), the Company may terminate this Agreement and Executive's employment hereunder upon at least 30 days' prior written notice to Executive. Any question as to the existence of the Disability of Executive as to which Executive and Company cannot agree shall be determined in writing by a qualified independent physician as appointed by Company and Executive (or Executive's representative). The determination of Disability made in writing to Company and Executive shall be final and conclusive for all purposes of this Agreement.

iii.   Termination by the Company for Cause.

1. The Company may, at its option, terminate this Agreement and Executive's employment hereunder for Cause (as defined herein) upon giving notice of termination to Executive (following the expiration of the applicable cure period, if any) which notice specifies that the Company deems such termination to be for "Cause" hereunder and specifies in reasonable detail the grounds or circumstances for such "Cause". Executive's employment shall terminate on the date on which such notice shall be given, unless Executive cures such deficiency resulting in the Company terminating Executive for Cause as provided herein.

2. For purposes hereof, "Cause" shall mean Executive's (a) conviction of, guilty or nolo contendere plea to, or confession of guilt to, a felony or act involving moral turpitude, (b) willful misconduct or gross negligence which is materially injurious (monetarily or otherwise) and would reasonably be expected to cause actual harm to the Company in the reasonable discretion of the Management Committee after a written notice and a 14 day opportunity to cure, (c) material violation of the Company's policies or procedures in effect from time to time which would reasonably be expected to cause actual harm to the Company after a written notice and a 14 day opportunity to cure, or (d) failure in any material respect to perform Executive's duties as reasonably assigned to Executive by the Management Committee from time to time and consistent with Executive's title and position after a written notice and a 30 day opportunity to cure. Notwithstanding the foregoing, Executive shall be given a reasonable opportunity during any applicable cure period, for Executive together with counsel, to be heard before the Management Committee and if such hearing occurs, a second written notice from the Company stating that, in the good faith judgment of the Management Committee, Executive was guilty of the conduct giving rise to termination for Cause.

iv.   Without Cause by the Company. The Company may, at its option, at any time terminate Executive's employment for no reason or for any reason whatsoever (other than for Cause or due to death or Disability). Executive shall be entitled to Severance only in the event of termination without cause and shall consist of eighteen months of the Executive's then-current Base Salary. All Severance Payments shall be payable in accordance with the Company's customary payroll practices.

v.   Termination By Executive. Executive may terminate this Agreement and Executive's employment hereunder at any time with or without Good Reason upon at least 30

days written notice to the Company.  For purposes of this Agreement, "Good Reason" shall mean, in the absence of a written consent of the Executive:

1. a reduction in the Executive's Base Salary by 10% or more and such reduction is neither company-wide nor applicable to all senior executives of the Company;

2. any action by the Company which results in a material diminution in Executive's title, position, authority or duties from those set forth in this Agreement;

3. any failure by the Company to comply with any provision of this Agreement (other than an isolated, insubstantial or inadvertent failure which is promptly remedied after notice to the Company) including, but not limited to, the failure of the Company to pay any portion of Executive's current compensation;

4. material breach by the Company of Company's Operating Agreement if such breach would materially prejudice Executive;

5. a Change of Control (as defined below) that occurs without Executive's written consent;

6. the relocation of the Company's headquarters to a location greater than 50 miles from the Company's current location without Executive's written consent; or

7. company fails to obtain a written agreement from any successor of Company to assume and perform this Agreement; and within 90 days of learning of the occurrence of any such event and in the absence of any circumstance that constitutes Cause, Executive terminates employment with Company by a written notice specifying in reasonable detail the facts constituting Good Reason.

"Change of Control" shall be deemed to have occurred upon the earliest to occur of any of the following events, each of which shall be determined independently of the others:

(1) a natural person, partnership (whether general or limited), limited liability company, joint venture, trust, estate, association, corporation, government or any department or agency thereof, custodian, nominee or any other individual or entity in its own or any representative capacity (collectively referred to herein as "Person") (together with any affiliates of such Person) is or becomes the beneficial owner, directly or indirectly, of voting interests of Company entitling such Person to exercise fifty percent (50%) or more of the total voting power of such voting interests;

(2) shareholders of Company adopt a plan of complete or substantial liquidation or an agreement providing for the distribution of all or substantially all of its assets; or

(3) there has occurred a "Change of Control," as such term (or any term of like import) is defined in any of the following documents which is in effect with respect to Company at the time in question:  any note, evidence of indebtedness or agreement to lend funds to Company, any option, incentive or employee benefit plan of Company or any employment, severance, termination or similar agreement with any person who is then an employee of Company.

vi. <u>Mutual Agreement</u>.  This Agreement and Executive's employment hereunder may be terminated at any time, with or without notice, by the mutual agreement of the Company and Executive.

vii. <u>Morality Clause.</u> Executive may be terminated immediately upon any serious act of misconduct by Executive, including, but not limited to, an act of dishonesty, theft or misappropriation of Company Property, moral turpitude, insubordination, or any act injuring abusing or endangering others or negatively impacting the image and reputation of the Company. In the event of termination under the Morality Clause, the Executive shall not be entitled to any Severance and shall be paid up to the date of termination with no further obligations being owed by the Company.

(b)   <u>The Company's Obligations Upon Termination.</u>

i. <u>For Cause; Termination by Executive Other Than For Good Reason.</u> If the Company shall terminate this Agreement and Executive's employment hereunder for Cause or if the Executive shall terminate this Agreement and Executive's employment hereunder other than for Good Reason, the Company's sole obligation to Executive under this Agreement or otherwise shall be for the Company to (i) pay to Executive the amount of any Base Salary earned, but not yet paid to Executive, prior to the effective date of such termination (the "Termination Date"); (ii) to the extent not previously reimbursed, reimburse Executive for any expenses incurred by Executive through the Termination Date in accordance with Section 4.7; and (iii) pay and/or provide any other amounts or benefits that are vested amounts or vested benefits or that Executive is otherwise entitled to receive under any plan, program, policy or practice (with the exception of those, if any, relating to severance) on the Termination Date in accordance with such plan, program, policy or practice; (clauses (i) through (iii) above, the "Accrued Obligations").

ii. <u>Without Cause; for Good Reason.</u> If, during the Term, the Company shall terminate this Agreement and Executive's employment hereunder without Cause and other than due to death or Disability or Executive terminates this Agreement and Executive's employment hereunder for Good Reason, the Company shall (i) pay and/or provide to Executive the Accrued Obligations in accordance with Section 15(b)(i) above, (ii) pay to Executive the Severance Payments, (iii) pay to the Executive all Bonus earned but not yet paid and (iv) the Company shall release the Executive from the covenants contained in the Non-Disclosure of Information and Restrictive Covenant.

iii. <u>Mutual Agreement.</u> Upon any termination of this Agreement and the Executive's employment hereunder by mutual agreement of the Company and Executive, unless otherwise mutually agreed to, the Company's sole obligation to Executive under this Agreement or otherwise shall be for the Company to (i) pay and/or provide to Executive the Accrued Obligations in accordance with Section 15(b)(i) above; and (ii) pay to the Executive all Bonus earned but not yet paid and any Bonus expected or recognized during the current fiscal year and including such Termination Date.

iv. <u>Death.</u> If this Agreement and Executive's employment hereunder shall terminate as a result of Executive's death, the Company's sole obligation to Executive under this Agreement or otherwise shall be for the Company to (i) pay and/or provide to Executive the Accrued Obligations in accordance with Section 15(b)(i) above; and (ii) pay to the Executive all Bonus earned but not yet paid and any Bonus expected or recognized during the current fiscal year and including such Termination Date.

v. <u>Disability.</u> If this Agreement and Executive's employment hereunder shall terminate as a result of the Executive's Disability, the Company's sole obligation to Executive

under this Agreement or otherwise shall be for the Company to (i) pay and/or provide to Executive the Accrued Obligations in accordance with Section 15(b)(i) above; and (ii) pay to the Executive all Bonus earned but not yet paid and any Bonus expected or recognized during the current fiscal year and including such Termination Date.

vi.   <u>Vested Benefits</u>.  In addition to the payments and benefits set forth in this Section, amounts which are vested benefits or which are subject to acceleration or which Executive is otherwise entitled to receive under any plan, program, policy or practice (with the exception of those relating to severance) on the date of termination, shall be payable in accordance with such plan, policy, practice or agreement.

**IN WITNESS WHEREOF**, the Parties acknowledge and agree to the terms of this Employment Agreement and have hereunto set their hands and seals as of the date first written above.

**COMPANY:**
Red Dice Holdings, LLC                    )

By:  _____            )   ATTEST: _____
     Print: _Michael Ottaway_            )
                                          )   Print: _Michelle Gides_
As Its: _Member_                          )

**EXECUTIVE:**

_____                   )   ATTEST: _____
Vincent M. Keber, III                     )
                                          )   Print: _Charles K. Smith_

## CONSULTING AGREEMENT

THIS CONSULTING AGREEMENT (the "Agreement") is made this __5__ day of April 2012 (the "Effective Date"), by RED DICE HOLDINGS, LLC, (the "Company"), and **CHARLES K. SMITH**, an Alabama resident ("Consultant") (the foregoing collectively, the "Parties" and each a "Party").

## R E C I T A L S

WHEREAS, On or about **April __ 2012**, the Company retained Executive to serve as a senior officer in the capacity of **Chief Operating Officer**; and

WHEREAS, The Parties wish to memorialize formally the material terms and conditions applicable to Consultant's consulting position with the Company.

WHEREFORE, In furtherance of the foregoing events and objectives, and with full acknowledgement of and intent to be bound by the terms hereof, the Parties agree as follows:

## W I T N E S S E T H

**1.     Integration.**   The Parties expressly incorporate the foregoing Recitals as material terms of this Agreement, reflecting not only their intent and objectives but also the consideration to be exchanged by the Parties hereunder.

**2.     Employment; Nature of Relationship; Term.**   Upon written approval of the Management Committee, the Company may retain the employment of Consultant's consulting services based upon the terms and conditions stated herein.

**3.     Scope and Extent of Employment Duties.**   Consultant shall serve as the Company's **Chief Operating Officer**.   Consultant shall devote his time and attention to the Company's business as directed by the President of the Company.   Consultant may engage in any directorship, consulting project, or other active business engagements, including employment in another business owned by Consultant, during the term of this Agreement, regardless of whether such activity is pursued for gain, profit or nonprofit; provided, however, such activities do not materially interfere with Consultant's duties as Chief Operating Officer.   Consultant may invest his assets, however, in other non-affiliated companies or ventures, provided that same does not require Consultant's services in the operation of their affairs, and provided further that such companies or ventures (except for Left Bank, LLC) do not compete either directly or indirectly with the Company, its affiliates and/or assigns.

3.1     **Roles and Responsibilities**:   Some of the Consultant responsibilities shall include, but is not limited to, the following:

**OVERVIEW:** To insure the profitable growth and mission of the Company is obtained to the best of Consultant's ability.  The Consultant must conduct himself in a professional manner at all times. Consultant will report to the President and provide operational and administrative guidance and oversight to the Company, as well as work on specific projects such as acquisitions and strategic planning.

**Finance/Accounting/Legal Oversight:**   Develop and monitor Company budgets and ensure monthly monitoring for variances and compliance.  Maintains good current understanding of accounting and other business practices. Assess the current financial structure of the corporations and develop ideas for improvement. Oversees cost control of the new product implementation. To

conduct monthly corporate performance meetings for each facility to include a review of financial statements, business plans and related matters. Generate action plans as needed. Responsible for working with the appropriate Consultants· and departments to ensure timely and accurate accounting, budgeting and financial reporting. This will include monthly operating reports as well as quarterly and yearly financial reports. Will also work closely with Company legal staff and outside counsel on contract negotiations, compliance issues, filings and other pertinent legal matters.

**Acquisitions:**   Work with the President and Management Committee to identify and analyze potential investment and acquisition candidates for the Company. Develop pro forma models, cost justification analysis and pricing models to determine cost of acquisition and purchase parameters. Will take the lead with other Consultants in negotiating the acquisition. Will oversee the contractual/legal negotiations, working closely with the Company legal counsel.

**Integration:**   Will develop post acquisition integration plans to successfully bring the newly acquired company or investment into Company operations, ensuring a smooth integration of personnel, marketing, product manufacturing, accounting and operations within agreed upon budget and timing parameters.

**Objectives:** Assist President in the development and enhancement of corporate objectives, rewards philosophies, and strategic planning in relation to staffing and trends in human resource management. Participate in and promote a team environment by working with management to accomplish corporate responsibilities and objectives. Continually monitor all aspects to improve workflow and production. Ensure that proper constructing and operations reports are prepared and communicated between departments and the Management Committee in a timely-manner. Develops long range as well as short range overall plans for the company with regard to volume and type of work desired, quality of work desired, future growth, etc. Responsible, with the President, for the integration of all the above into an organized controlled smooth flowing system.

**Additional Responsibilities:**   May be assigned by the Management Committee at any time, set forth in writing and provided to Consultant.

**4.     Compensation.**   The Company shall pay Consultant the following compensation for all services rendered hereunder:

(A)   *Base Compensation.*   Shall be determined upon Management Committee written approval, which shall be agreed upon with Consultant no later than six (6) months from the date of the Execution of this Agreement

(B) **_Employment Taxes and Benefits._**   Consultant agrees as an independent contractor that Consultant is not entitled to unemployment insurance benefits OR workers' compensation benefits, and that Consultant is obligated to pay federal and state income tax on any money paid pursuant to the contract relationship.  Consultant understands that Company shall not provide any employment benefits to Consultant, including vacation pay, sick leave, retirement benefits, health or disability benefits AND social security AND Consultant benefits of any kind.

**5.     Expenses.**   The Company shall reimburse Consultant for all reasonable out-of-pocket expenses Consultant incurred during the Term in connection with the performance of Consultant's duties and obligations under this Agreement, according to the Company's reimbursement policies in effect from time to time and provided that Consultant shall submit documentation which the Company deems reasonable with respect to such expenses.

**6.     Non-Disclosure of Information and Restrictive Covenant.** [See Exhibit ____]

**7.     Assignment.**  The Consultant acknowledges that his services are unique and personal. Accordingly, the Consultant may not assign his rights or delegate his duties or obligations under this Agreement. The Company's rights and obligations under this Agreement shall inure to the benefit of, and shall be binding upon, the Company's successors and assigns.

**8.     Notices.**  All notices, elections, offers, acceptances, and other communications hereunder shall be in writing and shall be delivered in person with written acknowledgment by the recipient of such delivery; by facsimile/telecopy with confirmation; by overnight delivery service with receipt and tracking number; or by United States Mail by way of certified or registered mail, return receipt requested, to the address provided by each Member to the Company or to the Company at its principal business address.  A notice, election, offer, acceptance, or other communication shall be deemed to be received:   **_(A)_** if by personal delivery, on the date delivered with written acknowledgment by the recipient of such delivery;  **_(B)_** if by facsimile/telecopy, on the date confirmed by receipt / statement of the transmitting machine;  **_(C)_** if by overnight delivery service, on the date delivered; and  **_(D)_** if by United States Mail, on the date delivered with written acknowledgment on the return receipt.

**9.     Entire Agreement; Amendment; Severability; Headings; Gender References.**  This Agreement, constitutes the entire understanding of the Parties hereto, explicitly superseding the confirmatory letter previously signed by the Parties and referenced in the Recitals above. No modifications, amendments, or other statements to this Agreement shall be binding on the Parties unless executed in writing and signed by the Party to be bound by such instrument.

If any provision of this Agreement is held invalid or unenforceable, such invalidity or unenforceability shall not affect the other provisions of this Agreement and, to that extent, the provisions of this Agreement are intended to be and shall be deemed to be severable.

Headings in this contract are for convenience and reference only and shall not be used to interpret or construe provisions hereunder.   All references in this Agreement shall be gender neutral, such that the masculine shall include the feminine and *vice versa,* and neutral references shall encompass both.  Where applicable, the singular shall include the plural and *vice versa.*

**10.     Non-Waiver.**  No delay or failure by either Party to exercise any right hereunder, and no partial or single exercise of such right, shall constitute a waiver of that or any other right, unless otherwise expressly provided herein.

**11.    Binding Agreement.** This Agreement shall bind the executors, administrators, representatives, estates, heirs, beneficiaries, and other successors of the Parties.

**12.    Governing Law; Legal Fees.** California law shall govern this Agreement and all questions arising hereunder. Each Party hereto expressly and irrevocably waives trial by jury in any suit, action, or proceeding in relation to this Agreement. In any suit, action, or proceeding to enforce, interpret, or challenge the enforceability of this Agreement, the prevailing Party in such suit, action, or proceeding shall be entitled to its reasonable attorneys' fees and all other costs of arbitration or other action, through all authorized appeals.

**13.    Execution.** This Agreement may be executed in counterparts, and faxed signatures of this Agreement shall constitute an original instrument qualified for admission into evidence in any court or administrative proceeding, through all authorized appeals.

**14.    Indemnification.** Providing the Consultant was not negligent in the performance of Consultant's duties provided for herein, if the Consultant is made a party, or is threatened to be made a party, to any suit or proceeding, whether civil, criminal, administrative, investigative, appellate or other by reason of the fact that he is or was a director, officer, Consultant, agent, manager, consultant or representative of the Company or any of its subsidiaries or is or was serving at the request of the Company or any of its subsidiaries, or in connection with her service hereunder, as a director, officer, member, Consultant, agent, manager, consultant or representative of any other entity, or if any claim is made, or is threatened to be made, that arises out of or relates to the Consultant's service in any of the foregoing capacities, then the Consultant shall promptly be indemnified and held harmless, and shall be entitled to prompt advancement of expenses, including without limitation attorneys' fees and other charges of counsel, in each case, to the fullest extent provided under applicable law, the Company's Operating Agreement, and the Company's officers' and directors' liability insurance policies.

**15.    Termination.**

    (a)    Events of Termination. This Agreement and Consultant's consulting employment hereunder shall terminate upon the occurrence of any one or more of the following events and payment for services rendered up to the date of termination shall be paid according to Company's standard payment practices:

        i.    Termination By the Company. The Company may, at its option and with written approval by the Management Committee, at any time terminate Consultant's consulting employment for no reason or for any reason whatsoever by providing 5 days written notice of intent to terminate.

        ii.    Termination By Consultant. Consultant may terminate this Agreement and Consultant's consulting employment for no reason or for any reason whatsoever by providing 5 days written notice of intent to terminate. Upon receiving said notice, Company may elect to forego notice and terminate Consultants contract immediately.

*[Signature Page to Follow]*

**IN WITNESS WHEREOF,** the Parties acknowledge and agree to the terms of this Consulting Employment Agreement and have hereunto set their hands and seals as of the date first written above.

**COMPANY:**
Red Dice Holdings, LLC

By: _____
  Print: _____

As Its: _____

)
)
)
)
)

ATTEST: _____

Print: _____

**CONSULTANT:** _____

Charles K. Smith

)
)
)

ATTEST: _____

Print: _____

**EXHIBIT G**

**FUNDING AGREEMENT BETWEEN RED DICE HOLDING LLC AND
EQUITYTREND LLC/JT TRADING**

## ESCROW AGREEMENT

THIS ESCROW AGREEMENT, (the "Agreement") made this day of April ___, 2012 , by and among, **Red Dice Holdings, LLC**, 2665 Ariane Drive, Suite 207, San Diego, CA 92117 ("RDH") and **Equity Trend Advisors LLC**, in care of **JT Trading** ("ETJT" or "Escrow Agent")) and, with offices at Carmel Valley Center II, 11995 El Camino Real, Suite 301, San Diego, CA 92130

WHEREAS, in consideration and incompliance of the Operating Agreement dated the 5th day of April 2012, the parties hereby agree as follows:

WHEREAS, Escrow Agent is holding Twenty Four Million One Hundred Sixty-Six Thousand Six Hundred Sixty-Seven (24,166,667) shares of common stock of Medical Marijuana Inc., a Oregon corporation ("MJNA shares") on behalf of RDH, in accordance with the Operating Agreement (the "Operating Agreement") by and between Dixie Holdings, LLC, a Colorado limited liability company and Medical Marijuana, Inc., a Oregon corporation; and

WHEREAS, ETJT, acting in its capacity as a registered broker-dealer, shall cause the MJNA shares to be sold at the then current fair market value price, for the benefit of RDH, and to disburse the proceeds form such sale or sales of the MJNA shares ("Funds") in accordance with the terms and conditions of the Operating Agreement (a "Funding Request").

WHEREAS, Escrow Agent is agreeable to act as escrow agent without compensation under this Agreement and to disburse the Funds in accordance with the terms and conditions hereinafter set forth.

NOW, THEREFORE, in consideration of the mutual covenants and promises set for the below, the parties agree:

1. Establishment of Escrow Account.

    1.1. An escrow account shall be established under this Agreement by with Escrow Agent at who shall hold the MJNA shares, liquidate the MJNA shares and distribute the Funds from time to time as hereinafter set forth (the "Escrow Account"). Escrow Agent shall not commingle the Funds.

    1.2. ETJT acknowledges and agrees that the MJNA shares and Funds in the Escrow Account are to be used exclusively for the purpose of funding operations and development of RDH.

2. Disbursements.

    2.1. The Escrow Agent shall disburse all or a portion of the Funds in accordance with the following:

(a) Upon receipt of a Funding Request by RDH which shall acknowledge that certain milestones have been achieved set forth below, Funds shall be allocated for that particular milestone and shall direct the party to which funding is to be received, attached as **Exhibit A**.

(b) ETJT shall commence liquidation of shares within three (3) business day from receipt of the Funding Request. Funds shall be disbursed to RDH within three (3) business days from date shares are sold.

2.2. Upon the sale of the MJNA shares and the termination or proper disbursement of all the Funds, the Escrow Agreement shall terminate.

3. Escrow Agent's Responsibility.

3.1. Upon disbursement of all or any portion of the Funds in accordance with this Agreement, Escrow Agent shall have no further responsibility with respect to the amounts so disbursed. In this regard, it is expressly agreed and understood that in no event shall the aggregate amount of disbursements from the Escrow Account by Escrow Agent exceed the amounts deposited by in the Escrow Account plus accrued interest and increased fair market value of the MJNA shares, as provided herein.

3.2. RDH understands and agrees that the duties of Escrow Agent are purely ministerial in nature and RDH further agrees that Escrow Agent shall not be liable for any action taken or omitted hereunder or under this Agreement except in the case of its bad faith, negligence or willful misconduct.

3.3 Escrow Agent shall furnish to RDH an accounting of the receipts in, and disbursements from, the Escrow Accounts, as requested.

3.4. RDH agrees to indemnify Escrow Agent and its partners, and agents (herein the "Indemnities") against, and to hold them harmless of and from, any and all loss, liability, cost, damage and expense, any and all loss, limitation, reasonable attorneys' fees, except in the case of Escrow Agent's bad faith, negligence, or willful misconduct, which the Indemnities may suffer or incur by reason of any action, claim or proceeding brought by any third party against the Indemnities, arising out of or relating in any way to this Agreement, or the performance of its duties hereunder.

4. Miscellaneous.

4.1. This Agreement encompasses the entire Agreement of the parties and shall not be modified except by an instrument in writing signed by the parties.

4.2. This Agreement shall be governed by and construed in accordance with the laws of the State of California and the proper venue and jurisdiction for any action or claim with respect to this Agreement or any document delivered pursuant hereto shall be in the appropriate court in San Diego, CA except as for provided in section 4.3.

4.3. In the event of the receipt of conflicting instructions prior to discharge of the Escrow Agent, Escrow Agent shall commence an arbitration before a single arbitrator acceptable to Escrow Agent under the rules of the American Arbitration Association, whose decision shall be final that shall be located in San Diego, CA. Upon receipt of a final decision from the arbitrator, the Escrow Agent shall comply therewith and upon such compliance shall be discharged from all further liability. The decision of the arbitrator shall be final, and may be reduced to judgment by any party hereto or the Escrow Agent. The arbitration must be resolved within 15 days of a request for arbitration. RDH shall pay their own attorney fees and legal costs. The aforementioned parties shall equally split the Escrow Agent's and arbitrator's reasonable fees and costs.

4.4. All notice required to be given in connection with this Agreement shall be sent via certified mail or overnight express with receipt and addressed as follows:

If to: RDH  2665 Ariane Dr, Suite 207, San Diego, CA 92117 with a copy to Dixie Holdings, LLC: 777 E. Speer Blvd., Denver, Colorado 80203

If to ETJT: 11995 El Camino Real, Suite 301, San Diego, CA 92130

**IN WITNESS WHEREOF,** this Agreement has been executed this day of 5 April 2012.

Red Dice Holdings, LLC

Print Name: _____
Its: _____

Equity Trend Advisors LLC

Print Name: _____
Its: _____

JT Trading

Print Name: _____
Its: _____

## EXHIBIT A

## REQUEST FOR FUNDING

Equity Trend Advisors LLC, in care of JT Trading of Carmel Valley Center II, 11995 El Camino Real, Suite 301 San Diego, CA 92130(the "ETJT")

### AND

Red Dice Holdings, LLC of 2665 Ariane Drive, Suite 207, San Diego, CA 92117(the "RDH")

**DATE OF REQUEST:** _____

**TRANSACTION DESCRIPTION:**
** Attach a copy of the Agreement to which the disbursement applies.

**AMOUNT OF FUNDS REQUESTED: ($)** _____

**TERMS FOR DISBURSEMENT:**

_____

_____

**FUNDS TO BE DISBURSED TO:**

_____

Attn: _____  Contact No.: (____) ____-_____

**ADDITIONAL DIRECTION:**

_____

_____

**FEES:** Fee Earned by ETJT $_____

**REQUESTED BY:**
Red Dice Holding

_____          _____
Michael R. Llamas, Member        Vincent M. Keber III, Managing Member

{00882888 / 1}

## *DISBURSEMENT INSTRUCTIONS*

*Upon written confirmation from RDH of the Closing and each of the relevant milestones being reached and in compliance with the Request for Funding, the disbursement will be as follows:*

(A) **At Closing,** the Company shall sell Two Hundred Fifty Thousand Dollars ($250,000) (exclusive of broker's fees) in MJNA Shares and the Proceeds to the Company shall be tendered for payments as follows:

> $50,000 to be released for DIXIE Member employee incentives;
> $150,000 for the payment of DIXIE Member investor debts;
> $50,000 for the payment of DIXIE Member short term account payables;

(B) **At Milestone 1,** which is contingent on Left Bank, LLC, on behalf of Pharmasphere, sourcing and obtaining required location and lease for the facility, signing a lease agreement for the facility and maintaining the required licensing, the Company shall sell Two Hundred Fifty Thousand Dollars ($250,000) (exclusive of broker's fees) in MJNA Shares and the Proceeds to the Company shall be tendered for payments as follows:

> $50,000 to Vincent M. Keber, III
> $50,000 to Charles Smith
> $150,000 for the payment of DIXIE Member investor debts;(will discuss flow of funds...since debt is held in Tripp's name with Left Bank and then between Tripp personally with investor to satisfy CO law. Will provide proof of payment if needed)

(C) **At Milestone 2,** which is contingent upon the successful integration of a new product offering (such as medicated chewing gum) or any other product currently controlled by MJNA Member, into the operations of the Company including defining the manufacturing, packaging and marketing requirements necessary for product launch, the Company shall sell One Hundred Thousand Dollars ($100,000) in MJNA Shares and the Proceeds to the Company shall be tendered for payments as follows:  (i) $100,000 to DIXIE Member for the purpose of repaying debt to affiliated companies.

(D) **Balance.** The balance of Eight Hundred Fifty Thousand ($850,000) in MJNA Shares allocated herein, less all brokerage fees incurred from any liquidation of shares and based upon all contingencies stated in Sections 9.1 (n)(i), (n)(ii) and (n)(iii)of the Operating Agreement being fulfilled, shall be used solely as working capital for operations of the Company including but not limited to operations, licensing, research/development and marketing as approved in writing by the Management Committee in the operations budget.

(E) **Additional Milestones.**  Additional milestones may be set by RDH at any time and same shall be provided to Escrow Agent and incorporated herein.

# EXHIBIT H
## KEBER AND SMITH WARRANTS





## STOCK OPTION WARRANT AGREEMENT

Medical Marijuana, Inc.., a Oregon corporation (the "**Company**"), pursuant to the agreement by and between Cannabank, Inc., a Delaware company and Vincent M. Keber III, a individual dated the 5ᵗʰ day of April 2012, (the "**Agreement**"), hereby grants to the individual listed below (the "**Optionee**"), an option to purchase the number of shares of the common stock of the Company ("**Common Stock**"), set forth below (the "**Option**").

| | |
|---|---|
| **Optionee:** | Vincent M. Keber III, an individual |
| **Grant Date:** | April 5, 2012 |
| **Exercise Price per Share:** | $[.06 ] /Share |
| **Total Exercise Price:** | $ 100,000 |
| **Total Number of Shares Subject to the Option:** | One Million, Six Hundred Sixty-Six Thousand Six Hundred Sixty-Six (1,666,666) shares |
| **Expiration Date:** | April 4, 2014 |
| **Type of Option:** | Restricted Shares |
| **Termination:** | The Option shall terminate on the Expiration Date set forth above or, if earlier, in accordance with the terms of the Stock Option Agreement. |

By his or her signature, the Optionee agrees to be bound by the terms and conditions herein. The Optionee fully understands all provisions of this Option Agreement.

| **Medical Marijuana, Inc.** | | **Vincent M. Keber III** | |
|---|---|---|---|
| By: | _____ | By: | _____ |
| Print Name: | Michael R. Llamas | | Vincent M. Keber III |
| Title: | President | | |
| Address: | 2665 Ariane Drive, Suite 201, San Diego CA 92117 | Address: | 1301 Wazee Street 25 Denver, CO 80204 |

---

1



## STOCK OPTION WARRANT AGREEMENT

Medical Marijuana, Inc.., a Oregon corporation (the "*Company*"), pursuant to the agreement by and between Cannabank, Inc., a Delaware company and Charles Smith, a individual dated the 5ᵗʰ day of April 2012, (the "*Agreement*"), hereby grants to the individual listed below (the "*Optionee*"), an option to purchase the number of shares of the common stock of the Company ("*Common Stock*"), set forth below (the "*Option*").

| | |
|---|---|
| **Optionee:** | Charles Smith, an individual |
| **Grant Date:** | April 5, 2012 |
| **Exercise Price per Share:** | $[.06 ] /Share |
| **Total Exercise Price:** | $ 100,000 |
| **Total Number of Shares Subject to the Option:** | One Million, Six Hundred Sixty-Six Thousand Six Hundred Sixty-Six (1,666,666) shares |
| **Expiration Date:** | April 4, 2014 |
| **Type of Option:** | Restricted Shares |
| **Termination:** | The Option shall terminate on the Expiration Date set forth above or, if earlier, in accordance with the terms of the Stock Option Agreement. |

By his or her signature, the Optionee agrees to be bound by the terms and conditions herein. The Optionee fully understands all provisions of this Option Agreement.

| | | | |
|---|---|---|---|
| **Medical Marijuana, Inc.** | | **Charles Smith** | |
| By: | | By: | |
| Print Name: | Michael R. Llamas | | Charles K. Smith |
| Title: | President | | |
| Address: | 2665 Ariane Drive, Suite 201, San Diego CA 92117 | Address: | 108 Augusta Ct. Fairhope, AL 36532 |

t

**EXHIBIT I**

**LICENSING AGREEMENT WITH MJNA FOR TERRASPHERE GROW TECHNOLOGY**



**EXHIBIT J**
**OPERATING BUDGET**



MESSNER & REEVES, LLC

ATTORNEYS AT LAW

1430 WYNKOOP STREET
SUITE 300
DENVER, COLORADO 80202
TELEPHONE: 303-623-1800   FACSIMILE: 303-623-0552

ROBERT HINCKLEY
rhinckley@messner.com

DIRECT DIAL:
(303) 405-4182

June 11, 2013

**VIA FEDERAL EXPRESS: 7999 7195 3607**
**VIA EMAIL: MICHELLESIDESESQ@YAHOO.COM**
           **BART@MACKAYVENTURES.COM**

Michelle Sides, Chairman and Chief Operating Officer
Medical Marijuana, Inc.
2665 Ariane Drive, Suite 207
San Diego, CA 92117

Dear Ms. Sides:

As you are aware, this law firm represents Dixie Holdings, LLC ("Dixie"). I am a partner in the firm's Litigation Department. As previous attempts to resolve the ongoing disputes between Dixie and Medical Marijuana, Inc. ("MJNA") have been unsuccessful, I have been asked to step in and proceed with litigation. This letter serves as a final attempt to resolve all issues before proceeding in this regard.

Dixie hereby demands that MJNA comply with all obligations under the Operating Agreement of Red Dice Holdings, LLC (the "Agreement"). A copy of the signed Agreement is enclosed and marked as **EXHIBIT A.** Further, Dixie demands MJNA resolve and cure its mismanagement of MJNA as well as the direct damages Red Dice Holdings, LLC ("Red Dice") has suffered as a result. Dixie also demands that MJNA fully comply with the allocation of payments via the MJNA Shares (defined below) as required under the Agreement.

