```
MESSNER REEVES LLP
Robert B. Hinckley, Jr. (CA State Bar No. 290786)
1430 Wynkoop Street, Suite 300
Denver, Colorado 80202
Telephone: (303) 623-1800
Facsimile: (303) 623-0552
E-mail: rhinckley@messner.com
```

**F I L E D**
Clerk of the Superior Court

JUL 1 8 2013

Attorneys for Plaintiff
Dixie Holdings, LLC derivatively on behalf of Red Dice Holdings, LLC

SUPERIOR COURT FOR THE STATE OF CALIFORNIA

FOR THE COUNTY OF SAN DIEGO, CENTRAL DISTRICT

| | |
|---|---|
| **DIXIE HOLDINGS, LLC**, a Colorado limited liability company, derivatively on behalf of **RED DICE HOLDINGS, LLC**, a California limited liability company,<br><br>Plaintiff,<br><br>v.<br><br>**MEDICAL MARIJUANA, INC.**, a California corporation,<br><br>Defendant. | Case No. 37-2013-00058302-CU-BC-CTL<br><br>**PLAINTIFFS' VERIFIED DERIVATIVE COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF:**<br><br>1) BREACH OF CONTRACT<br><br>2) DECLARATORY JUDGMENT<br><br>**DEMAND FOR JURY TRIAL** |

BY FAX

COMES NOW, Dixie Holdings, LLC ("Dixie"), derivatively on behalf of Red Dice Holdings, LLC ("Red Dice"), by and through its attorneys, Messner Reeves, LLP, and submits its Verified Complaint for Damages and Declaratory Relief against Medical Marijuana, Inc. ("MJNA"), and states as follows:

**PARTIES**

1. Red Dice is a California limited liability company with its business address of record located at 2665 Ariane Dr., Suite 207, San Diego, California 92117. Red Dice is a two-member limited liability company. Red Dice is in the business of licensing, marketing and managing the "Dixie 'Elixirs'" brand and products, as well as developing and distributing certain legal hemp and cannabis based products.

JUL 18 2013 PM 4:16

{01075124 / 2}
PLAINTIFFS' VERIFIED COMPLAINT

2.  Dixie is a Colorado limited liability company with its principal place of business located at 1610 Wynkoop St., Suite #400, Denver, CO 80202. Dixie is a member of Red Dice with a forty percent (40%) ownership interest.

3.  MJNA is an Oregon corporation with its principal place of business located at 2665 Ariane Dr., Suite 207, San Diego, California 92117. MJNA is the other member of Red Dice with a sixty percent (60%) ownership interest.

## JURISDICTION AND VENUE

4.  Jurisdiction over all causes of action is proper in the San Diego County Superior Court pursuant to California Constitution, Article VI, Section 10.

5.  Jurisdiction over all defendants is proper in the San Diego County Superior Court because all defendants are doing business in the state of California.

6.  Venue in San Diego County is property pursuant to Cal. Code Civ. Proc. § 395.5 because the underlying contract in dispute was entered into in San Diego County and Red Dice and MJNA's principal places of business are located in San Diego County.

## GENERAL BACKGROUND

7.  Red Dice is a California limited liability company formed on or about April 5, 2012 by Dixie and MJNA for the purpose of licensing, marketing and managing the "Dixie 'Elixirs'" brand and products, as well as developing and distributing certain legal hemp and cannabis based products. A copy of the Operating Agreement is attached hereto as **Exhibit 1**.

8.  Red Dice has only two members, with the following ownership interests: MJNA sixty percent (60%) and Dixie forty percent (40%). *See* Exhibit B to Operating Agreement attached hereto as **Exhibit 1**.

9.  Vincent M. Keber, III and Charles Smith are the principal owners of Dixie.

10.  Upon information and belief, MJNA, as a corporation, has a multitude of shareholders; the largest of which is a Delaware corporation known as Hemp Deposit and Distribution Corporation, Inc. ("HDDC").

11.  Upon information and belief, HDDC is primarily owned and controlled by Michael Llamas or through his representative Michelle Side, current COO of MJNA. Michael Llamas previously served as the President, CEO, and Chairman of the board for MJNA until approximately September 2012.

12.  Pursuant to the Operating Agreement, § 1.1, Vincent Keber, III serves as the initial Manager of Red Dice, with powers limited by those expressly reserved for the Management Committee. *See* **Exhibit 1**.

