UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
DOUGLAS J. HORN and CINDY HARP-HORN,

             Civ Action No: 15-cv-701 FPG/MJR

      Plaintiff,

             ***AFFIDAVIT OF PLAINTIFFS***

 -against-

MEDICAL MARIJUANA, INC.,
DIXIE ELIXIRS AND EDIBLES,
RED DICE HOLDINGS, LLC, and
DIXIE BOTANICALS,
      Defendants,
----------------------------------------------------------------X

STATE OF IOWA  )
         : ss.:
COUNTY OF ADAIR)

  DOUGLAS J. HORN, being duly sworn, deposes and says:

  1. I and my wife Cindy are the Plaintiffs in this action.

  2. I submit this Affidavit in Support of our motion for summary judgment on certain statutory causes of action. As such, I primarily defer to my counsel's Declaration in Support and his Memorandum of Law, along with the Affidavit and Report of our expert Dr. Kenneth Graham as to the basis for the Court to respectfully grant this Motion.

  3. I offer this Affidavit to give the Court a background of facts surrounding my taking of the Dixie Elixirs product in question, which led to my termination of employment in October, 2012, and giving rise to this action.

  4. I am and have always been, in a team with my wife and co-plaintiff, an over-the-road trucker since 1998. Since that time, my wife and I drive across the United States hauling various loads such as expedited food, pharmaceuticals and liquid chemicals. In October, 2012, we worked for Enterprise Transportation in this regard.

1

5. On February 24, 2012, I was involved in a serious work-related semi-truck accident in which I suffered, among other things, severe shoulder and back injuries. Over the months following the accident, I submitted to physical therapy and took various pain medications in an attempt to mitigate the trauma of the accident. However, at that time, those methods did not work.

6. In September, 2012, when we were on an assignment by our then employer Enterprise Transportation, Cindy and I viewed a magazine at a book store in Texas where we had stopped while off-duty. We reviewed the magazine originally to investigate the feasibility of a medical marijuana product for Cindy's mother who was inflicted with cancer, and who was going through a difficult time with those treatments.

7. Annexed hereto as Exhibit "1" is a copy of the first page of the magazine and the advertisement page for the Dixie Elixir product in question. At the point we read the Defendants' magazine advertisement, I also considered this product for myself to treat the pain I still had stemming from the truck accident some seven months earlier.

8. In this magazine advertisement on Page 42, Defendants' represent:

    a) ". . . .new product line called Dixie X, which contains 0% THC . . .";

    b) " the non-psychoactive products . . ."

9. My and my wife's investigation of this product did not stop there. For instance, we researched the product both by watching YouTube videos of the CEO of the Company, "Tripp Keber", and by reading the Frequently Asked Questions ("FAQs").

10. The YouTube videos dated August 8 and August 23, 2012 we viewed can be found at:

    a. https://youtu.be/Urlwtw_xQ48

    b. https://youtu.be/yDjIGXS58ds

    c. https://youtu.be/k42_Kpp13mk

11. In these videos, Defendants' CEO states continuously that the products are "THC-free", there was "no THC" and it had "0% THC." He also said these were "wellness products."

12. Annexed hereto as Exhibit "2" on page 2, were the FAQs the Company published back in September, 2012. In those, Defendants' specifically state:

**"What is the difference between CBD from hemp and CBD from medical cannabis?"** (bold in the original).

> "While the two plants are botanically related, *our hemp contains no THC* and numerous medical studies have shown CBD to have significant potential health benefits from a variety of ailments ranging from epilepsy to pain management. Medical cannabis contains THC and may provide relief from various ailments, however, with a psychotropic effect." Emphasis added.

13. All of their advertising that I relied upon, magazine, FAQs and YouTube videos were consistent. According to Defendants, their products had no THC, and I indeed was looking for something for pain management. It was a perfect match.

14. Most telling were the Company's FAQs that followed over the years and which drastically changed. The Company has been warning consumers specifically *not* to take the product if they were subject to random drug-test screening for employment or other reasons. Annexed hereto as Exhibit "3" is the April 8, 2015 FAQ by Defendants admitting to their false advertising to which I responded in September, 2012.

15. I was subject to regular such testing (urine) over the 14 years prior to 2012 that I was a trucker. I had no incident until taking this product.

16. The reason why we specifically researched this product was to investigate the contents so that I would not jeopardize my employment. I state to the Court that I was specifically aware that I could not ingest "THC" or Tetrahydrocannabinol, which is the chemical in Marijuana that would produce a "dirty" result in any random drug screening that I would give for my employment. I knew I had to stay away from THC.

