UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
DOUGLAS J. HORN and CINDY HORN,                    Civil Action No. 15-cv-701
                                                   (FPG)(MJR)
                              Plaintiffs,

                    -against-

MEDICAL MARIJUANA, INC.;
DIXIE ELIXIRS AND EDIBLES;
RED DICE HOLDINGS, LLC; and
DIXIE BOTANICALS
                              Defendants.
-------------------------------------------------------------------X


### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS MMI/RDHs' MOTION FOR SUMMARY JUDGMENT


KUPILLAS, UNGER & BENJAMIN, LLP.

Jeffrey Benjamin
*Attorney for Plaintiffs*
DOUGLAS J. HORN and CINDY HORN
1 Linden Place, Suite 410
Great Neck, NY 11021
(516) 213-4493

i

## TABLE OF CONTENTS

PRELIMINARY STATEMENT………………………………......................…….…1

STATEMENT OF FACTS…………………….…….………………………...........2

EXPERT TESTIMONY………………….…………….…………………………….5

PLAINTIFFS' CAUSES OF ACTION...……………………….......................10

STANDARD FOR SUMMARY JUDGMENT…………………….…..............10

ARGUMENT………………………………………….......................................11

ISSUES OF FACT PRECLUDING SUMMARY JUDGMENT…….......…….................11

A.    The Defendants' Interrelationship and Clear Action of

MMI/RDH……………………………………………………………….........11

B.    Cindy Horn suffered damages……………………........……….................14

C.    Plaintiffs' Record of Evidence Supports RICO, GBL and Fraud…………...........15

         I    Plaintiffs Have Proven Every Element Under Their RICO Claims...........16

              i) Separate and Distinct RICO Enterprise…….…………………….....17

              ii) Pattern of Racketeering Activity…………………………............18

              iii) At Least Two Acts of Racketeering………………………….........18

              iv) Continuity……………………………………………….......................20

              v) Harm and Causation…………………………….………….................….21

         II.    Plaintiffs Have Proven Every Element of Their Claims Under GBL 349 and 350
              for Deceptive Practices and False Advertising...........................................22

              a)  Consumer-Oriented……………………………..............…........…........22

              b)  Misleading Act or Practice…………………......…………….............23

              c)  Injury……………………….…………………….......................24

         III.    Fraud……………………………………………….......................................24

D.   UCC Section 2-318……………………………………......................……......24

E.   Negligence……………………………………..…………..............................25

# **TABLE OF AUTHORITIES**

**Cases**

*Adirondack Transit Lines, Inc. v. United Transp. Union, Local 1582*, 305 F.3d 82, 85 (2d Cir.

 2002)……………………………………………………...........…............10

*Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986)……………………………...10

*Mathirampuzha v. Potter*, 548 F.3d 70, 74 (2d Cir. 2008)………………………….....10

*Orlander v. Staples, Inc.*, 802 F. 3d 289 (2nd Cir. 2015)……………………………..10

DHL v. MMI, Superior Court, San Diego, CA, Case No. 37-2013-00058302]………...11

*Riverwoods Chappaqua Corp. v. Marine Midland Bank*, 30 F.3d 339, 343-44 (2d Cir.

 1994………………………………………………….................................................16

*See Cedric Kushner Promotions Ltd. v. King*, 533 U.S. 158, 161, 121 S. Ct. 2087, 150 L. Ed. 2d

 198 (2001)……….............................................................................................17

*Spira v. Nick*, 876 F. Supp. 553,561(S.D.N.Y.1995)…………………….…………...….17

*Gross v. Waywell*, 628 F. Supp. 2d 475, 497 (S.D.N.Y. 2009)........................................17

*Spool v. World Child Intern. Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008)..........18

*United States v. Turkette*, 452 U.S. 576, 593, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981)

.............................................................................................................................19

*Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 107 S. Ct. 2759,

97 L. Ed. 2d 121 (1987))...............................................................................................19

*Baisch v. Gallina*, 346 F.3d 366, 373 (2d Cir. 2003).........................................................21

*Lerner v. Fleet Bank*, 318 F.3d 113 (2d Cir 2003).........................................................21

*Holve v. McCormick & Co.*, 2018 U.S. Dist. LEXIS 137428 (W.D.N.Y. August 14,2018)

.............................................................................................................................22

*Petrosino v. Stearn's Prods.*, No. 16-CV-7735 (NSR), 2018 U.S. Dist. LEXIS 55818, 2018 WL

1614349, at *6 (S.D.N.Y. Mar. 30, 2018) ) (alterations in original)

    (citing GBL §§ 349(a),.....................................................................................22

*Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009) ...............................................22

*Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000)................................................22

*Goldemberg v. Johnson & Johnson Consumer Cos.*, Inc., 8 F. Supp. 3d 467, 478 (S.D.N.Y.

    2014).......................................................................................................22

*Koch v. Greenberg*, 14 F. Supp. 3d 247, 261 (S.D.N.Y. 2014)........................................22

**Statutes & Rules**

15 U.S.C §52 …………………………………………………………………*passim*

18 U.S.C. §1716…………………………………………………………………9,16

18 U.S.C. §1961, et seq…... …………………………………………………  *passim*

21 U.S.C. §1308 ……………………………………………………………….*passim*

GBL 349 – 350 ……………………………………………………………..*passim*

Federal Rule of Civil Procedure 56 ………………………………………………..3

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

DOUGLAS J. HORN and CINDY HORN,               Civil Action No. 15-cv-701
                                                                       (FPG)(MJR)
                                        Plaintiffs,

            -against-                                     **PLAINTIFFS' MEMORANDUM
                                                                       OF LAW IN OPPOSITION TO
MEDICAL MARIJUANA, INC.;                            MMI/RDH's MOTION FOR
DIXIE ELIXIRS AND EDIBLES;                         SUMMARY JUDGMENT**
RED DICE HOLDINGS, LLC; and
DIXIE BOTANICALS
                                        Defendants.
------------------------------------------------------------------x

        Plaintiff, DOUGLAS J. HORN and CINDY HORN (collectively "Plaintiff") by their

attorneys, KUPILLAS, UNGER & BENJAMIN, LLP. respectfully submit this memorandum of

law in opposition to the motion for summary judgment of defendants MEDICAL MARIJUANA,

INC. and RED DICE HOLDINGS, LLC. (collectively the "MMI/RDH Defendants").

