```
UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-----------------------------------------X
DOUGLAS J. HORN and CINDY HARP-HORN,

                    Plaintiffs,
                                         Civil Action No.
       -against-                         15-cv-701 FPG/MJR

MEDICAL MARIJUANA, INC., DIXIE ELIXIRS
AND EDIBLES, RED DICE HOLDINGS, LLC and
DIXIE BOTANICALS,

                    Defendants.
-----------------------------------------X
```

                    805 Third Avenue
                    New York, New York

                    December 12, 2017
                    10:06 A.M.

     EXAMINATION BEFORE TRIAL OF DR. CINDY ORSER, an Expert Witness appearing on behalf of the Defendants herein, taken pursuant to Notice, and held at the above time and place before Terri Fudens, a Stenotype Reporter and Notary Public of the State of New York.

1                CINDY ORSER
2    the article.  It's the second page of the exhibit,
3    but it's page 9 of the article under the heading
4    the major plant Cannabinoids, do you see that?
5         A    Yes.
6         Q    And the sentence says
7    tetrahydrocannabinol, otherwise known as THC.  I
8    should say THC is in parentheses, is a powerful
9    psychoactive agent, analgesic, muscle relaxant,
10   antispasmodic, neuroprotective antioxidant that
11   delivers 20 times the anti-inflammatory power of
12   aspirin and twice the power of Hydrocortisone.
13             Do you see that paragraph?
14        A    Yes.
15        Q    THC is a wonder drug; isn't it?
16             MR. SHEPS:  Objection as to
17             form.
18        Q    Can you answer the question?
19        A    It's pretty amazing.
20        Q    Did you ever describe marijuana as a
21   wonder drug?
22        A    No.
23        Q    Are you an advocate of keeping THC in
24   formulated cannabis products?
25        A    Yes.

```
 1                    CINDY ORSER
 2        Q    Why?
 3        A    Well, to the best of our knowledge,
 4   THC is a key contributor to the effectiveness of
 5   cannabis.  So removing THC from cannabis per se
 6   wouldn't make sense.
 7        Q    Is it fair to say that a product, and
 8   I mean a formulated product, we're talking about a
 9   formulated product in this case, would be
10   ineffective without any THC?
11        A    No.
12        Q    What then makes a product effective
13   without THC?  What component of a formulated
14   Medical Marijuana product would make it effective
15   without THC?
16        A    CBD.
17             MR. SHEPS:  Objection.
18        Q    Okay.  CBD is not a Schedule 1 drug;
19   correct?
20             MR. SHEPS:  Objection.
21        A    I don't believe so.
22        Q    Are you aware of the Schedule 1
23   substances?
24        A    I think there's three.
25        Q    There are three in your line of work,
```

```
 1                       CINDY ORSER
 2   allowed is what?
 3                  MR. SHEPS:  Objection.
 4        A     Less than .3 percent.
 5        Q     Where is that standard from?
 6        A     Before 2014, I'm not sure.
 7        Q     Less than .3 percent only came to be
 8   a requirement post 2014?
 9                  MR. SHEPS:  Objection.
10        A     I'm associating it with the Farm
11   Bill, but that might not be accurate.
12        Q     Do you know the original source of
13   that .3 threshold that you mentioned?
14        A     I don't.
15        Q     What does that .3 threshold apply to
16   exactly, levels of what in what?
17        A     .3 percent of THC.
18        Q     In what?
19        A     In the raw -- the raw plant, the
20   extracted plant.  Whatever the hemp product is.
21        Q     Well, is it the raw hemp plant, or is
22   it some other product?
23        A     Well, people aren't going to import
24   raw hemp.  They're going to be importing extract.
25        Q     Well, didn't this paragraph suggest
```

1                      CINDY ORSER
2   so I don't really know if they're related.
3        Q    So this product that -- this was one
4   of the things that -- these four pages were what
5   you reviewed as a basis for your opinions in your
6   report; correct?
7        A    Yes.
8        Q    Who provided you these?
9        A    It was in the Messner Reeves
10  documents.
11       Q    These are not specific as to a lot of
12  the product?
13       A    Correct.
14       Q    So as I think you just stated, these
15  do not correspond to the product that Mr. Horn
16  says that he took between October 1 and October 9,
17  2012; right?
18       A    Correct.
19       Q    Would it have been useful to you to
20  get the Certificates of Analysis that did apply to
21  that particular product?
22       A    Yes.
23       Q    Did you ask for those particular
24  Certificates of Analysis?
25       A    Apparently they don't exist.

