UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
DOUGLAS J. HORN and CINDY HORN,            Civil Action No. 15-cv-701
                                              (FPG)(MJR)

                     Plaintiffs,

        -against-

MEDICAL MARIJUANA, INC.;
DIXIE ELIXIRS AND EDIBLES;
RED DICE HOLDINGS, LLC; and
DIXIE BOTANICALS
                     Defendants.
------------------------------------------------------------------X


### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
### <u>DIXIE ELIXIRS AND EDIBLES' MOTION FOR SUMMARY JUDGMENT</u>

KUPILLAS, UNGER & BENJAMIN, LLP.

Jeffrey Benjamin
*Attorney for Plaintiffs*
DOUGLAS J. HORN and CINDY HORN
1 Linden Place, Suite 410
Great Neck, NY 11021
(516) 213-4493

## TABLE OF CONTENTS

STATEMENT OF FACTS………………………..…………………….............1

PREDICATE ACTS AND FALSE ADVERTISING ……………..……….…..…1

STANDARD FOR SUMMARY JUDGMENT…………………................................3

ARGUMENT……………………………………….........................................3

    I.     Plaintiffs Have Proven RICO . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ..3

         *a.*  Separate and Distinct RICO Enterprise………………………….4

         *b.*  Pattern of Racketeering Activity ………………………………5

             *i.*  At Least Two Acts of Racketeering ………………………...5

             *ii.*  Continuity ……………………………………………...8

         c.  Harm and Causation ……………………………………...8

II.    There is a Disputed Issue of Material Fact as to the GBL Claim ……………...…9

      a.     Affirmation Action/Consumer-Oriented …………………………9

      b.     Misleading Nature of Ad …………………………………..12

      c.     Cindy Horn Suffered Damages……………………......….…………16

      d.     The Plaintiffs Have Standing ……………………………………18

      e.     The Plaintiffs Did Not Misquote the Ad ……………………..19

III.    The Fraud Claim is Sustainable …………………………………20

IV.    Products Liability is Sustainable …………………………………...21

V.    The Plaintiffs Did Not Receive What Was Purchased ………………………21

VI.    The Plaintiffs Have Proven Negligence ………………………………21

VII.    The Negligent Infliction Claim is Sustainable ……………………………...22

Conclusion ……………………………………………………………22

## <u>TABLE OF AUTHORITIES</u>

**Statutes & Rules**

15 U.S.C §52 ……………………………………………………………………2-3

18 U.S.C. §1716……………………………………………………………………2

18 U.S.C. §1961, et seq…... ……………………………………………… *passim*

21 U.S.C §801-971 ………………………………………………………………...2

21 U.S.C. §1308 …………………………………………………………………...2

GBL 349 – 350 ………………………………………………………………*passim*

Federal Rule of Civil Procedure 56 ……………………………………………...3

**Cases**

*Accredited Aides Plus, Inc. v. Program Risk Management, Inc.,* 147 A.D.3d 122,
  46 N.Y.S.3d 246 (3d Dept. 2017)…………………………………………11

*Ackerman v. Coca-Cola Co.,* 2010 WL 2925955 (E.D.N.Y. 2010). ………………………17

*Adirondack Transit Lines, Inc. v. United Transp. Union, Local 1582*, 305 F.3d 82 (2d Cir.
  2002)…………………………………………………………..........…............. …..3

*Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 107 S. Ct. 2759,
  97 L. Ed. 2d 121 (1987))............................................................................5

*Baisch v. Gallina*, 346 F.3d 366, 373 (2d Cir. 2003)............................................................8

*Benetech, Inc. v. Omni Financial Group, Inc.,* 116 A.D.3d 1190, 984 N.Y.S.2d 186
  (3d Dept. 2014)…………………………………………………………………11

*Buonasera v. Honest Company, Inc.,* 208 F.Supp.3d 555 (S.D.N.Y. 2016)………………...15

*Campbell v. Freshbev LLC*, 322 F.Supp.3d 330 (E.D.N.Y. 2018)……………………...14; 15

*Cedric Kushner Promotions Ltd. v. King*, 533 U.S. 158, 121 S. Ct. 2087,
  150 L. Ed. 2d 198 (2001)…….....................................................................17

*Crabhouse of Douglaston Inc. v. Newsday Inc.*, 801 F. Supp. 2d 64 (E.D.N.Y. 2011)………4

DHL v. MMI, Superior Court, San Diego, CA, Case No. 37-2013-00058302]………..........11

*David v. #1 Mktg. Serv., Inc.,* 113 A.D.3d 810, 979 N.Y.S.2d 375 (3d Dept. 2014)………12

*Delgado v. Ocwen Loan Servicing, LLC,* 2014 WL 4773991 (E.D.N.Y.).  …………………12

*Fink v. Time Warner Cable*, 714 F.3d 739 (2d Cir. 2013)…………………………………19

*Goshen v. Mut. Life Ins. Co of New York,* 98 N.Y.2d 314, 774 N.E.2d 1190,
    746 N.Y.S.2d 858 (2002)……………………………………………………………...18

*Graham v. Eagle Distributing Co., Inc.,* 224 A.D.2d 921, 921-22,
    637 N.Y.S.2d 583, 583 (4 Dept. 1996)………………………………………………11

