UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

DOUGLAS J. HORN, et al.,

                                        Plaintiffs,

                                                              Case # 15-CV-701-FPG
v.

                                                              DECISION AND ORDER

MEDICAL MARIJUANA, INC., et al.,

                                        Defendants.

# INTRODUCTION

Plaintiffs Douglas J. Horn and Cindy Harp-Horn bring suit against Defendants Medical Marijuana, Inc. ("MMI"), Dixie Elixirs and Edibles ("Dixie LLC"), Red Dice Holdings, LLC ("RDH"), and Dixie Botanicals.[1] ECF No. 1. Plaintiffs allege that Defendants engaged in fraud, negligence, and unlawful conduct with respect to the sale and marketing of their hemp-based consumable oil—"Dixie X Dew Drops." Before the Court are six motions: (1) Plaintiffs' motion for partial summary judgment (ECF No. 60); (2) Defendants MMI and RDH's motion for summary judgment (ECF No. 61); (3) Defendant Dixie LLC's motion for summary judgment (ECF No. 62); (4) Plaintiffs' motion to amend (ECF No. 68); (5) Dixie LLC's motion to strike (ECF No. 71); and (6) Defendants MMI and RDH's motion to strike (ECF No. 74). The Court resolves all of these motions in this omnibus order.

# LEGAL STANDARD

Summary judgment is appropriate when the record shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

---

[1] In August 2016, the Clerk of Court filed an entry of default against Dixie Botanicals after it failed to appear. *See* ECF Nos. 22, 28.

56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in the non-moving party's favor. *See Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005). However, the non-moving party "may not rely on conclusory allegations or unsubstantiated speculation." *F.D.I.C. v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (quotation omitted).

## BACKGROUND[2]

This case concerns a product called CBD oil. CBD is short for "cannabidiol," and it is one of the "unique molecules" found in the *Cannabis sativa* plant. ECF No. 61-8 at 18. The *Cannabis sativa* plant is better known as the plant from which marijuana is derived. But it is also the species of plant from which industrial hemp is derived. The Eighth Circuit provides a helpful description:

> Both industrial hemp and the drug commonly known as marijuana derive from the plant designated *Cannabis sativa* L. In general, drug-use cannabis is produced from the flowers and leaves of certain strains of the plant, while industrial-use cannabis is typically produced from the stalks and seeds of other strains of the plant. All cannabis plants contain tetrahydrocannabinol (THC), the substance that gives marijuana its psychoactive properties, but strains of the plant grown for drug use contain a higher THC concentration than those typically grown for industrial use.

*Monson v. Drug Enforcement Admin.*, 589 F.3d 952, 955 (8th Cir. 2009) (emphasis added). In other words, the distinction is one of degree—while "the marijuana plant and industrial hemp plant come from the same botanical species," the "hemp plant has been crossbred to have low

---

[2] Generally, when cross-motions for summary judgment are filed, the court "must consider each motion independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the non-moving party." *Physicians Comm. for Responsible Medicine v. Leavitt*, 331 F. Supp. 2d 204, 206 (S.D.N.Y. 2004). However, for purposes of describing the background of the case, the Court describes the facts as taken in the light most favorable to Plaintiffs, unless otherwise noted.

concentrations of THC." Shelly B. DeAdder, *The Legal Status of Cannabidiol Oil and the Need for Congressional Action*, 9 BIOPLR 68, 72 (2015). CBD can be extracted from both the marijuana and hemp varieties of *Cannabis sativa*. *See id.* at 72 & n.34.

Products containing CBD have become hot commodities in recent years, and sales are "projected to grow tremendously." W. Michael Schuster & Jack Wroldsen, *Entrepreneurship and Legal Uncertainty: Unexpected Federal Trademark Registrations for Marijuana Derivatives*, 55 AMBLJ 117, 135 (2018). Advocates claim that CBD provides numerous health benefits, particularly in the area of pain management. *See id.* at 128-29; *see also* ECF No. 61-8 at 19.

The product at issue here is a hemp-derived CBD oil called "Dixie X Dew Drops" (hereinafter "Dixie X"). Cindy Orser, Defendants' scientific expert, explains how these products are generally created. There is an initial "extraction step," where hemp is combined with a solvent like ethanol, butane, pressurized $CO_2$, or propane. ECF No. 61-8 at 79-80. This process yields a CBD extract, which is then distilled to remove plant compounds, solvents, THC, and other materials. *Id.* at 83. The intended end-product is a pure CBD concentrate that can then be infused into a consumable final product.

Like other CBD oil products, Dixie X contains CBD that is "isolate[d] and extract[ed]" from hemp plants. ECF No. 60-8 at 1; *see also* ECF No. 69-4 at 12-13. The resulting CBD is then "infuse[d] . . . into [a] line of hemp products." ECF No. 60-8 at 1. The label on Dixie X indicates that it contains "[p]ure glycerin, hemp whole plant extract, CBD extract derived from medicinal hemp, [and] cinnamon extract." ECF No. 60-15 at 1 (asterisk omitted). Importantly, despite the extraction and distillation process, Dixie X contains a detectible, albeit small, amount of THC. *See, e.g.*, ECF No. 60-14.

All three defendants played a role in the sale of Dixie X.  MMI and Dixie LLC entered into a joint venture to produce, distribute, and sell Dixie X.  *See* ECF No. 69-2 at 1.  They formed RDH for that purpose in April 2012.  *Id.*  MMI would hold a 60% ownership stake in RDH, while Dixie LLC would hold a 40% stake.  *See* ECF No. 68-2 at 106.  Tripp Keber, who was also Dixie LLC's managing member, would act as the manager of RDH.[3]  *Id.* at 2.  In practice, it appears that MMI provided financial support for the venture, Dixie LLC manufactured Dixie X, and RDH was responsible for selling the product.  *See* ECF No. 61-1 ¶¶ 3-5.  There is also a question of fact as to whether Keber acted as a director of MMI, though the exact dates of his tenure are unclear from the record.  *Compare* ECF No. 61-11 ¶ 12, *with* ECF No. 68-2 at 79.

In September 2012, Plaintiffs purchased a 500 mg bottle of Dixie X.  They had researched the product from various sources, and they hoped it would relieve the pain and inflammation Douglas was then suffering from as a result of a motor vehicle accident.[4]  Plaintiffs claimed to have relied on four sources in deciding to purchase Dixie X.

