# *Williams v. Gentry*

United States District Court for the District of Nevada

June 18, 2020, Decided; June 18, 2020, Filed

Case No. 2:04-cv-01620-KJD-EJY

**Reporter**

2020 U.S. Dist. LEXIS 107564 *; 2020 WL 3302971

JESSICA **WILLIAMS**, Petitioner, v. JO **GENTRY**, et al,[1] Respondents.

**Subsequent History:** Appeal terminated, 08/27/2020

**Prior History:** *Williams v. Bodo, 2007 U.S. Dist. LEXIS 43032 (D. Nev., June 11, 2007)*

# Core Terms

marijuana, metabolite, blood, driving, nanograms, plant, vagueness, drivers, refrigerate, seeds, stems, exculpatory, impairment, vial, overbreadth, milliliter, evidentiary, lab, retesting, traffic, jurists, notice, intelligence, destroyed, apposite, illicit, acid, unforeseeable, users, novo

**Counsel:** [*1] For Jessica **Williams**, Petitioner: Lori C Teicher, Michael Pescetta, Federal Public Defender, Las Vegas, **NV** 89101.

For Jo **Gentry**, et al., Respondent: Victor H Schulze, II,

LEAD ATTORNEY, **Nevada** Attorney General's Office, Las Vegas, **NV**.

**Judges:** KENT J. DAWSON, United States District Judge.

**Opinion by:** KENT J. DAWSON

# Opinion

ORDER

This habeas matter under *28 U.S.C. § 2254* comes before the Court for a final decision on the multiple grounds presented.

*Introduction*

Petitioner Jessica **Williams** seeks to overturn her 2001 **Nevada** state conviction, pursuant to a jury verdict, of six counts of driving with a prohibited substance in her blood in violation of then *N.R.S. 484.3795(1)(f)*.

The criminal case arose from the tragic deaths of six teenagers assigned to a roadside cleanup crew who were

---

[1] It appears from the inmate locator page on the state corrections department's website that Ms. **Williams** is out on parole on her sixth and final consecutive sentence. Should there be any further proceedings in this federal matter, the parties should substitute a proper current respondent in the place of her former physical custodian. The 1976 Advisory Committee Notes to Subdivision (b) of Rule 2 of the Rules Governing Section 2254 Cases suggest that the proper respondent for a petitioner who is on parole is "the particular . . . parole officer responsible for supervising the applicant, and the official in charge of the parole or probation agency, or the state correctional agency, as appropriate."

struck and killed on March 19, 2000, when the vehicle that *Williams* was driving veered off the road into the median. According to the factual summary by the Supreme Court of *Nevada*, *Williams* had stayed up all night the prior evening. *Williams* admitted that she had smoked marijuana approximately two hours before veering off the road and that she had used the drug "ecstasy" the prior evening. *Williams* had a pipe with marijuana residue and a plastic bag with marijuana. Blood draws [*2] taken that day tested positive for the presence of the active ingredient of marijuana and a metabolite thereof. *Williams* maintained that she had fallen asleep at the wheel. See *Williams v. State, 118 Nev. 536, 50 P.3d 1116, 1126-27 (2002)* (*Williams I*).[2]

*Williams* was charged with, *inter alia*, six counts of violating then N.R.S. 484.3795, which provided in pertinent part at the relevant time:

1. A person who:

. . . .

(d) Is under the influence of a controlled substance or is under the combined influence of intoxicating liquor and a controlled substance;

. . . . ; or

(f) Has a prohibited substance in his blood or urine in an amount equal to or greater than the amount set forth in subsection 3 of N.R.S. 484.379,

and does any act or neglects any duty imposed by law while driving or in actual physical control of any vehicle on or off the highways of this state, if the act or neglect of duty proximately causes the death of, or substantial bodily harm to, a person other than himself, is guilty of a category B felony . . . .

N.R.S. 484.3795(1)(d) & (f), *recodified at N.R.S. 484C.430(d) & (f).*[3]

The jury acquitted *Williams* on all six counts of the statutory alternative under N.R.S. 484.3795(1)(d) based upon being under the influence of a controlled substance. The jury convicted *Williams* on all six counts the

alternative under N.R.S. 484.3795(1)(f) based upon having [*3] a prohibited substance in her blood in a requisite amount. This verdict in turn was based upon evidence seeking to establish that *Williams* had the active ingredient of marijuana and also a metabolite thereof in her bloodstream. *Williams I, 118 Nev. at 539-40, 50 P.3d at 1118-19* (discussing also other charges).

Following review, and for the reasons discussed herein, the Court grants a conditional writ of habeas corpus on Ground 8(a) of the petition, as amended, subject to the State's ability to retry *Williams* within the time period established by this order. The Court discusses Ground 8(a) first and then the related Grounds 8(b) and 9.

The Court denies relief on all remaining grounds other than Ground 8(a) for the reasons stated herein, including Grounds 1, 4, 5, 7, 8(b) and 9. Technically, the Court need not necessarily reach any grounds as to which *Williams* may not secure greater relief than she has via the conditional writ granted herein. However, the Court had done extensive work on all then-pending grounds prior to entry of the stay in 2011; and it has updated that prior work on all remaining grounds in preparing this order. At this point, after now many years of combined state and federal litigation, the matter should be postured [*4] for a definitive and final resolution in the event of any appeal from the current order and judgment. The Court accordingly issues a decision as to all remaining claims presented, so that, *inter alia*, this matter potentially may be conclusively resolved on any appeal without a remand based at least on the presence of unadjudicated claims. While the Court is fully confident that a conditional writ grant is warranted on Ground 8(a), a resolution of all claims pending in the district court by this order best serves the interests of justice for all concerned after now two decades of state and federal litigation.

### Standard of Review

When the state courts have adjudicated a claim on the

---

[2] The parties do not challenge the accuracy of the state supreme court's background factual recital, which accordingly is presumed to be correct under 28 U.S.C. § 2254(e)(1). *See, e.g.*, Sims v. Brown, 425 F.3d 560, 563 n.1 (9th Cir. 2005).

This Court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court. The Court summarizes same solely as background to the issues presented in this case, and it does not

summarize all such material. No statement of fact made in describing statements, testimony or other evidence in the state court constitutes a finding by this Court.

[3] The three principal statutory provisions discussed herein all were recodified under different numbering in a 2009 revision, without any change of substance. The Court will reference the new numbering in the initial citation to each provision, but the Court otherwise will cite thereafter to the original numbering.

Williams v. Gentry

merits, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) imposes a "highly deferential" standard for evaluating the state court ruling that is "difficult to meet" and "which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster, 563 U.S. 170, 131 S. Ct. 1388, 179 L. Ed. 2d 557 (2011)*. In particular, "[a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless **[*5]** the adjudication of the claim — (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *28 U.S.C. § 2254(d)*.

Under this highly deferential standard of review, a federal court may not grant habeas relief merely because it might conclude that the state court decision was incorrect. *Pinholster, 563 U.S. at 202*.

Rather, a state court decision is "contrary to" law clearly established by the Supreme Court only if it applies a rule that contradicts the governing law set forth in Supreme Court case law or if the decision confronts a set of facts that are materially indistinguishable from a Supreme Court decision and nevertheless arrives at a different result. *E.g., Mitchell v. Esparza, 540 U.S. 12, 15-16, 124 S. Ct. 7, 157 L. Ed. 2d 263 (2003)* (*per curiam*). A state court decision is not contrary to established federal law merely because it does not cite the Supreme Court's opinions. *Id.* Indeed, the Supreme Court has held that a state court need not even be aware of its precedents, so long as neither the reasoning nor the result of its **[*6]** decision contradicts them. *Id.* Moreover, "[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." *540 U.S. at 16*. For, at bottom, a decision that does not conflict with the reasoning or holdings of Supreme Court precedent is not contrary to clearly established federal law.

A state court decision constitutes an "unreasonable application" of clearly established federal law only if it is demonstrated that the state court's application of Supreme Court precedent to the facts of the case was not only incorrect but "objectively unreasonable." *E.g., Mitchell, 540 U.S. at 18*; *Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)*.

To the extent that a state court's factual findings are challenged, the "unreasonable determination of fact" clause of *Section 2254(d)(2)* controls on federal habeas review. *E.g., Lambert v. Blodgett, 393 F.3d 943, 972 (9th Cir. 2004)*. This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." *393 F.3d at 973*. Rather, AEDPA requires substantially more deference to the state court factual finding:

> . . . . [I]n concluding that a state-court finding is unsupported **[*7]** by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox, 366 F.3d 992, 1000 (9th Cir. 2004)*; *see also Lambert, 393 F.3d at 972*.

In contrast, when the state courts have not adjudicated a claim on the merits, such as where the state courts rejected the claim instead on procedural grounds, the above-described AEDPA deference on legal and factual issues does not apply; and the federal courts instead review the claim *de novo. E.g., Pirtle v. Morgan, 313 F.3d 1160, 1165* & 1167-68 (9th Cir. 2002).

However, in all events, under *28 U.S.C. § 2254(e)(1)*, any state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence. *E.g., Pirtle, 313 F.3d at 1168*.

### *Discussion*

### *Ground 8(a): Denial of Fair Warning by Judicial Expansion of Statute*

In Ground 8(a), **_Williams_** alleges in principal part that she was denied due process of law in violation of the *Fourteenth Amendment* when she was denied fair warning of the conduct prohibited by an unforeseeable and retroactive judicial expansion of the relevant statutes by the state supreme court. She alleges that the statutes **[*8]** as written did not give fair warning that the

Williams v. Gentry

presence of an inactive ingredient of marijuana, marijuana metabolite, in her bloodstream would bring her within the terms of the statutes. She alleges that she thus could not be convicted based upon what therefore was an improper alternative theory of culpability, the presence of marijuana metabolite in her bloodstream, such that a new trial is required. (ECF No. 110, at 44-47.)

### Review of the Merits

Ground 8(a) was rejected by the state supreme court on the basis of procedural default rather than on the merits. (ECF No. 98-4, at 11.) Federal habeas review of the merits thus is *de novo* following upon **Williams** having overcome the procedural default.

In *Bouie v. City of Columbia, 378 U.S. 347, 84 S. Ct. 1697, 12 L. Ed. 2d 894 (1964)*, the Supreme Court reaffirmed the bedrock principle that a criminal statute must provide fair notice of what is prohibited by the statute:

> The basic principle that a criminal statute must give fair warning of the conduct that it makes a crime has often been recognized by this Court. As was said in *United States v. Harriss, 347 U.S. 612, 617, 74 S.Ct. 808, 812, 98 L.Ed. 989*,
>
> > "The constitutional requirement of definiteness is violated by a criminal statute that fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the **[*9]** statute. The underlying principle is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed."
>
> . . . . We have recognized [*inter alia*] . . . that "No one may be required at peril of life, liberty or property to speculate as to the meaning of penal statutes. All are entitled to be informed as to what the State commands or forbids." *Lanzetta v. New Jersey, 306 U.S. 451, 453, 59 S.Ct. 618, 619, 83 L.Ed. 888*.

*378 U.S. at 350-51* (citation to additional authorities omitted).

The undersigned strongly encourages the judges conducting any appellate review in this case to review an actual physical hard copy bound volume containing the relevant statutes within the **Nevada** Revised Statutes.

A person of ordinary intelligence would see the following

in a hard copy volume containing the statute prior to March 19, 2000.

Under the chapter subheading "General Provisions," the second statute in Chapter 484 of the **Nevada** Revised Statutes provided:

> **NRS 484.013** **Definitions**.
> As used in this chapter, unless the context otherwise requires, the words and terms defined in 484.014 to 484.217, inclusive, have the meanings ascribed to them in those sections.

*N.R.S. 484.013*, *as amended through* 1999 Laws, ch. 622, § 21, p. 3415 (now *N.R.S. 484C.010*) (the 1999 law expressly added what came to be codified as *N.R.S. 484.1245*).

Under the same chapter subheading **[*10]** "General Provisions" in Chapter 484, nearly 100 statutes provided definitions that thus were generally applicable to the remaining provisions in Chapter 484. The definitions were set forth in alphabetical order, from "Administrative roadblock" in *N.R.S. 484.014* through "Vehicle" in *N.R.S. 484.217*.

These generally-applicable statutory definitions for the entirety of Chapter 484 included the following definition:

> **NRS 484.1245** **"Prohibited substance" defined**.
>
> "Prohibited substance" means any of the following substances if the person who uses the substance has not been issued a valid prescription to use the substance *and the substance is classified in schedule I or II pursuant to NRS 453.166 or 453.176 when it is used*:
>   1. Amphetamine.
>   2. Cocaine or cocaine metabolite.
>   3. Heroin or heroin metabolite (morphine or 6-monoacetyl morphine).
>   4. Lysergic acid diethylamide.
>   5. Marijuana or marijuana metabolite.
>   6. Methamphetamine.
>   7. Phencyclidine.

*N.R.S. 484.1245*, *as added by* 1999 Laws, ch. 622, § 21, p. 3414-15 (currently redesignated as *N.R.S. 484C.080*) (emphasis added).

It is undisputed that marijuana metabolite was not classified in the schedule I or II referred to in *N.R.S.*

*484.1245* at the time of the incident. *See, e.g., State v. Williams*, 120 Nev. 473, 480, 93 P.3d 1258, 1262 (2004) (*Williams* II). In contrast, other metabolites referred to in *N.R.S. 484.1245* were classified under **[\*11]** schedules I or II, such as, for example, the classification of cocaine metabolite under schedule II. (See state district court finding at ECF No. 76-20, at 3.)

As noted previously, *Williams* was convicted of, *inter alia*, six counts of violating R.R. S. 484.3795(1)(f), which provided in pertinent part:

> 1. A person who:
>
>       . . . .
>
>       (f) Has a prohibited substance in his blood or urine in an amount equal to or greater than the amount set forth in subsection 3 of *N.R.S. 484.379*,
>
> and does any act or neglects any duty imposed by law while driving or in actual physical control of any vehicle on or off the highways of this state, if the act or neglect of duty proximately causes the death of, or substantial bodily harm to, a person other than himself, is guilty of a category B felony . . . .

*N.R.S. 484.3795(1)(f)*, *as amended through* 1999 Laws, ch. 480, § 9, p. 2452-53, ch. 622, § 28, p. 3422-23 (currently redesignated as *N.R.S. 484C.430(1)(f)*).

In using the phrase "prohibited substance," *N.R.S. 484.3795(1)(f)* did not expressly state a definition for "prohibited substance" over and above the generally applicable definition provided for in *N.R.S. 484.1245* for the entirety of Chapter 484.

*N.R.S. 484.379(3)*, in turn, provided in pertinent part as follows:

> 3. It is unlawful for any person to drive or be in actual physical control **[\*12]** of a vehicle on a highway or on premises to which the public has access with an amount of a prohibited substance in his blood or urine that is equal to or greater than:

⊞ *Go to table1*

*N.R.S. 484.379(3)* *as amended through* 1999 Laws, ch. 480, § 7, p. 2451, ch. 622, § 23, p. 3415-16 (currently redesignated as *N.R.S. 484C.110(3)*).

In using the phrase "prohibited substance," *N.R.S. 484.379* did not expressly state a definition for "prohibited substance" over and above the generally-applicable definition provided for in *N.R.S. 484.1245* for the entirety of Chapter 484.

The natural reading of these three provisions to a person of ordinary intelligence would be that a person would be guilty of violating *N.R.S. 484.3795(1)(f)* if (a) they had a prohibited substance as defined by *N.R.S. 484.1245* in their blood or urine in an amount equal to or greater than the amount specified in *N.R.S. 484.379(3)*, and *(b)* they proximately caused the death of or substantial bodily harm to another person through **[\*13]** an act or neglect of legal duty while driving or controlling a vehicle.

This natural reading of the three provisions to a person of ordinary intelligence was to an extent reinforced by *Nevada* jurisprudence prior to March 19, 2000. In civil litigation applying Chapter 484 of the *Nevada* Revised Statutes, the definition of a term or phrase in the opening "General Provisions" section of the chapter controlled and established the meaning of the remaining provisions in the chapter. In *Elliott v. Mallory Electric Corporation, 93 Nev. 580, 571 P.2d 397 (Nev. 1977)*, the plaintiff argued that a vehicle on private land was encompassed within the reach of *N.R.S. 484.445* because "[o]n its face, the statute is unqualified and, standing alone, would appear to apply to vehicles wherever located." *571 P.2d at 399*. The Supreme Court of *Nevada* responded that: "Chapter 484 as a whole, however, indicates a more limited intent." *Id.* *N.R.S. 484.777(1)* stated that the chapter applied only to "highways," and *N.R.S. 484.065* — from the "General Provisions" — defined a "highway" in pertinent part as a way "maintained by a public authority," as opposed to a private entity. The *Nevada* high court thus did not ignore a narrowing definition in the opening "General Provisions" when that qualification was not expressly referenced in a later specific provision, reading Chapter 484 "as a whole." **[\*14]** [4]

Additionally given such prior jurisprudence, a person of ordinary intelligence would conclude that a narrowing definition in the "General Provisions" in Chapter 484 would control the meaning of the same terminology in other portions of the chapter, even if the narrowing qualification in the definition statute was not expressly repeated in a later specific provision. Such a natural reading of the statute would tend to follow with even greater force due to the strict construction given criminal

---

[4] *See also* *Lee v. State, 116 Nev. 452, 997 P.2d 138 (Nev. 2000)* (in a criminal case decided less than a month after the

incident in this case, the state supreme court similarly held that the opening definition of "highway" in Chapter 484 controlled, reversing the conviction).

Williams v. Gentry

prohibitions.

In 2003, the state district court granted **_Williams_** a new trial on postconviction review based upon the above-described reading of the statutes. The district court concluded that marijuana metabolite did not constitute a prohibited substance for purposes of _N.R.S. 484.3795(1)(f)_ because marijuana metabolite was not listed in the referenced schedule I or II at the relevant time and therefore did not fall within the definition of prohibited substance in _N.R.S. 484.1245_. (ECF No. 76-20, at 2-5.)

The state supreme court reversed, holding that **_Williams_**' claim was procedurally barred because it was a new claim that could have been raised in prior proceedings. The court held in this regard, _inter alia_, that **_Williams_** [*15] could not establish actual prejudice to overcome the procedural bar because "marijuana metabolite is a prohibited substance under _NRS 484.379_ and _484.1245_." **_Williams II, 93 P.3d at 1261_**. The court stated that "_NRS 484.379_ clearly lists marijuana metabolite as a prohibited substance and gives the amount in nanograms per milliliter that must be present in the blood or urine to constitute a violation of the statute." _Id._

The court acknowledged that _N.R.S. 484.1245_ was "also the part of the same statutory scheme" as the other provisions and further that marijuana metabolite was not listed in the schedules expressly referenced in 484.1245. _Id., at 1261-62_. The court nonetheless rejected **_Williams_**' reliance upon the provision as thus not including marijuana metabolite in the definition of prohibited substance because "it is clear from the plain language of both _NRS 484.379_ and _484.1245_ that marijuana metabolite is a prohibited substance." _Id._ The court further relied upon legislative history, including committee hearings, reflecting, first, that the three provisions all were added to Chapter 484 by the same bill and, second, that marijuana metabolite was added to the listing in the statutes along with several other substances after it was determined that there were standards for detecting these [*16] substances in the blood. The court concluded from this summary of the legislative history that "the Legislature intended to specifically list marijuana metabolite as a prohibited substance under _NRS 484.1245_ and _484.379(3)_, and to incorporate it by reference under _NRS 484.3795(1)(f)_." _Id._

The Supreme Court of **_Nevada_** of course is the final arbiter of **_Nevada_** state law. But, as noted, it is a bedrock principle of federal due process law that a criminal statute must provide fair notice of that which is prohibited by the statute. _Bouie, supra._

That bedrock due process principle can be violated by vague or overbroad language in a criminal statute that leaves one to speculate as to its meaning. _Bouie, 378 U.S. at 351-52_. However, _Bouie_ further instructs that the fair warning required by due process also can be denied by an unforeseeable retroactive judicial expansion of a criminal statute:

> It is true that in the Connally and Lanzetta cases, and in other typical applications of the principle, the uncertainty as to the statute's prohibition resulted from vague or overbroad language in the statute itself, and the Court concluded that the statute was "void for vagueness." The instant case seems distinguishable, since on its face the language of . . . [the state statute] was [*17] admirably narrow and precise . . . . The thrust of the distinction, however, is to produce a potentially greater deprivation of the right to fair notice in this sort of case, _where the claim is that a statute precise on its face has been unforeseeably and retroactively expanded by judicial construction_, than in the typical 'void for vagueness' situation. When a statute on its face is vague or overbroad, it at least gives a potential defendant some notice, by virtue of this very characteristic, that a question may arise as to its coverage, and that it may be held to cover his contemplated conduct. When a statute on its face is narrow and precise, however, it lulls the potential defendant into a false sense of security, giving him no reason even to suspect that conduct clearly outside the scope of the statute as written will be retroactively brought within it by an act of judicial construction. If the _Fourteenth Amendment_ is violated when a person is required "to speculate as to the meaning of penal statutes," as in Lanzetta, or to "guess at [the statute's] meaning and differ as to its application," as in Connally, the violation is that much greater when, because the uncertainty as to the statute's meaning [*18] is itself not revealed until the court's decision, a person is not even afforded an opportunity to engage in such speculation before committing the act in question.

_378 U.S. at 351-52_ (emphasis added).

In reviewing the federal due process claim here on _de novo_ review, the Court holds that **_Williams_** was denied due process of law because the state supreme court's unforeseeable and retroactive expansion of the reach of the otherwise clear language of the relevant state statutes denied **_Williams_** fair notice of what was prohibited.

Williams v. Gentry

As written, this is a simple and clear state statutory scheme.

If the substance is defined as a prohibited substance under _N.R.S. 484.1245_ and is present in an amount satisfying _N.R.S. 484.379_, then the defendant is guilty of violating N.R.S. 3795(f)(1) in the additional circumstances set forth therein.

It is that simple.

And the language used in the statute is clear and precise. If a substance listed in _N.R.S. 484.1245_ is not listed in the referenced schedules, it is not a prohibited substance for purposes of Chapter 484.

