UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
───────────────────────────────

DOUGLAS J. HORN, et al.,

                              Plaintiffs,

                              Case # 15-CV-701-FPG

v.

                              DECISION AND ORDER

MEDICAL MARIJUANA, INC., et al.,

                              Defendants.
───────────────────────────────

## INTRODUCTION

Presently before the Court are the parties' cross-motions for reconsideration of the Court's April 17, 2019 Decision and Order, which resolved the parties' motions for summary judgment.[1] For the reasons that follow, Defendants' motions for reconsideration (ECF Nos. 97, 106) are GRANTED IN PART and DENIED IN PART, and Plaintiffs' cross-motion for reconsideration (ECF No. 112) is DENIED.

## LEGAL STANDARD

Both sides cite Federal Rule of Civil Procedure 54(b) as the basis for their motions. Rule 54(b) provides:

> [A]ny order or other decision, however designated, that adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties does not end the action as to any of the claims or parties and may be revised at any time before the entry of a judgment adjudicating all the claims and all the parties' rights and liabilities.

---

[1] Plaintiffs initially filed a notice of appeal after the Court issued its Decision and Order. *See* ECF No. 92. That appeal has since been dismissed, and the Second Circuit issued its mandate on November 12, 2019. *See Horn v. Medical Marijuana, Inc.*, No. 19-1437, ECF No. 45 (dated Nov. 12, 2019); *see also Bedasie v. Mr. Z Towing, Inc.*, No. 13-CV-5453, 2017 WL 6816331, at *3 (E.D.N.Y. Dec. 21, 2017) (stating that jurisdiction returns to the district court after appeal once a mandate is issued).

1

"A district court has the inherent power to reconsider and modify its interlocutory orders prior to the entry of judgment . . . ." *United States v. LoRusso*, 695 F.2d 45, 53 (2d Cir. 1982).

A litigant seeking reconsideration must set forth "controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Richard v. Dignean*, 126 F. Supp. 3d 334, 337 (W.D.N.Y. 2015); *see also Micolo v. Fuller*, No. 6:15-CV-06374, 2017 WL 2297026, at *2 (W.D.N.Y. May 25, 2017) ("To merit reconsideration under Rule 54(b), a party must show 'an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent a manifest injustice.'").

## BACKGROUND

In their motions, both sides take issue with the Court's ruling on whether "Dixie X Dew Drops"—the product at issue—constituted a controlled substance under the federal Controlled Substances Act ("CSA"). *See* ECF No. 97-3 at 4; ECF No. 112-3 at 3. Some background may be helpful.

Dixie X is a CBD oil. "CBD is short for 'cannabidiol,' and it is one of the 'unique molecules' found in the *Cannabis sativa* plant." *Horn v. Med. Marijuana, Inc.*, 383 F. Supp. 3d 114, 119 (W.D.N.Y. 2019) (internal citation omitted). The *Cannabis sativa* plant is the plant from which marijuana and hemp are derived. *Id.* The difference between the two is that "drug-use cannabis is produced from the flowers and leaves of certain strains of the plant, while industrial-use [hemp] is typically produced from the stalks and seeds of other strains of the plant." *Id.* This leads to differences in the concentration of tetrahydrocannabinol ("THC") in each variety. THC is "the substance that gives marijuana its psychoactive properties." *Id.*

2

In 2012, the time of the relevant events, the general rule was that all parts and derivatives of the *Cannabis sativa* plant were defined as "marijuana" and prohibited under the CSA.[2] *See id.* at 123 (citing 21 U.S.C. §§ 802(16), 841(a)(1)). Despite its low THC content and lack of psychoactive effect, the industrial hemp plant and any derivatives fell within this definition because hemp "is a variety of the *Cannabis sativa* plant." *Id.*; *United States v. White Plume*, 447 F.3d 1067, 1073 (8th Cir. 2006) (noting that "the CSA does not distinguish between marijuana and hemp").

But the CSA carved out several exceptions to this general rule. Specifically, "[e]xcluded from the definition of marijuana were certain parts of the plant that are incapable of germination: (1) the mature stalks of the *Cannabis sativa* plant, (2) fiber produced from the stalks of the *Cannabis sativa* plant, (3) oil or cake made from the seeds of the *Cannabis sativa* plant, (4) any compound, manufacture, salt, derivative, mixture, or preparation of the mature stalks, fiber, oil, or cake[], and (5) the sterilized seed of the *Cannabis sativa* plant." *Horn*, 383 F. Supp. 3d at 123. Importantly, however, "resin extracted from mature hemp stalks was not excepted from the definition of marijuana." *Id.*; *see also* 21 U.S.C. § 802(16) (2012). As a result, hemp-based products could only be lawfully manufactured and sold in the United States to the extent they were derived from excepted parts of the *Cannabis sativa* plant (and thus were not considered marijuana under the CSA).