Should MJNA comply in all respects with the demand in this letter, Dixie is willing to continue in its business relationship with MJNA (subject to additional stipulations of MJNA provided hereto).

In the event MJNA refuses to take these steps, Dixie intends to aggressively enforce its rights under the Agreement. This includes pursuit of an arbitration hearing, as discussed in the Agreement.

**MJNA has materially breached the Agreement in several respects.**

1.   *MJNA has failed to contribute its initial capital contribution to Red Dice as set forth in the Agreement.* Pursuant to Section 9 of the Agreement, MJNA agreed to contribute an aggregate total of 24,166,667 unrestricted shares of common stock of MJNA ("MJNA Shares") valued at a price per share of $0.06. MJNA represented and warranted that the MJNA Shares would be seasoned,

{01057146 / 4}

# MESSNER & REEVES, LLC
### ATTORNEYS AT LAW

Medical Marijuana, Inc.
June 11, 2013
Page 2 of 4

free trading shares of MJNA common stock.  MJNA further represented and warranted to Dixie that the MJNA Shares contributed in exchange for membership interests of Red Dice were not deemed "control stock" as such term is defined under SEC rules and regulations.

As you are well aware, MJNA has failed for over a year to contribute all of the MJNA Shares to Red Dice in exchange for its membership interests in Red Dice.  MJNA has stated its delays in contributing the MJNA Shares have resulted from an inability to obtain a proper legal opinion and other related issues.  MJNA has also disclosed to Dixie that the MJNA Shares would not be free trading, rather the MJNA Shares will be restricted shares, which is a material breach of the Agreement.  Simply put, these are unacceptable excuses and the MJNA Shares must be contributed immediately as required under the Agreement.

2.     *Mandatory Purchase Right*.  Pursuant to <u>Section 11</u> of the Agreement, upon information and belief, MJNA has directly and indirectly, through its executive management, committed acts of fraud and acts of moral turpitude against Red Dice, its clients, employees, shareholders, affiliates and third-parties (the "<u>Fraudulent Acts</u>").  Pursuant to the Agreement, if the Management Dommittee reasonably agrees that such Fraudulent Acts damage or adversely affect Red Dice and its operations, Dixie may purchase MJNA's interest for the purchase price set forth in the Agreement.  Based on the facts as currently known, we are confident that the Management Committee will determine that MJNA has committed one or more Fraudulent Acts resulting in a Purchase Event (as defined in the Agreement).  Should the Management Committee not reach agreement as to this issue, the required third party option will result in a determination that Fraudulent Acts have been committed that damaged Red Dice.

## Other issues of concern regarding MJNA.

1.     · *Financial Accounting*.  Dixie is deeply concerned that the financial records of MJNA are inaccurate and/or misleading, even though they have been certified by you as being true and correct.  It is Dixie's view that MJNA (a) lacks proper accounting and reporting procedures, and (b) upon information and belief, has materially misstated its financial reporting in publicly filed documents certified as being true and correct by you.  For example, the financial information provided by Red Dice to MJNA for the fourth quarter of 2012 and for the first quarter of 2013 appears to be inaccurately reported by MJNA in its quarterly filings made with OTC Markets.  Red Dice has repeatedly requested copies of MJNA's auditor work papers and consolidation schedule to verify the method of financial reporting implemented by MJNA.  These requests are continuously ignored.  We hereby demand MJNA provide Red Dice the auditor work papers and consolidation schedules used by MJNA's auditor to prepare the financial statements for the fourth quarter of 2012 and the first quarter of 2013 by 5:00pm MT on June 13, 2013.  Failure to do so will force the management of Red Dice to publicly disclose its belief that MJNA's financial statements are incorrect and materially misleading.

MESSNER & REEVES, LLC
ATTORNEYS AT LAW

Medical Marijuana, Inc.
June 11, 2013
Page 3 of 4

2.      *Corporate Governance.* As you are well aware, Vincent M. Keber, III is a principal of Dixie as well as a former director of MJNA. Mr. Keber resigned from the board because of the lack of information provided by the officers and chairman of MJNA, the lack of formal board meetings, and, upon information and belief, various other improper actions by MJNA's officers and chairman. Due to the multiple instances of fraud and moral turpitude committed by MJNA, Mr. Keber, along with his affiliated entities and partners, are understandably concerned about any potential liability he might face from an MJNA shareholder lawsuit. As a result, we hereby demand MJNA, HDDC, Michelle Sides, and Michael Llamas shall indemnify the parties as set forth below.

3.      *Articles of Incorporation.* For several years, the officers of MJNA have fraudulently filed amendments to the articles of incorporation either increasing or decreasing the authorized capital of MJNA without shareholder approval. Dixie was told that proper corrective actions would be taken by May 2013. As of the date of this letter, we are unaware of any actions taken by MJNA to remedy this material problem. We hereby demand MJNA calls a shareholder meeting by 5:00pm MT on June 18, 2013 to take appropriate corrective actions to amend the articles of incorporation.

4.      *Issuance of MJNA Shares.* Pursuant to review of a publicly filed MJNA disclosure and the fact that Mr. Keber was never consulted about any stock issuances while he was a board member (see above), upon information and belief, MJNA has improperly issued shares of common stock without proper board or shareholder approval. We hereby demand MJNA provides proper notice for a special shareholder meeting by 5:00pm MT on June 18, 2013 to take appropriate corrective actions to properly issue stock to its affiliates.

**Proposed solution and additional stipulations required of MJNA.**

In summary, notwithstanding MJNA's multiple breaches of the Agreement and mismanagement of MJNA by certain affiliated individuals, Dixie believes that these issues can be resolved so long as MJNA agrees to the following:

1.  The MJNA Shares shall be allotted to Red Dice as provided by the Agreement and no later than 5:00pm MT on June 27, 2013.

2.  The Agreement shall be amended and restated by MJNA and Dixie, no later than 5:00pm MT on June 27, 2013, to provide as follows:

    a.  Dixie shall have a 60% membership interest and MJNA shall have a 40% membership interest.

    b.  Certain provisions in the Agreement that provide for an automatic return of Dixie IP in the event MJNA is subject to any of the following: (i) an SEC investigation, (ii) failed audit, (iii) failed 15C-211, (iv) any lawsuit against MJNA regarding

{01057146 / 4}

MESSNER & REEVES, LLC
ATTORNEYS AT LAW

Medical Marijuana, Inc.
June 11, 2013
Page 4 of 4

        fraud or other issues directly related to actions by management/shareholders, and (v) additional triggers to be discussed by the parties.

3. Pursuant to an Indemnity Agreement, MJNA, HDDC, Michelle Sides, and Michael Llamas shall indemnify Dixie Holdings, LLC, Red Dice, Left Bank, LLC, Vincent M. Keber, III and Charles K. Smith from any and all third-party claims no later than 5:00pm MT on June 27, 2013.

4. D&O insurance shall be obtained for the officers of Red Dice and MJNA no later than 5:00pm MT on June 27, 2013.

5. MJNA shall provide Red Dice the auditor work papers and consolidation schedule used by MJNA's auditor to prepare the financial statements for the fourth quarter of 2012 and the first quarter of 2013 by 5:00pm MT on June 13, 2013.

6. MJNA shall call a shareholder meeting by 5:00pm MT on June 18, 2013 to take appropriate corrective actions to amend the articles of incorporation and to properly issue stock to its affiliates.

7. Any other additional items to be discussed between Dixie and MJNA.

    As discussed above, should MJNA fail to agree to these steps, Dixie will proceed in the manner described under the terms of the Agreement. Claims will include, but not be limited to, breach of fiduciary duty, breach of contract and fraud.

    We demand that you provide written confirmation: (a) that acknowledges your receipt of this letter and desire to comply with the timeframes set forth above; (b) of your agreement to comply with the terms and conditions of the Agreement; and (c) that you will work with Dixie in good faith to reach a mutually agreed upon solution no later than 5:00pm MT on June 27, 2013. Failure to comply with any of Dixie's demands by the respective dates provided herein will trigger the arbitration process provided by the Agreement.

    We look forward to an expeditious resolution to these disputes.

        Sincerely,

        MESSNER & REEVES, LLC

        Robert B. Hinckley, Esq.

Enclosure

{01057146 / 4}

# OPERATING AGREEMENT
## OF
## RED DICE HOLDINGS, LLC.

This **OPERATING AGREEMENT** dated as of the 5th day of April 2012 ("Effective Date"), by and between **Medical Marijuana Inc.**, an Oregon corporation ("MJNA Member") and **Dixie Holdings LLC, a/k/a Dixie Elixirs** (collectively herein, the "DIXIE Member").

## RECITAL

**WHEREAS**, MJNA is a company in the business of providing management, investment, consulting services and capital for legal hemp and cannabis based products and business; and

**WHEREAS**, DIXIE is a company that has licensing, trademarks, proprietary materials, formulations and services for certain legal hemp and cannabis based businesses and the related facilities and equipment to manufacture and distribute same; and

**WHEREAS**, MJNA Member and DIXIE Member desire to form an entity "Red Dice Holdings, LLC" ("Company") in which the parties will be the Members for the purposes set forth herein.

## ARTICLE 1
## DEFINITIONS AND INTERPRETATION

**1.1**   **Definitions**.  Where used in this Agreement, in addition to capitalized terms defined on first use herein, the following words or phrases shall have the meanings set forth below:

"Act" means the California Limited Liability Company Act, (Cal. Corp. Code §17050-1 ("Act"). By this Agreement, the Members enter into this Agreement in accordance with the laws of the State of California. The rights and obligations of the Members will be as stated in the applicable legislation of the Act, except as provided for herein.

"Affiliate" in relation to any Person means any Person that controls, is controlled by or is under common control with that Person. For the purposes of this definition, the term "control" means (i) beneficial and/or legal ownership of at least fifty percent (50%) or more of the outstanding voting securities of a company or other business organization with voting securities (or such percentage as required under any particular jurisdiction to confer controlling powers through ownership of voting securities broadly equivalent to the controlling powers attendant on ownership of at least fifty percent (50%) or more of outstanding voting securities in a United States corporation), (ii) a fifty percent (50%) or greater interest in the net assets or profits of a partnership or other business organization without voting securities.

"Agreement" means this Operating Agreement, together with the Exhibits attached hereto, each of which is hereby incorporated by reference herein, and any instrument amending this Agreement in accordance hereto.

"Asset Value" with respect to any Company asset means:



(a)     The fair market value when contributed of any asset contributed to the Company by any Member;

(b)     The fair market value on the date of distribution of any asset distributed by the Company to any Member as consideration for a capital interest in the Company;

(c)     The fair market value of all Property at the time of the happening of any of the following events:  (A) the admission of a Member to, or the increase of a capital interest of an existing Member in, the Company in exchange for a Capital Contribution; or (B) the liquidation of the Company under Regulation Section 1.704-1(b)(2)(ii)(g); or

(d)     The Basis of the asset in all other circumstances.

"Basis" with respect to an asset means the adjusted basis from time to time of such asset for federal income tax purposes.

"Books and Records" means all material communications between any Member or any of its Affiliates and governmental patent offices, the internal patent file and the invention disclosure documents of any Member or any of its Affiliates, or any such Affiliate's corporate intellectual property department, if any. Notwithstanding the foregoing or anything else contained in this Agreement.

"Capital Account" means an account to be maintained by the Company for each Member in accordance with Treasury Regulation Section 1.704-1(b)(2)(iv).

"Capital Contributions" means, with respect to any Member, the fair market value of the money and the services, if any, and the initial fair market value of any Property (other than money or services) contributed to the Company by the Member.

"Code" shall mean the Internal Revenue Code of 1986 or corresponding provisions of subsequent superseding federal revenue laws.

"Confidential Information" means all information that would reasonably be regarded as of a confidential or commercially sensitive nature by the Party to which the information relates or the Party (or its relevant Affiliate) to whom the information belongs, including, without limitation, any matter relating to or arising in connection with this Agreement, the Transactions or the business or affairs of the Parties and their Affiliates.

"Effective Date" shall have the meaning set forth in the Preamble.

"Intellectual Property" shall include, but shall not be limited to all United States and foreign common law, registered and unregistered trademarks, trade names, trade dress, product specifications, copyrighted materials, patents, trade secrets, customer lists, and all rights associate therewith.

"Manager" initially means Vincent M. Keber, III, in his capacity as the Manager of the Company and such other Persons serving as managers of the Company from time to time.

"Management Committee" shall have the meaning set forth in Section 9.2



"Member" means a Person executing this Agreement from time to time during the existence of the Company as a member of the Company with a Membership Interest on the basis provided herein.

"Membership Interests" " means, subject to the specific rights, benefits, and obligations granted to Members in this Agreement, the interest of a Member in the Company, including without limitation rights to distributions (liquidating or otherwise), allocations, information and to consent to or approve matters pertaining to the Company and such other matters with respect to the Company as expressly provided herein.

"Party" or "Parties" means DIXIE Member or MJNA Member or, as the context requires or admits, both DIXIE Member and MJNA Member.

"Person" shall mean any individual or entity, and the heirs, executors, administrators, legal representatives, successors, and assigns of such Person where the context so permits.

"Proceeds" mean monetary proceeds or any other liquid asset of any kind received by the Company from any means whatsoever, before payment of any expenses, fees or charges of any kind.

"Profits" and "Losses" for any Fiscal Year or other period means an amount equal to the Company's taxable income or loss for such year or period determined in accordance with Code Section 703(a) and the Regulations thereunder with the following adjustments:

(a) All items of income, gain, loss and deduction of the Company required to be stated separately shall be included in taxable income or loss;

(b) Income of the Company exempt from federal income tax shall be treated as taxable income;

(c) expenditures of the Company described in Code Section 705(a)(2)(B) or treated as such expenditures under Regulation Section 1.704-1(b)(2)(iv)(i) shall be subtracted from taxable income;

(d) The difference between Basis and Asset Value shall be treated as gain or loss upon the happening of any event described in clauses (i), (ii) or (iii) of the definition of Asset Value;

(e) Gain or loss resulting from the disposition of Property on which gain or loss is recognized for federal income tax purposes shall be determined with reference to the Asset Value of such Property;

(f) Depreciation shall be determined in accordance with Treasury Regulations §1.704-1(b)(2)(iv)(g)(3) based upon Asset Value instead of as determined for federal income tax purposes; and

"Property" means all real and personal property, tangible and intangible, owned by the Company.



"Treasury Regulations" means the Treasury Regulations promulgated under or otherwise applicable to the Code.

## ARTICLE 2
## ORGANIZATION

**2.1**   **Formation**.  The Company has been/will be formed as a limited liability company under and pursuant to the provisions of the Act by the filing of the Articles of Organization with the Secretary of State of the State of California.  The rights and liabilities of the Members shall be as provided under the Act, the Articles of Organization and this Agreement.  Each Member hereby acknowledges that it has carefully reviewed the Articles of Organization and that each of the provisions of the Articles of Organization is acceptable to such Member.

**2.2**   **Name**.  The name of the Company is **Red Dice Holdings, LLC,** formation documents shall be attached as *Exhibit A* which shall be formed and affixed within thirty (30) days from Effective date.

**2.3**   **Term**.  The Company shall exist perpetually unless otherwise specified in the Articles of Organization, or unless sooner terminated in accordance with this Agreement.

**2.4**   **Purposes/Company Business**.  The purposes of the Company are to engage in any activity and/or business for which limited liability companies may be formed under the Act (including the Company Business as defined in Section 2.1).  The Company shall have all the powers necessary or convenient to affect any purpose for which it is formed, including all powers granted by the Act.

**2.5**   **No State-Law Partnership**.  No provision of this Agreement shall be deemed or construed to constitute the Company a partnership of the Members (including, without limitation, a limited partnership) for any purposes other than federal and state tax purposes, if any.

**2.6**   **Assumed Names**.  The Management Committee may cause the Company to do business under one or more assumed names.

**2.7**   **Registered Agent; Principal Offices; Other Offices**.  The statutory registered agent of the Company in the State of California shall be Michelle L. Sides, Esq., or such other Person or Persons as the Management Committee may designate from time to time in the manner provided by law.  The address for the registered agent of the Company shall be 2665 Ariane Drive, Suite 207, San Diego, California 92117 until otherwise designated by the Management Committee. The principal office of the Company in the State of California, and shall initially shall be at 2665 Ariane Drive, Suite 207, San Diego, California 92117 or at such place within the state of California as the Management Committee may designate from time to time, and the Company shall maintain records there as required by the Act.  The Company may have such other offices within the state of California as the Management Committee may designate from time to time.

## ARTICLE 3
## BUSINESS OF THE COMPANY

**3.1**   **The Company Business**.  The Company will provide management and consulting services as well as acquire future projects that will provide value and benefit to the Company and



each Member shall act in a manner consistent with the Company objectives (collectively the "Company Business"). More specific terms of business structuring and distributions are as follows:

**3.2 Guarantees.** No Member shall be required to provide guarantees from its affiliated entities and Persons as it pertains to acquiring the Project.

**3.3 Unrelated Business(es).** Neither Member shall have any ownership in the individual businesses, subsidiaries and/or affiliates of the other Member.

**ARTICLE 4**
**CAPITAL CONTRIBUTIONS**

**4.1 Capital Account Balances.** Upon execution of this Agreement the balance in each of the Members' Capital Accounts shall be as set forth on *Exhibit B*.

**4.2 Membership Interests.** Each of the Members shall have the Membership Interests specified on *Exhibit B*.

**4.3 Capital Contributions.** The Capital Contributions to the Company shall be contributed in cash, performance, property or other approved methods as by the Members as follows: a separate Capital Account shall be maintained for each Member. Neither Member shall withdraw any part of its Capital Account. Upon the demand of either Member, the Capital Accounts of the Members shall be maintained at all times in the proportions in which the Members share in the Profits and Losses of the Membership Interests.

**4.4 Profit and Losses.** The net Profits of the Company shall be divided proportionately between the Members and the net Losses shall be borne equally by them as per the Membership Interest percentage. A separate income account shall be maintained for each Member. Profits and Losses shall be charged or credited to the separate income account of each Member. If a Member has no credit balance in his income account, losses shall be charged to its capital account.

**4.5 Additional Capital Contributions.** Upon the unanimous consent of the Management Committee, each Member shall contribute its pro rata portion of all additional capital necessary to conduct the Company Business, as set forth expressly in the preliminary budget and each subsequent budget or as the Management Committee may otherwise agree is necessary ("Additional Capital Contributions"). Upon thirty (30) days written notice by the Management Committee of a demand for additional capital, each of the then-Members shall contribute, in proportion to their respective Membership Interests, such additional capital contributions to the Company as determined by the Management Committee.

**4.6 Interest.** Except as may be expressly set forth herein, no interest shall be paid by the Company on Capital Contributions or on balances in Members' Capital Accounts.

**4.7 Loans From Members.** Loans by a Member to the Company shall not be considered capital contributions. Unless otherwise agreed by all of the Members, if any Member shall advance funds to the Company, the making of such advances shall not result in any increase in the amount of the Capital Account of such Member. The amounts of any such advances shall be

a debt of the Company to such Member and shall be payable or collectible only out of the Company assets in accordance with the terms and conditions upon which such advances are made. The repayment of loans from a Member to the Company upon liquidation shall be subject to the order of priority provided in Section 9.4.

4.8    **Capital Accounts.**

(a) A separate Capital Account shall be maintained for each Member. The beginning Capital Accounts for the Members shall consist of the Total Value of their respective Initial Capital Contributions. In all other instances, the beginning Capital Account for a Member shall consist of the Total Value of property or services actually contributed by that Member to the capital of the Company; however the Member percentages shall not exceed the percentages identified on *Exhibit B*, without unanimous consent of the Members. The Capital Accounts of the Members shall be:

(i)  increased by:

(A)    the amount of the Member's cash or other contributions to the Company;

(B)    the initial Asset Value of Property contributed by the Member to the Company, net of liabilities secured by the Property that the Company is considered to assume under or take subject to in accordance with Code Section 752; and

(C)    the Member's distributive share of Profits and any items of income or gain allocated to the Member; and

(ii)  decreased by:

(A)    cash or other distributions to the Member from the Company;

(B)    the Asset Value of Property distributed in kind to the Member, net of liabilities secured by the Property that the Member is deemed to assume under or take subject to in accordance with Code Section 752; and

(C)    the Member's distributive share of Losses and any items of loss or deduction allocated to the Member.

(b) The maintenance of Capital Accounts shall be subject to the following special rules:

(i) a Member's Capital Account shall not be credited for any Capital Contribution which the Member is obligated to make until the contribution is actually made or deemed to have been made;



(ii) if a Member transfers all or any portion of its Membership Interest in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Membership Interest;

(iii) if the Asset Value of Company assets are adjusted as provided in the definition of "Asset Value" above, the Capital Accounts of all Members shall be adjusted simultaneously to reflect the aggregate net adjustment which would have occurred if the Company recognized gain or loss equal to the amount of such aggregate net adjustment and such gain or loss was allocated to the Members in the manner required by Section 5 below;

(c) the provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulation Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with its provisions. To the extent that this Agreement is inconsistent with or incomplete with respect to the Treasury Regulations, the Capital Accounts of the Members shall be maintained in accordance with the Treasury Regulations.

## ARTICLE 5
## MEMBERS

**5.1    Members.**  The sole Members of the Company on the Effective Date are the MJNA Member and DIXIE Member.  The addresses of each Member are set forth on *Exhibit ___*. Beginning with the Effective Date, and for a period of one year there are no other Members of the Company and no other Person has any right to take part in the ownership of the Company unless approved in writing by all Members.

**5.2    Admission of Additional Members.**  Additional Members of the Company may be added only if: (a) except as provided in Section 5.5, the addition of any such proposed additional Member is approved unanimously in writing, prior to such admission, by all the then existing Members; and (b) such proposed additional Member executes and delivers to the Company and each of the Members a counterpart of this Agreement and agrees to be bound by all of the terms and provisions hereof.

**5.3    Authority; Liability to Third Parties.**  Except as otherwise expressly provided herein, only MJNA Member and DIXIE Member has the authority or power to act for or on behalf of the Company, to do any act that would be binding on the Company, or to incur any expenditures on behalf of the Company as per approved budget(s).  No Member has the authority or power to make any representation, warranty or create any liability for any other Member without such other Member's prior written consent, and the Company has no such authority or power with respect to any Member.  No Member shall be liable for the debts, obligations or liabilities of the Company, including under a judgment, decree or court order.

**5.4    Effect of Bankruptcy, Dissolution, Etc. of a Member.**  The bankruptcy, dissolution, liquidation, or termination of a Member shall not cause the termination or dissolution of the Company and the business of the Company shall continue.  Upon any such occurrence, the



trustee, receiver, executor, administrator, committee, guardian or conservator of such Member shall have all the rights of such Member for the purpose of settling or managing its estate or property, subject to satisfying conditions precedent to the admission of such assignee as a substitute Member. The transfer by such trustee, receiver, executor, administrator, committee, guardian or conservator of any Member Interest shall be subject to all of the restrictions, hereunder to which such transfer would have been subject if such transfer had been made by such bankrupt, dissolved, liquidated, or terminated Member.

**5.5**   **Transfer of Membership Interests.** No Member shall, directly or indirectly, transfer any Membership Interest to any Person except with the written consent of all other Members.

**5.6**   **Voluntary Termination.** The Membership may be dissolved at any time by the unanimous agreement of the Members, in which event the Members shall proceed with reasonable promptness to liquidate the business of the Membership. The Membership name shall be sold with the other assets of the business. The assets of the Membership business shall be used and distributed in the following order: (a) to pay or provide for the payment of all Membership liabilities and liquidating expenses and obligations; (b) to equalize the income accounts of the Members; (c) to discharge the balance of the income accounts of the Members; (d) to equalize the capital accounts of the Members; and (e) to discharge the balance of the capital accounts of the Members.

**5.7**   **Matters Subject to Member Approval.** MJNA Member and DIXIE Member shall he the only Members with authority to act regarding any day to day decisions made, obligation incurred or power exercised by or on behalf of the Company as per approved budget(s). Unanimous Member Consent must be obtained with respect to any of the following:

(a) Execute any and all documentation required to close any transaction without written approval or authorization.

(b) the lease, license, transfer or encumbrance of all or substantially all of its assets;

(c) any reorganization, merger, consolidation or similar transaction or series of related transactions involving the Company;

(d) any voluntary liquidation or dissolution, other than as a result of the expiration or termination of this Agreement pursuant to the terms hereof;

(e) any (i) admission in writing to its inability generally to pay its debts as they become due; (ii) general assignment, arrangement or composition with or for the benefit of its creditors; (iii) institution of a proceeding seeking a judgment of insolvency or bankruptcy or any other similar relief, or petition for the winding up or liquidation of the Company; or (iv) seeking or appointing of an administrator, receiver, conservator, trustee, custodian or other similar official for the Company or for all or substantially all of its assets;

(f) any split, combination or reclassification of any Membership Interests; ·



(g) the declaration, setting aside or making of any distributions (whether in cash or property) to any Member, except for any payments with respect to debt owed to a Member or payments or distributions specifically required under this Agreement;

(h) except as expressly set forth in this Agreement, the issuance of any additional Membership Interests or other equity interests (including any interests convertible into or exercisable for equity interests) of the Company, or the admission of any Person as a Member of the Company;

(i) the expansion into lines of business or the conduct of any business other than the Company Business;

(j) entry by the Company or any of its subsidiaries into any joint ventures or partnerships or establishment of any subsidiaries;

(k) any action that would cause the Company to become a party to or bound by any agreement that, by its terms (i) directly or indirectly restricts or prevents the Company's performance of the Company Business, such as a non-compete or an exclusivity agreement or (ii) directly obligates any Member or any of its Affiliates to take or not take any action;

(l) any action that would cause the Company or any of its Subsidiaries to become subject to the registration or reporting requirements of the Securities Act, the Exchange Act or any similar securities laws of any other jurisdiction; the granting of any registration rights to any Person; or the listing of any securities on any securities exchange or over-the-counter trading system; or

(m) a change to the Company's name or amendment or modification of the Articles of Organization of the Company, this Agreement, including any change in the purposes of the Company.

**5.8**   **No Resignation of a Member.**  No Member shall resign, withdraw, retire or otherwise take any action to effect any of the foregoing.

**5.9**   **Transactions with Members and their Affiliates.**  The Company shall not enter into, amend, modify or subject to waiver of any provision of any transaction or contract, or series of related transactions and contracts, with any Member or any Affiliate of any Member, except as otherwise provided herein or with the approval of the Management Committee.

**5.10**   **Other Business.**  The DIXIE Member may engage in or possess interests in other business ventures that are unconnected, unrelated and do not in any way compete with the Company which is further identified in the NonCompete Agreement(s) attached as *Exhibit C.*

**5.11**   **Meetings of Members.**

(a) Meetings of the Members may be called by Members holding among them at least 40% of the issued and outstanding Membership Interests by written notice thereof



(specifying the place and time of such meeting) that is delivered to each other Member at least six days prior to such meeting. Neither the business to be transacted at, nor the purpose of, such special meeting need be specified in the written notice (or waiver of notice) thereof. Unless otherwise expressly provided in this Agreement, at any meeting of the Members, a 75% of the outstanding Membership Interests represented either in person or by proxy, shall constitute a quorum. At all meetings of the Members at which a quorum of eligible Members is present, except as otherwise may be required by this Agreement, the affirmative vote of Members holding 75% of the eligible outstanding Membership Interests shall constitute the act of the Members. Each Member may, with respect to any vote, consent, or approval that it is entitled to grant pursuant to this Agreement, grant or withhold such vote, consent or approval in its sole discretion.

5.12    **Provisions Applicable to All Meetings.**

(a) Any meeting shall be held at the principal place of business of the Company, unless the notice of such meeting specifies a different place.

(b) Attendance in person or in the case of a Member which is not a natural person, by a principal or agent in person at a meeting shall constitute a waiver of notice of such meeting.

(c) A Member may vote at such meeting by a written proxy executed by that Member and delivered to another Member. A proxy shall be revocable unless it is stated to be irrevocable.

(d) No action may be taken by Members at a meeting or otherwise unless the right to take such action is (i) expressly provided for in this Agreement or (ii) required under the Act or other applicable law.

(e) Any action required or permitted to be taken at a meeting may be taken without a meeting, without prior notice and without a vote if a consent or consents in writing, setting forth the action so taken, is signed by the Members having not fewer than the minimum number of Membership Interests or votes that would be necessary to take the action at a meeting at which all Members entitled to vote on the action were present and voted; provided that, in the event the action by written consent is taken by less than all of the Members, the Manager shall promptly provide all Members with written notice of such action.

(f) Members may participate in and hold such meeting by means of conference telephone, video conference or similar communications equipment by means of which all Persons participating in the meeting can hear each other.

## ARTICLE 6
## ALLOCATIONS AND DISTRIBUTIONS

6.1    **Allocation of Income and Loss.**

(a)     Taxable income shall be allocated each fiscal year to the Members in accordance with their respective Membership Interests in the Company.

(b)     Losses shall be allocated to each of the Members in accordance with their respective Membership Interests in the Company.

(c)     To the extent required, allocations shall be made in accordance with Section 704(c) of the Code, and the amount of depreciation, gain or loss with respect to the Company's property shall be computed with reference to the Asset Value of the Property rather than its adjusted basis, but only to the extent required under applicable Treasury Regulations.

**6.2     Determination of Income and Loss.** At the end of each fiscal year of the Company, income, gain, loss, deduction and credit (or items thereof) shall be determined for the accounting period then ending and shall be allocated to the Members as provided herein.

**6.3     Cash Distributions.** The distributable cash of the Company shall be determined at least annually by the Management Committee, by the percentage set forth by *Exhibit B* herein. All distributions of cash or other assets of the Company shall be made and paid to the Members pro rata in accordance with such Members' Interests.

### ARTICLE 7
### OWNERSHIP OF COMPANY PROPERTY

All Company Property transferred and/or acquired by the Company shall be owned by the Company as an entity; no Member or Manager, individually or collectively, shall have any ownership interest in such Company Property, or any portion thereof; and each Member's Membership Interest shall be personal property for all purposes. At all times after the Closing Date, the Company shall hold title to all of the Company Property in the name of the Company and not in the name of any Member or Manager. All Company Property shall be recorded as the property of the Company or one of its Subsidiaries on the books and records of the Company, irrespective of the name in which legal title to such Company Property is held.

### ARTICLE 8
### FISCAL MATTERS; BOOKS AND RECORDS

**8.1     Bank Accounts; Investments.** Capital Contributions, revenues and any other Company funds shall be deposited by the Company in a bank account established in the name of the Company in furtherance of the purposes of the Company. Funds deposited in the Company's bank accounts may be withdrawn only to be invested in furtherance of the Company's express and previously authorized purposes, to pay Company debts or obligations or to be distributed to the Members pursuant to this Agreement.

**8.2     Records Required by Act; Right of Inspection.**

(a) *Records Required.* During the term of the Company, the Management Committee, at the expense of the Company, shall maintain in the Company's principal office all records required to be kept pursuant to the Act, including a current list of the names, addresses and Membership Interests held by each of the



Agreement with Left Bank, LLC and shall be attached as *Exhibit E* which shall be affixed within thirty (30) days from the Effective Date.

(c) DIXIE Member shall provide standard legal indemnifications for all trademarks and/or licensing agreements transferred into the Company pursuant to an assignment agreement;

(d) DIXIE Member use its best efforts to acquire new licensing, trademarks and/or patents as determined and approved by the Company to be held in the Company name;

(e) Manager shall be responsible for the management of all sales, marketing, promotions and related matters for the Company. All media shall be approved in writing within three business days by both Members prior to any distribution of any kind; provided, however, a Member's failure to approve or disapprove such media within three business days shall be deemed the express such Members approval;

(f) DIXIE Member shall execute a NonCompete Agreement with the Company including, but not limited to its products, services, marketing, business plans, financials, investor relations and other Confidential Information as defined within said NonCompete Agreement. The NonCompete Agreement is attached as *Exhibit C.*

(g) DIXIE Member shall cause Vincent M. Keber, III and Charles Smith to both execute mutually agreed upon Employment contracts with the Company. Employment Agreements for Vincent M. Keber, III and Charles Smith are attached as *Exhibit F.*

(h) DIXIE Member shall provide the Company with an Exclusive Licensing Agreement for all products held by and/or to be acquired by the Company and licensed to Left Bank, LLC (or other entities to be identified in the future by the Management Committee) to be the sole manufacturer and distributor of said products. The Exclusive Licensing Agreement is attached as *Exhibit E.*

(i) Manager shall prepare monthly budget reports for the Company to be reviewed, modified and approved by the Members.

(j) Manager shall run the day to day operations of the Company.