13. Pursuant to the Operating Agreement, § 9.4, Dixie and MJNA, as the sole members of Red Dice, were each authorized to appoint a single representative to the Red Dice Management Committee. Vincent Keber, III and Michael Mona, formerly of MJNA and current President of CannaVest Corp., were the initial representatives of the Management Committee. *See* **Exhibit 1**.

14. Vincent Keber, III continues to serve on Red Dice's Management Committee.

15. Michael Mona was removed from his position on the Management Committee in November 2012 when he assumed his position as President of CannaVest Corp. It is unclear at this time who the MJNA designated Management Committee representative is, as no formal appointment has been made to replace Michael Mona.

16. The Management Committee is reserved certain authority over management of Red Dice. The Operating Agreement, § 9.5 specifically reserves the following relevant authority:

"General Powers of the Management Committee. Except for those actions expressly reserved for the Manager and Members (individually or as a group) as provided in this Agreement, no act shall be taken, sum expended, decision made, obligation incurred or power exercised by or on behalf of the Company with respect to any of the following without the written approval of the Management Committee and as per approved budget(s):

...

b. incur or amend any indebtedness on behalf of the Company;
c. entry into, termination or amendment of any material contract, or any material election of rights or remedies or any other material decision or determination, or the granting of any material waivers or consents, under any material contract; for purposes of this Section 9.3(c) a material contract includes any contract which is reasonably expected to provide for the making of payments by the Company in any calendar year of greater than $50,000 (unless the payment for a particular contract in excess of such $50,000 threshold is expressly provided for in the Company's budget);

...

e. institution, compromise or settlement of any material litigation or arbitration proceeding, or settlement of any insurance claim for an amount in excess of fifty thousand dollars ($50,000);
f. creation or incurrence of any lien or encumbrance on any asset of the Company;

...

n. the purchase or acquisition, directly or indirectly, of any assets in a transaction or series of related transactions for consideration (including assumed liabilities and indebtedness) in excess of one hundred thousand dollars ($100,000); or
o. entry into any contract or agreement to take any of the foregoing actions."

17. The Operating Agreement, § 9.3 provides that upon "Stale Mate" of the Management Committee as to issues arising from the reserved powers described in paragraph

16 above, the Members shall retain a neutral third-party to resolve those decisions the Members cannot unanimously agreed upon.

18. The Operating Agreement was drafted by MJNA and its attorneys and/or representatives.

19. In good faith reliance on MJNA's representations that it would perform its obligations under the terms and conditions of the Operating Agreement, Red Dice has assumed liabilities in excess of one-million dollars ($1,000,000.00) during its operation.

## MANDATORY INITIAL CONTRIBUTIONS TO THE RED DICE COMPANY

20. The Red Dice Members: Dixie and MJNA are contractually required to perform specific obligations as conditions of execution of the Operating Agreement. The relevant conditions follow.

21. Pursuant to the Operating Agreement, § 9.1, Vincent Keber, III and Charles Smith were required to, and in fact did, enter into employment and consulting agreements, as well as Non-Disclosures, "NonCompete" and Confidentiality agreements with Red Dice. *See* **Exhibits C and F** to Operating Agreement attached hereto as **Exhibit 1**.

22. Pursuant to the Operating Agreement, § 9.1, Dixie was required to, and did in fact, transfer its entire inventory and intellectual property to Red Dice. *See* **Exhibits D** to Operating Agreement attached hereto as **Exhibit 1**.

23. Pursuant to the Operating Agreement, § 9.1(k), MJNA was required to transfer 24,166,667 unrestricted common stock shares of MJNA, valued at a price per share of $0.06 (the "Shares"), into escrow for use by Red Dice within fifteen (15) days of executing the Operating Agreement as funding for operation of Red Dice and as consideration to Dixie. *See* **Exhibit G** to Operating Agreement attached hereto as **Exhibit 1**.