17. As can be seen in the multiple media in which they advertised this product, the Defendants consistently represented that their products had "0% THC", and were "THC free." After these "across the board" statements by Defendants in the magazine advertising, YouTube videos and Frequently Asked Questions, I thought I could take this product without jeopardizing my job.

18. The Court should respectfully note that, I did not and have not smoked marijuana or been around it for the 14 years I was a trucker and for the years prior thereto; and neither do I have an employment history or criminal record showing any use of marijuana.

19. As an over-the-road trucker, subject to regular and random drug-test screenings, I was acutely aware that in addition to the prohibition from smoking marijuana, I could not take any product with THC in it. However, I was also aware that I was able to take products with Cannabinoids ("CBD") in them. That is what Defendants advertised this product to be, and that's what I thought I was taking.

20. On September 17, 2012, I ordered the Defendants' "Dixie X CBD Dew Drops 500mg Tincture. Annexed hereto as Exhibit "4" is a copy of the paid invoice for this product. Within one week of receiving this product, I then ingested it as directed by placing a dropper full of the liquid in my mouth and swallowing it.

21. On October 9, 2012, as I had regularly done over 14 years prior thereto, I submitted to a required, random, urine drug test screening. Annexed hereto as Exhibit "5" is the confirmatory Report dated October 11, 2012. I was confirmed for a positive test result for "marijuana metabolite" with a result of 29 ng/ml, almost double the cutoff concentration limit.

22. Almost immediately thereafter, I was terminated from my 14-year long career as a trucker, and referred to required drug education courses through a Substance Abuse Professional Evaluation program ("SAP").

23. Upon learning that the Defendants' product caused me to have THC in my system, I immediately (October 18, 2012) ordered another batch of the tincture for the purpose of

having it tested at a lab. While I ordered the 500mg tincture, Defendant mistakenly sent me the 100mg tincture.

24.     Once I received the unopened product, on or around October 29, 2012 I found the lab known as "EMSL Analytical, INC" for the purpose of confirming that the defendants' product I took contained THC. Annexed collectively hereto as Exhibit "5" are copies of the 1) the EMSL invoice to me for this testing; 2) the Analysis confirming the Defendants' product had 170 ug/g of THC in it; and 3) EMSL's Chain of Custody document.

25.     Sure enough, the EMSL lab confirmed for me the Defendants' product contained THC contrary to all of their advertising materials I relied upon before taking the product.

26.     Even more remarkably, annexed hereto as Exhibit "6" is the email I received from the National Director at EMSL lab, Scott Van Etten. This email of November 8, 2012 states:

> "Douglas,
> Your report is attached. Since the ample contained THC, I may not be able to return it to you as per our DEA registration. I am checking on that. I'll send you an email either way . . .."

and later that day at 3:27 p.m.

> "Douglas
> We can't return your sample."

27.     If the Court ever needed any evidence of the illegality of Defendants' sending me this product in the mail to me in New York, it's the above email and refusal by a DEA registered lab stating it was illegal to send it back!

28.     Moreover, I understand through this litigation that the Defendants have produced Certificates of Analysis admitting the product indeed contained an amount of THC.

29.     I brought this case, and indeed the instant motion, because I lost my career and income for 5 years, because I took this product. While the issue of my damages is clearly an issue of fact, there is no such issue as to the Defendants' liability for sending me an illegal product through the mail, and falsely advertising it as having "0% THC" in multiple media.

30. I would never have taken this product if Defendants' advertising was truthful and said even "trace amounts of THC" or "0.00001% THC" or anything hinting of any THC. In relying on such false advertising, my career and income was taken away and put myself and my family into financial ruin for an extended period.

31. There is simply no question that the Defendants, Colorado and California companies respectively, sent a federally illegal product to me in New York through the mail. The Court should respectfully grant me summary judgment as to liability under the RICO and GBL 350 claims in this lawsuit.

WHEREFORE, by reason of all of the foregoing, it is respectfully requested that Plaintiff's motion for summary judgment as to liability of all Defendants be granted in its entirety and that Plaintiffs be allowed to proceed to a trial on the issue of damages, together with such other and further relief as the Court deems just and proper.

Dated: August 28, 2018

_____
DOUGLAS J. HORN

Subscribed and Sworn to before me this
28 day of August, 2018.

_____
Notary Public

[Notary Seal: MAGGIE MASKER, Commission Number 801582, My Commission Expires 02·03·2020, IOWA]

_____
CINDY HARP-HORN

Subscribed and Sworn to before me this
28 day of August, 2018.

_____
Notary Public

[Notary Seal: MAGGIE MASKER, Commission Number 801582, My Commission Expires 02·03·2020, IOWA]

6