## PRELIMINARY STATEMENT

        This is an action for damages for *inter alia*, deceptive business practices and violations of

the New York General Business Law Art 22-A, §349 ("Deceptive Practices Act" or GBL §349"),

GBL §350 for false advertising, violations of the federal Racketeer Influenced and Corrupt

Organizations Act ("RICO") 18 U.S.C. §1962(a)-(d), UCC § 2-318, strict products liability for

selling an unreasonably dangerous product, fraud and negligence.

        In summary, Defendants MMI/RDH *inter alia* promoted, provided capital for, consulted,

sold and distributed hemp-based products such as the Dixie X Elixir tincture liquid that they

provided to Plaintiff DOUGLAS HORN, which was shipped to his home in New York and

which he ingested. Immediately after ingesting the liquid product, he lost his job from a

mandatory random drug-test screening in his career as an over-the-road trucker. The laboratory

1

test showed the presence of "THC" tetrahydrocannabinol, the psychoactive component of marijuana. In October 2012, and before, the Defendants unequivocally and continually represented on their websites, You Tube videos, press releases and advertising media that their products contain "0%" THC, had "no THC" and were "THC free." Defendants boasted that the products were tested multiple times in different ways in order to insure that they were safe for consumers. Throughout the various media, MMI/RDH promised that they did not grow, sell or distribute and products which violate United States Laws and/or the "Controlled Substances Act." Defendants, in order to promote their own and respective commercial interests, partnered together with co-Defendant DIXIE ELIXIRS for a common profitable purpose to market and distribute the various hemp-based products. Plaintiffs' case attacks their intentional, alternatively negligent, conduct in putting out a product that clearly contained THC leading to Plaintiffs approximate 5 year ban from their career and devastating economic damages.

## STATEMENT OF FACTS

A more complete statement of the facts and supporting evidence related to the parties' respective summary judgment motions are fully set forth in the Plaintiffs' accompanying Rule 56(a)(2) filings which are herein incorporated by reference.

The Plaintiffs have been a team of over-the-road truckers since 1998 (Plaintiff's Affidavit, ¶4). The Plaintiffs have driven across the Untied States hauling various loads such as expedited food, pharmaceuticals, and liquid chemicals (*Id.*). In October 2012, the Plaintiffs worked for Enterprise Transportation as drivers (*Id.* at ¶4).

Previously, on February 24, 2012, the Plaintiff Douglas J. Horn was involved in a serious work-related semi-truck accident in which he suffered, *inter alia*, severe shoulder and back injuries (*Id.* at ¶5). Ensuring physical therapy and pain medication failed to alleviate his ongoing

2

and chronic pain (*Id.*). In September 2012, plaintiffs saw an advertisement for the DIXIE
ELIXIR product (*Id.* at ¶7).  In response to the affirmative claims made regarding the pain
alleviating properties of DIXIE X, as well as the fact that it contained "0% THC . . . ." (*Id.* at ¶8),
plaintiff further researched the DIXIE ELIXER product—by watching YouTube videos of the
CEO of the Company (Tripp Keber) and reading the website FAQs (*Id.* at ¶9)—and ultimately
decided to purchase and use the product.

In the videos, Keber states continuously that the products are "THC-free"; there is "no
THC"; and that it has "0% THC" (*Id.* at ¶11).  He also claimed that it was a "wellness" product
(*Id.*).

In the FAQs published in September 2012, the Defendants wrote:

What is the difference between CBD from hemp and CBD from medical
cannabis?

While the two plants are botanically related, our hemp contains **no THC** and
numerous medical studies have significant potential health benefits from a variety
of ailments ranging from epilepsy to pain management.  Medical cannabis
contains THC and may provide relief from various ailments, however, with a
psychotropic effect. [Emphasis Added].

(*Id.* at ¶12).

Significantly, the Defendants' marketing FAQs deliberately changed over the years (*Id.*
at ¶14).  Subsequent to the Plaintiffs' unforeseen and detrimental discovery, the Defendants
began to warn consumers not to take their product if a user was subject to random drug-test
screening for employment or other reasons (*Id.*).

The Plaintiffs specifically relied upon the advertising, magazine, FAQs, and YouTube
videos that the DIXIE ELIXER products contained no THC and were effective for pain
management. (*Id.* at ¶13).  The Plaintiff was subject to regular testing (urine) over the 14 years

3

prior to 2012 as a trucker (*Id*. at ¶15).  He was incident-free (*Id*.).

The Plaintiffs specifically researched the product to investigate the contents so that the Plaintiff would not jeopardize his employment (*Id*. at ¶16).  The Plaintiff was specifically aware that he could not ingest any "THC" or Tetrahydrocannabinol (the chemical in Marijuana) that would produce a "dirty" result in any random drug screening)(*Id*.).  The Plaintiff knew to stay away from THC (*Id*.).

As seen in the multiple media in which they advertised the product, the Defendants consistently represented that the products had "0% THC" that were "THC free" (*Id*. at ¶17). After these "across the board" statements by the Defendants in the magazine advertising, YouTube videos and FAQs, the Plaintiff reasonably believed that he could take the product without jeopardizing his employment (*Id*.).