                                                               157

 1                         CINDY ORSER
 2     Analysis in front of you were a representative --
 3     were as to a representative sample of that which
 4     was on the market on October 1, 2012?
 5                    MR. SHEPS:  Objection.
 6                    MR. BORON:  Objection as to
 7            form.
 8          A     I don't know.
 9          Q     So we don't even know if what was
10     tested here on these Certificates of Analysis was
11     even a representative sample; correct?
12          A     Correct.
13                    MR. BORON:  Objection as to
14            form.
15                    MR. SHEPS:  Objection.
16          Q     I guess the question is then why do
17     you think these would be useful in determining the
18     THC content of the Dixie Elixir product at issue
19     here?
20          A     I found this relevant because it
21     demonstrates that Dixie was complying with the
22     requirements in the State of Colorado, that their
23     products are below the .3 percent THC.
24          Q     That .3 percent is a Colorado
25     threshold?

```
 1                    CINDY ORSER
 2      A    It's Colorado, but it's also the Farm
 3 Bill; right?   But it is Colorado.
 4      Q    Back in 2012, the Farm Bill didn't
 5 apply; right?
 6      A    Right.
 7      Q    So back in 2012, was .3 percent a
 8 state legal limit for THC in Colorado?
 9               MR. SHEPS:  Objection.
10      A    That was my assumption.
11      Q    We had to get the .3 percent from
12 somewhere.   It's not your testimony that it came
13 from the Controlled Substances Act; right?
14               MR. BORON:  Objection as to
15               form.
16               MR. SHEPS:  Objection.
17      A    I can't clarify that without looking
18 at the document.
19      Q    To your knowledge, in 2012, say in
20 the month of October of 2012, there was no maximum
21 legal limit for THC in the State of New York;
22 correct?
23               MR. SHEPS:  Objection.
24      A    I don't know.
25      Q    Do you have an idea of whether -- if
```

1                    CINDY ORSER

2      the reason for you not having the specific

3      Certificates of Analysis had anything to do with

4      CannLabs' closure as a business?

5                    MR. BORON:  Objection to form.

6           A     I can't say.

7           Q     As you sit here today, you don't know

8      where CannLabs records would be held?

9           A     I don't know.

10          Q     Do you think that Jennifer Murray

11     would be able to tell me?

12                   MR. BORON:  Objection to the

13              form.

14          A     I don't know.

15          Q     Do you have any reason to believe

16     with your testimony as to the relevance of this

17     that this can be relied upon as an accurate

18     measure of THC in the product of October 1, 2012?

19                   MR. BORON:  Objection as to

20              form.

21                   MR. SHEPS:  Objection.

22          A     I can't really say that either.

23          Q     Okay.  What are batch records as

24     compared to Certificate of Analysis?

25          A     So a batch record would be for

1                    CINDY ORSER

2    whatever the batch size is, whatever that unit is.

3    So batch is -- usually the cured flower is a

4    batch, or a bulk extraction is a batch.  This is a

5    finished product.

6         Q    Would there have been batch records

7    with respect to both the product that was tested

8    on October 16 and the one that was tested back on

9    October 1, 2012?

10        A    That's a question for CannLabs and

11   Dixie.  I don't know the answer.

12        Q    Is that something that you would have

13   liked to have seen for this report?

14        A    Yes.

15        Q    Did you ask them for that?

16             MR. BORON:  Objection as to

17        form.

18             MR. SHEPS:  Objection.

19        A    I did not.

20        Q    To clarify, the batch records have to

21   do with the quantity of the sample that's provided

22   to make these Certificates of Analysis; is that a

23   proper statement?

24        A    It's just upstream of a finished

25   product.  So, you know, if you're Stouffer and

1                    CINDY ORSER

2   you're manufacturing frozen lasagna, first you

3   have to cook the noodles, right, and then you have

4   to make the sauce.  Then you have your final

5   product, which is the lasagna.

6        Q    Gotcha.  But batch records don't talk

7   about THC, right, to your knowledge?

8              MR. SHEPS:  Objection.

9        A    To my knowledge for them, I don't

10  know.

11       Q    Did you at all find it unusual that

12  they gave you these Certificates of Analysis for a

13  different product?

14       A    Well, yes.

15             MR. BORON:  Objection as to

16             form.

17       Q    Okay.  Looking at the actual face of

18  these documents, if you would, the first page of

19  Graham 13, Graham Exhibit 13, does show what you

20  stated as the maximum legal limit for THC --

21  excuse me, to .3 percent, 0.3 percent?