*Goldemberg v. Johnson & Johnson Consumer Cos., Inc.,* 8 F.Supp.3d 467
    (S.D.N.Y. 2014)………………………………………………………………………14

*Greene v. Gerber Products Co.,* 262 F.Supp.3d 38 (E.D.N.Y. 2017)……………………...17

*Gross v. Waywell*, 628 F. Supp. 2d 475, 497 (S.D.N.Y. 2009)................................................4

*Hidalgo v. Johnson & Johnson Consumer Companies, Inc.,* 148 F.Supp.3d 285
    (S.D.N.Y. 2015)………………………………………………………………………16

*Holve v. McCormick & Co.*, 2018 U.S. Dist. LEXIS 137428 (W.D.N.Y. August 14, 2018)
    …………………………………………………………………………………………9

*Izquierdo v. Mondelez Intl., Inc.,* 2016 WL 6459832 (S.D.N.Y.)…………………………17

*Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9 (2d Cir.1986)……………………………...............3

*Lerner v. Fleet Bank*, 318 F.3d 113 (2d Cir 2003)...............................................................8

*Mathirampuzha v. Potter*, 548 F.3d 70 (2d Cir. 2008)……………………………...............3

*Orlander v. Staples, Inc.*, 802 F. 3d 289 (2nd Cir. 2015)…………………………………10

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.,*
    85 N.Y.2d 20, 623 N.Y.S.2d 529, 647 N.E.2d 741 (1995)………………………...20

*People on Complaint of Moffitt v. Wendelken*, 10 Misc.2d 442
    (City Magistrate's Court of New York, Borough of Manhattan, 1956)…………...10

*Riverwoods Chappaqua Corp. v. Marine Midland Bank*, 30 F.3d 339  (2d Cir.
    1994……………………………………………………….....................................4

*Spagnola v. Chubb Corp.,* 574 F.2d 64 (2d Cir. 2009)…………………………………12

*Spira v. Nick*, 876 F. Supp. 553 (S.D.N.Y.1995)……………………..…………....…………..4

*Spool v. World Child Intern. Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008)..........5; 8

*Teller v. Bill Hayes, Ltd.,* 213 A.D.3d 141, 145, 630 N.Y.S.2d 769, 772 (2d Dept. 1995)..11

*United States v. Turkette*, 452 U.S. 576, 593, 101 S. Ct. 2524,
69 L. Ed. 2d 246 (1981)..............................................................................................6

*UPS Store, Inc. v. Hagan*, 99 F.Supp.3d 426 (S.D.N.Y. 2015)…………………………21

*Weisblum v. Prophase Labs, Inc.,* 88 F.Supp.3d 283 (S.D.N.Y. 2015)……………………19

*Wilson v. Northwestern Mut. Ins. Co.,* 625 F.3d 54 (2d Cir. 2010). ………………………12

The Plaintiffs, Douglas J. Horn and Cindy Harp-Horn ("Plaintiffs"), submit this Memorandum of Law in Opposition to Defendant DIXIE's Motion for Summary Judgment.

## Statement of Facts

For the sake of brevity as to the facts, the Plaintiffs respectfully refer the Court to the annexed Affidavits of the Plaintiffs, Affidavit of Ellen Voie, Affidavit of Kenneth Graham, Ph.D., as well as the Local Rule 56(a)(2) Statement accompanying this opposition.

## Predicate Acts and False Advertising

Plaintiffs fully incorporate by reference herein, Plaintiff's Expert's (Dr. Kenneth D. Graham, Forensic Toxicologist and Pharmacologist) annexed Affidavit along with his two (2) supporting Reports disclosed in discovery in this case. Because Dr. Graham is a "Forensic" Toxicologist, he is uniquely qualified to show the Court the marriage between law and science in this matter to prove Defendants' strict liability under these statutes for the manufacturing, distributing, selling and the *sending* of their Dixie Dew Drops Tincture product that may very well have been legal to distribute and sell in Colorado in 2012, but was clearly illegal in New York then.

Briefly stated, in his review of the materials in this case, Dr. Graham identified multiple *per se* violations of the federal Controlled Substances Act ("CSA") with respect to Defendants' conduct, testimony and the documents they produced. Dr. Graham has shown the Defendants liable for the below predicate statutory offenses, the existence of which prove Plaintiffs' cases under §349 and GBL §350 for false advertising, and *inter*

1

*alia,* mail and wire fraud under the federal Racketeer Influenced and Corrupt Organizations Act ("RICO") 18 U.S.C. §1962(a)-(d).

More specifically, Dr. Graham showed that the Defendants' final product formulations of the Dixie X Dew Drops Tincture product with the presence of "*any"* amount of THC rendered it a Schedule 1 controlled substance as described under 21 U.S.C. §1308.11, and not eligible for an exemption to a Schedule I classification under 21 U.S.C. §1308.35 since it was formulated, marketed and distributed for human consumption.

Further, Dr. Graham showed that Defendants' manufacturing process test results in its Certificates of Analysis produced in discovery showing the presence of THC in the product signifies that the advertising and public statements asserting the product contained "no THC" were false and unlawful under 15 U.S.C §52.

Dr. Graham stated that since the Defendants were not registered with the US Drug Enforcement Administration, their distribution of a Schedule I substance, such as Dixie Dew Drops Tincture product across state lines was unlawful under 21 U.S.C §801-971 and, if the product was shipped through the domestic mail system, the distribution was also unlawful under 18 U.S.C. §1716.  In addition, the defendants manufactured and distributed a controlled substance in violation of 21 U.S.C. §841.