Plaintiffs first learned about Dixie X in an issue of "High Times" magazine—a periodical dedicated to marijuana culture and news.  In an article titled "High & Healthy" by Elise McDonough, there was the following writeup:

> CBD for Everyone!
>
> Using a proprietary extraction process and a strain of high-CBD hemp grown in a secret, foreign location, Colorado's Dixie Elixirs and Edibles now offers a new product line called Dixie X, which contains 0% THC and up to 500 mg of CBD. This new CBD-rich medicine will be available in several forms, including a tincture, a topical and in capsules.  Promoted as "a revolution in medical hemp-powered wellness," the non-psychoactive products will first roll out in Colorado

---

[3] "Tripp" appears to be the nickname of Vincent M. Keber, III.  *See* ECF No. 69-2 at 2 (stating that "Vincent M. Keber, III" acted as manager of RDH); ECF No. 69-4 at 25 (stating that "Tripp Keber" is "President" of RDH).

[4] For ease of reference, the Court refers to Plaintiffs by their first names.

MMCs (medical marijuana centers), with plans to quickly expand outside the medical marijuana market. "It has taken a tremendous amount of time, money and effort, but finally patients here in Colorado—and ultimately all individuals who are interested in utilizing CBD for medicinal benefit—will be able to have access to it," says Tripp Keber, Dixie's managing director. "We are importing industrial hemp from outside the US using an FDA import license—it's below federal guidelines for THC, which is 0.3%—and we are taking that hemp and extracting the CBD. We have meticulously reviewed state and federal statutes, and we do not believe that we're operating in conflict with any federal law as it's related to the Dixie X [hemp-derived] products."

ECF No. 61-7 at 42.

After reviewing the article, Plaintiffs decided to conduct further research. They watched two YouTube videos of interviews between podcasters and a person who identifies himself as Tripp Keber (the "YouTube interviews").[5] In these videos, Keber stated that Dixie X did not contain THC.[6]

Plaintiffs also reviewed an FAQ on the Dixie X website, which provided further information on the product:

**Is CBD from hemp legal?**

Our revolutionary Hemp oil cannabidiol (CBD) wellness products are legal to consume both here in the U.S. and in many countries abroad. The United States currently considers industrial hemp products to be legal as long as they are derived from industrial hemp and not from any part of the plants categorized . . . as marijuana. Dixie x's parent company Medical Marijuana, Inc., is a publicly traded company . . . that does not grow, sell or distribute any substances that violate United States Law or the controlled substance act. . . . .

**What is the difference between CBD from hemp and CBD from medical cannabis?**

---

[5] Plaintiffs cite a third YouTube video in their materials, but it appears that this video was posted on YouTube after Plaintiffs purchased Dixie X. *See* ECF No. 60-1 ¶ 7(c). The Court therefore disregards that video.

[6] Plaintiffs failed to identify with specificity the times at which Keber made the relevant statements in the YouTube videos. The Court did not exhaustively review the YouTube videos, but only reviewed them in part to verify that Keber made the alleged statements. *Cf.* Fed. R. Civ. P. 56(c)(1)(A) (requiring a party to cite "particular parts of materials in the record" when supporting factual positions).

While the two plants are botanically related, our hemp contains no THC . . . . Medical cannabis contains THC and may provide relief from various ailments, however, with a psychotropic effect.

ECF No. 60-8 at 1-2.

Finally, Cindy called a "1-800" number associated with Dixie X and spoke to a customer service representative. ECF No. 61-6 at 88-89. The representative confirmed that Dixie X contained "zero percent THC." *Id.* at 91.

After reviewing all of this information, Plaintiffs decided to purchase Dixie X. On September 17, 2012, Cindy ordered a 500mg tincture of Dixie X through the Dixie X website and had it delivered to Plaintiffs' home in Lockwood, NY. Shortly thereafter, Douglas consumed the product.

In October 2012, as part of its normal practice, Douglas's employer, Enterprise Trucking, required that he submit to a random drug test. A few days after the drug test, Enterprise notified Douglas that he had tested positive for THC. At 29 ng/mL, Douglas's sample contained almost double the "cutoff" concentration of THC. Enterprise thereafter terminated Douglas's employment. Cindy, who worked with Douglas at Enterprise Trucking, resigned from the company because she believed it would be unsafe to work alone.

Soon thereafter, Plaintiffs purchased a second bottle of Dixie X to determine whether it had caused the positive test result. They sent the bottle to EMSL Analytical, Inc., for testing. Testing confirmed that Dixie X contained THC.

In August 2015, Plaintiffs brought this action, alleging that Dixie X caused Douglas's positive drug test and thereby caused him to lose his employment. Plaintiffs raise nine claims against Defendants:

1. Deceptive business practices and false advertising under New York General Business Law §§ 349, 350;

2. Fraudulent inducement;

3. Violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO");

4. Strict Products Liability;

5. Breach of Contract;

6. Breach of Express Warranty;

7. Unjust Enrichment;

8. Negligence; and

9. Negligent Infliction of Emotional Distress.

ECF No. 1.

Before turning to the motions, the Court discusses a legal issue that is foundational to this litigation: whether, in 2012, Dixie X constituted a controlled substance under the federal Controlled Substances Act ("CSA"). *See* 21 U.S.C. § 801 *et seq.* Plaintiffs argue that Dixie X is a controlled substance because it contains THC. Defendants counter that Dixie X is not a controlled substance because it is derived from lawfully imported hemp and contains less than .3% THC. This percentage is allegedly the maximum amount of THC that an imported industrial hemp plant can lawfully contain.

Taking the facts in the light most favorable to Plaintiffs, the Court agrees that, in 2012, Dixie X constituted a controlled substance under the CSA. But it reaches this conclusion for reasons different than those articulated by Plaintiffs.

Marijuana is a controlled substance under the CSA, and therefore, as a general matter, it is unlawful to distribute or dispense it. *See* 21 U.S.C. §§ 802(16), 841(a)(1). In 2012, the CSA defined marijuana as follows:

> The term "marihuana" means all parts of the plant Cannabis sativa L., whether growing or not; the seeds thereof; the resin extracted from any part of such plant; and every compound, manufacture, salt, derivative, mixture, or preparation of such plant, its seeds or resin. Such term does not include the mature stalks of such plant, fiber produced from such stalks, oil or cake made from the seeds of such plant, any other compound, manufacture, salt, derivative, mixture, or preparation of such mature stalks (except the resin extracted therefrom), fiber, oil, or cake, or the sterilized seed of such plant which is incapable of germination.