Nothing in either of the two state supreme court decisions discussing the statutory scheme in truth states a foreseeable basis for disregarding the clear and precise legislative language requiring that a substance must be listed **[\*19]** in the referenced schedules to be a prohibited substance.[5]

The state high court stated multiple times, in pertinent part, that "marijuana metabolite is a prohibited substance under . . . _NRS . . . 484.1245_." _E.g._, _**Williams II, 93 P.3d at 1261**_; _see also id., at 1262_ ("it is clear from the plain language of . . . _NRS . . . 484.1245_ that marijuana

metabolite is a prohibited substance"). Such a bald statement simply reads out of that statute the clear and precise language stating that "'Prohibited substance' means any of the following substances _if_ [_inter alia_] . . . _the substance is classified in schedule I or II pursuant to_ NRS 453.166 _or_ 453.176 _when it is used._" Undeniably, marijuana metabolite was not listed in the referenced schedules at the relevant time; and the clear and precise language of the statutory definition in _N.R.S. 484.1245_ therefore was not satisfied. The state supreme court's repeating a statement multiple times instead that "marijuana metabolite is a prohibited substance under _N.R.S. 484.1245_" does not make that statement either true or a foreseeable construction of the statute to a person of ordinary intelligence.[6]

In this same vein, the state supreme court elaborated in its 2016 decision:

> Finally, the **[\*20]** plain language of _NRS.484.1245_ included the words "marijuana metabolite." It is difficult to conceive under these circumstances how this court expanded the scope of _NRS 484.1245_ in a novel, unforeseeable, or indefensible fashion by reading the words "marijuana metabolite" as being included in the definition of a prohibited substance when those exact words were used. Thus, _**Williams'**_ [sic] fails to demonstrate actual prejudice to

---

[5] The Court emphasizes that this is _de novo_ review of a federal law due process fair warning claim. The state supreme court did not decide such a federal claim on the merits in either _**Williams II**_ in 2004 or on the later appeal in 2016 during the federal stay. Such a federal claim was not presented during _**Williams**_ II in 2004, which is what led to the federal stay. _See_ ECF No. 78, at 5–6 & 10. And on appeal during the stay, the state supreme court clearly did not decide any federal law claim on the merits, including as an alternative basis for decision. The court instead eschewed making any rulings on the merits, stating that "[w]e address the merits of _**Williams'**_ claims of ineffective assistance of counsel and judicial expansion only in the context of determining whether she has demonstrated actual prejudice." ECF No. 98-4, at 11. In a related vein, such an express statement clearly establishes that the state court is deciding the state appeal on a state law ground that is independent of the federal law issue. _E.g._, _Moran v. McDaniel, 80 F.3d 1261, 1269 (9th Cir. 1996)_. It further is well-established that if a state court rejects a claim solely on the basis of procedural default and that default is overcome in federal court, as it has been here, then federal review of the merits of the federal law claim is _de novo_. _See, e.g._, _Williams v. Filson, 908 F.3d 546, 564 (9th Cir. 2018)_ (following holding that the procedural bar invoked was not an adequate state law ground); _Riley v. McDaniel, 786 F.3d 719, 723 (9th Cir. 2015)_ (same); _Dickens v. Ryan, 740 F.3d 1302,_

_1321 (9th Cir. 2014)_ (en banc); _Pirtle, supra. See also_ _**Visciotti v. Martel, 862 F.3d 749, 768-69 (9th Cir. 2016)**_ (a federal court's review of cause and prejudice issues is _de novo_ when the state court makes a stand-alone cause-and-prejudice determination). The Court rejected respondents' procedural default defense in this case because the state law bar was not an adequate ground in the circumstances presented. (See ECF No. 67, at 13; ECF No. 116, at 5-9; ECF No. 133.)

Accordingly, when this Court discusses the state supreme court's stated reasoning on the state law issue in its prejudice analysis, it does so strictly as a federal court reviewing the federal due process fair warning claim on the merits on a _de novo_ basis, in considering whether the state high court unforeseeably expanded the state statute. Adjudication of _**Nevada**_ state law is exclusively the province of the Supreme Court of _**Nevada**_, but this Court in turn is duty bound to adjudicate the related federal constitutional issue.

[6] This Court of course omitted for this paragraph the references in the quotes by the Supreme Court of _**Nevada**_ also to _N.R.S. 484.379_. However, for a statement that marijuana metabolite is a prohibited substance under the plain language of "both" statutes to be true, that statement must be true as to each statute. The state high court's statement clearly is not true as to _N.R.S. 484.1245_. This Court discusses _N.R.S. 484.379_ below.

Williams v. Gentry

overcome the filing of a late petition. (ECF No. 98-4, at 17.)

This analysis would have been compelling if _N.R.S. 484.1245_ in fact had said only: "'Prohibited substance' means any of the following substances," followed immediately by a list of substances that included the exact words "marijuana metabolite." In such a statute, the use of those exact words would have signified that marijuana metabolite was a prohibited substance for purposes of Chapter 484.

But the statute did not say that. The statute very clearly and precisely stated that "Prohibited substance' means any of the following substances," _if_ two conditions were met, and the second one indisputably was not met as to marijuana metabolite. The state supreme court's question-begging "those exact words were used" analysis thus indeed was novel, [*21] unforeseeable, and indefensible. A person of ordinary intelligence could not foresee that the state high court would read only the "marijuana metabolite" exact words while disregarding the additional exact, clear and precise statutory words stating that the listed substances, including marijuana metabolite, would be "prohibited substances" under Chapter 484 only if, _inter alia_, included in the referenced schedules. Again, the state supreme court simply read out of the statute exact, clear and precise words that precluded marijuana metabolite and the other listed substances from being a prohibited substance where a substance was not included in the referenced schedules.

The state supreme court continued to disregard the limiting definition in _N.R.S. 484.1245_ when it relied upon the listing of marijuana metabolite in _N.R.S. 484.379_. _See_ _Williams II, 93 P.3d at 1261_; ECF No. 98-4, at 14-15. Yet the list in _N.R.S. 484.379_ lists the same substances that are listed in _N.R.S. 484.1245_, in substantially the same order, only adding specific threshold amounts for a violation. No language in _N.R.S. 484.379_ purports to define "prohibited substance" at all, much less any differently than the controlling actual definition of "prohibited substance" set forth in _N.R.S. 484.1245_, which lists the same substances [*22] in that same order. _N.R.S. 484.379_, unlike _N.R.S. 484.1245_, does not state what "prohibited substance" "means;" and the statute, again only establishes threshold amounts for a violation, within a statutory scheme where the clear and precise language in _N.R.S. 484.1245_ established when a listed substance would be a prohibited substance.

The state high court's legislative history analysis similarly begged the question.

The supreme court noted that an earlier version of the proposed legislation had included a list instead of "controlled substances" that included twenty-one substances but did not include, _inter alia_, cocaine metabolite, heroin metabolite, marijuana, and marijuana metabolite. In later committee hearings, however, it was determined that only substances for which "there was a standard for detecting [the substances] in the blood" should be included, as opposed to "simply looking for 'detectable amounts' of each substance." As a result, substances for which there was no established standard for detection in the blood were deleted from the list and substances for which there was such a standard, such as marijuana metabolite, were added to the list. The court concluded from this legislative history that "the Legislature [*23] intended to specifically list marijuana metabolite as a prohibited substance under _NRS 484.1245_ and _484.379(3)_, and to incorporate it by reference under _NRS 484.3795(1)(f)_." _See_ _Williams II, 93 P.3d at 1262-63_.

The court elaborated in its 2016 decision during the federal stay that this legislative history "indicated that the Legislature specifically intended marijuana metabolite to be included in the _definition_ of a prohibited substance." (ECF No. 98-4, at 12, emphasis added.) To set forth statutory amounts of prohibited substances rather than following the approach in the original bill of punishing any detectable amount." (_Id., at 15-16, n.5_.) The court concluded that this was "evidence of the Legislature's thoughtful decision to include marijuana metabolite _within the definition_ of a prohibited substance _regardless of the language referring to the schedule._" (_Id._, emphasis added.)

The substantial problem with this analysis is that, clearly, all three statutory provisions were part of the _same_ legislative enactment. _E.g._, _Williams II, 93 P.3d at 1262_ ("_NRS 484.1245_, _484.379(3)_, and _484.3795(1)(f)_ are all additions to Chapter 484, arising from Senate Bill 481 during the 70th Session of the _**Nevada**_ Legislature."). The same legislature that changed the constituents in the original list [*24] in the bill to only items with an established standard for measurement in the blood also changed that original list from one simply of "controlled substances." That same legislature instead adopted — in the final legislation — the limiting concept of "prohibited substance," which it then expressly, clearly and precisely defined as a substance that was listed _and, inter alia, also_ was "_classified in schedule I or II pursuant to _NRS 453.166_ or _453.176_ when it is used._" _N.R.S. 484.1245_ (emphasis added). The state high court's strained

Williams v. Gentry

legislative history analysis literally disregarded this clear and precise definition, opting to instead construe the statute as adopting a *different definition* than was stated in the legislation *"regardless* of the language referring to the schedule." (ECF No. 98-4, at 15-16, n.5, emphasis added.)

Such a novel and unforeseeable legislative history analysis, expressly disregarding clear statutory language, could not have been anticipated by a person of ordinary intelligence. Such an analysis would not have been foreseeable to a person of ordinary intelligence even if they had dug down into bill histories and contemporaneous legislative committee hearing transcripts over and above an assessment [*25] based directly on the clear and plain language of the statute.

The Supreme Court of **Nevada** again is the final arbiter of **Nevada** state law. The court has the authority, as that final arbiter, to effectively read language out of a state statute, including a state criminal statute. But when the state high court effectively read out of *N.R.S. 484.1245* the clear and precise language requiring that a substance must be listed in the referenced schedules to be a prohibited substance, **Williams** was denied fair warning in violation of the federal Due Process Clause.

Again, it is that simple. For a person of ordinary intelligence who pulled the actual hard copy volume down off the shelf and viewed the relevant statutory provisions in their entirety in context, the state supreme court's construction of the law expressly "regardless" of what the state legislature instead in fact had said in *N.R.S. 484.1245* was wholly unforeseeable.

The Court accordingly holds, on *de novo* review, that **Williams** was deprived of fair warning by an unforeseeable and retroactive judicial expansion of the relevant statutory scheme, denying her due process of law.

### Harmless-Error Review

As noted previously, **Williams** was convicted of violating *N.R.S. 484.3795(1)(f)* based in pertinent part

upon [*26] allegedly having a prohibited substance in her blood at the relevant time. The pertinent verdict forms did not distinguish between a conviction based upon the presence of marijuana in her blood and one based upon the presence of marijuana metabolite. The verdicts instead referred in pertinent part to **Williams** driving and/or being in actual physical control "with a prohibited substance in blood." (*E.g.*, ECF No. 76-7, at 2.) Under the instructions and verdict forms, the jury thus could find **Williams** guilty on a legally invalid basis, the presence of marijuana metabolite, that denied her due process.

A conviction is subject to challenge if the jury may have relied upon a constitutionally invalid alternative basis for guilt while rendering a verdict that did not distinguish between that invalid alternative basis and a valid one. *See Hedgpeth v. Pulido, 555 U.S. 57, 58, 129 S. Ct. 530, 172 L. Ed. 2d 388 (2008)*. The error is not a structural error, however; and it instead is potentially subject to review for harmless error. *Id., at 60-62*. In the present case, however, respondents have not raised any issue or defense of harmless error as to Ground 8. It thus would appear that respondents arguably have waived the issue. *See, e.g., Reyes v. Lewis, 833 F.3d 1007, 1033 (9th Cir. 2016)*.

The Court in any event concludes that the error [*27] was not harmless.

On collateral review, the harmless-error standard from *Brecht v. Abrahamson, 507 U.S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993)*, controls. Under *Brecht*, the record must demonstrate that the error resulted in actual prejudice. *E.g., Davis v. Ayala, 576 U.S. 257, 135 S.Ct. 2187, 2197, 192 L. Ed. 2d 323 (2015)*. Federal habeas relief is appropriate under this standard if the court is left with grave doubt as to whether the trial error had a substantial and injurious effect or influence in determining the jury's verdict. *Id., at 2198. Brecht* requires more than a reasonable possibility that the error might have contributed to the conviction, and the court instead must find that the defendant sustained actual prejudice from the error. *Id.*[7]

Where a jury has been presented with both valid and legally invalid alternative bases for conviction, harmless-

---

[7] The *Brecht* harmless-error standard applies on federal habeas review regardless of whether the court's review is *de novo*, as it is here, or instead is deferential review under AEDPA. *E.g., Kirkpatrick v. Chappell, 950 F.3d 1118, 1128-29 (9th Cir. 2020)*. On deferential review, the *Brecht* standard subsumes any question as to whether a state court's harmless-error

determination under *Chapman v. California, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967)*, was objectively unreasonable. In the present case, the state supreme court did not reach the merits and further made no such harmless-error determination; and this Court thus simply applies *Brecht* wholly without any such indirect subsumed consideration of the *Chapman* standard.

Williams v. Gentry

error review does not consist of reviewing merely for sufficiency of the evidence on the valid alternative. *See, e.g., Riley v. McDaniel, 786 F.3d 719, 725-26 (9th Cir. 2015)*. Thus, a demonstration only that evidence exists which rationally could be viewed as supporting the valid alternative theory "is not enough to establish that the error was harmless." *Id., at 726*. Rather, "the relevant question is 'not simply whether [the reviewing court] can be reasonably certain that the jury *could* have convicted . . . based [*28] on the valid theory . . . ,' but whether '[the reviewing court] can be reasonably certain that the jury *did* convict . . . based on the valid . . . theory." *Id.* (citing prior authority, with emphasis in the original authority).[8] That is, the question is not whether the jury could have convicted the defendant under a valid alternative theory based on the evidence presented, but instead is whether the reviewing court can be reasonably certain that the jury did convict her based on the valid theory. *Id.*

In the present case, the defense was able to raise a fairly substantial question for the jury at trial as to whether the State's evidence in fact established that the requisite amount of the active ingredient of marijuana was present in *Williams*' blood at the relevant time. In contrast, the defense's own evidence instead ultimately tended to confirm that a requisite amount of marijuana metabolite was present (if marijuana metabolite otherwise validly had constituted a prohibited substance under the definition in *N.R.S. 484.1245* at the relevant time).

Three blood draws were taken at roughly thirty-minute intervals by a hospital trauma room nurse. Two vials of blood were drawn in each draw and [*29] then retained in an evidentiary kit. The next day, a vial from each draw was tested for the police by an outside laboratory, Associated Pathologist Laboratories (APL). The second vial from each draw was additionally retained for possible later testing, such as for testing by the defense. (See, e.g., ECF No. 75-11, at 30-31, including the stipulation at 30; ECF No. 75-19, at 6-9; ECF No. 75-22, at 14-15; ECF NO. 75-25, at 7-8.)

APL obtained values from the three vials of blood tested, in the order that they were drawn originally, of 5.5, 5.1, and 4.8 nanograms per milliliter respectively for the active ingredient of marijuana, delta-9 tetrahydrocannabinol

(*THC*). These values all exceeded the 2 nanogram minimum value for marijuana set forth in *N.R.S. 484.379(3)*. (ECF No. 75-11, at 31-32; ECF No. 75-19, at 41.)

APL obtained values from the three sample vials, in the same order, of 62, 57, and 52 nanograms per milliliter respectively for an inactive metabolite of marijuana, delta-9 *THC* carboxylic acid (carboxylic acid).[9] These values all well exceeded the 5 nanogram minimum value for marijuana metabolite set forth in that particular statute (for a situation where marijuana metabolite constituted a prohibited [*30] substance under the statutory definition in *N.R.S. 484.1245* at the relevant time). (ECF No. 75-11, at 31-32; ECF No. 75-12, at 15-16 & 23; ECF No. 75-19, at 20-21; ECF No. 75-25, at 6.)

The defense presented expert testimony seeking to establish, *inter alia*, that APL's *THC* values were not reliable because APL had not run adequate known control samples to assure that the lab's test equipment was calibrated and functioning properly at the time of its analysis. The expert testified that a proper protocol would have involved running three known control samples with values of 1, 5 and 10 nanograms per milliliter respectively that were close to the range of values expected to be obtained from the forensic samples from *Williams*' blood that were to be tested. APL instead ran only a single control of a known *THC* sample with 20 nanograms per milliliter, well above the expected values from the forensic samples. (ECF No. 75-22, at 17-21; ECF No. 75-25, at 10-12.)

The single control run by APL for carboxylic acid also was at 20 nanograms per milliliter. However, unlike the *THC* control, this control amount was not far above the expected values. Rather, the tested values obtained for the forensic samples for the [*31] metabolite far exceeded rather than came in well below the control level as had been the case with APL's testing instead for *THC*. (*See* ECF No. 75-25, at 11.)

The defense additionally had a second lab — the Center for Human Toxicology at the University of Utah (CHT) — independently test all six vials, including both the original three vials previously tested by APL and the three vials reserved for possible defense testing. (ECF No. 75-22, at

---

[8] The prior authority, **Babb v. Lozowsky, 719 F.3d 1019 (9th Cir. 2013)**, was overruled on other grounds, as recognized in *Moore v. Helling, 763 F.3d 1011, 1021 (9th Cir. 2014)*. *Babb* otherwise remains good law. *See, e.g., Kieren v. Nevada Attorney General, No. 11-17815, 584 Fed.Appx. 305 n.1 (9th*

*Cir. Sept. 22, 2014)*.

[9] Different expert and other witnesses used different shorthand references for carboxylic acid, after clearly identifying the metabolite in their testimony. The Court uses the one shorthand reference throughout herein for consistency and clarity.

12-16 & 20-24; ECF No. 75-25, at 10-11.)

The values for **THC** obtained by CHT for the six vials all were below the 2 nanogram threshold required by _N.R.S. 484.379(3)_ for marijuana. CHT obtained test values of (a) 1.4 nanograms per milliliter for the previously-tested vial from the first blood draw, and 0.9 nanograms for the untested vial; (b) 0.0 nanograms per milliliter for the previously-tested vial from the second blood draw, and 0.7 nanograms for the untested vial; and (c) 1.3 nanograms per milliliter for the previously-tested vial from the third blood draw, and 0.5 nanograms for the untested vial. (ECF No. 75-22, at 22-23.)

While the **THC** values in the CHT testing all were below the 2 nanogram threshold, the CHT testing was conducted approximately ten months after **[*32]** the blood samples were taken. APL had not refrigerated or frozen the samples in the meantime. Defense and prosecution expert testimony debated back and forth at trial as to, _inter alia_, whether the samples should have been refrigerated, the prospect that the **THC** in an unrefrigerated sample could degrade — substantially — during that interval under the limited research at the time, the extent to which that that research further was qualified by the fact that the samples in the research used blood "spiked" directly with **THC** in the lab rather than blood where the **THC** had been incorporated into the blood sample naturally following smoking marijuana, and, ultimately, the extent to which the lower CHT values were attributable to such possible degradation of the **THC** over time rather than other factors such as CHT using an allegedly better control protocol than APL. (See, e.g., ECF No. 75-22, at 25-30; ECF No. 75-25, at 8-9, 12, 14, 15 & 19-20; ECF No. 75-26, at 16-18 & 20-24.)

In contrast, the CHT test results for the metabolite carboxylic acid included, with exceptions, multiple readings above the 5 nanogram threshold set forth in _N.R.S. 484.379(3)_ (for situations where the metabolite further qualified as **[*33]** a prohibited substance under the definition in _N.R.S. 484.1245_). CHT obtained test values of (a) 54.5 nanograms per milliliter for the previously-tested vial from the first blood draw, and 10.2 nanograms for the untested vial; (b) "not detected" for the previously-tested vial from the second blood draw, and "unreported" for the untested vial; and (c) 36.9 nanograms per milliliter for the previously-tested vial from the third blood draw, and 3.6 nanograms for the untested vial. The expert who presented the CHT test results opined that the "unreported" or "not determined" result as to the second, previously untested vial from the second draw "was inconclusive, because it was a poor signal."

But he was confident in the accuracy of the remaining test values (including those as to **THC** content). (ECF No. 75-22, at 23-24 & 28-29; _see also_ ECF No. 75-25, at 14.) Significantly, carboxylic acid was not affected by possible degradation during room-temperature storage at the very least to the same substantial potential extent as **THC**. (ECF No. 75-25, at 11; ECF No. 75-26, at 16.)

Defense forensic toxicology expert Dr. Michael Peat, Ph.D, opined that none of the test results — as to either **THC** or carboxylic acid **[*34]** — by either lab were reliable given the wide variability between and within all of the sundry test results by the two labs. (ECF No. 75-25, at 17; ECF No 75-26, at 23.)

The trial court instructed the jury that both marijuana and marijuana metabolite constituted a prohibited substance when found in the blood in an amount equal to or greater than 2 nanograms and 5 nanograms per milliliter respectively. The instructions did not direct the jury to consider whether a sufficient amount was present of either substance in any particular order. The jury thus could consider either substance first, and jurors therefore did not have to consider the other substance if they found that a sufficient amount was present of the substance that they considered first. (_See_ ECF No. 76-6, at 18 & 21.)

During the State's initial closing argument, the prosecution, _inter alia_, noted that the requisite amount of **THC** was present based upon the 5.5 nanogram per milliliter APL lab result exceeding the 2 nanogram threshold for marijuana. The prosecution further emphasized, however, that "**THC** was not the only substance tested for" and that the 62 nanogram per milliliter APL lab result for marijuana metabolite was "well **[*35]** in excess of what is required by the statute" of 5 nanograms per milliliter. (ECF No. 76-2, at 17-18.)

In the defense closing, **Williams'** counsel argued, _inter alia_, that the APL forensic test values for **THC** were not reliable because the lab had used only the single 20 nanogram per milliliter control that was far above the expected possible values from the forensic samples. Counsel further relied on Dr. Peat's opinion generally that all of the test results by both labs were unreliable given the wide test values obtained, and he challenged the lack of specifics as to testing procedures in the prosecution testimony introducing the APL test results. Counsel otherwise did not make any specific argument challenging the validity of the carboxylic acid test values standing alone. He instead stated that the statute allowed conviction based upon five nanograms of metabolite, which he asserted "doesn't even have any effect on an individual," with counsel then urging that "[i]t's a very

unfair law." The State's objection to this argument was sustained, and the court instructed the jury essentially that it was to apply the law as set forth in the court's instructions. (ECF No. 76-2, at 29-30; ECF **[*36]** No. 76-3, at 2-5.)

In the State's rebuttal argument, the prosecution, *inter alia*, referred again to the APL test values for both **_THC_** and carboxylic acid, which all substantially exceeded the respective 2 and 5 nanogram per milliliter statutory threshold amounts. The prosecution further argued in support of the validity of the APL test values. Thereafter, the prosecution referenced the CHT test values for carboxylic acid from the first and third blood draws, emphasizing the following:

> Even if you look at their tests, ten months later, if you look at the carboxy **_THC_** [*i.e.*, carboxylic acid] when they retested, 36.9. It's still 12 times — not quite 12 — about five, six times over five nanograms per millilitor [sic] on the carboxy.
> The marijuana metabolite was still there.
> On the other test that they did, it came out to . . . 10.2. First sample, third sample, they came out 10.2. Even if you use the defense's numbers, we're at least double five nanograms per milliliter on the metabolite, and — and on one instance, we're five times — six times — seven times the metabolite. (Indicating)

> So whether you use their science or APL's science, it comes out the same. We'd submit that they're entirely consistent. **[*37]**

(ECF No. 76-3, at 10-13.)

The trial judge sent the jury home for the night after closing arguments. (ECF No. 76-3, at 15.) Starting the next day, the jury deliberated for one full day and then into the middle of the following morning. (ECF Nos. 76-5, at 2-7 & 16-18.)

Over the course of the first day of deliberations, the jury asked several questions. (ECF No. 76-5, at 2-7.) The first set of questions included a request for clarification of the meaning on the verdict form of, *inter alia*, "with a prohibited substance in blood resulting in death of" the victim. (*Id.*, at 3-5.) The trial judge responded in open court:

> Okay, ladies and gentlemen, as to that, I need to refer you to the jury instructions, which collectively

define the law and you need to read those instructions then.

(*Id.*, at 5.)