But there was another wrinkle: the CSA also separately prohibited THC, *see* 21 U.S.C. § 812(c)(17), and many hemp-based products contain "trace amounts of THC." *Hemp Indus. Ass'n v. Drug Enforcement Admin.*, 333 F.3d 1082, 1085 (9th Cir. 2003) [hereinafter "*Hemp I*"]. This

---

[2] The CSA has since been amended to legalize industrial hemp production. *See Horn*, 383 F. Supp. 3d at 124 (discussing legislative history).

3

raised a question: were products made from excepted parts of the *Cannabis sativa* plant nonetheless unlawful because they contained miniscule, non-psychoactive amounts of THC?

In a pair of cases from the early 2000s, the Ninth Circuit answered that question in the negative. *See Hemp I*, 333 F.3d at 1089-90; *Hemp Indus. Ass'n v. Drug Enforcement Admin.*, 357 F.3d 1012 (9th Cir. 2004) [hereinafter "*Hemp II*"]. First, it held that the prohibition against THC referred to synthetic, not naturally occurring, THC. *See Hemp I*, 333 F.3d at 1089-90; *Hemp II*, 357 F.3d at 1017. Second, it held that products made from excepted parts of the *Cannabis sativa* plant "were not included in the definition of marijuana—and therefore were not unlawful under the CSA—*even if* they contained trace amounts of [naturally occurring] THC." *Horn*, 383 F. Supp. 3d at 123. The Ninth Circuit reviewed the legislative history and concluded that "Congress 'knew what it was doing' when it chose to exempt certain derivatives from the definition of marijuana notwithstanding the presence of trace amounts of THC." *Id.* at 124.

Based on these conclusions, the Ninth Circuit invalidated new DEA regulations to the extent they purported to ban hemp-based products that contained trace amounts of naturally occurring THC. *See Hemp II*, 357 F.3d at 1018-19. But products containing synthetic THC or marijuana were still prohibited under the CSA. *See Horn*, 383 F. Supp. 3d at 124.

This Court relied on the above authority to conclude that, in 2012, Dixie X was a controlled substance. *See Horn*, 383 F. Supp. 3d at 124. Given the apparent absence of dispute, the Court proceeded on the assumption that Dixie X's CBD byproduct constituted a resin extracted from the mature stalk. *See id.* at 124. This led the Court to conclude that Plaintiffs had a sufficient claim under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), as a RICO claim may be predicated on the distribution and sale of a controlled substance like marijuana. *Id.* at 131-32.

## DISCUSSION

Both sides now move for reconsideration of this aspect of the Court's prior order. Defendants argue that the Court erred insofar as it assumed that Dixie X contained "resin extract derived from the *Cannabis sativa* plant" and thus constituted marijuana. ECF No. 97-1 at 5; *see also* ECF No. 106. Defendants dispute that fact and contend there is no evidence in the record to support that conclusion.

Plaintiffs, on the other hand, dispute the Court's reasoning but not its conclusion. They contend that "any product that contains any amount of THC was a Schedule I controlled substance in 2012." ECF No. 112-3 at 3.

The Court takes up Plaintiffs' argument first and rejects it. Plaintiffs assert that Dixie X was a controlled substance because it contained THC, which was a Schedule I controlled substance in 2012. *See* 21 C.F.R. § 1308.11(d)(31). They also assert that Dixie X remained a controlled substance under 21 C.F.R. § 1308.35 because it was intended for human consumption. *See* 21 C.F.R. § 1308.35(a) (exempting certain cannabis-based products from the CSA so long as they are not intended for human consumption).

The problem with Plaintiffs' argument is that it runs headlong into the *Hemp* cases, where the Ninth Circuit invalidated the very regulations on which Plaintiffs rely. *See Hemp II*, 357 F.3d at 1019 (permanently enjoining enforcement of the regulations). The court stated in no uncertain terms that those regulations "may not be enforced with respect to THC that is found within the parts of *Cannabis* plants that are excluded from the CSA's definition of 'marijuana' or that is not synthetic." *Id.* at 1018. Accordingly, the mere presence of naturally occurring THC in a product does not render it a controlled substance so long as it is derived from an excepted part of the

5

*Cannabis sativa* plant. *See id.* at 1018-19. Therefore, the Court denies Plaintiffs' motion for reconsideration.