(k) MJNA Member shall contribute 24,166,667 unrestricted shares of common stock of ("MJNA Shares") of Medical Marijuana, Inc., an Oregon corporation, valued at a price per share of $0.06 subject to the Company reaching certain milestones pursuant to that certain Funding Agreement dated as of the Effective Date ("the "Funding Agreement") attached as *Exhibit G.*   MJNA does not guarantee that the cost per share to be $0.06 as valuation is determined upon liquidation. MJNA Member represents and warrants that the MJNA Shares shall be seasoned, free trading shares of common stock and the Company shall be



permitted to sell such MJNA Shares in the public market as provided for herein and contingent upon certain stated Milestones being achieved. MJNA Member further represents and warrants to the Company and DIXIE Member that the MJNA Shares contributed to the Company in exchange for Membership Interests of the Company are not deemed "control stock" as such term is defined under the SEC Regulations. The MJNA Shares, issued in the name of Red Dice Holdings, LLC, shall be placed in a mutually acceptable escrow account within fifteen (15) business days from the Effective Date.

(1). The MJNA Shares, at the direction of the Management Committee, shall be sold and the Proceeds allocated as follows:

(A) At Closing, the Company shall sell Two Hundred Fifty Thousand Dollars ($250,000) (exclusive of broker's fees) in MJNA Shares and the Proceeds to the Company shall be tendered for payments as follows:

(i) $50,000 to be released for DIXIE Member employee incentives;

(ii) $150,000 for the payment of DIXIE Member investor debts;

(iii) $50,000 for the payment of DIXIE Member short term account payables;

(B) At Milestone 1, which is contingent on Left Bank, LLC, on behalf of Pharmasphere, sourcing and obtaining required location and lease for the facility, signing a lease agreement for the facility and maintaining the required licensing, the Company shall sell Two Hundred Fifty Thousand Dollars ($250,000) (exclusive of broker's fees) in MJNA Shares and the Proceeds to the Company shall be tendered for payments as follows:

(i) $50,000 to Vincent M. Keber, III

(ii) $50,000 to Charles Smith

(iii) $150,000 for the payment of DIXIE Member investor debts.

(C) At Milestone 2, which is contingent upon the successful integration of a new product offering (such as medicated chewing gum) or any other product currently controlled by MJNA Member, into the operations of the Company including defining the manufacturing, packaging and marketing requirements necessary for product launch, the Company shall sell One Hundred Thousand Dollars ($100,000) in MJNA Shares and the Proceeds to the Company shall be tendered for payments as follows:

(i) $100,000 to DIXIE Member for the purpose of repaying debt to affiliated companies.



(D) The balance of Eight Hundred Fifty Thousand ($850,000) in MJNA Shares allocated herein, less all brokerage fees incurred from any liquidation of shares and based upon all contingencies stated in sections (n)(i), (n)(ii) and (n)(iii) being fulfilled, shall be used solely as working capital for operations of the Company including but not limited to operations, licensing, research/development and marketing as approved in writing by the Management Committee in the operations budget.

(l) Upon the Closing, both Vincent M. Keber, III and Charles Smith shall each receive $100,000 worth of MJNA common stock warrants priced at $0.06 per share attached as *Exhibit H*.

(m) MJNA Member shall license the Company with the TerraSphere grow technology and shall provide management of said new equipment pursuant to a Licensing Agreement with MJNA which shall be affixed as *Exhibit I* within ninety (90) days from Effective Date. MJNA Member shall provide standard legal indemnifications for such license;

(n) MJNA Member shall assist in locating and performing due diligence on any new product lines and additional facilities and state licensed businesses within the industry that shall be approved by the Company.

(o) MJNA Member shall provide website management for the Company.

(p) Each approved Company project shall be identified, approved by the Management Committee. The Management Committee is required to approve all new acquisitions and product lines and all budgeting matters. An approved initial operational budget is attached as *Exhibit J* which shall be afffied within sixty (60) days from the Effective Date.

**9.2 Management Committee.** Except as otherwise expressly provided in this Agreement, the powers of the Company shall be exercised by or under the authority of, and the business and affairs of the Company shall be managed under the direction of, a Management Committee (the "Management Committee") as described herein.

**9.3 Management Committee Stale Mate.** In the event the Members are unable to be unanimous in any decision required to be unanimous, the Members shall mutually agree to designate an independent third party to be retained, and paid for by the Company, to provide the decision in the best interest of the Company. Both Members shall abide by the final decision of the independent third party.

**9.4 Composition of the Management Committee.** The Management Committee shall consist of two individuals. DIXIE Member and MJNA Member shall be entitled to appoint one individual to the Management Committee. Initially, the members of the Management Committee consist of Vincent M. Keber, III and Michael R. Llamas or Michael Mona II.



**9.5 General Powers of the Management Committee.** Except for those actions expressly reserved for the Manager and Members (individually or as a group) as provided in this Agreement, no act shall be taken, sum expended, decision made, obligation incurred or power exercised by or on behalf of the Company with respect to any of the following without the written approval of the Management Committee and as per approved budget(s):

(a) the appointment or replacement of any officer of the Company;

(b) incur or amend any indebtedness on behalf of the Company;

(c) entry into, termination or amendment of any material contract, or any material election of rights or remedies or any other material decision or determination, or the granting of any material waivers or consents, under any material contract; for purposes of this Section 9.3(c) a material contract includes any contract which is reasonably expected to provide for the making of payments by the Company in any calendar year of greater than $50,000 (unless the payment for a particular contract in excess of such $50,000 threshold is expressly provided for in the Company's budget);

(d) termination or amendment of any material governmental approval, authorization, license or permit;

(e) institution, compromise or settlement of any material litigation or arbitration proceeding, or settlement of any insurance claim for an amount in excess of fifty thousand dollars ($50,000);

(f) except as expressly provided in the Company's budget, the creation, incurrence, or assumption of any indebtedness of the Company for borrowed money;

(g) distributions other than a distribution in connection with the dissolution and liquidation of the Company;

(h) approval of the Company's budgets;

(i) selection of the Company's accountants;

(j) creation or incurrence of any lien or encumbrance on any asset of the Company,

(k) any transfer or license of any of intellectual property rights of the Company;

(l) establishment of any reserves from Company funds, including reserves with respect to Company operations and reserves for the payment of Company obligations;

(m) the purchase or acquisition of any equity securities (or any securities convertible into or exercisable for any equity securities) of any Person;



(n) the purchase or acquisition, directly or indirectly, of any assets in a transaction or series of related transactions for consideration (including assumed liabilities and indebtedness) in excess of one hundred thousand dollars ($100,000); or

(o) entry into any contract or agreement to take any of the foregoing actions.

**9.6** **Place of Meetings.** Meetings of the Management Committee shall be held at the principal office of the Company as provided herein, or at such other place as may be designated by the Management Committee. The individuals serving on the Management Committee may appoint from among themselves a chairperson to preside at meetings of the Management Committee. Any individual shall be permitted to attend any meeting of the Management Committee in person or by conference call pursuant to Section 9.14.

**9.7** **Regular Meetings.** The Management Committee shall meet at least quarterly. No notice need be given of regular meetings that the Management Committee previously has designated a time and place for the meeting.

**9.8** **Special Meetings.** Special meetings of the Management Committee may be held at any time upon the request of at least one (1) of the members of the Management Committee. A notice of any special meeting shall be sent to the last known address of each member at least seven (7)) days before the meeting. Notice of the time, place and purpose of such meeting may be waived in writing before or after such meeting, and shall be equivalent to the giving of notice. Attendance of a member at such meeting shall also constitute a waiver of notice thereof, except where such member attends for the express purpose of objecting to the transaction of any business on the ground that the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular or special meeting of the Management Committee need be specified in the notice or waiver of notice of such meeting. The members of the Management Committee shall cooperate and use their reasonable best efforts to schedule meetings at times and places that will maximize attendance.

**9.9** **Quorum of and Action by the Management Committee.** The presence, in person or by conference call, of at least two (2) members of the Management Committee shall constitute a quorum for the transaction of business at any meeting of the Management Committee constituting at least one (1) designated by MJNA Member and one (1) designated by DIXIE Member. Each member shall be entitled to one vote. Except as otherwise expressly provided in this Agreement, any action to be taken or approved by the Management Committee hereunder must be taken or approved by majority of the Management Committee and any action so taken or approved shall constitute the act of the Management Committee.

**9.10** **No Compensation.** The members of the Management Committee shall serve in such capacity without compensation by the Company. The members of the Management Committee will be entitled to reimbursement from the Company for their out-of-pocket expenses incurred in attending any meeting.

**9.11** **Resignation and Removal.** Any member of the Management Committee may resign at any time by giving notice to the Company and the Member that designated such individual. Such resignation shall be made in writing and shall take effect upon the resignation date



designated in the notice, or if no such date is designated, upon the earlier of the receipt of such notice of resignation by the remaining members of the Management Committee or the time such individual is replaced by the Member that designated such individual. Any individual serving on the Management Committee by designation of a Member may be removed, either with or without cause, only upon the written request of such Member. Any such removal shall be effective upon the removal date designated in the request, or if no such date is designated, upon the receipt of such request by the Company and by such individual.

**9.12 Vacancies.** Any vacancy occurring with respect to an individual serving on the Management Committee by designation of a Member shall be replaced by that Member pursuant to Section 9.3.

**9.13 Action by Written Consent.** Any action that may be taken at a meeting of the Management Committee may be taken without a meeting if a consent in writing, setting forth the action to be taken, shall be signed by the Members. No notice shall be required in connection with the use of a written consent pursuant to this Section.

**9.14 Standard of Care.** Every Person serving on the Management Committee shall discharge his or her duties as a Manager in good faith, with the care an ordinarily prudent person in a like position would exercise under similar circumstances.

**9.15 Conference Telephone Meetings.** Meetings of the Management Committee may be held by means of conference telephone or similar communications equipment so long as all persons participating in the meeting can hear each other. Participation in a meeting by means of conference telephone shall constitute presence in person at such meeting, except where a person participates in the meeting for the express purpose of objecting to the transaction of any business at such meeting on the ground that the meeting is not lawfully called or convened.

**9.16 Employment of Others.** The Management Committee shall be authorized to appoint, employ, or contract with, at the expense of the Company, any Person it may deem necessary or desirable for the transaction of the business of the Company as per approved budget.

**9.17 Indemnification.** Notwithstanding the foregoing, the Company shall indemnify, save harmless and pay all judgments arising against the Management Committee and its members, directors, officers, employees and agents from any cost, expense, claim, liability or damage incurred by reason of such Person's relationship to the Company or any act performed or omitted to be performed by them in connection with this Article 9 or the business of the Company, including attorney's fees and costs incurred by them in connection with the defense of any action based on any such act or omission, which attorneys' fees and costs may be paid as incurred, including all such liabilities under any Federal or state securities act (including the Securities Act of 1933, as amended) as permitted by law, except that the Company shall have no indemnification obligation hereunder with respect to any act or omission of any Person that constitutes willful misconduct, gross negligence, or was outside the scope of such Person's authority under this Article 9. All judgments against the Company with respect to which any Person is entitled to indemnification may only be satisfied from the Company's assets. Any Person entitled to be indemnified hereunder shall also be entitled to recover its attorney's fees and costs of enforcing this indemnity from the Company's assets. This section shall survive



termination of the Agreement. Any suit and/or action filed relating to this Agreement against an action or inaction of MJNA Member shall be the sole financial responsibility to defend said action and/or claim of the MJNA Member and shall indemnify DIXIE Member of same. Any suit and/or action filed relating to this Agreement against an action or inaction of DIXIE Member shall be the sole financial responsibility to defend said action and/or claim of the DIXIE Member and shall indemnify MJNA Member of same.

## ARTICLE 10
## INFORMATION AND CONFIDENTIALITY

**10.1** <u>Information</u>. In addition to the other rights specifically set forth in this Agreement, each Member is entitled to all information to which that Member is entitled to have access pursuant to the Act under the circumstances and subject to the conditions therein stated.

**10.2** <u>Confidentiality</u>. Each Member acknowledges that, from time to time, it may receive information from or regarding the Company or the other Member that is confidential in nature. Each Member shall hold in strict confidence any confidential information it receives regarding the Company or the other Member and may not disclose it to any Person, except for disclosures (i) compelled by law (but the Member must notify the Management Committee promptly of any request for that information, before disclosing it if practicable), (ii) to advisers or representatives of the Member or Persons to which that Member's Interest may be transferred as permitted by this Agreement, but only if the recipients have agreed to be bound by the provisions of this Article, or (iii) of information that Member has also received from a source independent of the Company that the Member reasonably believes obtained the information without breach of confidentiality. The Members acknowledge that breach of the provisions of this Article may cause irreparable injury to the Company for which monetary damages are inadequate, difficult to compute, or both. Accordingly, the Members agree that the provisions of this Article may be enforced by specific performance.

## ARTICLE 11
## TERMINATION; WINDING UP

**11.1** <u>Termination</u>. At any time after the date hereof, the Members may unanimously agree in writing to terminate this Agreement, without cost or penalty. The effective date of termination under this Section 11.1 shall be the date on which the Members unanimously agree in writing.

**11:2** <u>Mandatory Offer to Sell</u>.

        (a) Purchase Event. For purposes of this Agreement, any one of the following events shall constitute a "Purchase Event":

                (i) The insolvency of a Member or the making of an assignment for the benefit of creditors by the Member or the filing of a petition in bankruptcy by or against the Member, or the distribution or transfer of the Units, in whole or in part, to a spouse or third party by virtue of a decree of dissolution of the Member's marriage or other order of a court.



(ii) The commission of any act by a Member, directly or indirectly including through a third-party, which involves theft, embezzlement, fraud, or other act of moral turpitude or criminal act (exclusive of misdemeanors or infractions), committed against the Company, its clients, employees, shareholders or affiliates, or against any third-party if the Management Committee reasonably believes said acts will damage or adversely affect the Company and its operations.

**11.3 Purchase Price in Case of Insolvency or Wrongful Conduct.** If the Purchase Event is an event set forth herein, the per price at which the Member Interest shall calculated as (.50) multiplied by the Company's average earnings before income taxes ("EBIT") over the 3 fiscal years immediately preceding the date of the Purchase Event (or the average EBIT for those fiscal years that the Company has been in existence if less than 3 fiscal years). The average EBIT of the Company shall be computed by the then outside accountant for the Company based on generally accepted accounting principles.

**11.4 Purchase Price for Voluntary Termination – First Right of Refusal.** If the Purchase Event is an event set forth herein, the per price at which the Member Interest shall calculated as (.75) multiplied by the Company's average earnings before income taxes ("EBIT") over the 5 fiscal years immediately preceding the date of the Purchase Event (or the average EBIT for those fiscal years that the Company has been in existence if less than 5 fiscal years). The average EBIT of the Company shall be computed by the then accountant for the Company based on generally accepted accounting principles.

**11.5 Method and Time of Payment.** The purchase price shall be paid to the selling Member under Section 11.3 and Section 11.4 is as follows: (i) as the Parties agree, or (ii) if they cannot agree, then at the option of the purchasing Member(s) or Company, over a period of thirty-six (36) months following the occurrence of any Purchase Event, with the principal unpaid balance accruing interest thereon at a rate of 6% per annum or such other interest rate as may be fixed by the Management Committee. The purchaser shall have the right to prepay such amounts at any time without premium or interest penalty.

**11.6 Winding Up.** If this Agreement is terminated and/or the Company is dissolved by a unanimous vote of the Members the Company's affairs shall be wound up as soon as reasonably practicable in the manner set forth below. The Company shall continue to abide by any contracts or other agreements to which the Company is a party regarding the conduct of the ordinary business of the Company.

(a) Appointment of Liquidator. The winding up of the Company's affairs shall be supervised by a liquidator. The liquidator shall be appointed jointly by mutual agreement of the Members. In the event the Members cannot agree upon the appointment of a liquidator, then the Members shall seek the appointment of a liquidator through a court of competent jurisdiction. The liquidator to be established pursuant to these provisions shall have expertise in the area of real estate development.

(b) Powers of Liquidator. In winding up the affairs of the Company, the liquidator shall have full right and unlimited discretion, for and on behalf of the Company:

(i) to prosecute and defend civil, criminal or administrative suits;

(ii) to collect Company assets, including obligations owed to the Company;

(iii) to settle and close the Company's business;

(iv) to dispose of and convey all Company Property for cash, and in connection therewith to determine the time, manner and terms of any sale or sales of Company Property, having due regard for the activity and condition of the relevant market and general financial and economic conditions; ·

(v) to pay all reasonable selling costs and other expenses incurred in connection with the winding up of the proceeds of the disposition of Company Property;

(vi) to discharge the Company's known liabilities and, if necessary, to set up, for a period not to exceed five (5) years after the date of dissolution, such cash reserves as the liquidator may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company;

(vii) to distribute any remaining proceeds from the sale of Company Property to the Members;

(viii) to prepare, execute, acknowledge and file articles of dissolution under the Act and any other certificates, tax returns or instruments necessary or advisable under any applicable law to effect the winding up and termination of the Company; and

(ix) to exercise, without further authorization or consent of any of the parties hereto or their legal representatives or successors in interest, all of the powers conferred upon the Management Committee under the terms of this Agreement to the extent necessary or desirable in the good faith judgment of the liquidator to perform its duties and functions. The liquidator (if not a member of the Management Committee), while acting in such capacity on behalf of the Company, be entitled to the indemnification rights set forth herein.

**11.7  Compensation of Liquidator.** The liquidator appointed as provided herein shall be entitled to receive such reasonable compensation for its services as shall be agreed upon by the liquidator and all of the Members.

**11.8  Distribution of Company Property and Proceeds of Sale Thereof.**



(a) Order of Distribution.  Upon completion of all desired sales of Company Property, and after payment of all selling costs and expenses, the liquidator shall distribute the proceeds of such sales, and the Company Property that is to be distributed in kind, to the following groups in the following order of priority:

(i) to the extent permitted by law, to satisfy Company liabilities to creditors, including Members who are creditors through loans or otherwise (other than for past due Company distributions) of the Company, whether by payment or establishment of reserves;

(ii) to satisfy Company obligations to Members to pay past due Company distributions;

(iii) to the Members, in accordance with the positive balances in their respective Capital Accounts; and

(iv) to the Members in accordance with their respective Interests.

(b) Insufficient Assets.  The claims of each priority group specified above shall be satisfied in full before satisfying any claims of a lower priority group.  If the assets available for disposition are insufficient to dispose of all of the claims of a priority group, the available assets shall be distributed in proportion to the amounts owed to each creditor or the respective Capital Account balances or Interests of each Member in such group.

**11.9  Final Audit.**  Within a reasonable time following the completion of the liquidation, the liquidator shall supply to each of the Members a statement which shall set forth the assets and the liabilities of the Company as of the date of complete liquidation and each Member's pro rata portion of distributions.

**11.10  Deficit Capital Accounts.**  Notwithstanding anything to the contrary contained in this Agreement, and notwithstanding any custom or rule of law to the contrary, to the extent that the deficit, if any, in the Capital Account of any Member results from or is attributable to deductions and losses of the Company (including non-cash items such as depreciation), or distributions of money pursuant to this Agreement to all Members in proportion to their respective Interests, upon dissolution of the Company such deficit shall not be an asset of the Company and such Member shall not be obligated to contribute such amount to the Company to bring the balance of such Member's Capital Account to zero.

## ARTICLE 12
## INDEMNIFICATION, INSURANCE

**12.1  Indemnification and Advance of Expenses.**  The Company shall indemnify and/or advance expenses to a Person who was, is, or is threatened to be made a named defendant or respondent in a proceeding because the person (i) is or was a member of the Management Committee, a Member, officer, employee or agent of the Company, or (ii) is or was serving at the request of the Company as a manager, member, director, officer, partner, proprietor, trustee, employee, agent, or similar functionary of another foreign or domestic limited liability company,

corporation, partnership, joint venture, sole proprietorship, trust, employee benefit plan, or other enterprise, to the fullest extent provided by, and in accordance with the procedures set forth in any applicable laws.

**12.2** **Insurance.** Subject to the Act, the Company may purchase and maintain officer and director insurance, or other insurance and/or arrangements on behalf of any Person who is or was a member of the Management Committee, a Member, employee, agent or other Person identified above in Section 12.1 against any liability asserted against him or incurred by him in such a capacity or arising out of his status as such a Person, whether or not the Company would otherwise have the power to indemnify him against that liability.

**12.3** **Limit on Liability of Members.** The indemnification set forth in this Article 15 shall in no event cause the Members to incur any liability beyond their total Capital Contributions, nor shall it result in any liability of the Members to any third party.

## ARTICLE 13
## MICELLANEOUS PROVISIONS

**13.1** **Entire Agreement.** This Agreement contains the entire agreement among the Members relating to the subject matter hereof, and all prior agreements relative hereto which are not contained herein are terminated.

**13.2** **Governing Law.** This Agreement shall be governed by and construed in accordance with the local, internal laws of the State of California. In particular, this Agreement is intended to comply with the requirements of the Act and the Articles of Organization. In the event of a direct conflict between the provisions of this Agreement and the mandatory, non-waivable and/or non-modifiable provisions of the Act, or any provision of the Articles of Organization, then the Act, and the Articles of Organization, in that order of priority, will control.

**13.3** **Mediation of Disputes.** The Members agree that any and all disputes concerning this agreement will first be subject to mediation prior to any party filing for arbitration or any other methods if dispute resolution. Should the parties not be able to settle this matter through mediation, they agree to arbitrate the subject dispute pursuant to Section 13.4.

**13,4** **Arbitration of Disputes.** Any dispute or claim in law or equity between Members arising out of this Agreement shall be decided by neutral, binding arbitration and not by Court action, except as provided by California law for judicial review of arbitration proceedings. The arbitration shall be conducted in accordance with the rules of the California Civil Codes and Code of Civil Procedures.

**13.5** **Successors and Assigns.** This Agreement shall be binding upon and shall inure to the benefit of the Members and their respective heirs, legal representatives, successors and assigns.

**13.6** **Severability.** This Agreement is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations. If any provision of this Agreement or the application thereof to any Person or circumstance shall, for any reason and to any extent, be invalid or unenforceable, but the extent of such invalidity or unenforceability does not destroy the basis of the bargain among the Members as expressed

herein, the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law.

**13.7** **Headings.** The Article and Article headings appearing in this Agreement are for convenience of reference only and are not intended, to any extent or for any purpose, to limit or define the text of any Article.

**13.8** **Construction.** Whenever required by the context, as used in this Agreement, the singular number shall include the plural, and vice versa, and the gender of all words used shall include the masculine, feminine and the neuter. Unless expressly stated herein, all references to Articles refer to articles of this Agreement, and all references to Exhibits are to schedules attached hereto, each of which is made a part hereof for all purposes.

**13.9** **Offset.** Whenever the Company is to pay any sum to any Member, any amounts that Member owes the Company may be deducted from that sum before payment.

**13.10** **Effect of Waiver or Consent.** A waiver or consent, express or implied, to or of any breach or default by any Person in the performance by that Person of its obligations with respect to the Company is not a consent or waiver to or of any other breach or default in the performance by that Person of the same or any other obligations of that Person with respect to the Company. Failure on the part of a Person to complain of any act of any Person or to declare any Person in default with respect to the Company, irrespective of how long that failure continues, does not constitute a waiver by that Person of its rights with respect to that default until the applicable statute-of-limitations period has run.

**13.11** **Waiver of Certain Rights.** Each Member irrevocably waives any right it may have to maintain any action for partition of the property of the Company.

**13.12** **Counterparts and Binding Effect.** This Agreement may be executed in one or more counterparts, each of which shall be an original, but all of which taken together shall constitute a single document. This Agreement shall be binding upon each Member as evidenced by their signatures below.

**13.13** **Attorney's Fees.** If any Member becomes involved in litigation or proceedings arising out of or in connection with this Agreement, including, but not limited to, the interpretation or performance thereof, the court or tribunal in such litigation or proceeding, or in a separate suit, shall award attorney's fees to the prevailing party. Unless judgment goes by default, the attorney fee award shall not be computed in accordance with any court schedule, but shall be such as to fully reimburse all attorney's fees actually incurred in good faith, regardless of the size of the judgment, it being the intention of the Members to fully compensate for all the attorney's fees paid or incurred in good faith by the prevailing party.

**13.14** **Amendment of Agreement.** This Agreement may be amended only in writing, in whole or in part, at any time only by the execution thereof by all of the Members. No provision of this Agreement may be waived except by a writing signed by the party to be charged therewith.



13.15 <u>Notices</u>. Notifications, as defined above, given under this Agreement shall be duly given to the appropriate addresses set forth below (or to such other addresses as a party may designate as to itself by notice to the other):

If to MJNA MEMBER:
Medical Marijuana, Inc.
2665 Ariane Drive, Suite 207, San Diego, CA 9211'
Tel: 209-207-9691; Fax: 866-763-6414

If to DIXIE MEMBER:
Dixie Holdings, LLC
Vincent M. Keber, III
6701 East Stapleton Drive North, Denver, CO 80216
Tel: _____ Fax: _____

**IN WITNESS WHEREOF**, the Majority Interest Members of the Company have evidenced the adoption of this Agreement in accordance with the Act by their signatures below, such adoption to be effective as of the Effective Date first above written.

MEMBERS:

**Medical Marijuana, Inc.**

Print Name: _____
Its: _____

**Dixie Holdings, LLC**

By: _____
Print Name: _____
Its: _____

**Exhibits Attached**
Exhibit A – Red Dice Holdings, LLC Formation Documents
Exhibit B – Membership Interest
Exhibit C – Keber and Smith NonDisclosure / NonCompetes
Exhibit D – Dixie Member Inventory to be Transferred
Exhibit E – Exclusive Licensing Agreement with Left Bank, LLC
Exhibit F – Keber Employment Contract; Smith Consulting Agreement
Exhibit G – Licensing Agreement with MJNA for Terresphere Grow Technology
Exhibit H – Operating Budget

# EXHIBIT A

## NEW ENTITY FORMATION DOCUMENTS



## EXHIBIT B
## MEMBERSHIP INTEREST

**MEMBER**

**MEMBERSHIP INTEREST**

Medical Marijuana, Inc.          60%
2665 Ariane Drive, Suite 207
San Diego, CA 92117

Dixie Holdings, LLC          40%
6701 East Stapleton Drive North
Denver, CO 80216

# EXHIBIT C
## KEBER AND SMITH NONDISCLOSURE / NONCOMPETE'S

Exhibit _C_

Non-Disclosure, Non-Compete, Confidentiality Agreement

Confidentiality and Nondisclosure Agreement (the "Agreement"), effective this ____ day of April 2012, by and among the undersigned Employee Vincent M. Keber III (the "Employee"), whose mailing address is 1301 Wazee St. Unit 2E, Denver CO 80204 and, Medical Marijuana, Inc., its affiliates and/or assigns, whose corporate mailing address is 2665 Ariane Drive Suite 207, San Diego, CA 92117(the "Company/Corporate").

## BACKGROUND INFORMATION

The Company and its Affiliates (as defined herein) are engaged in the business of providing legal and cannabis based products, manufacturing, research/development and related businesses (collectively the "Business"). The Company wishes to employ the Employee in connection with the Company's Business and the Employee has agreed to become or continue to be so employed. Pursuant to such employment, the Employee has been and/or will be exposed to and has received or will receive confidential and proprietary information of the Company or relating to the Company's business or affairs as defined in Section 1(a) below. The parties acknowledge and agree that the Trade Secrets and Other Confidential Information are valuable, special and unique assets of the Company and that the Trade Secrets and Other Confidential Information which the Employee has received and/or will receive would allow the Employee or a third party recipient of such information to unfairly and inequitably compete against the Company and to otherwise cause the Company significant and irreparable harm. Accordingly, in consideration of the mutual agreements contained herein, the parties agree as follows:

## OPERATIVE PROVISIONS

1. **Confidentiality.**

   a. **Definition:** For purposes of this Agreement, collectively the terms "Trade Secrets and/or Confidential Information" shall mean information disclosed to Employee as a consequence of their employment relationship with the Company (and/or its subsidiaries or affiliates) and not generally known in their industry, whether tangible or intangible and whether written or oral, including but not limited to technical information, computer software, know-how, product information, concepts, operational processes, business and marketing plans/promotions, development, financial information, expansion plans, business policies and practices, customer, investor and/or vendor lists, manufacturing processes, designs, trade processes or secrets, industry research and information as to other business relationships of the Company and related matters.

   Employee shall not disclose, during or after the term of Employee's employment with the Company, all or any part of the Confidential Information to any person, corporation, other legal entity, or organization for any reason or purpose. In the event of Employee's breach or threatened breach of this section, the Company shall be entitled to a preliminary restraining order and an injunction to restrain and enjoin Employee from such disclosure. In addition to or in lieu of such action, the Company may pursue all other remedies available for such breach or threatened breach, including but not limited to the recovery of damages from Employee.

   b. **Unauthorized Disclosure.** The Employee agrees that during the course of his/her employment with the Company and until the date ending four (4) years following termination the Employee will keep such Trade Secrets and Other Confidential Information confidential and will not disclose or furnish to any other person or, directly or indirectly, use for his/her own account or the account of any other person, any Trade Secrets and Other Confidential Information, no matter from where or in what manner he/she may have acquired such Trade Secrets and Other Confidential Information, and he shall retain all such Trade Secrets and Other Confidential Information in trust for the benefit of the Company, its Affiliates and the successors and assigns of any of them. This confidentiality covenant has no geographical or territorial restriction. Upon the termination of employment, the Employee promptly will supply to the Company all property, keys and Confidential Information which has been produced by, received by or otherwise submitted to the Employee in the course of his/her employment with the Company, including the period during and prior to the Employee's employment with the Company.

   c. **Inventions.** The Employee agrees that any and all inventions, discoveries, improvements, processes, copyrights and trademarks made, developed, discovered or acquired by him during his/her employment by the Company solely or jointly with others or otherwise, which relate to the business of the Company, and all knowledge possessed by the Employee relating thereto (collectively, the "Inventions"), shall be fully and promptly disclosed to the Company's and shall be the sole and absolute property of the Company and the Company shall be the sole and absolute owner thereof.

2. **Prohibited and Competitive Activities.** The Employee and the Company recognize that due to the nature of the Employee's engagement by the Company, the Employee has had and will have access to Trade Secrets and Other Confidential Information. The Employee acknowledges that such Trade Secrets and Other Confidential Information has been and will be of central importance to the business of the Company and its Affiliates and that disclosure of it to, or its use by, others (including, without

{00876391 / 4}

limitation, the Employee (other than with respect to the Company's business and affairs) could cause substantial loss to the Company. The Employee accordingly agrees as follows:

a.    **Prohibited Activities.**  The Employee will not, at any time during the course of Employee's employment and for the four (4) year period following the termination of Employee's employment: (i) directly or through one or more intermediaries, solicit for employment, employ or be involved with the employment of any person who, at the time of such solicitation, is employed by the Company or any Affiliate thereof; (ii) directly or indirectly, whether for his/her own account or for the account of any other person, solicit, divert or endeavor to entice away from the Company or any Affiliate, or otherwise engage in any activity intended to terminate, disrupt or interfere with, the Company's or any of its Affiliate's relationships with, customers, or otherwise adversely affect the Company's or any of its Affiliate's relationship with Customers or other business relationships of the Company or any Affiliate thereof; or (iii) publish or make any statement critical of the Company, or its Affiliates, or any of their respective Employees, agents, consultants or shareholders, or in any way adversely affect or otherwise malign the business or reputation of any of the foregoing persons being herein referred to as a **"Prohibited Activity"**); unless required to do so by law. Company shall not publish or make any statement critical of the Employee in any way that would adversely affect or otherwise malign his/her reputation.

b.    For a period of four (4) years after the termination of this Agreement, Employee shall not, within a radius of fifty (50) miles from the Company's present corporate headquarters or any of its facilities, directly or indirectly, own, manage, operate, control, be employed by, participate in, or be connected in any manner with the ownership, management, operation, or control similar to the type of business conducted by the Company at the time this Agreement terminates.  In the event of Employee's actual or threatened breach of this restrictive covenant, the Company shall be entitled to a preliminary restraining order and injunction in order to restrain Employee from such breach.  Nothing in this Agreement shall be construed to prohibit the Company from pursuing any other available remedies at law or in equity.

3    **Divisibility of Covenant Period.**  If any portion of the restrictive covenant contained in this Agreement is held to be unreasonable, arbitrary or against public policy, such covenant shall be considered divisible with the remaining provisions deemed effective and be specifically enforceable against the Employee.

4    **Enforcement.**  The parties understand and agree that the covenants set forth in this Agreement are essential elements of the Company's engagement of the Employee and that without the Employee's agreement to comply with such covenants; the Company would not have agreed to engage or to continue to engage the Employee, or to provide Employee with Trade Secrets and Other Confidential Information. Further, the Employee expressly acknowledges that the restrictions contained in this Agreement are reasonable in scope and are necessary to accomplish the mutual objectives of the parties and to protect the Company's legitimate interests in protecting their business. The Employee further acknowledges that any violation of the restrictions contained in this Agreement will cause significant and irreparable harm to the. for which the Company Company's remedy is binding arbitration as defined in section 16 of "Employment Agreement. The Company shall also be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief, including but not limited to a temporary restraining order, a temporary or preliminary injunction or a permanent injunction, to enforce the provisions of this Agreement.