24. The Operating Agreement required all of the Shares to be transferred by MJNA into the escrow account for the benefit of Red Dice within fifteen (15) days. The Operating Agreement, § 9.1(k)(1) details when and under what conditions the Shares would then be sold and the proceeds distributed and/or used by Red Dice:

   a. Upon closing of the deal, Red Dice was authorized to sell $250,000.00 worth of the Shares. Red Dice was then required to use the $250,000.00 to pay Dixie's principals ($50,000.00) and for repayment of Dixie's investor debts ($150,000.00) and outstanding short-term liabilities ($50,000.00).

   b. Upon completion "Milestone 1," Red Dice was authorized to sell $250,000.00 worth of the Shares. Red Dice was then required to use the $250,000.00 to pay Dixie's principals ($100,000.00) and for repayment of Dixie Member investor debts ($150,000.00). "Milestone 1" required Left Bank, LLC, an entity controlled by Vincent Keber, III, on behalf of Pharmasphere, to source a

facility, sign a lease and maintain the required licensing necessary for operation of Red Dice. "Milestone 1" was completed.

c. Upon completion of "Milestone 2," Red Dice was authorized to sell $100,000.00 worth of Shares. Red Dice was then required to use the $100,000.00 to pay Dixie's debts to affiliated companies. "Milestone 2" required successful integration of a new product or an existing product controlled by MJNA into the Red Dice operations, to include manufacturing, packaging and marketing necessary for product launch. "Milestone 2" was completed.

d. After closing and completion of Milestones 1 and 2, Red Dice was authorized to sell the remaining Shares and use the proceeds as working capital for the operation of Red Dice's business ventures.

25. In accordance with § 9.1(k) of the Operating Agreement, the requirements outlined for completion of Milestones 1 and 2 were substantially satisfied.

26. Despite satisfaction of subparts a-c above, MJNA did not transfer the Shares into the escrow account as detailed in **Exhibit G** and § 9.1(k) of the Operating Agreement within fifteen (15) days of execution. To date, MJNA has not transferred any shares to Red Dice.

27. In accordance with the terms and conditions of the Operating Agreement, Dixie did perform all of its obligations under said agreement, including transfer of its inventory and intellectual property, as well as signing the required employment, Non-disclosure, "Noncompete" and Confidentiality agreements.

## THE MICHAEL LLAMAS TRANSACTION

28. After fifteen (15) days had elapsed following execution of the Operating Agreement, Dixie requested that MJNA transfer the Shares into the escrow account to no avail. MJNA has failed to transfer the required Shares up to the date of filing of this Complaint.

29. Over the next several months, Dixie, individually and on behalf of Red Dice, repeatedly requested that MJNA perform its obligations under the Operating Agreement and transfer the Shares. During this period, Dixie was forced to fund the operation of Red Dice entirely through its own assets and in contradiction to the purpose of entering the Operating Agreement with MJNA. A copy of correspondence sent to MJNA regarding its obligations under the Operating Agreement is attached hereto as **Exhibit 2**.

30. In September of 2012, MJNA's CEO, President and Chairman of its board of directors, Michael Llamas, was required to step down from these positions as a result of his federal indictment relating to fraudulent mortgage transactions. A copy of the Llamas' Superseding Indictment is attached hereto as **Exhibit 3**.

31. Upon information and belief, following Michal Llamas stepping down as CEO, President and Chairman of MJNA, he continued to play an active role in the management of MJNA through his intermediary, Michelle Sides, the current COO.

32. In November of 2012, after repeated threats from Dixie to terminate the Red Dice Operating Agreement as a result of MJNA's continuing material breaches, Michael Llamas offered to personally transfer two-hundred thousand dollars ($200,000.00) to Red Dice as a bridge loan until further financing could be secured. This loan was made in order to persuade Dixie to continue operating Red Dice.

33. Later that same month, Michael Llamas also agreed to transfer ten million (10,000,000) unrestricted common stock shares of MJNA held by HDDC into a brokerage account, to have those shares sold, and to transfer the proceeds of those stock sales directly to Dixie or its affiliates and its representatives, Vincent Keber, III and Charles Smith, personally. Michael Llamas made this payment on behalf of Red Dice to Dixie and its affiliates and representatives, Vincent Keber, III and Charles Smith as repayment of obligations Red Dice incurred pursuant to the terms of the Operating Agreement, § 9.1(c).

34. As consideration for the transfer of the ten million (10,000,000) unrestricted common stock shares of MJNA held by HDDC, Red Dice directed the repayment to Michael Llamas personally of the first 3,333,333 shares sold, equaling the amount Red Dice owed on the two-hundred thousand dollar ($200,000.00) bridge loan.