On September 17, 2012, the Plaintiff ordered the Defendants' "Dixie X CBD Dew Drops 500mg Tincture" (*Id*. at ¶20).  Within one week of receiving this product, he ingested it as directed by placing a dropper full of the liquid in his mouth and swallowing it (*Id*.).  On October 9, 2012, as he had regularly done over 14 years prior thereto, the Plaintiff submitted to a required, random, urine drug test screening (*Id*. at ¶21).  In a Report dated October 11, 2012, the Plaintiff was confirmed for a positive test result for marijuana metabolite with a result of 29 ng/ml, <u>almost double the cutoff concentration limit</u> (*Id*.).

As a result of this test result, the Plaintiff was forthwith terminated from his 14-year-long career as a trucker and referred to required drug education courses through a Substance Abuse Professional Evaluation program ("SAP")(*Id*. at ¶22).

Upon learning that the Defendants' product caused him to have THC in his system, on October 18, 2012, the Plaintiff ordered another batch of the tincture for the purpose of having it

tested at a lab (*Id*. at ¶23).  Though the Plaintiff ordered the 500 mg tincture, the Defendant

mistakenly sent him the 100 mg tincture (*Id*.).  Once the Plaintiff received the unopened product,

on or about October 29, 2012, he found the lab known as "EMSL Analytical, INC" for the

purpose of confirming that the Defendants' product the Plaintiff took contained THC (*Id*. at ¶24).

The EMSL lab confirmed that the Defendants' product contained THC contrary to their

advertising materials that he relied upon (*Id*. at ¶25).  In connection with their findings, on

November 8, 2012, the Plaintiff received an email from the National Director at EMSL lab, Scott

Van Etten (*Id*. at ¶26), stating:

> Your report is attached.  Since the sample contained THC, I may not be able to
> return it to you as per our DEA registration.  I am checking on that.  I'll send you
> an email either way . . . .

(*Id*. at ¶26).

Plaintiff would never have taken the defendants' product if the Defendants' advertising

was truthful and said even "trace amounts of THC" or "0.00001% THC" or anything hinting of

it. (*Id*. at ¶30).  In relying on such advertising, the Plaintiff's career and income were lost causing

financial ruin for an extended period (*Id*.).

## EXPERT TESTIMONY

Multiple questions of fact are raised by the Plaintiff expert forensic scientist. Both the

Plaintiffs' allegations and the documents in support as Exhibits herein are fully substantiated by

the independent findings of Dr. Kenneth Graham, a regarded Forensic Toxicologist and

Pharmacologist with over twenty-five years of related field experience.  Dr. Graham evaluated

both the evidence and the testimony involving and related to the THC content of the product

taken by the Plaintiff and the implications of it on a urine drug screen (Id. at ¶2).  He is also

opined as to whether the product complies with federal statutes for controlled substances (Id.).

5

Following his investigation, Dr. Graham specifically concluded that the Defendants did not provide the Plaintiffs, nor their own expert, with process batch or test records, or certificates of analyses pertaining to the actual product purchased and used by the Plaintiff (*Id*. at ¶6(a)). Failure to provide these documents, despite having been specifically requested, suggests that either (i) they do not exist any longer or that (ii) the formulation and product analyses were not conducted despite the Defendants' advertising and statements that the products are rigorously tested multiple times during the manufacturing process using both traditional ISO17025 chemical testing facilities, as well as cannabinoid testing facilities, to ensure their products meet the highest standards (*Id*.).

According to Dr. Graham, the presence of at least 170 ug/g (170/ppm) of tetrahydocannabinol (THC) was measured by EMSL Analytical, Inc. (test date of November 6, 2012), in a Dixie X Elixir product containing a label quantity of 100 mg cannabidiol (CBD) and that this quantity significantly exceeded by three-fold the 50 ppm THC concentration in hemp products used in experimental studies that demonstrated the ability of such products to produce a positive THC drug result (*Id*. at ¶6(b)).

The results provided in Defendants' Certificates of Analysis (COAs) prepared by CannLabs, Inc. (test date of October 16, 2012), for a labeled 500 mg Dixie X Dew Drop product contended to represent the similar product originally purchased and consumed by the Plaintiffs indicates the product contained 500 ug/g (500 ppm) THC, which significantly exceeded by ten-fold the 50 ppm THC concentration in hemp products used in experimental studies that demonstrated the ability of such products to produce a positive THC drug screen result (*Id*. at ¶6(c)).

Based upon the aforementioned independent laboratory analysis and the Certificate of

Analysis records provided by the Defendants, the product and similar Dixie products contained a measurable amount of THC (*Id*.a t ¶6(e)) contrary to defendants' representations at the time these products were marketed to Plaintiffs.  The product was incorrectly asserted to have "0%" THC; public statements by the product's managing director proclaimed that the product "contains no THC." (*Id*.).  The claims were affirmatively contradicted by measurable presence of THC in the products and represent false advertising under 15 U.S.C. 52 (*Id*.).

As indicated by Dr. Graham, since the offending product was launched in early 2012, it has been promoted as an imported industrial hemp-delivered wellness product and CBD-rich medicine containing either 100 mg or 500 mg of CBD and "0%" THC—being reasonably suggestive that it was free of THC, the psychoactive constituent contributing to the behavioral effects and toxicity of cannabis (*Id*. at ¶6(g)).  Industrial hemp strains are cultivated to increase the concentration of CBD and lower the concentration of THC content (*Id*.).  Unlike THC, CBD is not psychoactive (*Id*.).

In 2012, federal law specifically prohibited the commercial farming of any variety of Cannabis Sativa, but permitted the importation and industrial use of hemp material subject to the express proviso that *it maintained a THC content of less than 0.3% by weight* (*Id*.).  As discussed by Dr. Graham, the 0.3% limit does not apply to final product formulations in which the presence of *any* amount of THC would render it a Schedule 1 controlled substance as described under 21 U.S.C. 1308.11 (Id.).

Though Defendants assert to the contrary, they have not be able to point to a relevant statutory citation or other reference to support their contention that the Dixie Elixir products offered to consumers complied with federal and state laws. (*Id*.).  This is because no such authority exists.