22       A    Yes.

23       Q    And next to it it says asterisk,

24  undetectable, and the asterisk seems to refer to

25  the asterisk explanation underneath.  It says:

```
 1                    CINDY ORSER
 2   .05 and .04 are less than .3; correct?
 3        A    Correct.
 4        Q    However, those numbers indicate some
 5   quantity of THC; right?
 6        A    Detectable, even though right here
 7   they say if it's below .1, it's not detectable,
 8   even though they're reporting it later.
 9        Q    When you say reporting it later, are
10   you talking about the .05 percent?
11        A    On the first page it says
12   undetectable.  It defines undetectable as below
13   0.1, but yet on the last two pages, they're
14   reporting a value of less than .1.  The .04 and
15   .05 percent.
16        Q    So there is, at least with respect to
17   the .05, a detectable amount of THC; correct?
18             MR. BORON:  Objection as to
19             form.
20        A    It's being reported.
21        Q    And it doesn't say undetectable
22   there; right?
23        A    Right.
24        Q    So that is some quantity of THC in at
25   least these Certificates of Analysis?
```

1                    CINDY ORSER
2     industrial hemp, that this was the final
3     formulated product?
4                MR. BORON:  Objection to form.
5                MR. SHEPS:  Objection.
6        A    It says 500 milligrams.  It gives a
7     sample size.  I'm assuming it was the formulated
8     product.
9        Q    Were you ever supplied the product
10    from Dixie or Medical Marijuana or anybody?
11       A    No.
12       Q    Okay.  Moving on to page 4 of your
13    report.
14               MR. SHEPS:  Can we take a brief
15               break?
16               MR. BENJAMIN:  Okay.
17               (At this time, a brief recess
18               was taken.)
19               MR. SHEPS:  I just want to
20               clarify something for the record.
21               Jeff, we had spoken just a moment ago
22               about the exhibit marked as Orser D
23               which was an internal chain of
24               custody with an order ID 281201415
25               dated October 29, 2012.

Case 1:15-cv-00701-JWF   Document 70-13   Filed 11/16/18   Page 13 of 15

178

```
 1                       CINDY ORSER
 2    together; right?
 3         A     Yes.
 4         Q     What state are you talking about
 5    there?
 6         A     Colorado.
 7         Q     And because that's the state where we
 8    believe the product was manufactured; correct?
 9         A     Correct.
10         Q     You're saying that there's also a
11    federal limit of the .3 percent.  You see that
12    there?
13         A     Yes.
14         Q     As you sit here today, you don't know
15    the source of that maximum threshold for the THC
16    guideline?
17         A     Not in 2012.
18         Q     But in 2014, it was the Farm Bill?
19         A     Yes.
20         Q     And in that statement, implicit in
21    that statement, because you haven't stated it
22    specifically, you're applying that .3 percent
23    threshold to the final formulated Dixie product at
24    issue here?
25         A     Yes.
```

CINDY ORSER

```
 1                    CINDY ORSER
 2          form.  What numbers?
 3               MR. BENJAMIN:  I just stated
 4          them.  170 as opposed to 500 in the
 5          Certificates of Analysis.
 6               MR. BORON:  500 what?
 7               MR. BENJAMIN:  500 parts per
 8          million.
 9               THE WITNESS:  .05.
10               MR. BENJAMIN:  That's the .05
11          number.
12       Q   Given that, given what evidence of
13   chain of custody are there or adulteration issues
14   is there with that kind of ratio?
15               MR. SHEPS:  Objection.
16               MR. BORON:  Objection as to
17          form.
18       A   It's just the comparability.  These
19   aren't C of As for the product Mr. Horn took.
20   We've never seen the product Mr. Horn took.  The
21   product he took was never tested.  This is another
22   version of the product at a later date.  We don't
23   know if they changed, how they did anything.
24   There's a degree of uncertainty here.
25       Q   You mentioned -- do you feel that the
```

1                    CINDY ORSER
2        A    Yes.
3        Q    Now I submit to you that HempMeds PX
4   has been stated to be the company that was
5   offering the Dixie Botanicals brand.  Pursuant to
6   a letter that the Horns actually received.
7             But looking simply at the information
8   in that frequently asked question, that is
9   actually an FAQ with respect to workplace drug
10  screening; correct?
11       A    Yes.
12       Q    If I told you that the Dixie
13  Botanical FAQs have changed over the years to
14  include that, that language, would that indicate
15  to you that Dixie, and here HempMeds, was aware
16  that THC produced -- that THC was in their product
17  and produced positive test results?
18                 MR. BORON:  Objection to form.
19                 MR. SHEPS:  Objection.
20       A    I would interpret this that they knew
21  there could be some THC, but they were making
22  efforts to have THC free products.
23       Q    As of the date of the posting of
24  those FAQs; correct?
25                 MR. BORON:  Objection as to