As a Schedule I controlled drug substance under 21 U.S.C. §1308.11, Dixie X Elixir was subject to specific packaging and labelling requirements under 21 U.S.C. §1302.03. Since the product was a Schedule I controlled substance, the absence of language on its packaging and labels therefore violated packaging and labeling requirements under 21 U.S.C. §1302.03.

Finally the multiple representations that Defendants disseminated across multiple media that the products "do not conflict with any state or Federal law" and that the parent company, Medical Marijuana, Inc. "does not grow, sell or distribute any substances that violate United States Law or the controlled substances act" are clearly false and violate 15 U.S.C §52 covering the dissemination of false advertisements.

These multiple violations of the Controlled Substances Act summarized above constitute strict liability under the two causes of action under which Plaintiffs' move herein.

## **Standard of Review**

"Summary judgment may not be granted unless 'the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.'" Fed.R.Civ.P. 56(c)(2); see *Adirondack Transit Lines, Inc. v. United Transp. Union, Local 1582*, 305 F.3d 82, 85 (2d Cir. 2002).  The role of the court in deciding a motion for summary judgment "is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party." *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 11 (2d Cir.1986).  Factual determinations are reviewed in a light most favorable to non-moving party.  *Mathirampuzha v. Potter*, 548 F.3d 70, 74 (2d Cir. 2008).

## **Argument**

### I.    **Plaintiffs Have Proven Every Element Under Their RICO Claims.**

To establish a civil RICO claim, Plaintiff must establish (A) a separate and distinct RICO enterprise that (B) engaged in a pattern of racketeering activity (C) causing

harm to the Plaintiff. 18 U.S.C. §1962(c); *Riverwoods Chappaqua Corp. v. Marine Midland Bank*, 30 F.3d 339, 343-44 (2d Cir. 1994).

### A) Separate and Distinct RICO Enterprise

A civil RICO claim arises under 18 U.S.C. §1962(c) when a RICO "person" participates in the conduct of a RICO "enterprise" through a pattern of racketeering activity:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

The "person" and "enterprise" in a civil RICO action must be distinct. *See Riverwoods*, 30 F.3d at 344. In other words, a RICO claim requires at least two separate and distinct entities. *See Cedric Kushner Promotions Ltd. v. King*, 533 U.S. 158, 161, 121 S. Ct. 2087, 150 L. Ed. 2d 198 (2001)(requiring "[t]he existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name").

When analyzing a civil RICO claim, the Court "begin[s] from an understanding of what enterprise is alleged." *Crabhouse of Douglaston Inc. v. Newsday Inc.*, 801 F. Supp. 2d 64, 74 (E.D.N.Y. 2011)(Hurley, J.)(quoting *Spira v. Nick*, 876 F. Supp. 553, 561 (S.D.N.Y. 1995) (Kaplan, J.)). There are two types of RICO enterprises: "'legal entities' such as corporations and partnerships, and 'any union or group of individuals associated in fact although not a legal entity.'" *Gross v. Waywell*, 628 F. Supp. 2d 475, 497 (S.D.N.Y. 2009) (Marrero, J.)(quoting 18 U.S.C. §1961(4)).

The latter enterprise, known as an "association-in-fact" enterprise, applies here,

where the RICO enterprise is comprised of the three "persons" i.e. the legal entity Defendants Medical Marijuana, Inc, Dixie Elixirs, LLC. and Red Dice Holdings, LLC. Each of these legal entities had a hand in the promotion and marketing, manufacturing and distributing, packaging and labeling, and selling and sending out the Dixie Dew Drops Tincture product containing the controlled substance THC to consumers in New York, which Plaintiff Douglas Horn took. There is no better example of a RICO enterprise than the coordinated effort of these three Defendants to market, distribute, sell and of course profit from, the Tincture product sold to Plaintiff here. In 2012, Defendants stated in their press release those many years ago their medical marijuana industry had a value of $5,000,000,000. See Exhibit "10."

### B. Pattern of Racketeering Activity

The second element for a civil RICO action is a pattern of racketeering activity. A pattern of racketeering activity requires "at least two acts of racketeering activity, . . . the last of which occurred within ten years . . . after the commission of a prior act of racketeering activity. 18 U.S.C. §1961(5). An act of racketeering "must be among the various criminal offenses list[ed] in §1961(1), and they must be 'related, and [either] amount to or pose a threat of continuing criminal activity.'" *Spool v. World Child Intern. Adoption Agency*, 520 F.3d 178, 183 (2d Cir. 2008) (citation omitted). In short, a "pattern of racketeering activity" must consist of (1) multiple racketeering activities (2) that threaten continuing criminal activity.

### i)    At Least Two Acts of Racketeering

Plaintiffs' Complaint (Exhibit "A") alleges the following under 18 U.S.C. §1961(1) and §1962:

a) Selling and/or distributing a product through the U.S. mail that was known or should have been known to be a controlled substance or otherwise illegal or otherwise in violation of federal or state law;

b) Inducing the sale of an illegal product through promises of curing medical conditions of consumer purchasers of said product;

c) Misrepresenting in advertising that the Dixie Products were safe and legal for consumers;

d) Misrepresenting that the products complied New York State and the federal laws and regulations;

e) Purposefully failing to disclose material facts regarding the product to induce the purchase of an illegal product;

f) Concealing the true chemical content from consumers in its advertising and labelling in order to avoid inquiry into the legality of same.