21 U.S.C. § 802(16) (2012). Breaking this definition down, the Court notes that marijuana was broadly defined to include "all parts" of the *Cannabis sativa* plant. The industrial hemp plant fell within this definition because it is a variety of the *Cannabis sativa* plant. *See, e.g.*, *Monson*, 589 F.3d at 961-62; *Hemp Indus. Ass'n v. Drug Enforcement Admin.*, 333 F.3d 1082, 1085 n.2 (9th Cir. 2003) [hereinafter "*Hemp I*"].

As the statute made clear, however, the definition of marijuana contained several exceptions. Excluded from the definition of marijuana were certain parts of the plant that are incapable of germination: (1) the mature stalks of the *Cannabis sativa* plant, (2) fiber produced from the stalks of the *Cannabis sativa* plant, (3) oil or cake made from the seeds of the *Cannabis sativa* plant, (4) any compound, manufacture, salt, derivative, mixture, or preparation of the mature stalks, fiber, oil, or cake (excluding resin extracts), and (5) the sterilized seed of the *Cannabis sativa* plant. 21 U.S.C. § 802(16) (2012).

It bears emphasizing that resin extracted from mature hemp stalks was not excepted from the definition of marijuana. *See Hemp Indus. Ass'n v. Drug Enforcement Admin.*, 357 F.3d 1012, 1018 (9th Cir. 2004) (internal quotation marks omitted) [hereinafter "*Hemp II*"]. Congress apparently included this "exception to the exception" for resin extract "out of concern that the

'active principle' in marijuana, later understood to be THC, might be derived from nonpsychoactive hemp and so be used for psychoactive purposes." *Id.* at 1018 n.5.

A few conclusions may be drawn from the definition of marijuana as it stood in 2012. First, the industrial hemp plant came within the statutory definition of marijuana despite its low THC concentration. At the time, the CSA made no distinction on the basis of THC concentration. *See Monson*, 589 F.3d at 961 ("[M]arijuana is defined to include *all* Cannabis sativa L. plants, regardless of THC concentration."); *N.H. Hemp Council, Inc. v. Marshall*, 203 F.3d 1, 7-8 (1st Cir. 2000).

Second, and perhaps counterintuitively, certain derivatives of the industrial hemp plant were not included in the definition of marijuana—and therefore were not unlawful under the CSA—*even if* they contained trace amounts of THC. The Ninth Circuit reached this conclusion in a pair of cases from the early 2000s. *See Hemp I*, 33 F.3d at 1091; *Hemp II*, 357 F.3d at 1018. At issue in those cases were the validity of DEA rules that would have banned the possession and sale of products made from sterilized hemp seed, hemp-seed oil, and hemp-seed cake. *See Hemp I*, 333 F.3d at 1085; *Hemp II*, 357 F.3d at 1013-14. These products contain "minuscule trace amounts of THC" but do not have psychoactive effects. *Hemp I*, 333 F.3d at 1085. The Ninth Circuit observed that these products fit "within the plainly stated exception[s] to the CSA definition of marijuana." *Hemp II*, 357 F.3d at 1017. The legislative history also indicated that Congress was aware that "hemp seed and oil contain small amounts of the active marijuana ingredient in marijuana, but that the active ingredient was not present in sufficient proportion to be harmful." *Hemp I*, 333 F.3d at 1089. Thus, Congress "knew what it was doing" when it chose to exempt certain derivatives from the definition of marijuana notwithstanding the presence of trace amounts of THC. *Hemp II*, 357 F.3d at 1018.

Third, the exemption for certain hemp-based products containing naturally-occurring THC did not extend to resin extracted from the plant. As discussed above, there was an explicit "exception to the exception" for such resins. *See id.* at 1018 n.5. In practical effect, this means that the legality of a hemp-based product turned on the manner in which it is produced: an oil made from hemp seeds was exempt and lawful, while a resin extracted from hemp stalks was not exempt and was unlawful. *See* 21 U.S.C. § 802(16) (2012).

The legal landscape has since shifted. In 2014, Congress passed the Agricultural Act of 2014. *See* 7 U.S.C. 5940. This legislation legalized industrial hemp cultivation under restricted conditions relating to research. Then, in 2018, as part of a more extensive legalization of industrial hemp production, the CSA was amended to exclude hemp from the definition of marijuana. *See* 21 U.S.C. § 802(16)(B)(i). Hemp is defined as the "Cannabis sativa L. and any part of that plant, including the seeds thereof and all derivatives, extracts, cannabinoids, isomers, acids, salts, and salts of isomers, whether growing or not, with a [THC] concentration of not more than 0.3 percent on a dry weight basis." 7 U.S.C. § 1639o(1). Thus, it appears that the CSA now excludes from the definition of marijuana *any* part, derivative, or extract of the *Cannabis sativa* plant if its THC concentration falls below that threshold level.

For purposes of this litigation, however, the question is whether Dixie X constituted a controlled substance in 2012. Based on the plain language of the statute, and taking the facts in the light most favorable to Plaintiffs, the Court answers that question in the affirmative. Dixie X is a mixture that contains extract from the *Cannabis sativa* plant. Defendants do not contend that the CBD byproduct from the extraction process can be described as anything other than a "resin extracted from" the *Cannabis sativa* plant. 21 U.S.C. 802(16) (2012) (defining marijuana to include "the resin extracted from any part" of the *Cannabis sativa* plant, as well as "every

compound" or "mixture" of the resin). And Dixie X cannot come within any exception because resin extracts are explicitly excluded. *See id.*; *Hemp II*, 357 F.3d at 1018 n.5. In 2012, the CSA granted no exceptions to hemp derivatives on the basis of low THC concentration. Accordingly, Dixie X constituted a controlled substance under the CSA, and it was therefore unlawful to "knowingly or intentionally . . . manufacture, distribute, or dispense" it. 21 U.S.C. § 841(a)(1).

## DISCUSSION

Before the Court are six motions. Substantively, Defendants move for summary judgment on all claims,[7] and Plaintiffs move for partial summary judgment on the issue of liability on the New York General Business Law claims and the RICO violation. Procedurally, Plaintiffs have filed a motion to amend, and Defendants have filed two motions to strike certain evidence Plaintiffs submitted in connection with the motions for summary judgment. The Court will address the motion to amend and motions to strike before proceeding to the merits.