Meanwhile, before being brought in for the responses to the first set of questions, the jury inquired further. The jury asked, *inter alia*, whether, for the defendant to be found guilty under the prohibited-substance potential alternative basis for culpability, she must "have violated all five statements" in Instruction No. 6, which stated the elements for that alternative basis for liability. (*Id.*, at 6; see also ECF No. 76-6, at 18.) **[*38]** Thereafter, in addition to responding regarding the elements overall, the court stated as follows regarding the prohibited substance element in particular:

> As to subpart two, it refers to marijuana or marijuana — or marijuana metabolite. It can be either or the other, one or the other, but it must be found by the jury beyond a reasonable doubt as to one or the other.

(*Id.*, at 6.)

The court then told the jury in response to another question, requesting clarification regarding the impairment alternative, also that the jurors must read the instructions to answer that question. The jury immediately asked back in writing, while still in the courtroom: "If we go back and read our instructions and are still confused, what next?" To which the judge responded: "Ladies and gentlemen, the answer to that question is: You reread the instructions." (*Id.*)

Given the foregoing record, this Court cannot be reasonably certain that the jury did convict based on the valid marijuana alternative for culpability rather than the constitutionally invalid marijuana metabolite alternative, regarding **_Williams_**' convictions based upon driving with a prohibited substance in her blood. Indeed, on the record presented, it was in **[*39]** truth more probable that the jury convicted **_Williams_** based on the invalid marijuana metabolite alternative.

The jury instructions did not require that the jury consider the valid marijuana alternative prior to considering the invalid marijuana alternative. The trial court's response to the jury's question during deliberations further drove home the point that the jury could consider "either or the other, one or the other," with no particular order being established in which the jury considered either.[10] In that

---

[10] The presence or absence of an instruction directing the jury

to consider a valid alternative prior to what later proved to be an invalid alternative has been a significant factor in determining

consideration, by finding guilt under the prohibited-substance statute, the jury clearly rejected Dr. Peat's blanket opinion that none of the test results, by either APL or CHT, and as to both marijuana and marijuana metabolite, were reliable. Once having crossed that analytical threshold rejecting Dr. Peat's blanket opinion, the path of least resistance for the trier of fact then was to find **Williams** guilty based upon the presence of, at the very least, marijuana metabolite, without regard to marijuana itself. There were strenuously disputed issues raised about the APL marijuana test results, including whether that lab used an adequate control protocol. In contrast, there was **[*40]** far less question, once Dr. Peat's blanket unreliability opinion was rejected, as to the validity and reliability of the test results, by either lab, for marijuana metabolite; and multiple test values by both labs came in well in excess of the minimum statutory threshold. As the State ably framed the salient point in its rebuttal argument, "[e]ven if you use the defense's numbers," there was at least twice and as much as several times the required amount of marijuana metabolite, "[s]o whether you use their science or APL's science, it comes out the same."

On such a record, it was far more probable that the jury convicted **Williams** based upon the constitutionally invalid marijuana metabolite alternative rather than the valid marijuana alternative. The more natural, and more ready, resolution by a trier of fact on the evidence presented would be to simply find the presence of sufficient marijuana metabolite, without further reaching or attempting to resolve the more strenuously disputed factual issues regarding the presence of sufficient **THC** in the blood samples, given the presence of an amply sufficient quantity of carboxylic acid even in multiple test results obtained **[*41]** during defense testing.

Moreover, the length of the deliberations, and the fact that the jury had multiple questions during their deliberations, including questions specifically about culpability under the prohibited-substance statute, which were not all answered directly, further cut against any finding of harmless error in this case. *See, e.g., United*

States v. Velarde-Gomez, 269 F.3d 1023, 1036 (9th Cir. 2001) *(en banc)* (lengthy deliberations suggest a difficult case and weigh against a finding of harmless error).

This Court thus cannot say with reasonable certainty that the jury *did* rely on the valid marijuana alternative for culpability. The Court accordingly is left with grave doubt as to whether the error had a substantial and injurious effect or influence in determining the jury's verdict; and the Court finds that **Williams** sustained actual prejudice from the error. The Court therefore holds that the fair-warning violation in this case was not harmless error.

**Williams** accordingly is entitled to relief on Ground 8(a). The Court will grant a conditional writ of habeas corpus under the terms and conditions set forth at the end of this order, subject to the State's ability to retry **Williams** on the pertinent charges within the timeframe established **[*42]** therein.[11]

### Ground 8(b): Denial of Fair Warning by Vagueness

In Ground 8(b), **Williams** alleges that she was denied due process when she was denied fair warning of the conduct prohibited because the statutory scheme allegedly was unconstitutionally vague. She alleges in particular that the statute was unconstitutionally vague because *N.R.S. 484.1245* excluded marijuana metabolite from the definition of prohibited substance while *N.R.S. 484.379* allegedly included it. (ECF No. 110, at 47-50.)

Ground 8(b) was presented to the state courts on state postconviction review, and the state supreme court affirmed the rejection of the petition on the basis of procedural default rather than the merits. (See discussion in note 12, *infra.*) Federal habeas review of the merits thus is *de novo* following upon **Williams** having overcome the procedural default in this Court.

Grounds 8(a) and 8(b) do not present complementary alternative bases for relief but instead are based on mutually inconsistent premises. A claim such as Ground

whether an error was harmless. *See, e.g., Riley, 786 F.3d at 727* (discussing and distinguishing prior authority that had held that an error invalidating a premeditation alternative for first-degree murder was harmless where, *inter alia*, the jury was directed to consider the felony-murder alternative first).

[11] While review here clearly is *de novo*, the Court would reach the same outcome even on deferential review under AEDPA. A rejection of **Williams**' fair-warning claim on the merits by the state courts would have been an objectively unreasonable

application of clearly established federal law as determined by the United States Supreme Court, as the state supreme court's judicial expansion of the relevant statutes was not foreseeable to a person of ordinary intelligence. Further, while the bulk of **Williams'** state and federal court argument has been directed instead to Ground 8(b), discussed *infra*, (a) Ground 8(a) clearly is presented in the amended petition (ECF No. 110, at 44-47); and (b) Ground 8(a) was exhausted following upon, *inter alia*, the state supreme court's holding that that claim was procedurally barred (ECF No. 98-4, at 11 & 15-17).

8(a) is premised upon an unforeseeable judicial expansion of clear and precise statutory language. A claim such as Ground 8(b) is premised upon the relevant statutory language instead being vague **[*43]** as written. While both premises form the basis for a type of fair-warning due process claim, the premises are inherently inconsistent and each thus form the basis for a different type of fair-warning claim. Put simply, the pertinent statutory language of course cannot be both clear and precise and vague on the very same point at issue, such as here whether marijuana metabolite was a prohibited substance at the relevant time. *See generally Bouie, 378 U.S. at 351-54.*

A petitioner of course may allege and pursue inherently contradictory claims in the alternative. However, in terms of deciding the merits of the claims, this Court's holding on Ground 8(a) that the state supreme court unforeseeably ignored clear and precise statutory language theretofore establishing that marijuana metabolite was not a prohibited substance at the relevant time necessarily precludes a holding by the Court on Ground 8(b) that the statutory scheme instead was vague.

Petitioner's counsel clearly places substantial reliance instead on Ground 8(b), and the federal reply argues Ground 8(b) extensively to the exclusion of Ground 8(a). (*See* ECF No. 127, at 2-8.) The Court, however, analyzed the fair-warning claim in Ground 8(a) substantially **[*44]** the same way that it does now nearly ten years ago prior to the stay. (*See* ECF No. 78, at 2-7 & 9-10.) The Court has seen nothing in the post-stay argument, including ***Williams***' extensive argument relying instead more on Ground 8(b) that leads it to a contrary conclusion. This Court again strongly encourages any reviewing court to review a physical volume containing the relevant statutes rather than looking at provisions in isolation on a computer screen. At bottom, the statutory scheme involved was clear, precise and in truth simple; and the state supreme court unforeseeably expanded that clear and precise statutory language.

A critical flaw in petitioner's argument under Ground 8(b), as well as with the state supreme court's analysis, follows from improperly treating *N.R.S. 484.379* as a statute

defining "prohibited substance." That statute contained no such definition and instead only established the amounts required to sustain a conviction where a substance otherwise qualified as a prohibited substance. There was only one controlling statutory definition of prohibited substance, in *N.R.S. 484.1245*; and marijuana metabolite did not satisfy that definition at the relevant time. It is and was that simple, to a person **[*45]** of ordinary intelligence reading the statutory language, as a whole, along with prior jurisprudence at the relevant time.

Moreover, there was no contradictory vagueness — with one provision allegedly excluding marijuana metabolite and another allegedly including it — in the relevant statutes *as written. N.R.S. 484.1245, as written*, did not categorically exclude marijuana metabolite as a prohibited substance. If marijuana metabolite had been listed in the relevant schedules, then *N.R.S. 484.1245* would have *included* marijuana metabolite as a prohibited substance and there would have been no alleged conflict between *N.R.S. 484.1245* and *N.R.S. 484.379*. Thus, taking ***Williams***' vagueness theory to its truth illogical conclusion, the statutes would have been vague and in conflict if marijuana metabolite was not listed in the relevant schedules but would have not been vague and in conflict if the metabolite instead *was* listed in the relevant schedules. That illogical conclusion drives home the point that the true problem here is not any vagueness in the statutes as written. As written, the statutes were clear and not in conflict. The matter of whether marijuana metabolite was or was not listed in the relevant schedules was a subsequent and independent **[*46]** condition that had nothing to do with the clarity or vagueness of how the statutes read on their face. Clearly, precisely — and simply — if marijuana metabolite was listed in the schedules it was prohibited substance; and it was not a prohibited substance if it was not so listed. The true problem here is that the Supreme Court of ***Nevada*** read the clear and precise limiting language in *N.R.S. 484.1245* out of that statute. That is a judicial expansion issue, not an issue of vagueness in the statutes as written.

Ground 8(b) does not provide a basis for federal habeas relief. Ground 8(a) instead is the correct basis for the grant of habeas relief here.[12]

---

[12] Before turning from Ground 8, the Court recaps the state and federal procedural history relevant to exhaustion and procedural default issues as to Grounds 8(a) and 8(b), as there have been varying and inconsistent statements in this regard during the extended state and federal litigation.

In her first state postconviction petition, litigated by her trial counsel, ***Williams*** alleged only that her conviction violated due process because one of the two possible bases for her conviction was invalid as a matter of law because marijuana metabolite did not satisfy the definition of a prohibited

substance under _N.R.S. 484.1245_. She based the due process claim on _Griffin v. United States, 502 U.S. 46, 112 S. Ct. 466, 116 L. Ed. 2d 371 (1991)_, and _Leary v. United States, 395 U.S. 6, 89 S. Ct. 1532, 23 L. Ed. 2d 57 (1969)_. _Williams_ did not include a claim corresponding to current Ground 8(a) that she was denied fair warning by a judicial expansion of the statute, which, indeed, had not occurred yet as of that point. (ECF No. 76-18, at 7-8 & 12-15; ECF No. 76-21, at 5-9 & 14-15.)

It is subject to question whether _Griffin_ and _Leary_ in fact establish a freestanding due process claim as opposed to merely addressing the consequence of an alternative basis for culpability under a general verdict being otherwise legally invalid for one reason or another. The _Pulido_ decision discussed in the text _supra_ clearly limits any expansive reading of _Griffin_ and _Leary_ in that regard. _Pulido_ requires that any such situation involving an invalid alternative basis of culpability must be reviewed for harmless error as opposed to reversal being automatic. In all events, the salient point regarding exhaustion is that the purported "_Griffin-Leary_" substantive claim presented in the first state petition was not the same claim presented in Ground 8(a) of a deprivation of due process due to a denial of fair warning from a judicial expansion of the relevant statutes.

The fact that a judicial-expansion claim corresponding to Ground 8(a) had not been presented in the first state petition was the reason why this action ultimately was stayed in 2011. (_See_ ECF No. 78, at 5-6, 8 & 10.) _Williams_ did present the claim in federal court. (ECF No. 24, at 39-40; ECF No. 24-2, at 1-2.)

In the second state postconviction proceeding, _Williams_ initially raised, _inter alia_, a pure judicial-expansion claim corresponding to current Ground 8(a). (See ECF No. 99-1, at 118-21; ECF No. 99-2, at 28.) The State responded to the claim from the outset as if it instead were a vagueness claim, which as discussed in the text is a different claim. (See ECF No. 100, at 99-118.) Thereafter, over the course of the proceedings, _Williams_ articulated also the actual vagueness claim that forms the basis of current Ground 8(b), _i.e._, that one statutory provision excluded and another instead included marijuana metabolite as a prohibited substance. At times, the in truth mutually exclusive Ground 8(a) judicial-expansion and Ground 8(b) vagueness claims were to an extent intermixed with one another in _Williams_' argument. One and then the other claim would have more prominence in successive filings, without any distinction being made between the two mutually exclusive claims. (See, e.g., ECF No. 100-1, at 60-63 & 69-70; ECF No. 102-4, at 6-7 & 9-13; ECF No. 102-2, at 2-5; ECF No. 101-3, at 9-13; ECF No. 101, at 6-7, which have been reordered into chronological order.) _Williams_ had presented vagueness arguments in prior state court proceedings, but she had not presented the vagueness claim in Ground 8(b) in any such prior proceedings. (See ECF No. 76-12, at 22-24; _Williams I, 118 Nev. at 545-47, 50 P.3d at 1122-23_.) Statements in the state court, by both sides, that would suggest to the contrary are incorrect. (See, e.g., ECF No. 100, at 107-11; ECF No. 101-3, at 16-17.) Ground

8(b) was not presented until the second state proceedings.

In its order of affirmance on the final postconviction appeal, the Supreme Court of **Nevada** expressly took up a purely judicial-expansion claim corresponding to Ground 8(a) and rejected that claim as procedurally defaulted. (ECF No. 98-4, at 11 & 15-17.) Ground 8(a) thus is exhausted.

_Williams_ also clearly presented a vagueness due process substantive claim corresponding to Ground 8(b) to the state district court and state supreme court while litigating the second state petition. (See above record cites.) The state supreme court affirmed the denial of that petition as procedurally barred, without exception as to any claim. (ECF No. 98-4, at 2-3, 11 & 18.) Ground 8(b) thus is exhausted.

In its more recent ruling on respondents' motion to dismiss, this Court — in contrast to the description of the claims herein — described Ground 8(a) as a claim under _Griffin_ and _Leary_ arguing "that marijuana metabolite, carboxylic acid, is not listed in the drug schedules and, therefore, was not a prohibited substance as defined in _NRS 484.1245_ at the time of the alleged offense." (ECF No. 116, at 5.) And the Court described Ground 8(b) as a claim that _Williams_ was denied fair warning by a judicial expansion of the statute, _i.e._, as a claim corresponding to Ground 8(a) as analyzed herein. (_Id._, at 5-6.) These descriptions were incorrect. As discussed in the text, Ground 8(a) instead was based on judicial expansion; and Ground 8(b) is based upon a vagueness theory, with those two alternatives being mutually exclusive.

Having so described the two claims, the Court further stated in the prior order that Ground 8(a) "was first argued to the **Nevada** Supreme Court when the State appealed the grant of _Williams_' first state postconviction petition." (_Id._, at 6.) That statement was correct as to the claim described as Ground 8(a) in that order, but it is not correct as to the judicial-expansion claim discussed herein as Ground 8(a). Again, the reason for the stay was that that judicial-expansion claim — which the Court described in ECF No. 116 as Ground 8(b) — was not exhausted.

The Court further stated in ECF No. 116 that Ground 8(a), as described therein, "is not procedurally barred and declines to revisit this ruling." (_Id._) In all events, the analysis applied in the Court's prior orders leads to the conclusion that neither the judicial-expansion claim in Ground 8(a) nor the vagueness claim in Ground 8(b) — as described in this order — are procedurally defaulted under federal law. (See _id., at 7-9_; ECF No. 67, at 9-13; ECF No. 78, at 8; ECF No 133.) The state procedural bar relied upon by the state high court was not an adequate state law ground in the circumstances presented in this case.

_Williams_ thus has overcome the procedural default of the claims separate and apart from any reliance also on _Martinez v. Ryan, 566 U.S. 1, 132 S. Ct. 1309, 182 L. Ed. 2d 272 (2012)_. She thus need not establish ineffective assistance of first

### Ground 9: Ineffective Assistance of Counsel

In Ground 9, **_Williams_** alleges that she was denied effective assistance of counsel in violation of the _Sixth_ and _Fourteenth Amendments_ when trial and appellate counsel failed to raise the constitutional challenges in Ground 8. (ECF No. 110, at 51-53.)

Ground 9 was raised on state postconviction review, and the state supreme court rejected the claim on the basis of procedural default rather than the merits. (ECF No. 98-4, at 11-15.) Federal review of the **[*47]** merits thus is _de novo_ following upon **_Williams_** having overcome the procedural default in this Court. (_See_ ECF No. 116, at 7-9; ECF No. 133.)

On a claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged test of _Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)_. She must demonstrate that: (1) counsel's performance fell below an objective standard of reasonableness; and (2) counsel's defective performance caused actual prejudice. On the performance prong, the issue is not what counsel might have done differently but rather is whether counsel's decisions were reasonable from his perspective at the time. The reviewing court starts from a strong presumption that counsel's conduct fell within the wide range of reasonable conduct. On the prejudice prong, the petitioner must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. _E.g., Beardslee v. Woodford, 327 F.3d 799, 807-08 (9th Cir. 2003)._

Trial and direct appeal counsel could not have raised the claim in Ground 8(a) _per se_ because the judicial expansion did not occur until the state supreme court's order on appeal on **_Williams_**' first state petition. Counsel could have raised the related state-law argument that marijuana metabolite **[*48]** was not a prohibited substance at the relevant time, but the judicial-expansion claim had not yet arisen prior to the later order disregarding _N.R.S. 484.1245_ in part. It thus does not appear that **_Williams_** raises a viable ineffective-

assistance claim in this regard. She in any event would not be entitled to greater relief on this aspect of Ground 9 than she is being granted under Ground 8(a) of this order.

Ground 9 further alleges that **_Williams_**' trial and direct appeal counsel were ineffective for the failure to raise the vagueness challenge raised in Ground 8(b). The Court's holding that Ground 8(b) — as opposed to Ground 8(a) — does not provide a basis for federal habeas relief also leads to the conclusion that this aspect of Ground 9 does not present a viable ineffective-assistance claim. This conclusion follows even if the Court were to assume _arguendo_ that **_Williams_**' counsel rendered deficient performance by failing to raise the vagueness challenge at trial and on appeal, in contrast to an argument in the alternative that marijuana metabolite clearly was not a prohibited substance at the relevant time under the governing statutory definition. The Court's holding that **_Williams_** is not entitled to **[*49]** relief on Ground 8(b) leads to the conclusion that **_Williams_** cannot establish the requisite prejudice on this aspect of Ground 9.

Ground 9 therefore does not provide a basis for habeas relief.

The Court now turns to the remaining claims in the amended petition, which are not at least directly related to the fair-warning claims, starting in order with Ground 1.

### Ground 1: Failure to Refrigerate Blood Samples

In Ground 1(a), **_Williams_** alleges that she was denied due process of law in violation of the _Fourteenth Amendment_ when the State failed to refrigerate blood samples that were taken and tested following her arrest and thereby failed to preserve their alleged potential exculpatory value for contradictory testing by the defense. In Ground1(b), petitioner alleges that the state trial court erred by holding that she did not satisfy _Leonard v. State, 117 Nev. 53, 17 P.3d 397 (2001)_, on this federal constitutional due process issue. **_Williams_** alleges that later exculpatory defense test results were rendered subject to challenge by the State, based on the State's failure to refrigerate the samples to preserve their evidentiary value. (ECF No. 110, at 6-19; _see also_ ECF No. 1, at 9-20.)[13]

---

postconviction counsel as cause for a failure to pursue a claim of ineffective assistance of trial counsel in turn serving as cause for a failure to pursue the substantive claims in Grounds 8(a) & 8(b).

[13] With only minor variation primarily as to style or form, Ground 1 in the amended petition filed by appointed counsel is the same

as in the original and amending petitions filed by original counsel. The omission of material from ECF No. 1, pages 17-18, and ECF No. 24, pages 17-18, from the original and amending petitions represents the largest difference in terms of amount of content. The Court has redesignated Parts 1 and 2 instead as (a) and (b), which is more consistent with the practice

Williams v. Gentry

In its August 2, 2002, published decision on direct appeal, the Supreme Court **[\*50]** of *Nevada* rejected the federal due process claim presented to that court on the following grounds:

D. *Destruction of evidence*

*Williams* next contends that her conviction should be vacated because the State failed to preserve her blood sample. *Williams* raised this argument in a motion to suppress the blood evidence and also claims that the district court committed plain error in refusing to conduct a suppression hearing until the close of trial.

1. *Suppression of evidence*

In *Arizona v. Youngblood*,[FN60] the United States Supreme Court held that the state's failure to preserve evidence does not warrant dismissal unless the defendant can show bad faith by the government and prejudice from the loss of the loss of the evidence.[FN61] We have reached a similar conclusion:

> [T]he State's loss or destruction of evidence constitutes a due process violation only if the defendant shows either that the State acted in bad faith or that the defendant suffered undue prejudice and the exculpatory value of the evidence was apparent before it was lost or destroyed. Where there is no bad faith, the defendant has the burden of showing prejudice. The defendant must show that "'it could be reasonably anticipated **[\*51]** that the evidence sought would be exculpatory and material to [the] defense.'" It is not sufficient to show "'merely a hoped-for conclusion'" or "'that examination of the evidence would be helpful in preparing [a] defense.'"[FN62]

Additionally, in *State v. Hall*, we held that a lab's routine destruction of a DUI defendant's blood sample, after a year, did not constitute bad faith.[FN63]

Here, the blood evidence was not lost or destroyed by the State. Instead, without the State's knowledge, the blood sample was stored by an independent lab (APL) in an unrefrigerated location—according to the

lab's normal procedures. *Williams* did not request a retest of her blood sample for over ten months after it was drawn. Upon request, the State stipulated to allow the retest and there is no evidence that the State delayed the request in any way.

The district court concluded that *Williams* had failed to show that the State acted in bad faith or that the exculpatory value of the blood samples was apparent or material to her defense at the time that it was stored at room temperature. *Nevada* case law, as clearly articulated in *Leonard v. State*, [FN64] supports this conclusion. *Williams* has failed to demonstrate **[\*52]** how this decision was erroneous.

Accordingly, we conclude that the district court properly determined that *Williams* failed to show the non-refrigeration constituted a due process violation. We also concur with the district court's decision to allow the jury to consider all of the evidence relating to the original test, the retest, the delay in retesting, and the lack of refrigeration. The jury was free to weigh the evidence as it deemed appropriate.

[FN60] *488 U.S. 51, 109 S.Ct. 333, 102 L.Ed.2d 281 (1988)*.

[FN61] *Id. at 57-58*.

[FN62] *Leonard v. State, 117 **Nev**. 53, 68, 17 P.3d 397, 407 (2001)* (citations omitted).

[FN63] *105 **Nev**. 7, 9, 768 P.2d 349, 350 (1989)*.

[FN64] *117 **Nev**. 53, 17 P.3d 397*.