Defendants' argument is persuasive, however. Defendants clarify that they dispute that Dixie X contains a resin extracted from a mature hemp stalk. They submit the affidavit of Stuart Titus, CEO of Medical Marijuana, Inc., who avers that the CBD extract was not produced from the resin of any mature stalks. ECF No. 97-2 at 2.

Despite having an opportunity to do so, Plaintiffs do not proffer any evidence to show that Dixie X contains synthetic THC or is derived from a non-excepted part of the *Cannabis sativa* plant. Instead, Plaintiffs proffer supplemental affidavits of Kenneth D. Graham, their toxicology expert, who merely reiterates his opinions about the legality of hemp-based products. *See* ECF Nos. 112-1, 120. Those affidavits fail to create a genuine issue of material fact. *See SLSJ, LLC v. Kleban*, 277 F. Supp. 3d 258, 268 (D. Conn. 2017) ("As a general rule an expert's testimony on issues of law is inadmissible.").

Accordingly, because Plaintiffs have not presented any evidence to show that Dixie X contains either synthetic THC or natural THC derived from marijuana—as the CSA defines that term—Plaintiffs cannot prove their RICO claim to the extent it is premised on the allegation that Dixie X is a controlled substance. *See Horn*, 383 F. Supp. 3d at 131-32 (discussing RICO standards).

Nevertheless, the Court disagrees with Defendants that the RICO claim should be dismissed. Plaintiffs premise their RICO claim not only on Defendants' alleged distribution of a controlled substance, but also on Defendants' alleged mail and wire fraud.[3] *See* ECF No. 1 at 10-

---

[3] Initially, Plaintiffs also alleged that Defendants violated 18 U.S.C. § 1957, but they did not present that theory in their summary judgment materials. *Compare* ECF No. 1 at 11, *with* ECF No. 60-25, *and* ECF No. 69-26. Accordingly, that theory has been abandoned. *See Camarda v. Selover*, 673 F. App'x 26, 30 (2d Cir. 2016) (summary order).

6

11; ECF No. 2 at 4. Because the Court concluded that the RICO claim survived summary judgment on the controlled-substance theory, it previously declined to address whether "Defendants also engaged in other predicate acts of racketeering, including mail and wire fraud." *Horn*, 383 F. Supp. 3d at 132 n.11. The Court must now address those issues.[4]

Plaintiffs bring their RICO claim under 18 U.S.C. § 1962(c), which "makes it unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." *Ferri v. Berkowitz*, 678 F. Supp. 2d 66, 72-73 (E.D.N.Y. 2009) (internal quotation marks omitted). "To establish a civil RICO claim . . . a plaintiff must allege (1) conduct, (2) of an enterprise, (3) through a pattern (4) of racketeering activity, as well as injury to business or property as a result of the RICO violation." *Flexborrow LLC v. TD Auto Fin. LLC*, 255 F. Supp. 3d 406, 414 (E.D.N.Y. 2017) (internal quotation marks omitted).

"The pattern of racketeering activity must consist of two or more predicate acts of racketeering," *id.*, which must be "related" and must "pose a threat of continued criminal activity." *DeFalco v. Bernas*, 244 F.3d 286, 320 (2d Cir. 2001). Mail and wire fraud constitute racketeering activity. 18 U.S.C. § 1961(1)(B). "The mail and wire fraud statutes prohibit the use of those means of communication in furtherance of 'any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises.'" *Ideal Steel Supply Corp. v. Anza*, 373 F.3d 251, 256 (2d Cir. 2004), *rev'd in part and vacated in part on other grounds by Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006). False advertising can constitute mail or wire fraud. *See, e.g.*, *4 K & D Corp. v. Concierge Auctions, LLC*, 2 F. Supp. 3d

---

[4] The Court confines its analysis to those arguments that the parties raised in their summary-judgment and reconsideration briefing.

525, 539 (S.D.N.Y. 2014) (allegedly false marketing materials could constitute predicate racketeering activities based on mail and wire fraud statutes); *Diamonds Plus, Inc. v. Kolber*, 960 F.2d 765 (8th Cir. 1992) (predicate acts of mail and wire fraud existed for civil RICO claim, where defendant falsely advertised his ability to provide commercial financing to prospective customers); *United States v. Andreadis*, 366 F.2d 423 (2d Cir. 1966) (affirming mail and wire fraud convictions of defendant who fraudulently marketed "miracle weight-reducing drug").