5.    **Intent of Parties.**  The covenants and agreements herein shall be construed as agreements independent of any other provision of Employee's employment.

6.    **Mandatory Disclosure.**  The Employee shall, in the event that he/she is requested or required (by oral question, interrogatory, request for information or documents, subpoena, investigative demand or similar process) to disclose any information supplied to the Employee in the course of his/her dealings with the Company, if he/she may lawfully required to do so.

7.    **Redelivery of Confidential Material.**  Upon the Company's request, and in any case upon the termination of Employee's employment, the Employee shall promptly deliver to the Company all written data containing, or reflecting any information about the Company, its shareholders, officers, directors, Employees, agents or consultants, (whether prepared by the Company or otherwise, and whether in the possession of the Employee or his/her representatives) and will not retain any copies, extracts or other reproductions in whole or in part of such data. The redelivery of such material shall not relieve the Employee of his/her obligation of confidentiality or of the other obligations imposed hereunder.

8.    **Miscellaneous Provisions.**

a.    **Notices.**  All notices, requests or other communications under this Agreement shall be in writing and shall be considered as properly given or made if hand delivered with a confirmation receipt obtained, mailed by the United States Postal Service from within the United States by certified mail, postage prepaid and return receipt requested, or sent by telecopier, and addressed to the location set forth in the preamble to this Agreement or to such other address or telecopier number as any party may have designated by like notice furnished to all other parties hereto. All notices shall be deemed effective when deposited in the U.S. Mails, delivered or transmitted via Telecopier.

{00876391 / 4}

b.     Entire Agreement. This Agreement supercedes and is in full substitution for any previous confidentiality, nondisclosure, or noncompete agreement previously signed by the Employee in contemplation of, or during his/her employment with the Company.

c.     Assignment.   This Agreement shall be assignable by the Company without the prior written consent of the Employee.

d.     Acknowledgments.  The Employee acknowledges that he/she has been provided with a copy of this Agreement for review prior to signing it, that the Company hereby encourages the Employee to have this Agreement reviewed by his/her own attorney prior to signing it, that the Employee has signed the Agreement of his/her own free will, and that the Employee understands the purposes and effects of this Agreement.

e.     Headings.  The headings of this Agreement are inserted for convenience and identification only, and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

f.     Application of California Law.  This Agreement, and the application or interpretation thereof, shall be governed exclusively by its terms and by the laws of the State of California and venue residing in San Joaquin County.

g.     Counterparts.  This Agreement may be executed in any number of counterparts, each of which shall be deemed an original.

h.     Arbitration.  Any controversies arising out of the terms of this Agreement or its interpretation shall be settled in San Francisco, California in accordance with the rules of the American Arbitration Association, and the judgment upon award may be entered in any court having jurisdiction thereof.

i.     Waiver. The waiver by the Company of a breach or threatened breach of this Agreement shall not be construed as a waiver of any subsequent breach by the Employee. The refusal or failure of the Company to enforce the restrictive covenants contained herein or contained in any other similar agreement against any other Employee, agent, or independent contractor of the Company, for any reason, shall not constitute a defense to the enforcement of this Agreement by the Company against the Employee, nor shall it give rise to any claim or cause of action by such Employee against the Company.

j.     Affiliate:  The term "affiliate" when used in this Agreement shall mean any other person or entity that directly or indirectly controls, or is under common control with, or is controlled by the specified person or entity herein, or if a person, any member of the immediate family of such individual, or any entity formed on behalf of the Company and/or in which Michael R. Llamas has ownership of any nature.  As used in this definition, "control" shall mean possession, directly or indirectly, of power to direct or cause the direction of management or policies and "immediate family" shall mean any parent, child, grandchild, spouse, or sibling.

k.     Company:  The term "Company" as used herein, shall include the Company and any Affiliate of the Company, its shareholders, consultants, officers, directors, and subsidiaries.

In witness whereof, the parties have hereunto executed this Agreement.

Company

Medical Marijuana, Inc.

By:

Print Name:

Employee

Vincent M. Keber III

Exhibit _C_

## Non-Disclosure, Non-Compete, Confidentiality Agreement

Confidentiality and Nondisclosure Agreement (the "Agreement"), effective this ____ day of April 2012, by and among the undersigned Employee Vincent M. Keber III (the "Employee"), whose mailing address is 1301 Wazee St. Unit 2E, Denver CO 80204 and, Red Dice Holdings, LLC, its affiliates and/or assigns, whose corporate mailing address is 2665 Ariane Drive Suite 207, San Diego, CA 92117(the "Company/Corporate").

### BACKGROUND INFORMATION

The Company and its Affiliates (as defined herein) are engaged in the business of providing legal and cannabis based products, manufacturing, research/development and related businesses (collectively the "Business"). The Company wishes to employ the Employee in connection with the Company's Business and the Employee has agreed to become or continue to be so employed. Pursuant to such employment, the Employee has been and/or will be exposed to and has received or will receive confidential and proprietary information of the Company or relating to the Company's business or affairs as defined in Section 1(a) below. The parties acknowledge and agree that the Trade Secrets and Other Confidential Information are valuable, special and unique assets of the Company and that the Trade Secrets and Other Confidential Information which the Employee has received and/or will receive would allow the Employee or a third party recipient of such information to unfairly and inequitably compete against the Company and to otherwise cause the Company significant and irreparable harm. Accordingly, in consideration of the mutual agreements contained herein, the parties agree as follows:

### OPERATIVE PROVISIONS

1.  **Confidentiality.**

    a.      **Definition:** For purposes of this Agreement, collectively the terms "Trade Secrets and/or Confidential Information" shall mean information disclosed to Employee as a consequence of their employment relationship with the Company (and/or its subsidiaries or affiliates) and not generally known in their industry, whether tangible or intangible and whether written or oral, including but not limited to technical information, computer software, know-how, product information, concepts, operational processes, business and marketing plans/promotions, development, financial information, expansion plans, business policies and practices, customer, investor and/or vendor lists, manufacturing processes, designs, trade processes or secrets, industry research and information as to other business relationships of the Company and related matters.

    Employee shall not disclose, during or after the term of Employee's employment with the Company, all or any part of the Confidential Information to any person, corporation, other legal entity, or organization for any reason or purpose. In the event of Employee's breach or threatened breach of this section, the Company shall be entitled to a preliminary restraining order and an injunction to restrain and enjoin Employee from such disclosure. In addition to or in lieu of such action, the Company may pursue all other remedies available for such breach or threatened breach, including but not limited to the recovery of damages from Employee.

    b.      **Unauthorized Disclosure.** The Employee agrees that during the course of his/her employment with the Company and until the date ending four (4) years following termination the Employee will keep such Trade Secrets and Other Confidential Information confidential and will not disclose or furnish to any other person or, directly or indirectly, use for his/her own account or the account of any other person, any Trade Secrets and Other Confidential Information, no matter from where or in what manner he/she may have acquired such Trade Secrets and Other Confidential Information, and he shall retain all such Trade Secrets and Other Confidential Information in trust for the benefit of the Company, its Affiliates and the successors and assigns of any of them. This confidentiality covenant has no geographical or territorial restriction. Upon the termination of employment, the Employee promptly will supply to the Company all property, keys and Confidential Information which has been produced by, received by or otherwise submitted to the Employee in the course of his/her employment with the Company, including the period during and prior to the Employee's employment with the Company.

    c.      **Inventions.** The Employee agrees that any and all inventions, discoveries, improvements, processes, copyrights and trademarks made, developed, discovered or acquired by him during his/her employment by the Company solely or jointly with others or otherwise, which relate to the business of the Company, and all knowledge possessed by the Employee relating thereto (collectively, the "Inventions"), shall be fully and promptly disclosed to the Company's and shall be the sole and absolute property of the Company and the Company shall be the sole and absolute owner thereof.

2.      **Prohibited and Competitive Activities.** The Employee and the Company recognize that due to the nature of the

{00876391 / 4}

Employee's engagement by the Company, the Employee has had and will have access to Trade Secrets and Other Confidential Information. The Employee acknowledges that such Trade Secrets and Other Confidential Information has been and will be of central importance to the business of the Company and its Affiliates and that disclosure of it to, or its use by, others (including, without limitation, the Employee (other than with respect to the Company's business and affairs) could cause substantial loss to the Company. The Employee accordingly agrees as follows:

      a      **Prohibited Activities.** The Employee will not, at any time during the course of Employee's employment and for the four (4) year period following the termination of Employee's employment: (i) directly or through one or more intermediaries, solicit for employment, employ or be involved with the employment of any person who, at the time of such solicitation, is employed by the Company or any Affiliate thereof; (ii) directly or indirectly, whether for his/her own account or for the account of any other person, solicit, divert or endeavor to entice away from the Company or any Affiliate, or otherwise engage in any activity intended to terminate, disrupt or interfere with, the Company's or any of its Affiliate's relationships with, customers, or otherwise adversely affect the Company's or any of its Affiliate's relationship with Customers or other business relationships of the Company or any Affiliate thereof; or (iii) publish or make any statement critical of the Company, or its Affiliates, or any of their respective Employees, agents, consultants or shareholders, or in any way adversely affect or otherwise malign the business or reputation of any of the foregoing persons being herein referred to as a **"Prohibited Activity"**); unless required to do so by law. Company shall not publish or make any statement critical of the Employee in any way that would adversely affect or otherwise malign his/her reputation.

      b.      For a period of four (4) years after the termination of this Agreement, Employee shall not, within a radius of fifty (50) miles from the Company's present corporate headquarters or any of its facilities, directly or indirectly, own, manage, operate, control, be employed by, participate in, or be connected in any manner with the ownership, management, operation, or control similar to the type of business conducted by the Company at the time this Agreement terminates. In the event of Employee's actual or threatened breach of this restrictive covenant, the Company shall be entitled to a preliminary restraining order and injunction in order to restrain Employee from such breach. Nothing in this Agreement shall be construed to prohibit the Company from pursuing any other available remedies at law or in equity.

    3      **Divisibility of Covenant Period.** If any portion of the restrictive covenant contained in this Agreement is held to be unreasonable, arbitrary or against public policy, such covenant shall be considered divisible with the remaining provisions deemed effective and be specifically enforceable against the Employee.

    4      **Enforcement.** The parties understand and agree that the covenants set forth in this Agreement are essential elements of the Company's engagement of the Employee and that without the Employee's agreement to comply with such covenants, the Company would not have agreed to engage or to continue to engage the Employee, or to provide Employee with Trade Secrets and Other Confidential Information. Further, the Employee expressly acknowledges that the restrictions contained in this Agreement are reasonable in scope and are necessary to accomplish the mutual objectives of the parties and to protect the Company's legitimate interests in protecting their business. The Employee further acknowledges that any violation of the restrictions contained in this Agreement will cause significant and irreparable harm to the for which the Company Company's remedy is binding arbitration as defined in section 16 of "Employment Agreement. The Company shall also be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief, including but not limited to a temporary restraining order, a temporary or preliminary injunction or a permanent injunction, to enforce the provisions of this Agreement.

    5,      **Intent of Parties.** The covenants and agreements herein shall be construed as agreements independent of any other provision of Employee's employment.

    6.      **Mandatory Disclosure.** The Employee shall, in the event that he/she is requested or required (by oral question, interrogatory, request for information or documents, subpoena, investigative demand or similar process) to disclose any information supplied to the Employee in the course of his/her dealings with the Company, if he/she may lawfully required to do so.

    7. ··      **Redelivery of Confidential Material.** Upon the Company's request, and in any case upon the termination of Employee's employment, the Employee shall promptly deliver to the Company all written data containing, or reflecting any information about the Company, its shareholders, officers, directors, Employees, agents or consultants, (whether prepared by the Company or otherwise, and whether in the possession of the Employee or his/her representatives) and will not retain any copies, extracts or other reproductions in whole or in part of such data. The redelivery of such material shall not relieve the Employee of his/her obligation of confidentiality or of the other obligations imposed hereunder.

    8.      **Miscellaneous Provisions.**

      a.      **Notices.** All notices, requests or other communications under this Agreement shall be in writing and shall be considered as properly given or made if hand delivered with a confirmation receipt obtained, mailed by the United States Postal Service from within the United States by certified mail, postage prepaid and return receipt requested, or sent by telecopier, and

{00876391 / 4}

addressed to the location set forth in the preamble to this Agreement or to such other address or telecopier number as any party may have designated by like notice furnished to all other parties hereto. All notices shall be deemed effective when deposited in the U.S. Mails, delivered or transmitted via Telecopier.

b. **Entire Agreement.** This Agreement supercedes and is in full substitution for any previous confidentiality, nondisclosure, or noncompete agreement previously signed by the Employee in contemplation of, or during his/her employment with the Company.

c. **Assignment.** This Agreement shall be assignable by the Company without the prior written consent of the Employee.

d. **Acknowledgments.** The Employee acknowledges that he/she has been provided with a copy of this Agreement for review prior to signing it, that the Company hereby encourages the Employee to have this Agreement reviewed by his/her own attorney prior to signing it, that the Employee has signed the Agreement of his/her own free will, and that the Employee understands the purposes and effects of this Agreement.

e. **Headings.** The headings of this Agreement are inserted for convenience and identification only, and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

f. **Application of California Law.** This Agreement, and the application or interpretation thereof, shall be governed exclusively by its terms and by the laws of the State of California and venue residing in San Joaquin County.

g. **Counterparts.** This Agreement may be executed in any number of counterparts, each of which shall be deemed an original.

h. **Arbitration.** Any controversies arising out of the terms of this Agreement or its interpretation shall be settled in San Francisco, California in accordance with the rules of the American Arbitration Association, and the judgment upon award may be entered in any court having jurisdiction thereof.

i. **Waiver.** The waiver by the Company of a breach or threatened breach of this Agreement shall not be construed as a waiver of any subsequent breach by the Employee. The refusal or failure of the Company to enforce the restrictive covenants contained herein or contained in any other similar agreement against any other Employee, agent, or independent contractor of the Company, for any reason, shall not constitute a defense to the enforcement of this Agreement by the Company against the Employee, nor shall it give rise to any claim or cause of action by such Employee against the Company.

j. **Affiliate:** The term "affiliate" when used in this Agreement shall mean any other person or entity that directly or indirectly controls, or is under common control with, or is controlled by the specified person or entity herein, or if a person, any member of the immediate family of such individual, or any entity formed on behalf of the Company and/or in which Michael R. Llamas has ownership of any nature. As used in this definition, "control" shall mean possession, directly or indirectly, of power to direct or cause the direction of management or policies and "immediate family" shall mean any parent, child, grandchild, spouse, or sibling.

k. **Company:** The term "Company" as used herein, shall include the Company and any Affiliate of the Company, its shareholders, consultants, officers, directors, and subsidiaries.

In witness whereof, the parties have hereunto executed this Agreement.

Company

Red Dice Holdings, LLC.

By: _____

Print Name: _____

Employee _____

Vincent M. Keber III

Exhibit 𝒞

**Non-Disclosure, Non-Compete, Confidentiality Agreement**

Confidentiality and Nondisclosure Agreement (the "Agreement"), effective this ____ day of April 2012, by and among the undersigned Consultant Charles K. Smith (the "Consultant"), whose mailing address is 108 Augusta Court, Fairhope AL 36532 and, Medical Marijuana, Inc., its affiliates and/or assigns, whose corporate mailing address is 2665 Ariane Drive Suite 207, San Diego, CA 92117(the "Company/Corporate").

## BACKGROUND INFORMATION

The Company and its Affiliates (as defined herein) are engaged in the business of providing legal and cannabis based products, manufacturing, research/development and related businesses (collectively the "Business"). The Company wishes to employ the Consultant in connection with the Company's Business and the Consultant has agreed to become or continue to be so employed. Pursuant to such employment, the Consultant has been and/or will be exposed to and has received or will receive confidential and proprietary information of the Company or relating to the Company's business or affairs as defined in Section 1(a) below. The parties acknowledge and agree that the Trade Secrets and Other Confidential Information are valuable, special and unique assets of the Company and that the Trade Secrets and Other Confidential Information which the Consultant has received and/or will receive would allow the Consultant or a third party recipient of such information to unfairly and inequitably compete against the Company and to otherwise cause the Company significant and irreparable harm. Accordingly, in consideration of the mutual agreements contained herein, the parties agree as follows:

## OPERATIVE PROVISIONS

1.   **Confidentiality.**

a.   **Definition:** For purposes of this Agreement, collectively the terms "Trade Secrets and/or Confidential Information" shall mean information disclosed to Consultant as a consequence of their employment relationship with the Company (and/or its subsidiaries or affiliates) and not generally known in their industry, whether tangible or intangible and whether written or oral, including but not limited to technical information, computer software, know-how, product information, concepts, operational processes, business and marketing plans/promotions, development, financial information, expansion plans, business policies and practices, customer, investor and/or vendor lists, manufacturing processes, designs, trade processes or secrets, industry research and information as to other business relationships of the Company and related matters.

Consultant shall not disclose, during or after the term of Consultant's employment with the Company, all or any part of the Confidential Information to any person, corporation, other legal entity, or organization for any reason or purpose. In the event of Consultant's breach or threatened breach of this section, the Company shall be entitled to a preliminary restraining order and an injunction to restrain and enjoin Consultant from such disclosure. In addition to or in lieu of such action, the Company may pursue all other remedies available for such breach or threatened breach, including but not limited to the recovery of damages from Consultant.

b.   **Unauthorized Disclosure.** The Consultant agrees that during the course of his/her employment with the Company and until the date ending four (4) years following termination the Consultant will keep such Trade Secrets and Other Confidential Information confidential and will not disclose or furnish to any other person or, directly or indirectly, use for his/her own account or for the account of any other person, any Trade Secrets and Other Confidential Information, no matter from where or in what manner he/she may have acquired such Trade Secrets and Other Confidential Information, and he shall retain all such Trade Secrets and Other Confidential Information in trust for the benefit of the Company, its Affiliates and the successors and assigns of any of them. This confidentiality covenant has no geographical or territorial restriction. Upon the termination of employment, the Consultant promptly will supply to the Company all property, keys and Confidential Information which has been produced by, received by or otherwise submitted to the Consultant in the course of his/her employment with the Company, including the period during and prior to the Consultant's employment with the Company.

c.   **Inventions.** The Consultant agrees that any and all inventions, discoveries, improvements, processes, copyrights and trademarks made, developed, discovered or acquired by him during his/her employment by the Company solely or jointly with others or otherwise, which relate to the business of the Company, and all knowledge possessed by the Consultant relating thereto (collectively, the "Inventions"), shall be fully and promptly disclosed to the Company's and shall be the sole and absolute property of the Company and the Company shall be the sole and absolute owner thereof.

2.   **Prohibited and Competitive Activities.** The Consultant and the Company recognize that due to the nature of the Consultant's engagement by the Company, the Consultant has had and will have access to Trade Secrets and Other Confidential Information. The Consultant acknowledges that such Trade Secrets and Other Confidential Information has been and will be of central

{00877605 / 1}

importance to the business of the Company and its Affiliates and that disclosure of it to, or its use by, others (including, without limitation, the Consultant (other than with respect to the Company's business and affairs) could cause substantial loss to the Company. The Consultant accordingly agrees as follows:

a    **Prohibited Activities.** The Consultant will not, at any time during the course of Consultant's employment and for the four (4) year period following the termination of Consultant's employment: (i) directly or through one or more intermediaries, solicit for employment, employ or be involved with the employment of any person who, at the time of such solicitation, is employed by the Company or any Affiliate thereof; (ii) directly or indirectly, whether for his/her own account or for the account of any other person, solicit, divert or endeavor to entice away from the Company or any Affiliate, or otherwise engage in any activity intended to terminate, disrupt or interfere with, the Company's or any of its Affiliate's relationships with, customers, or otherwise adversely affect the Company's or any of its Affiliate's relationship with Customers or other business relationships of the Company or any Affiliate thereof; or (iii) publish or make any statement critical of the Company, or its Affiliates, or any of their respective Consultants, agents, consultants or shareholders, or in any way adversely affect or otherwise malign the business or reputation of any of the foregoing persons being herein referred to as a **"Prohibited Activity"**); unless required to do so by law. Company shall not publish or make any statement critical of the Consultant in any way that would adversely affect or otherwise malign his/her reputation.

b.    For a period of four (4) years after the termination of this Agreement, Consultant shall not, within a radius of fifty (50) miles from the Company's present corporate headquarters or any of its facilities, directly or indirectly, own, manage, operate, control, be employed by, participate in, or be connected in any manner with the ownership, management, operation, or control similar to the type of business conducted by the Company at the time this Agreement terminates. In the event of Consultant's actual or threatened breach of this restrictive covenant, the Company shall be entitled to a preliminary restraining order and injunction in order to restrain Consultant from such breach. Nothing in this Agreement shall be construed to prohibit the Company from pursuing any other available remedies at law or in equity.

3    **Divisibility of Covenant Period.** If any portion of the restrictive covenant contained in this Agreement is held to be unreasonable, arbitrary or against public policy, such covenant shall be considered divisible with the remaining provisions deemed effective and be specifically enforceable against the Consultant.

4    **Enforcement.** The parties understand and agree that the covenants set forth in this Agreement are essential elements of the Company's engagement of the Consultant and that without the Consultant's agreement to comply with such covenants; the Company would not have agreed to engage or to continue to engage the Consultant, or to provide Consultant with Trade Secrets and Other Confidential Information. Further, the Consultant expressly acknowledges that the restrictions contained in this Agreement are reasonable in scope and are necessary to accomplish the mutual objectives of the parties and to protect the Company's legitimate interests in protecting their business. The Consultant further acknowledges that any violation of the restrictions contained in this Agreement will cause significant and irreparable harm to the for which the Company Company's remedy is binding arbitration as defined in section 16 of "Employment Agreement." The Company shall also be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief, including but not limited to a temporary restraining order, a temporary or preliminary injunction or a permanent injunction, to enforce the provisions of this Agreement.

5.    **Intent of Parties.** The covenants and agreements herein shall be construed as agreements independent of any other provision of Consultant's employment.

6.    **Mandatory Disclosure.** The Consultant shall, in the event that he/she is requested or required (by oral question, interrogatory, request for information or documents, subpoena, investigative demand or similar process) to disclose any information supplied to the Consultant in the course of his/her dealings with the Company, if he/she may lawfully required to do so.

7.    **Redelivery of Confidential Material.** Upon the Company's request, and in any case upon the termination of Consultant's employment, the Consultant shall promptly deliver to the Company all written data containing, or reflecting any information about the Company, its shareholders, officers, directors, Consultants, agents or consultants, (whether prepared by the Company or otherwise, and whether in the possession of the Consultant or his/her representatives) and will not retain any copies, extracts or other reproductions in whole or in part of such data. The redelivery of such material shall not relieve the Consultant of his/her obligation of confidentiality or of the other obligations imposed hereunder.

8.    **Miscellaneous Provisions.**

a.    **Notices.** All notices, requests or other communications under this Agreement shall be in writing and shall be considered as properly given or made if hand delivered with a confirmation receipt obtained, mailed by the United States Postal Service from within the United States by certified mail, postage prepaid and return receipt requested, or sent by telecopier, and addressed to the location set forth in the preamble to this Agreement or to such other address or telecopier number as any party may have designated by like notice furnished to all other parties hereto. All notices shall be deemed effective when deposited in the U.S.

Mails, delivered or transmitted via Telecopier.

b.    Entire Agreement. This Agreement supercedes and is in full substitution for any previous confidentiality, nondisclosure, or noncompete agreement previously signed by the Consultant in contemplation of, or during his/her employment with the Company.

c.    Assignment. This Agreement shall be assignable by the Company without the prior written consent of the Consultant.

d.    Acknowledgments. The Consultant acknowledges that he/she has been provided with a copy of this Agreement for review prior to signing it, that the Company hereby encourages the Consultant to have this Agreement reviewed by his/her own attorney prior to signing it, that the Consultant has signed the Agreement of his/her own free will, and that the Consultant understands the purposes and effects of this Agreement.

e.    Headings. The headings of this Agreement are inserted for convenience and identification only, and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

f.    Application of California Law. This Agreement, and the application or interpretation thereof, shall be governed exclusively by its terms and by the laws of the State of California and venue residing in San Joaquin County.

g.    Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original.

h.    Arbitration. Any controversies arising out of the terms of this Agreement or its interpretation shall be settled in San Francisco, California in accordance with the rules of the American Arbitration Association, and the judgment upon award may be entered in any court having jurisdiction thereof.

i.    Waiver. The waiver by the Company of a breach or threatened breach of this Agreement shall not be construed as a waiver of any subsequent breach by the Consultant. The refusal or failure of the Company to enforce the restrictive covenants contained herein or contained in any other similar agreement against any other Consultant, agent, or independent contractor of the Company, for any reason, shall not constitute a defense to the enforcement of this Agreement by the Company against the Consultant, nor shall it give rise to any claim or cause of action by such Consultant against the Company.

j.    Affiliate: The term "affiliate" when used in this Agreement shall mean any other person or entity that directly or indirectly controls, or is under common control with, or is controlled by the specified person or entity herein, or if a person, any member of the immediate family of such individual, or any entity formed on behalf of the Company and/or in which Michael R. Llamas has ownership of any nature. As used in this definition, "control" shall mean possession, directly or indirectly, of power to direct or cause the direction of management or policies and "immediate family" shall mean any parent, child, grandchild, spouse, or sibling.

k.    Company: The term "Company" as used herein, shall include the Company and any Affiliate of the Company, its shareholders, consultants, officers, directors, and subsidiaries.

In witness whereof, the parties have hereunto executed this Agreement.

Company

Medical Marijuana, Inc.

By: _____

Print Name: _____

Consultant _____

Charles K. Smith

Exhibit _C_

## Non-Disclosure, Non-Compete, Confidentiality Agreement

Confidentiality and Nondisclosure Agreement (the "Agreement"), effective this ____ day of April 2012, by and among the undersigned Consultant Charles K. Smith (the "Consultant"), whose mailing address is 108 Augusta Court, Fairhope AL 36532 and, **Red Dice Holdings, LLC,** its affiliates and/or assigns, whose corporate mailing address is 2665 Ariane Drive Suite 207, San Diego, CA 92117(the **"Company/Corporate").**

### BACKGROUND INFORMATION

The Company and its Affiliates (as defined herein) are engaged in the business of providing legal and cannabis based products, manufacturing, research/development and related businesses (collectively the **"Business").** The Company wishes to employ the Consultant in connection with the Company's Business and the Consultant has agreed to become or continue to be so employed. Pursuant to such employment, the Consultant has been and/or will be exposed to and has received or will receive confidential and proprietary information of the Company or relating to the Company's business or affairs as defined in Section 1(a) below. The parties acknowledge and agree that the Trade Secrets and Other Confidential Information are valuable, special and unique assets of the Company and that the Trade Secrets and Other Confidential Information which the Consultant has received and/or will receive would allow the Consultant or a third party recipient of such information to unfairly and inequitably compete against the Company and to otherwise cause the Company significant and irreparable harm. Accordingly, in consideration of the mutual agreements contained herein, the parties agree as follows:

### OPERATIVE PROVISIONS

1. **Confidentiality.**

   a. **Definition:** For purposes of this Agreement, collectively the terms "Trade Secrets and/or Confidential Information" shall mean information disclosed to Consultant as a consequence of their employment relationship with the Company (and/or its subsidiaries or affiliates) and not generally known in their industry, whether tangible or intangible and whether written or oral, including but not limited to technical information, computer software, know-how, product information, concepts, operational processes, business and marketing plans/promotions, development, financial information, expansion plans, business policies and practices, customer, investor and/or vendor lists, manufacturing processes, designs, trade processes or secrets, industry research and information as to other business relationships of the Company and related matters.

   Consultant shall not disclose, during or after the term of Consultant's employment with the Company, all or any part of the Confidential Information to any person, corporation, other legal entity, or organization for any reason or purpose. In the event of Consultant's breach or threatened breach of this section, the Company shall be entitled to a preliminary restraining order and an injunction to restrain and enjoin Consultant from such disclosure. In addition to or in lieu of such action, the Company may pursue all other remedies available for such breach or threatened breach, including but not limited to the recovery of damages from Consultant.

   b. **Unauthorized Disclosure.** The Consultant agrees that during the course of his/her employment with the Company and until the date ending four (4) years following termination the Consultant will keep such Trade Secrets and Other Confidential Information confidential and will not disclose or furnish to any other person or, directly or indirectly, use for his/her own account or the account of any other person, any Trade Secrets and Other Confidential Information, no matter from where or in what manner he/she may have acquired such Trade Secrets and Other Confidential Information, and he shall retain all such Trade Secrets and Other Confidential Information in trust for the benefit of the Company, its Affiliates and the successors and assigns of any of them. This confidentiality covenant has no geographical or territorial restriction. Upon the termination of employment, the Consultant promptly will supply to the Company all property, keys and Confidential Information which has been produced by, received by or otherwise submitted to the Consultant in the course of his/her employment with the Company, including the period during and prior to the Consultant's employment with the Company.

   c. **Inventions.** The Consultant agrees that any and all inventions, discoveries, improvements, processes, copyrights and trademarks made, developed, discovered or acquired by him during his/her employment by the Company solely or jointly with others or otherwise, which relate to the business of the Company, and all knowledge possessed by the Consultant relating thereto (collectively, the "Inventions"), shall be fully and promptly disclosed to the Company's and shall be the sole and absolute property of the Company and the Company shall be the sole and absolute owner thereof.

{00877605 / 1}

2.  **Prohibited and Competitive Activities.**  The Consultant and the Company recognize that due to the nature of the Consultant's engagement by the Company, the Consultant has had and will have access to Trade Secrets and Other Confidential Information. The Consultant acknowledges that such Trade Secrets and Other Confidential Information has been and will be of central importance to the business of the Company and its Affiliates and that disclosure of it to, or its use by, others (including, without limitation, the Consultant (other than with respect to the Company's business and affairs) could cause substantial loss to the Company. The Consultant accordingly agrees as follows:

a  **Prohibited Activities.**  The Consultant will not, at any time during the course of Consultant's employment and for the four (4) year period following the termination of Consultant's employment: (i) directly or through one or more intermediaries, solicit for employment, employ or be involved with the employment of any person who, at the time of such solicitation, is employed by the Company or any Affiliate thereof; (ii) directly or indirectly, whether for his/her own account or for the account of any other person, solicit, divert or endeavor to entice away from the Company or any Affiliate, or otherwise engage in any activity intended to terminate, disrupt or interfere with, the Company's or any of its Affiliate's relationships with, customers, or otherwise adversely affect the Company's or any of its Affiliate's relationship with Customers or other business relationships of the Company or any Affiliate thereof; or (iii) publish or make any statement critical of the Company, or its Affiliates, or any of their respective Consultants, agents, consultants or shareholders, or in any way adversely affect or otherwise malign the business or reputation of any of the foregoing persons being herein referred to as a "Prohibited Activity"); unless required to do so by law. Company shall not publish or make any statement critical of the Consultant in any way that would adversely affect or otherwise malign his/her reputation.

b.  For a period of four (4) years after the termination of this Agreement, Consultant shall not, within a radius of fifty (50) miles from the Company's present corporate headquarters or any of its facilities, directly or indirectly, own, manage, operate, control, be employed by, participate in, or be connected in any manner with the ownership, management, operation, or control similar to the type of business conducted by the Company at the time this Agreement terminates. In the event of Consultant's actual or threatened breach of this restrictive covenant, the Company shall be entitled to a preliminary restraining order and injunction in order to restrain Consultant from such breach. Nothing in this Agreement shall be construed to prohibit the Company from pursuing any other available remedies at law or in equity.

3  **Divisibility of Covenant Period.**  If any portion of the restrictive covenant contained in this Agreement is held to be unreasonable, arbitrary or against public policy, such covenant shall be considered divisible with the remaining provisions deemed effective and be specifically enforceable against the Consultant.

4  **Enforcement.**  The parties understand and agree that the covenants set forth in this Agreement are essential elements of the Company's engagement of the Consultant and that without the Consultant's agreement to comply with such covenants; the Company would not have agreed to engage or to continue to engage the Consultant, or to provide Consultant with Trade Secrets and Other Confidential Information. Further, the Consultant expressly acknowledges that the restrictions contained in this Agreement are reasonable in scope and are necessary to accomplish the mutual objectives of the parties and to protect the Company's legitimate interests in protecting their business. The Consultant further acknowledges that any violation of the restrictions contained in this Agreement will cause significant and irreparable harm to the for which the Company Company's remedy is binding arbitration as defined in section 16 of "Employment Agreement. The Company shall also be entitled, upon application to a court of competent jurisdiction, to obtain injunctive relief, including but not limited to a temporary restraining order, a temporary or preliminary injunction or a permanent injunction, to enforce the provisions of this Agreement.