35. Subsequent to this transaction, an additional 4,842,275 shares were sold on behalf of Red Dice to repay pre-existing liabilities owed to Dixie and its affiliates and representatives as contemplated in § 9.1(k) and to fund the ongoing operations of Red Dice.

36. Red Dice is still in possession of 1,824,392 shares of MJNA, which it is unable to sell due to insider trading max sales laws and regulations.

37. While no formal written agreement was executed related to the Michael Llamas bridge loan or the transfer and sale of HDDC's MJNA shares, it was agreed between the parties that Red Dice would transfer shares or the cash equivalent back to HDDC and/or Michael Llamas once MJNA performed its contractual obligation under the Operating Agreement and transferred the Shares to Red Dice.

### THE MANDATORY OFFER TO SELL PROVISION

38. Section 11.2 of the Operating Agreement provides that: "Mandatory Offer to Sell. (a) Purchase Event. For purposes of this Agreement, any one of the following events shall constitute a "Purchase Event":

(i) The insolvency of a Member ...

(ii) The commission of any act by a Member, directly or indirectly including through a third-party, which involves theft, embezzlement, fraud, or other act of moral turpitude or criminal act (exclusive of misdemeanors or infractions), committed against the Company, its clients, employees, shareholders or affiliates, or against any third-party if the Management Committee reasonably believes said acts will damage or adversely affect the Company and its operations."

39. Pursuant to 11.2 of the Operating Agreement

40. At the time the Operating Agreement forming Red Dice was executed and through September of 2012, Michael Llamas served as CEO, President and Chairman of MJNA.

41. In September of 2012, Michael Llamas was indicted on four counts of mail fraud and wire fraud in the U.S. District Court, E.D. California, Case No.: 2:12-cr-00315-JAM. The Superseding Indictment of Michael Llamas is attached hereto as **Exhibit 3**.

42. Following Michael Llamas' September 2012 indictment, Michael Llamas was formally removed as MJNA's CEO, President and Chairman.

43. Upon information and belief, (1) Michael Llamas is still the controlling shareholder of MJNA through his personal corporate entity, HDDC; (2) HDDC, still controls the operations of MJNA through the current COO, Michelle Sides; (3) Michael Llamas still actively acts on behalf of and communicates by and through MJNA's attorneys, Procopio, Cory, Hargreaves and Savitch LLP.

44. Upon information and belief, MJNA, Michelle Sides and/or Michael Llamas personally, and/or through his intermediaries, including Michelle Sides, have (1) actively disregarded MJNA's corporate structure; (2) failed to adhere to corporate formalities required by law such as holding and documenting corporate board of director meetings and votes as so required, which includes MJNA's failure to obtain board of director approval for the sale of its majority owned subsidiary, PhytoSPHERE Systems, LLC's assets to CannaVest Corp.; (3) published false and misleading financial statements to the public; (4) published false and misleading disclosure documents to the public; (5) and engaged in a pattern of behavior intended to mislead and defraud its investors, affiliates, subsidiaries, and business partners, including Red Dice and Dixie.

45. The actions of MJNA, Michelle Sides and/or Michael Llamas, personally and/or through his intermediaries, constitute a violation of § 11.2(a)(ii) of the Operating Agreement because they amount to fraud and/or acts of moral turpitude that have damaged and will continue to damage in the future or adversely affect Red Dice and its operations.

46. MJNA, Michelle Sides and/or Michael Llamas' actions described above constitute a violation of § 11.2(a)(ii) of the Operating Agreement and have therefore triggered § 11.2 of the Operating Agreement's Mandatory Offer to Sell Provision.

# FIRST CLAIM FOR RELIEF
## BREACH OF CONTRACT
### (Against Defendant MJNA —Derivative Claim)

47. Dixie incorporates the foregoing paragraphs 1 through 46 as though expressly set forth herein.

48. Dixie has standing to bring this action on behalf of Red Dice as a current member of the Company owning a forty percent (40%) interest.

49. Red Dice, through its minority shareholder Dixie, has made numerous oral and written demands on its fellow member, MJNA, to provide the Shares pursuant to the terms and conditions of the Operating Agreement. Over thirty days (30) ago, Red Dice, through its minority shareholder Dixie, sent letter correspondence to MJNA demanding it perform its obligations under the Operating Agreement. A copy of correspondence sent to MJNA regarding its obligations under the Operating Agreement is attached hereto as **Exhibit 2**.