7

Despite a definition in many states of "CBD-only" product as having less than 0.3% or 0.5% THC, as opined by Dr. Graham, <u>any product containing THC in any amount is considered marijuana and Schedule I controlled drug substance under 21 U.S.C. 1308.11</u> (*Id.*).  Likewise, since the offending product—and similar Dixie products—are derived from cannabis plant material that contain THC, these products are not be eligible for an exemption to a Schedule I classification under 21 U.S.C. 1308.35 since the products were formulated, marketed, and distributed for human consumption (*Id.*). Marijuana is not a benign drug and remains a Schedule I controlled substance under Federal law (*Id.* at ¶6(h)).  Moreover, no such legislative movement relates to driving or operating other dangerous instrumentalities after taking such substances but, rather, relate solely to recreational use, the consideration of which is inapplicable to this action.

Since 170 ug/g (170 ppm) THC was measured by EMSL Analytical, Inc., in a Dixie H Elixir containing a labeled 100 mg CBD and 500 ug/g (500 ppm) THC was measured by CannLabs, Inc. in a Dixie X Dew Drop containing a labeled 500 mg CBD, those products and presumably similar Dixie products with differing lot numbers would be classified as Schedule I controlled substances under federal law (*Id.*).

Another material issue of fact addressed by Dr. Graham is the Dixie Elixir company website content and public statements issued by its managing director that Dixie X Elixirs are tested multiple times during the manufacturing process using both ISO17025 compliant testing facilities as well as cannabinoid testing facilities (*Id.* at ¶6(j)).  However, if the product was tested for cannabinoid content during the manufacturing process as claimed by the defendants, the results would have shown that their product did in fact contain a measurable quantity of THC, which would then classify the product as a DEA Schedule 1 substance under 21 U.S.C. 1308.35 (*Id.*) *as a matter of law*.  Manufacturing process test results clearly demonstrated the

presence of THC in the product formulation which clearly indicates that the advertising and public statements to the contrary asserting that it contained no THC were plainly false and subject to 15 U.S.C. 52 (*Id*.).  Defendants' alternative position, to wit, that the offending formulation was not tested for cannabinoid content, runs contrary to the propriety of Defendants' public assurances that their product contained no THC (*Id*.).

Further, as neither the Defendants nor the Plaintiffs were registered with the U.S. D.E.A., the distribution of a Schedule I substance such as Dixie X Elixir across state lines would be unlawful under *21 U.S.C. 801-971* (*Id*. at ¶6(k)).  If the product was shipped through the domestic mail system, the distribution would be further deemed unlawful under *18 U.S.C. 1716* (*Id*.).  Finally, the Defendants' respective manufacture and distribution of a controlled substance is violative of *21 U.S.C. 841* (*Id*.).

Finally, as Dr. Graham addresses, Schedule I controlled substances under *21 U.S.C. 1308.35* are subject to specific packaging and labeling requirements under *21 U.S.C. 1302.03* (*Id*. at ¶6(l)).  Consequently, each commercial container of a controlled substance must contain a label providing definitive information of contents and bearing the symbol designating the schedule on which the product is listed (*Id*.).  Defendants wholly failed to comply with these statutory mandates.  The offending product label did not list THC as an ingredient or bear a symbol reflecting that it was a Schedule I controlled substance and, therefore, violated packaging and labeling requirements under federal law (*Id*.).  Without the required label content, the Plaintiffs could not be deemed to possess the requisite information necessary to make an informed decision about whether to use the Dixie X Elixir product (*Id*.).

Based upon all of the foregoing, the claims that the offending product did not conflict with any federal law are false (*Id*. at ¶6(m)).

9

## PLAINTIFFS' CAUSES OF ACTION

To the extent that the defendants seek Rule 12(b) dismissal on the pleadings, plaintiffs object to those portions of their respective motions on the ground of untimeliness and failure to raise many of the arguments in their original pleadings.  The aforementioned Statement of Facts are collectively set forth in the plaintiffs' August 6, 2015 complaint, plaintiffs' August 6, 2015 Civil Rico Statement—ignored by defendants—and the record in its entirety.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment may not be granted unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c)(2); see *Adirondack Transit Lines, Inc. v. United Transp. Union, Local 1582*, 305 F.3d 82, 85 (2d Cir. 2002).  The role of the court in deciding a motion for summary judgment "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986).  Factual determinations are reviewed in a light most favorable to non-moving party.  *Mathirampuzha v. Potter*, 548 F.3d 70, 74 (2d Cir. 2008).

Plaintiffs have factually demonstrated that they purchased the Defendants' *DIXIE X* product in direct reliance upon Defendants' intended public advertising, marketing and public relations information. Plaintiffs have additional alleged and factually demonstrated that the aforementioned product did not conform with their multiple representations, to wit, "no or 0% THC," and this material false representation resulted in catastrophic economic and reputational harm to the Plaintiffs.  On this basis, as a matter of law, plaintiffs have stated a claim under New York law.  See, *Orlander v. Staples, Inc.*, 802 F. 3d 289 (2nd Cir. 2015).

10

## ARGUMENT

## ISSUES OF FACT PRECLUDING SUMMARY JUDGMENT

The clear factual scenario set forth and demonstrated by the record in this action fully supports denial of the Defendants' respective motions for summary judgment. The record fully supports the existence of numerous material issues of fact that militate against summary judgment to the Defendants and require determination by the trier of fact.

### A.     The Defendants' Interrelationship and Clear Action of MMI/RDH

Throughout their Memorandum of Law, Defendants MMI/RDH have done their utmost to veil and obfuscate their interrelationship from both a business and legal status perspective in an effort to avoid liability in this case. They have not proceeded in good faith—and for clear reason. The documents prepared by these Defendants and placed into the public domain set forth the true nature of these parties' interrelationship.