Through evidence and testimony elicited in this case, Plaintiffs have proven all of the above, though they are only required to prove two (2). Notwithstanding this limited list in a)-f) above, the evidence and testimony Plaintiffs have elicited in this case prove far more bad conduct. (See the Affidavit and accompanying reports of Dr. Kenneth Graham annexed to this Motion).

Civil RICO deputizes civil litigants as "private attorney general[s]" to further the "preventive and remedial" purposes of the statute. *Id.* at 481 (quoting *United States v. Turkette*, 452 U.S. 576, 593, 101 S. Ct. 2524, 69 L. Ed. 2d 246 (1981), and *Agency Holding Corp. v. Malley-Duff & Associates, Inc.*, 483 U.S. 143, 107 S. Ct. 2759, 97 L. Ed. 2d 121 (1987)). The Court acts as a gatekeeper in civil RICO cases to ensure that the alleged offenses are "of a degree sufficiently serious not only to inflict injury upon its immediate private victims, but also to cause harm to significant public processes or institutions, or otherwise pose threats to larger societal interests worthy of the severe punitive and deterrent purposes embodied in the statute. *Id.* The alleged offenses here are

serious. Plaintiffs have proven multiple violations of the Controlled Substances Act, which evidences a significant risk of repetition across the entire U.S. consumer landscape and exemplifies civil RICO's "preventive" purpose:

There is nothing more illustrative of Defendants' liability then their own later-published statement in an FAQ, admitting to the very liability Plaintiffs have proven here. Dixie's answer in the attached Exhibit "3", in the April 8, 2015 FAQ stated the following:

> **"Does Cannibidiol (CBD) and other natural hemp based constituents show up on a drug test?"**
>
> "Most workplace drug screens and tests target delta9-tetrahydrocannabinol (THC) and do not detect the presence of Cannabidiol (CBD) *or other legal natural hemp based constituents*. However, studies have shown that eating hemp foods and oils *can cause confirmed positive results* when screening urine and blood specimens. Accordingly, if you are subject to any form of drug testing, *we recommend (as does the United States Military) that you DO-NOT ingest our products*, and consult with your healthcare, drug screening/testing company or employer."

It cannot not be often that a Plaintiff can find an admission, or even an acknowledgement, of racketeering activity such as that in the above, albeit years after Defendants put a controlled substance out in the stream of commerce. In publishing such a damning statement, Defendants appear to have taken a dose of honesty after their false advertising of the product throughout 2012 and forward.

**ii) Continuity**

Plaintiffs have clearly proven continuity when it comes to Defendants' enterprise. Throughout all Exhibits offered to Court in support of this motion, it is clear that Defendants are a mainstay in the promotion, marketing, manufacture, distribution, sale and shipment of their controlled substance products (Dixie Dew Drops Tincture here)

since their inception in 2012. The fact that Defendants' FAQs, having changed over the years to actually recommend *not* to take their product if a consumer is subject to workplace drug testing, is dispositive proof of this continuity recognized by the RICO statute and case law.

### C. Harm and Causation

Plaintiffs clearly have suffered now six (6) years of career-ending financial harm. Annexed hereto as Exhibit "14" is a copy of Plaintiff's expert Economist's (Dr. Mark Zaporowski) report finding damages in the amount of $836,544 as of one year ago.

"To establish a RICO claim, a plaintiff must show: (1) a violation of the RICO statute, 18 U.S.C. §1962; (2) an injury to business or property; and (3) that the injury was caused by the violation of Section 1962." *Spool*, 520 F.3d at 183.

As for Causation, the Second Circuit uses a two-part test for proximate cause in civil RICO. *Baisch v. Gallina*, 346 F.3d 366, 373 (2d Cir. 2003). "First, the plaintiff's injury must have been 'proximately caused by a pattern of racketeering activity violating 18 U.S.C. §1962 or by individual RICO predicate acts.'" (quoting *Lerner v. Fleet Bank*, 318 F.3d 113 (2d Cir 2003). "Second, the plaintiff must have suffered a direct injury that was foreseeable." Here, Plaintiffs have clearly shown in their attached Affidavit that but for taking Defendants product, the distribution of which was the racketeering activity and the RICO predicate acts, Plaintiff Douglas Horn would not have been terminated from his employment. He took the product proximate in time to the positive test for THC in the drug screening, and had no employment or criminal history of marijuana use.