### I.    Motion to Amend

Plaintiffs move to amend their complaint in three respects. First, they argue that Defendant "Dixie Elixirs and Edibles" is misnamed and should be corrected to "Dixie Holdings, LLC a/k/a Dixie Elixirs." ECF No. 68-1 at 2. Second, Plaintiffs seek leave to withdraw three of their

---

[7] Defendants MMI and RDH also move for judgment on the pleadings under Rule 12(c). The Court finds such motion untimely and declines to address it. Under Rule 12(c), a motion for judgment on the pleadings must be made after pleadings are closed but "early enough not to delay trial." Fed R. Civ. P. 12(c). Here, Defendants filed their answer in February 2016, and the deadline to amend pleadings was in March 2017. Defendants therefore had an extensive period in which to challenge Plaintiffs' complaint, but they waited more than one year after the later deadline, when discovery had already been completed, to raise their arguments. Under these circumstances, the Court concludes that consideration of Defendants' motion would delay trial—even though a trial date has not been set—insofar as it would require further litigation on issues tangential to the merits and would prevent timely resolution of those claims for which summary judgment is inappropriate. *See Grajales v. Puerto Rico Ports Auth.*, 682 F.3d 40, 46 (1st Cir. 2012) ("[O]nce the parties have invested substantial resources in discovery, a district court should hesitate to entertain a Rule 12(c) motion that asserts a complaint's failure to satisfy the plausibility requirement.").

claims—breach of contract, breach of express warranty, and unjust enrichment. Third, Plaintiffs request to add a claim for false advertising under the Lanham Act. *See* 15 U.S.C. 1125(a).

As Defendants note, Judge Roemer issued a scheduling order in this case. Under the order, the parties had until March 21, 2017 to file motions to amend the pleadings. *See* ECF No. 31 at 1. Plaintiffs did not file their motion to amend until November 16, 2018—more than a year and a half after the deadline. *See* ECF No. 68. Consequently, the more onerous "good cause" standard set forth in Rule 16(b), rather than the "liberal standard of Rule 15(a)," governs. *Guadagno v. M.A. Mortenson Co.*, No. 15-CV-482, 2018 WL 4870693, at *4 (W.D.N.Y. Oct. 2, 2018). "To show good cause, a movant must demonstrate diligence before filing her motion, such that despite the movant's effort, the deadline to amend the pleadings could not have been reasonably met." *Scott v. Chipotle Mexican Grill, Inc.*, 300 F.R.D. 193, 197 (S.D.N.Y. 2014). Diligence is the primary consideration in deciding whether to permit an amended complaint, but a court may also consider "other relevant factors including . . . whether allowing the amendment of the pleading at this stage of the litigation will prejudice defendants." *Kassner v. 2nd Ave. Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir. 2007).

Plaintiffs waited a substantial period of time after the deadline to amend their complaint. Furthermore, they did not file their motion until more than two months after the parties filed motions for summary judgment. Plaintiffs do not argue that they acted diligently or that they have otherwise satisfied the "good cause" standard; they merely claim that the new Lanham Act claim satisfies the *Twombly* pleading standard. Given these circumstances and the absence of developed argument, the Court denies the motion to the extent that Plaintiffs seek to add the Lanham Act claim. *See Mohegan Lake Motors, Inc. v. Maoli*, No. 16CV6717, 2018 WL 4278352, at *5 (S.D.N.Y. June 8, 2018) ("The burden of showing diligence rests on the moving party.").

Nevertheless, the Court will grant the motion so as to correct the defendant's name and to permit Plaintiffs to withdraw three of their claims. Defendants identify no prejudice with respect to these amendments, and Defendant "Dixie Elixirs and Edibles" appears to concede that they were named incorrectly. *See* ECF No. 82 at 4. Despite Plaintiffs' delay and the pending summary judgment motions, the Court finds the technical correction of one party's name and the withdrawal of some claims appropriate and permissible.

Accordingly, Plaintiffs' motion is granted in part and denied in part. The name of Defendant "Dixie Elixirs and Edibles" is corrected to "Dixie Holdings, LLC a/k/a Dixie Elixirs." The Clerk of Court is directed to amend the caption to reflect this change. In addition, the Court permits Plaintiffs to withdraw their claims for breach of contract, breach of express warranty, and unjust enrichment.

## II.    Motions to Strike

Defendants have filed motions to strike certain materials on which Plaintiffs rely for summary judgment, arguing that they are inadmissible. Plaintiffs oppose the motions.

"[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment." *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013). Under Rule 56(c)(2), a party "may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The 2010 Committee Notes "make clear," however, "that there is no need to make a separate motion to strike such inadmissible evidence." *Codename Enters., Inc. v. Fremantlemedia N. Am., Inc.*, No. 16 Civ. 1267, 2018 WL 3407709, at *4 (S.D.N.Y. Jan. 12, 2018) (internal quotation marks and brackets omitted). Instead, a court may consider arguments relating to the admissibility of evidence when it evaluates the merits of the summary judgment motion. *See id.* ("Because evidence inadmissible at trial is

insufficient to create a genuine dispute of material fact, the Court need not engage in separate analysis of the motion to strike.").

Consistent with this authority, the Court considers it more practical to evaluate Defendants' evidentiary objections in the course of analyzing the parties' summary judgment motions, as opposed to assessing those objections separately within the context of a motion to strike. Defendants' motions to strike are therefore denied.

## III.    Motions for Summary Judgment

Defendants move for summary judgment on all claims, while Plaintiffs move for summary judgment as to liability on the General Business Law and RICO claims. The Court examines each claim in turn.

### a.    Deceptive Business Practices and False Advertising

Plaintiffs allege that Defendants violated Sections 349 and 350 of New York General Business Law. Section 349 makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce . . . in this state." N.Y. Gen. Bus. Law § 349(a). Section 350 renders false advertising unlawful under similar terms. *See id.* § 350. "To assert a claim under either section, a plaintiff must establish that the defendant engaged in consumer oriented conduct that is materially misleading, and [that] plaintiff was injured as a result of the deceptive act or practice." *Bowring v. Sapporo U.S.A., Inc.*, 234 F. Supp. 3d 386, 390 (E.D.N.Y. 2017). "The only difference between the two is that Section 350 more narrowly targets deceptive or misleading advertisements, while Section 349 polices a wider range of business practices." *Cline v. TouchTunes Music Corp.*, 211 F. Supp. 3d 628, 635 (S.D.N.Y. 2016).

Defendants argue, among other things, that the statutes do not apply because the deceptive transaction did not take place in New York. The Court agrees.

In *Goshen v. Mut. Life Ins. Co. of N.Y.*, 774 N.E.2d 1190 (N.Y. 2002), the New York Court of Appeals held that Sections 349 and 350 are limited in their territorial reach. "[T]o qualify as a prohibited act under the statute, the deception of a consumer must occur in New York." *Goshen*, 774 N.E.2d at 1195. The court reasoned that the purpose of the provisions was to "address commercial misconduct occurring within New York." *Id.* Absent a clear territorial limitation, the provisions could be applied "nationwide, if not global[ly]," which would induce a "tidal wave of litigation" against New York businesses and interfere with other states' abilities to "regulate their own markets and enforce their own consumer protection laws." *Id.* at 1196.