*Williams I, 118 **Nev**. at 551-53, 50 P.3d at 1126-27*.

The state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court at the time of the state high court's August 2, 2002, decision.

*Williams* has not directly challenged the recital of the underlying facts on this claim by the Supreme Court of *Nevada*, and the court's recital thus is presumed to be correct unless shown to be incorrect by clear and convincing evidence. *See, e.g., Sims, supra.* (See also text, *supra, at 19-24*, with related discussion of and citation to the state court record.)

---

in this District.

Williams v. Gentry

In *Arizona v. Youngblood, 488 U.S. 51, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988)*, the Supreme Court addressed a claim similarly based upon a failure to refrigerate and preserve the evidentiary value **[\*53]** of biological evidence. In that case, the State failed to refrigerate clothing of the child victim that had semen stains from the perpetrator. The defendant urged that he was denied due process because the State's failure to refrigerate the clothing and preserve the evidentiary value of the semen samples denied him the opportunity to perform tests on the samples that he claimed potentially would have eliminated the possibility that he was the perpetrator. *See 488 U.S. at 52-54*.

The Supreme Court characterized the due process claim presented as one based upon "the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant." *488 U.S. at 57*. The Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *488 U.S. at 58*. The Supreme Court stated its "unwillingness to read the 'fundamental fairness' requirement of the Due Process Clause . . . as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance **[\*54]** in a particular prosecution." *Id.* When the failure to preserve potentially relevant evidence "can at worst be described as negligent" and "there [is] no suggestion of bad faith on the part of the police," then "there [is] no violation of the Due Process Clause." *488 U.S. at 58*.

The Supreme Court further expanded upon these principles as follows:

> . . . . First, [*California v.*] *Trombetta, [467 U.S. 479, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984)]* speaks of evidence whose exculpatory value is "apparent." *467 U.S., at 489, 104 S.Ct., at 2534*. The possibility that the semen samples could have exculpated respondent if preserved or tested is not enough to satisfy the standard of constitutional materiality in *Trombetta*. Second, we made clear in *Trombetta* that the exculpatory value of the evidence must be apparent "before the evidence was destroyed." *Ibid.*

(emphasis added). Here, respondent has not shown that the police knew the semen samples would have exculpated him when they failed to perform certain tests or to refrigerate the boy's clothing; this evidence was simply an avenue of investigation that might have led in any number of directions. *The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost **[\*55]** or destroyed*. . . .

*488 U.S. at 56* n.\* (emphasis added).

In the present case, the **_Nevada_** Supreme Court's rejection of **_Williams_**' claim was in full accord with the foregoing principles.

At the time that the evidentiary value of the blood samples was compromised through the failure to refrigerate the samples, the police had no knowledge that the evidence *then* was exculpatory — a proposition that remains speculative to this day. The police instead had been informed by the laboratory that the blood samples had tested positive for prohibited substances in the required amounts. Accordingly, the only knowledge possessed by the police when the evidentiary value of the samples was impaired was that the evidence was inculpatory rather than exculpatory.

That, quite simply, is the end of the claim. The claim — under clearly established federal law as determined by the United States Supreme Court — never has been a viable one because **_Williams_** cannot establish the requisite bad faith on the part of the State. Under that clearly established federal law, "[t]he presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence **[\*56]** at the time it was lost or destroyed." *488 U.S. at 56* n.\*. Petitioner cannot establish this fundamental prerequisite for the finding of bad faith necessary for a due process violation under controlling Supreme Court precedent. Under that precedent, when the failure to preserve potentially relevant evidence "can at worst be described as negligent" and "there [is] no suggestion of bad faith on the part of the police," then "there [is] no violation of the Due Process Clause." *488 U.S. at 58*.[14]

---

[14] The conclusion that Ground 1 is without merit holds true even if the Court, with the benefit of hindsight here in 2020, and despite the backward-looking nature of deferential review under

AEDPA, were to disregard marijuana metabolite as a prohibited substance because of this Court's contemporaneous holding on Ground 8(a) in this order. Prior to the time that the evidentiary value of the blood draw evidence was impaired, test results had

Williams v. Gentry

*Williams*' arguments to the contrary are, at best, unpersuasive, and, at worst, beg the question.

*Williams* urges that the blood samples were "constitutionally material" evidence because allegedly it is very difficult to achieve accurate test results for marijuana even in the best of laboratories, the laboratory in question allegedly did not use proper procedures in its testing of the samples, and *Williams* had no other way than retesting to determine whether the test results were accurate or reliable. She contends that the evidence accordingly was constitutionally material under *Trombetta*. (ECF No. 110, at 6-7.)

In *Youngblood*, the Supreme Court specifically rejected such a reading of *Trombetta* that sought to equate potential usefulness [*57] or possible exculpatory value with constitutional materiality. The Court stated explicitly that "[t]he possibility that the semen samples *could have* exculpated respondent if preserved or tested is not enough to satisfy the standard of constitutional materiality in *Trombetta*." 488 U.S. at 56 n.* (emphasis added). The clear holding in *Youngblood* is that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." 488 U.S. at 58. Petitioner thus cannot bootstrap to a due process violation via arguments seeking to demonstrate the potential exculpatory value that the evidence possibly might have had if it had been better preserved for later defense testing. The potential for exculpatory value, *i.e.*, the possible relevancy and materiality of the evidence

from an evidentiary standpoint if tested earlier, clearly is insufficient to establish a due process claim.

*Williams* further contends that this case presents "a clear example of textbook bad faith," for ten reasons. (ECF No. 110, at 12.)

First, petitioner asserts that the State "knew or should have known" that the blood samples were not being refrigerated [*58] but did nothing about it. (*Id.*)

*Williams* does not identify any evidence supporting the bald assertion that the State had actual knowledge that the blood samples were not being refrigerated. The state supreme court's order instead found that "without the State's knowledge, the blood sample was stored by an independent lab (APL) in an unrefrigerated location." *Williams I, 50 P.3d at 1126*. Petitioner, who has the burden of proof on federal habeas review, has not demonstrated that the state supreme court's factual determination was an unreasonable one nor has she overcome the presumption of correctness attached to that factual finding.[15]

In this same general vein, *Williams* asserts that the laboratory "was reprimanded by the College of American Pathologists for substandard testing," referring to a "report issued by the College of American Pathologists" as to which the state supreme court denied a motion to expand the record. (ECF No. 110, at 6 & n.3.) However, the actual exhibit in question is a letter to defense counsel from the College of American Pathologists responding to an inquiry that he raised after trial. (ECF No. 24-2, at 5.)[16]

_____

shown the presence of not only carboxylic acid but also *THC* in sufficient quantities to convict. Thus, even *arguendo* disregarding the carboxylic acid test results, the police had no knowledge of the alleged exculpatory value of the blood draw evidence prior to the time that its evidentiary value was impaired, because the prior *THC* results standing alone also were inculpatory at that time. Moreover, deferential review under AEDPA *is* backward-looking. *Pinholster, 563 U.S. at 181-82*. The state supreme court's decision on this claim thus must be reviewed in the context of the record and law at the time of its August 2, 2002, decision. *Id.* At that time, *Williams* had not yet even raised the state law argument that marijuana metabolite did not constitute a prohibited substance under the definition in *N.R.S. 484.1245*.

[15] The deference accorded to state factual findings on federal habeas review applies as well to factual findings made by state appellate courts. *See, e.g., Sumner v. Mata, 455 U.S. 591, 592-93, 102 S. Ct. 1303, 71 L. Ed. 2d 480 (1982)*; *Ali v. Hickman, 584 F.3d 1174, 1180-81 (9th Cir. 2009)*; *Estrada v. Scribner, 512 F.3d 1227, 1236 (9th Cir. 2008)*. *Williams* maintains that

the laboratory was an agent of the State. (*E.g.*, ECF No. 110, at 7.) However, she cites no apposite and controlling Supreme Court precedent on the books at the time of the state supreme court's August 2, 2002, decision that required the state court to find, in applying the law specifically under *Youngblood*, that the State knew what the lab knew as to how the samples were stored. This Court's review of Ground 1 is not *de novo* but instead is deferential review looking back to the state of United States Supreme Court law as of August 2, 2002.

[16] It is subject to question whether the letter may be considered on federal habeas review under *Pinholster*. The letter was not part of the trial evidence, and it does not appear that the letter otherwise was part of the lower court record presented on direct appeal. The state supreme court's decision declining to make the letter part of the record on direct appeal — at a point after *Williams*' principal brief already had been filed — perhaps may be the end of the matter with regard to inclusion in the state court record properly reviewed in federal court on Ground 1 under AEDPA. In any event, even if considered herein, the letter does not lead to a different outcome for the reasons discussed

The letter reflects that, following counsel's inquiry, **[\*59]** the laboratory had agreed, *inter alia*, to thereafter store all specimens in refrigerated, limited-access, secure storage facilities. The accrediting body accordingly "determined not to take further action with respect to APL." The letter is dated September 17, 2001, a year-and-a-half after the laboratory had received and processed the ***Williams*** blood samples. The letter does not show any relevant knowledge by the State regarding the lab's practices in March 2000. Nor, in all events, does the letter reflect the knowledge that is required to show bad faith under *Youngblood, i.e.*, "the police's knowledge of *the exculpatory value of the evidence* at the time it was lost or destroyed." *488 U.S. at 56* n\*(emphasis added).

Moreover, to the extent that ***Williams*** relies on the assertion that the State "should have known" that the blood samples were not being refrigerated, she runs directly afoul of *Youngblood*. The Court expressly held in *Youngblood* that negligence does not give rise to a due process violation. *488 U.S. at 58*. Petitioner's reliance upon a constructive knowledge "should have known" standard therefore is misplaced. Moreover, again, the knowledge required for a due process violation is not of possible **[\*60]** flaws in laboratory procedures but instead is "of the exculpatory value of the evidence at the time it was lost or destroyed." *488 U.S. at 56* n.\* (emphasis added).

Second, ***Williams*** urges that the State was in bad faith because the State already had obtained its blood test results prior to the failure to refrigerate the samples and "clearly gained every advantage in preventing" petitioner from effectively retesting the samples. (ECF No. 110, at 12.)[17] Nothing in *Youngblood* looks to whether the State allegedly secured an advantage at trial from the failure to preserve the evidence in determining whether the State acted in bad faith in failing to preserve the evidence. The *Youngblood* Court noted that the State in that case had not attempted to make any use of the materials in question in its case in chief. *488 U.S. at 56*. But the Court did not make that point a factor in its determination of bad faith. *See id.* Again, the relevant inquiry under *Youngblood* is whether the State knew of the — actual not merely speculative — exculpatory value of the evidence at the time that it was lost or destroyed. Merely distinguishing a Supreme Court decision on some basis does not make a state court's application of the decision an **[\*61]** objectively unreasonable one. Moreover, the jury in ***Williams***' case was presented with evidence

regarding the circumstances surrounding the original test, the failure to refrigerate the samples, and the effect that this had on the defense's ability to challenge the original test with an effective retest.

Third, ***Williams*** asserts that the State was in bad faith because the State's testing of the samples allegedly was unscientific. (ECF No. 110, at 12.) Nothing in *Youngblood* looks to whether the State's testing of lost or destroyed evidence was sufficiently scientific in determining whether the State was in bad faith in thereafter failing to preserve the evidence. *Cf. 488 U.S. at 59* ("the police do not have a constitutional duty to perform any particular tests"). To the extent that ***Williams*** relies upon statements taken out of context from *Trombetta*, the state supreme court was not objectively unreasonable in following the Supreme Court's clear and express holding in *Youngblood* that, under its prior authority in *Trombetta*, "[t]he presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was **[\*62]** lost or destroyed. *488 U.S. at 56* n.\*.

Fourth, much like her second argument, ***Williams*** contends that the State was in bad faith because the State used the blood test results against her at trial, unlike in *Youngblood* where the State also was unable to obtain any significant evidentiary value from the semen samples. (ECF No. 110, at 12.) On federal habeas review, however, petitioner must do more than merely distinguish a prior Supreme Court opinion in some respect in order to obtain relief. Petitioner instead must demonstrate that the state supreme court's decision rejecting her claim was either contrary to or an unreasonable application of the prior Supreme Court precedent. Merely distinguishing the opinion on some basis not central to the Supreme Court's holding is insufficient to carry this burden. The holding in *Youngblood* as to bad faith turned upon whether the police had knowledge of the exculpatory value of the evidence prior to its loss or destruction, not upon whether the State obtained inculpatory test results prior to the loss or destruction of the evidence.

Fifth, ***Williams*** contends that the State was in bad faith because petitioner was denied a "*Youngblood* instruction" at trial. (*Id.*) Nothing **[\*63]** in the *Youngblood* majority opinion's analysis hinges the State's good or bad faith upon whether the defendant is given such an

_____

in the text.

[17] The state court record does not reflect that the State ever

opposed, obstructed or delayed a defense request specifically to test the samples.

instruction at trial. *Cf. 488 U.S. at 54* (noting the instruction only in the factual summary). An opinion by Justice Stevens concurring in the judgment relied in part upon the fact that the jury had been instructed that a negative inference could be drawn from the State's failure to preserve the evidence. See *488 U.S. at 59-60*. However, there were five justices in the majority in *Youngblood*, such that Justice Stevens' views in his separate opinion do not circumscribe or qualify the majority opinion. Petitioner must demonstrate that the state supreme court's decision was contrary to or an unreasonable application of the holdings of the United States Supreme Court, not contrary to or an unreasonable application of a separate opinion written by a single justice.[18]

Sixth, **Williams** contends that the State was in bad faith because her expert was never given the opportunity to test a valid biological sample, allegedly unlike *Youngblood*. (ECF No. 110, at 12.) This purported distinction is a false distinction. In *Youngblood*, the defense expert did *not [\*64]* have an opportunity to test a valid biological sample because the police failed to refrigerate the child's clothing with the semen samples. Just as **Williams** alleges occurred in the present case, the biological sample became available to the defense expert for testing only after it had lost its evidentiary value through the failure to refrigerate the evidence. *See 488 U.S. at 58* ("the evidence — such as it was — was made available to respondent's expert who declined to perform any tests on the samples"). That was the very point in *Youngblood*, that the evidentiary value of the evidence was lost before the defense could conduct testing in an effort to develop exculpatory evidence. The Supreme Court held in that circumstance that proof was required that the police knew of the exculpatory value of the evidence before it was lost or destroyed. Here, just as in *Youngblood*, mere speculation that testing of refrigerated evidence may have exonerated the defendant is insufficient to establish a due process violation. The false distinction relied upon by **Williams** in this regard between *Youngblood* and the present case merely further underscores that there is no due process violation in this

case under the directly **[\*65]** apposite holding in *Youngblood*.

Seventh, in this same vein, **Williams** urges that the State was in bad faith because, at the time of her district-court arraignment on May 22, 2000, "all possibility of valid retesting was destroyed because the State failed to preserve the blood." (ECF No. 110, at 7 & 12.) Petitioner in part is responding in this regard to the statement by the Supreme Court of **Nevada** that she not did request a retest of her blood sample for over ten months after it was drawn. Petitioner posits that she would not have been able to effectively retest the blood samples even at the time of her district-court arraignment because the evidentiary value of the samples for retesting allegedly already had been lost by that time. However, the Supreme Court did not hinge its holding in *Youngblood* that there was no due process violation upon whether the defense had an effective opportunity to test the biological sample before its evidentiary value was lost. Rather, again, the bad faith inquiry under *Youngblood* turns upon whether the police knew of the exculpatory value of the evidence before it was lost or destroyed. **Williams** once again is seeking to proceed down an analytical trail **[\*66]** that is grounded in argument that lacks any foundation in the Supreme Court's actual holding in *Youngblood*.

Eighth, **Williams** contends that the State acted in bad faith because the destruction of the evidentiary value of the blood was not "routine," purportedly unlike *Youngblood*. (ECF No. 110, at 12.) Nothing in *Youngblood* remotely suggests that the Supreme Court's holding turned upon whether the loss or destruction of the evidence could be described as "routine." In *Youngblood*, a police criminologist did not examine the child's clothing and observe the semen stains until over a year after the incident. By that time, because the clothes had not been refrigerated at the outset, the evidentiary value of the biological samples had been lost. *488 U.S. at 54*. The Supreme Court specifically refers to what the samples might have shown "had the clothing been properly refrigerated." *Id.* Again, nothing in the Supreme Court's

---

[18] Moreover, **Williams** did not request the instruction that was used in *Youngblood*. In that case, the jury was instructed: "If you find that the State has . . . allowed to be destroyed or lost any evidence whose content or quality are in issue, you may infer that the true fact is against the State's interest." *488 U.S. at 59-60*. **Williams** requested that her jury instead be instructed: "The State has a duty to preserve evidence which may be exculpatory as to the defendant. If you find that the State has failed to preserve such evidence, the defendant is entitled to a

verdict of not guilty." (ECF No. 76-2, at 13.) That charge was not given in *Youngblood*, and *Youngblood* clearly does not support a jury instruction directing a verdict of acquittal if the State fails to preserve evidence which only "may be" exculpatory. **Williams** thus was not denied "a *Youngblood* instruction," and the good or bad faith of the State in all events does not turn upon whether the jury was given such an instruction under the analysis in the majority opinion in *Youngblood*.

opinion suggests either that the failure to preserve the evidentiary value of the biological sample in *Youngblood* was "routine" or that any such "routineness" of the State's failure to preserve the evidentiary value had any bearing on the Court's holding. Rather, it appears that *Youngblood* **[*67]** and this case are nearly identical in this respect, given that both *Youngblood* and the present case involve the failure to preserve the evidentiary value of biological evidence through a failure to refrigerate the evidence.

Ninth, petitioner contends that the State acted in bad faith because three of the blood vials were for defense retesting. (ECF No. 110, at 12.) Such a fact only shows, at best, negligence on the part of the State, in that provision was made for defense retesting but ineffectively so due to lack of refrigeration of the blood samples. Nothing in *Youngblood* supports a finding of bad faith on the basis that samples were set aside for the defense. Merely setting aside material for defense retesting pursuant to standard procedure after the State obtained inculpatory test results does not signify that the State was aware that defense retesting in fact would be exculpatory before the evidentiary value of the samples was lost.

Finally, **Williams** contends, tenth, that the State acted in bad faith because the State allegedly waited until after she obtained what she thought were exculpatory negative test results to reveal that the samples had not been refrigerated and that the **[*68]** negative test results therefore were invalid. Petitioner posits — with no record support — that the State never would have raised the issue of lack of refrigeration if the retest results had been unfavorable to petitioner. (ECF No. 110, at 12.) The State's failure to note the lack of refrigeration earlier during the criminal case — and speculation as to what the State would have done if the retest results had been different — have nothing to do with the issue of bad faith under *Youngblood*. Bad faith under *Youngblood* turns upon whether the police knew the exculpatory value of the biological samples before their evidentiary value was lost, not upon any gamesmanship or speculation as to gamesmanship at trial.

At bottom, petitioner's multiple allegations of bad faith in

Ground 1 all derive from her counsel's own arguments as to what constitutes "bad faith," not upon any evidence satisfying the standard for bad faith enunciated by the Supreme Court in *Youngblood*. The state supreme court's rejection of a due process claim based upon such arguments clearly was neither contrary to nor an unreasonable application of clearly established law as determined by the United States Supreme Court as **[*69]** of August 2, 2002.

Petitioner's reliance upon __*Nevada*__ state cases, including the state supreme court's *Leonard* decision, is misplaced. Petitioner's burden under AEDPA is to demonstrate that the state supreme court's decision rejecting her claim was contrary to or an unreasonable application of clearly established federal law "as determined by the Supreme Court of the United States." *28 U.S.C. § 2254(d)(1)*. Demonstrating only that the state court's decision was, *arguendo*, inconsistent with one or more state supreme court decisions clearly does not carry that burden. Nor would demonstrating that the decision was, *arguendo*, inconsistent with lower federal court decisions in federal criminal cases, particularly such decisions that predate *Youngblood*, carry that burden. Petitioner posits that __*Nevada*__ state cases require proof that *either*: (1) the State acted in bad faith: *or* (2) the defendant suffered undue prejudice and the exculpatory value of the evidence was evident before it was destroyed. (ECF No. 110, at 11 &14.) Any such formulation, however, is not the test applied by the United States Supreme Court in *Youngblood*.[19] Moreover, neither a viable due process nor equal protection claim would be presented simply **[*70]** because the Supreme Court of __*Nevada*__ allegedly misapplied __*Nevada*__ law or departed from its past precedents. *See,e.g., Little v. Crawford, 449 F.3d 1075, 1983 & n.6 (9th Cir. 2006)*.

Ground 1 therefore does not provide a basis for federal habeas relief, whether as to parts (a) or (b) of the ground.

### Ground 4: Equal Protection, Substantive Due Process, Overbreadth &$Vagueness

In Ground 4,[20] **Williams** presents four distinct facial

---

[19] The Court notes in passing that it does not appear that petitioner in any event satisfied the formulation that she describes. The blood samples had tested positive, not negative, for the requisite amounts of marijuana and marijuana metabolite before their further evidentiary value was lost. The only hoped-for and speculative exculpatory value of the evidence therefore was not evident before its evidentiary value was destroyed. In

all events, however, regardless of how the **Nevada** cases *arguendo* properly should be applied, it is the standard formulated in *Youngblood*, not in any state court case or lower federal court case, that is controlling on federal habeas review under AEDPA on the due process claim.

[20] Ground 2 was dismissed on **Williams'** motion after the Court held that the ground was unexhausted. (ECF No. 50; ECF No.

Williams v. Gentry

constitutional challenges to the **_Nevada_** statutes pursuant to which she was convicted. The Court will divide these distinct claims into parts (a) through (d) of Ground 4.[21]

### Ground 4(a): Equal Protection

In Ground 4(a), **_Williams_** alleges that she was denied equal protection of the laws in violation of the _Fourteenth Amendment_ because, _inter alia_, the relevant state statutes allegedly impermissibly single out allegedly unimpaired drivers with trace amounts of marijuana or its metabolite in their blood or urine who allegedly pose no threat to traffic safety, such that the statute is not rationally related to a legitimate governmental purpose. Petitioner additionally argues that the statutes violate the _Equal Protection Clause_ because they arbitrarily impose a different burden of proof on "non-prescription" marijuana users as opposed to prescription marijuana users. **[*71]** (ECF No. 110, at 26-30.)

In its August 2, 2002, decision on direct appeal, the Supreme Court of **_Nevada_** addressed this claim at length, including consideration of the relevant legislative history of the state statutes. The court stated:

> A. Constitutionality of _NRS 484.379(3)_
>
> In 1999, the **_Nevada_** Legislature enacted _NRS 484.379(3)_, which provides, in pertinent part, that "[i]t is unlawful for any person to drive or be in actual physical control of a vehicle on a highway ... with an amount of a prohibited substance in his blood ... that is equal to or greater than" two nanograms per milliliter of marijuana or five nanograms per milliliter

of marijuana metabolite. The Legislature also added subsection (f) to _NRS 484.3795(1)_. Under that section, a person is guilty of a felony if the person "[h]as a prohibited substance in his blood or urine in an amount that is equal to or greater than the amount set forth in subsection 3 of _NRS 484.379_" and the person neglects a duty imposed by law while driving that proximately causes the death of or substantial bodily harm to another person.