The threat of continued criminal activity can be "closed-ended" or "open-ended." *Reich v. Lopez*, 858 F.3d 55, 60 (2d Cir. 2017). "Criminal activity that occurred over a long period of time in the past has closed-ended continuity, regardless of whether it may extend into the future. As such, closed-ended continuity is 'primarily a temporal concept,' and it requires that the predicate crimes extend 'over a substantial period of time.'" *Id.* (internal citations omitted). "[T]his Circuit generally requires that the crimes extend over at least two years." *Id.*

Open-ended continuity requires "criminal activity that by its nature projects into the future with a threat of repetition." *Id.* (internal quotation marks omitted). "Some crimes may by their very nature include a future threat, such as in a protection racket." *Id.* "When the business of an enterprise is primarily unlawful, the continuity of the enterprise itself projects criminal activity into the future. And similarly, criminal activity is continuous when the predicate acts were the regular way of operating that business, even if the business itself is primarily lawful." *Id.* (internal quotation marks and citations omitted).

For substantially the same reasons that Douglas Horn's fraudulent inducement claim survived summary judgment, the Court concludes that Douglas Horn may proceed with his RICO claim based on predicate acts of mail and wire fraud. *See Horn*, 383 F. Supp. 3d at 128-31. There is evidence that Defendants advertised in at least three different media—on their website, in

8

YouTube videos, and via their customer service representatives—that Dixie X did not contain THC. *See id.* at 129-30. There is evidence that these statements were false; "indeed, Defendants' own testing revealed that the product contained detectible amounts of THC." *Id.* at 129. Because Defendants tested Dixie X and found that it contained THC, yet advertised to the contrary, there is a basis to conclude that these statements were not mere misstatements or puffery, but part of a scheme to defraud. Furthermore, as the Court previously reasoned, Defendants had a motive to defraud consumers: "[a] jury could reasonably conclude that, to sell their products, Defendants needed to distinguish Dixie X from its unlawful counterparts; misrepresenting the THC content in the product would go a long way to dispelling consumers' concerns, as it did in Plaintiffs' case." *Id.* at 130.

In addition, these predicate acts are related and meet the test for open-ended continuity. Although the racketeering activity occurred during a circumscribed timeframe in 2012, there is sufficient evidence to conclude that Defendants' alleged acts of mail and wire fraud were "the regular way of operating [the] business" even though the business itself was "primarily lawful." *Reich*, 858 F.3d at 60. This is not a case where a defendant's scheme targets a particular victim, sets a specific goal, or is otherwise "inherently terminable." *Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.*, 187 F.3d 229, 244 (2d Cir. 1999); *see also Howard v. America Online Inc.*, 208 F.3d 741, 750 (9th Cir. 2000) (no threat of continuing criminal activity where misleading advertising stemmed from "one-time change in pricing policy"). Rather, Defendants falsely advertised Dixie X through a variety of media, targeting consumers nationally. Their claim that that Dixie X contained no THC was not one-off promotional puffery; it was a fundamental selling point of the product. In other words, Defendants' false pitch about Dixie X could reasonably be viewed as their regular way of advertising, promoting, and selling the product, and there was no

9

"obvious ending point" to that scheme. *Alkhatib v. N.Y. Motor Grp. LLC*, No. CV-13-2337, 2015 WL 3507340, at *21 (E.D.N.Y. June 3, 2015). The fact that Defendants later updated their website to reflect Dixie X's THC content does not undermine this conclusion. This is because "[w]hether predicate acts pose a threat of future conduct is evaluated as of the time the acts are committed." *Id.* at *20.

Accordingly, Defendants are not entitled to summary judgment on Douglas Horn's RICO claim.[5] But for the same reasons set forth in the prior order, Douglas Horn is also not entitled to summary judgment on the RICO claim, and Defendants are entitled to summary judgment on Cindy Harp-Horn's RICO claim. *See Horn*, 383 F. Supp. 3d at 133.

## CONCLUSION

For the reasons discussed above, Defendants' motions for reconsideration (ECF Nos. 97, 106) are GRANTED IN PART and DENIED IN PART, and Plaintiffs' cross-motion for reconsideration (ECF No. 112) is DENIED. The Court's prior order is modified insofar as Douglas Horn may now proceed with his RICO claim only to the extent it is premised on predicate acts of wire and mail fraud. He may not proceed with his claim on the theory that Dixie X is a controlled substance. By separate order, the Court will schedule a status conference to hear from the parties on the progress of this action.

IT IS SO ORDERED.

Dated: November 21, 2019
      Rochester, New York

_____
HON. FRANK P. GERACI, JR.
Chief Judge
United States District Court

---

[5] As the Court previously noted, Defendants are not precluded from raising issues of authentication and hearsay in their pretrial motions. *See Horn*, 383 F. Supp. 3d at 131. To the extent Defendants prevail on their arguments, the Court may revisit whether the RICO claim may proceed to trial. *Id.*

10