5.  **Intent of Parties.**  The covenants and agreements herein shall be construed as agreements independent of any other provision of Consultant's employment.

6.  **Mandatory Disclosure.**  The Consultant shall, in the event that he/she is requested or required (by oral question, interrogatory, request for information or documents, subpoena, investigative demand or similar process) to disclose any information supplied to the Consultant in the course of his/her dealings with the Company, if he/she may lawfully required to do so.

7.  **Redelivery of Confidential Material.**  Upon the Company's request, and in any case upon the termination of Consultant's employment, the Consultant shall promptly deliver to the Company all written data containing, or reflecting any information about the Company, its shareholders, officers, directors, Consultants, agents or consultants, (whether prepared by the Company or otherwise, and whether in the possession of the Consultant or his/her representatives) and will not retain any copies, extracts or other reproductions in whole or in part of such data. The redelivery of such material shall not relieve the Consultant or his/her obligation of confidentiality or of the other obligations imposed hereunder.

8.  **Miscellaneous Provisions.**

a.  **Notices.**  All notices, requests or other communications under this Agreement shall be in writing and shall be considered as properly given or made if hand delivered with a confirmation receipt obtained, mailed by the United States Postal

Service from within the United States by certified mail, postage prepaid and return receipt requested, or sent by telecopier, and addressed to the location set forth in the preamble to this Agreement or to such other address or telecopier number as any party may have designated by like notice furnished to all other parties hereto. All notices shall be deemed effective when deposited in the U.S. Mails, delivered or transmitted via Telecopier.

b.     Entire Agreement. This Agreement supercedes and is in full substitution for any previous confidentiality, nondisclosure, or noncompete agreement previously signed by the Consultant in contemplation of, or during his/her employment with the Company.

c.     Assignment. This Agreement shall be assignable by the Company without the prior written consent of the Consultant.

d.     Acknowledgments. The Consultant acknowledges that he/she has been provided with a copy of this Agreement for review prior to signing it, that the Company hereby encourages the Consultant to have this Agreement reviewed by his/her own attorney prior to signing it, that the Consultant has signed the Agreement of his/her own free will, and that the Consultant understands the purposes and effects of this Agreement.

e.     Headings. The headings of this Agreement are inserted for convenience and identification only, and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

f.     Application of California Law. This Agreement, and the application or interpretation thereof, shall be governed exclusively by its terms and by the laws of the State of California and venue residing in San Joaquin County.

g.     Counterparts. This Agreement may be executed in any number of counterparts, each of which shall be deemed an original.

h.     Arbitration. Any controversies arising out of the terms of this Agreement or its interpretation shall be settled in San Francisco, California in accordance with the rules of the American Arbitration Association, and the judgment upon award may be entered in any court having jurisdiction thereof.

i.     Waiver. The waiver by the Company of a breach or threatened breach of this Agreement shall not be construed as a waiver of any subsequent breach by the Consultant. The refusal or failure of the Company to enforce the restrictive covenants contained herein or contained in any other similar agreement against any other Consultant, agent, or independent contractor of the Company, for any reason, shall not constitute a defense to the enforcement of this Agreement by the Company against the Consultant, nor shall it give rise to any claim or cause of action by such Consultant against the Company.

j.     Affiliate. The term "affiliate" when used in this Agreement shall mean any other person or entity that directly or indirectly controls, or is under common control with, or is controlled by the specified person or entity herein, or if a person, any member of the immediate family of such individual, or any entity formed on behalf of the Company and/or in which Michael R. Llamas has ownership of any nature. As used in this definition, "control" shall mean possession, directly or indirectly, of power to direct or cause the direction of management or policies and "immediate family" shall mean any parent, child, grandchild, spouse, or sibling.

k.     Company. The term "Company" as used herein, shall include the Company and any Affiliate of the Company, its shareholders, consultants, officers, directors, and subsidiaries.

In witness whereof, the parties have hereunto executed this Agreement.

Company

Red Dice Holdings, LLC,

By:

Print Name:

Consultant

Charles K. Smith

# EXHIBIT D

## DIXIE MEMBER INVENTORY TO BE TRANSFERRED

Capital Inventory

| Item Category | Item | Quantity in Stock |
|---|---|---|
| Appliance | Anvil food machine | 1 |
| Appliance | Black & Decker food processor | 1 |
| Appliance | Coffee heater/dispensers | 2 |
| Appliance | Convection heater | 2 |
| Appliance | Flash freezer | 1 |
| Appliance | Freezers | 3 |
| Appliance | Garland oven | 1 |
| Appliance | GE Double range top burner | 1 |
| Appliance | Ice cream maker | 1 |
| Appliance | Ice Machine | 1 |
| Appliance | McCains Carbonator | 1 |
| Appliance | Microwave | 2 |
| Appliance | Minifridge | 3 |
| Appliance | Otis Spunkmeyer oven | 1 |
| Appliance | Steamers (with trays) | 3 |
| Bottles and Caps | 1 dram Clear Glass Vial w/ Blk Cap | 0.5 Case |
| Bottles and Caps | 1/2 oz Doublewall Jar w/ Lid | 90 |
| Bottles and Caps | 1/4 oz Doublewall Jar w/ Lid | 170 |
| Bottles and Caps | 12 oz Bottles | 2.3 Pallet |
| Bottles and Caps | 2 Dram Clear Jar | 80 |
| Bottles and Caps | 2 oz Boston Round Green, Blue or Amber | 4.8 Case |
| Bottles and Caps | 2 oz Plastic Natural w/ Fliptop | 200 |
| Bottles and Caps | 4 oz Plastic Natural w/ Fliptop | 178.0 Pallet |
| Bottles and Caps | Amber Bottles, 1 oz. | 4.0 Case |
| Bottles and Caps | Caps for 2 oz Plastic Boston Rounds | 6000 |
| Bottles and Caps | Clear Bottles, 1 oz. | Case |
| Bottles and Caps | Eye Droppers | 0.2 Box |
| Bottles and Caps | Oxygen Barrier Crown Caps (Gold) | 1.0 Case |
| Bottles and Caps | Oxygen Barrier Crown Caps (Silver) | 3.0 Case |
| Bottles and Caps | Shrink Wrap Sleeves (1.5 x 1) | 0.7 Case |
| Bottles and Caps | Spritzers | 250 |
| Boxes | 24 CELL BEER PARTITION | 200 |
| Boxes | 4-Packs Boxes | 5.0 Case |
| Boxes | Cases for 24 Elixir Bottles | 900 |
| Boxes | Packing Boxes (10x10x5) | 5 |
| Boxes | Packing Boxes (10x5x5) | 5 |
| Boxes | Packing Boxes (10x8x6) | 15 |
| Boxes | Packing Boxes (12x8x6) | 15 |
| Boxes | Packing Boxes (12x9x4) | 15 |
| Boxes | Packing Boxes (16x10x6) | 15 |
| Boxes | Packing Boxes (8 3/4x6 3/8x3 3/8) | 15 |
| Colors | Orange Color (3946) | 0.8 Bottle |
| Colors | Red Color | 0.1 Bottle |
| Colors | Yellow Color | 0.8 Bottle |

**Capital Inventory**

| Item Category | Item | Quantity in Stock |
|---|---|---|
| Containers | 1 dram amber vials | 250 |
| Containers | 1 dram eye droppers | 340 |
| Containers | 1 dram vials with caps | 2000 |
| Containers | 1/2 gallon palstic jugs | 35 |
| Containers | 8 oz jars | 20 |
| Containers | Edibles packaging boxes | 1200 |
| Containers | Long eye droppers | 40 |
| Cooking Supplies | Baking dishes | 2 |
| Cooking Supplies | Baking gloves | 2 |
| Cooking Supplies | Baking trays (Large) | 18 |
| Cooking Supplies | Baking trays (Med) | 3 |
| Cooking Supplies | Baking trays (Small) | 1 |
| Cooking Supplies | Brownie trays | 3 |
| Cooking Supplies | Candy molds | 15 |
| Cooking Supplies | Cooking pots | 5 |
| Cooking Supplies | Cooking thermometers | 3 |
| Cooking Supplies | Cooling racks | 6 |
| Cooking Supplies | Crock pots | 5 |
| Cooking Supplies | Cutting board | 2 |
| Cooking Supplies | Hot pads | 2 |
| Cooking Supplies | Ladels | 5 |
| Cooking Supplies | Large knives | 2 |
| Cooking Supplies | Measuring cups | 8 |
| Cooking Supplies | Measuring spoons | 2 sets |
| Cooking Supplies | Mixing bowls (plastic) | 2 |
| Cooking Supplies | Mixing bowls (steel) | 7 |
| Cooking Supplies | Muffin tray | 1 |
| Cooking Supplies | Pans | 2 |
| Cooking Supplies | Pizza cutter | 1 |
| Cooking Supplies | Rolling pin | 1 |
| Cooking Supplies | Rubber grabbers | 2 |
| Cooking Supplies | Scoops | 9 |
| Cooking Supplies | Spatulas | 8 |
| Cooking Supplies | Square metal baking trays | 5 |
| Cooking Supplies | Stockpots | 9 |
| Cooking Supplies | Tongs | 3 |
| Cooking Supplies | Truffle molds | 25 |
| Cooking Supplies | Wax paper | 1 |
| Cooking Supplies | Wisks | 10 |
| Electrical | 800 watt surge protector | 1 |
| Elixir | Non-medicated elixirs | 7 cases |
| Extraction | 1/2 in dia hose | 5.5' |
| Extraction | 1/2 in dia plastic tubing | 3 ft |
| Extraction | 10 ml syringe | 1 |

## Capital Inventory

| Item Category | Item | Quantity in stock |
|---|---|---|
| Extraction | 2 gallon white buckets | 5 |
| Extraction | 2L Erlenmeyer flask | 2 |
| Extraction | 5 ml syringe | 3 |
| Extraction | 5-gallon exhaust containment vessel (styrofoam) | 1 |
| Extraction | 6 Qt ice holder pot | 1 |
| Extraction | Alcatel 2204A Series vacuum pump | 1 |
| Extraction | Beakers (100 to 1000 ml) | 10 |
| Extraction | Beakers (2000 ml) | 5 |
| Extraction | Bubble bags (20 gallon) | 1 set |
| Extraction | Bubble bags (5 gallon) | 1 set |
| Extraction | Can filter | 1 |
| Extraction | Centering rings | 2 |
| Extraction | Ceramic pore filters | 2 |
| Extraction | Charcoal containers | 2 |
| Extraction | Coffee filters | 200 |
| Extraction | Counter weights | 3 |
| Extraction | Exhaust container | 1 |
| Extraction | Extraction cone | 1 |
| Extraction | Flasks | 3 |
| Extraction | Funnel | 1 |
| Extraction | Lab Stand w/ 3-prong clamp & C-clamp | 1 |
| Extraction | Large distillation set-up | 1 |
| Extraction | Medium ceramic pore filter | 1 |
| Extraction | Microscope | 1 |
| Extraction | Neoprene gasket | 1 |
| Extraction | NWKF25 C-clamps | 4 |
| Extraction | NWKF25 fitting to hose-barb adapter | 2 |
| Extraction | Press | 1 |
| Extraction | Pyrex dishes | 3 |
| Extraction | Razor blade handles | 2 |
| Extraction | Recovered solvent container | 1 |
| Extraction | Scoopula | 1 |
| Extraction | Scraper | 4 |
| Extraction | Silicon scraper | 1 |
| Extraction | Stainless steel top plate w/ brass needle valve | 1 |
| Extraction | Stir rods | 2 |
| Extraction | Styrofoam insulating covers | 2 |
| Extraction | Teflon tape | 5 rolls |
| Extraction | Vacuum lubricant | 1/2 bottle |
| Extraction | Vacuum round bottom trap | 1 |
| Extraction | Vacuum sealer | 1 |
| Extraction | Vacuum vessel holder | |
| Extraction | Vacuum vessel top plate C-clamp | 1 |
| Extraction | Vacuum vessel w/ hose barb | |

Capital Inventory

| Item Category | Item | Quantity in Stock |
|---|---|---|
| Extraction | Viton O-ring for top plate | 1 |
| Extraction | Wash bottles | 2 |
| Flavors | Dew Drop Flavor (Spearmint) | 0.6 Bottle |
| Flavors | Dew Drop Flavor (Vanilla) | 0.4 Bottle |
| Flavors | Dew Drop Flavor (Watermelon) | 0.3 Bottle |
| Flavors | Flavor - Cherry (380266) | 0.9 Bottle |
| Flavors | Flavor - Coffee Extract (341934) | 0.9 Bottle |
| Flavors | Flavor - Lemon Lime (307939) | 0.9 Bottle |
| Flavors | Flavor - Orange Tangerine (344876) | 0.9 Bottle |
| Flavors | Flavor - Watermelon (337867) | 0.9 Bottle |
| Flavors | Lemonade Concentrate | 1.0 Case |
| Flavors | Natural Red Hot Cinnamon 345468 | 0.5 Bottle |
| Flavors | Sweet Tea Concentrate | 4.0 Case |
| Flavors | Syrup, Blueberry | 2.0 Box |
| Flavors | Syrup, Grapefruit | 3.0 Box |
| Flavors | Syrup, Mandarin | 6.0 Box |
| Flavors | Syrup, Peach | 6.0 Box |
| Flavors | Syrup, Pomegranate | 2.0 Box |
| Flavors | Syrup, Red Currant | 4.0 Box |
| Flavors | Syrup, Sarsparilla | 5.0 Box |
| Flavors | Vanilla Crème 345469 | 0.9 Bottle |
| Flavors | Vanilla Extract (Rodelle) | 0.2 Bottle |
| Furnishings | Baking racks | 4 |
| Furnishings | Desk organizer | 1 |
| Furnishings | File Cabinets | 2 |
| Furnishings | Locking cabinets | 4 |
| Furnishings | Metal rolling table (30x30) | 4 |
| Furnishings | Metal rolling table (48x30) | 4 |
| Furnishings | Metal rolling table (90x30) | 6 |
| Furnishings | Plastic table set with four chairs | 1 |
| Furnishings | Rubber floor mats | 15 |
| Furnishings | Waste baskets | 5 |
| Furnishings | Water Coolers | 2 |
| Furnishings | White boards | 3 |
| Ice Cream | Ice Cream cup-spoon-lid sets | 2000 |
| Ice Cream | Ice cream supplies | 1 |
| Ingredient - Botanicals | Bees Wax Pastilles | 0.8 Bag |
| Ingredient - Botanicals | Bentonite (Clay) | 1.5 Bag |
| Ingredient - Botanicals | Castor Oil | 0.7 Drum |
| Ingredient - Botanicals | Cedarwood Himalayan India | 1.0 Bottle |
| Ingredient - Botanicals | Cocoa Butter Waffers | 1.0 Bag |
| Ingredient - Botanicals | Epsom Salts (Fine) | 3.5 Box |
| Ingredient - Botanicals | Eucalyptus Oil | 2.0 Bottle |
| Ingredient - Botanicals | Frankincense Olibanum Ethiopia | 0.3 Bottle |

Capital Inventory

| Item Category | Item | Quantity in Stock |
|---|---|---|
| Ingredient - Botanicals | Isopropyl Alcohol | 6.0 Bottle |
| Ingredient - Botanicals | Lavender Hungary | 1.3 Bottle |
| Ingredient - Botanicals | Lemon Oil | 0.8 Bottle |
| Ingredient - Botanicals | Lobelia | 0.8 Pack |
| Ingredient - Botanicals | Olive Oil Everyday Ex Virgin - #64755 Corto | 2.0 Bottle |
| Ingredient - Botanicals | Rosemary Camphor Type | 1.0 Bottle |
| Ingredient - Botanicals | Scotch Pine Bulgaria | 0.5 Bottle |
| Ingredient - Botanicals | Sea Salt | 3.5 Box |
| Ingredient - Edibles | Chocolate - French Vanilla Guittard 5640 | 0.5 Case |
| Ingredient - Edibles | Chocolate Chips (2000 ct) Guittard | 0.5 Box |
| Ingredient - Edibles | Coating Chocolate - A Peels 5790c | 0.5 Case |
| Ingredient - Edibles | Cocoa Powder Guittard Dutch Chocolate | 0.8 Bag |
| Ingredient - Edibles | Confectioners Sugar (powdered) | 0.9 Bag |
| Ingredient - Edibles | Corn Syrup | 0.7 Case |
| Ingredient - Edibles | Dry Powdered Milk (Organic Valley) | 2.5 Case |
| Ingredient - Edibles | Granulated Extra Fine Sugar | 5.0 Bag |
| Ingredient - Edibles | Heavy Cream | 0.8 Case |
| Ingredient - Edibles | Marshmellow (Mini Jet Puffed) | 2.5 Bag |
| Ingredient - Edibles | Rice Krispies | 1.0 Case |
| Ingredient - Edibles | Silicon Dioxide | 0.5 Bag |
| Ingredient - Edibles | Tapioca Syrup | 0.8 Pail |
| Ingredient - Edibles | Unsalted Butter | 0.9 Case |
| Ingredient - Edibles | Vegetable Oil | 0.5 Bottle |
| Ingredients | Grape flavoring | 1 gallon |
| Ingredients | Lemon juice | 1 bottle |
| Ingredients | Misc spices | 1 box |
| Ingredients | Mixed berry flavoring | 1 gallon |
| Ingredients | Peanut butter | 1 bucket |
| Ingredients - Misc | Agave Nectar | 0.4 Bottle |
| Ingredients - Misc | Caffeine | 1.0 Bag |
| Ingredients - Misc | Citric Acid | 0.5 Bag |
| Ingredients - Misc | Glycerin | 1.0 Drum |
| Ingredients - Misc | Hemp Oil (NUV 2100109) | 2.0 Bottle |
| Ingredients - Misc | Potassium Glucarate | 0.6 Drum |
| Ingredients - Misc | Sodium Benzoate | 0.8 Bag |
| Ingredients - Misc | Sodium Bicarbonate | 1.5 Box |
| Ingredients - Misc | TIC Gums Beverage 500 | 0.5 Bag |
| Ingredients - Misc | Water | 10.0 Bottle |
| Ingredients - Scrips | Ashwangandha Root | 1.0 Bag |
| Ingredients - Scrips | Capsules - Aqua-Aqua - Size 0 | 0.1 Bag |
| Ingredients - Scrips | Capsules - Aqua-White - Size 0 | 1.2 Bag |
| Ingredients - Scrips | Capsules - Orange-White - Size 0 | 1.2 Bag |
| Ingredients - Scrips | Conjugated Linoleic Acid | 0.6 Bag |
| Ingredients - Scrips | Eleuthero Root | 1.0 Bag |

Capital Inventory

| Item Category | Item | Quantity in Stock |
|---|---|---|
| Ingredients - Scrips | Hop Flour | 1.0 Bag |
| Ingredients - Scrips | L-Theanine | 1.0 Bag |
| Ingredients - Scrips | Rice Starch | 1.0 Bag |
| Ingredients - Scrips | Tumeric Powder | 0.5 Bag |
| Ingredients - Scrips | White Willow Bark | 1.5 Bag |
| Labels | 1-in Diameter Labels | 2.0 Box |
| Labels | Bath Salts Labels (Medium) | 1125 |
| Labels | Bath Salts Labels (Sample) | 520 |
| Labels | Bath Salts Labels (Small) | 1000 |
| Labels | Compliance Label | 0.4 Case |
| Labels | Compliance Label (Large) | 0.8 Case |
| Labels | Dew Drop Labels, Watermelon (1 oz.) | 1000 |
| Labels | Dew Drop Labels, Natural (1 oz.) | 500 |
| Labels | Dew Drop Labels, Spearmint (1 oz.) | 1250 |
| Labels | Dew Drop Labels, Vanilla | 500 |
| Labels | Dixie Roll Label (Individual) | 3800 |
| Labels | Edibles Crispy Treat Labels | 700 |
| Labels | Edibles Dixie Roll Labels | 500 |
| Labels | Edibles Fruit Lozenge Labels | 800 |
| Labels | Edibles Ingredient Labels (3x4) | 0.7 Case |
| Labels | Edibles Truffles Labels | 300 |
| Labels | Elixir Labels - Lemonade | 1200 |
| Labels | Elixir Labels - Sweet Tea | 300 |
| Labels | Elixir Labels -Water (Mixed Berry) | 100 |
| Labels | Elixir Labels, Blueberry | 1700 |
| Labels | Elixir Labels, Grapefruit | 2750 |
| Labels | Elixir Labels, Mandarin | 2378 |
| Labels | Elixir Labels, Peach | 2470 |
| Labels | Elixir Labels, Pomegranate | 1600 |
| Labels | Elixir Labels, Red Currant | 1400 |
| Labels | Elixir Labels, Sarsparilla | 2378 |
| Labels | Label Ribbon (4inx1345ft Sato TR4085 Black) | 4.0 Roll |
| Labels | Massage Oil Labels 1 Dram | 0.4 Roll |
| Labels | Massage Oil Labels 2 oz. | 0.4 Roll |
| Labels | Massage Oil Labels 4 oz. | 0.7 Roll |
| Labels | Pain Salve Labels .25 oz (Side) | 2.1 Roll |
| Labels | Pain Salve Labels .25 oz (Top) | 2.0 Roll |
| Labels | Pain Salve Labels .5 oz (Side) | 1.5 Roll |
| Labels | Pain Salve Labels .5 oz (Top) | 0.8 Roll |
| Labels | Pain Salve Labels 1.33 oz (Side) | 1.6 Roll |
| Labels | Pain Salve Labels 1.33 oz (Top) | 1.2 Roll |
| Labels | Snake Oil Labels 1 oz. | 400 |
| Labels | Snake Oil Labels 2 oz. | 1300 |
| Labels | Tonic Label | 2000 |

## Capital Inventory

| Item Category | Item | Quantity in Stock |
|---|---|---|
| Misc | 1 oz sample cups | 2000 |
| Misc | 2 oz. Sample Cups | 0.8 Case |
| Misc | Air filter machines | 2 |
| Misc | Charcoal | 0.2 Box |
| Misc | CO2, Small Canisters | 0.5 |
| Misc | Delicate Garmet Bag (Ex. Large) | 8 |
| Misc | Ethanol (Everclear) | 0.4 Case |
| Misc | Ethanol (Pure Deantured | 0.5 Case |
| Misc | Event banners | 1 |
| Misc | Filter Paper (9cm Fast) | 1.0 Box |
| Misc | Filter Paper (9cm Slow) | 1.0 Box |
| Misc | GLOVES - BLUE 3.5 MIL POWDER FREE NITRILE GLOBOX | 1.2 Case |
| Misc | Large metal wagon | 1 |
| Misc | Mason jars | 8 |
| Misc | Metal pails | 5 |
| Misc | New Wave Enviro Dairy Eastar Resin Bottle, 1-Gallon | 2.0 Case |
| Misc | Pallet Jack | 1 |
| Misc | Pallets | 10 |
| Misc | Pan Coating | 1.5 |
| Misc | Party supplies | 1 bin full |
| Misc | Plastic cups | 1750 |
| Misc | Plastic Wrap - 24 in | 0.5 Box |
| Misc | Propylene glycol | 55 gallons |
| Misc | Safety goggles | 5 |
| Misc | Syringes, 30 ml | 1.0 Box |
| Misc | Syringes, 60 ml | 2.0 Box |
| Misc | Ziplock Bags (Large) | 3.0 Box |
| Misc | Ziplock Bags (Small) | 4.0 Box |
| Packaging | 3x5 Heat Sealable Bags | 30.0 Pack |
| Packaging | 4" x 6" LDPE-Plain Opened Bags 2 mil | 300.0 Pack |
| Packaging | Bath Salts Bag (3 x 1.5 x 5) | 10.0 Pack |
| Packaging | Candy Jar for Dixie Rolls | 6 |
| Packaging | Dixie Roll Bags (8"x12") | 40 |
| Packaging | Dixie Rolls – Foil Wraps | 2.0 Pack |
| Packaging | Edible Boxes | 1.0 Case |
| Packaging | Ice Cream Cups | Case |
| Packaging | Massage Oil Information Cards | 0.3 Box |
| Packaging | Pain Salve Information Cards | 1.0 Box |
| Packaging | Pleated Cellophane Bag (2.5 x 1.25 x 5) | 0.8 Case |
| Packaging | Point of Sale Display Racks | 0.7 Case |
| Packaging | Poly tube on a roll 4 in 2 MIL 2150 ft | 0.1 Roll |
| Packaging | Scrips Information Cards | 0.7 Box |

**Capital Inventory**

| Item Category | Items | Quantity in Dec |
|---|---|---|
| Packaging | Shrink Wrap for Large Pain Salves | 1.0 Pack |
| Packaging | Shrink Wrap for Small Pain Salves | 1.0 Pack |
| Packaging | Shrinkwraps for Large Massage Oil Bottles | 0.4 Pack |
| Packaging | Shrinkwraps for Small Massage Oil Bottles | 0.3 Pack |
| Packaging | White Fluted Baking Cup 1 1/4" x 7/8" | 0.5 Case |
| Packing | 4-packs (plain) | 250 |
| Packing | 6-packs (plain) | 20 |
| Packing | Bubble Wrap (1/2") | 0.6 Roll |
| Packing | Bubble Wrap (1/4") | 3.0 Roll |
| Packing | Packaging Tape | 0.5 Box |
| Packing | Packing Peanuts | 1.0 Bag |
| Packing | Paper Bags (4 lb) | 5.0 Bag |
| Packing | Sleeve bags (blue) | 100 |
| R&D | Emulsifying wax | 5 lb |
| Safety | Fire extinguisher | 1 |
| Scales | Large digital scale | 1 |
| Storage | 12x12 Clear plastic carrying cases | 6 |
| Storage | Bins | 21 |
| Storage | Black kitchen storage bins | 4 |
| Storage | Large white plastic storage tray | 4 |
| Storage | Metal storage trunk (Rubbermaid) | 1 |
| Storage | Storage racks | 4 |
| Storage | Tote (blue) | 1 |
| Utilities and Tools | 300 capsule pill packers | 2 |
| Utilities and Tools | 3-way extension cord (Heavy duty) | 1 |
| Utilities and Tools | 4-way faucet splitter | 1 |
| Utilities and Tools | Acasi filler | 1 |
| Utilities and Tools | Air compressor | 1 |
| Utilities and Tools | Air compressor hoses | 2 |
| Utilities and Tools | Beverage tanks | 10 |
| Utilities and Tools | Bottle drying trees | 3 |
| Utilities and Tools | Bottle sanitizer | 1 |
| Utilities and Tools | Bottling machine (Applied Bottling) | 1 |
| Utilities and Tools | Buckets (5 gal) | 12 |
| Utilities and Tools | Cappers | 2 |
| Utilities and Tools | Category 5 cable | 1 box |
| Utilities and Tools | Chiller | 1 |
| Utilities and Tools | CO2 regulator | 1 |
| Utilities and Tools | CO2 tanks | 3 |
| Utilities and Tools | Coffee grinder | 2 |
| Utilities and Tools | Dollies | 2 |
| Utilities and Tools | Drink dispensing buckets | 6 |
| Utilities and Tools | Drink dispensing hoses | 5 |
| Utilities and Tools | Glass pill tampers | 2 |

**Capital Inventory**

| Item Category | Item | Quantity in Stock |
|---|---|---|
| Utilities and Tools | Hash maker | 1 |
| Utilities and Tools | Heat sealers | 2 |
| Utilities and Tools | Ice scoop (1/2 cup) | 1 |
| Utilities and Tools | Immersion blender | 2 |
| Utilities and Tools | Ninja blender | 2 |
| Utilities and Tools | Paper cutter | 1 |
| Utilities and Tools | Pipe cleaner brush | 1 |
| Utilities and Tools | Power drill | 1 |
| Utilities and Tools | Riobi skill saw | 1 |
| Utilities and Tools | Rolling carts | 3 |
| Utilities and Tools | Rubber hoses | 3 |
| Utilities and Tools | Scale (large A/C) | 1 |
| Utilities and Tools | Scales (small battery powered) | 3 |
| Utilities and Tools | Storage tank | 1 |
| Utilities and Tools | Syrup dispensing hose | 1 |
| Utilities and Tools | Tool box full of tools | 1 |

## Dixie Intellectual Property Exhibit

| Item # | Property | Category | Location of Property |
|---|---|---|---|
| 1 | Bath Salts | Botanical | Dixie Recipe & COGS Manual |
| 2 | Massage Oil | Botanical | Dixie Recipe & COGS Manual |
| 3 | Pain Salve | Botanical | Dixie Recipe & COGS Manual |
| 4 | Snake Oil | Botanical | Dixie Recipe & COGS Manual |
| 5 | Chocolate Truffles | Edible | Dixie Recipe & COGS Manual |
| 6 | Crispy Rice Treats | Edible | Dixie Recipe & COGS Manual |
| 7 | Dixie Rolls | Edible | Dixie Recipe & COGS Manual |
| 8 | Lozenges (Café Flavors) | Edible | Dixie Recipe & COGS Manual |
| 9 | Lozenges (Fruit Flavored) | Edible | Dixie Recipe & COGS Manual |
| 10 | Blueberry Elixir (40 mg) | Elixir 40 | Dixie Recipe & COGS Manual |
| 11 | Grapefruit Elixir (40 mg) | Elixir 40 | Dixie Recipe & COGS Manual |
| 12 | Lemonade Elixir | Elixir 40 | Dixie Recipe & COGS Manual |
| 13 | Mandarin Elixir (40 mg) | Elixir 40 | Dixie Recipe & COGS Manual |
| 14 | Mixed Berry Water | Elixir 40 | Dixie Recipe & COGS Manual |
| 15 | Peach Elixir (40 mg) | Elixir 40 | Dixie Recipe & COGS Manual |
| 16 | Pomegranite Elixir (40 mg) | Elixir 40 | Dixie Recipe & COGS Manual |
| 17 | Red Currant Elixir (40 mg) | Elixir 40 | Dixie Recipe & COGS Manual |
| 18 | Sarsparilla Elixir (40 mg) | Elixir 40 | Dixie Recipe & COGS Manual |
| 19 | Sweet Tea Elixir | Elixir 40 | Dixie Recipe & COGS Manual |
| 20 | Blueberry Elixir (75 mg) | Elixir 75 | Dixie Recipe & COGS Manual |
| 21 | Grapefruit Elixir (75 mg) | Elixir 75 | Dixie Recipe & COGS Manual |
| 22 | Mandarin Elixir (75 mg) | Elixir 75 | Dixie Recipe & COGS Manual |
| 23 | Peach Elixir (75 mg) | Elixir 75 | Dixie Recipe & COGS Manual |
| 24 | Pomegranite Elixir (75 mg) | Elixir 75 | Dixie Recipe & COGS Manual |
| 25 | Red Currant Elixir (75 mg) | Elixir 75 | Dixie Recipe & COGS Manual |
| 26 | Sarsparilla Elixir (75 mg) | Elixir 75 | Dixie Recipe & COGS Manual |
| 27 | Cannabis Isopropyl Extract | Ingredient | Dixie Production Database |
| 28 | Cannabis Olive Oil | Ingredient | Dixie Production Database |
| 29 | Essential Oil Blend (Massage) | Ingredient | Dixie Production Database |
| 30 | Essential Oil Blend (Salve and Bath Salts) | Ingredient | Dixie Production Database |
| 31 | Essential Oil Blend (Snake Oil) | Ingredient | Dixie Production Database |
| 32 | Lobelia Extract | Ingredient | Dixie Production Database |
| 33 | Lobelia Extract (Reduced) | Ingredient | Dixie Production Database |
| 34 | Lobelia Olive Oil | Ingredient | Dixie Production Database |
| 35 | Tonic Chemical Mixture | Ingredient | Dixie Production Database |
| 36 | Scrips - Focus Formula | Scrips | Dixie Recipe & COGS Manual |
| 37 | Scrips - Pain Formula | Scrips | Dixie Recipe & COGS Manual |
| 38 | Scrips - Sleep Formula | Scrips | Dixie Recipe & COGS Manual |
| 39 | Hash Extract-Glass | Smoking Grade | Dixie Recipe & COGS Manual |
| 40 | Dew Drops - Natural | Tincture | Dixie Recipe & COGS Manual |
| 41 | Dew Drops - Spearmint | Tincture | Dixie Recipe & COGS Manual |
| 42 | Dew Drops - Vanilla | Tincture | Dixie Recipe & COGS Manual |
| 43 | Dew Drops - Watermelon | Tincture | Dixie Recipe & COGS Manual |
| 44 | Tonic - Mandarin | Tonic | Dixie Recipe & COGS Manual |
| 45 | Dixie Proprietary Marks & Logos | Marketing | Marketing Database |
| 46 | Website: www.dixieelixirs.com | Marketing | Marketing Database/Hosting |
| 47 | Dixie related web domains | Marketing | Marketing Database/Hosting |
| 48 | - dixietinctures.com | | |
| 49 | - dixiebotanicals.com | | |
| 50 | - dixiescripts.com | | |

# EXHIBIT E

## EXCLUSIVE LICENSING AGREEMENT WITH LEFT BANK, LLC

**EXHIBIT F**

**KEBER EMPLOYMENT CONTRACT; SMITH CONSULTING AGREEMENT**



## EMPLOYMENT AGREEMENT

THIS EMPLOYMENT AGREEMENT (the "Agreement") is made this ___ day of April 2012 (the "Effective Date"), by **RED DICE HOLDINGS, LLC**, (the "Company"); and **VINCENT M. KEBER, III**, a Colorado resident ("Executive") (the foregoing collectively, the "Parties" and each a "Party").