50. Pursuant to the Operating Agreement, § 9.5(e), Management Committee approval is required for the institution of any litigation on behalf of Red Dice. The Management Committee is comprised of only two members, a MJNA Member and a Dixie Member. Because unanimous consent is required for Management Committee action, any further demands to the Management Committee are futile as MJNA will not institute legal action against itself to enforce the provisions of the Operating Agreement on behalf of Red Dice. Further complicating this issue is the fact that since Michael Llamas' removal from the Management Committee in September of 2012, MJNA has failed to appoint a replacement representative to the Management Committee. The only current representative appointed to the Management Committee is the Dixie representative, Vincent Keber, III.

51. Based on the futility of further demands as described above and numerous verbal and written requests made to MJNA to perform its obligations under the Operating Agreement, Dixie has satisfied the requirements of Cal. Corp. Code § 5710 and this derivative suit is proper.

52. Dixie and MJNA entered into the Operating Agreement to form Red Dice on or about April 5, 2012. *See* **Exhibit 1**.

53. Pursuant to the terms and conditions of the Operating Agreement, as more fully detailed in paragraphs 7 through 27 above, Dixie substantially performed each of its obligations under the Operating Agreement.

54. All the conditions precedent to MJNA performing its obligations pursuant to the Operating Agreement have been met, including execution of the Operating Agreement, achieving Milestones 1 and 2, and continued operation of Red Dice.

55. MJNA has failed to materially perform its obligations under the terms and conditions of the Operating Agreement. Specifically, MJNA has materially breached the

Operating Agreement by failing to contribute the 24,166,667 shares of its unrestricted common stock to Red Dice.

56. Red Dice has been damaged by MJNA's material breach of the Operating Agreement in that it lacks the Shares or equivalent financial capital to conduct its intended operations in amount to be proven at trial.

57. Dixie, on behalf of Red Dice, seeks all other incidental and/or consequential damages resulting from MJNA's material breach of the Operating Agreement the Court finds just and reasonable under the circumstances.

### SECOND CLAIM FOR RELIEF
### SPECIFIC PERFORMANCE
(Against Defendant MJNA —Derivative Claim)

58. Dixie incorporates the foregoing paragraphs 1 through 57 as though expressly set forth herein.

59. The Operating Agreement entered into by MJNA and Dixie is a specifically enforceable agreement because the terms and conditions of the agreement are sufficiently certain as to fully detail each party's contractual obligations and thus warrant specific performance.

60. The Operating Agreement is a just and reasonable contract and adequate consideration was offered by both parties. The Operating Agreement was also drafted by MJNA and its attorneys and/or representatives.

61. Pursuant to the terms and conditions of the Operating Agreement, as more fully detailed in paragraphs 7 through 27 above, Dixie substantially performed each of its obligations under the Operating Agreement.

62. All the conditions precedent to MJNA performing its obligations pursuant to the Operating Agreement have been met, including execution of the Operating Agreement, achieving Milestones 1 and 2, and continued operation of Red Dice.

63. MJNA has failed to materially perform its obligations under the terms and conditions of the Operating Agreement. Specifically, MJNA has materially breached the Operating Agreement by failing to contribute the 24,166,667 shares of its unrestricted common stock to Red Dice.

64. Red Dice's remedies at law are inadequate because the 24,166,667 shares of its unrestricted common stock are unique property.

65. Dixie, on behalf of Red Dice, seeks a ruling from the Court that MJNA is required to specifically perform its obligations under the Operating Agreement and contribute the 24,166,667 unrestricted common stock shares of MJNA as this is the exact equivalent of its contractual obligation.

66. Pursuant to Cal. Corp. Code § 17201(a)(2), where a member fails to provide property or services as agreed upon, a limited liability company may, at its option, require the member to provide cash equivalent to the fair market value of the property or services.

67. Alternatively, Dixie, on behalf of Red Dice, seeks a ruling from the Court that MJNA is required to contribute the equivalent cash value of the property and/or services it was obligated to contribute to the Company upon execution of the Operating Agreement.

68. Dixie, on behalf of Red Dice, seeks all other incidental and/or consequential damages resulting from MJNA's material breach of the Operating Agreement the Court finds just and reasonable under the circumstances.