Defendant RED DICE HOLDINGS, LLC ("RDH") is a California limited liability company. Pursuant to its Operating Agreement dated April 5, 2012 [Exhibit "A"], RDH is wholly owned by co-defendants MEDICAL MARIJUANA INC. ("MMI"), an Oregon business corporation [sixty (60%)] and DIXIE HOLDINGS LLC a/k/a DIXIE ELIXIR[1] ("DHL"), a Colorado limited liability company [forty (40%) percent].

At the time that Plaintiffs' claims arose, and by admission of all Defendants in this action, Tripp Keber was and is CEO and one of the principals of the DIXIE Defendants, along with a person known as Vincent M. Keber III. [Exhibit "B" – Complaint, DHL v. MMI, Superior

---

[1] DIXIE HOLDINGS LLC a/k/a DIXIE ELIXIR is incorrectly sued here as DIXIE ELIXIRS & EDIBLES. Though it has acknowledged that it has been incorrectly captioned, this defendant has represented that its proper name is Dixie Elixirs, LLC. However, the documents relating to these parties, which are submitted herewith, indicate that the proper name for this party is DIXIE HOLDINGS LLC a/k/a DIXIE ELIXIR. A corresponding cross-motion for leave to amend the complaint includes an application to amend the caption in this regard.

Court, San Diego, CA, Case No. 37-2013-00058302].

However, and contrary to the Defendants' assertions in their motion papers, <u>Mr. Keber was also the President of Defendant RDH</u> [Exhibit "C", p.25 – MMI's 06/30/2012 Information and Disclosure Statement Pursuant to Rule 15c2-(11)(a)(5)]. As evidenced by the aforementioned complaint, these three parties were completely integrated.  In the complaint, direct reference is made to these Defendants April 5, 2012 Operating Agreement which is annexed to that pleading [Exhibit "A" hereto] which indicates the joint managerial role in DHL ("Dixie") as well as RDH.

The Court may respectfully note that the same firm, Mura & Storm, has represented both MMI and RDH throughout this litigation, presumably because they are united in interest and there is no conflict. However, Tripp and Vincent Keber, occupy as both officers and principals of Dixie, with Tripp Keber a *concurrent* officer of RDH. And yet, the MMI/RDH Defendants argue herein that Tripp Keber does not speak for them. Such an argument appears disingenuous.

The Operating Agreement acknowledges specifically that the business of RDH is "providing legal and cannabis based products, manufacturing, research/development and related business." [Exhibit "A"**,** and its Exhibit C thereto (Non-Disclosure Agreements)].  Furthermore, also annexed to the Operating Agreement as its Exhibit F is the Employment Agreement between Mr. Vincent Keber and RDH dated April 5, 2012 in which he is specifically denominated as RDH's president (¶3) and Manager (¶3.1) at an annual salary of $170,000 (¶4(A)).  His functions are also delineated and include operations and marketing, among others.  A similar Consulting Agreement was executed with Mr. Keber's partner, Charles K. Smith of even date (Mr. Smith was also the Chief Operating Officer of RDH [Exhibit "C", p. 25 of 33].

MMI's 06/30/2012 Information and Disclosure Statement Pursuant to Rule 15c2-

12

(11)(a)(5) [Exhibit "C"] further asserts and acknowledges that RDH "owns the Dixie Brand of consumable products" (p. 12 of 33).  The Disclosure Statement further describes MMI's purpose to expand its wholesale sales into new markets (id.).  Furthermore, MMI specifically acknowledges in its SEC Disclosure that RDH is its "subsidiary" and that RDH's role is the "manufacturing, distribution and licensing" of the Dixie brand of products, including the subject product in this litigation [Exhibit C, p. 32 of 33]. When it comes to the Dixie products put out in the stream of commerce, MMI, RDH and DIXIE are all inextricably intertwined.

The MMI/RDH defendants' motion papers are comprised of two primary thrusts.  The first is their disguised 12(b) arguments which have been addressed herein supra.  The balance of their arguments are belied by the record and documents found in the public domain as discussed above.  The allegations by the MMI/RDH defendants in support of their motion for summary judgment that attempt to distance themselves from any involvement with DHL, marketing, advertising, operations and manufacturing are flatly contradicted by the parties' own documents cited supra.

The MMI/RDH defendants further attempt to disclaim liability on the basis that the plaintiffs were somehow unique, and accordingly should not have any remedies stemming from their material product misrepresentations as a result.  However, there is no authority that supports this contention in the context presented in this case.  Likewise, their self-serving assertion that they "did not believe" that their product did not violate the Controlled Substances Act, is an issue of fact to be determined by the fact trier, not a dispositive factual assertion.  It is absurd to suggest that this Court should rule on what a party unilaterally believed. The fact is, Plaintiffs' expert Dr. Kenneth Graham in his Reports and Affidavit pointed to multiple violations of federal law.

13

The balance of MMI/RDH's arguments are purely their own opinion on the facts. With a straight face, they argue that the magazine advertisement, the FAQs and the YouTube videos as well as RDH's customer service representative's statements to Cindy Horn were not directed to consumers and not misleading. Given the overwhelming record Plaintiffs offer the Court in the Exhibits and Affidavits annexed hereto, both of those arguments are either absurd or they are clear questions of fact.

Finally, the contention that the harm to Plaintiffs' was not "foreseeable" is completely incongruous with the reality of what occurred. An illegal substance was put into the stream commerce and affirmatively marketed in various media that it was 100% legal and THC free. Clearly, many consumers of the Dixie Elixir products specifically sought its touted benefits while simultaneously relying upon the Defendants' representations that their products were legal and untainted. There is nothing unforeseeable about that scenario. If these defendants failed to consider this scenario, they will have to live with the consequences of such highly irresponsible business activity.

**B.      Cindy Horn suffered damages**

Plaintiffs were a husband and wife team of truck drivers who were paid separately by the same employer, but who worked together daily in the same truck across the country, and over 14 years. When one went down (Douglas), the other (Cindy) naturally followed. Defendants argue that Cindy could have mitigated her damages by accepting a position to work alone in a far off position, yet as a solo woman in the trucking industry.