II.     **There is a Disputed Issue of Material Fact as to Every Element of Their Claims Under GBL 349 and 350 for Deceptive Practices and False Advertising.**

<u>Standard</u>

Only two months ago, this Court (Hon. Frank P. Geraci, Jr.) considered the standard under GBL 349 and GBL 350 in a labeling case such as the one here. In *Holve v. McCormick & Co.*, 2018 U.S. Dist. LEXIS 137428 (W.D.N.Y. August 14, 2018), this Court stated Plaintiffs' burden of proof at page 36:

> New York's GBL §§349 and 350 prohibit "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service in this state' and materially misleading advertising, respectively." *Petrosino v. Stearn's Prods.*, No. 16-CV-7735 (NSR), 2018 U.S. Dist. LEXIS 55818, 2018 WL 1614349, at *6 (S.D.N.Y. Mar. 30, 2018) ) (alterations in original) (citing GBL §§ 349(a), 350. A plaintiff must allege the following to state a prima facie claim under GBL § 349: "(1) the act or practice was consumer-oriented; (2) the act or practice was misleading in a material respect; and (3) the plaintiff was injured as a result." *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009) (citing *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000)). Whether an act or practice is deemed "misleading in a material respect" turns on whether it would be misleading or deceptive "to a reasonable consumer acting reasonably under the circumstances." *Goldemberg v. Johnson & Johnson Consumer Cos.*, Inc., 8 F. Supp. 3d 467, 478 (S.D.N.Y. 2014). The elements of a claim under § 350 are the same as those under § 349, except that a plaintiff must also demonstrate that the claim relates specifically to false advertising. See *Koch v. Greenberg*, 14 F. Supp. 3d 247, 261 (S.D.N.Y. 2014) ("GBL §350 prohibits false advertising and has the same elements as § 349 . . . .").

a)  **Affirmative Action/Consumer-Oriented**

The Dixie Defendants first argue that this "was not an Advertisement or an affirmative action taken by Defendants" (Dixie Memo, p. 4).  They look, in footnote, to the online dictionary definition of "advertisement," writing that neither the GBL nor New York case law defines the term (*Id* at n. 1).

At least one New York Court has looked to the Oxford Universal Dictionary

definition of "advertise" as follows:

> To call the attention of (another); to notify, admonish, or formally warn. Hence, to give notice of, make generally known.

*People on Complaint of Moffitt v. Wendelken*, 10 Misc.2d 442 (City Magistrate's Court of New York, Borough of Manhattan, 1956).

The Dixie Defendants argue that the Ad at issue was really an "editorial, periodical, or product review" containing "opinions, food recipes, reviews," but "was not a paid announcement" (Dixie Memo, p. 4). But this argument hinges on their definition of "advertisement," which includes the word "paid." The word "paid" does not appear in the definitions provided above, appearing in case law in New York.

Nor is the Dixie Defendants' argument that the Ad fails to constitute an advertisement because the article is not "exclusive" to them; and that there is no proof that Tripp Keber made the subject statements, availing (Dixie Defendants' Motion, p. 4). Again, there is nothing in the definition of "advertisement" that confines it to a certain form or exclusiveness. Instead, it is viewed in terms of a reasonable consumer; and a reasonable consumer in this case would believe that the Ad – whether exclusive or not and regardless of its specific form – was an advertisement. Indeed, in magazines and periodicals one frequently finds advertisements that appear to be more in the form of an informational article (e.g., inside of airplane magazines) but are in fact ads—whether they present opinions or not.

Notably, the Defendants cite no case law or other authority in support of their argument that they took no "consumer-oriented" action (*see*, Defendants' Memo, p. 4). At best, they include a footnote reference to their definition of "advertisement," and to argument that the Plaintiffs are not "consumers at large" "because they are subject to

randomized drug" testing (*Id.* at fn. 1; 2).

But this argument misconstrues the "consumers at large" analysis.  The Defendants try to mince the Plaintiffs into unfettered uniqueness solely by virtue of the fact that Douglas would invariably learn that there was THC in the Product.  It is, for example, private "contract disputes, unique to the parties" that "would not fall within the ambit of the statute." *Graham v. Eagle Distributing Co., Inc.,* 224 A.D.2d 921, 921-22, 637 N.Y.S.2d 583, 583 (4 Dept. 1996).  It cannot fairly be said that "the deceptive act or practice may not be limited to just the parties." *Teller v. Bill Hayes, Ltd.,* 213 A.D.3d 141, 145, 630 N.Y.S.2d 769, 772 (2d Dept. 1995).  Here, any number of consumers could be impacted by the false representation that the Product contained "0" THC, not just a truck driver and not just a consumer who undergoes regular testing at work.

Unquestionably, the Ad had a broader impact on consumers at large in that they were directed to consumers or potentially affecting similarly situated consumers. *Benetech, Inc. v. Omni Financial Group, Inc.,* 116 A.D.3d 1190, 1190, 984 N.Y.S.2d 186, 188 (3d Dept. 2014).

In *Accredited Aides Plus, Inc. v. Program Risk Management, Inc.,* 147 A.D.3d 122, 46 N.Y.S.3d 246 (3d Dept. 2017), the Third Department disagreed with the court's dismissal of the claim, which was based upon its determination that plaintiffs failed to allege more than a private contractual dispute.  The court found that the plaintiffs adequately met the threshold requirement of alleging that the PRM defendants' "actions and practices were directed at or had a broader impact on consumers at large." *Id.* at 134, 257.  The plaintiffs alleged that the defendants "made materially misleading statements" through advertisements, marketing materials and its website that were "released to the

11

general public," "targeted employers seeking workers' compensation coverage" and "were likely to mislead reasonable employers." *Id*.

As the Southern District of New York has stated, the consumer-oriented requirement may be satisfied by showing that the conduct at issue potentially affects similarly-situated consumers. *Wilson v. Northwestern Mut. Ins. Co.,* 625 F.3d 54, 64 (2d Cir. 2010).