*Goshen* has not been interpreted uniformly. In *Cruz v. FXDirectDealer, LLC*, 720 F.3d 115 (2d Cir. 2013), the Second Circuit recognized that there are "two divergent lines of decisions . . . regarding the proper territorial analysis." *Cruz*, 720 F.3d at 123. "The first line of decisions . . . . focus[es] on where the deception of the plaintiff occurs and require[s] . . . that a plaintiff actually view a deceptive statement while in New York." *Id.* "The second line of cases . . . . focus[es] on where the underlying deceptive 'transaction' takes place, regardless of the plaintiff's location or where the plaintiff is deceived." *Id.*

The Second Circuit has adopted the second approach, stating that a court should "focus on the location of the transaction, and in particular the strength of New York's connection to the allegedly deceptive transaction." *Id.* at 122. A plaintiff has statutory standing under Sections 349 and 340 if "some part of the underlying transaction . . . occurred in New York." *Id.* at 124 (internal brackets omitted).

Using this standard, the *Cruz* court held that the plaintiff, a Virginia resident, had statutory standing to sue the defendant, an online currency trading platform based in New York. *See id.* at 118-19. The court found standing because: (1) the defendant received payment in New York; (2)

the defendant only disbursed funds from customer accounts when the correct form was sent to its New York office; (3) the defendant required that all communications be directed to its New York office; and (4) the customer agreement provided that New York law governs all disputes and all suits must be brought in New York courts. *See id.* at 123-24. On these grounds, the court concluded that "the case . . . clearly involves a series of allegedly deceptive transactions that occurred in New York and implicate the interests of New York." *Id.* at 123.

Since *Cruz*, courts have examined the quantity and quality of the connections to New York in deciding whether a plaintiff has statutory standing for purposes of Sections 349 and 350. And as *Cruz* demonstrates, in the case of online transactions, that analysis can become highly granular. For example, in *Cline v. TouchTunes Music Corp.*, 211 F. Supp. 3d 628 (S.D.N.Y. 2016), the court found sufficient connections to permit a Section 349 claim. There, the plaintiff challenged a company's deceptive practices with respect to its "digital jukebox" application, which allowed smartphone users to purchase and play songs at bars and other venues. *See Cline v. TouchTunes Music Corp.*, No. 14-CV-4744, 2015 WL 127843, at *1 (S.D.N.Y. Jan. 7, 2015). Even though the plaintiff was not a New York resident and had only used the application outside of New York, the court allowed the claim to proceed because: (1) the company processed payments in New York; (2) the company's music servers were in New York; (3) the user agreement required that all suits be brought in New York and would be governed by New York law; and (4) users' music selections were transmitted to the company's New York servers. *TouchTunes*, 211 F. Supp. 3d at 633.

Here, Plaintiffs argue that there are sufficient connections to New York to implicate Sections 349 and 350 because: (1) they are New York residents; (2) Defendants shipped Dixie X to Plaintiffs' New York address; (3) Douglas consumed at least a portion of the product in New

York; and (4) Defendants' marketing and advertising were available to consumers in New York. *See* ECF No. 70-23 at 23-24. The Court is not persuaded.

Plaintiffs do not appear to dispute that they viewed Defendants' marketing—and thus were deceived—outside of New York. *See id.* Under the stricter reading of *Goshen*, Plaintiffs' claim fails. *See Cruz*, 720 F.3d at 123. Even under the broader approach endorsed by the *Cruz* court, the connections to New York are too attenuated to justify application of Sections 349 and 350. If any bright-line principle can be discerned from *Goshen* and *Cruz*, it is that Sections 349 and 350 are not intended to regulate New York businesses or protect New York residents solely on the basis of their residency; they are intended to police consumer transactions that "take place in New York State," regardless of the residency of the parties. *Goshen*, 774 N.E.2d at 1196 (stating that the analysis does not turn "on the residency of the parties"); *see also Cruz*, 720 F.3d at 122.

In this case, unlike in *Cruz* and *Cline*, Defendants were not located in New York and Plaintiffs do not allege that any part of the online transaction took place in New York. In the Court's view, the only relevant link is that Defendants shipped Dixie X into the state. But at that point, Plaintiffs had already been deceived by, and purchased the product from, the out-of-state Defendants. Application of Sections 349 and 350 would thus be based more on Plaintiffs' residency than on the location of the transaction itself. And as a matter of policy, the Court is not convinced that New York's interests are more strongly implicated in the transaction than those of other states. *See Goshen*, 774 N.E.2d at 1196.

Accordingly, the Court concludes that Plaintiffs do not have statutory standing to bring these claims against Defendants based on their purchase of Dixie X. Defendants are entitled to summary judgment on the General Business Law claims.

### b. Fraudulent Inducement

Plaintiffs premise their fraudulent inducement claim on the alleged misrepresentations contained in the "High Times" article, the FAQ on the Dixie X website, the YouTube interviews of Tripp Keber, and the customer-service phone call. Plaintiffs argue that Defendants falsely claimed that (1) Dixie X did not contain THC; (2) Dixie X was a legal product; (3) Dixie X was safe to consume; (4) Dixie X had health and wellness benefits; (5) Dixie X was adequately tested; and (6) Dixie X would not cause a positive drug test. Defendants challenge whether Plaintiffs can satisfy any of the necessary elements for a fraudulent inducement claim.

"Proof of fraudulent inducement under New York law requires a showing that (1) the defendant made a material false representation, (2) the defendant intended to defraud the plaintiff thereby, (3) the plaintiff reasonably relied upon the representation, and (4) the plaintiff suffered damage as a result of such reliance." *Baker-Rhett v. Aspiro AB*, 324 F. Supp. 3d 407, 418-19 (S.D.N.Y. 2018) (internal quotation marks omitted). With respect to intent, the plaintiff must demonstrate that the defendant made a knowing or reckless misrepresentation and intended to defraud the plaintiff thereby. *Turner v. Temptu Inc.*, No. 11 Civ. 4144, 2013 WL 4083234, at *11 (S.D.N.Y. Aug. 13, 2013).