At a pretrial hearing to consider the constitutionality of the prohibited substance statute, Senator Jon Porter, who initially proposed the legislation, testified that the Legislature **[*72]** intended to create a per se statute similar to the alcohol per se statute. During this hearing, Senator Porter noted that there were twelve different hearings on the bill and that the wording changed during the course of these hearings. The original draft of the bill provided that driving or being in control of a vehicle with "a detectable amount of a controlled substance" constituted a DUI violation. The bill was subsequently amended to include a short list of controlled substances, which were deemed to be prohibited substances, and if found in a driver's system, would constitute a per se DUI violation. In response to concerns over the absence of a defined level of drugs required for a conviction, the bill was amended, where possible, to include the federal standards set by the Substance Abuse and Mental Health Services Administration ("SAMHSA"). SAMHSA is the agency responsible for setting standards for toxicology testing of airline pilots, train engineers, and others who must be tested for drugs under federal law.

---

110, at 20.) It does not appear that **_Williams_** thereafter sought to exhaust and pursue the claim when the matter later was stayed. The stay order stated that "[w]ith a stay ordered based on the circumstances pertaining to Ground 8, the question of what additional claim or claims should be presented to the state courts is a matter for petitioner to determine when seeking relief in those courts." (ECF No. 91, at 3.)

The Court dismissed Ground 3 as not presenting a federal claim cognizable in federal habeas review as opposed to a purely state law claim. (ECF No. 116, at 10.) The claim that was presented to the state supreme court was rejected by that court on the merits. _Williams I, 118 Nev. at 550-51, 50 P.3d at 1125-26_ (emphasis in original). The Court notes additionally that **_Williams_** cites no apposite decision of the United States Supreme Court holding, at the time of the state supreme court's decision on the merits on August 2, 2002, that the Due Process

Clause mandates that the states consider preexisting negligence by another party to be relevant to the question of whether a defendant's own conduct was a proximate cause of death or injury in determining culpability under a criminal statute. Absent such authority, **_Williams_** would not be able to present a successful claim under AEDPA even if Ground 3 otherwise were cognizable.

[21] With only minor variation primarily as to style or form, Ground 4 in the amended petition filed by appointed counsel is the same as in the original and amending petitions filed by original counsel. Petitioner's division of Ground 4 instead into "Part 1" and "Part 2" arguably is not as clear, as there in truth are four separate claims. Moreover, it is the general practice in this District to divide habeas claims into subgrounds by letter rather than by number, referring, for example, to a Ground 4(a) rather than a Ground 4(1).

Williams v. Gentry

*Williams* challenges the constitutionality of the resulting prohibited substance statute, *NRS 484.379(3)*, on several bases, each of which will be separately addressed.

1. *Equal protection* [*73]

*Williams* first contends that *NRS 484.379(3)* violates the *Equal Protection Clause* because it impermissibly treats drivers with proscribed levels of drugs in their systems differently from others. In analyzing equal protection challenges, the appropriate level of judicial scrutiny must first be determined by considering the nature of the right being asserted. Statutes which involve fundamental rights (such as privacy) or which are based on suspect classifications (such as race) are subject to strict scrutiny. Statutes which do not infringe upon fundamental rights nor involve a suspect classification are reviewed using the lowest level of scrutiny-rational basis. Under the rational basis standard, legislation will be upheld so long as it is rationally related to a legitimate governmental interest.

In a footnote in *Williams*' opening brief, she argues that this court should apply a strict scrutiny standard because the "right" to drive is a fundamental right. In the context of a license revocation proceeding, we have previously held that there is no constitutional right to drive; rather, driving is a privilege. Other courts have similarly held that neither driving nor using illicit drugs constitute fundamental rights.[FN12] The **[*74]** appropriate level of scrutiny is thus the rational basis standard. During oral argument, *Williams*' counsel conceded that rational basis is the appropriate standard of review.

> [FN12] *State v. Phillips, 178 Ariz. 368, 873 P.2d 706, 709 & n. 5 (Ct.App.1994)*; *see also Shepler v. State, 758 N.E.2d 966,969 (Ind.Ct.App.2001)*; *People v. Gassman, 251 Ill.App.3d 681, 190 Ill.Dec. 815, 622 N.E.2d 845, 853 (1993)*.

All statutes are presumed constitutional and the party attacking the statute has the burden of establishing that the statute is invalid. The United States Supreme Court has provided the following guidelines in determining the rational basis of a statute:

> [A] legislature that creates these categories need not "actually articulate at any time the purpose or rationale supporting its

classification." Instead, a classification "must be upheld against equal protection challenge *if there is any reasonably conceivable state of facts that could provide a rational basis for the classification*."

A State, moreover, has no obligation to produce evidence to sustain the rationality of a statutory classification. "[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data." . . . Finally, courts are compelled . . . to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification **[*75]** does not fail rational-basis review because it "'is not made with mathematical nicety or because in practice it results in some inequality.'" "The problems of government are practical ones and may justify . . . rough accommodations-[however] illogical . . . and unscientific [the accommodations may be]."[FN14]

> [FN14] *Heller v. Doe, 509 U.S. 312, 320-21, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993)* (citations omitted) (emphasis added).

The State contends that the prohibited substance statute is rationally related to the State's interest in highway safety and in deterring illicit drug use. We agree.

In passing the prohibited substance statute, the Legislature clearly articulated its intent to follow the lead of nine other states and create a per se drug violation[FN15] similar to the alcohol per se statute. The Legislature considered extensive testimony before passing the law and rejected the concerns expressed by those opposed to the law, who argued it lacked a direct correlation between the prohibited drugs in a driver's system and impairment. Since the law was passed in 1999, the Legislature in 2001 had an opportunity to amend the statute and did not do so, although other aspects of the DUI statute were amended during the 2001 legislative session.

> [FN15] In considering **[*76]** this legislation, the Legislature received information that nine other states had already enacted per se drug statutes. These states included Arizona, Georgia, Illinois, Indiana, Iowa, Minnesota, Rhode Island, South Dakota, and Utah. At the time, statutes in Arizona, Georgia, and Illinois had been challenged and found to be a proper exercise of

Williams v. Gentry

legislative authority. Since then, Indiana and Iowa have also upheld their per se drug statutes. *Shepler*, 758 N.E.2d at 969; *Loder v. Iowa Dept. of Transp., 622 N.W.2d 513, 516 (Iowa Ct.App.2000)*. Based on another statute providing for medical use of marijuana, Georgia concluded that as to marijuana, the per se drug statute violated the *Equal Protection Clause* because it treated legal and illegal marijuana users differently without a rational basis. *Love v. State, 271 Ga. 398, 517 S.E.2d 53, 57 (1999)*. However, Georgia has subsequently recognized the validity of the statute as applied to drivers with cocaine in their system. *See Carthon v. State, 248 Ga.App. 738, 548 S.E.2d 649, 654 (2001)*; *Keenum v. State, 248 Ga.App. 474, 546 S.E.2d 288, 289 (2001)*.

We have previously recognized traffic safety as a rational basis for upholding statutes that regulate the use of substances that may impair a person's ability to drive. In considering Arizona's per se drug statute, the Arizona Court of Appeals concluded in *State v. Phillips* that banning driving by persons with any measurable amount of illicit drugs was constitutional because "the legislature **[*77]** was reasonable in determining that there is no level of illicit drug use which can be acceptably combined with driving a vehicle; the established potential for lethal consequences is too great." Likewise, we conclude that the governmental interest in maintaining safe highways is sufficient for our prohibited substance statute to survive a constitutional attack on the basis that it impermissibly treats drivers with the proscribed levels of illicit drugs in their system differently from others.

To the extent that **_Williams_**' argument is premised on the distinction made between legal and illegal users of marijuana, we likewise conclude that it lacks merit. This portion of **_Williams_**' argument is based on language in *NRS 484.1245* that exempts substances used by persons with a valid prescription for that substance from the definition of "prohibited substances" as used in *NRS 484.379(3)*. **_Williams_** also points to the exclusion of certain parts of the marijuana plant from the definition of "marijuana" in *NRS 453.096* in asserting there could be "legal" users, as well as the fact that doctors in **_Nevada_** may prescribe Marinol[FN18] to certain persons.

[FN18] Marinol is a drug containing one of the active ingredients in marijuana.

The State **[*78]** contends that **_Nevada_** did not recognize any lawful users of marijuana at the time of **_Williams_**' collision or conviction.[FN19] In addition, the State contends that even if such a distinction existed, it would be rationally related to a legitimate state objective in deterring illicit drug use. We agree.

[FN19] Though **_Nevada_** voters in the 2000 election approved a referendum authorizing the Legislature to draft a medicinal marijuana statute, the referendum was passed after **_Williams_**' collision and such a statute has not yet been enacted.

The Legislature could have reasonably determined that illegal use of a substance poses a greater threat to the public - and therefore warrants a harsher punishment - because unlike prescribed use, illegal use of drugs is not controlled. Specifically, a prescription is generally for a drug which has been reviewed and/or approved by the Food and Drug Administration ("FDA"), is of a specific potency, is prescribed at a certain dosage, and is often accompanied by warnings not to drive. Conversely, people who use illicit drugs do so to impair themselves - to obtain a specific effect or desired "high," which arguably makes them more likely to be unable to drive **[*79]** safely. Under *Heller v. Doe*,[FN20] this or any other reasonably conceivable rationale need not have been actually considered by our Legislature to provide a basis for upholding a statute reviewed under the rational basis test.

[FN20] *509 U.S. at 319-21, 113 S.Ct. 2637*.

We conclude that *NRS 484.379(3)* is rationally related to a legitimate state objective and is therefore constitutional. In doing so, we reiterate that it is the province of the Legislature to pass legislation, while our duty is to determine whether such legislation passes constitutional scrutiny and is therefore valid law.[FN21] Opponents of a valid statute must look to the Legislature rather than the judiciary to amend the law.

[FN21] *See Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803)*.

*Williams I,118 Nev. at 541-45, 50 P.3d at 1120-22* (citation footnotes 1-11, 13 & 16-17 omitted).

Under AEDPA, **_Williams_** must demonstrate that the foregoing decision is contrary to or an unreasonable

Williams v. Gentry

application of clearly established federal law as determined by the United States Supreme Court. Her arguments on this claim fall far short of carrying this burden.

At the very outset, **_Williams_**' contention that the Supreme Court of **_Nevada_** erred in not applying a strict scrutiny standard is not supported by apposite United States Supreme Court authority. Petitioner contends that "[o]nce a **[*80]** person is given a driving license by the State, he has an unenumerated constitutional right to drive."(ECF No. 110, at 26 n.13) Neither Supreme Court decision cited by petitioner holds that a "right to drive" is a fundamental federal constitutional right that gives rise to strict scrutiny on an equal protection challenge.[22] Deferential federal habeas review under AEDPA hardly is the context in which new "unenumerated" federal constitutional rights that have not been previously recognized by the United States Supreme Court are cut from whole cloth by a lower federal court substituting its judgment on the question for that of a state supreme court.[23]

**_Williams_** relies upon various studies, including an alleged 1993 federal government study that the amended petition alleges "determined that marijuana does not impair driving performance at low doses, and in fact enhances driver safety once the effects of the drug are felt by the user." (ECF No. 110, at 27.) Petitioner cites generally to such studies and quotes selected material without specific page citation. However, it does not appear that petitioner has properly made the **[*81]** actual studies themselves of record in this matter, such as through expert testimony specifically cited in the record. The Court cannot rely upon bare allegations without proper record support to establish any factual matter, and it is petitioner's burden to make the factual material of record and then to provide specific record citations.

Moreover, if **_Williams_** also did not make the studies properly of record in the state court record considered on direct appeal, *Pinholster* would appear to bar this Court from considering the studies even if otherwise presented properly in federal court.

In any event, even as described by **_Williams_**, the studies do not demonstrate that the state supreme court's conclusion that the relevant statutes is rationally related to the legitimate governmental interest of traffic safety was objectively unreasonable. Petitioner maintains that "low" doses of marijuana have "approximately the same effect" on driving ability as many nonprescription decongestant drugs, that even at high doses marijuana does not impair driving ability "as much as" alcohol, and that "the psychomotor impairment" associated with marijuana use is "minimal" and is compensated for when driving. **[*82]** As to the last point, petitioner maintains that the studies reflect that drivers "intoxicated by marijuana are often safer drivers than they normally would be because of their over-awareness of the effects of the drug" because they "will compensate where they can, for example, by slowing down or increasing effort." (*Id., at 27-28* & nn.16 & 17.)

It was not objectively unreasonable for the Supreme Court of **_Nevada_** to conclude that a decision by the **_Nevada_** Legislature that it did not want drivers on the road impaired with *arguendo* "approximately the same effect" as many nonprescription decongestants was rationally related to traffic safety. Such nonprescription medications often include warnings or cautions regarding driving while using the drugs. Indeed, a nonprescription drug referred to by petitioner - Benadryl - is accompanied by cautionary advisements that "marked drowsiness may occur" and that the user should "be careful when driving a motor vehicle or operating machinery."[24] It is hardly

---

[22] In *Bell v. Burson, 402 U.S. 535, 91 S. Ct. 1586, 29 L. Ed. 2d 90 (1971)*, the Supreme Court held that a State must provide procedural due process prior to suspending a driver's license and vehicle registration, regardless of whether the *state-created interest* reflected in a driver's license and vehicle registration, regardless of whether the state-created interest was denominated a "right" or instead a "privilege." Nothing in the case remotely states or implies that driving is a *federal constitutional right*. The decision in *Shapiro v Thompson, 394 U.S. 618, 89 S. Ct. 1322, 22 L. Ed. 2d 600 (1969)*, concerns a denial of welfare benefits to residents with less than a year of in-state residency. *Shapiro* does not even mention driving, much less establish that a right to drive is a fundamental constitutional right.

[23] A concession at oral argument on direct appeal that rational-

basis review applied would further cut against petitioner's argument in federal court that the state supreme court instead should have applied strict-scrutiny review. (*But cf.* ECF No. 110, at 26 n.13, denying that the point was conceded.) In all events, the state supreme court's application of rational-basis review rather than strict-scrutiny review clearly was neither contrary to nor an objectively unreasonable application of clearly established federal law as determined by the United States Supreme Court. This Court further would reach the same conclusion as to the standard applied on a *de novo* review.

[24] The Court takes judicial notice of the quoted advisements found on the manufacturer's website at www.benadryl.com . The other nonprescription medication referenced by petitioner - Actifed - carried similar cautions when this claim was reviewed internally circa 2010, but it appears that Actifed since has been

Williams v. Gentry

inconsistent with a legitimate governmental interest in traffic safety for a state legislature to determine that any purported benefits from having drivers on the road "approximately" similarly impaired from an **[\*83]** illicit drug is outweighed by the risks associated with such potential impairment.

It also was not objectively unreasonable for the Supreme Court of *__Nevada__* to conclude that a decision by the *__Nevada__* Legislature that it did not want drivers on the road potentially impaired by marijuana merely because they purportedly were not impaired "as much as" they would have been on alcohol was rationally related to traffic safety. The threshold required for alcohol intoxication under various state statutes does not necessarily establish - via a line also etched in Supreme Court precedent - an inexorable constitutional limit below which legislatures may not take action seeking to keep potentially impaired drivers off the road. Small comfort is provided following a tragedy from an observation that a driver with marijuana in her system was not impaired "as much as" she would have been on alcohol.

In this same vein, it was not objectively unreasonable for the Supreme Court of *__Nevada__* to conclude that a decision by the *__Nevada__* Legislature that it did not want drivers on the road who had to "compensate" for their impairment - by, *inter alia*, driving slowly or increasing effort in order to drive purportedly **[\*84]** safely - was rationally related to traffic safety. A rational legislature quite readily can - and most voters no doubt would think should - reject the exceedingly dubious proposition that a driver intoxicated on marijuana should be allowed to drive on the premise that they will drive safely because they will slow down and/or try to focus harder in an attempt to counteract the effects of their intoxication. A rational legislature - and the public - quite reasonably instead may want to have unimpaired drivers behind the wheel rather than drivers having to compensate, hopefully but not assuredly effectively, for an illicitly-induced potential impairment.

At bottom, petitioner's studies - as alleged in the pleadings - do not establish an absence of risk to safety from a driver with marijuana in her system. The studies instead seek to minimize that risk in relation to other factors that also impair driving ability and/or to weigh that risk differently than did the *__Nevada__* Legislature in this instance. Notably, petitioner does not direct the Court's attention to a scientific study specifically addressing the relevant nanogram values listed in N.R.S. 484.379 and unequivocally                establishing                beyond

peradventure **[\*85]**  that there can be no potential for impairment at that level. Such matters of degree and weighing of relative risk constitute the epitome of the type of decision reserved to legislatures under the rational basis standard of review. Petitioner has come forward with no apposite United States Supreme Court authority requiring that a state legislature give precedence to the studies upon which she relies as opposed to the standards and information - including the SAMHSA standards referred to by the *__Nevada__* Supreme Court - relied upon by the *__Nevada__* Legislature in making its legislative determination as to where the line should be drawn for public safety.

*__Williams__* has sought to frame the issue as one where the state legislature has "single[d] out for punishment . . . unimpaired drivers with trace amounts of marijuana or its metabolite . . . who pose no threat to traffic safety." (ECF No. 110, at 26.) The studies upon which she relies, however, as presented in her pleadings, do not unequivocally establish that drivers with the amounts of marijuana specified in N.R.S. 484.379 are unimpaired drivers who pose "no threat" to traffic safety. The *__Nevada__* Legislature considered substantially the same arguments as **[\*86]**  presented here by petitioner and rejected the position that there was no direct correlation between the presence of the substances in a driver's system and impairment. *See Williams I, 118 Nev. at 543, 50 P.3d at 1120-21.*

In this regard, *__Williams__* points to her own contemporaneous acquittal of driving under the influence of a controlled substance, *to wit*, marijuana and/or ecstasy, to a degree that rendered her incapable of safely driving her vehicle. Both this Court and the Ninth Circuit held on *__Williams__*' prior petition, however, that her acquittal by such a simultaneous verdict carries no collateral estoppel effect. *See Jessica __Williams__ v. Christine Bodo*, No. 2:03-cv-00874-PMP-LRL, ECF No.19, at 12-13 & n.10 (D. *Nev.*, Mar. 2, 2004), *affirmed, Williams v. Warden, 422 F.3d 1006, 1011 (9th Cir. 2005).* Further to the point, *__Williams__*' own individual acquittal by the jury specifically of the alternative DUI theory does not establish, as a general matter, that the *__Nevada__* Legislature has singled out drivers who as a class are "unimpaired" and who pose "no threat" to traffic safety. It is petitioner - not the *__Nevada__* legislature - who is positing in her argument that drivers with the specified amounts of a prohibited substance are not impaired and pose no threat.        The        *__Nevada__*        Legislature,        in contrast, **[\*87]**  appears to have "singled out" drivers who

_____

discontinued in the United States. An online citation source

therefore no longer is readily available.

Williams v. Gentry

it believes are potentially impaired and who, in its judgment, do pose a potential threat to traffic safety. Petitioner's alleged studies, as noted, concern not an absence of impairment and threat but instead seek to weigh the degree of impairment and resulting risk. Such weighing of risk and drawing of lines, again, constitute a classic matter of permissible legislative judgment - a judgment directed generally to the populace at large rather than to the particular situation of whether *Williams* herself was simultaneously acquitted of the alternative DUI theory in her case.

Moreover, *Williams*' argument ignores the second legitimate governmental interest discussed by the Supreme Court of *Nevada* - that of deterring (what was then) illicit drug use. Petitioner hardly carries her burden under AEDPA when she focuses only on one of two involved governmental interests and ignores the other.

Under rational basis review, the congruity between the means reflected in the legislative classification and the end sought to be served need not be perfect or exact. *Williams* has not demonstrated that the state supreme court's holding that the legislation was rationally **[*88]** related to a legitimate governmental interest was either contrary to or an unreasonable application of clearly established federal law - as to either of the two governmental interests discussed in the court's opinion.

The same conclusion follows as to petitioner's subsidiary argument that the statute violates the *Equal Protection Clause* because it arbitrarily imposes a different burden of proof on "nonprescription" marijuana users as opposed to prescription marijuana users. *Williams* refers in this regard to a provision that exempts substances used by persons with a valid prescription from the definition of prohibited substances. *See Williams I, 118 Nev. at 544, 50 P.3d at 1121*. The Supreme Court of *Nevada* determined that the *Nevada* Legislature could have reasonably determined that uncontrolled illicit use of a substance could pose a greater threat to the public, and the court further determined that the distinction was rationally related to a legitimate state objective also in deterring illicit drug use. The state supreme court's rejection of *Williams*' equal protection challenge on either basis was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. *Williams* relies **[*89]** on this subsidiary argument upon the decision of the Supreme Court of Georgia in *Love v. State, 271 Ga. 398, 517 S.E.2d 53 (1999)*. The Supreme Court of Georgia of course is not the Supreme Court of the United States. On deferential AEDPA review, this Court can no more substitute the judgment of the Supreme Court of Georgia for that of the Supreme Court of *Nevada* on the issue than it can substitute its own judgment for that of the state supreme court.[25]

In the final analysis, *Williams* has not come forward with any apposite authority from the United States Supreme Court tending to establish that the decision of the Supreme Court of *Nevada* rejecting her equal protection claim was either contrary to or an unreasonable application of clearly established federal law. Indeed, it is notable that a number of other state courts also have rejected similar challenges to comparable *per se* drug traffic safety statutes.[26] As noted above, petitioner

_____

[25] Moreover, in *Love*, the Supreme Court of Georgia addressed the relationship of the classification only to the state interest in traffic safety without also considering the state interest in deterring illicit drug use. *Compare Love*, 271 Ga. 402, 517 S.E.2d at 57 with *Williams I, 118 Nev. at 544, 50 P.3d at 1121-22*. Nor did the *Love* court address the additional public safety ramifications discussed in *Williams I. Id*. The Court additionally notes that the Supreme Court of Georgia also did not extend *Love* to a circumstance where the defendant was charged not simply with driving with a prohibited substance in her blood but instead was charged with reckless driving and vehicular homicide through reckless driving based in part upon having a prohibited substance in her blood. *See Ayers v. State, 272 Ga. 733, 534 S.E.2d 76 (2000)*. In all events, however, the Supreme Court of *Nevada* was not required to follow the Georgia Supreme Court's decision in *Love*. Petitioner's burden in this case is to demonstrate that the decision in *Williams I* on this issue was contrary to or an unreasonable application of clearly

established law *as determined by the United States Supreme Court.*

The Court additionally notes that, in *Love*, the Supreme Court of Georgia, like the Supreme Court of *Nevada*, otherwise held that there was a rational relationship between the *per se* drug statute and a legitimate governmental interest in public safety. That is, the Supreme Court of Georgia rejected the companion equal protection argument that *Williams* presents here based upon the contention that drivers with marijuana in their system necessarily are "unimpaired" and present "no threat" to traffic safety. *Love, 271 Ga. at 399-02, 517 S.E.2d at 55-56*.