### RECITALS

WHEREAS, On or about **April ___ 2012**, the Company retained Executive to serve on a full time basis as a senior officer in the capacity of **President**; and

WHEREAS, The Parties wish to memorialize formally the material terms and conditions applicable to Executive's employment position with the Company.

WHEREFORE, In furtherance of the foregoing events and objectives, and with full acknowledgement of and intent to be bound by the terms hereof, the Parties agree as follows:

### WITNESSETH

**1.    Integration.**   The Parties expressly incorporate the foregoing Recitals as material terms of this Agreement, reflecting not only their intent and objectives but also the consideration to be exchanged by the Parties hereunder.

**2.    Employment; Nature of Relationship; Term.**   The Company hereby affirms its employment of Executive, and Executive hereby affirms his acceptance of employment from and for the Company, upon the terms and conditions of this Agreement.  The Parties expressly acknowledge that the relationship between them is and shall be that of employer-Executive for a period of one (1) year from the Effective Date (the "Initial Term"); provided, however, that the period of the Executive's employment pursuant to this Agreement shall be automatically extended for successive one-year periods thereafter (each, a "Renewal Term"), in each case unless either Party hereto provides the other Party hereto with written notice that such period shall not be so extended at least 90 days in advance of the expiration of the Initial Term or the then-current Renewal Term, as applicable (the Initial Term and any Renewal Term, collectively, the "Term").

**3.    Scope and Extent of Employment Duties.**   Executive shall serve as the Company's **President**. Executive shall devote his time and attention to the Company's business on a full time basis.  Executive may engage in any directorship, consulting project, or other active business engagements during the term of this Agreement, regardless of whether such activity is pursued for gain, profit or nonprofit; provided, however, such activities do not materially interfere with Executive's duties as President.  Executive may invest his assets, however, in other companies or ventures, provided that same does not require Executive's services in the operation of their affairs, and provided further that such companies or ventures (except for Left Bank, LLC) do not compete either directly or indirectly with the Company, its affiliates and/or assigns.

3.1    **Roles and Responsibilities:**  Some of the Executive responsibilities include, but is not limited to, the following:

**OVERVIEW:** To insure the profitable growth and mission of the Company is obtained to the best of Executive's ability.  The Executive must conduct himself in a professional manner at all times. Executive will also be appointed as the manager of the Company and will assume the responsibilities set forth in the Company's operating agreement.  To oversee all existing and future product development.

{00876391 / 4}

**Operations:** Oversee the day to day operations of the Company. Ensure that the goals of the Company are implemented as directed by the Management Committee (as defined in the Company's operating agreement). Continually keep abreast of the industry and potential new product acquisitions for the Company. Present all potential new products to the Management Committee along with requisite financials showing potential impact on the Company.

**Marketing:** Manage all of the marketing activities of the Company and ensure that said activities are within the Company approved budgets and as approved by the Company.

**Communication with facility and Management Committee:** Will be responsible for keeping the Management Committee informed of important issues in Company. Prepare budgets and/or reports for the Management Committee as to each existing and new approved product.

**Recruiting/Staffing:** Work with management and other employees to source, screen and hire personnel. To recruit, select, train and monitor experienced qualified employees as needed. Executive shall consult with officers and managers on matters of employee retaliations, salary administration, terminations and employee grievances.

**Employee Relations:** Responsible for maintaining a positive, productive and safe workplace. Ability to connect with employees at all levels to create and maintain an open door environment that identifies issues early and allows management to address them. Will partner with the Management Committee to handle all performance management issues and for ensuring effective communication and adherence to corporate policies. Maintains a high degree of integrity and honesty in all business and personal affairs.

**Safety Programs:** Develop, monitor and review company safety programs. Ensure timely meetings addressing safety concerns and training.

**Objectives:** Participate in the development and enhancement of corporate objectives, rewards philosophies, and strategic planning in relation to staffing and trends in human resource management. Participate in and promote a team environment by working with management to accomplish corporate responsibilities and objectives. Continually monitor all aspects to improve workflow and production. Ensure that proper constructing and operations reports are prepared and communicated between departments and the Management Committee in a timely-manner. Develops long range as well as short range overall plans for the company with regard to volume and type of work desired, quality of work desired, future growth, etc. Responsible for the integration of all the above into an organized controlled smooth flowing system.

**Additional Responsibilities:** May be assigned by the Management Committee at any time, set forth in writing and provided to Executive.

4. **Compensation.** The Company shall pay Executive the following compensation for all services rendered hereunder:

(A) *Base Compensation.* The Company shall pay Executive One Hundred Seventy Thousand US Dollars ($170,000.00) per year which shall commence upon the Company's receipt of funding, and will be payable according to the Company's customary payroll practices.

(B) *Bonus*. There are no bonus' provided to Executive unless agreed to in writing by the Management Committee.

(C) *Equity Grants*. There are no Grants provided to Executive unless agreed to in writing by the Management Committee.

(D) *Participation in Employee Benefit Plans*. Except as expressly modified by this Agreement, the Executive shall be entitled to participate in all employee benefit plans or programs, and to receive all benefits, perquisites and emoluments, which are approved by the Management Committee and are generally made available by the Company to executive-level employees of the Company, to the extent permissible under the general terms and provisions of such plans or programs and in accordance with the provisions thereof.

(E) *Employment Taxes*. All payments to Executive shall constitute wages and, as such, shall be subject to the withholding and remission of federal employment taxes, California unemployment compensation taxes, and all other applicable taxes.

5.    **Expenses.**    The Company shall reimburse Executive for all reasonable out-of-pocket expenses Executive incurred during the Term in connection with the performance of Executive's duties and obligations under this Agreement, according to the Company's reimbursement policies in effect from time to time and provided that Executive shall submit documentation which the Company deems reasonable with respect to such expenses.

6.    **Non-Disclosure of Information and Restrictive Covenant.** [See Exhibit ___ ]

7.    **Assignment.** The Executive acknowledges that his services are unique and personal. Accordingly, the Executive may not assign his rights or delegate his duties or obligations under this Agreement. The Company's rights and obligations under this Agreement shall inure to the benefit of, and shall be binding upon, the Company's successors and assigns.

8.    **Notices.** All notices, elections, offers, acceptances, and other communications hereunder shall be in writing and shall be delivered in person with written acknowledgment by the recipient of such delivery; by facsimile/telecopy with confirmation; by overnight delivery service with receipt and tracking number; or by United States Mail by way of certified or registered mail, return receipt requested, to the address provided by each Member to the Company or to the Company at its principal business address. A notice, election, offer, acceptance, or other communication shall be deemed to be received:   *(A)* if by personal delivery, on the date delivered with written acknowledgment by the recipient of such delivery;   *(B)* if by facsimile/telecopy, on the date confirmed by receipt / statement of the transmitting machine;   *(C)* if by overnight delivery service, on the date delivered; and   *(D)* if by United States Mail, on the date delivered with written acknowledgment on the return receipt.

9.    **Entire Agreement; Amendment; Severability; Headings; Gender References.** This Agreement, constitutes the entire understanding of the Parties hereto, explicitly superseding the confirmatory letter previously signed by the Parties and referenced in the Recitals above. No modifications, amendments, or other statements to this Agreement shall be binding on the Parties unless executed in writing and signed by the Party to be bound by such instrument.

If any provision of this Agreement is held invalid or unenforceable, such invalidity or unenforceability shall not affect the other provisions of this Agreement and, to that extent, the provisions of this Agreement are intended to be and shall be deemed to be severable.

Headings in this contract are for convenience and reference only and shall not be used to interpret or construe provisions hereunder. All references in this Agreement shall be gender neutral, such that the masculine shall include the feminine and *vice versa*, and neutral references shall encompass both. Where applicable, the singular shall include the plural and *vice versa*.

**10. Non-Waiver.** No delay or failure by either Party to exercise any right hereunder, and no partial or single exercise of such right, shall constitute a waiver of that or any other right, unless otherwise expressly provided herein.

**11. Binding Agreement.** This Agreement shall bind the executors, administrators, representatives, estates, heirs, beneficiaries, and other successors of the Parties.

**12. Governing Law; Legal Fees.** California law shall govern this Agreement and all questions arising hereunder. Each Party hereto expressly and irrevocably waives trial by jury in any suit, action, or proceeding in relation to this Agreement. In any suit, action, or proceeding to enforce, interpret, or challenge the enforceability of this Agreement, the prevailing Party in such suit, action, or proceeding shall be entitled to its reasonable attorneys' fees and all other costs of arbitration or other action, through all authorized appeals.

**13. Execution.** This Agreement may be executed in counterparts, and faxed signatures of this Agreement shall constitute an original instrument qualified for admission into evidence in any court or administrative proceeding, through all authorized appeals.

**14. Indemnification.** If the Executive is made a party, or is threatened to be made a party, to any suit or proceeding, whether civil, criminal, administrative, investigative, appellate or other by reason of the fact that he is or was a director, officer, employee, agent, manager, consultant or representative of the Company or any of its subsidiaries or is or was serving at the request of the Company or any of its subsidiaries, or in connection with her service hereunder, as a director, officer, member, employee, agent, manager, consultant or representative of any other entity, or if any claim is made, or is threatened to be made, that arises out of or relates to the Executive's service in any of the foregoing capacities, then the Executive shall promptly be indemnified and held harmless, and shall be entitled to prompt advancement of expenses, including without limitation attorneys' fees and other charges of counsel, in each case, to the fullest extent provided under applicable law, the Company's Operating Agreement, and the Company's officers' and directors' liability insurance policies. The Company may obtain a directors and officers liability insurance policy covering Executive and to continue and maintain such policy. The amount of coverage shall be reasonable in relation to Executive's position and responsibilities during the Term provided that the cost and availability of such insurance is reasonable within the marketplace.

**15. Termination.**

(a) <u>Events of Termination</u>. This Agreement and Executive's employment hereunder shall terminate upon the occurrence of any one or more of the following events:

i. <u>Death.</u> In the event of Executive's death, this Agreement and Executive's employment hereunder shall automatically terminate effective as of the date and time of death.

ii. <u>Disability.</u> To the extent permitted by law, in the event of Executive's medically determined physical or mental disability that renders Executive substantially unable to perform Executive's material duties under this Agreement for a period of at least 90 consecutive days in any 12-month period or 120 non-consecutive days in any 12-month period, and which cannot be reasonably accommodated by the Company

without undue hardship ("Disability"), the Company may terminate this Agreement and Executive's employment hereunder upon at least 30 days' prior written notice to Executive. Any question as to the existence of the Disability of Executive as to which Executive and Company cannot agree shall be determined in writing by a qualified independent physician as appointed by Company and Executive (or Executive's representative). The determination of Disability made in writing to Company and Executive shall be final and conclusive for all purposes of this Agreement.

iii.   Termination by the Company for Cause.

1.   The Company may, at its option, terminate this Agreement and Executive's employment hereunder for Cause (as defined herein) upon giving notice of termination to Executive (following the expiration of the applicable cure period, if any) which notice specifies that the Company deems such termination to be for "Cause" hereunder and specifies in reasonable detail the grounds or circumstances for such "Cause". Executive's employment shall terminate on the date on which such notice shall be given, unless Executive cures such deficiency resulting in the Company terminating Executive for Cause as provided herein.

2.   For purposes hereof, "Cause" shall mean Executive's (a) conviction of, guilty or nolo contendere plea to, or confession of guilt to, a felony or act involving moral turpitude, (b) willful misconduct or gross negligence which is materially injurious (monetarily or otherwise) and would reasonably be expected to cause actual harm to the Company in the reasonable discretion of the Management Committee after a written notice and a 14 day opportunity to cure, (c) material violation of the Company's policies or procedures in effect from time to time which would reasonably be expected to cause actual harm to the Company after a written notice and a 14 day opportunity to cure, or (d) failure in any material respect to perform Executive's duties as reasonably assigned to Executive by the Management Committee from time to time and consistent with Executive's title and position after a written notice and a 30 day opportunity to cure. Notwithstanding the foregoing, Executive shall be given a reasonable opportunity during any applicable cure period, for Executive together with counsel, to be heard before the Management Committee and if such hearing occurs, a second written notice from the Company stating that, in the good faith judgment of the Management Committee, Executive was guilty of the conduct giving rise to termination for Cause.

iv.   Without Cause by the Company. The Company may, at its option, at any time terminate Executive's employment for no reason or for any reason whatsoever (other than for Cause or due to death or Disability). Executive shall be entitled to Severance only in the event of termination without cause and shall consist of eighteen months of the Executive's then-current Base Salary. All Severance Payments shall be payable in accordance with the Company's customary payroll practices.

v.   Termination By Executive. Executive may terminate this Agreement and Executive's employment hereunder at any time with or without Good Reason upon at least 30

days written notice to the Company. For purposes of this Agreement, "Good Reason" shall mean, in the absence of a written consent of the Executive:

1. a reduction in the Executive's Base Salary by 10% or more and such reduction is neither company-wide nor applicable to all senior executives of the Company;

2. any action by the Company which results in a material diminution in Executive's title, position, authority or duties from those set forth in this Agreement;

3. any failure by the Company to comply with any provision of this Agreement (other than an isolated, insubstantial or inadvertent failure which is promptly remedied after notice to the Company) including, but not limited to, the failure of the Company to pay any portion of Executive's current compensation;

4. material breach by the Company of Company's Operating Agreement if such breach would materially prejudice Executive;

5. a Change of Control (as defined below) that occurs without Executive's written consent;

6. the relocation of the Company's headquarters to a location greater than 50 miles from the Company's current location without Executive's written consent; or

7. company fails to obtain a written agreement from any successor of Company to assume and perform this Agreement; and within 90 days of learning of the occurrence of any such event and in the absence of any circumstance that constitutes Cause, Executive terminates employment with Company by a written notice specifying in reasonable detail the facts constituting Good Reason.

"Change of Control" shall be deemed to have occurred upon the earliest to occur of any of the following events, each of which shall be determined independently of the others:

(1) a natural person, partnership (whether general or limited), limited liability company, joint venture, trust, estate, association, corporation, government or any department or agency thereof, custodian, nominee or any other individual or entity in its own or any representative capacity (collectively referred to herein as "Person") (together with any affiliates of such Person) is or becomes the beneficial owner, directly or indirectly, of voting interests of Company entitling such Person to exercise fifty percent (50%) or more of the total voting power of such voting interests;

(2) shareholders of Company adopt a plan of complete or substantial liquidation or an agreement providing for the distribution of all or substantially all of its assets; or

(3) there has occurred a "Change of Control," as such term (or any term of like import) is defined in any of the following documents which is in effect with respect to Company at the time in question: any note, evidence of indebtedness or agreement to lend funds to Company, any option, incentive or employee benefit plan of Company or any employment, severance, termination or similar agreement with any person who is then an employee of Company.

vi. <u>Mutual Agreement</u>. This Agreement and Executive's employment hereunder may be terminated at any time, with or without notice, by the mutual agreement of the Company and Executive.

vii. <u>Morality Clause.</u> Executive may be terminated immediately upon any serious act of misconduct by Executive, including, but not limited to, an act of dishonesty, theft or misappropriation of Company Property, moral turpitude, insubordination, or any act injuring abusing or endangering others or negatively impacting the image and reputation of the Company. In the event of termination under the Morality Clause, the Executive shall not be entitled to any Severance and shall be paid up to the date of termination with no further obligations being owed by the Company.

(b)  <u>The Company's Obligations Upon Termination.</u>

i. <u>For Cause; Termination by Executive Other Than For Good Reason.</u> If the Company shall terminate this Agreement and Executive's employment hereunder for Cause or if the Executive shall terminate this Agreement and Executive's employment hereunder other than for Good Reason, the Company's sole obligation to Executive under this Agreement or otherwise shall be for the Company to (i) pay to Executive the amount of any Base Salary earned, but not yet paid to Executive, prior to the effective date of such termination (the "Termination Date"); (ii) to the extent not previously reimbursed, reimburse Executive for any expenses incurred by Executive through the Termination Date in accordance with Section 4.7; and (iii) pay and/or provide any other amounts or benefits that are vested amounts or vested benefits or that Executive is otherwise entitled to receive under any plan, program, policy or practice (with the exception of those, if any, relating to severance) on the Termination Date in accordance with such plan, program, policy or practice; (clauses (i) through (iii) above, the "Accrued Obligations").

ii. <u>Without Cause; for Good Reason.</u> If, during the Term, the Company shall terminate this Agreement and Executive's employment hereunder without Cause and other than due to death or Disability or Executive terminates this Agreement and Executive's employment hereunder for Good Reason, the Company shall (i) pay and/or provide to Executive the Accrued Obligations in accordance with Section 15(b)(i) above, (ii) pay to Executive the Severance Payments, (iii) pay to the Executive all Bonus earned but not yet paid and (iv) the Company shall release the Executive from the covenants contained in the Non-Disclosure of Information and Restrictive Covenant.

iii. <u>Mutual Agreement.</u> Upon any termination of this Agreement and the Executive's employment hereunder by mutual agreement of the Company and Executive, unless otherwise mutually agreed to, the Company's sole obligation to Executive under this Agreement or otherwise shall be for the Company to (i) pay and/or provide to Executive the Accrued Obligations in accordance with Section 15(b)(i) above; and (ii) pay to Executive all Bonus earned but not yet paid and any Bonus expected or recognized during the current fiscal year and including such Termination Date.

iv. <u>Death.</u> If this Agreement and Executive's employment hereunder shall terminate as a result of Executive's death, the Company's sole obligation to Executive under this Agreement or otherwise shall be for the Company to (i) pay and/or provide to Executive the Accrued Obligations in accordance with Section 15(b)(i) above; and (ii) pay to the Executive all Bonus earned but not yet paid and any Bonus expected or recognized during the current fiscal year and including such Termination Date.

v. <u>Disability.</u> If this Agreement and Executive's employment hereunder shall terminate as a result of the Executive's Disability, the Company's sole obligation to Executive

under this Agreement or otherwise shall be for the Company to (i) pay and/or provide to Executive the Accrued Obligations in accordance with Section 15(b)(i) above; and (ii) pay to the Executive all Bonus earned but not yet paid and any Bonus expected or recognized during the current fiscal year and including such Termination Date.

vi. <u>Vested Benefits</u>. In addition to the payments and benefits set forth in this Section, amounts which are vested benefits or which are subject to acceleration or which Executive is otherwise entitled to receive under any plan, program, policy or practice (with the exception of those relating to severance) on the date of termination, shall be payable in accordance with such plan, policy, practice or agreement.

**IN WITNESS WHEREOF**, the Parties acknowledge and agree to the terms of this Employment Agreement and have hereunto set their hands and seals as of the date first written above.

**COMPANY:**
Red Dice Holdings, LLC                                                   )

By: _____                          ) ATTEST: _____
    Print: _Michael Delury_                          )
As Its: _Member_                                     ) Print: _Michelle Vides_

**EXECUTIVE:**

_____                                )
Vincent M. Keber, III                                  ) ATTEST: _____
                                                       )
                                                         Print: _Charles K. Smith_

# CONSULTING AGREEMENT

THIS CONSULTING AGREEMENT (the "Agreement") is made this 5 day of April 2012 (the "Effective Date"), by RED DICE HOLDINGS, LLC, (the "Company"), and CHARLES K. SMITH, an Alabama resident ("Consultant") (the foregoing collectively, the "Parties" and each a "Party").

## RECITALS

WHEREAS, On or about April ___ 2012, the Company retained Executive to serve as a senior officer in the capacity of **Chief Operating Officer**; and

WHEREAS, The Parties wish to memorialize formally the material terms and conditions applicable to Consultant's consulting position with the Company.

WHEREFORE, In furtherance of the foregoing events and objectives, and with full acknowledgement of and intent to be bound by the terms hereof, the Parties agree as follows:

## WITNESSETH

**1.     Integration.**   The Parties expressly incorporate the foregoing Recitals as material terms of this Agreement, reflecting not only their intent and objectives but also the consideration to be exchanged by the Parties hereunder.

**2.     Employment; Nature of Relationship; Term.**   Upon written approval of the Management Committee, the Company may retain the employment of Consultant's consulting services based upon the terms and conditions stated herein.

**3.     Scope and Extent of Employment Duties.**   Consultant shall serve as the Company's **Chief Operating Officer.**   Consultant shall devote his time and attention to the Company's business as directed by the President of the Company.   Consultant may engage in any directorship, consulting project, or other active business engagements, including employment in another business owned by Consultant, during the term of this Agreement, regardless of whether such activity is pursued for gain, profit or nonprofit; provided, however, such activities do not materially interfere with Consultant's duties as Chief Operating Officer.   Consultant may invest his assets, however, in other non-affiliated companies or ventures, provided that same does not require Consultant's services in the operation of their affairs, and provided further that such companies or ventures (except for Left Bank, LLC) do not compete either directly or indirectly with the Company, its affiliates and/or assigns.

3.1     **Roles and Responsibilities:**   Some of the Consultant responsibilities shall include, but is not limited to, the following:

**OVERVIEW:**   To insure the profitable growth and mission of the Company is obtained to the best of Consultant's ability.   The Consultant must conduct himself in a professional manner at all times. Consultant will report to the President and provide operational and administrative guidance and oversight to the Company, as well as work on specific projects such as acquisitions and strategic planning.

**Finance/Accounting/Legal Oversight:**   Develop and monitor Company budgets and ensure monthly monitoring for variances and compliance. Maintains good current understanding of accounting and other business practices. Assess the current financial structure of the corporations and develop ideas for improvement. Oversees cost control of the new product implementation. To

{00877605 / 1}

conduct monthly corporate performance meetings for each facility to include a review of financial statements, business plans and related matters. Generate action plans as needed. Responsible for working with the appropriate Consultants and departments to ensure timely and accurate accounting, budgeting and financial reporting. This will include monthly operating reports as well as quarterly and yearly financial reports. Will also work closely with Company legal staff and outside counsel on contract negotiations, compliance issues, filings and other pertinent legal matters.

**Acquisitions:** Work with the President and Management Committee to identify and analyze potential investment and acquisition candidates for the Company. Develop pro forma models, cost justification analysis and pricing models to determine cost of acquisition and purchase parameters. Will take the lead with other Consultants in negotiating the acquisition. Will oversee the contractual/legal negotiations, working closely with the Company legal counsel.

**Integration:** Will develop post acquisition integration plans to successfully bring the newly acquired company or investment into Company operations, ensuring a smooth integration of personnel, marketing, product manufacturing, accounting and operations within agreed upon budget and timing parameters.

**Objectives:** Assist President in the development and enhancement of corporate objectives, rewards philosophies, and strategic planning in relation to staffing and trends in human resource management. Participate in and promote a team environment by working with management to accomplish corporate responsibilities and objectives. Continually monitor all aspects to improve workflow and production. Ensure that proper constructing and operations reports are prepared and communicated between departments and the Management Committee in a timely manner. Develops long range as well as short range overall plans for the company with regard to volume and type of work desired, quality of work desired, future growth, etc. Responsible, with the President, for the integration of all the above into an organized controlled smooth flowing system.

**Additional Responsibilities:** May be assigned by the Management Committee at any time, set forth in writing and provided to Consultant.

4.  **Compensation.** The Company shall pay Consultant the following compensation for all services rendered hereunder:

(A) _**Base Compensation.**_ Shall be determined upon Management Committee written approval, which shall be agreed upon with Consultant no later than six (6) months from the date of the Execution of this Agreement

    *(B)*    **_Employment Taxes and Benefits._**    Consultant agrees as an independent contractor that Consultant is not entitled to unemployment insurance benefits OR workers' compensation benefits, and that Consultant is obligated to pay federal and state income tax on any money paid pursuant to the contract relationship. Consultant understands that Company shall not provide any employment benefits to Consultant, including vacation pay, sick leave, retirement benefits, health or disability benefits AND social security AND Consultant benefits of any kind.

**5.**    **Expenses.**    The Company shall reimburse Consultant for all reasonable out-of-pocket expenses Consultant incurred during the Term in connection with the performance of Consultant's duties and obligations under this Agreement, according to the Company's reimbursement policies in effect from time to time and provided that Consultant shall submit documentation which the Company deems reasonable with respect to such expenses.

**6.**    **Non-Disclosure of Information and Restrictive Covenant.** [See Exhibit ____ ]

**7.**    **Assignment.** The Consultant acknowledges that his services are unique and personal. Accordingly, the Consultant may not assign his rights or delegate his duties or obligations under this Agreement. The Company's rights and obligations under this Agreement shall inure to the benefit of, and shall be binding upon, the Company's successors and assigns.

**8.**    **Notices.** All notices, elections, offers, acceptances, and other communications hereunder shall be in writing and shall be delivered in person with written acknowledgment by the recipient of such delivery; by facsimile/telecopy with confirmation; by overnight delivery service with receipt and tracking number; or by United States Mail by way of certified or registered mail, return receipt requested, to the address provided by each Member to the Company or to the Company at its principal business address. A notice, election, offer, acceptance, or other communication shall be deemed to be received: *(A)* if by personal delivery, on the date delivered with written acknowledgment by the recipient of such delivery; *(B)* if by facsimile/telecopy, on the date confirmed by receipt / statement of the transmitting machine; *(C)* if by overnight delivery service, on the date delivered; and *(D)* if by United States Mail, on the date delivered with written acknowledgment on the return receipt.

**9.**    **Entire Agreement; Amendment; Severability; Headings; Gender References.** This Agreement, constitutes the entire understanding of the Parties hereto, explicitly superseding the confirmatory letter previously signed by the Parties and referenced in the Recitals above. No modifications, amendments, or other statements to this Agreement shall be binding on the Parties unless executed in writing and signed by the Party to be bound by such instrument.

If any provision of this Agreement is held invalid or unenforceable, such invalidity or unenforceability shall not affect the other provisions of this Agreement and, to that extent, the provisions of this Agreement are intended to be and shall be deemed to be severable.

Headings in this contract are for convenience and reference only and shall not be used to interpret or construe provisions hereunder. All references in this Agreement shall be gender neutral, such that the masculine shall include the feminine and *vice versa*, and neutral references shall encompass both. Where applicable, the singular shall include the plural and *vice versa.*

**10.**    **Non-Waiver.** No delay or failure by either Party to exercise any right hereunder, and no partial or single exercise of such right, shall constitute a waiver of that or any other right, unless otherwise expressly provided herein.

**11.     Binding Agreement.** This Agreement shall bind the executors, administrators, representatives, estates, heirs, beneficiaries, and other successors of the Parties.

**12.     Governing Law; Legal Fees.** California law shall govern this Agreement and all questions arising hereunder. Each Party hereto expressly and irrevocably waives trial by jury in any suit, action, or proceeding in relation to this Agreement.     In any suit, action, or proceeding to enforce, interpret, or challenge the enforceability of this Agreement, the prevailing Party in such suit, action, or proceeding shall be entitled to its reasonable attorneys' fees and all other costs of arbitration or other action, through all authorized appeals.

**13.     Execution.** This Agreement may be executed in counterparts, and faxed signatures of this Agreement shall constitute an original instrument qualified for admission into evidence in any court or administrative proceeding, through all authorized appeals.

**14.     Indemnification.** Providing the Consultant was not negligent in the performance of Consultant's duties provided for herein, if the Consultant is made a party, or is threatened to be made a party, to any suit or proceeding, whether civil, criminal, administrative, investigative, appellate or other by reason of the fact that he is or was a director, officer, Consultant, agent, manager, consultant or representative of the Company or any of its subsidiaries or is or was serving at the request of the Company or any of its subsidiaries, or in connection with her service hereunder, as a director, officer, member, Consultant, agent, manager, consultant or representative of any other entity, or if any claim is made, or is threatened to be made, that arises out of or relates to the Consultant's service in any of the foregoing capacities, then the Consultant shall promptly be indemnified and held harmless, and shall be entitled to prompt advancement of expenses, including without limitation attorneys' fees and other charges of counsel, in each case, to the fullest extent provided under applicable law, the Company's Operating Agreement, and the Company's officers' and directors' liability insurance policies.

**15.     Termination.**

        (a)     Events of Termination.  This Agreement and Consultant's consulting employment hereunder shall terminate upon the occurrence of any one or more of the following events and payment for services rendered up to the date of termination shall be paid according to Company's standard payment practices:

                i.   Termination By the Company.  The Company may, at its option and with written approval by the Management Committee, at any time terminate Consultant's consulting employment for no reason or for any reason whatsoever by providing 5 days written notice of intent to terminate.

                ii.  Termination By Consultant.  Consultant may terminate this Agreement and Consultant's consulting employment for no reason or for any reason whatsoever by providing 5 days written notice of intent to terminate.  Upon receiving said notice, Company may elect to forego notice and terminate Consultants contract immediately.

*[Signature Page to Follow]*

IN WITNESS WHEREOF, the Parties acknowledge and agree to the terms of this Consulting Employment Agreement and have hereunto set their hands and seals as of the date first written above.

**COMPANY:**
Red Dice Holdings, LLC

By: _____
         Print: _____

As Its: _____

)
)
)
)

ATTEST:

Print: _Michelle Sides_


**CONSULTANT:** _____

Charles K. Smith

)
)
)

ATTEST:

Print: _Vincent M. Kehoe_

**EXHIBIT G**

**FUNDING AGREEMENT BETWEEN RED DICE HOLDING LLC AND
EQUITYTREND LLC/JT TRADING**



## ESCROW AGREEMENT

**THIS ESCROW AGREEMENT,** (the "Agreement") made this day of April ___, 2012 , by and among, **Red Dice Holdings, LLC,** 2665 Ariane Drive, Suite 207, San Diego, CA 92117 ("RDH") and **Equity Trend Advisors LLC,** in care of **JT Trading** ("ETJT" or "Escrow Agent")) and, with offices at Carmel Valley Center II, 11995 El Camino Real, Suite 301, San Diego, CA 92130

**WHEREAS,** in consideration and incompliance of the Operating Agreement dated the 5th day of April 2012, the parties hereby agree as follows:

**WHEREAS,** Escrow Agent is holding Twenty Four Million One Hundred Sixty-Six Thousand Six Hundred Sixty-Seven (24,166,667) shares of common stock of Medical Marijuana Inc., a Oregon corporation ("MJNA shares") on behalf of RDH, in accordance with the Operating Agreement (the "Operating Agreement") by and between Dixie Holdings, LLC, a Colorado limited liability company and Medical Marijuana, Inc., a Oregon corporation; and

**WHEREAS,** ETJT, acting in its capacity as a registered broker-dealer, shall cause the MJNA shares to be sold at the then current fair market value price, for the benefit of RDH, and to disburse the proceeds form such sale or sales of the MJNA shares ("Funds") in accordance with the terms and conditions of the Operating Agreement (a "Funding Request").

**WHEREAS,** Escrow Agent is agreeable to act as escrow agent without compensation under this Agreement and to disburse the Funds in accordance with the terms and conditions hereinafter set forth.

**NOW, THEREFORE,** in consideration of the mutual covenants and promises set for the below, the parties agree:

1. Establishment of Escrow Account.

    1.1. An escrow account shall be established under this Agreement by with Escrow Agent at who shall hold the MJNA shares, liquidate the MJNA shares and distribute the Funds from time to time as hereinafter set forth (the "Escrow Account"). Escrow Agent shall not commingle the Funds.

    1.2. ETJT acknowledges and agrees that the MJNA shares and Funds in the Escrow Account are to be used exclusively for the purpose of funding operations and development of RDH.

2. Disbursements.

    2.1. The Escrow Agent shall disburse all or a portion of the Funds in accordance with the following:

(a) Upon receipt of a Funding Request by RDH which shall acknowledge that certain milestones have been achieved set forth below, Funds shall be allocated for that particular milestone and shall direct the party to which funding is to be received, attached as **Exhibit A.**

(b) ETJT shall commence liquidation of shares within three (3) business day from receipt of the Funding Request. Funds shall be disbursed to RDH within three (3) business days from date shares are sold.

2.2. Upon the sale of the MJNA shares and the termination or proper disbursement of all the Funds, the Escrow Agreement shall terminate.

### 3. Escrow Agent's Responsibility.

3.1. Upon disbursement of all or any portion of the Funds in accordance with this Agreement, Escrow Agent shall have no further responsibility with respect to the amounts so disbursed. In this regard, it is expressly agreed and understood that in no event shall the aggregate amount of disbursements from the Escrow Account by Escrow Agent exceed the amounts deposited by in the Escrow Account plus accrued interest and increased fair market value of the MJNA shares, as provided herein.