### THIRD CLAIM FOR RELIEF
### DECLARATORY JUDGMENT
(Against Defendant MJNA —Derivative Claim)

69. Dixie incorporates the foregoing paragraphs 1 through 68 as though expressly set forth herein.

70. California Civ. Proc. Code § 1060 provides that a Court may determine the legal rights and duties with respect to another under a written contract where an actual controversy relating to the legal rights and duties of the respective parties exists.

71. The Operating Agreement, attached hereto as Exhibit 1, is a valid, enforceable written agreement concerning the rights and duties of Red Dice, Dixie and MJNA.

72. An actual controversy exists as to whether MJNA, through its executives, intermediaries and affiliates, has materially breached § 11.2(a)(ii) of the Operating Agreement through the conduct alleged at paragraphs 38 through 46.

73. Red Dice has a material interest in ensuring that its members are in compliance with the provisions of the Operating Agreement, and particularly, the moral turpitude provision put into said agreement by MJNA.

74. As previously stated above, upon information and belief, the following acts constitute a material breach of § 11.2(a)(ii) of the Operating Agreement:

   a. Michael Llamas was indicted for mortgage fraud;
   b. MJNA, Michelle Sides and/or Michael Llamas personally, and/or through his intermediaries, including Michelle Sides, actively disregarded MJNA's corporate structure;
   c. MJNA, Michelle Sides and/or Michael Llamas personally, and/or through his intermediaries, including Michelle Sides, failed to adhere to corporate formalities required by law such as holding and documenting corporate board of director meetings and votes as so required, which includes MJNA's failure

       to obtain board of director approval for the sale of its majority owned subsidiary, PhytoSPHERE Systems, LLC's assets to CannaVest Corp.;

    d. MJNA, Michelle Sides and/or Michael Llamas personally, and/or through his intermediaries, including Michelle Sides, published false and misleading financial statements to the public;

    e. MJNA, Michelle Sides and/or Michael Llamas personally, and/or through his intermediaries, including Michelle Sides, published false and misleading disclosure documents to the public;

    f. MJNA, Michelle Sides and/or Michael Llamas personally, and/or through his intermediaries, including Michelle Sides, engaged in a pattern of behavior intended to mislead and defraud its investors, affiliates, subsidiaries, and business partners, including Red Dice and Dixie.

75. The "Stale Mate" provision found at § 9.3 of the Operating Agreement states that disputes that cannot be resolved by the Management Committee shall be determined by a neutral third-party. The Court is a neutral third-party capable of resolving this dispute concerning the Parties legal rights and duties.

76. Dixie, on behalf of Red Dice, seeks a declaration from the Court that MJNA has violated § 11.2(a)(ii) of the Operating Agreement, triggering the Mandatory Offer to Sell provision.

77. A judicial declaration pursuant to Cal. Civ. Proc. Code § 1060 is necessary and appropriate at this time so that Red Dice's rights under the Operating Agreement may be determined with certainty.

WHEREFORE, Dixie Holdings, LLC, derivatively as a member of Red Dice Holdings, LLC, requests that the Court enter judgment in its favor, awarding the following relief:

    a. Judgment against Defendant Medical Marijuana, Inc. in an amount to be proven at trial;

    b. Judgment against Defendant Medical Marijuana, Inc. that it is required to specifically perform its obligation under the Operating Agreement and contribute the 24,166,667 unrestricted shares of its common stock; or pursuant to Cal. Corp. Code § 17201(a)(2), it is required to contribute the cash equivalent of the property or services it promised;

    c. For incidental, consequential and/or other damages in an amount to be determined at Trial;

    d. Declaratory relief that MJNA has violated § 11.2(a)(ii) of the Operating Agreement, triggering the Mandatory Offer to Sell provision;

    e. For attorneys' fees and costs as the Court deems just and proper;

    f. For such other and further relief as the Court deems just and equitable.

Dated: July 18, 2013        MESSNER REEVES, LLP

By: _____
Robert B. Hinckley, Jr.
Attorneys for Plaintiff
DIXIE HOLDINGS, LLC derivatively on behalf of
RED DICE HOLDINGS, LLC

{01075124 / 2}

PLAINTIFFS' VERIFIED COMPLAINT