Annexed immediately hereto is the Affidavit of Ellen Voie, the CEO of the Women in Trucking Association. Ms. Voie debunks this argument on its face and in full. The Court is respectfully referred to that Affidavit to understand the adverse circumstances of a woman taking

14

a solo position in the trucking industry. The nature and circumstances of the proposed position made it a non-viable option for Cindy Horn, as she testified.

### C.      Plaintiffs' Record of Evidence Supports RICO, GBL and Fraud

Plaintiffs fully incorporate by reference herein, Plaintiff's Expert's (Dr. Kenneth D. Graham, Forensic Toxicologist and Pharmacologist) annexed Affidavit along with his two (2) supporting Reports disclosed in discovery in this case. Because Dr. Graham is a "Forensic" Toxicologist, he is uniquely qualified to show the Court the marriage between law and science in this matter to prove Defendants' strict liability under these statutes for the manufacturing, distributing, selling and the *sending* of their Dixie Dew Drops Tincture product that may very well have been legal to distribute and sell in Colorado in 2012, but was clearly illegal in New York then.

Briefly stated, in his review of the materials in this case, Dr. Graham identified multiple *per se* violations of the federal Controlled Substances Act ("CSA") with respect to Defendants' conduct, testimony and the documents they produced. Dr. Graham has shown the Defendants liable for the below predicate statutory offenses, the existence of which prove Plaintiffs' cases under §349 and GBL §350 for false advertising, and *inter alia,* mail and wire fraud under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. §1962(a)-(d).

More specifically, Dr. Graham showed that the Defendants' final product formulations of the Dixie X Dew Drops Tincture product with the presence of "*any*" amount of THC rendered it a Schedule 1 controlled substance as described under 21 U.S.C. §1308.11, and not eligible for an exemption to a Schedule I classification under 21 U.S.C. §1308.35 since it was formulated, marketed and distributed for human consumption.

Further, Dr. Graham showed that Defendants' manufacturing process test results in its Certificates of Analysis produced in discovery showing the presence of THC in the product signifies that the advertising and public statements asserting the product contained "no THC" were false and unlawful under 15 U.S.C §52.

Dr. Graham stated that since the Defendants were not registered with the US Drug Enforcement Administration, their distribution of a Schedule I substance, such as Dixie Dew Drops Tincture product across state lines was unlawful under 21 U.S.C §801-971 and, if the product was shipped through the domestic mail system, the distribution was also unlawful under 18 U.S.C. §1716.  In addition, the defendants manufactured and distributed a controlled substance in violation of 21 U.S.C. §841.

As a Schedule I controlled drug substance under 21 U.S.C. §1308.11, Dixie X Elixir was subject to specific packaging and labelling requirements under 21 U.S.C. §1302.03. Since the product was a Schedule I controlled substance, the absence of language on its packaging and labels therefore violated packaging and labeling requirements under 21 U.S.C. §1302.03.

Finally the multiple representations that Defendants disseminated across multiple media that the products "do not conflict with any state or Federal law" and that the parent company, Medical Marijuana, Inc. "does not grow, sell or distribute any substances that violate United States Law or the controlled substances act" are clearly false and violate 15 U.S.C §52 covering the dissemination of false advertisements.

## I.      Plaintiffs Have Proven Every Element Under Their RICO Claims.

To establish a civil RICO claim, Plaintiff must establish (A) a separate and distinct RICO enterprise that (B) engaged in a pattern of racketeering activity (C) causing harm to the Plaintiff. 18 U.S.C. § 1962(c); *Riverwoods Chappaqua Corp. v. Marine Midland Bank*, 30 F.3d 339, 343-

44 (2d Cir. 1994).

### i)       Separate and Distinct RICO Enterprise

A civil RICO claim arises under 18 U.S.C. § 1962(c) when a RICO "person" participates

in the conduct of a RICO "enterprise" through a pattern of racketeering activity:

> "It shall be unlawful for any person employed by or associated with any
> enterprise engaged in, or the activities of which affect, interstate or foreign
> commerce, to conduct or participate, directly or indirectly, in the conduct of such
> enterprise's affairs through a pattern of racketeering activity or collection of
> unlawful debt." *18 U.S.C. § 1962(c)*.

The "person" and "enterprise" in a civil RICO action must be distinct. *See Riverwoods*,

30 F.3d at 344. In other words, a RICO claim requires at least two separate and distinct entities.

*See Cedric Kushner Promotions Ltd. v. King*, 533 U.S. 158, 161, 121 S. Ct. 2087, 150 L. Ed. 2d

198 (2001) (requiring "[t]he existence of two distinct entities: (1) a 'person'; and (2) an

'enterprise' that is not simply the same 'person' referred to by a different name").

When analyzing a civil RICO claim, the Court "begin[s] from an understanding of what

enterprise is alleged." *Crabhouse of Douglaston Inc. v. Newsday Inc.*, 801 F. Supp. 2d 64, 74

(E.D.N.Y. 2011) (Hurley, J.) (quoting *Spira v. Nick*, 876 F. Supp. 553, 561 (S.D.N.Y. 1995)

(Kaplan, J.)). There are two types of RICO enterprises: "'legal entities' such as corporations and

partnerships, and 'any union or group of individuals associated in fact although not a legal

entity.'" *Gross v. Waywell*, 628 F. Supp. 2d 475, 497 (S.D.N.Y. 2009) (Marrero, J.) (quoting 18

U.S.C. §1961(4)).

The latter enterprise, known as an "association-in-fact" enterprise, applies here, where the

RICO enterprise is comprised of the three "persons" i.e. the legal entity Defendants Medical

Marijuana, Inc, Dixie Elixirs, LLC. and Red Dice Holdings, LLC. Each of these legal entities had a hand in the promotion and marketing, manufacturing and distributing, packaging and labeling, and selling and sending out the Dixie Dew Drops Tincture product containing the controlled substance THC to consumers in New York, which Plaintiff Douglas Horn took. There is no better example of a RICO enterprise than the coordinated effort of these three Defendants to market, distribute, sell and of course profit from, the Tincture product sold to Plaintiff here.