## B.     There Is a Disputed Issue of Material Fact as to the Misleading Nature of the Ad.

As discussed liberally in the Plaintiffs' Rule 56 Statement, if Plaintiffs have not outright proven Defendant's multiple misleading misrepresentations within the evidence proferred, there is at least, a disputed issue of material fact as to the misleading nature of them.

Whether an act is materially misleading is defined objectively and looks to whether the act is likely to mislead a reasonable consumer acting reasonably under the circumstances. *Spagnola v. Chubb Corp.,* 574 F.2d 64, 67 (2d Cir. 2009).

An act or practice will be deemed to be deceptive where it is "likely to mislead a reasonable consumer acting reasonably under the circumstances." *David v. #1 Mktg. Serv., Inc.,* 113 A.D.3d 810, 812, 979 N.Y.S.2d 375 (3d Dept. 2014).

Courts "view each allegedly misleading statement in light of its content on the product label or advertisement as a whole." *Delgado v. Ocwen Loan Servicing, LLC*, 2014 WL 4773991, 8 (E.D.N.Y.).

Here, it cannot be said that the Plaintiffs failed to raise a disputed issue of material fact as to the material misrepresentation contained in the Ad and other media.  Numerous statements therein would lead any reasonable consumer to believe that the product

contained "0% THC", "no THC", was "THC free", and was "without psychoactive effect [of THC]."

Plaintiffs' set out to prove that list of deceptive practices and false advertising acts in their Complaint (Exhibit "A") under GBL §349 and §350:

a.   misrepresenting in advertising that the Dixie Products were safe and legal for consumers;

b.   misrepresenting in advertising that Defendants had adequately tested their products;

c.   misrepresenting that the products complied New York State and the federal laws and regulations;

d.   misrepresenting that their products contained no THC;

e.   misrepresenting that the ingestion of its products would not cause a positive toxicology result;

f.   misrepresenting that their products had beneficial health, wellness and medical uses.

As in the RICO claims argued above, through evidence and testimony elicited in this case, Plaintiffs have proven all of the above categories of deceptive practices and false advertisements. Notwithstanding this limited list in a.-f. above, the evidence and testimony Plaintiffs have elicited in this case prove far more bad conduct. (See the Affidavit and accompanying reports of Dr. Kenneth Graham annexed to this Motion). Dr. Graham is not only a Forensic Toxicologist, he is a Pharmacologist and is competent to and has testified to false advertising and labeling as well, and Defendants' violations of federal law.

The multiple media advertisements and affirmative statements that the Tincture product had "no THC", was "THC free" and had "0% THC" was painfully misleading. This was conclusively shown in Defendants' own Certificates of Analysis produced in

this case, as well as the EMSL lab report Plaintiff obtained regarding the Defendants'
product he took, confirming an amount of THC in Defendants unopened bottle of the
Dew Drops Tincture it later sent to Plaintiff.

Plaintiff Douglas was a reasonable consumer acting reasonably. He researched the
product on multiple media; he relied on the multiple express representations that there
was no THC in the product he bought and took; he was aware of products with the
innocuous "CBD" in them, as opposed to the illegal THC; and he was well aware of the
employment repercussions if he did ingest THC as a truck driver subject to DOT random
drug testing over his then 14-year career.

In *Campbell v. Freshbev LLC*, 322 F.Supp.3d 330 (E.D.N.Y. 2018), the consumer
plaintiff alleged that the juice label with the name "Cranberry Apple" implied that the
product had more cranberry juice than apple, when the ingredient list stated that it
contained more apple than cranberry. This was sufficient to state a claim for deceptive
advertising.

There, the defendants also argued that the term "fresh" on the product was not
misleading because the label included the word "pressure" that would resolve any
consumer confusion about freshness. However, the court ruled that the term "fresh" was
misleading in isolation, and, hence, it was not clear as a matter of law that such confusion
would be resolved by additional statements elsewhere on the label. *Id*. at 342 (*citing,*
*Goldemberg v. Johnson & Johnson Consumer Cos., Inc.,* 8 F.Supp.3d 467, 479-80
(S.D.N.Y. 2014)("Although the presence of a disclaimer or other clarifying language may
defeat a claim of deception, the Court cannot hold as a matter of law that the product
labels are not misleading to a reasonable consumer").

With regard to the "Cranberry Apple" name, the ingredient statement revealed that it contained more apple than cranberry.  The defendants argued that the name of the product was not intended to be an expression of the proportionality of the juices and, regardless, any confusion could be resolved by reading the ingredient list.  The court disagreed, noting that, because it violated FDA requirements, a reasonable consumer might be misled into believing that Cranberry Apple juice had more cranberry than apple. *Campbell*, 322 F.Supp.3d at 342.

Here, there is at least a disputed issue as to the misleading nature of the Ad, the FAQs, and the other research that the Plaintiffs came upon from the Defendants regarding the product.  There was ostensibly *no warning or truth* in the labeling on the Defendant's bottle (See Exhibit "9"), as examined of the "ingredients" label in *Campbell* – the express representations about the zero level of THC were enough to mislead the average consumer in general and the Plaintiffs in particular.  As the Defendants themselves concede, whether the Ad was materially misleading is generally a question of fact (Defendants' Memo, p. 5).  Particularly in this case, with the wealth of information the Plaintiffs researched and considered, only a finder of fact can determine whether the Ad and all the other consistent materials put out by DIXIE was misleading to the reasonable consumer.