All of these elements must be proven by clear and convincing evidence. *See Aguirre v. Best Care Agency, Inc.*, 961 F. Supp. 2d 427, 447 (E.D.N.Y. 2013). Therefore, "[a]t the summary judgment stage, a party must proffer enough proof to allow a reasonable jury to find by clear and convincing evidence the existence of each of the elements necessary to make out a claim for fraud in the inducement." *Waran v. Christie's Inc.*, 315 F. Supp. 3d 713, 718 (S.D.N.Y. 2018). "Clear and convincing proof is highly probable and leaves no doubt. . . . . [The] standard demands a high order of proof and forbids the awarding of relief whenever the evidence is loose, equivocal, or

contradictory because fraud will not be assumed on doubtful evidence or circumstances of mere suspicion." *Id.*

At the outset, the Court concludes that that Plaintiffs' claim may not proceed based on the following representations: that Dixie X was a legal product; that Dixie X was safe to consume; that Dixie X had health and wellness benefits; that Dixie X was adequately tested; and that Dixie X would not cause a positive drug test. This is because Plaintiffs have provided insufficient evidence to establish that, at the time those statements were made, Defendants knew they were false and intended to defraud consumers. *See U.S. ex rel. O'Donnell v. Countrywide Home Loans, Inc.*, 822 F.3d 650, 658 (2d Cir. 2016) ("[A] representation is fraudulent only if made with the contemporaneous intent to defraud—*i.e.*, the statement was knowingly or recklessly false and made with the intent to induce harmful reliance."). The difficulty is that Plaintiffs offer little in the way of evidence that illuminates the intent, state of mind, or beliefs of Defendants or their agents when the statements were made. For example, Plaintiffs point to no deposition testimony, company emails or documents, or other evidence that suggests that when the website FAQs were posted, Defendants knew their product was an unlawful controlled substance, was unsafe, and did not provide the purported wellness benefits. Given the absence of evidence related to the beliefs and knowledge of Defendants, their employees, and their agents, Plaintiffs' fraud claim fails as a matter of law as to the above statements.

The only actionable statement is Defendants' misrepresentation that Dixie X did not contain THC. First, there is evidence that this statement is false—indeed, Defendants' own testing revealed that the product contained detectible amounts of THC.

Second, there is evidence that Douglas reasonably relied on the misrepresentation. Plaintiffs carefully researched the product to ensure that it did not contain THC. It is reasonable

to conclude that the explicit representations in the FAQs and in the YouTube videos regarding the absence of THC would allay consumers' concerns about ingesting a product associated with marijuana.

Third, there is evidence that Douglas lost his job because he consumed Dixie X.

Fourth, there is evidence that Defendants made the false statements with the requisite knowledge and intent. In August 2012, Tripp Keber stated in the YouTube videos that Dixie X did not contain THC. But there is evidence that Defendants had been testing Dixie X "during its development and manufacturing" and had found the presence of THC. ECF No. 61-1 ¶ 6 (stating that testing "showed levels of THC well within legal limits"); ECF No. 61-13. Given Keber's high position within all three defendant companies, a jury could reasonably infer that he knew the results of such testing. And in light of his varying roles, a jury could attribute Keber's August 2012 statements to all three defendants. Similarly, because RDH represented on its website FAQs and through its customer service that Dixie X did not contain THC, despite having test results showing the presence of THC in its products, a jury could find that RDH knew that such representations were false.[8] Furthermore, all three defendants had a motive to defraud consumers. A jury could reasonably conclude that, to sell their products, Defendants needed to distinguish Dixie X from its unlawful counterparts; misrepresenting the THC content in the product would go a long way to dispelling consumers' concerns, as it did in Plaintiffs' case.

Thus, Plaintiffs' fraudulent inducement claim is viable, at least in part. The Court also notes three other considerations that further limit Plaintiffs' claim.

---

[8] The record suggests that RDH operated the Dixie X website: RDH was the entity tasked with selling Dixie X; RDH identifies itself as the seller in the FAQ; and RDH's parent company—MMI—is identified as the "parent company" in the FAQ. ECF No. 69-6 at 1. Plaintiffs do not explain how the statements in the FAQ may be attributed to Dixie LLC or Medical Marijuana. *See Mouawad Nat'l Co. v. Lazare Kaplan Int'l Inc.*, 476 F. Supp. 2d 414, 421 (S.D.N.Y. 2007) (discussing circumstances in which corporate parent is liable for acts of subsidiary).

First, Plaintiffs may not proceed with their claim based on the alleged misrepresentations contained in the "High Times" article. As Defendants point out, the article is not an advertisement but a writeup about Dixie X by a third party. The only arguable connection between the article's contents and Defendants is that the article quotes Tripp Keber. However, the article would be inadmissible to the extent that Plaintiffs intend to rely on it to prove that Tripp Keber actually made those statements. *See Larez v. City of Los Angeles*, 946 F.2d 630, 642 (9th Cir. 1991) (quotations of party opponent which are recited in newspaper article present hearsay problems insofar as they are "offered for the truth of the matter asserted: that [the party opponent] did in fact make the quoted statement"). Plaintiffs offer nothing but speculation to argue that Defendants had a role in publishing the article.

Second, Cindy's lost wages are not recoverable. A fraudulent inducement claim requires "a showing of proximate causation," *i.e.*, that the injury "is the natural and probable consequence of the defrauder's misrepresentation or . . . the defrauder ought reasonably to have foreseen that the injury was a probable consequence of his fraud." *Bank of Am. Corp. v. Lemgruber*, 385 F. Supp. 2d 200, 218 (S.D.N.Y. 2005). Cindy's lost wages were not the direct result of Defendants' alleged fraud; rather, they were derivative of Douglas's injury and too attenuated from Defendants' wrongful conduct to be actionable. *See Kregos v. Assoc. Press*, 3 F.3d 656, 665 (2d Cir. 1993) (stating that the losses for a fraud claim must be the "direct, immediate, and proximate result of the misrepresentation").

Third, Defendants argue that the website FAQs and YouTube videos are inadmissible insofar as they are not authenticated and contain hearsay. Further, Defendants contend that Plaintiffs did not produce the YouTube videos during discovery. Although these are colorable issues, both sides have failed to sufficiently develop them. The Court would benefit from further

briefing on whether the printouts of the website FAQs can be authenticated. *See, e.g.*, *United States v. Gasperini*, 894 F.3d 482, 489-90 (2d Cir. 2018) (discussing issue); *Universal Church, Inc. v. Universal Life Church/ULC Monastery*, No. 14 Civ. 5213, 2017 WL 3669625, at *3 n.7 (S.D.N.Y. Aug. 8, 2017) (same). Likewise, while Defendants argue that Plaintiffs failed to disclose the YouTube videos in discovery, they do not cite any specific discovery request that Plaintiffs did not adequately answer or supplement. Consequently, the Court concludes that these issues are better raised in the context of pretrial motions than on summary judgment. To the extent Defendants prevail on their arguments, the Court may revisit whether the fraudulent inducement claim may proceed to trial.