[26] *See, e.g., State v. Smet, 288 Wis. 525, 537-40, 709 N.W.2d 474, 480-82 (2005); Shepler v. State, 758 N.E.2d 966, 968-70 (Ind. Ct. App. 2001); Loder v. Iowa Dept. of Transp., 622 N.W.2d 513, 516 (Iowa Ct. App. 2000); State v. Phillips, 178 Ariz. 368, 371-72 873 P.2d 706, 709-10 (1994); People v. Gassman, 251 Ill.App.3d 681, 692-93, 622 N.E.2d 845, 853-54,*

cannot establish that a state court decision is contrary to or an unreasonable application of clearly established federal law under AEDPA by citation to the decisions of other state courts rather [*90] than to decisions of the United States Supreme Court. However, on the other hand, the fact that numerous state courts have ruled contrary to her position tends to cut against her claim that the _**Nevada**_ Supreme Court's similar rejection of her claim was an objectively unreasonable application of United States Supreme Court precedent.

Ground 4(a) accordingly does not provide a basis for federal habeas relief.[27]

### _Ground 4(b): Substantive Due Process_

In Ground 4(b), _**Williams**_ alleges that she was denied substantive due process in violation of the _Fourteenth Amendment_ because the relevant _**Nevada**_ state statutes allegedly are not rationally related to traffic safety because the statutes subject purportedly unimpaired drivers to prosecution. (ECF No. 110, at 30-33.)

The Supreme Court of _**Nevada**_ rejected this claim on the following grounds in its August 2, 2002, decision:

> 2. _Due process_
>
> _**Williams**_ next argues that the statute violates her right to substantive due process.[FN22] In this claim, _**Williams**_ seems to mimic her equal protection arguments. _**Williams**_ claims that the State may not deprive her of her right to drive while having "low" levels of marijuana because there [*91] is no

---

_190 Ill. Dec. 815 (1993)_; _see also State v. Schulz_, 34 N.Ed. 3d 176 (Ct. App. Ohio 2015); _Love, 271 Ga. at 399-02, 517 S.E.2d at 55-56_ (discussed in n. 25, _supra_); _cf. United States v. Reed, 734 F.3d 881, 889-91 (9th Cir. 2013)_ (surveying state _per se_ drugged driving laws in the course of holding that _**Nevada**_'s statutes pertaining to driving with more than 2 nanograms of marijuana were assimilated by the federal Assimilative Crimes Act).

[27] Any equal protection challenge within Ground 4(a) focused specifically on prosecution for the presence of marijuana metabolite further would appear to be mooted by the Court's contemporaneous holding in this order on Ground 8(a) that _**Williams**_ could not be convicted based upon the presence of marijuana metabolite. That is, _**Williams**_ would not be entitled to greater relief on any successful metabolite-focused claim in Ground 4(a) than she is entitled to on Ground 8(a), a conditional writ grant with a possible retrial. In this regard, the state court

rational, non-arbitrary connection to a legitimate purpose. In addition, _**Williams**_ claims that the means utilized by the Legislature to achieve its legitimate purpose are too onerous because there is no legitimate interest in prosecuting unimpaired drivers for DUI. We conclude this argument lacks merit.

> As previously discussed, there are several ways in which the statute could be rationally related to legitimate governmental objectives. One plausible rationale suffices even if not considered or articulated by the Legislature.[FN23] Further, when the constitutionality of a statute is examined using the rational basis standard, the state is not compelled to use the least restrictive means to reach the desired objective.[FN24] A statute analyzed under this standard must survive a constitutional challenge "even when there is an imperfect fit between means and ends."[FN25]

> [FN22] U.S. Const. amend. XIV, § 1.

> [FN23] _Heller, 509 U.S. at 319-21, 113 S.Ct. 2637_.

> [FN24] _Id. at 320-21, 113 S.Ct. 2637_.

> [FN25] _Id. at 321, 113 S.Ct. 2637_.

_**Williams I**, 118 **Nev.** at 545, 50 P.3d at 1122_.

The state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

As the state high court noted, _**Williams**_' substantive due process claim in the main parallels [*92] her equal

record reflects that marijuana metabolite is not psychoactive. (_E.g._, ECF No. 75-12, at 15 & 23; ECF No. 75-19, at 20-21; ECF No. 75-25, at 6.) The Court has not been presented with argument regarding an impairment-based rationale focused specifically on marijuana metabolite. Perhaps a legislature permissibly may find a sufficiently strong enough association between the presence of metabolite in certain amounts under typical testing protocols and the presence, as a practical matter at the relevant time, also of psychoactive content potentially resulting in intoxication. Moreover, as discussed in the text, the state supreme court also posited the additional legislative purpose of deterring (then) illicit drug use. Thus, even if a metabolite-focused aspect of Ground 4(a) is not mooted by the Court's holding on Ground 8(a), it is not a foregone conclusion that the state supreme court's August 2, 2002, implicit rejection also of that aspect of Ground 4(a) was either contrary to or an objectively unreasonable application of clearly established federal law as determined by the United States Supreme Court.

Williams v. Gentry

protection claim and mirrors the arguments presented therein. This Court's discussion of Ground 4(a), *supra*, accordingly is substantially applicable to Ground 4(b) as well.

The state supreme court's holding that the **Nevada** statutory scheme was rationally related to legitimate governmental interests accordingly was neither contrary to nor an unreasonable application of clearly established federal law. As discussed at length as to Ground 4(a), **Williams**' cited studies, as alleged in her pleadings, did not establish beyond peradventure that a driver with the amount of marijuana or metabolite specified in the statute was unimpaired and presented no threat to public safety. Nor was the **Nevada** Legislature, which during legislative hearings considered substantially the same arguments that now are presented by **Williams**, required to accept her selected studies over the studies and standards that it followed in adopting the legislation. The day has long passed when courts, in considering a substantive due process claim, will substitute their own judgment for a considered state or federal legislative judgment on an issue and instead constitutionalize their own assessment of the underlying **[*93]** empirical data and competing policy considerations.[28]

Further, **Williams** once again ignores the dual legitimate governmental interests noted by the Supreme Court of **Nevada** in rejecting her constitutional challenges. **Williams** posits that "[t]he legislative purpose behind NRS 384.3795(1)(f) is to remove impaired drivers from

_____

[28] Indeed, **Williams** explicitly relies in her substantive due process argument on two 1920's Supreme Court decisions - *Truax v. Corrigan, 257 U.S. 312, 42 S. Ct. 124, 66 L. Ed. 254 (1921)*, and *F.S. Royster Guano Co. v. Virginia, 253 U.S. 412, 40 S. Ct. 560, 64 L. Ed. 989 (1920)* - that were part of the long-discredited *Lochner* era of highly active federal judicial intervention in legislative decisions. *See, e.g.,* Katie R. Eyer, *Protected Class Rational Basis Review, 95 N.C. L. REV. 975, 980 (2017)* (referring to "the *Lochner*-era precedent of *F.S.Royster Guano Co.*"); Monica Youn, *The Chilling Effect and the Problem of Private Action, 66 VAND. L. REV. 1473, 1524-25* & n.213 (2013) (*Truax* and similar cases exhibited "the defining error of the *Lochner* era"). As the Ninth Circuit observed in *Armendariz v. Penman, 75 F.3d 1311, 1318 (9th Cir. 1996)* (*en banc*), "[t]he Supreme Court's opinion in *Lochner v. New York, 198 U.S. 45, 25 S.Ct. 539, 49 L.Ed. 937 (1905)*, now symbolizes an era in which the Court, invalidating economic legislation, engaged in a level of judicial activism which was unprecedented in its time and unmatched since." The Supreme Court would even state during this period, somewhat inartfully from today's perspective, that the "[d]etermination by the Legislature of what constitutes proper

the roads and punish them accordingly." (ECF No. 110, at 31.) The state supreme court, however, expressly referred to legitimate governmental interests both in traffic safety and "in deterring illicit drug use." *Williams I, 118 Nev. at 544, 50 P.3d at 1121*. Petitioner accordingly misses the mark when she suggests that the statute impermissibly punishes individuals for "merely using marijuana . . . [with] no relationship whatsoever to driving impairment." (ECF No. 110, at 31.) The statute, as found by the state supreme court, instead is directed at both promoting traffic safety and deterring (then) illicit drug use. **Williams** hardly establishes that **[*94]** the state supreme court's decision was an objectively unreasonable application of clearly established federal law when she disregards the full basis for the state court's decision.

**Williams** further urges that the statute is unconstitutional "because it fails to require a causal relationship between the ingested substance and the event leading to the injury or death of another." (ECF No. 110, at 36.) She relies upon *Ashcroft v. Free Speech Coalition, 535 U.S. 234, 122 S. Ct. 1389, 152 L. Ed. 2d 403 (2002)*, which stated that a federal child pornography law could not be read to prohibit obscenity "because it lacks the required link between its prohibitions and the affront to community standards prohibited by the definition of obscenity." *535 U.S. at 249*. She draws from this quote - from a case addressing whether a statute unconstitutionally abridged free speech - the principle that "[c]learly, legislation to be constitutional must have a causal relationship between

exercise of police power is not final or conclusive but is subject to supervision by the courts." *Meyer v. Nebraska, 262 U.S. 390, 400, 43 S. Ct. 625, 67 L. Ed. 1042 (1923)*. However, ultimately, Justice Brandeis' dissent in *Truax* instead "would mark the Court's future course" in response to the "overreaching" in *Truax* and similar *Lochner* era decisions. *See* John C.P. Goldberg, *The Constitutional Status of Tort Law: Due Process and the Right to a Law for the Redress of Wrongs, 115 YALE L.J. 524, 576 (2005)*. *Lochner* and its progeny were repudiated by the late 1930's.

**Williams** thus relies on 1920's Supreme Court caselaw that was repudiated over eight decades ago. Legislative decisions instead are afforded much more deference under current substantive due process Supreme Court precedent. *See,e.g., Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust, 508 U.S. 602, 639, 113 S. Ct. 2264, 124 L. Ed. 2d 539 (1993)*. Accordingly, in sharp contrast to the long-repudiated interventionist authority relied upon by **Williams**, in this federal habeas case a deferential standard of review instead is being applied under AEDPA to a state court decision that in turn was applying a deferential standard of review to an underlying legislative determination.

what is prohibited and what occurred." (ECF No. 110, at 37.)

*Williams* cites no apposite precedent from the United States Supreme Court supporting such an approach to constitutional adjudication where the analysis of a subsidiary issue in a *First Amendment* decision is applied in lieu of well-established substantive due process precedent. The Supreme **[*95]** Court of *Nevada* identified the proper controlling legal principles for a substantive due process claim, and its application of those principles to this case was not objectively unreasonable. *Free Speech Coalition* is far afield from the present case and is neither apposite to this case nor contrary to the state supreme court's decision. This Court - particularly on deferential AEDPA review - clearly cannot overturn the state supreme court's decision on such a flawed argument seeking to apply precedent from a different area of constitutional law.[29]

In this same vein, *Williams* urges that her simultaneous acquittal on an alternative theory of driving under the influence establishes that there is no causal nexus between the presence of marijuana and "the accident," such that N.R.S. 384.3795(1)(f) is unconstitutional. Petitioner's logic is flawed in a number of respects. First, as discussed as to Ground 4(a), a simultaneous acquittal in a single trial carries no collateral estoppel effect. Second, the constitutionality of N.R.S. 384.3795(1)(f) under a substantive due process analysis in all events does not turn upon petitioner's characterization of causation in her particular case. The question instead is one of whether the *Nevada* **[*96]** statutory scheme is rationally related to a legitimate governmental interest. The state supreme court's determination that the statutory line drawn was rationally related to legitimate governmental interests - both in traffic safety and deterring (then) illicit drug use - was not an objectively unreasonable application of clearly established federal law. Petitioner's "causal nexus" argument instead is drawn from inapposite *First Amendment* authority and seeks to hinge the constitutionality of the statutes upon her characterization of causation in her own particular case. That is a fundamentally flawed analysis that finds no support in apposite Supreme Court case law.

As with Ground 4(a), in the final analysis, *Williams* has not come forward with any apposite authority from the United States Supreme Court tending to establish that the state supreme court's rejection of her substantive due process claim was either contrary to or an unreasonable application of clearly established federal law. As discussed also regarding her equal protection claim, it is notable that a number of other state courts have rejected similar constitutional challenges to comparable *per se* drug traffic safety statutes. The fact **[*97]** that numerous state courts have ruled contrary to her position tends to cut against her claim that the *Nevada* state supreme court's similar rejection of her claim was an objectively unreasonable application of United States Supreme Court precedent.

Ground 4(b) accordingly does not provide a basis for federal habeas relief.[30]

### Ground 4(c): Overbreadth

petitioner's flawed legal argument and her flawed hypothetical beg the question of whether the state supreme court's conclusion that the statute was rationally related to a legitimate governmental interest was an unreasonable application of clearly established and controlling United States Supreme Court precedent as of August 2, 2002.

[29] *Williams* relies upon a hypothetical in support of this argument that similarly is flawed. She posits a hypothetical of a man who has residual marijuana in his system when the right front tire on his vehicle blows out "suddenly without warning" causing an accident that kills six people. *Williams* urges that the man would be subject to conviction and incarceration under NRS 384.3795(1)(f) solely because of his having marijuana in his system despite the fact that the tire suddenly blowing out was the sole cause of the accident per the hypothetical. (ECF No. 110, at 32.) *Williams* ignores the fact that the express terms of NRS 384.3795(1)(f) allow a conviction only where the defendant "does any act or neglects any duty imposed by law while driving or in actual physical control of any vehicle . . . , if the act or neglect of duty proximately causes the death of, or substantial bodily harm to, a person other than himself." The man in the hypothetical would not be culpable under the statute solely by virtue of the presence of marijuana in his system unless in addition his act or neglect of duty proximately caused death or substantial bodily harm to another. In all events, both

[30] The discussion in note 27, *supra*, regarding marijuana metabolite is substantially applicable to Ground 4(b) as well. *Williams* additionally posits that the Supreme Court of *Nevada* failed to follow a state constitutional provision and that its decision was inconsistent with prior state caselaw. (ECF No. 110, at 31 n.21.) *Williams* must demonstrate a violation of federal - not state - law in order to obtain federal habeas relief. The Supreme Court of *Nevada* further is the final arbiter of the application of *Nevada* state law to the facts of petitioner's case. If the state supreme court was not persuaded by petitioner's state law arguments that is the end of the matter insofar as federal review is concerned.

In Ground 4(c), **_Williams_** alleges that the relevant **_Nevada_** statutes are "unconstitutionally overbroad under the Federal Due Process Clause" because they allegedly fail to recognize that there are lawful uses to some parts of the marijuana plant and allegedly punish legal as well as illegal use of marijuana and its metabolites. Petitioner relies upon a statutory definition of marijuana in a different statute, _N.R.S. 453.096_, as support for her argument that **_Nevada_** law does not punish all uses of all parts of the marijuana plant. She maintains, for example, that hemp oil is excluded from the _N.R.S. 453.096_ definition of marijuana but allegedly still contains tetrahydrocannabinol (**_THC_**), the main psychoactive ingredient of marijuana. (ECF No. 110, at 33-35.)

The Supreme Court of **_Nevada_** rejected this claim on the following basis:

### 4. _Overbreadth_

**_Williams_**' [next] constitutional challenge is that **[\*98]** _NRS 484.379(3)_ fails to recognize the lawful use of the parts of the marijuana plant that are excluded from the definition of marijuana under _NRS 453.096(2)_. **_Williams_** argues that this impermissibly punishes the use of all marijuana and that since it captures legal conduct, the statute is overbroad. She also argues that marijuana is not precisely defined in _NRS 484.3795_.

"[T]he overbreadth doctrine permits the facial invalidation of laws that inhibit the exercise of _First Amendment_ rights."[FN40] An overbreadth challenge may only be made if a statute infringes upon constitutionally protected conduct.[FN41] Absent such infringement, an overbreadth challenge must fail.[FN42]

We have already determined that the statute being challenged by **_Williams_** does not affect constitutionally protected conduct. Therefore, **_Williams_**' overbreadth argument is without merit.

> [FN40] _Chicago v. Morales, 527 U.S. 41, 52, 119 S.Ct. 1849, 144 L.Ed.2d 67 (1999)_ (plurality opinion).
>
> [FN41] _Hoffman Estates v. Flipside, Hoffman Estates, 455 U.S. 489, 494, 102 S.Ct. 1186, 71 L.Ed.2d 362 (1982)._
>
> [FN42] _Id._

_Williams I, 118 Nev. at 547-48, 50 P.3d at 1123-24_.

The state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law.

The state supreme court's analysis was in full accord with governing Supreme Court precedent at the time of its August 2, 2002, decision. The Ninth Circuit summarized the governing law in this area as follows, **[\*99]** in addressing an overbreadth challenge grounded in the Free Exercise and _Establishment Clauses of the First Amendment_:

> The more fundamental problem with GMA's argument is that it assumes that overbreadth challenges can be based on any constitutional provision. However, the Supreme Court suggested in _United States v. Salerno, 481 U.S. 739, 107 S.Ct. 2095, 95 L.Ed.2d 697 (1987)_, that the "overbreadth" doctrine generally encompasses only freedom-of-speech challenges. See _id. at 745, 107 S.Ct. 2095_ ("[W]e have not recognized an 'overbreadth' doctrine outside the limited context of the _First Amendment_"); see also _Alexander v. United States, 509 U.S. 544, 555, 113 S.Ct. 2766, 125 L.Ed.2d 441 (1993)_ ("The 'overbreadth' doctrine, which is a departure from traditional rules of standing, permits a defendant to make a facial challenge to an overly broad statute restricting speech, even if he himself has engaged in speech that could be regulated under a more narrowly drawn statute" (emphasis added)); _Canatella v. California, 304 F.3d 843, 853 n. 12 (9th Cir.2002)_ (overbreadth standing pursuant to _Broadrick_ [v. _Oklahoma, 413 U.S. 601, 608, 93 S. Ct. 2908, 37 L. Ed. 2d 830 (1973)]_ "applies only to statutes that regulate speech"); _Lind v. Grimmer, 30 F.3d 1115, 1122 (9th Cir.1994)_ (suggesting overbreadth doctrine is designed to avert "a potential chilling effect on speech and lack of a proper party before the court").

> Although the Court recently suggested that overbreadth challenges can be brought in a few other settings, see _Sabri v. United States, 541 U.S. 600, 609-10, 124 S.Ct. 1941, 158 L.Ed.2d 891 (2004)_ (citing cases addressing the right to travel, the right to abortion, and legislation under section 5 of the Fourteenth Amendment), **[\*100]** the Court stated that "[o]utside these limited settings, and absent a good reason, [it does] not extend an invitation to bring overbreadth claims." _Id. at 610, 124 S.Ct. 1941_. Indeed, the Court cautioned that

"facial challenges are best when infrequent," and in particular, overbreadth challenges "are especially to be discouraged." *Id. at 609, 124 S.Ct. 1941*. We therefore reject GMA's overbreadth challenges based upon the Free Exercise and *Establishment Clauses*.

*Gospel Missions of America v. City of Los Angeles, 419 F.3d 1042, 1051 (9th Cir. 2005)*.

**Williams** does not base the overbreadth claim in Ground 4(c) upon an allegedly overly broad infringement of any constitutional right, much less the requisite infringement of freedom of speech necessary to present a viable overbreadth challenge. She instead claims an overly broad infringement of purportedly licit use of certain parts of the marijuana plant. (ECF NO. 110, at 35.) Licit use of certain parts of the marijuana plant under a state statute is not a constitutionally protected right, much less one protected by the *First Amendment* prohibition on legislation restricting freedom of speech. Petitioner's overbreadth claim thus does not even make it out of the starting gate. She has no arguable constitutional overbreadth claim. **Williams** cites no United States Supreme Court precedent supporting this claim, as there **[*101]** was no such apposite precedent supporting the claim at the time of the August 2, 2002, state supreme court decision. That court's rejection of the claim indisputably was neither contrary to nor an unreasonable application of clearly established federal law as determined by the Supreme Court.

Ground 4(c) therefore does not provide a basis for federal habeas relief.[31]

### Ground 4(d): Vagueness

In Ground 4(d), **Williams** alleges that the relevant **Nevada** statutes are void for vagueness because they allegedly do not provide fair notice of what conduct is

---

[31] Petitioner further makes multiple factual assertions in the amended petition in support of the claim that are not supported by any specific citation to the state court record. For example, she alleges that "[i]t is known that hemp oil made from [marijuana] seeds contain **THC**." (ECF No. 110, at 35.) Any relative **THC** content of processed hemp oil is not something of which the Court can take judicial notice. Particularly following *Pinholster*, a petitioner must demonstrate support in the state court record for all factual assertions relied upon in support of federal habeas relief.

The Court also notes that, outside of overbreadth doctrine,

prohibited. She maintains in this ground that there are over 400 compounds in marijuana and that the statutes are not clear as to which compounds are unlawful. She further urges that the statutes are unclear because a person may test positive for marijuana from second-hand marijuana smoke, and she uses the hypothetical example of a security guard who ingests second-hand smoke at a concert. She maintains, *inter alia*, that the statutes are unclear because **THC** and its metabolites are detectable in a user's blood for days and in her urine for weeks. She contends that a purportedly unimpaired driver will have no idea or indication **[*102]** when or if her driving will violate the statute days or weeks after ingesting marijuana. (ECF No. 110, at 36-38.)

The Supreme Court of **Nevada** rejected this claim on the following grounds:

### 3. Vagueness

**Williams** claims that the prohibited substance statute is void for vagueness because she cannot tell what part of the marijuana plant or which marijuana metabolites are prohibited or when she has reached the levels proscribed by *NRS 484.379(3)*.

A statute is void for vagueness if it fails to give a person of ordinary intelligence fair notice that her conduct is forbidden by statute. While a facial attack may be asserted as to a statute that implicates constitutionally protected conduct, a statute that does not implicate constitutionally protected conduct, as in this instance, may be void for vagueness only if it is vague in all of its applications. The Due Process Clause "'does not require impossible standards of specificity in penal statutes.'" Instead, a statute will be deemed to have given sufficient warning as to proscribed conduct when the words utilized have a well settled and ordinarily understood meaning when viewed in the

petitioner has no standing to present the challenge that she seeks to mount. Under the facts of this case, **Williams** had marijuana in her system not from hemp oil or any of the other myriad purportedly licit uses postulated in her pleadings but instead from illicit use of marijuana - per her own admission as well as per the pipe and bag of marijuana (which was not simply mature stems or sterilized seeds exempted by *N.R.S. 453.096*) recovered at the scene. *See also* note 32, *infra* (defense concession in opening statement).

In the final analysis, however, the claim simply lacks any foundation in established constitutional doctrine as determined by the United States Supreme Court.

context of the entire statute. Statutes are presumptively valid and the burden is on those attacking [*103] them to show their unconstitutionality. *Williams* thus has the burden of proving that the statute failed to provide adequate notice of the proscribed conduct.

In *Phillips*, [*supra*,] the Arizona Court of Appeals considered the argument that Arizona's per se drug statute was unconstitutionally vague. The court rejected the claim and held that the statute provided adequate warning of the proscribed conduct because none of the terms utilized in the statute defied common understanding, and interpretation of the statute was not dependent on a third party's judgment. *Phillips* held that a potential offender was therefore on notice that any driver who has ingested a prohibited drug would be subject to prosecution.[FN33] In *People v. Gassman*, the Illinois Court of Appeals rejected a vagueness challenge to the Illinois per se drug statute for similar reasons. Like the Arizona statute, the Illinois statute prohibits driving with any detectable amount of drugs in the system.