3.2. RDH understands and agrees that the duties of Escrow Agent are purely ministerial in nature and RDH further agrees that Escrow Agent shall not be liable for any action taken or omitted hereunder or under this Agreement except in the case of its bad faith, negligence or willful misconduct.

3.3 Escrow Agent shall furnish to RDH an accounting of the receipts in, and disbursements from, the Escrow Accounts, as requested.

3.4. RDH agrees to indemnify Escrow Agent and its partners, and agents (herein the "Indemnities") against, and to hold them harmless of and from, any and all loss, liability, cost, damage and expense, any and all loss, limitation, reasonable attorneys' fees, except in the case of Escrow Agent's bad faith, negligence, or willful misconduct, which the Indemnities may suffer or incur by reason of any action, claim or proceeding brought by any third party against the Indemnities, arising out of or relating in any way to this Agreement, or the performance of its duties hereunder.

### 4. Miscellaneous.

4.1. This Agreement encompasses the entire Agreement of the parties and shall not be modified except by an instrument in writing signed by the parties.

4.2. This Agreement shall be governed by and construed in accordance with the laws of the State of California and the proper venue and jurisdiction for any action or claim with respect to this Agreement or any document delivered pursuant hereto shall be in the appropriate court in San Diego, CA except as for provided in section 4.3.

4.3. In the event of the receipt of conflicting instructions prior to discharge of the Escrow Agent, Escrow Agent shall commence an arbitration before a single arbitrator acceptable to Escrow Agent under the rules of the American Arbitration Association, whose decision shall be final that shall be located in San Diego, CA. Upon receipt of a final decision from the arbitrator, the Escrow Agent shall comply therewith and upon such compliance shall be discharged from all further liability. The decision of the arbitrator shall be final, and may be reduced to judgment by any party hereto or the Escrow Agent. The arbitration must be resolved within 15 days of a request for arbitration. RDH shall pay their own attorney fees and legal costs. The aforementioned parties shall equally split the Escrow Agent's and arbitrator's reasonable fees and costs.

4.4. All notice required to be given in connection with this Agreement shall be sent via certified mail or overnight express with receipt and addressed as follows:

If to: RDH 2665 Ariane Dr, Suite 207, San Diego, CA 92117 with a copy to Dixie Holdings, LLC: 777 E. Speer Blvd., Denver, Colorado 80203

If to ETJT: 11995 El Camino Real, Suite 301, San Diego, CA 92130

**IN WITNESS WHEREOF,** this Agreement has been executed this day of 5 April 2012.

Red Dice Holdings, LLC

Print Name: _____
Its: _____

Equity Trend Advisors LLC

Print Name: _____
Its: _____

JT Trading

Print Name: _____
Its: _____

{00882888 / 1}

## EXHIBIT A

### REQUEST FOR FUNDING

Equity Trend Advisors LLC, in care of JT Trading of Carmel Valley Center II, 11995 El Camino Real, Suite 301 San Diego, CA 92130(the "ETJT")

### AND

Red Dice Holdings, LLC of 2665 Ariane Drive, Suite 207, San Diego, CA 92117(the "RDH")

**DATE OF REQUEST:** _____

**TRANSACTION DESCRIPTION:**
** Attach a copy of the Agreement to which the disbursement applies.

**AMOUNT OF FUNDS REQUESTED: ($)** _____

**TERMS FOR DISBURSEMENT:**
_____
_____

**FUNDS TO BE DISBURSED TO:**
_____
_____
Attn: _____ Contact No.: (____) _____-_____

**ADDITIONAL DIRECTION:**
_____
_____
_____

**FEES:** Fee Earned by ETJT $_____

**REQUESTED BY:**
**Red Dice Holding**

_____          _____
Michael R. Llamas, Member          Vincent M. Keber III, Managing Member

{00882888 / 1}

## *DISBURSEMENT INSTRUCTIONS*

*Upon written confirmation from RDH of the Closing and each of the relevant milestones being reached and in compliance with the Request for Funding, the disbursement will be as follows:*

(A) **At Closing**, the Company shall sell Two Hundred Fifty Thousand Dollars ($250,000) (exclusive of broker's fees) in MJNA Shares and the Proceeds to the Company shall be tendered for payments as follows:

$50,000 to be released for DIXIE Member employee incentives;

$150,000 for the payment of DIXIE Member investor debts;

$50,000 for the payment of DIXIE Member short term account payables;

(B) **At Milestone 1**, which is contingent on Left Bank, LLC, on behalf of Pharmasphere, sourcing and obtaining required location and lease for the facility, signing a lease agreement for the facility and maintaining the required licensing, the Company shall sell Two Hundred Fifty Thousand Dollars ($250,000) (exclusive of broker's fees) in MJNA Shares and the Proceeds to the Company shall be tendered for payments as follows:

$50,000 to Vincent M. Keber, III

$50,000 to Charles Smith

$150,000 for the payment of DIXIE Member investor debts;(will discuss flow of funds...since debt is held in Tripp's name with Left Bank and then between Tripp personally with investor to satisfy CO law. Will provide proof of payment if needed)

(C) **At Milestone 2**, which is contingent upon the successful integration of a new product offering (such as medicated chewing gum) or any other product currently controlled by MJNA Member, into the operations of the Company including defining the manufacturing, packaging and marketing requirements necessary for product launch, the Company shall sell One Hundred Thousand Dollars ($100,000) in MJNA Shares and the Proceeds to the Company shall be tendered for payments as follows: (i) $100,000 to DIXIE Member for the purpose of repaying debt to affiliated companies.

(D) **Balance**. The balance of Eight Hundred Fifty Thousand ($850,000) in MJNA Shares allocated herein, less all brokerage fees incurred from any liquidation of shares and based upon all contingencies stated in Sections 9.1 (n)(i), (n)(ii) and (n)(iii)of the Operating Agreement being fulfilled, shall be used solely as working capital for operations of the Company including but not limited to operations, licensing, research/development and marketing as approved in writing by the Management Committee in the operations budget.

(E) **Additional Milestones**. Additional milestones may be set by RDH at any time and same shall be provided to Escrow Agent and incorporated herein.

{00882888 / 1}

# EXHIBIT H
## KEBER AND SMITH WARRANTS





## STOCK OPTION WARRANT AGREEMENT

Medical Marijuana, Inc., a Oregon corporation (the *"Company"*), pursuant to the agreement by and between Cannabank, Inc., a Delaware company and Vincent M. Keber III, a individual dated the 5th day of April 2012, (the *"Agreement"*), hereby grants to the individual listed below (the *"Optionee"*), an option to purchase the number of shares of the common stock of the Company (*"Common Stock"*), set forth below (the *"Option"*).

| | |
|---|---|
| **Optionee:** | Vincent M. Keber III, an individual |
| **Grant Date:** | April 5, 2012 |
| **Exercise Price per Share:** | $[.06 ] /Share |
| **Total Exercise Price:** | $ 100,000 |
| **Total Number of Shares Subject to the Option:** | One Million, Six Hundred Sixty-Six Thousand Six Hundred Sixty-Six (1,666,666) shares |
| **Expiration Date:** | April 4, 2014 |

**Type of Option:**  Restricted Shares

**Termination:**  The Option shall terminate on the Expiration Date set forth above or, if earlier, in accordance with the terms of the Stock Option Agreement.

By his or her signature, the Optionee agrees to be bound by the terms and conditions herein. The Optionee fully understands all provisions of this Option Agreement.

**Medical Marijuana, Inc.**

By: _____

Print Name:  Michael R. Llamas

Title:  President

Address:  2665 Ariane Drive, Suite 201, San Diego
CA 92117

**Vincent M. Keber III**

By: _____
Vincent M. Keber III

Address:  1301 Wazee Street 2E
Denver, CO 80204

t



## STOCK OPTION WARRANT AGREEMENT

Medical Marijuana, Inc.., a Oregon corporation (the *"Company"*), pursuant to the agreement by and between Cannabank, Inc., a Delaware company and Charles Smith, a individual dated the 5th day of April 2012, (the *"Agreement"*), hereby grants to the individual listed below (the *"Optionee"*), an option to purchase the number of shares of the common stock of the Company (*"Common Stock"*), set forth below (the *"Option"*).

| | |
|---|---|
| **Optionee:** | Charles Smith, an individual |
| **Grant Date:** | April 5, 2012 |
| **Exercise Price per Share:** | $[.06 ] /Share |
| **Total Exercise Price:** | $ 100,000 |
| **Total Number of Shares Subject to the Option:** | One Million, Six Hundred Sixty-Six Thousand Six Hundred Sixty-Six (1,666,666) shares |
| **Expiration Date:** | April 4, 2014 |

**Type of Option:**    Restricted Shares

**Termination:**    The Option shall terminate on the Expiration Date set forth above or, if earlier, in accordance with the terms of the Stock Option Agreement.

By his or her signature, the Optionee agrees to be bound by the terms and conditions herein. The Optionee fully understands all provisions of this Option Agreement.

| Medical Marijuana, Inc. | | Charles Smith | |
|---|---|---|---|
| By: | | By: | |
| Print Name: | Michael R. Llamas | | Cᴜᴀᴇᴇᴄs K. Sᴍɪᴛʜ |
| Title: | President | | |
| Address: | 2665 Ariane Drive, Suite 201, San Diego CA 92117 | Address: | 108 Augusta Ct. Fairhope, AL 36532 |

1

# EXHIBIT I

## LICENSING AGREEMENT WITH MJNA FOR TERRASPHERE GROW TECHNOLOGY



## EXHIBIT J
## OPERATING BUDGET



1  BENJAMIN B. WAGNER
   United States Attorney
2  RUSSELL L. CARLBERG
   TODD D. LERAS
3  PAUL A. HEMESATH
   Assistant U.S. Attorneys
4  501 I Street, Suite 10-100
   Sacramento, CA  95814
5  Tel: (916) 554-2700
   Fax: (916) 554-2900
6



**FILED**

MAY 30 2013

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
          DEPUTY CLERK

7

8              IN THE UNITED STATES DISTRICT COURT

9           FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11 UNITED STATES OF AMERICA,          )  CASE NO. 2:12 CR 315 JAM
                                      )
12                  Plaintiff,        )  VIOLATIONS:  18 U.S.C. § 1341 -
                                      )  Mail Fraud (18 Counts); 18 U.S.C.
13 v.                                 )  § 1343 - Wire Fraud (32 Counts);
                                      )  18 U.S.C. §§ 981(a)(1)(C),
14 LEE LOOMIS,                        )  981(a)(1)(D), 982(a)(2); 28
      aka Lawrence Leland Loomis,     )  U.S.C. § 2461(c) - Criminal
15 JOHN HAGENER,                      )  Forfeiture
   DARREN FEHST,                      )
16 MICHAEL LLAMAS,                    )
   PETER WOODARD,                     )
17 JOSEPH A. GEKKO, and               )
   DAWN C. POWERS,                    )
18                                    )
                    Defendants.       )
19 _____)

20

21         S U P E R S E D I N G   I N D I C T M E N T

22

23 COUNTS ONE THROUGH TWELVE: [18 U.S.C. § 1341 - Mail Fraud]

24     The Grand Jury charges:

25                    LEE LOOMIS,
                aka Lawrence Leland Loomis, and
26                   JOHN HAGENER,

27 defendants herein, as follows:

28

# I.   INTRODUCTION

At all times relevant to this Superseding Indictment:

1.   Defendant LEE LOOMIS, who was also known as Lawrence Leland Loomis, resided in the State of Illinois before relocating to the State and Eastern District of California in 2007.  Defendant LOOMIS controlled an Illinois limited liability company named Loomis Wealth Solutions, LLC ("LWS") with offices in:  Roseville, California; Pleasanton, California; and elsewhere.  Through LWS, defendant LOOMIS held himself out as a wealth management consultant.

2.   Defendant LEE LOOMIS controlled a Delaware limited liability company named Advantage Financial Group Holdings, LLC ("AFGH").  AFGH was a holding company.  Defendant LEE LOOMIS solicited investors in California and Illinois to make minimum investments of $250,000 in AFGH in order to become "members" of the LLC.  Defendant LOOMIS thereby collected approximately $10 million from approximately 40 investors in AFGH.

3.   Defendant LEE LOOMIS, through AFGH, owned a controlling interest in a California limited liability company called Advantage Financial Partners of California, LLC ("AFP-CA").  AFP-CA had an office in Chico in the State and Eastern District of California.  AFP-CA was a business that acquired residential real estate and re-sold it to individuals whom defendant LOOMIS and others recruited as "nominee" purchasers.  Johnny E. Grivette, Jr. a/k/a/ Jay Grivette, charged elsewhere, was the manager of AFP-CA during 2006 and 2007.

4.   Defendant LEE LOOMIS controlled an Illinois limited liability company called Advantage Plan Plus, LLC ("APP").  In and around 2006, defendant LOOMIS solicited investors in California and Illinois to invest in APP by falsely promising them approximately 12%

1  returns on their investments in a "high yield" liquid "savings

2  account."   Defendant LOOMIS collected over $1.8 million from investors

3  in APP.

4       5.   Defendant JOHN HAGENER resided in the State of Illinois and

5  periodically stayed and did business in the State and Eastern District

6  of California.   Defendant HAGENER was the father-in-law of defendant

7  LOOMIS.

8       6.   Defendants LEE LOOMIS and JOHN HAGENER controlled two

9  Delaware limited liability companies: (1) Naras Secured Fund, LLC

10  ("Naras #1"); and (2) Naras Secured Fund #2, LLC ("Naras #2"),

11  (collectively, "Naras Funds").

12       7.   Defendant JOHN HAGENER controlled a Delaware limited

13  liability company called Lismar Financial Services, LLC ("Lismar").

14  Defendant HAGENER, through Lismar, managed the Naras Funds.   The Naras

15  Funds were purported Regulation D private placement offerings of

16  unregistered securities that defendant LOOMIS offered to members of

17  LWS and others.

18       8.   Defendant JOHN HAGENER was a signatory on the bank accounts

19  of the Naras Funds maintained at Washington Mutual Bank in both

20  Roseville, California and Glendale Heights, Illinois.

21       9.   Equity Trust Company ("Equity Trust") was a third-party

22  entity, located in Elyria, Ohio, through which defendants LEE LOOMIS,

23  JOHN HAGENER, and others arranged for investors to transfer retirement

24  balances to the Naras Funds via a self-directed individual retirement

25  account.

26            II.   **THE SCHEME TO DEFRAUD**

27       10.   Between no later than December 2007 and continuing through

28  at least August 2008, in the State and Eastern District of California,

3

1  and elsewhere, defendants LEE LOOMIS, JOHN HAGENER and others known

2  and unknown to the Grand Jury, did knowingly devise and intend to

3  devise, and participate in a material scheme and artifice to defraud

4  investors and to obtain money from investors by means of materially

5  false and fraudulent pretenses, representations, and promises.  As a

6  result of the fraud, defendants LEE LOOMIS, JOHN HAGENER, and others,

7  obtained money to which they were not entitled.

8  III. <u>WAYS AND MEANS</u>

9      The principal ways and means used to accomplish the scheme to

10  defraud were as follows:

11      11.   Defendant LEE LOOMIS devised, orchestrated, and executed

12  with others, including defendant JOHN HAGENER, a scheme to defraud

13  victims who were induced to invest money in investment funds called

14  the Naras Funds based on false representations that they were was

15  safe, secured, guaranteed, liquid and would pay 12% annual returns.

16      12.   Defendant LEE LOOMIS and others acting at his direction

17  used and caused to be used newspapers and the United States mail to

18  advertise investment seminars held in California, Illinois, and

19  Washington.   In advertisements and literature, defendant LEE LOOMIS

20  held himself out as a successful investment advisor who could build

21  wealth for "middle to upper middle income Americans."   In addition, he

22  marketed a wealth-building "Advantage" financial plan as "simply the

23  best financial plan ever created."

24      13.   Defendant LEE LOOMIS and others held initial two-hour

25  seminars where he provided an overview of his wealth-building program

26  and collected financial information from interested attendees, who

27  were then screened for credit-worthiness and financial resources.

28  Attendees with substantial savings, home equity, retirement accounts,

4

1  and/or high credit scores, were invited to come back to a weekend

2  workshop where defendant LOOMIS and others acting at his direction

3  made various representations and promises to investors to convince

4  them to become members of LWS and to invest in the Naras Funds.

5       14.    Defendant LEE LOOMIS urged investors he recruited into his

6  wealth-building program to "harvest" the equity in their own primary

7  residences by refinancing their homes to obtain cash for investment in

8  the Naras Funds.  He also encouraged members to move their money from

9  their IRAs and 401(k) retirement accounts to self-directed IRAs from

10  which money could then be invested in the Naras Funds.  Defendants

11  LOOMIS and HAGENER often directed investors to wire their home equity

12  and retirement monies to the Naras Funds, at times through a third-

13  party.

14       15.    During the workshops, and in one-on-one meetings with

15  investors, defendant LEE LOOMIS and others falsely represented that

16  monies invested in the NARAS Funds would be invested in second

17  mortgages paying a 14% annual rate of return and would be secured by

18  deeds of trust on real properties.  Defendant LEE LOOMIS and others

19  represented the Naras Funds to be safe, "liquid, high-yield accounts"

20  that would pay investors a 12% annual rate of return, and could be

21  fully redeemed after an investor's request.

22       16.    In truth, defendants LEE LOOMIS and JOHN HAGENER did not

23  invest the Naras Funds in second mortgages, did not obtain secured

24  deeds of trust, and the Naras Funds did not generate the 12% rate of

25  return as promised.  Moreover, the Naras Funds were not liquid or

26  readily redeemable.  Contrary to the representations made by

27  defendants, funds provided by investors were often depleted in order

28  to: (1) fund the operations of other companies affiliated with

5

1  defendant LOOMIS; (2) pay earlier investors in the Naras Funds,
2  earlier investors in APP, and earlier investors in AFGH, with money
3  collected from later investors in the Naras Funds; and (3) pay for
4  other undisclosed expenditures.  For instance, the Naras Funds account
5  statements dated June 30, 2008, reflected that investors had total
6  individual account balances exceeding $10 million in the aggregate.
7  In truth, the Naras Funds bank accounts actually held only
8  approximately $200,000 in the aggregate.

9       17.   Defendant LEE LOOMIS and others falsely represented to
10  investors that the Naras Funds' obligations to pay periodic
11  distributions to investors were secured by "guaranty" agreements made
12  by AFP-CA.   In truth, AFP-CA's guarantee was illusory because, unknown
13  to many investors: (1) LOOMIS controlled AFP-CA; (2) AFP-CA did not
14  have substantial assets to back the "guaranty"; and (3) unknown to
15  most investors, AFP-CA, through its holding company, had actually
16  borrowed approximately $1.9 million from the Naras Funds and not
17  repaid that debt.

18       18.   With defendant LEE LOOMIS's knowledge, defendant JOHN
19  HAGENER and others prepared, caused to be prepared, and caused to be
20  mailed monthly Naras Funds account statements for each investor
21  showing an individualized account number, account balance, and monthly
22  return on the balance consistent with an approximately 12% annualized
23  rate of return.   These Naras Funds account statements were sent via
24  the United States mail from Roseville, California; and Glendale
25  Heights, Illinois, to investors in the Eastern District of California
26  and elsewhere in furtherance of the scheme.   In truth, the NARAS Funds
27  did not maintain individualized accounts for investors; the balances
28  represented on the monthly statements were false; and the purported

1  monthly earnings were false.

2      19.    As a result of various fraudulent acts of the defendants,

3  investors in the Naras Funds lost over $7 million dollars.

4                      IV.    THE MAILINGS

5      20.    On or about the dates set forth below, defendants LEE

6  LOOMIS, JOHN HAGENER, and others known and unknown to the Grand Jury,

7  for the purpose of executing the above-described scheme, did knowingly

8  place, and cause to be placed, in an authorized depository for mail

9  matter, the mail matter described below, to be sent and delivered by

10  the United States Postal Service:

| Ct | Date | Sender | Recipient | Item |
|----|------|--------|-----------|------|
| 1 | 03/28/2008 | JOHN HAGENER, Naras Secured Fund #2, LLC, Roseville, CA | Investor M.N., Orangevale, CA | Washington Mutual Bank cashier's check for $3,000.00, sent via U.S. Mail |
| 2 | 07/01/2008 | JOHN HAGENER, Naras Secured Fund #2, LLC, Roseville, CA | Investors D.R.B. and L.B., San Jose, CA | Naras Secured Fund #2 investment report dated June 1-30, 2008, sent via U.S. Mail |
| 3 | 07/01/2008 | JOHN HAGENER, Naras Secured Fund #2, LLC, Roseville, CA | Investor M.N., Orangevale, CA | Naras Secured Fund #2 investment report dated June 1-30, 2008, sent via U.S. Mail |
| 4 | 07/01/2008 | JOHN HAGENER, Naras Secured Fund, LLC, Roseville, CA | Investors R.P. and G.P, Redding, CA | Naras Secured Fund investment report dated June 1-30, 2008, sent via U.S. Mail |

7

| Ct | Date | Sender | Recipient | Item |
|---|---|---|---|---|
| 5 | 07/30/2008 | JOHN HAGENER, Naras Secured Fund #2, LLC, Roseville, CA | Investors P.T. and K.T., Crystal Lake, IL | Washington Mutual Bank cashier's check for $971.93, sent via U.S. Mail |
| 6 | 08/01/2008 | JOHN HAGENER, Naras Secured Fund #2, LLC, Roseville, CA | Investors M.I. and L.M., Redding, CA | Naras Secured Fund #2 investment report dated July 1-31, 2008, sent via U.S. Mail |
| 7 | 08/01/2008 | JOHN HAGENER, Naras Secured Fund #2, LLC, Roseville, CA | Investor H.L.F., Los Gatos, CA | Naras Secured Fund #2 investment report dated July 1-31, 2008, sent via U.S. Mail |
| 8 | 08/01/2008 | JOHN HAGENER, Naras Secured Fund #2, LLC, Roseville, CA | Investors P.A. and T.A., Roseville, CA | Naras Secured Fund #2 investment report dated July 1-31, 2008, sent via U.S. Mail |
| 9 | 08/01/2008 | JOHN HAGENER, Naras Secured Fund #2, LLC, Roseville, CA | Investors E.A. and N.A., Shingle Springs, CA | Naras Secured Fund #2 investment report dated July 1-31, 2008, sent via U.S. Mail |
| 10 | 08/01/2008 | JOHN HAGENER, Naras Secured Fund #2, LLC, Roseville, CA | Investors M.D. and J.D., Sunnyvale, CA | Naras Secured Fund #2 investment report dated July 1-31, 2008, sent via U.S. Mail |
| 11 | 08/01/2008 | JOHN HAGENER, Naras Secured Fund #2, LLC, Roseville, CA | Investors R.E. and L.E., New Berlin, WI | Naras Secured Fund #2 investment report dated July 1-31, 2008, sent via U.S. Mail |

| Ct | Date | Sender | Recipient | Item |
|----|------|--------|-----------|------|
| 12 | 11/03/2008 | JOHN HAGENER, Naras Secured Fund #2, LLC, Roseville, CA | Investors D.R.B. and L.B., San Jose, CA | Letter from JOHN HAGENER and Naras Secured Fund #2 with investment report dated October 1-31, 2008, sent via U.S. Mail |

All in violation of Title 18, United States Code, Sections 2 and 1341.

COUNTS THIRTEEN THROUGH TWENTY-THREE: [18 U.S.C. § 1343 - Wire Fraud]

The Grand Jury further charges:

LEE LOOMIS,
aka Lawrence Leland Loomis,
JOHN HAGENER,

defendants herein, as follows:

1.   The allegations contained in paragraphs 1-19 of Counts One through Twelve of this Superseding Indictment are re-alleged and incorporated herein as if set forth in full.

2.   On or about the dates set forth below, in the State and Eastern District of California, defendants LEE LOOMIS, JOHN HAGENER, and others known and unknown to the Grand Jury, for the purpose of executing the above-described scheme, did knowingly cause to be transmitted by means of wire communication in interstate commerce, certain writings, signs, signals, pictures, and sounds, as described below:

| CT | DATE OF WIRE | DESCRIPTION OF APPROXIMATE WIRE COMMUNICATION | SENDER | RECIPIENT |
|----|--------------|-----------------------------------------------|--------|-----------|
| 13 | 03/26/2008 | $50,000 interstate wire transfer sent via Fedwire system from investor T.O. | Wells Fargo Bank, San Francisco, CA | Washington Mutual Bank, Roseville, CA |

| CT | DATE OF WIRE | DESCRIPTION OF APPROXIMATE WIRE COMMUNICATION | SENDER | RECIPIENT |
|---|---|---|---|---|
| 14 | 03/27/2008 | $120,000 interstate wire transfer sent via Fedwire system from Equity Trust on behalf of investors P.A. and T.A. | United Western Bank, Denver, CO | Washington Mutual Bank, Roseville, CA |
| 15 | 04/25/2008 | $250,000 interstate wire transfer sent via Fedwire system from investor D.R.B. | Wells Fargo, San Francisco, CA | Washington Mutual Bank, Roseville, CA |
| 16 | 05/01/2008 | $447,633 interstate wire transfer sent via Fedwire system from Equity Trust on behalf of investors R.J. and I.J. | United Western Bank, Denver, CO | Washington Mutual Bank, Roseville, CA |
| 17 | 05/01/2008 | $123,880 interstate wire transfer sent via Fedwire system from Equity Trust on behalf of investor T.O. | United Western Bank, Denver, CO | Washington Mutual Bank, Roseville, CA |
| 18 | 06/03/2008 | $250,000 interstate wire transfer sent via Fedwire system from investors R.E. and L.E. | Wells Fargo Bank, San Francisco, CA | Washington Mutual Bank, Roseville, CA |
| 19 | 06/17/2008 | $396,398 interstate wire transfer sent via Fedwire system from investors M.D. and J.D. | Comerica Bank, Detroit, MI | Washington Mutual Bank, Roseville, CA |
| 20 | 06/30/2008 | $262,926 interstate wire transfer sent via Fedwire system from Lender Services Direct on behalf of investor H.L.F. | South County Bank, Rancho Santa Margarita, CA | Washington Mutual Bank, Roseville, CA |

| CT | DATE OF WIRE | DESCRIPTION OF APPROXIMATE WIRE COMMUNICATION | SENDER | RECIPIENT |
|---|---|---|---|---|
| 21 | 08/04/2008 | $244,925 interstate wire transfer sent via Fedwire system from Equity Trust Co. on behalf of investor G.C. | United Western Bank, Elyria, OH | Washington Mutual Bank, Roseville, CA |
| 22 | 08/14/2008 | $174,400 interstate wire transfer sent via Fedwire system from Equity Trust Co. on behalf of investor H.L.F. | United Western Bank, Elyria, OH | Washington Mutual Bank, Roseville, CA |
| 23 | 08/14/2008 | Letter from LEE LOOMIS, sent via electronic mail | adygdon@ loomiswealth. com | Investors P.T. and K.T., Crystal Lake, IL |

All in violation of Title 18, United States Code, Sections 2 and 1343.

COUNTS TWENTY-FOUR THROUGH TWENTY-SIX:   [18 U.S.C. § 1341 – Mail Fraud]

 The Grand Jury further charges:

LEE LOOMIS,
aka Lawrence Leland Loomis,
and
DARREN FEHST,

defendants herein, as follows:

## I.   INTRODUCTION

 At all times relevant to this Superseding Indictment:

 1.   The allegations contained in paragraphs 1, 2, 3, 6, 7 and 12 of Counts One through Twelve of this Superseding Indictment are re-alleged and incorporated herein as if set forth in full.

 2.   Defendants LEE LOOMIS and JOHN HAGENER controlled a California corporation called Advanced Lending Group, Inc., dba Nationwide Lending Group ("NLG").  NLG was a loan brokerage firm that

1 originated over 100 mortgage loans that were sold on the secondary

2 loan market. Defendant LEE LOOMIS through an entity in which he

3 exercised a controlling interest named Advantage Financial Partners,

4 LLC ("AFP-CA") acquired control of NLG in or around 2006-2007, and

5 placed defendant JOHN HAGENER in the position of President. In early

6 2007, NLG had an office in Temecula, California. From approximately

7 September 2007 through April 2008, Christopher Jared Warren, charged

8 elsewhere, managed the day-to-day loan origination business of NLG

9 from an office in Roseville, California.

10     3.    Defendant DARREN FEHST was an appraiser licensed in the

11 State of California. Defendant FEHST controlled an entity named

12 Appraiser Networking Solutions, LLC ("ANS") a California limited

13 liability company.

14     4.    Flagstar Bank was a bank the accounts of which were then

15 insured by the Federal Deposit Insurance Corporation.

16                    **II.  THE SCHEME TO DEFRAUD**

17     5.    Beginning no later than in August 2007 and continuing

18 through at least December 2007, in the State and Eastern District of

19 California, and elsewhere, defendants LEE LOOMIS, DARREN FEHST, and

20 others known and unknown to the Grand Jury, did knowingly devise and

21 intend to devise, and participate in a material scheme and artifice to

22 defraud residential real property lenders and participants in the

23 secondary loan market and to obtain property by means of materially

24 false and fraudulent pretenses, representations, and promises from

25 such lenders and participants. As a result of the fraud, defendants

26 LEE LOOMIS, DARREN FEHST, and others, obtained real property and money

27 to which they were not entitled.

28 ///

### III.   WAYS AND MEANS

The principal ways and means used to accomplish the scheme to defraud were as follows:

6.   As part of his wealth-building "Advantage" financial plan, defendant LEE LOOMIS required members who joined Loomis Wealth Solutions ("LWS")   (and who could medically qualify) to purchase whole life insurance indexed to the stock market through a life insurance company known the Grand Jury and identified herein as "Insurance Company A."   Defendant LOOMIS promised members that by doing so, they would earn the upside of the stock market without the risk.   Defendant LOOMIS and others acting at his direction promised that LWS would reimburse members their monthly life insurance payments for one year or until such time that they generated sufficient income through a "nominee" residential real estate purchase program, described below, to pay the life insurance premiums.

7.   Defendant LEE LOOMIS and others acting at his direction also falsely represented and promised that members who agreed to be "nominees" in the purchase of residential real estate investment properties selected by defendant LOOMIS would bear no costs associated with having title to the homes in their names.   Defendant LOOMIS falsely promised to pay all down payments, fees, mortgages, property taxes, and upkeep on the properties.

8.   Defendant LEE LOOMIS falsely represented that the rental income on the homes would cover the life insurance premiums due to Insurance Company A, cover all the expenses of home ownership, and would be sufficient to generate additional profits.   Defendant LOOMIS guaranteed investors that one of his companies – Advantage Financial Group Holdings, LLC ("AFGH") – would make the payments in the event

13

1  rental income was insufficient to make all of these payments.
2  Defendant LOOMIS and others acting at his direction referred to these
3  guarantees as his "assurance" plan.

4  ... 9.    To provide properties that nominees could buy, defendant
5  LOOMIS and others arranged for one of his companies, AFP-CA, to
6  purchase distressed real properties at market value.   Defendant LOOMIS
7  then caused the properties to be "flipped" or quickly resold to
8  members of LWS at artificially inflated prices.   In order to carry out
9  the scheme and obtain financing for nominee buyers, defendant LOOMIS
10 arranged for an appraiser - defendant DARREN FEHST - to provide
11 artificially high appraisals and misled lenders into believing
12 nominees had made down payments and, therefore, had a significant
13 financial stake in the properties.

14     10.    The manager of AFP-CA, Johnny E. Grivette, Jr., a/k/a Jay
15 Grivette, acting with the approval and ratification of defendant LEE
16 LOOMIS, signed a contract with defendant DARREN FEHST, an appraiser,
17 that obligated AFP-CA to make payments to defendant FEHST's company
18 ANS consisting of approximately 5% of the "potential profit" on
19 properties appraised by defendant FEHST.   During 2007, AFP-CA's
20 arrangement with defendant FEHST changed to a payment of $5,000 per
21 home and a monthly payment of $30,000.   Defendant FEHST appraised many
22 of the properties AFP-CA sold to nominees at an artificially high
23 price and falsely certified on the appraisals that he had no financial
24 interest or stake in the transaction.   Defendant FEHST thereby
25 concealed his financial interest in the transactions from lenders and
26 participants in the secondary loan market.

27     11.    Between no later than May 2007 through at least December
28 2007, in furtherance of the scheme, the following residential real

properties were purchased by AFP-CA and then flipped to the nominee buyers listed below, in the State and Eastern District of California, and elsewhere:

| Property Description | Nominee Buyer(s) |
|---|---|
| 2820 Sweeney Road, Antioch, CA | D.D. and S.D. |
| 5918 Pebble Creek, Rocklin, CA | V.K. and P.K. |
| 387 Angelus St., Turlock, CA | K.H. and M.H. |
| 5077 Mesa Ridge Dr., Antioch, CA | L.H. and D.H. |
| 1126 W. Downs St., Stockton, CA | K.K. |
| 1917 Kern Mtn. Way, Antioch, CA | J.F. |
| 6882 Annapolis Quay, Stockton, CA | D.N. and T.N. |
| 11508 Pyrites Way, Gold River, CA | R.G. and J.G. |
| 730 Ashlynn Way, Stockton, CA | Y.T.W. and W.C. |
| 3830 Zaira Court, Stockton, CA | S.C. and P.B. |

12.    Defendant LEE LOOMIS and others caused nominee buyers to obtain 80% financing on the inflated purchase price of the investment homes identified above through third-party mortgage lenders, often using the LOOMIS-controlled entity NLG to create the loan applications and sell the loans.  The proceeds of the sales went to AFP-CA, which defendant LEE LOOMIS and others controlled.