### ii)      Pattern of Racketeering Activity

The second element for a civil RICO action is a pattern of racketeering activity. A pattern of racketeering activity requires "at least two acts of racketeering activity, . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity. 18 U.S.C. §1961(5). An act of racketeering "must be among the various criminal offenses list[ed] in §1961(1), and they must be 'related, and [either] amount to or pose a threat of continuing criminal activity.'" *Spool v. World Child Intern. Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (citation omitted). In short, a "pattern of racketeering activity" must consist of (1) multiple racketeering activities (2) that threaten continuing criminal activity.

### iii) At Least Two Acts of Racketeering

Plaintiffs' Complaint (Defendant's Exhibit "A") alleges the following under 18 U.S.C. §1961(1) and §1962:

a)  Selling and/or distributing a product through the U.S. mail that was known or should have been known to be a controlled substance or otherwise illegal or otherwise in violation of federal or state law;

18

b) Inducing the sale of an illegal product through promises of curing medical conditions of consumer purchasers of said product;

c) Misrepresenting in advertising that the Dixie Products were safe and legal for consumers;

d) Misrepresenting that the products complied New York State and the federal laws and regulations;

e) Purposefully failing to disclose material facts regarding the product to induce the purchase of an illegal product;

f) Concealing the true chemical content from consumers in its advertising and labelling in order to avoid inquiry into the legality of same.

Through evidence and testimony elicited in this case, Plaintiffs have proven all of the above, though they are only required to prove two (2). Notwithstanding this limited list in a)-f) above, the evidence and testimony Plaintiffs have elicited in this case prove far more bad conduct. (See the Affidavit and accompanying reports of Dr. Kenneth Graham annexed to this Motion).

Civil RICO deputizes civil litigants as "private attorney general[s]" to further the "preventive and remedial" purposes of the statute. *Id. at 481* (quoting *United States v. Turkette*, 452 U.S. 576, 593, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981), and *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 107 S. Ct. 2759, 97 L. Ed. 2d 121 (1987)). The Court acts as a gatekeeper in civil RICO cases to ensure that the alleged offenses are "of a degree sufficiently serious not only to inflict injury upon its immediate private victims, but also to cause harm to significant public processes or institutions, or otherwise pose threats to larger societal

19

interests worthy of the severe punitive and deterrent purposes embodied in the statute. *Id.* The alleged offenses here are serious. Plaintiffs have proven multiple violations of the Controlled Substances Act, which evidences a significant risk of repetition across the entire U.S. consumer landscape and exemplifies civil RICO's "preventive" purpose:

There is nothing more illustrative of Defendants' liability then their own later-published statement in an FAQ, admitting to the very liability Plaintiffs have proven here. Dixie's answer in the attached Exhibit "3", in the April 8, 2015 FAQ stated the following:

**"Does Cannibidiol (CBD) and other natural hemp based constituents show up on a drug test?"** (bold in the original).

"Most workplace drug screens and tests target delta9-tetrahydrocannabinol (THC) and do not detect the presence of Cannabidiol (CBD) *or other legal natural hemp based constituents*. However, studies have shown that eating hemp foods and oils *can cause confirmed positive results* when screening urine and blood specimens. Accordingly, if you are subject to any form of drug testing, *we recommend (as does the United States Military) that you DO-NOT ingest our products*, and consult with your healthcare, drug screening/testing company or employer." Emphasis added.

It cannot not be often that an admission such as the one above is found, or even an acknowledgement of racketeering activity, albeit years after Defendants put a controlled substance out in the stream of commerce. In publishing such a damning statement, Defendants appear to have taken a dose of honesty after their false advertising of the product throughout 2012 and forward.

### iv) Continuity

Plaintiffs have clearly proven continuity when it comes to Defendants' enterprise. Throughout all Exhibits offered to Court in support of this motion, it is clear that Defendants are a mainstay in the promotion, marketing, manufacture, distribution, sale and shipment of their

controlled substance products (Dixie Dew Drops Tincture here) since their inception in 2012. The fact that Defendants' FAQs, having changed over the years to actually recommend _not_ to take their product if a consumer is subject to workplace drug testing, is dispositive proof of this continuity recognized by the RICO statute and case law.

### v) Harm and Causation

Plaintiffs have suffered now six (6) years of career-ending financial harm. Annexed hereto as Exhibit "14" is a copy of Plaintiff's expert Economist's (Dr. Mark Zaporowski) report finding damages in the amount of $836,544 as of one year ago.

"To establish a RICO claim, a plaintiff must show: (1) a violation of the RICO statute, 18 U.S.C. §1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962." *Spool*, 520 F.3d at 183.

As for Causation, the Second Circuit uses a two-part test for proximate cause in civil RICO. *Baisch v. Gallina*, 346 F.3d 366, 373 (2d Cir. 2003). "First, the plaintiff's injury must have been 'proximately caused by a pattern of racketeering activity violating 18 U.S.C. §1962 or by individual RICO predicate acts.'" (quoting *Lerner v. Fleet Bank*, 318 F.3d 113 (2d Cir 2003). "Second, the plaintiff must have suffered a direct injury that was foreseeable." Here, Plaintiffs have clearly shown in their attached Affidavit that but for taking Defendants product, the distribution of which was the racketeering activity and the RICO predicate acts, Plaintiff Douglas Horn would not have been terminated from his employment. He took the product proximate in time to the positive test for THC in the drug screening, and had no employment or criminal history of marijuana use.

## II.  Plaintiffs Have Proven Every Element of Their Claims Under GBL 349 and 350 for Deceptive Practices and False Advertising.