In *Buonasera v. Honest Company, Inc.,* 208 F.Supp.3d 555 (S.D.N.Y. 2016), the consumer alleged that the manufacturer's deceptive acts of mislabeling hair care and body wash products as "all natural," "plant-based," and containing "no harsh chemicals" were aimed at consumers, as required to state claims for violations of the GBL.  The consumer also sufficiently alleged damage, where he claimed that he paid a premium for

the products.  The court also found that the plaintiff stated a breach of express warranty

claim in light of the fact that the court was unable to determine as a matter of law that the

statements were not misleading under the GBL.

In *Hidalgo v. Johnson & Johnson Consumer Companies, Inc.,* 148 F.Supp.3d 285

(S.D.N.Y. 2015), the defendant argued that the complaint failed to plausibly allege that

its representations about its Bedtime Products were materially misleading, and thus likely

to mislead a reasonable customer.  The complaint alleged, however, sufficient claims to

sustain the GBL claim.  The plaintiff's claim was that the "clinically proven"

representations were misleading because the Bedtime Products were not clinically

proven.  The "clinically proven" representations would lead a reasonable customer to

believe that the Products, in isolation, had been clinically proven as a sleep aid.  While

the defendant claimed that the complaint admitted that the defendant conducted testing on

the products, the core allegation was that never tested the efficacy of the products alone.

The court could not find that the disclosure of the three-step routine on the back of the

bottles and other advertising materials obviated the possibility that the "clinically proven"

language was misleading.

### C.    Cindy Horn Suffered Actionable Injury

Plaintiffs were a husband and wife team of truck drivers who were paid separately

by the same employer, but who worked together daily in the same truck across the

country, and over 14 years. When one went down (Douglas), the other (Cindy) naturally

followed. Defendants argue that Cindy could have mitigated her damages by accepting a

position to work alone in a far off position, yet as a solo woman in the trucking industry.

Annexed immediately hereto is the Affidavit of Ellen Voie, the CEO of the

Women in Trucking Association. Ms. Voie debunks this argument on its face and in full. The Court is respectfully referred to that Affidavit to understand the adverse circumstances of a woman taking a solo position in the trucking industry. The nature and circumstances of the proposed position made it a non-viable option for Cindy Horn, as she testified.

An actual injury claim under Section 349 typically requires a plaintiff to allege that, on account of a materially misleading practice, she purchased a product and did not receive the full value of her purchase. *Izquierdo v. Mondelez Intl., Inc.,* 2016 WL 6459832, 7 (S.D.N.Y.). This prong may be satisfied through an allegation that a plaintiff overpaid for the product, or, stated differently, by a claim that a plaintiff paid a premium for a product based on the defendants' inaccurate representations. *Ackerman v. Coca-Cola Co.,* 2010 WL 2925955, 23 (E.D.N.Y. 2010).

In *Greene v. Gerber Products Co.,* 262 F.Supp.3d 38 (E.D.N.Y. 2017), the plaintiff alleged that, had she known that the defendant's allergy claims were false in a product, she would not have paid as much as she did for the Instant Formula, and further stated that the parents' value a formula's ability to protect their children from developing allergies. She alleged that she did not receive the benefit of her bargain because she paid for a benefit that the Instant Formula did not provide. Such allegations were sufficient to state a claim for an injury under GBL sections 349 and 350 because they claimed that the plaintiff paid a premium for a product based on the defendant's inaccurate representations. *Greene, supra* 262 F.Supp.3d at 67.

**D.** **The Plaintiffs, as New York Residents Who Paid For the Product From, and Received the Product from the Defendants In, New York, Have Standing to Pursue This Claim.**

The Defendants argue that the Plaintiffs' claim must fail because the ad was read out-of-state.  What is overlooked, however, is that the Plaintiffs were New York residents; that they ordered the Product for delivery in New York; and the Product was delivered to, ingested in, and caused harm within the State of New York.  The undisputed fact is that the Product was deliberately sent to consumers residing within the State of New York.

The Defendants argue that the deceptive act here did not occur in New York and therefore does not provide a cause of action (Defendants' Memo, p. 7).  However, the Plaintiffs unquestionably did research on the Product over and beyond what they viewed in the out-of-state magazine.  This included going onto YouTube, looking at the Defendants' website, and speaking with the Defendants' customer service representatives. Furthermore, the Defendants furnished the Product (good) to the Plaintiffs within the State of New York.

In fact, in *Goshen v. Mut. Life Ins. Co of New York*, 98 N.Y.2d 314, 774 N.E.2d 1190, 746 N.Y.S.2d 858 (2002), the Court stated that Section 349 was not "intended to function as a per se bar to out-of-state plaintiffs' claims of deceptive acts leading to transactions within the state."  *Id*. at 324.

It is respectfully submitted that this case represents a factual scenario, in which the Plaintiffs – New York residents – viewed the Ad while out of state, but ordered the product to be delivered to their local address.  The Product was sold to the Plaintiffs across state lines and shipped to them in New York.  Furthermore, the harm the Plaintiffs

suffered as a result of the Defendants' misrepresentations were felt and experienced in New York. Furthermore, the web-based information available about the Product was available to any and all persons, including those residing in the State of New York. The Defendants therefore were marketing, selling, and shipping their product within the State of New York.