In sum, Plaintiffs' fraudulent inducement claim is viable as to Douglas's claim for damages resulting from Defendants' misrepresentation that Dixie X did not contain THC. Defendants are otherwise entitled to summary judgment on the claim.

### c. RICO

Plaintiffs and Defendants move for summary judgment on the RICO claim. Plaintiffs argue that all of the elements are satisfied as a matter of law based on the record evidence. Defendants counter that there is insufficient evidence to prove that they engaged in a pattern of racketeering activity. The Court concludes that there are genuine issues of material facts that preclude summary judgment in either side's favor.

Plaintiffs bring their RICO claim under 18 U.S.C. § 1962(c).[9] That provision "makes it unlawful for any person employed by or associated with any enterprise engaged in, or the activities

---

[9] In their Civil Rico Statement, Plaintiffs asserted violations of subsections (a), (b), (c), and (d) of Section 1962. Plaintiffs do not argue in their summary judgment briefing that they have viable claims under any subsection besides subsection (c). *See* ECF No. 60-25 at 5-7. The Court limits its analysis accordingly. *See Gaston v. City of New York*, 851 F. Supp. 2d 780, 796 (S.D.N.Y. 2012).

of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." *Ferri v. Berkowitz*, 678 F. Supp. 2d 66, 72-73 (E.D.N.Y. 2009) (internal quotation marks omitted). "To establish a civil RICO claim . . . a plaintiff must allege (1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity, as well as injury to business or property as a result of the RICO violation." *Flexborrow LLC v. TD Auto Fin. LLC*, 255 F. Supp. 3d 406, 414 (E.D.N.Y. 2017) (internal quotation marks omitted).

"The pattern of racketeering activity must consist of two or more predicate acts of racketeering," *id.*, which must be "related" and must "pose a threat of continued criminal activity." *DeFalco v. Bernas*, 244 F.3d 286, 320 (2d Cir. 2001). Racketeering activity is defined to include "any offense involving . . . the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance . . . punishable under any law of the United States." 18 U.S.C. § 1961(1)(D). This definition extends to the cultivation, manufacture, and sale of marijuana. *See, e.g.*, *Safe Streets Alliance v. Hickenlooper*, 859 F.3d 865, 882 (10th Cir. 2017) (operation of marijuana cultivation facility "necessarily would involve *some* racketeering activity").

In this case, Plaintiffs have provided sufficient evidence to show a pattern of racketeering activity. Specifically, Douglas avers that he purchased two bottles of Dixie X—a controlled substance constituting marijuana under the CSA—from Defendants. These two transactions constitute two predicate acts of racketeering activity.[10] *See* 18 U.S.C. § 1961(1)(D). This is so even if Defendants subjectively believed that Dixie X was not a controlled substance, as such belief

---

[10] To be sure, each defendant played a different role in the venture, and it appears that RDH had the responsibility of selling and distributing Dixie X to consumers. Nevertheless, liability under RICO also extends to those who have "some part in directing" the affairs of the enterprise. *DeFalco*, 244 F.3d at 309.

would not preclude a finding that they violated the CSA.  It is unlawful "for any person knowingly or intentionally" to distribute or dispense a controlled substance.  21 U.S.C. § 841(a)(1).  A defendant satisfies the knowledge requirement if he "knew he possessed a substance listed on the schedules" or, alternatively, if he "knew the identity of the substance he possessed" whether or not he knew it was listed on the schedules.  *McFadden v. United States*, 135 S. Ct. 2298, 2304 (2015).  Here, there are sufficient facts from which it can be inferred that Defendants knew the identity of the substance they possessed—a mixture containing a resin extract derived from the *Cannabis sativa* plant.  In 2012, that substance fell within the definition of marijuana under the CSA.  21 U.S.C. § 802(16) (2012); *see also McFadden*,135 S. Ct. at 2304 ("[I]gnorance of the law is typically no defense to criminal prosecution.").

These transactions also meet the relatedness and continuity requirements.  *See DeFalco*, 244 F.3d at 320.  The transactions are related, in that the sale of these controlled substances was the business of Defendants' venture.  *See Reich v. Lopez*, 858 F.3d 55, 61-62 (2d Cir. 2017).  Defendants' activities also presented a threat of continued criminal activity.  The sale of hemp-based CBD products was no mere aberration of unlawful conduct: it was the *raison d'être* of Defendants' venture.  *See id.* at 60 (stating that criminal activity poses a continuous threat when the "predicate acts were the regular way of operating that business").  Indeed, in a June 2012 SEC filing, MMI indicated that it intended to invest heavily in RDH to "expand[] its operations state by state" and to "rais[e] additional capital to expand the operations of the company."  ECF No. 69-4 at 32.  Given the inherent illegality of the product and Defendants' intent to continue and expand those operations, Plaintiffs have provided sufficient evidence to prove a pattern of racketeering

activity.[11]  Therefore, Defendants are not entitled to summary judgment based on the arguments they raise.

But Plaintiffs are not entitled to summary judgment either.  There is a genuine issue of material fact on one necessary element: whether Defendants' conduct proximately caused Douglas's injuries.  "[A] plaintiff suing under RICO must establish that the RICO offense was the 'proximate cause' of the plaintiff's injuries."  *Empire Merchs., LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 141 (2d Cir. 2018).  "Proximate cause requires some direct relation between the injury asserted and the injurious conduct alleged, and a link that is too remote, purely contingent, or indirect is insufficient."  *Id.* (internal quotation marks, ellipses, brackets omitted).

Here, there is a genuine dispute of material fact as to whether Dixie X caused Douglas's positive drug test and thereby caused him to lose his job.  Plaintiffs aver that Douglas had not used marijuana "for the 14 years [he] was a trucker," ECF No. 60-6 ¶ 18, and Plaintiffs' expert opines that Douglas's positive drug test resulted from his "daily use of Dixie X" in the days leading up to the test.  ECF No. 60-21 at 5.