*Nevada*'s prohibited substance statute is even more explicit than the Arizona or Illinois statutes because only ten substances or metabolites are prohibited and the proscribed amount is indicated for both blood and urine levels. [*104] In addition, because the statute contains the specific amount of drug that is prohibited, there is even less need to depend on a third party's judgment.

The substance at issue in the present case is marijuana and its metabolite. Although marijuana is not defined in NRS Chapter 484, it is defined in *NRS 453.096*. A metabolite, as defined in an ordinary dictionary, means a "product of metabolism."[FN36] Considering the plain meaning of the terms, we conclude that a person of ordinary intelligence has adequate notice of the meaning of marijuana, and that marijuana metabolites are those metabolites that result from ingesting marijuana - as defined in *NRS 453.096*. We note that *Williams* appears to have clearly understood the common meaning of the term "marijuana." *Williams* acknowledged being a regular marijuana user and turned over her pipe containing marijuana residue to a police officer at the collision site. She was also found to be in possession of a plastic bag later found to contain marijuana.

*Williams*' second vagueness claim is that a person cannot tell when he or she will reach the prohibited

levels of marijuana. In *Slinkard v. State*, we considered and rejected this same argument with regard to the alcohol per se statute. [*105] We determined that a person of average intelligence could reason that consumption of a substantial quantity of alcohol could result in the proscribed level and held that this sufficed to satisfy the notice requirement. In the context of this case, the argument is even weaker because unlike alcohol - which may be legally possessed and consumed - it is unlawful to use or possess marijuana in any amount.[FN39] *Williams* was given adequate notice that she was not permitted to legally possess or use marijuana, yet she chose to do both and then drive a vehicle. Further, the statute provides adequate notice that it is unlawful to drive with clearly defined levels of marijuana or marijuana metabolite in the bloodstream.

[FN36] See Random House Webster's College Dictionary 823 (2d ed.1996).

. . . .

[FN39] *NRS 453.336* (possession of a controlled substance); *NRS 453.411* (being under the influence of a controlled substance).

*Williams I, 118 Nev. at 545-47, 50 P.3d at 1122-23* (citation footnotes 26-35 & 37-38 omitted).

The state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law.

Over and above the analysis of the constitutional claim by the state supreme court under the authorities cited therein, [*106] *Williams* does not appear to have standing to pursue most or all of the void-for-vagueness claim presented. At the relevant time, it was long-established law that, outside of the *First Amendment* context, a criminal defendant has standing to raise a vagueness challenge only if the statute is vague as applied to her specific conduct. *See, e.g., United States v. Dischner, 974 F.2d 1502, 1510 (9th Cir.1992)*, overruled on other grounds by *United States v. Morales, 108 F.3d 1031, 1035 n.1 (9th Cir.1997)* (*en banc*). Outside of the *First Amendment* context, the reviewing court need examine the vagueness challenge only under the facts of the particular case and decide whether, under a reasonable construction of the statute, the conduct in question is prohibited. *Id.* An individual who engages in conduct that clearly is proscribed cannot complain of the vagueness of the law as applied to the conduct of others under other hypothetical applications of the statute. *See*

Williams v. Gentry

*Dischner, 974 F.2d at 1510 n.5*.

In the present case, **_Williams_** presents no evidence that she ingested only certain of the allegedly 400 compounds in marijuana, and not others, to the extent that that would make a difference. Nor did she ingest marijuana solely through second-hand smoke, such as while acting as a security guard at a concert. Nor did she ingest marijuana days or weeks before the incident and then abstain **[*107]** continuously up to the time of the incident. Rather, she admitted to using marijuana as recently as approximately two hours prior to the incident, and police recovered **_Williams_**' pipe and bag of marijuana at the scene. *Williams I, 118 Nev. at 539, 50 P.3d at 1118*. **_Williams_**' own conduct therefore fell squarely within the very core of the conduct proscribed by the statute. She therefore does not have standing to challenge the statute for vagueness based upon hypothetical situations that have no relevance to her own situation - where by her own admission she had smoked marijuana approximately two hours before the incident and where she had illegal marijuana in her possession at the time.[32]

Ground 4(d) therefore does not provide a basis for federal habeas relief.

### Ground 5: Sufficiency of the Evidence and Jury Instruction

In Ground 5, **_Williams_** presents what are two factually related but nonetheless legally distinct claims. The Court will divide these distinct claims into subparts (a) and (b) of Ground 5. The Court will discuss the challenge to the sufficiency of the evidence first in order to more efficiently set forth the background to the two claims.[33]

### Ground 5(a): Sufficiency of the Evidence - Stems and Seeds

In Ground 5(a), **_Williams_** alleges **[*108]** that the evidence was insufficient to sustain a conviction under N.R.S. 484.3795(1)(f) because the State allegedly failed to prove that the marijuana and marijuana metabolite

levels in her bloodstream came from illegal rather than legal portions of the marijuana plant. She proceeds from the premise that "mature stems of the plant . . . or the sterilized seed of the plant" are excluded from the statutory definition of "marijuana" under N.R.S. 453.096, which is quoted in full, *infra*. From this premise, she urges that the **_THC_** and marijuana metabolite found in a person's blood resulting from the purported "lawful" use of marijuana - *i.e.*, allegedly, smoking stems and seeds included within a bag of marijuana - cannot be lawfully punished under N.R.S. 484.3795(1)(f). Petitioner asks the Court "to imagine a drinking fountain from which one half of the fountain is legal to drink while the other half is illegal." She maintains that "[t]he burden is on the state to show from which side of the fountain the defendant drank." (ECF No. 110, at 39-40.)

On direct appeal, **_Williams_**, as she has done here, intertwined a claim challenging the sufficiency of the evidence on this basis also with a claim of trial court error in declining to give a jury instruction **[*109]** on this argument. The two claims were bundled together under the following contention heading: "THE TRIAL COURT ERRED IN NOT ALLOWING JESSICA A JURY INSTRUCTION ON HER THEORY OF THE CASE AND THERE WAS INSUFFICIENT EVIDENCE FOR THE JURY TO CONVICT ON THE SIX (6) DRIVING UNDER THE INFLUENCE CHARGES." (ECF No. 76-11, at 5; ECF No. 76-12, at 24.)

At the end of its lengthy published opinion on direct appeal, the Supreme Court of **_Nevada_** added a concluding paragraph to summarily reject the remaining claims on the merits. The paragraph expressly referred to multiple claims in abbreviated fashion, including, in pertinent part, the following:

E. *Other claims of error*

**_Williams_** further . . . contends that the district court erred . . . in refusing a proffered jury instruction . . . . These arguments were fully briefed. We have considered them and conclude that they too lack merit.

---

[32] **_Williams_** also was convicted of use of a controlled substance, to wit, marijuana and/or ecstasy, and possession of a controlled substance, to wit, marijuana. *118 Nev. at 540, 50 P.3d at 1119*; ECF No. 76-6, at 15; ECF No. 76-7, at 14 & 16. **_Williams_**' counsel stated on the record to the jury in the defense opening statement that **_Williams_** had instructed him not to defend against these charges. ECF No. 75-3, at 16. Finally, on Ground

4(d) as well, **_Williams_** provides no citation to any state court record support, other than one piece of expert testimony at trial.

[33] With only minor variation primarily as to style, form or supporting citation, Ground 5 in the amended petition filed by appointed counsel is the same as in the original and amending petitions filed by original counsel.

*Williams I, 118 Nev. at 554, 50 P.3d at 1127*.

*Williams* did not file any rehearing petition suggesting that the state supreme court had overlooked any claim. Neither side has suggested during the subsequent federal litigation, spanning seventeen years and two federal habeas actions, that the state supreme court failed to consider all claims presented on direct appeal, **[*110]** including the challenge to the sufficiency of the evidence that *Williams* intertwined with the jury-instruction claim that the court did expressly reference.

When a state court denies relief in an order that expressly addresses some of the claims raised by a defendant but that does not expressly refer to another claim that she also raises, "a federal habeas court must presume that the [unmentioned] federal claim was adjudicated on the merits - but that presumption can in some limited circumstances be rebutted." *Johnson v. Williams, 568 U.S. 289, 292-93, 133 S. Ct. 1088, 185 L. Ed. 2d 105* & 301 (2013). This presumption, while not irrebuttable, "is a strong one that may be rebutted only in unusual circumstances." *Id., at 302*. While it is preferable, time and docket permitting, for an appellate court to list every distinct claim properly presented by an appellant, "federal courts have no authority to impose mandatory opinion-writing standards on state courts." *Id., at 300*.

In the present case, *Williams* does not refer to, much less seek to overcome, the above presumption, in her amended petition and reply that were filed several years after the above *Williams* decision. Nor does she make any argument here in the district court that this Court's review of Ground 5(a) should be *de novo* premised on **[*111]** any argument that the claim was overlooked. What appears to be most probable is that a busy state supreme court wrapping up what had been a long order simply referred to two claims that had been inartfully argued together by counsel by the shorthand reference to *Williams*' claim based upon "refusing a proffered jury instruction." The Supreme Court of *Nevada* certainly reflected an intention to also clear the "other claims of error," which had been "fully briefed," with the court briefly reflecting that it had "considered them and conclude[d]

that they too lack[ed] merit." The court referred to the very portion of *Williams*' briefing that included the insufficient-evidence claim, *i.e.*, her briefing also arguing that her proffered instruction on the same underlying factual point should have been given. The order in question otherwise was denying relief on the merits while affirming a judgment of conviction on direct review, without asserting instead any procedural bars. Particularly given that no one has suggested in the ensuing eighteen years that the state supreme court overlooked what this Court parses out separately as Ground 5(a), the Court holds that unusual circumstances are not **[*112]** presented such as would overcome the strong presumption that the Supreme Court of *Nevada* rejected the claim on the merits.[34]

When a state court rejects a claim on the merits without articulating a specific rationale, AEDPA's deferential standard of review continues to apply. *Harrington v. Richter, 562 U.S. 86, 92, 131 S. Ct. 770, 178 L. Ed. 2d 624* & 97-100 (2011). In that situation, the federal court must consider the arguments or theories that could have supported the state court's decision:

> A state court's determination that a claim lacks merit precludes federal habeas relief so long as "fairminded jurists could disagree" on the correctness of the state court's decision. *Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004)*. . . . .
>
> . . . . Under § 2254(d), a habeas court must determine what arguments or theories supported *or, as here, could have supported*, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court. . . . .
> . . . . It bears repeating that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable. . . . .
>
> If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, **[*113]** *§*

---

[34] The Court has an obligation to independently determine the correct standard of review, and the issue is nonwaivable. *E.g., Amado v. Gonzalez, 758 F.3d 1119, 1133 n.9 (9th Cir. 2014)*. However, the fact that no one involved in the case has considered a possibility that the state may have overlooked this claim until the prospect is raised now by a federal reviewing court eighteen years later (together with the other factors discussed in the text) "makes such a mistake [by the state court

in 2002] most improbable." *Williams, 568 U.S. at 306*. That is, petitioner's failure to pursue the point previously is pertinent information under the Supreme Court's *Williams* opinion when this Court exercises its obligation to independently determine the correct standard of review. *See also Harrington v. Richter, 562 U.S. 86, 100, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011)* ("Richter has *failed to show* that the California Supreme Court's decision did not involve a determination of the merits of his claim.") (emphasis added).

2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings. *Cf. Felker v. Turpin, 518 U.S. 651, 664, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996)* (discussing AEDPA's "modified res judicata rule" under *§ 2244*). It preserves authority to issue the writ in cases where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with this Court's precedents. It goes no further. *Section 2254(d)* reflects the view that habeas corpus is a "guard against extreme malfunctions in the state criminal justice systems," not a substitute for ordinary error correction through appeal. *Jackson v. Virginia, 443 U.S. 307, 332, n. 5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)* (Stevens, J., concurring in judgment). As a condition for obtaining habeas corpus from a federal court, a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.

*Richter, 562 U.S. at 101-03* (emphasis added).

In the present case, the state supreme court's summary rejection of Ground 5(a) on the merits was neither contrary to nor an objectively unreasonable application of clearly established federal law as determined by the United States Supreme Court.

On **[*114]** a challenge to the sufficiency of the evidence, the habeas petitioner faces a "considerable hurdle." *Davis v. Woodford, 333 F.3d 982, 992 (9th Cir. 2003)*. Under the standard announced in *Jackson v. Virginia, 443 U.S. 307, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979)*, the jury's verdict must stand if, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *E.g., Davis, 333 F.3d at 992*. The reviewing court, when faced with a record of historical facts that supports conflicting inferences, therefore must presume that the trier of fact resolved any such conflicts in favor of the prosecution and defer to that resolution, even if the resolution by the state court trier of fact of specific conflicts does not affirmatively appear in the record. *Id.* The *Jackson* standard is applied with reference to the substantive elements of the criminal offense as defined by state law. *E.g., Davis, 333 F.3d at 992*.

When the deferential standards of AEDPA and *Jackson* are applied together, the controlling question for decision

on federal habeas review thus becomes one of whether the state court's decision reflected an unreasonable application of the *Jackson* standard to the evidence presented at trial. *See, e.g., Juan H. v. Allen, 408 F.3d 1262, 1274-75 (9th Cir. 2005)*. Accordingly, to present a successful insufficient-evidence **[*115]** claim under *Jackson* on federal habeas review, the petitioner typically must overcome two layers of deference: deference to the jury's decision under *Jackson*, and, also, where the state court rejected the claim on the merits, to the state court's decision under AEDPA. *E.g., Kyzar v. Ryan, 780 F.3d 940, 948 (9th Cir. 2015)*.

The statute pertinent to **Williams**' claim, *N.R.S. 453.096*, which was given as a jury charge, provided - in full - as follows at the relevant time:

1. "Marihuana" means:

(a) *All parts of any plant of the genus Cannabis, whether growing or not*;

(b) The *seeds* thereof;
(c) The resin extracted from any part of the plant; and

(d) *Every compound*, manufacture, salt, derivative, mixture or preparation of the plant, *its seeds* or resin.

2. "Marihuana" does not include the *mature* stems of the plant, *fiber produced from the stems*, oil or cake made from the seeds of the plant, any other compound, manufacture, salt, derivative, mixture or preparation of the *mature* stems (except the resin extracted therefrom), fiber, oil or cake, or the *sterilized* seed of the plant *which is incapable of germination*.

*N.R.S. 453.096*, as amended through 1975 Laws, ch. 319, § 1, p. 450 (emphasis added); *see also* ECF No. 76-6, at 20 (jury instruction).

**Williams** alleges, *inter alia*, that (a) **[*116]** the portions of the plant exempted under *N.R.S. 453.096* "contain the same four hundred (400) compounds as" the parts of the plant included within the definition; and (b) she "established at trial that the bag of marijuana contained mature stems and seeds." (ECF No. 110, at 39-40.) Once again, as with multiple preceding claims, petitioner provides no supporting citation to the state court

record.[35]

It appears that the scant portions of the state court trial record that relate to this claim reflect only the following.

After the incident, officers recovered from the van that **Williams** had been driving, *inter alia*, a glass pipe and a baggie containing "a green leafy substance" that the officers believed to be marijuana. Laboratory testing confirmed that the green leafy substance was marijuana, weighing 8.45 grams, or nearly a third of an ounce. (ECF No. 75-7, at 33; ECF No. 75-8, at 7 & 12; ECF No. 75-11, at 32.)

The evidence regarding blood draws is summarized in more detail, *supra, at 19-20*. The lab results obtained for the State reflected that **Williams**' blood - as of the time of the first blood draw a little over an hour after the incident - had more than twice the amount provided for in *N.R.S. 484.379(3)* for marijuana and more than **[*117]** twelve times the amount provided for in the statute for marijuana metabolite. At the time of the third blood draw, the lab results reflected that **Williams**' blood still had more than twice the statutory amount of marijuana and over ten times the statutory amount of marijuana metabolite.

During direct examination of a defense expert, **Williams**' counsel asked the expert to describe the parts of the marijuana plant. The State objected on the basis that the court had ruled that testimony regarding parts of the plant was not admissible. The trial judge acknowledged that he had made "certain pretrial rulings" but allowed the question for background and general information. (ECF

No. 75-9, at 19.)[36]

The expert thereafter testified that the parts of the marijuana plant included, *inter alia*, stems and seeds and further that he commonly would find stems and seeds in the samples of marijuana that he analyzed. Defense counsel asked the expert to examine the bag of marijuana in evidence to determine whether there were any stems or seeds in the marijuana. On initial review, the expert testified that he saw "leaves and stems . . . quite a few stems . . . actually," but he further stated that "I **[*118]** do not see any seeds, though, in here." Counsel then himself sought to point out what he believed was a seed in the marijuana, which elicited a sustained objection. The expert then acceded that "[t]here may be one or two seeds" in the marijuana. The expert was not asked whether, and did not testify that, the stems that he observed were "mature" stems. The expert also was not asked whether, and did not testify that, the maybe "one or two seeds" were sterilized seeds incapable of germination. (ECF No. 75-19, at 19-20.)[37]

During closing argument, **Williams**' counsel - not a witness - held the bag of marijuana in front of the jury and asked them to "take a look and notice - the seeds - and, more particularly, the stems that are involved - that are in this particular marijuana." Counsel - not a witness - stated that "there are some parts that are in there that are stems." (ECF No. 76-2, at 21; ECF No. 76-3, at 4.)

Defense counsel further stated in closing argument that "Dr. Kelly, I elicited from him, that all parts of the plant

---

[35] **Williams** has had ample opportunity to demonstrate support for her claims in the state court record. Two different sets of lawyers collectively have filed three original or amending petitions and two replies over the nearly sixteen-year life of this habeas case. ECF Nos. 1, 24, 77, 110 & 127. Federal habeas pleading is not notice pleading, and a petitioner cannot leave it to the Court to go searching through an extensive trial transcript to find possible support for her multiple claims, on claim after claim.

[36] While the claims challenging the sufficiency of the evidence and the refusal to give a jury charge were exhausted on direct appeal, **Williams** did not fairly present and exhaust what would have been a wholly distinct challenge claiming constitutional error in a pretrial ruling limiting this line of inquiry in the first instance. This Court has addressed only the claims that were both exhausted in the state court and presented in the federal pleadings. The claim presented in Ground 5(a) challenging the sufficiency of the evidence is decided based on the evidence that in fact was admitted at trial, without regard to any issues as to what evidence instead should have been admitted. *Cf.*

*McDaniel v. Brown, 558 U.S. 120, 130-31, 130 S. Ct. 665, 175 L. Ed. 2d 582 (2010)*. The Court thus has no occasion to delve into why the line of inquiry was precluded and/or whether it should have been precluded. The Court further notes again that **Williams** was not restricted by this Court in the claims that she could pursue in state court during the stay of this action. (See note 20, *supra*.)

[37] The Court notes as an aside in passing that mostly seedless marijuana, called *sinsemilla* (Spanish for "without seed"), is cultivated by segregating female plants from male plants to prevent pollination, which increases potency. It thus is not at all implausible that a bag of marijuana - such as potentially the one viewed by the expert at trial - would not have included seeds or many seeds. *See, e.g., United States v. Hudson, 717 F.2d 1211, 1214 (8th Cir. 1983); State v. Smith, 51 Or.App. 777, 627 P.2d 26, 27 (1981); In re Jaffee, 319 Or. 172, 874 P.2d 1299, 1307 n.5 (1994)*. In all events, in the evidence presented at **Williams**' trial, the expert testified only that he possibly observed "one or two seeds;" and he did not testify that any such seeds were sterilized and not capable of germination.

contain *THC*, to various amounts, but every part would contain it." (ECF No. 76-2, at 122.) The Court, unaided by any record citation by petitioner, **[\*119]** was unable to find testimony by the witness stating that all parts of the marijuana plant contain *THC*. Dr. Raymond Kelly, Ph.D, a forensic toxicology expert called by the State, instead responded affirmatively on cross to two questions asking whether (a) "the [marijuana] plant contains various parts;" and (b) *THC* was "one of the components that's in the marijuana plant." (ECF No. 75-12, at 14 & 22-23.) Establishing only that the marijuana plant "contains . . . parts" and that there is *THC* "in the marijuana plant" does not establish that there is *THC* in every part of the marijuana plant. Just as a matter of basic logic, it can be true that a plant has parts and that it has *THC* without it also being necessarily true that the *THC* in the plant is in every part of the plant. The witness thus did not testify that every part of the plant contained *THC* in various amounts but only that *THC* was a component of the marijuana plant, without specifying the location or concentration of the *THC*. Dr. Kelly's testimony therefore did not establish in particular that mature stems - if any in the marijuana in evidence - and sterilized seeds - if any in that marijuana - contained *THC* in any amount, much **[\*120]** less in any amount material to the issues in the case.

Counsel argued in the defense closing that there was no way to know that the marijuana and metabolite in the blood tests came from the "criminalized" rather than the "non-criminalized" portion of the marijuana plant. (ECF No. 76-3, at 4.) The State responded to ***Williams'*** "stems and seeds" argument with the, to an extent, apt point that ***Williams*** had conceded the criminal charge of using marijuana - not non-criminal marijuana - at the relevant time, such that she could not "have it both ways." (*Id.*)

On the foregoing record, an implicit determination by the state supreme court that, viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt was not an objectively unreasonable application of *Jackson.*

With regard to seeds, the relevant ***Nevada*** statute expressly *includes* seeds within the definition of "marijuana." To the extent, if any, that there were seeds in the nearly one-third ounce of marijuana in evidence, there was no evidence in the record that any such seeds

were sterilized seeds incapable of germination. Viewing the evidence **[\*121]** in the light most favorable to the prosecution, which is what is required on *Jackson* review, a rational juror readily could have concluded on the evidence presented that any *THC* and/or marijuana metabolite measured in ***Williams'*** bloodstream that arguably was attributable specifically to seeds was from a portion of the marijuana plant that constituted "marijuana" under <u>N.R.S. 453.096</u>.[38]

Similarly, with regard to stems, the statute expressly includes "all parts" of the *Cannabis* plant with a pertinent exception only for "mature" stems. The statute further refers to the capability of producing fiber from such stems, suggesting a fair amount of substantiality. There was no evidence in the record that any stems in the nearly one-third ounce of marijuana were "mature" stems, and the exclusionary language in the statute refers only to "mature" stems as against the general rule that "all parts" of the plant are included within the definition of "marijuana." Viewing the evidence in the light most favorable to the prosecution, which again is what is required on *Jackson* review, a rational juror easily could have concluded on the evidence presented that any *THC* and/or marijuana metabolite measured in ***Williams'*** bloodstream **[\*122]** that arguably was attributable to stems was from a portion of the marijuana plant that constituted "marijuana" under <u>N.R.S. 453.096</u>.

Moreover, the jury itself could see the third of an ounce of marijuana in evidence and the relative amount of seeds, sterilized or not, and stems, mature or not, in relation to the remaining indisputably marijuana in the baggie. It was not objectively unreasonable for the Supreme Court of ***Nevada***, viewing the evidence in the light most favorable to the State and presuming that the jury resolved all conflicting inferences in favor of the State, to conclude that the jury properly could find on the evidence presented that the amount of any licit material was insubstantial in relation to the amount of indisputably marijuana in the baggie. The jury, again, had the baggie of marijuana in evidence before it.