13.    As for the down payments to purchase the properties, defendant LOOMIS and others acting at his direction, including Jay Grivette, intentionally concealed from lenders, and participants in the secondary loan market that the nominee buyers were not making actual down payments for the properties purchased.  At times, AFP-CA, the Naras Funds, and other entities controlled by defendant LOOMIS, reimbursed down payments back to nominee buyers outside of escrow.  At other times, defendant LEE LOOMIS and others induced the escrow

15

1   officer handling loan closings to apply monies and credits from one
2   escrow to another in order to conceal the fact that nominees were not
3   making down payments with their own funds.

4       14.   Defendants LEE LOOMIS, DARREN FEHST, and others concealed
5   from lenders and participants on the secondary loan market the true
6   nature of the property flip transactions.   That is, defendants
7   concealed that LOOMIS, acting through various entities, was
8   orchestrating non-arm's length sales, was using nominee purchasers
9   that he controlled to buy his own properties, that the price of the
10  properties was artificially inflated, and that defendant LOOMIS was
11  making substantial payments to corruptly influence the appraiser,
12  defendant FEHST.

13      15.   As a result of the fraudulent acts of the defendants,
14  lenders were induced to issue loans to the nominee buyers.   In
15  addition, as a result of the fraudulent acts of the defendants,
16  lenders and participants on the secondary loan market suffered losses
17  of over $2,500,000.

18                  **IV.   THE MAILINGS**

19      16.   On or about the dates set forth below, defendants LEE
20  LOOMIS, DARREN FEHST, and others known and unknown to the Grand Jury,
21  for the purpose of executing the above-described scheme, did knowingly
22  place, and cause to be placed, in an authorized depository for mail
23  matter, the mail matter described below, to be sent and delivered by
24  the United States Postal Service, or knowingly caused the mail matter
25  described below to be delivered by private and commercial interstate
26  carrier:

27
28

| Ct | Date | Sender | Recipient | Item |
|----|------|--------|-----------|------|
| 24 | 06/20/2007 | Placer County Recorder's Office, Auburn, CA | Flagstar Bank, Troy, MI | Deed of Trust re: 5918 Pebble Creek Dr., Rocklin, CA, sent via U.S. Mail |
| 25 | 10/05/2007 | AFP-CA Chico, CA | Darren Fehst, ANS, Brentwood, CA | Check for $5,000 for 3830 Zaira Court, Stockton, CA, sent via FedEx |
| 26 | 10/08/2007 | San Joaquin County Recorder's Office, Stockton, CA | Lender Services Direct, Mission Viejo, CA | Deed of Trust for 730 Ashlynn Way, Stockton, CA, sent via U.S mail |

All in violation of Title 18, United States Code, Sections 2 and 1341.

<u>COUNTS TWENTY-SEVEN THROUGH TWENTY-NINE</u>: [18 U.S.C. § 1341 – Mail Fraud]

The Grand Jury further charges:

LEE LOOMIS,
aka Lawrence Leland Loomis,
MICHAEL LLAMAS,
PETER WOODARD, and
JOSEPH A. GEKKO, and
DAWN C. POWERS,

defendants herein, as follows:

I.   <u>INTRODUCTION</u>

At all times relevant to this Superseding Indictment:

1.    The allegations contained in paragraphs 1, 2, and 4 of Counts Twenty-Four through Twenty-Six of this Superseding Indictment are re-alleged and incorporated herein as if set forth in full.

2.    Defendants MICHAEL LLAMAS and PETER WOODARD resided in San Joaquin County, in the State and Eastern District of California.

3.    Defendants MICHAEL LLAMAS and PETER WOODARD were managing members of LW Premier Holdings, LLC ("LWPH") and the later formed Cobalt One, LLC ("Cobalt One"), both California limited liability

1   companies.   LWPH and Cobalt One shared offices in Tracy, in the State

2   and Eastern District of California.

3       4.    Defendants MICHAEL LLAMAS and PETER WOODARD controlled bank

4   accounts associated with LWPH and Cobalt One at Bank of America in

5   Tracy, California.

6       5.    Defendant JOSEPH A. GEKKO resided in Tulsa, Oklahoma, and

7   in Orange County, California.   He controlled an entity called Lender

8   Services Direct ("LSD"), an unlicensed escrow company with offices in

9   Tulsa, Oklahoma, and Mission Viejo, California.

10      6.    Defendant JOSEPH A. GEKKO controlled bank accounts

11  associated with LSD at South County Bank in Rancho Santa Margarita,

12  California, and in Irvine, California.

13      7.    Defendant DAWN POWERS resided in Placer County, in the

14  State and Eastern District of California.   Defendant POWERS was an

15  employee of Loomis Wealth Solutions ("LWS") and worked directly for

16  and reported to defendant LEE LOOMIS.

17      8.    Defendant DAWN POWERS was a signatory on the bank accounts

18  of the Naras Funds maintained at Washington Mutual Bank in both

19  Roseville, California and Glendale Heights, Illinois.

20                    II.   THE SCHEME TO DEFRAUD

21      9.    Beginning no later than in November 2007 and continuing

22  through approximately August 2008, in the State and Eastern District

23  of California, and elsewhere, defendants LEE LOOMIS, MICHAEL LLAMAS,

24  PETER WOODARD, JOSEPH A. GEKKO, DAWN C. POWERS, and others known and

25  unknown to the Grand Jury, did knowingly devise, intend to devise, and

26  participate in a material scheme and artifice to defraud residential

27  real property lenders and participants in the secondary loan market

28  and to obtain property by means of materially false and fraudulent

1  pretenses, representations, and promises from such lenders and

2  participants. As a result of the fraud, defendants LEE LOOMIS,

3  MICHAEL LLAMAS, PETER WOODARD, JOSEPH A. GEKKO, DAWN C. POWERS, and

4  others, obtained real property and money to which they were not

5  entitled.

6                           III.   WAYS AND MEANS

7          The principal ways and means used to accomplish the scheme to

8   defraud were as follows:

9          10.   The allegations contained in paragraphs 6-8 of Counts

10  Twenty-Four through Twenty-Six of this Superseding Indictment are re-

11  alleged and incorporated herein as if set forth in full.

12         11.   To provide properties for the nominees to buy so that they

13  could participate in defendant LEE LOOMIS's "assurance" plan to

14  generate income to pay insurance premiums to Insurance Company A, in

15  late 2007 the defendants began to acquire newly-built homes and

16  converted condominiums from developers at substantial discounts. Such

17  properties were to be sold to nominee investors at full list price.

18  Lenders were deceived into believing that that the nominees had

19  sufficient assets and limited liabilities to buy these properties and

20  were providing money for the down payments. In addition, defendants

21  misled lenders about the actual sales price of the homes.

22         12.   In approximately September 2007, defendant LEE LOOMIS was

23  introduced to defendants MICHAEL LLAMAS and PETER WOODARD. Defendants

24  LLAMAS and WOODARD, through LWPH and Cobalt (collectively,

25  "LWPH/Cobalt"), approached builders of new homes and developers of

26  condominium conversion projects and entered into "option contracts" or

27  "joint venture" agreements that included a price discount of

28  approximately 30% to 50% off the reported sale price of each property

1 to be sold as part of a bulk real estate purchase.  In 2007 and 2008,

2 with the knowledge of defendant LEE LOOMIS, LWPH/Cobalt entered into

3 such agreements with home builders and developers located in

4 Bakersfield, California; Atwater, California; Ft. Myers, Florida; Port

5 St. Lucie, Florida; and other locations.  Under the agreement, it

6 appeared that LWPH/Cobalt would buy the properties in bulk.

7      13.    In reality, LWPH/Cobalt did not intend to purchase the

8 homes and take title to them. Rather, the homes were to be sold to

9 individual nominees recruited by defendant LOOMIS and others as part

10 of defendant LOOMIS's "assurance" payment plan involving payments to

11 Insurance Company A.  More particularly, after acquiring the "option"

12 to purchase the homes at a discounted price, LWPH/Cobalt "assigned"

13 the rights to buy the homes to the nominees at the full reported sale

14 price, not at the discounted price at which they were actually

15 acquired.

16      14.    Between in or about December 2007 through in or about April

17 2008, in furtherance of the scheme, defendants LEE LOOMIS, MICHAEL

18 LLAMAS, PETER WOODARD, and others, caused nominee buyers recruited by

19 defendant LEE LOOMIS to purchase approximately twenty-three

20 residential real properties in Bakersfield, in the State and Eastern

21 District of California, as part of the program, including the

22 following properties:

| Property Description | Nominee Buyer(s) |
| --- | --- |
| 9212 Rhine Valley Dr., Bakersfield, CA | A.M. and S.M. |
| 9020 Sentido Dr., Bakersfield, CA | A.M. and S.M. |
| 9308 Rhine Valley Dr., Bakersfield, CA | E.A. and N.A. |
| 9201 Rhine Valley Dr., Bakersfield, CA | K.M.L. |
| 9313 Sentido Dr., Bakersfield, CA | J.H. and J.H. |

| | |
|---|---|
| 9226 La Sonrisa Way, Bakersfield, CA | G.W. and D.W. |
| 9312 Rosewood Ave., Bakersfield, CA | A.G. and S.G. |
| 9316 Rosewood Ave., Bakersfield, CA | A.G. and S.G. |
| 9305 Sentido Dr., Bakersfield, CA | W.E. and T.E. |
| 9003 Rhine Valley Dr., Bakersfield, CA | C.L. and M.L. |
| 9019 Rhine Valley Dr., Bakersfield, CA | C.L. and M.L. |

15.    Defendant LEE LOOMIS and others typically obtained individual home loans for the nominees through the Loomis-controlled entity NLG to finance the purchases as investment properties at the full sales price paid by the nominee.  Defendant LEE LOOMIS and others did not disclose the existence of the option contract price discount to the lenders nor to the participants in the secondary loan market.

16.    Defendants LEE LOOMIS, MICHAEL LLAMAS, PETER WOODARD, JOSEPH A. GEKKO, DAWN C. POWERS, and others, including Christopher Jared Warren, who ran NLG on a day-to-day basis, variously arranged that purchase contracts, NLG's loan applications, and LSD's Form HUD-1 Settlement Statements for nominees provided to lenders falsely represented that borrowers would be making down payments of approximately 10% to 20% of the reported purchase price of the homes. Through a series of sham financial transactions, defendants deceptively made it appear that the nominee buyers had made a genuine down payment from their own funds when, in fact, the buyers made no genuine down payment.

17.    To make it appear that a nominee buyer was making the down payment, defendants LEE LOOMIS, DAWN POWERS, and others typically caused the Naras Fund to write a check to the GEKKO-controlled escrow company, Lender Services Direct ("LSD"), for the amount of the down

21

1  payment that was supposedly from the nominee buyer.  Because the Naras
2  Fund bank accounts frequently ran short of funds and could not cover
3  the outstanding checks written to LSD, defendant GEKKO directed LSD
4  employees to hold down payment checks until after the loans were
5  funded and lender money was received by LSD.  Then, before the close
6  of escrow and at the direction of defendant GEKKO and employees of
7  LSD, LSD's bank wired an amount of money representing the savings from
8  the option agreement discount to the bank accounts of LWPH/Cobalt.
9  LWPH/Cobalt, in turn, subtracted the down payment amounts from the
10 option savings wires it received.  LWPH/Cobalt then wired the down
11 payment amounts to the Naras Fund bank accounts.

12      18.   After the lenders' funds were credited to the Naras Fund
13 bank account, LSD deposited the purported "down payment" checks from
14 the Naras Fund.  After that, LWPH/Cobalt divided what was left (that
15 is, the difference between the option savings minus the down payment),
16 retained half of that amount, and wired the other half to LWS as its
17 share of the profit split with LWPH/Cobalt.

18      19.   As a result of these machinations, lenders and participants
19 in the secondary loan market were deceived into believing that the
20 nominees had made down payments on the properties and therefore had a
21 substantial financial stake from their own funds in the properties.  In
22 fact, no down payments had been made by the nominees at all.  Any down
23 payment actually came from the lenders.  Defendants LOOMIS, POWERS,
24 LLAMAS, WOODARD, GEKKO and others caused millions of dollars to be
25 transferred via interstate wire in furtherance of this aspect of the
26 scheme.

27      20.   At the direction of defendant JOSEPH A. GEKKO and others,
28 LSD created many of the HUD-1 Settlement Statements used in the

1   closing of the fraudulent home purchases that were provided to lenders
2   and participants in the secondary loan market.  As defendants LEE
3   LOOMIS, MICHAEL LLAMAS, PETER WOODARD, JOSEPH A. GEKKO, DAWN C.
4   POWERS, and others knew, LSD's Estimated HUD-1 Settlement Statements
5   ordinarily concealed the large intended option savings payments to
6   LWPH/Cobalt.  This was done in order to deceive lenders and borrowers
7   during the underwriting and funding process.  After funding, at the
8   direction of defendants GEKKO, LLAMAS, and others, LSD caused Final
9   HUD-1 Settlement Statements to be produced which then included large
10  payments to LWPH/Cobalt as seller's side obligations.  The Final HUD-1
11  Settlement Statement concealed the fact that the disbursements to
12  LWPH/Cobalt were, in fact, an aggregate sum of the illusory down
13  payments and the profit split between LWPH/Cobalt and LWS in
14  connection with the option contract.

15      21.   The payments to Cobalt One on the Final HUD-1 Settlement
16  Statements were sometimes disguised as payments to satisfy mortgage
17  loans or liens on properties supposedly held by Cobalt One.  In truth,
18  Cobalt One did not hold mortgage loans or liens on the properties that
19  were being sold to nominees.  On several occasions, defendants MICHAEL
20  LLAMAS and PETER WOODARD caused builders and developers who had
21  entered into an option contract to record a false Deed of Trust in
22  favor of Cobalt One for a fictitious debt in an amount equal to the
23  price discount on the properties.  Cobalt One did this to deceive
24  lenders and participants in the secondary loan market into believing
25  that the large payment to Cobalt One was in connection with a
26  legitimate lien and to conceal the fact that the builder, in truth,
27  had sold the property for a substantially lower price than the sales
28  price reported to the lenders.

22.   NLG and others falsely represented on the asset portion of buyers' home loan applications that nominee buyers had liquid assets in the Naras Funds, when, in truth, monies in the Naras Funds were not liquid and were regularly used to fund current operating expenses of AFGH, LWS and other entities controlled by defendant LEE LOOMIS.   In some instances, NLG and others falsely represented on the asset portion of home loan applications for nominee buyers that the nominees had liquid assets in the Naras Funds when, in truth, they had made no investment in the Naras Funds at all.

23.   At the direction of defendant LEE LOOMIS, and others, including Christopher Jared Warren of NLG, defendant DAWN C. POWERS and others provided to lenders false verifications of deposit in the Naras Funds on behalf of nominees who were purchasing/financing homes.

24.   Defendants LEE LOOMIS, and others, including Christopher Jared Warren of NLG, caused borrowers' income and assets to be inflated and caused the liabilities of certain borrowers to be concealed on uniform residential loan applications, as necessary, to obtain funding on mortgage loans.

25.   From in or about June 2008 through in or about August 2008, defendants JOSEPH A. GEKKO, LEE LOOMIS, and others, through a series of eight large interstate wire transfers caused over $3,000,000 of lender money in LSD's escrow account to be wired directly from LSD's bank account to the bank accounts of LWS and another entity associated with defendant LOOMIS, North State Property Management, so that defendant LOOMIS could make required payroll payments, pay overdue mortgages, and further the continuation of the scheme.   That resulted in LSD not having sufficient funds in its account to close escrow on many transactions for which it had received lender funds.

26.    As a result of the above-described fraudulent actions of defendants and others, nominees were caused to purchase and finance over 200 properties, causing over $10,000,000 in losses to lenders and participants in the secondary loan market.

## V.   THE MAILINGS

27.    On or about the dates set forth below, in the State and Eastern District of California, defendants LEE LOOMIS, MICHAEL LLAMAS, PETER WOODARD, JOSEPH A. GEKKO, DAWN C. POWERS, and others known and unknown to the Grand Jury, for the purpose of executing the above-described scheme, did knowingly place, and cause to be placed, in an authorized depository for mail matter, the mail matter described below, to be sent and delivered by the United States Postal Service, or knowingly caused the mail matter described below to be delivered by private and commercial interstate carrier:

| Ct | Date | Sender | Recipient | Item |
|----|------|--------|-----------|------|
| 27 | 12/07/2007 | Kern County Recorder's Office, Bakersfield, CA | Lender Services Direct, Mission Viejo, CA | Deed of Trust re: 9020 Sentido Dr., Bakersfield, CA, sent via U.S. Mail |
| 28 | 01/02/2008 | Kern County Recorder's Office, Bakersfield, CA | Lender Services Direct, Mission Viejo, CA | Deed of Trust for $1,260,000.00, sent via U.S. mail |
| 29 | 01/11/2008 | Kern County Recorder's Office, Bakersfield, CA | Lender Services Direct, Mission Viejo, CA | Deed of Trust for $2,097,288.00, sent via U.S. mail |

All in violation of Title 18, United States Code, Sections 2 and 1341.

///

25

1  COUNTS THIRTY THROUGH FIFTY: [18 U.S.C. § 1343 - Wire Fraud]

2      The Grand Jury further charges:

3

4                        LEE LOOMIS,
               aka Lawrence Leland Loomis,
                     MICHAEL LLAMAS,
5                     PETER WOODARD,
                 JOSEPH A. GEKKO, and
6                    DAWN C. POWERS,

7
8  defendants herein, as follows:

9      1.    The allegations contained in paragraphs 1-26 of Counts

10 Twenty-Seven through Twenty-Nine of this Superseding Indictment are

11 re-alleged and incorporated herein as if set forth in full.

12     2.    On or about the dates set forth below, in the State and

13 Eastern District of California, defendants LEE LOOMIS, MICHAEL LLAMAS,

14 PETER WOODARD, JOSEPH A. GEKKO, DAWN C. POWERS, and others known and

15 unknown to the grand jury, for the purpose of executing the above-

16 described scheme, did knowingly cause to be transmitted by means of

17 wire communication in interstate commerce, certain writings, signs,

18 signals, pictures and sounds, as described below:

| CT | DATE OF WIRE | DESCRIPTION OF APPROXIMATE WIRE TRANSFER | SENDER | RECIPIENT |
|---|---|---|---|---|
| 30 | 12/10/2007 | $78,757 interstate wire transfer sent via Fedwire system by LSD re: 9212 Rhine Valley Dr. | South County Bank, Rancho Santa Margarita, CA | Bank of America, Tracy, CA |
| 31 | 12/10/2007 | $78,757 interstate wire transfer sent via Fedwire system by LSD re: 9020 Sentido Dr. | South County Bank, Rancho Santa Margarita, CA | Bank of America, Tracy, CA |

| CT | DATE OF WIRE | DESCRIPTION OF APPROXIMATE WIRE TRANSFER | SENDER | RECIPIENT |
|---|---|---|---|---|
| 32 | 12/10/2007 | $109,714 interstate wire transfer sent via Fedwire system by LWPH re: 9020 Sentido Dr. and 9308 Rhine Valley Dr. | Bank of America, Tracy, CA | Washington Mutual Bank, Roseville, CA |
| 33 | 12/10/2007 | $35,310 interstate wire transfer sent via Fedwire system by LWPH re: 9212 Rhine Valley Dr., 9020 Sentido Dr., and 9308 Rhine Valley Dr. | Bank of America, Tracy, CA | Washington Mutual Bank, Roseville, CA |
| 34 | 01/02/2008 | $109,094 interstate wire transfer sent via Fedwire system by LWPH re: 9201 Rhine Valley Dr. and other properties | Bank of America, Tracy, CA | Washington Mutual Bank, Roseville, CA |
| 35 | 01/03/2008 | $12,953 interstate wire transfer sent via Fedwire system by LWPH re: 9313 Sentido Dr. | Bank of America Tracy, CA | Washington Mutual Bank, Roseville, CA |
| 36 | 01/04/2008 | $7,444 interstate wire transfer sent via Fedwire system by LWPH re: 9226 La Sonrisa Way | Bank of America Tracy, CA | Washington Mutual Bank, Roseville, CA |
| 37 | 02/19/2008 | $87,757 interstate wire transfer sent via Fedwire system by LSD re: 9312 Rosewood Ave. | South County Bank, Rancho Santa Margarita, CA | Bank of America, Tracy, CA |
| 38 | 02/19/2008 | $83,557 interstate wire transfer sent via Fedwire system by LSD re: 9316 Rosewood Ave. | South County Bank, Rancho Santa Margarita, CA | Bank of America, Tracy, CA |

| CT | DATE OF WIRE | DESCRIPTION OF APPROXIMATE WIRE TRANSFER | SENDER | RECIPIENT |
|----|----|----|----|----|
| 39 | 02/19/2008 | $160,784 interstate wire transfer sent via Fedwire system by Cobalt One re: 9312 Rosewood Ave., 9316 Rosewood Ave., and 9305 Sentido Dr. | Bank of America, Tracy, CA | Washington Mutual Bank, Roseville, CA |
| 40 | 02/19/2008 | $38,643 interstate wire transfer sent via Fedwire system by Cobalt One re: 9316 Rosewood Ave., 9305 Sentido Dr., and 9312 Rosewood Ave. | Bank of America, Tracy, CA | Washington Mutual Bank, Roseville, CA |
| 41 | 02/22/2008 | $101,981 interstate wire transfer sent via Fedwire system by Cobalt One re: 9003 Rhine Valley Dr. and 9019 Rhine Valley Dr. | Bank of America, Tracy, CA | Washington Mutual Bank, Glendale Heights, IL |
| 42 | 02/22/2008 | $27,766 interstate wire transfer sent via Fedwire system by Cobalt One re: 9003 Rhine Valley Dr., 9019 Rhine Valley Dr., and other properties | Bank of America, Tracy, CA | Washington Mutual Bank, Roseville, CA |
| 43 | 06/02/2008 | $250,000 interstate wire transfer sent via Fedwire system from LSD | South County Bank, Rancho Santa Margarita, CA | Washington Mutual Bank, Roseville, CA |
| 44 | 06/10/2008 | $490,000 interstate wire transfer sent via Fedwire system from LSD | South County Bank, Rancho Santa Margarita, CA | Washington Mutual Bank, Roseville, CA |
| 45 | 06/11/2008 | $550,000 interstate wire transfer sent via Fedwire system from LSD | South County Bank, Rancho Santa Margarita, CA | Washington Mutual Bank, Roseville, CA |

| CT | DATE OF WIRE | DESCRIPTION OF APPROXIMATE WIRE TRANSFER | SENDER | RECIPIENT |
|---|---|---|---|---|
| 46 | 07/02/2008 | $600,000 interstate wire transfer sent via Fedwire system from LSD | South County Bank, Rancho Santa Margarita, CA | Washington Mutual Bank, Roseville, CA |
| 47 | 07/02/2008 | $300,000 interstate wire transfer sent via Fedwire system from LSD | South County Bank, Rancho Santa Margarita, CA | Washington Mutual Bank, Roseville, CA |
| 48 | 07/09/2008 | $350,000 interstate wire transfer sent via Fedwire system from LSD | South County Bank, Rancho Santa Margarita, CA | Washington Mutual Bank, Roseville, CA |
| 49 | 07/11/2008 | $200,000 interstate wire transfer sent via Fedwire system from LSD | South County Bank, Rancho Santa Margarita, CA | Washington Mutual Bank, Roseville, CA |
| 50 | 08/26/2008 | $320,697 interstate wire transfer sent via Fedwire system from LSD re: various files | South County Bank, Rancho Santa Margarita, CA | Washington Mutual Bank, Roseville, CA |

All in violation of Title 18, United States Code, Sections 2 and

1343.

FORFEITURE ALLEGATION:   [18 U.S.C. §§ 981(a)(1)(C), 981(a)(1)(D), 982(a)(2); 28 U.S.C. § 2461(c)]

The Grand Jury further charges:

1.  The allegations contained in the above Superseding

Indictment, including Counts One through Fifty of this Superseding

Indictment, are hereby re-alleged and incorporated for the purpose of

1   alleging forfeiture pursuant to Title 18, United States Code, §§

2   981(a)(1)(C), 981(a)(1)(D), 982(a)(2); and Title 28, United States

3   Code, § 2461.

4        2.   Pursuant to one or more of the following: Title 18, United

5   States Code, §§ 981(a)(1)(C), 981(a)(1)(D), 982(a)(2); and Title 28,

6   United States Code, § 2461, and upon conviction of one or more of the

7   offenses set forth in the above Superseding Indictment, defendants

8   LEE LOOMIS, JOHN HAGENER, DARREN FEHST, MICHAEL LLAMAS, PETER

9   WOODARD, JOSEPH A. GEKKO, and DAWN C. POWERS, shall forfeit to the

10  United States, any and all property, real or personal, which

11  constitutes or is derived from proceeds of the criminal conduct

12  and/or scheme alleged in this Superseding Indictment, or any property

13  traceable to such property, including but not limited to:

14            a.   Approximately $133,803.53 in U.S. Currency seized from

15                 Washington Mutual Bank, N.A., Account # 4420842802,

16                 held in the name of Advantage Financial Group Holdings

17                 Management LLC, and

18            b.   Approximately $328,495.75 in U.S. Currency seized from

19                 Washington Mutual Bank, N.A., Account # 4412174338,

20                 held in the name of Loomis Wealth Solutions LLC.

21       3.   Pursuant to Title 18, United States Code, §§ 981(a)(1)(C),

22  981(a)(1)(D), 982(a)(2); and Title 28, United States Code, § 2461, if

23  any property subject to forfeiture, as a result of any act or

24  omission of defendants or agents of defendants or upon direction by

25  the defendants:

26            a.   cannot be located upon the exercise of due diligence;

27            b.   has been transferred or sold to, or deposited with, a

28                 third party;

1          c. has been placed beyond the jurisdiction of the court;

2          d. has been substantially diminished in value; or

3          e. has been commingled with other property which cannot

4          be divided without difficulty,

5   the United States of America shall be entitled to forfeiture of any

6   other property of the defendants, up to the value of the property

7   subject to forfeiture, including but not limited to a personal

8   forfeiture money judgment, pursuant to Title 21, United States Code,

9   Section 853(p), as incorporated by Title 18, United States Code,

10  Section 982(b)(1), and Title 28, United States Code, Section 2461(c).

11

12                                      A TRUE BILL.

13                                      _/S/_____

14                                      FOREPERSON

15  BENJAMIN B. WAGNER
    United States Attorney

16

17

18

19

20

21

22

23

24

25

26

27

28

*No.* _ _ _ _ _ _ _ _ _ _

~~Case 2:12-cr-00315-JAM    Document 103    Filed 05/30/13    Page~~ 32 of 33

# UNITED STATES DISTRICT COURT

*Eastern District of California*

*Criminal Division*

## THE UNITED STATES OF AMERICA

*vs.*

LEE LOOMIS, aka Lawrence Leland Loomis, JOHN HAGENER,
DARREN FEHST, MICHAEL LLAMAS, PETER WOODARD,
JOSEPH A. GEKKO and DAWN C. POWERS

## I N D I C T M E N T

**VIOLATION(S):** 18 U.S.C. § 1341 - Mail Fraud (18 counts);
18 U.S.C. § 1343 - Wire Fraud (32 counts); and
18 U.S.C. §§ 981(a)(1)(C), 981(a)(1)(D), 982(a)(2);
28 U.S.C. § 2461(c) - Criminal Forfeiture

*A true bill,*

*/S/*

_____
*Foreman.*

*Filed in open court this* _____ 30 _____ *day*

*of* _____ MAY _____ *, A.D. 20* 13

_____
*Clerk.*

*Bail, $* _ _ _ _ **NO PROCESS NECESSARY** *as to Loomis, Hagner, Llamas, woodard, Gekko and Powrs*

**NO BAIL WARRANT** *as to Fehst*

GPO 863 525

2:12-CR-315 KJM

<u>PENALTY SLIP</u>
<u>SUPERSEDING INDICTMENT</u>

<u>DEFENDANTS:</u>        LEE LOOMIS, aka Lawrence Leland Loomis
                        JOHN HAGENER, DARREN FEHST, MICHAEL LLAMAS,
                        PETER WOODARD, and JOSEPH A. GEKKO,
                        and DAWN C. POWERS

<u>COUNTS 1-12, 24-26 and 27-29:</u>

VIOLATION:              18 U.S.C. § 1341 - Mail Fraud

PENALTY:                Not more than 20 years imprisonment,
                        $250,000 fine, or both
                        Up to 3 years supervised release.

                        For Count 24, which affected a financial
                        institution, Not more than 30 years,
                        $250,000 fine, not more than 5 years
                        supervised release

<u>DEFENDANTS:</u>        LEE LOOMIS, aka Lawrence Leland Loomis
                        JOHN HAGENER, MICHAEL LLAMAS,
                        PETER WOODARD, JOSEPH A. GEKKO,
                        and DAWN C. POWERS

<u>COUNTS 13-23 and 30-50:</u>

VIOLATION:              18 U.S.C. § 1343 - Wire Fraud

PENALTY:                Not more than 20 years imprisonment,
                        $250,000 fine, or both
                        Up to 3 years supervised release.

VIOLATION:              18 U.S.C. § 981(a)(1)(C), 981(a)(1)(D),
                        982(a)(2) and 28 U.S.C. § 2461(c) - Criminal
                        Forfeiture

PENALTY:                Criminal forfeiture of Money or property is
                        subject to proof in a separate proceeding
                        immediately following conviction at a
                        criminal trial

PENALTY ASSESSMENT: $100 assessment for each count

F I L E D
Clerk of the Superior Court

JUL 1 8 2013

BY FAX

FILED
CIVIL BUSINESS OFFICE 4
CENTRAL DIVISION

2013 JUL 18 AM 9: 09

SAN DIEGO COUNTY, CA

JUL 18 2013 PM 4:15

1 | MESSNER REEVES, LLP
2 | Robert B. Hinckley, Jr. (CA State Bar No. 290786)
  | 1430 Wynkoop Street, Suite 300
3 | Denver, Colorado 80202
  | Telephone: (303) 623-1800
4 | Facsimile: (303) 623-0552
  | E-mail: rhinckley@messner.com

5 | Attorneys for Plaintiff
6 | Dixie Holdings, LLC derivatively on behalf of Red Dice Holdings, LLC

7

8 |        SUPERIOR COURT FOR THE STATE OF CALIFORNIA

9 |         FOR THE COUNTY OF SAN DIEGO, CENTRAL DISTRICT

10

11 | **DIXIE HOLDINGS, LLC, a** Colorado ) Case No. **37-2013-00058302-CU-BC-CTL**
   | limited liability company, derivatively )
12 | on behalf of **RED DICE HOLDINGS,** ) **AFFIDAVIT OF CHARLES K. SMITH**
   | **LLC, a** California limited liability ) **IN SUPPORT OF PLAINTIFF'S**
13 | company, ) **VERIFIED COMPLAINT**
   |                                         )
14 |                                         )
   |          Plaintiff,                     )
15 |                                         )
   | v.                                      )
16 |                                         )
   | **MEDICAL MARIJUANA, INC., a** )
17 | California corporation, )
   |                                         )
18 |          Defendant. )
   |                                         )
19 |                                         )
20 |                                         )

21

22 |        1.      My name is Charles K. Smith.  The facts stated herein are based upon my
23 | personal knowledge.

24 |        2.      I am a Manager of Dixie Holdings, LLC. I am also the Chief Operating
   | Officer of Red Dice Holdings, LLC.
25
   |        3.      I have reviewed this Verified Complaint with my counsel and have authorized
26 | its filing.

27 |        4.      The allegations in this Verified Complaint, other than those based on
28 | information and belief, are true and accurate to the best of my knowledge.

{01077195 / 1}
AFFIDAVIT IN SUPPORT OF PLAINTIFFS' VERIFIED COMPLAINT

5.    I assert my belief in the truth of these matters under penalty of perjury.

FURTHER AFFIANT SAYETH NAUGHT.

Charles K. Smith

Subscribed and sworn to before me this 18th day of July, 2013 by Charles K. Smith.

Witness my hand and official seal.

Notary Public  *Marielle Gagne*

My commission expires: 9/14/2017

MARIELLE GAGNE
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20054035957
MY COMMISSION EXPIRES SEPTEMBER 14, 2017

{01077195 / 1}

AFFIDAVIT IN SUPPORT OF PLAINTIFFS' VERIFIED COMPLAINT