Only two months ago, this very Court by the Hon. Frank P. Geraci, Jr. considered the standard under GBL 349 and GBL 350 in a labeling case such as the one here, in part. In *Holve v. McCormick & Co.*, 2018 U.S. Dist. LEXIS 137428 (W.D.N.Y. August 14, 2018), this Court stated Plaintiffs' burden of proof at page 36:

> "New York's GBL §§349 and 350 prohibit "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state' and materially misleading advertising, respectively." *Petrosino v. Stearn's Prods.*, No. 16-CV-7735 (NSR), 2018 U.S. Dist. LEXIS 55818, 2018 WL 1614349, at *6 (S.D.N.Y. Mar. 30, 2018) ) (alterations in original) (citing GBL §§ 349(a), 350. A plaintiff must allege the following to state a prima facie claim under GBL § 349: "(1) the act or practice was consumer-oriented; (2) the act or practice was misleading in a material respect; and (3) the plaintiff was injured as a result." *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009) (citing *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000)). Whether an act or practice is deemed "misleading in a material respect" turns on whether it would be misleading or deceptive "to a reasonable consumer acting reasonably under the circumstances." *Goldemberg v. Johnson & Johnson Consumer Cos.*, Inc., 8 F. Supp. 3d 467, 478 (S.D.N.Y. 2014). The elements of a claim under § 350 are the same as those under § 349, except that a plaintiff must also demonstrate that the claim relates specifically to false advertising. See *Koch v. Greenberg*, 14 F. Supp. 3d 247, 261 (S.D.N.Y. 2014) ("GBL §350 prohibits false advertising and has the same elements as § 349 . . . .").

### i) Consumer-Oriented

There is simply no question that the offering of the Dixie X Tincture product to the general public through magazine advertisements, You Tube videos, FAQs, press releases and the utter absence of warning labels as to THC or controlled substance content was consumer oriented conduct by the Defendants. The basis of this case is that Plaintiff Douglas *consumed* this product and immediately afterward tested positive for THC, and was then immediately terminated from his employment. The Defendants' concerted supplying of the product, for a price, was

22

quintessential consumer-oriented conduct.

**ii)    Misleading Act or Practice**

Plaintiffs' set out to prove that list of deceptive practices and false advertising acts in their Complaint (Defendants' Exhibit "A") under GBL §349 and §350:

      a.    misrepresenting in advertising that the Dixie Products were safe and legal for consumers;

      b.    misrepresenting in advertising that Defendants had adequately tested their products;

      c.    misrepresenting that the products complied New York State and the federal laws and regulations;

      d.    misrepresenting that their products contained no THC;

      e.    misrepresenting that the ingestion of its products would not cause a positive toxicology result;

      f.    misrepresenting that their products had beneficial health, wellness and medical uses.

As in the RICO claims argued above, through evidence and testimony elicited in this case, Plaintiffs have proven all of the above categories of deceptive practices and false advertisements. Notwithstanding this limited list in a.-f. above, the evidence and testimony Plaintiffs have elicited in this case prove far more bad conduct. (See the Affidavit and accompanying reports of Dr. Kenneth Graham annexed to this Motion). Dr. Graham is not only a Forensic Toxicologist, he is a Pharmacologist and is competent to and has testified to false advertising and labeling as well, and Defendants' violations of federal law.

The multiple media advertisements and affirmative statements that the Tincture product had "no THC", was "THC free" and had "0% THC" was painfully misleading. This was conclusively shown in Defendants' own Certificates of Analysis produced in this case, as well as

the EMSL lab report Plaintiff obtained regarding the Defendants' product he took, confirming an amount of THC in Defendants unopened bottle of the Dew Drops Tincture it later sent to Plaintiff.

Plaintiff Douglas was a reasonable consumer acting reasonably. (See the Affidavit of Plaintiffs). Mr. Horn researched the product on multiple media; he relied on the multiple express representations that there was no THC in the product he bought and took; he was aware of products with the innocuous "CBD" in them, as opposed to the illegal THC; and he was well aware of the employment repercussions if he did ingest THC as a truck driver subject to DOT random drug testing over his then 14-year career.

### iii)    Injury

According to Plaintiffs' expert economist, Plaintiffs suffered lost income damages from termination to the date of the expert report August 23, 2017 in the present value of 836,544.

### III    Fraud

For reasons identical to, and upon the same testimonial and evidentiary support referenced above, Plaintiffs have proven or at least shown a question of fact as to their Fraudulent Inducement claim. The above arguments need not be reiterated. In summary, Plaintiff has shown that he justifiably relied on the multiple misrepresentations in multiple media by the Defendants as to the lack of THC content in the product which lead to his damages. Defendants cannot escape liability because they simply state "they believed" what they were sending to a New York consumer did not violate federal law. It clearly did.

### D.    UCC Section 2-318

Plaintiffs herein have also shown a question of fact, mainly through Defendants own Certificates of Analysis and Plaintiffs' EMSL lab report that the Defendants' product

24

unequivocally contained THC. As such and by definition, there is a question of fact that it was unreasonably dangerous and defective as Defendants offered to the nationwide consuming public.

**E.    Negligence**

Plaintiffs have alternatively alleged the above conduct and evidence supporting constituted negligent conduct. While the above analysis describes a consistent and intentional course of conduct by Defendants to profit from the sale of their product, it at very least establishes a course of negligent conduct which the Court should also respectfully pass through to the trier of fact.

WHEREFORE, Plaintiffs respectfully request that this Court deny the Defendants' DIXIE's  motion for summary judgment and grant such other and further as the court may deem just proper.

Dated: Great Neck, New York
   November 15, 2018     KUPILLAS, UNGER & BENJAMIN, LLP.

*Jeffrey Benjamin*
Jeffrey Benjamin
*Attorney for Plaintiffs*
DOUGLAS J. HORN and CINDY HORN
1 Linden Place, Suite 410
Great Neck, NY 11021
(516) 213-4493

25