In *Weisblum v. Prophase Labs, Inc.,* 88 F.Supp.3d 283 (S.D.N.Y. 2015), the consumer sufficiently alleged that he relied on oral guarantees by the CEO of an over the counter cold remedy product manufacturer, and that the allegedly materially deceptive acts caused consumer's injury, to state a claim under the GBL, where he relied on such representations in deciding to purchase the products. There, the plaintiff read the package that Cold-EEZE are "clinically proven" to reduce the severity and duration of the common cold and that they would reduce the severity of his cold systems; would not have purchased the product in the absence of such representations; and purchased the product in California; reviewed the lozenges' packaging before deciding to purchase them, and relied on the claims that the product would shorten and reduce the severity of his cold. *Id.* at 286.

### E. The Plaintiffs Did Not Materially Misquote the Ad in the Complaint.

The Defendants argue that the Plaintiffs materially misquoted the Ad in their Complaint (Defendants' Memo, p. 8). However, the sole legal authority they cite to in support of the claim is *Fink v. Time Warner Cable*, 714 F.3d 739 (2d Cir. 2013)(Defendants' Memo, p. 8), a case that does not contain any reference to the GBL. Furthermore, the case dealt with a pre-answer Motion to Dismiss, not a Motion for Summary Judgment. 714 F.3d at 742. Had the Plaintiffs materially misquoted the Ad in

their Complaint, the Defendants doubtless would (and should) have moved to dismiss it long before the factual record was developed.  Indeed, now that discovery has been conducted, the content of the Ad are on record and the allegations of the Complaint are not dispositive (even assuming, *arguendo*, that they were incorrect).

### III.     The Plaintiffs' Fraud Claim is Sustainable.

The Defendants argue, unconvincingly, that the Plaintiffs adduced no evidence that they "omitted" or made "any material facts" "that could have influenced their purchase of Dixie X (Defendants' Memo, p. 14).  This argument categorically fails in light of the statements that the Defendants made in the Ad that have been disproven by virtue of the testing that Douglas underwent, and that the Plaintiffs' expert witness undertook of the Product.

Likewise unavailing is the Defendants' argument that the Plaintiffs cannot establish justifiable reliance (Dixie Defendants' Memo p. 15).  Given that the Plaintiffs were reasonable consumers with no independent knowledge of the merits of the Product or the know-how to determine that the representations about it were false, they reasonably relied upon the purported truth of the Ad.  That they were "truckers" subject to random drug testing simply made the Defendants' misrepresentations material to them, not discoverable for their falsity.  The Defendants erroneously equate the fact that the Plaintiffs were in a profession in which the alleged lack of THC in the Product was material to them with the idea that they occupied some superior position of knowledge about scientific manufacture of the Product and its testing.  They indeed went "above and beyond" that of the "average" consumer by looking the Product up online.  However, suggesting that they should have known that the Product contained THC when it was

represented not to is without basis in the record.

Furthermore, the GBL "does not require that a defendant intended to defraud or mislead." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.,* 85 N.Y.2d 20, 623 N.Y.S.2d 529, 647 N.E.2d 741, 745 (1995).  Nor does it require proof of justifiable reliance.  *UPS Store, Inc. v. Hagan*, 99 F.Supp.3d 426, 441 (S.D.N.Y. 2015).

## IV.   Products Liability is Sustainable Where the Product was Indeed Defective.

The Product was defective under the UCC as a matter of strict liability in that it altered Douglas' urine tests to his egregious financial detriment.  The Product indeed defective in that it contained THC.

## V.   The Plaintiffs Under No Set of Facts "Received Exactly What They Purchased."

The Defendants argue that the Plaintiffs' unjust enrichment claim should be dismissed "because they received the product they ordered" (Dixie Defendants' Memo, p. 22).  Though they dub the Complaint "barebones" (*Id*.), there is little dispute that the facts adduced during discovery allege far more than that the Plaintiffs received what they ordered.  To the contrary, because of the Defendants' misrepresentations, the Plaintiffs ultimately lost their gainful employment.

## VI.   The Plaintiffs Have Proven Negligence.

The Defendants incredibly argue that there "is absolutely no evidence that Defendants failed to exercise reasonable care in designing or developing" the Product (Dixie Defendants Memo, p. 23).  The Plaintiffs' expert witness has minimally established that the Defendants were at least negligent in their production, handling, marketing, and advertising of the Product.

**VII.    The Defendants' Misrepresentations Resulting in Loss of the Plaintiffs' Employment Presents a Disputed Issue of Material Fact as to Negligent Infliction of Emotional Distress.**

The Dixie Defendants argue that the "Plaintiffs offered no proof of any physical or emotional injury" (Dixie Defendants' Memo, p. 24).  But the Plaintiffs suffered loss when they both lost their careers over the Product.  There is a disputed issue of material fact as to whether the Plaintiffs were in fact harmed by the Product.

<strong>Conclusion</strong>

For the reasons set forth above, the Defendant DIXIE's Motion for Summary Judgment should be denied in its entirety, along with such other relief the Court deems proper.

Dated:  November 15, 2018
         Great Neck, New York

KUPILLAS, UNGER & BENJAMIN, LLP.

*Jeffrey Benjamin*
Jeffrey Benjamin
Attorneys for Plaintiffs
1 Linden Place, Suite 410-A
Great Neck, NY 11021
(516) 213-4493