Defendants dispute this conclusion.  Although Defendants do not contend that Douglas smoked marijuana or otherwise consumed a THC-laden product besides Dixie X, Defendants' expert asserts there is insufficient evidence to make a scientifically valid connection between Douglas's consumption of Dixie X and his positive drug test.  The expert notes that there are many variables that affect whether and to what extent THC will stay in one's system, including dosage, frequency of use, individual rates of absorption and metabolism, etc.  ECF No. 61-9 at 4.  The expert opines that the absence of evidence on two relevant variables—the amount of THC contained in the *specific* bottle of Dixie X which Douglas consumed, and the exact amount of

---

[11] In light of this conclusion, the Court need not assess whether, as Plaintiffs claim, Defendants also engaged in other predicate acts of racketeering, including mail and wire fraud.  *See* ECF No. 2 at 3-4.

Dixie X that Douglas consumed prior to his drug test—renders it "impractical to calculate . . . a range of expected contaminating THC metabolite" in Douglas's urine sample at the time of his test. *Id.* at 4-5. And, as a result, "no one can opine with any degree of scientific confidence that it was the Dixie product used by [Douglas] that caused him to fail his" drug test. *Id.* at 5. The Court may not resolve this factual dispute on summary judgment. *See Scanner Techs. Corp. v. Icos Vision Sys. Corp., N.V.*, 253 F. Supp. 2d 624, 634 (S.D.N.Y. 2003) ("The credibility of competing expert witnesses is a matter for the jury, and not a matter to be decided on summary judgment.").

The Court does conclude that Plaintiffs are not entitled to recover under RICO for any damages Cindy sustained. The link between Cindy's pecuniary losses and Defendants' racketeering activity is "too remote" and "indirect" to satisfy the requirement of proximate causation. *Empire Merchs., LLC*, 902 F.3d at 141. Defendants' conduct did not directly cause Cindy to terminate her employment; it was only because Douglas was terminated that Cindy suffered any harm as a result of Defendants' conduct. *See id.* (stating that a court should "rarely go beyond the first step when assessing causation under civil RICO" (internal quotation marks omitted)). Such indirect, derivative injuries are not cognizable under civil RICO. *See id.* at 141-44.

Because genuine issues of material facts exist as to Plaintiffs' RICO claim, summary judgment is inappropriate in their favor. Defendants are entitled to summary judgment on the RICO claim only as to Cindy's claim for damages.

### d. Strict Products Liability, Negligence, and Negligent Infliction of Emotional Distress Claims

Plaintiffs argue that Defendants are liable under theories of strict products liability, negligence, and negligent infliction of emotional distress. The first two of these claims fail because

Plaintiffs have not provided evidence that they suffered cognizable injuries. "The general rule under New York law is that economic loss is not recoverable under a theory of negligence or strict products liability." *Am. Tel. & Tel. Co. v. New York City Human Res. Admin.*, 833 F. Supp. 962, 982 (S.D.N.Y. 1993); *see also Labajo v. Best Buy Stores, L.P.*, 478 F. Supp. 2d 523, 532 (S.D.N.Y. 2007) (consumer who was allegedly deceived by store's free-magazine promotion could not bring negligence claim because "she does not allege any personal injury or property damage"). Plaintiffs seek damages for their economic losses, but they do not claim that they suffered any personal injury or injury to property as a result of Defendants' conduct. Their negligence and strict products liability claims therefore fail.

Granted, Plaintiffs allege that they suffered emotional distress due to Defendants' conduct. A claim for negligent infliction of emotional distress is cognizable in New York, and some courts have suggested that such a cause of action might be viable under a products liability theory. *See Luna v. Am. Airlines*, 676 F. Supp. 2d 192, 206 (S.D.N.Y. 2009); *O'Sullivan v. Duane Reade, Inc.*, No. 108570/05, 2010 WL 1726079, at *7 n.4 (N.Y. Sup. Ct. Apr. 20, 2010). Nonetheless, under New York law, a claim for negligent infliction of emotional distress must possess "some guarantee of genuineness." *J.H. v. Bratton*, 248 F. Supp. 3d 401, 416 (E.D.N.Y. 2017). This requires "a specific, recognized type of negligence that obviously has the propensity to cause extreme emotional distress, such as the mishandling of a corpse or the transmission of false information that a parent or child had died." *Id.* (internal quotation marks and bracket omitted). The element may also be satisfied where there is a "breach of the duty owed directly to the injured party [which] endangered the plaintiff's physical safety or caused the plaintiff to fear for his or her own physical safety." *Id.* (internal quotation marks omitted). "In the absence of such special circumstances, psychiatric testimony may suffice for such a guarantee of genuineness, but a plaintiff's

uncorroborated testimony of upsetness will not." *Vumbaca v. Terminal One Grp. Ass'n L.P.*, 859 F. Supp. 2d 343, 376 (E.D.N.Y. 2012) (internal brackets and quotation marks omitted).

In this case, Plaintiffs' situation does not fall into any of the special circumstances for which a claim is recognized. *See Vaughn v. Am. Multi Cinema, Inc.*, No. 09 Civ. 8911, 2010 WL 3835191, at *5 (S.D.N.Y. Sept. 13, 2010) (termination of employment not a special circumstance giving rise to claim for negligent infliction of emotional distress). Furthermore, Plaintiffs offer no evidence to otherwise establish a guarantee of genuineness: they do not even provide evidence from Douglas concerning the degree to which he suffered psychological trauma because of these events, let alone evidence from a medical or valid corroborating source. *See Luna*, 676 F. Supp. 2d at 208 (plaintiff, who had been served chicken dinner with "part of a lizard" in it, had viable claim for emotional distress, where plaintiff proffered medical testimony to support claim of psychological injury). Under these circumstances, Plaintiffs do not have a viable claim for negligent infliction of emotional distress.

Accordingly, without cognizable personal, property, or psychological injury, Plaintiffs' claims for negligence, strict products liability, and negligent infliction of emotional distress fail. Defendants are entitled to summary judgment on these claims.

## CONCLUSION

For the reasons discussed above, Plaintiffs' motion to amend (ECF No. 68) is GRANTED IN PART and DENIED IN PART. Defendants' motions to strike (ECF Nos. 71, 74) are DENIED. Plaintiffs' motion for partial summary judgment (ECF No. 60) is DENIED. Defendants' motions for summary judgment (ECF No. 61, 62) are GRANTED IN PART and DENIED IN PART.

As a result of these rulings, the only surviving claims are Douglas's claims for fraudulent inducement and civil RICO. All other claims against Defendants are dismissed. The Clerk of

Court is directed to amend the name of Defendant "Dixie Elixirs and Edibles" to "Dixie Holdings, LLC a/k/a Dixie Elixirs."  By separate order, the Court will schedule a status conference to hear from the parties on the progress of this action.

IT IS SO ORDERED.

Dated: April 17, 2019
          Rochester, New York

_____
HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court