In short, viewing the evidence in the light most favorable to the State, a rational juror easily could have concluded that the defense, both figuratively as well as essentially literally, was clutching at straws in this regard. The short shrift given this claim by the Supreme Court of ***Nevada*** is

---

[38] The Court is not suggesting that ***Williams*** had any burden at trial to establish any fact. At the end of the proverbial day, however, there was no evidence in the record before the jury of

the presence - in a baggie of illicit marijuana - of any sterilized seeds incapable of germination. The jury clearly was not precluded from finding ***Williams*** guilty merely because seeds possibly were in the marijuana in evidence.

indicative of its lack of merit. The state high court's summary rejection of **[\*123]** this claim clearly was not an objectively unreasonable application of *Jackson*.

Ground 5(a) therefore does not provide a basis for federal habeas relief.[39]

### Ground 5(b): Jury Instruction - Stems and Seeds

In Ground 5(b), **_Williams_** alleges that the state trial court erred in not allowing a jury instruction on a theory of defense based on her stems-and-seeds argument described above in Ground 5(a).

As described above, the Supreme Court of **_Nevada_** summarily rejected this claim as being without merit, in this instance specifically referring to the claim now presented in Ground 5(b). The Court reviews this summary rejection under AEDPA's deferential standard of review. (See text, *supra, at 69-72*.)

**_Williams_** contends only that she was entitled "as a matter of law to an instruction on a theory of the case," and she cites only a **_Nevada_** state case that in turn cites state authorities. Petitioner does not allege that she was denied a federal constitutional right by the denial of the

jury charge. She does not cite any apposite United States Supreme Court authority establishing a federal constitutional violation from the denial of the unspecified jury charge. (ECF No. 110, at 39-40).

Even **[\*124]** separate and apart from AEDPA, federal habeas review is not a second *de novo* direct appeal in which the federal district court rehears claims of state district court error under state law. The federal habeas petitioner instead must allege federal claims with particularity, including specifying the federal constitutional ground upon which she relies. *E.g., Mayle v. Felix, 545 U.S. 644, 655-56, 125 S. Ct. 2562, 162 L. Ed. 2d 582 (2005)*. Further, as has been noted repeatedly herein, it is the petitioner's burden on federal habeas review to demonstrate that the state supreme court's rejection of her federal constitutional claim - if one is alleged in the first instance - was either contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court. **_Williams_**' conclusory claim fails to allege the denial of a specific constitutional right, fails to allege any factual specifics in support of her claim with regard to the jury charge requested, and fails to demonstrate that the state supreme court's rejection of her claim was contrary to or an unreasonable application of clearly established

---

[39] In addressing this claim, the Court has hewed to what was contained in the state court record filed herein, which did not include very much on this issue. The Court must note in passing, however, that there is a very clear reason why statutes such as *N.R.S. 453.096* distinguish between licit and illicit parts of *Cannabis* plants. That reason would not at all help **_Williams_**' claim. The circa 1971 **_Nevada_** statute substantially tracks the definition in the circa 1937 federal statute codified at *21 U.S.C. § 802(16)*. As the Ninth Circuit has explained, this statutory definition excludes portions of the *Cannabis* plant that (a) have other licit utility, while (b) having no more than "miniscule trace amounts of **_THC_**" that are insufficient to be psychoactive and show up in drug screens. *See Hemp Industries Assoc. v. DEA, 357 F.3d 1012, 1013* & n.2, & 1018 (9th Cir. 2004) (*Hemp II*); *Hemp Industries Assoc. v. DEA, 333 F.3d 1082, 1085* & 1088-89 (9th Cir. 2003) (*Hemp I*). Thus, in truth, if **_Williams_** had established - in a record that fully explained the situation - that she had smoked also portions of the plant falling outside the definition of "marijuana" under *N.R.S. 453.096*, she would not have established that the noncriminal portions of the plant potentially contributed materially to her drug screen results. While **_THC_** perhaps may be present in some licit parts of the plant, in no more than trace amounts, it is not - at all - present in the same amounts as in the illicit parts.

**_Williams_**' analogy of a drinking fountain from which one half of the fountain is legal to drink while the other half is illegal

therefore is flawed. Even if the baggie in her case (or more precisely the pipe bowls that she actually smoked that day) had been half full of licit material with the other half being illicit "marijuana," that would not have led to half of the **_THC_** content in her blood coming from licit material. That material is licit under *N.R.S. 453.096* precisely because it has, at best, only trace amounts of **_THC_**.

It thus would appear that the trial court likely properly excluded pretrial what was a misleading and completely flawed defense. The argument could lead nowhere productive because there simply was not enough **_THC_** in any such licit portions of the plant - if any in fact were smoked in this case - to materially impact **_Williams_**' blood test results. The material was licit again precisely because of the absence of any significant amount of **_THC_**. Defense counsel was able to work the argument back into the case at trial initially via the back door of "background." **_Williams_** thereafter has been able to make something out of what in truth would be nothing only because the state court record on file is so bare on the point.

However, in all events, whether the Court hews strictly to what is in the state court record or instead also looks to the underlying reason why any licit materials were licit, Ground 5(a) clearly does not present an "extreme malfunction" in the **_Nevada_** state criminal justice system as would warrant relief under AEDPA. This is a completely meritless claim, both strictly on the record presented as well as in actual truth.

Williams v. Gentry

federal law under any United States Supreme Court precedent.

Independent review of the record reflects that *Williams* requested **[*125]** the following jury instruction, as read by defense counsel when the charges were settled:

> If the jury finds that the State has proven beyond a reasonable doubt the defendant's blood contained two or more nanograms of marijuana and/or five or more nanograms of marijuana metabolite, then it is - it's encumbent [sic] upon the jury to find beyond a reasonable doubt that the two or more nanograms of marijuana and/or five or more nanograms of marijuana metabolite came from those parts of the marijuana plant listed in N.R.S. 453.09r6 [sic], subsection (1).

(ECF No. 76-2, at 13.)

The State objected to the proposed instruction on the basis that: (a) there had been no evidence presented in the case that the marijuana in evidence and that was smoked was anything other than the illegal portion of the plant; (b) the baggie of marijuana was in evidence for the jury to see; (c) there had been no defense presented on it; and (d) the instruction thus would only confuse the jury. The trial court sustained the objection. (*Id.*)[40]

On the minimal state court record and federal court argument presented, *Williams* has not demonstrated that the state supreme court's rejection of this claim - to any extent that a federal constitutional claim even **[*126]** has been articulated even in this Court at this late juncture - was either contrary to or an objectively unreasonable application of clearly established federal law as determined by the United States Supreme Court at the time of the state court's August 2, 2002, decision. *Williams* does not cite any Supreme Court authority, much less apposite authority, that the state court decision

was contrary to or unreasonably applied.[41] Moreover, as described in the factual background *supra* in the discussion of Ground 5(a), *Williams* argued her stems-and-seeds defense to the jury and the jury instructions included the statutory definition of "marijuana" upon which she based the argument. It thus does not appear that - under whatever unalleged federal constitutional theory upon which she seeks to proceed - *Williams* sustained any actual material prejudice as a result of the trial court's refusal to give the additional jury charge.

Ground 5(b) therefore does not provide a basis for federal habeas relief.[42]

### Ground 7: Juanita McDonald Case

In Ground 7,[43] *Williams* alleges that the state trial court erred when the court ruled that the defense could not refer to another case, the *Juanita McDonald* case. *Williams* **[*127]** asserts - again without specific citation to support in the state court record - that the lab that tested *Williams*' blood tested Juanita McDonald's blood higher for marijuana metabolite than a police laboratory allegedly had.[44]

In its concluding paragraph in its August 2, 2002, order of affirmance on direct appeal, the Supreme Court of *Nevada* summarily rejected, *inter alia*, *Williams*' claim "that the district court erred by prohibiting her attorney from talking about an unrelated case," for lack of merit. *Williams I, 118 Nev. at 554, 50 P.3d at 1127*. To the extent, if any, that *Williams* states a federal constitutional claim, the Court reviews the state supreme court's summary rejection of the claim under AEDPA's deferential standard of review. (See text, *supra, at 69-72*.)

---

[40] The Court notes again that *Williams* neither exhausted in the state courts nor raised in her federal pleadings any claim challenging any pretrial ruling in limine restricting the presentation of evidence regarding parts of the marijuana plant. The only pertinent claims that were exhausted and then raised in federal court challenged the sufficiency of the evidence and the refusal to give the additional jury charge. (See note 36, *supra*.)

[41] While *Williams* cites no federal cases on this claim, at any level, the Court notes that lower federal court cases discussing a generalized due process right to a theory-of-defense instruction - particularly in cases arising before AEDPA - would not suffice. Under AEDPA, *Williams* must show that the state court's decision was contrary to or unreasonably applied an

apposite holding of the United States Supreme Court in existence on August 2, 2002. She has not even attempted to do so here.

[42] See also note 39, *supra*, regarding the underlying fundamental flaw in this theory of defense. The Court's decision, however, is based upon the record and argument presented herein.

[43] The Court dismissed Ground 6 as bare and conclusory. (ECF No. 116, at 11.)

[44] With only minor variation primarily as to style, form or supporting citation, Ground 7 in the amended petition filed by appointed counsel is the same as in the original and amending petitions filed by original counsel.

Williams v. Gentry

*Williams* alleges only that the state trial court "committed reversible error." Petitioner does not allege that she was denied a federal constitutional right. She does not cite any apposite United States Supreme Court authority establishing a federal constitutional violation. As the Court noted as to Ground 5(b), federal habeas review is not a second *de novo* direct appeal in which the federal district court rehears claims of state district court error under state law. The federal **[*128]** habeas petitioner instead must allege federal claims with particularity, including specifying the federal constitutional ground upon which she relies. *Felix, supra.* Further, as also has been noted repeatedly herein, it is the petitioner's burden on federal habeas review to demonstrate that the state supreme court's rejection of her federal constitutional claim - if one is alleged in the first instance - was either contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court at the time of the state supreme court's decision. In counseled filings, *Williams* fails to specify the federal constitutional ground upon which she relies and fails to demonstrate that the state supreme court's rejection of her claim was contrary to or an unreasonable application of clearly established federal law under any apposite Supreme Court precedent existing at the time of its decision on August 2, 2002.

Ground 7 therefore does not provide a basis for federal habeas relief.[45]

### Consideration of a Certificate of Appealability

Under *Rule 11 of the Rules Governing Section 2254 Cases*, the district court must issue or deny a certificate of appealability (COA) when it enters a final order

---

[45] In a February 20, 2007, motion to dismiss, respondents sought, *inter alia*, the dismissal of Ground 7 for failure to state a cognizable claim. (ECF No. 38, at 9; ECF No. 41, at 2.) In its order on that motion to dismiss, the Court reached only exhaustion issues as to Grounds 2 and 3; and the Court deferred consideration of the remaining issues until after *Williams* sought appropriate relief vis-à-vis the unexhausted Ground 2. (ECF No. 42, at 1 & 4-5.) Thereafter, the Court gave respondents an opportunity to file a renewed motion to dismiss pursuing the deferred issues. (ECF No. 50.) In that renewed motion, respondents, without explanation, did not again argue that Ground 7 failed to state a cognizable claim. (ECF No. 52.)

While Ground 7 does not state a cognizable claim, the Court's disposition herein instead is on the merits. Two different sets of lawyers have filed two replies for *Williams*; and, each time, they have declined to present any argument in support of Ground 7,

adverse **[*129]** to the applicant. Based on its holding on Ground 8(a), the Court is granting a conditional writ of habeas corpus subject to a possible retrial. However, the Court otherwise is denying relief on the remaining grounds. Some of the rejected grounds could have or at least conceivably could have led instead to an unconditional writ grant if they had been meritorious. The Court's final order thus is in part adverse to petitioner.

Following a limited and conditional writ grant, there are circumstances in which a petitioner will not need to obtain a COA to pursue certain grounds in the court of appeals. If respondents appeal the conditional writ grant, then petitioner as appellee would not need to cross-appeal and would not need to obtain a COA to argue any ground pursued in support of the district court's judgment, so long as petitioner does not seek greater relief under the judgment via that ground, even if the alternative ground pursued may involve an attack on the district court's reasoning. *Jennings v. Stephens, 574 U.S. 271, 276-83, 135 S. Ct. 793, 190 L. Ed. 2d 662 (2015).* Petitioner would need to timely appeal or cross-appeal and obtain a COA, however, to pursue any ground upon which she at least seeks to obtain greater relief than that granted in the district court, **[*130]** such as an unconditional writ grant vacating her convictions without a possible retrial. *See id.*

This Court cannot foretell whether either or both sides will either appeal or cross-appeal. Nor can it foretell what specific relief petitioner might seek in pursuing any rejected grounds in the Court of Appeals. *Cf. id., at 281* (a cross-appeal is required not merely where a party, if fully successful on her arguments, would certainly obtain greater relief than that provided below; a cross-appeal is required if the party's arguments are presented "*with a view* either to enlarging [her] own rights thereunder or of

deferring to what are facially inadequate allegations in the original and amending petitions. (ECF No. 77, at 6; ECF No. 127, at 2.) Counsel thus repeatedly have declined to articulate a federal constitutional basis for the claim, have failed to cite to any record support for the claim, and have failed to identify any United States Supreme Court authority supporting the claim, which is subject to deferential review under AEDPA. With no elaboration of the inadequately presented claim after nearly sixteen years and two sets of lawyers, the appropriate disposition of this claim at this point is on the merits rather than for failure to state a cognizable claim possibly with leave to amend. *Accord James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994)* (inadequate conclusory allegations do not warrant federal habeas relief). The claim further is mooted by the grant of relief on Ground 8(a), as it would not lead to greater relief - if a federal constitutional claim were presented, which it is not - than that granted on Ground 8(a), *i.e.*, a possible retrial.

lessening the rights of [her] adversary") (quoting prior authority with emphasis added in *Jennings*).

The more prudent course for this Court therefore would be to make a COA ruling as to each rejected ground, regardless of whether a COA ultimately may be required as to that ground on any appeal, without the Court seeking to project whether a COA likely will be required. That way, if the Court of Appeals determines that a COA is required in the circumstances then presented to that court on any appeal, there will be no need for a limited remand to the district court for consideration of whether **[\*131]** to issue a COA as to any ground.

To obtain a COA as to the claims rejected by the district court on the merits, under *28 U.S.C. § 2253(c)*, a petitioner must make a "substantial showing of the denial of a constitutional right." *Slack v. McDaniel, 529 U.S. 473, 483-84, 120 S. Ct. 1595, 146 L. Ed. 2d 542 (2000); Hiivala v. Wood, 195 F.3d 1098, 1104 (9th Cir. 1999)*. To satisfy this standard, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong." *Slack, 529 U.S. at 484*.

As to claims rejected instead on procedural grounds, the petitioner must show: (1) that jurists of reason would find it debatable whether the petition stated a valid claim of a denial of a constitutional right; and (2) that jurists of reason would find it debatable whether the district court was correct in its procedural ruling. *Id., at 484*. While both such showings must be made to obtain a COA, "a court may find that it can dispose of the application in a fair and prompt manner if it proceeds first to resolve the issue whose answer is more apparent from the record and arguments." *Id., at 485*. Where a plain procedural bar is properly invoked, an appeal is not warranted. *Id., at 484*.

The Court accordingly makes the following COA rulings, in serial order, to the extent that a COA ultimately is required as to the specific grounds on any appeal. **[\*132]**

A COA will be denied as to **Ground 1**, including both parts (a) and (b), as jurists of reason would not find the Court's rejection of the claim herein on the merits to be debatable or wrong. The state supreme court's decision was neither contrary to nor an objectively unreasonable application of the controlling Supreme Court authority in, *inter alia*, Arizona *v. Youngblood, 488 U.S. 51, 109 S. Ct. 333, 102 L. Ed. 2d 281(1988)*. Any alleged variance with either state court cases or lower federal court cases does not provide a basis for relief under AEDPA. (**See text, *supra, at 32-44*.**)

A COA will be denied as to the Court's earlier procedural ruling that **Ground 2** is unexhausted, as jurists of reason would not find it debatable whether the district court was correct in that procedural ruling. Petitioner further did not pursue the voluntarily dismissed ground when this action later was stayed for exhaustion, with the stay order expressly eschewing placing any limits on the claims that could be pursued during the stay. (**ECF No. 50; ECF No. 91, at 3; ECF No. 110, at 20. See text, *supra, at 45 n.20*.**)

A COA will be denied as to the Court's earlier procedural ruling that **Ground 3** does not present a federal claim cognizable on federal habeas review as opposed to a purely state law claim. Jurists **[\*133]** of reason would not find it debatable whether the district court was correct in that ruling. (**ECF No. 116, at 10.**) Moreover, the state supreme court rejected the claim presented to that court on the merits, and *Williams* cites no apposite Supreme Court authority as of that time holding that the Due Process Clause mandates that the states consider preexisting negligence by another party to be relevant to the question of whether a defendant's own conduct was a proximate cause of death or injury in determining culpability under a criminal statute. *Williams* therefore would not present a viable federal claim in any event under AEDPA. (**See text, *supra, at 45 n.20*.**)

A COA will be denied as to the Court's rejection on the merits of the four distinct constitutional claims in **Ground 4**, which the Court has subdivided into parts (a) through (d). Jurists of reason would not find the rejection of the four claims to be debatable or wrong, as the state supreme court's decision on each claim was neither contrary to nor an objectively unreasonable application of Supreme Court precedent at the time of the state court's decision. (**See text, *supra, at 45-68*.**)

A COA will be denied as to the Court's rejection on the merits of the two factually related but **[\*134]** legally distinct claims in **Ground 5**, which the Court has subdivided into parts (a) and (b). Jurists of reason would not find the rejection of the two claims to be debatable or wrong. The state supreme court's summary rejection of the two claims was neither contrary to nor an objectively unreasonable application of Supreme Court precedent. *Inter alia*, petitioner's underlying premise that the baggie of marijuana in evidence contained portions of the marijuana plant that were not illegal under state law is not supported by the minimal record on the point. (**See text, *supra, at 69-81*; see also *id., at 78 n.39*.**)

A COA will be denied as to the Court's procedural ruling

Williams v. Gentry

dismissing **Ground 6** as bare and conclusory. Jurists of reason would not find it debatable whether the district court was correct in that ruling. **(ECF No. 116, at 11.)**

A COA will be denied as to **Ground 7**, as jurists of reason would not find the Court's rejection of the claim herein on the merits to be debatable or wrong. Indeed, the ground does not even allege a federal constitutional claim. **(See text, _supra, at 81-82_.)**

On **Ground 8(a)**, on _de novo_ review, the Court has granted a conditional writ of habeas corpus, subject to a possible retrial. **(See text, _supra, at 5-26_ & 29 n.12.)** Petitioner **[*135]** has not requested greater relief in the district court on Ground 8(a) than has been provided herein. **(See ECF No. 110, at 44 & 47.)** It thus does not appear that consideration of a possible COA as to any aspect of Ground 8(a) is required.

A COA will be denied as to the due process statutory vagueness challenge in **Ground 8(b)**. Jurists of reason would not find the Court's rejection of the claim on the merits on _de novo_ review herein to be debatable or wrong. _Inter alia_, there was no contradictory vagueness in the statute as written. The true problem in the case instead is that the Supreme Court of _**Nevada**_ read clear and precise limiting language in _N.R.S. 484.1245_ out of that statute. That is a judicial expansion issue, which led to the Court granting relief on Ground 8(a). There is no vagueness, however, in the statutes as written, which instead are very clear and precise. Grounds 8(a) and 8(b) are alternative but contradictory grounds for relief. The Court's grant of relief on Ground 8(a) necessarily leads to the rejection of the contradictory Ground 8(b). **(See text, _supra, at 27-29_.)**

Finally, a COA will be denied as to the ineffective-assistance claims in **Ground 9** based on the failure of trial and appellate counsel **[*136]** to raise the claims in Ground 8. Jurists of reason would not find the Court's rejection of the claims on the merits on _de novo_ review to be debatable or wrong. The meritorious constitutional claim in Ground 8(a) had not arisen at the time of the trial and direct appeal, and the rejection of Ground 8(b) herein leads to the rejection of the remaining aspect of Ground 9. **(See text, _supra, at 31-32_.)**

IT THEREFORE IS ORDERED that the petition, as amended, is GRANTED IN PART and DENIED IN PART, with the Court granting the relief specified below on Ground 8(a) and denying any relief on any of the other claims raised herein.

IT FURTHER IS ORDERED that a writ of habeas corpus

is conditionally GRANTED and that the judgment of conviction filed on April 6, 2001, in No. 00C166483 in the Eighth Judicial District Court for the State of _**Nevada**_ hereby is VACATED IN PART, with the six convictions for driving and/or being in actual control of a vehicle with a prohibited substance in the blood resulting in death in Counts I through VI hereby being VACATED, and that petitioner Jessica _**Williams**_ shall be released from all custody and/or other restraints under said vacated convictions, including parole or other supervision, **[*137]** within thirty (30) days of the later of the conclusion of any proceedings, by any party, seeking appellate or _certiorari_ review of this Court's judgment, if affirmed in relevant part, or the expiration of the delays for seeking such appeal or review, unless the State through respondents files a written election in this matter within that thirty day period to retry petitioner and thereafter commences jury selection in the retrial within one hundred twenty (120) days following the election to retry, subject to reasonable request for modification of the time periods in the judgment by either party pursuant to Rules 59 or 60.

IT FURTHER IS ORDERED that the Clerk of Court shall enter final judgment accordingly in favor of petitioner and against respondents, conditionally granting the petition for a writ of habeas corpus as provided in the preceding two paragraphs. It is the Court's intention that the judgment so entered will be final and appealable, concluding the matter in the district court, subject to the above-referenced post-judgment motions following the conclusion of any review or the expiration of the time to seek such review.

IT FURTHER IS ORDERED that a certificate of appealability, to the **[*138]** extent that one is required, is DENIED as to all claims as to which relief has been denied, for the reasons outlined in the text, _supra, at 83-87_.

The Clerk further shall provide a copy of this order and the judgment to the Clerk of the Eighth Judicial District Court, in connection with that court's No. 00C166483.

DATED: June 18, 2020

/s/ Kent J. Dawson

KENT J. DAWSON

United States District Judge

Williams v. Gentry

**Table1 (***Return to related document text***)**

| Prohibited substance | Urine Nanograms per milliliter | Blood Nanograms per milliliter |
|---|---|---|
| (a) Amphetamine | 500 | 100 |
| (b) Cocaine | 150 | 50 |
| (c) Cocaine metabolite | 150 | 50 |
| (d) Heroin | 2,000 | 2 |
| (e) Heroin metabolite | | |
| (1) Morphine | 2,000 | 50 |
| (2) 6-monoacetyl morphine | 10 | 10 |
| (f) Lysergic acid diethylamide | 25 | 10 |
| (g) Marijuana | 10 | 2 |
| (h) Marijuana metabolite | 15 | 5 |
| (i) Methamphetamine | 500 | 100 |
| (j) Phencyclidine | 25 | 10 |

**Table1 (***Return to related document text***)**