# EXHIBIT A



# ECONOMIC LOSS ANALYSIS

## OF

## ALLEGED LOSSES OF DOUGLAS & CINDY HORN

**SUBMITTED TO:**
**MURA & STORM, PLLC**
**September 29, 2017**

**Charles S. Amodio, CPA, CFF, MAFF, MBA, Partner**
**Direct Phone: 518.288.2142**
**Email: camodio@fazcpas.com**

PRIVILEGED COMMUNICATION
NOT TO BE DUPLICATED WITHOUT EXPRESS CONSENT OF MURA & STORM, PLLC

18 Division Street, Suite 413 • Saratoga Springs, NY 12866
5 Penn Plaza, 19th Floor • New York, NY 10001
Telephone: 518.288.2160 • Toll Free: 877-234-3303 • Facsimile: 888.456.2049
www.fazcpas.com

**ECONOMIC LOSS ANALYSIS OF ALLEGED LOSSES OF DOUGLAS & CINDY HORN**

**CERTIFICATION**

I certify that I have no financial interest or claims contingent upon the disposition of this case, in connection with which I have prepared an analysis and report. The analysis is based exclusively upon the available data and the application of generally accepted economic and statistical methods. The reported analyses, opinions, and conclusions are limited only by the assumptions and limiting conditions, and they contain my unbiased professional analyses, opinions, and conclusions.

Charles S. Amodio, CPA, CFF, MAFF, MBA
Partner
Ferraro Amodio & Zarecki CPAs

**LIMITING CONDITIONS**

My opinions were formed based upon our investigation, research, information obtained and documents examined as of this date. I may conduct additional research if new information is made available to me. As a result, my opinions set forth herein are subject to modification. I reserve the right to modify the opinions and conclusions expressed in this report based upon further investigation conducted after the date of this report. I may prepare additional exhibits to be used in support of my opinions.

PRIVILEGED COMMUNICATION
NOT TO BE DUPLICATED WITHOUT EXPRESS CONSENT OF MURA & STORM, PLLC

*1*



Ferraro
Amodio
&Zarecki CPAs
Forensic Accountants & Financial Advisors

18 DIVISION STREET, SUITE 413 • SARATOGA SPRINGS, NY 12866
5 PENN PLAZA, 19TH FLOOR • NEW YORK, NY 10001
www.fazcpas.com

# ECONOMIC LOSS ANALYSIS OF ALLEGED LOSSES OF DOUGLAS & CINDY HORN

## BACKGROUND

Douglas and Cindy Horn were employed by Enterprise Products Company ("Enterprise") for several years. Mr. Horn was terminated during October 2012 as a result of a dirty drug test. We understand shortly thereafter, Mrs. Horn voluntarily resigned from the company. As a result, they are making a claim for an economic loss.

## ASSUMPTIONS

Mr. Horn was terminated on October 17, 2012, and his last day of work was October 16, 2012. We understand Mrs. Horn voluntarily resigned from Enterprise during January 2013 and her last work day at Enterprise was November 16, 2012.

<u>Worklife and Life Expectancy</u> – At the time of his termination, Mr. Horn was just shy of 47.5 years of age. As of September 1, 2017, he had a work-life expectancy of 11.63 years to an age of 64. The reference of work-life expectancy is the Markov study.

<u>Baseline Earnings</u> – Mr. Horn's wages were $69,125 during 2011. Using a 2.2% growth rate, the average daily wages are $193.55 during 2012. Mr. & Mrs. Horn were involved in an accident during February 2012 and were both unable to work for approximately three months. Mr. Horn worked approximately 287 days in 2012 and the projected wages are based on the daily rate for the 287 days.

<u>Wage Inflation</u> – The annual inflation in earnings is 2.20%. The reference is the Bureau of Labor Statistics (bls.gov) website.

<u>Fringe Benefits</u> – There are two fringe benefits to be considered in this analysis:

a) <u>Employer Pension Contributions</u> – It has been asserted that Enterprise Products Company was contributing 2% of the Horns' wages to their 401K plans. We have not verified this percentage nor this benefit. Furthermore, the benefit is only realized when an employee makes a contribution during a given year. Per EBT testimony of Mrs. Horn, during a ten year period, the Horns did not make contributions in more than half of those years.

b) <u>Health Benefits</u> – It is our understanding Mr. Horn had health insurance benefits as an employee of Enterprise. The health insurance coverage has been valued at $1,800 per month and the Horns were contributing $2,028 annually towards the cost of coverage. Since Mr. Horn was terminated and Mrs. Horn was still employed by the company, Mrs. Horn would have received health insurance benefits. Also, per EBT testimony of Mr. Horn, he has been receiving health benefits with ICX. He started with ICX during November 2015.

PRIVILEGED COMMUNICATION
NOT TO BE DUPLICATED WITHOUT EXPRESS CONSENT OF MURA & STORM, PLLC



Ferraro
Amodio
& Zarecki CPAs
Forensic Accountants & Financial Advisors

18 Division Street, Suite 413 • Saratoga Springs, NY 12866
5 Penn Plaza, 19th Floor • New York, NY 10001
www.fazcpas.com

**ECONOMIC LOSS ANALYSIS OF ALLEGED LOSSES OF DOUGLAS & CINDY HORN**

Retirement Distributions – Mr. Horn liquidated his IRA during 2013 for $74,136. Mrs. Horn liquidated her 401K during 2014 for $83,203.

## CONCLUSIONS

Douglas Horn Wages

Mr. Horn's employability after his dirty drug test was impaired, however, Mr. Horn was involved in a trucking accident which also made him less attractive to potential future employers. The February 2012 driving accident[1] is a part of Mr. Horn's driver history as a DOT reportable accident. It was determined that the accident was preventable, which would have also impacted Mr. Horn's viability as a candidate for new driving positions after Enterprise. Further, his post-Enterprise work history includes working for several different companies during 2013, 2014 and 2015. At the end of 2013 Mr. Horn began driving for KL Harring transporting high security freight. Per EBT testimony, he worked at KL Harring for six months and voluntarily quit due to a "disagreement on home time." Mr. Horn did not have another job lined up before he quit and was out of work for three months before finding another position. Thus, Mr. Horn's dirty drug test cannot be considered to be the sole reason he had trouble obtaining a new position with a similar compensation package as Enterprise. The conclusion of plaintiffs' expert that all of Mr. Horn's wage losses were solely caused by the dirty drug test is not supportable. In addition, under assumption #3, the plaintiff's economist assumes the Horns would have received a 6.25% premium above their actual 2016 wages. There is no documentation to support this assumption.

Cindy Horn Wages

Per EBT testimony of Cindy Horn, the Horns were planning to begin working in early 2013 for Enterprise's crude oil transportation division based in Lake Charles, Louisiana, and both Doug and Cindy would have had their own trucks. Thus, Mrs. Horn was, in fact, planning to drive her own truck solo for Enterprise in 2013. We understand Mrs. Horn was still offered an employment opportunity within Enterprise after Mr. Horn's termination.[2] It is my understanding from the EBT testimony the compensation package for the new opportunity within Enterprise was potentially greater than her existing compensation package. A plaintiff is expected to mitigate losses by making reasonable efforts to offset losses when possible. Since Mrs. Horn voluntarily resigned and rejected an offer for another position with a greater compensation potential, she failed to mitigate the loss. Thus, I am of the opinion Mrs. Horn does not have a loss of earnings. Any reduction in income for Mrs. Horn is based on her decision to resign from Enterprise[3].

---

[1] Per the Enterprise Personnel File Letter dated March 22, 2012 to Douglas Horn, it was determined by the Enterprise Director of Safety, Nolan Everett, that the "DOT Reportable" accident was "Preventable."
[2] Per Personnel Action Request dated November 16, 2012, Mrs. Horn was transferred from Avenel to Lake Charles.
[3] See Exhibit A

PRIVILEGED COMMUNICATION
NOT TO BE DUPLICATED WITHOUT EXPRESS CONSENT OF MURA & STORM, PLLC



Ferraro
Amodio
& Zarecki cpas
Forensic Accountants & Financial Advisors

18 Division Street, Suite 413 • Saratoga Springs, NY 12866
5 Penn Plaza, 19th Floor • New York, NY 10001
www.farcpas.com

**ECONOMIC LOSS ANALYSIS OF ALLEGED LOSSES OF DOUGLAS & CINDY HORN**

<u>Health Benefits</u>
Plaintiffs' economist's calculation assumes the Horns have suffered a compensable loss of health benefits since the time they stopped working for Enterprise. However, Mrs. Horn's voluntary resignation from Enterprise caused them to lose that benefit.

<u>Employer Pension Contributions</u>
Per the plaintiffs' economist's assumption #7, Enterprise was contributing 2% of the Horns' wages into their 401K plan. As referenced above, the benefit is only received when an employee makes a contribution. Since the Horn's did not make contributions in more than half the years during a ten-year period, the benefit is arbitrary and the assumption is inappropriate. Any calculations for Mrs. Horn are improper since she voluntarily quit her position with Enterprise. Thus, she voluntarily gave up the right to receive the fringe benefit from Enterprise.

<u>Retirement Distributions</u>
The plaintiff's economist calculated lost earnings from the early withdrawal of Mr. Horn's IRA. The projected loss is based on an interest rate obtained from the Wall Street Journal website. The plaintiffs' economist failed to account for the usage of the funds to pay expenses and debts. Furthermore, we have not been provided with bank account information to determine if, in fact, Mr. Horn had access to other funds to avoid liquidation of his retirement savings. In addition, the calculations by the plaintiffs' economist are speculative and assume positive returns each year. With respect to Mrs. Horn, she voluntarily resigned from the company, thus, there is no basis for asserting a loss of income from the early withdrawal of her 401K.

**SUMMARY**

In summary, I am of the opinion the economic loss to Douglas Horn is **$121,263**. Mr. Horn began working for ICX during November 2015 and his 2016 wages[4] were comparable to the projected wages. Thus, the economic loss is limited to wage losses from October 16, 2012 through 2015 (See Table 1). There are no economic losses for health benefits since Mrs. Horn's voluntary resignation from Enterprise caused the Horns to lose that benefit. There are no economic losses for employer contributions since the benefit to the Horns was ambiguous based on their inconsistent participation in the 401K plan. Lastly, there are no economic losses for early retirement distributions based on the Horns' ability to use the funds to pay expenses and debts.

I further opine that Cindy Horn has no economic loss since Mrs. Horn voluntarily resigned and rejected an offer for another position and failed to mitigate the loss. Any reduction in income or benefits for Mrs. Horn is based on her decision to resign from Enterprise.

---

[4] See Exhibit B

Ferraro Amodio & Zarecki CPAs
Forensic Accountants & Financial Advisors
10 Division Street, Suite 413 • Saratoga Springs, NY 12866
5 Penn Plaza, 19th Floor • New York, NY 10001
www.faxcpas.com

## ECONOMIC LOSS ANALYSIS OF ALLEGED LOSSES OF DOUGLAS & CINDY HORN

| Table 1 - Douglas J. Horn | | | | |
|---|---|---|---|---|
| Year | Age | Projected Wages | Actual Wages | Reduction in Income |
| 2011 | 48 | | 69,125 | |
| 2012 | 49 | 55,549 | 44,625 | $ 10,924 |
| 2013 | 50 | 72,200 | 14,671 | 57,529 |
| 2014 | 51 | 73,788 | 31,738 | 42,050 |
| 2015 | 52 | 75,412 | 64,652 | 10,760 |
| 2016 | 53 | 77,071 | 78,098 | - |
| | | | **TOTAL** | $ 121,263 |

## EXHIBITS

Exhibit A – Cindy Horn EBT Testimony and Enterprise Employee File
Exhibit B – 2016 Wages for Douglas Horn

## SUMMARY OF INFORMATION CONSIDERED

Documents Reviewed

- The EBT (Examination Before Trial) of Douglas J. Horn on May 8, 2017 and May 9, 2017;
- The EBT of Cindy Harp-Horn dated May 9, 2017;
- The 2011, 2012, 2013, 2014, 2015, and 2016 personal income tax returns of Douglas J. Horn and Cindy Harp-Horn;
- 2013 Form 1065 for Horn Transport, LLC;
- The Plaintiff's computation of plaintiff's lost earnings;
- The expert disclosure and report of economist, Mark P. Zaporowski, Ph.D;
- The Enterprise employee file of Douglas J. Horn;
- The 2004 through 2012 W-2's of Douglas J. Horn from Enterprise;
- The 2004 through 2012 earnings and deductions detail register from Enterprise for Douglas J. Horn;
- The Enterprise employee file of Cindy Harp-Horn;

PRIVILEGED COMMUNICATION
NOT TO BE DUPLICATED WITHOUT EXPRESS CONSENT OF MURA & STORM, PLLC
5



Ferraro
Amodio
& Zarecki CPAs
Forensic Accountants & Financial Advisors

18 DIVISION STREET, SUITE 413 • SARATOGA SPRINGS, NY 12866
5 PENN PLAZA, 19TH FLOOR • NEW YORK, NY 10001
www.fazcpas.com

**ECONOMIC LOSS ANALYSIS OF ALLEGED LOSSES OF DOUGLAS & CINDY HORN**

- The 2004 through 2012 W-2's of Cindy Harp-Horn from Enterprise;
- The 2004 through 2012 earnings and deductions detail register from Enterprise for Cindy Harp-Horn;
- The Enterprise 401 (k) plan retirement savings statement for Douglas J. Horn from January 1, 2003 through November 2, 2012;
- The Enterprise 401 (k) plan retirement savings statement for Douglas J. Horn from January 1, 2008 through November 2, 2012;
- The Enterprise 401 (k) plan retirement savings statement for Cindy Harp-Horn from January 1, 2003 through May 27, 2014; and
- The Enterprise 401 (k) plan retirement savings statement for Cindy Harp-Horn from January 1, 2008 through April 30, 2014.

PRIVILEGED COMMUNICATION
NOT TO BE DUPLICATED WITHOUT EXPRESS CONSENT OF MURA & STORM, PLLC



Ferraro Amodio & Zarecki CPAs
Forensic Accountants & Financial Advisors

18 DIVISION STREET, SUITE 413 • SARATOGA SPRINGS, NY 12866
5 PENN PLAZA, 19TH FLOOR • NEW YORK, NY 10001
www.fazcpas.com

# EXHIBIT B



29 September 2017

To: Hanoch Sheps Exq.
.......Messner Reeves LLP

From: Cindy S. Orser, PhD

*RE: Douglas J. Horn and Cindy Harp-Horn v. Medical Marijuana, Dixie Elixirs & Edibles, Red Rice Holdings, LLC and Dixie Botanicals*

I have reviewed the following documents as provided:

1. CannLabs Certificate of Analysis: 10.12.Dixie X 500mg Dew Drop (02475533xA9B4D).png
2. CannLabs Certificate of Analysis: 10.16.12.500mg Dew Drop CBD0803MIXE2 (1) (02475534.xA9B4D).pdf
3. CannLabs Certificate of Analysis: 10.16.12CBD1011RD-500mg (02475535xA9B4D).pdf
4. CannLabs Certificate of Analysis: 10.16.12.DD 500 mg CBD0803MIXE2 (02475536xA9B4D).pdf
5. Laboratory report #281201415 from EMSL Analytical Laboratory dated Nov 5, 2012
6. Clinical Reference Lab materials (02343464xA9B4D).pdf
7. Complaint and Jury Demand—Douglas Horn v. Medical Marijuana Inc., Dixie Elixir & Edibles, Red Dice Holdings, LLC, and Dixie Botanicals.
8. Douglas Horn Deposition Transcripts dated 5-9-17 and 5-8-17
7. Written report by expert witness Kenneth Graham, PhD, RPh dated August 29, 2012
8. Photo of Bottle – Plaintiff's Supplemental Disclosure
9. Plaintiff's Expert Disclosure

**Background**

The conflict between federal and state laws on the medical and recreational use of cannabis products, the lack of consistency among state laws, and the availability of cannabis and CBD products in dispensaries and online has caused significant confusion for researchers, regulators, patients and consumers, particularly with regard to CBD products. It is important to remember

1

that the events under review in this case happened in 2012, five years ago, under 2012 regulations.

In 2012 under the Controlled Substance Act, it was federally legal to import industrial hemp stalks as they typically contain less than the federal guideline limit for THC in imported industrial hemp, which is 0.3%. It is widely known that those *Cannabis sativa* L. strains being grown for medical marijuana (MMJ) use at the time typically contained 10 to 20% THC. It is also relevant to recognize that cannabis testing was a new testing market in 2012 and there were very few cannabis analytical testing labs with validated testing procedures in place and only in MMJ complicit states. Neither New York or New Jersey fell into that category in 2012.

**Brief Sequence of Events**

1. Mr. Horn, who had suffered personal injury in a vehicular accident on Feb 24, 2012, made the decision to purchase a high CBD product produced by Dixie Elixir & Edibles and to start using it on or around October 1, 2012 for pain relief. We do not know how much of the product Mr. Horn actually ingested.

2. Dixie Elixirs & Edibles in 2012 imported industrial hemp from outside the US using an FDA import license and extracted the CBD from the plant stalks and made their formulation in Colorado. This Dixie X product line, 500 mg CBD Elixir was commercially launched on September 5, 2012.

3. Mr. Horn's employment required random drug testing. On October 9, 2012, he was randomly selected to supply a urine sample for drug testing. Subsequently on Oct 11, 2012, he learned that he had failed the drug test for a THC metabolite (we are not instructed as to which one) testing at 29 ng/ml with the limit being 15 ng/ml. THC is rapidly metabolized by humans to the equally psychoactive 11- hydroxy-THC (11-OH-THC), and then to the inactive 11-nor-9-carboxy-THC (THC-COOH) metabolite, the normal excreted form.

4. Following being terminated from his job, Mr. Horn purchased an over-the-counter drug test kit and following the kit instructions, collected a urine sample and mailed it to the testing laboratory for analysis. The result was positive for a marijuana metabolite according to Dr. Graham's expert report, but again we do not know which one.

5. Mr. Horn ordered more of the CBD product from Dixie Elixirs & Edibles with the intention to have it tested in New York. The product received was not the identical product which he had taken. The formula was the 100 mg CBD and not the 500 mg CBD Elixir.

6. The 100 mg product was submitted to an EMSL Analytical Laboratory in New Jersey for analysis. The laboratory purportedly identified THC in the product at a concentration of 170 µg/g or 170 ppm but did not report a value for CBD or any other substance in the exemplar product. The 100 mg exemplar product was then purportedly destroyed, providing no

2

possibility for any other laboratory to test the product to confirm the findings of the EMSL laboratory.

**Review of Testing DATA**

Within this series of events we have two sources of product testing data to review:  1) the Certificates of Analysis from CannLabs in Denver, Colorado of the Dixie Elixirs & Edibles' 500 mg product; and the Certificate of Analysis of the 100 mg product by EMSL Analytical Laboratory in New Jersey.

*Dixie Elixirs & Edibles Products -*
CannLabs was an analytical cannabis testing laboratory licensed by the City of Denver and the State of Colorado.  CannLabs provided certificates of analysis for three separate representative Dixie Elixirs & Edibles products in the timeframe of October 2012 including one with the same name as purchased by the Plaintiff; *i.e.* 500 mg CBD Dew Drops:

#1      In CannLabs report identified as 10.16.12.500mg Dew Drop CBD0803MIXE2 (1) (02475534xA9B4D).pdf, the total THC is reported to be **0.05%** for product Dixie X Hemp CBD 500mg Dew Drop.

#2      In CannLabs report identified as 10.16.12.CBD1011RD-500mg (02475535xA9B4D).pdf, the total THC is reported to be **0.04%** for product CBD1011R&D-500mg.

#3      In CannLabs report identified as 10.16.12.DD 500 mg CBD0803MIXE2m (02475536xA9B4D).pdf, the total THC is reported to be **0.04%** for product CBD0803MIXE2.

All three of the Dixie Elixirs & Edibles products had an order of magnitude less than the state and federal limit of 0.3% THC; in fact, the same Dixie X Hemp 500 mg Dew Drop contained just 0.05% THC.

No testing results were provided by CannLabs for the Dixie X Hemp 100 mg Dew Drop product.

*EMSL Analytical Testing Laboratory –*
EMSL Analytical has dozens of accredited analytical testing labs throughout the U.S. focusing on industrial hygiene, environmental and food testing using validated protocols (see Appendix A for full list of tests offered).  The EMSL lab report originated from the Corporate office in Cinnaminson NJ.  It does not appear that the EMSL Analytical Laboratory network has any accreditation to test cannabis, and therefore no accredited validated procedures.

The EMSL Lab test results was on a different product, the Dixie X Hemp 100 mg Dew Drop, and not the 500 mg product as consumed by the Plaintiff and as tested by CannLabs in Denver. EMSL reported a THC content of 170 µg/g or 0.017% THC which is again an order of magnitude below the federal threshold for a hemp stalk derived product.  It is curious that the report did

3

not also report a CBD value for the product since that was the main active ingredient and would have provided a critical comparative value.

No testing results were provided by the EMSL Lab or by the Plaintiff for the Dixie X Hemp 500 mg Dew Drop product that he actually consumed. In Dr. Graham's report, he extrapolates from the THC content in the 100 mg product to arrive at the THC content in the 500 mg product by multiplying 0.017% x 5 = 0.085% which requires making the assumption that the 100 mg was a simple 5-fold dilution of the 500 mg; but since we were not informed as to the volume of the sample, we do not know if this is appropriate or not. Nonetheless, if we take Dr. Graham's value at 0.085%, this is again far below the state and federal threshold for THC at 0.3%.

### Urine Drug Test:

Many variables can affect how long THC and its metabolite THC-COOH remain in your system. An edible goes through your gut and then your liver and then makes its way to the kidneys via the blood. Cannabinoid detection times in urine depend upon pharmacological factors (e.g., drug dose, route of administration, duration and frequency of use and individual rates of absorption, metabolism and excretion), and methodological issues including analytes evaluated, matrix, type of hydrolysis, cut-off or threshold used, and sensitivity of the method. The primary psychoactive constituent of cannabis, $\Delta 9$-tetrahydrocannabinol (THC), is rapidly absorbed during smoking, and due to its high lipophilicity is widely distributed to adipose tissue, liver, lung, and spleen. Body stores of THC increase with increasing frequency and chronicity of cannabis use. THC-COOH has an elimination **half-life** (time it takes to exit the body) of about **4 days on average**. THC is rapidly metabolized to the equally psychoactive 11- hydroxy-THC (11-OH-THC), and to the inactive 11-nor-9-carboxy-THC (THCCOOH) metabolite and its glucuronide and sulfate conjugates.[1] In other words, the actual form of THC that is measured and reported on any report is relevant and in particular if it is found in urine.

Studies involving humans indicate that 80%-90% of the total dose of delta-9-THC (THC) is excreted within 5 days--approximately 20% in urine and 65% in feces[2]

### Expert Summary Findings:

Both myself and Dr. Kenneth Graham are PhDs. Neither of us are MDs or Attorneys. I am an experienced diagnostic, laboratory scientist with most recent direct experience working with cannabis as the Laboratory Director and Chief Science Officer for a cannabis testing laboratory in Las Vegas, NV. All issues associated with this case that deal with legality, regulations,

---

[1] Huestis, MA.; Smith, ML. Human cannabinoid pharmacokinetics and interpretation of cannabinoid concentrations in biological fluids and tissues. In: Elsohly, M., editor. Marijuana and the Cannabinoids. New York: Humana Press; 2005. p. 205-235.

[2] Hunt AC, Jones RT (1980) Tolerance and disposition of THC in man. Pharm Exp Ther 215:135-44.

4

reconciliation of 2012 and 2017 regulations and legal precedent should be left to the Attorneys and the court. Here I will provide my concluding comments on the matters related to the science and analytical lab testing.

1) Without any analytical laboratory test results to review as to what was contained in the actual Dixie Elixir product that was used by Mr. Horn, no one can opine with any degree of scientific confidence that it was the Dixie product used by Mr. Horn that caused him to fail his random DOT urine test of October 9, 2012.

2) CannLabs test results report both a CBD value as well as a THC value which is important as reference for the product, since the main ingredient was CBD. The test results from the EMSL Analytical Lab only reported a THC value which makes comparison to the Colorado lab findings incongruous.

3) There is considerable uncertainty with regards to whether or not the Plaintiffs maintained proper chain-of-custody over the Dixie X Hemp 100 mg Dew Drops product that was tested by the EMSL Lab back in 2012. Even more uncertainty exists for the untampered state of the remaining Dixie X Hemp 500 mg Dew Drop product.

4) Looking at the EMSL website (https://www.emsl.com/Default.aspx) for the accredited analytical testing lab in New Jersey where the testing was done, there is no listing for cannabinoid analysis, no method is referenced. Accurate cannabinoid analysis would require having the proper certified reference standards in hand to compare with a previously generated calibration curve using those same reference standards.

5) Because we do not know the amount of Dixie X Hemp 500 mg Dew Drop product Mr. Horn allegedly consumed prior to submitting to a urine drug test, it is impractical to calculate with any degree of scientific certainty a range of expected contaminating THC metabolite in his urine sample based on either the analytical lab testing results reported by CannLabs in Colorado or by the EMSL Lab in New Jersey. Ideally, the remainder of the actual product in question, ie. Dixie X Hemp 500 mg Dew Drops, should have been timely tested by a certified cannabis testing lab for both CBD and THC content.

6) Even though Dr. Graham intimates that Mr. Horn could have experienced the conversion of CBD to THC in his stomach, there is no evidence that occurred. Despite Dr. Graham's reference to two publications where a synthetic stomach pH environment was created and molecular rearrangements were noted from CBD to THC, there is *no* evidence from a living, biological system that CBD is chemically transformed to THC in the stomach at any appreciable level and therefore should not be included in any calculations of potential THC metabolites being excreted.

7) The Plaintiffs should have been aware that the labeling on the Dixie X Hemp 500 mg Dew Drop product was not definitive of product content. There was NO certificate of analysis included, only the statement, "this product contains CBD and other cannabinoids." The primary

5

responsibility in a largely unregulated industry in 2012 rests on the buyer/consumer.  The
Plaintiffs appeared to be aware of the potential risk of THC contamination and the impact of
failing a urine test failure for THC given their line of employment.  The Plaintiffs should have
had the product tested prior to ingesting knowing their livelihood was at risk.

**APPENDIX A.**

# EMSL Lab Details

| | |
|---|---|
| **Laboratory** | Corporate - Cinnaminson, NJ |
| **Address** | 200 Route 130 North, Cinnaminson, NJ, 08077 |
| **Phone** | 1-800-220-3675, Fax: (856) 786-5974 |

Click here for map/directions (courtesy Google Maps)



Cinnaminson Laboratory (Corporate Lab) - Laboratory Hours: Monday- Friday 8AM – Midnight, Saturday 8AM - 6PM, Sunday On-Call



| Services carried out by this Laboratory ( click the Name for details ) | Lab Hours |
|---|---|
| Asbestos Lab Services | Chain of Custody Form |
| Consumer Products Testing | Chain of Custody Form |
| DNA and PCR Testing Laboratory | Chain of Custody Form |
| Environmental Chemistry Lab Services | Chain of Custody Form |
| Food and Beverage Testing | Chain of Custody Form |
| Home Owner Services | Chain of Custody Form |
| Indoor Air Quality (IAQ) Lab Services | Chain of Custody Form |
| Industrial Hygiene (IH) Lab Services | Chain of Custody Form |
| Lead and Metals Lab Services | Chain of Custody Form |
| Legionella Testing Lab Services | Chain of Custody Form |
| Materials Testing Lab | Chain of Custody Form |
| Microbiology Laboratory | Chain of Custody Form |
| Radiological Testing | Chain of Custody Form |

| List of Qualifications ( click the Certificate for details ) | Certificate # | Expires |
|---|---|---|
| AIHA-LAP, LLC ELLAP | 100194 | 09/01/2018 |
| AIHA-LAP, LLC EMLAP | 100194 | 09/01/2018 |
| AIHA-LAP, LLC IHLAP | 100194 | 09/01/2018 |
| AIHA ELPAT Participant - Paint Chips, Soil, Dust Wipes, Air | 100194 | |
| AIHA EMPAT Participant - Bacteria and Fungi | 100194 | |
| AIHA IHPAT Participant - Asbestos, Metals, Silica, Organics, 3M Diffusive Sampler, Formaldehyde and Beryillium | 100194 | |
| A2LA Bulk Asbestos and Lead - Cinnaminson | 2845.01 | 05/31/2019 |
| A2LA Chemistry (Food Chemistry/Materials Science) - Cinnaminson | 2845.15 | 05/31/2019 |
| A2LA Food Micro - Cinnaminson | 2845.14 | 05/31/2019 |
| A2LA Material Science/Mechanical - Cinnaminson | 2845.16 | 05/31/2019 |
| NVLAP - Air and Bulk | 101048-0 | 06/30/2018 |
| API - 2011 Food PT certificate | Certificate | |
| NSF Material Program (Brake Pads) - SAE J2975:2011 | CO192670-AL004 | 02/28/2018 |
| IRSST Recognition - PLM and TEM | See list | |
| National Radon Proficiency Program | NRPP ID 109000 AL | 01/31/2019 |
| National Radon Safety Board - Radon | NRSB-ARL6006 | 07/30/2019 |
| National Radon Safety Board - Radon Measurement Specialist | NRSB 15SS037 | 07/30/2019 |
| National Radon Safety Board - Radon Measurement Specialist | NRSB 17SS064 | 07/30/2019 |
| CDC Elite - Legionella Certificate of Proficiency | Certificate | 10/27/2017 |

7

| | | |
|---|---|---|
| FDA - Drug Firm Registration | 3003933331 | 12/31/2017 |
| US Dept of Justice - DEA certificate | RE0419716 | 08/31/2018 |
| US Dept of Justice - Explosives License/Permit | 8-NJ-005-33-0F-00326 | 06/01/2020 |
| CPSC - Cinnaminson - Metals, Lead, Phthalates | Letter - ID #1140 | |
| EPA - UCMR - Inorganic anions (Chlorate) | Approval letter | |
| USDA - Soil Permit | P330-17-00019 | 01/27/2020 |
| Maine - Analyst Individual Certification List | See list | |
| Vermont - Analyst Individual Certification List (Cinnaminson) | See list | |
| NC - Microbiology and Inorganic Chemistry | 34700 | 07/31/2017 |
| AL - Cryptosporidium and Giardia | 41260 | 06/30/2018 |
| AL - Asbestos and Lead in Drinking Water | 41260 | 06/30/2018 |
| AL - Radon | NRSB-ARL6006 | 07/30/2019 |
| AK - Radon | NRSB-ARL6006 | 07/30/2019 |
| AZ - PLM and TEM | Letter - AZ0955 | 06/30/2018 |
| AZ - Radon | NRSB-ARL6006 | 07/30/2019 |
| AR- Radon | NRSB-ARL6006 | 07/30/2019 |
| CA - Asbestos, Lead and Chemistry for Metals in Drinking Water, Bulk Asbestos, Cryptospordium and Giardia | 1877 | 06/30/2018 |
| CA - Radon | NRSB-ARL6006 | 07/30/2019 |
| NJ - Office of Attorney General - CDS | CDS #CA00030200 | 03/31/2018 |
| CO - PCM, PLM and TEM | AL - 15133 | 01/30/2018 |
| CO - Asbestos in Drinking Water | Letter | 05/31/2018 |
| CO - Lead in Drinking Water | Letter | 05/31/2018 |
| CO - Radon | NRSB-ARL6006 | 07/30/2019 |
| CT - Asbestos, Lead, Micro, Env. Chemistry, Radiochemicals and Cryptosporidium | PH-0270 | 06/30/2018 |
| CT - Radon | NRSB-ARL6006 | 07/30/2019 |
| DE - Asbestos, Chemistry, Radon, Micro, Cryptosporidium and Giardia in Drinking Water | Letter | 06/30/2018 |
| NY - ELAP - Legionella | 10872 | 04/01/2018 |
| FL - Asbestos, Lead, Chemistry, Microbiology, Cryptosporidium and Giardia | E87975 | 06/30/2018 |
| FL - Radon | RB2034 | 07/22/2018 |
| FL - Radon Measurement Specialist | R2451 | 06/22/2018 |
| GA - Asbestos, Lead, Micro and Cryptosporidium-Giardia | 972 | 06/30/2018 |
| GA - Radon | NRSB-ARL6006 | 07/30/2019 |
| HI - Bulk Asbestos | L-01-032 | 07/10/2018 |
| HI - Asbestos in Drinking Water 100.2 | Letter | 06/30/2018 |
| HI - Radon | NRSB-ARL6006 | 07/30/2019 |
| ID - Asbestos in Drinking Water | NJ00337 | 06/30/2018 |
| ID - Radon | NRSB-ARL6006 | 07/30/2019 |
| IL - Cryptosporidium | 1703036 | 06/30/2018 |
| IL - Radon | RNL2008202 | 09/30/2019 |
| IN - Lead, Chemistry and Asbestos in Drinking Water | C-NJ-04 | 06/30/2018 |
| IN - Radon Lab Tester License | RTL00760 | 12/31/2017 |
| IA - Radon Measurement license | L00032 | 03/01/2018 |
| KS - Radon | KS-LB-0005 | 09/30/2019 |
| KS - Radon Measurement Technician | KS-MS-0338 | 09/30/2019 |
| KY - Radon | NRSB-ARL6006 | 07/30/2019 |

8

| | | |
|---|---|---|
| LA - Asbestos in Drinking Water | LA170022 | 12/31/2017 |
| LA - Chemistry, Asbestos in Air, Non-potable Water and Solid Hazardous Waste, Fungi Direct and Cultures | 04127 | 06/30/2018 |
| LA - Radon | NRSB-ARL6006 | 07/30/2019 |
| ME - Asbestos, Radiochemistry, Env. Lead, E. coli, Crypto and Giardia in DW | 2016030 | 08/16/2018 |
| ME - Radon | SPC202 | 09/30/2017 |
| ME - Air Asbestos Analysis | LA-0038 | 10/31/2018 |
| ME - Bulk Asbestos Analysis | LB-0039 | 10/31/2018 |
| MD - Asbestos, Chemistry and Radiochemistry in Drinking Water | 331 | 06/30/2018 |
| MD - Radon | NRSB-ARL6006 | 07/30/2019 |
| MA - PCM, PLM and TEM | AA000056 | 09/28/2018 |
| MA - Asbestos, Lead and Radiochemistry in Drinking Water | M-NJ337 | 06/30/2018 |
| MA - Cryptosporidium | See letter | 06/30/2018 |
| MA - Radon | NRSB-ARL6006 | 07/30/2019 |
| MI - Asbestos, Micro and Cryptosporidium in Drinking Water | 9970 | 06/30/2018 |
| MI - Radon | NRSB-ARL6006 | 07/30/2019 |
| MN - Radon | NRSB-ARL6006 | 07/30/2019 |
| MS - Asbestos in Drinking Water | Letter | 06/30/2018 |
| MS - Radon | NRSB-ARL6006 | 07/30/2019 |
| MO - Radon | NRSB-ARL6006 | 07/30/2019 |
| MT - Asbestos and Chemistry in Drinking Water | CERT0016 | 01/01/2018 |
| MT - Radon | NRSB-ARL6006 | 07/30/2019 |
| NE - Micro and Asbestos in Drinking Water | NE-OS-19-08 | 06/30/2018 |
| NE - Radon Measurement Specialist | 342 | 03/31/2019 |
| NE - Radon Measurement License | RMB-1083 | 03/31/2019 |
| NV - Asbestos in DW and Bulk Asbestos (PLM) | NJ003372018-1 | 07/31/2018 |
| NV - Radon | NRSB-ARL6006 | 07/30/2019 |
| NH - Asbestos and Radiochemistry in Drinking Water | 2988 | 10/22/2017 |
| NH - Radon | NRSB-ARL6006 | 07/30/2019 |
| NJ - NELAP - Asbestos, Chemistry, Gravimetric, TO-15, Microbiology, Radon, Cryptosporidium and Giardia | 03036 | 06/30/2018 |
| NM - Radon | NRSB-ARL6006 | 07/30/2019 |
| NY - ELAP - Asbestos, Metals, TCLP, Lead, Chemistry, PCB, Radon, Total Coliform, TO-15, TO-17 and TO-10A | 10872 | 04/01/2018 |
| NJ - Radon Measurement License | MEB92525 | 04/24/2018 |
| NJ - DWLD OSC - Permit to Store Explosives | 12510 | 03/31/2018 |
| NC - Asbestos in Drinking Water and Cryptosporidium | 34700 | 07/31/2018 |
| NC - Radon | NRSB-ARL6006 | 07/30/2019 |
| ND - Radon | NRSB-ARL6006 | 07/30/2019 |
| ND - TCLP, Metals and Pesticides | R-208 | 06/30/2018 |
| OH - Cryptosporidium | Letter | 06/30/2018 |
| OH - Lead in Paint Chips, Wipes, Soil and Air | E10002 | 06/02/2018 |
| OH - Radon | RL39 | 07/11/2019 |
| OH - Ohio VAP - Asbestos and VOC/TO-15 | CL105 | 04/19/2018 |
| OK - Radon | NRSB-ARL6006 | 07/30/2019 |
| OR - Radon | NRSB-ARL6006 | 07/30/2019 |
| PA - Radon | 2573 | 03/13/2019 |
| PA - Radon Analyst Certification | 3111 | 09/29/2019 |
| PA - Asbestos, Chemistry, Radon, Micro and Cryptosporidium | 014-001 | 11/30/2017 |
| PA - Philadelphia - PCM, PLM and TEM | ALL-137 | 04/30/2018 |

| | | |
|---|---|---|
| NJ - Radioactive Materials License | RAD150001 - 535776 | 08/31/2020 |
| RI - PCM, PLM and TEM | AAL-075 | 04/30/2018 |
| RI - Asbestos, Chemistry and Radiochemistry in DW | LAO00318 | 12/30/2017 |
| SC - Asbestos in Drinking Water | 94017001 | 06/30/2018 |
| SC - Cryptosporidium | 94017002 | 06/30/2018 |
| SC - Radon | NRSB-ARL6006 | 07/30/2019 |
| SD - Asbestos in Drinking Water | Letter | 06/30/2018 |
| SD - Radon | NRSB-ARL6006 | 07/30/2019 |
| TN - Asbestos in Drinking Water | TN02856 | 06/30/2018 |
| TN - Radon | NRSB-ARL6006 | 07/30/2019 |
| TX - Asbestos, Lead, Chemistry and Micro in Drinking Water | T104704177-17-13 | 08/31/2018 |
| TX - PCM, PLM and TEM | 300161 | 11/02/2017 |
| TX - Mold | LAB1002 | 01/08/2018 |
| TX - Radon | NRSB-ARL6006 | 07/30/2019 |
| UT - Radon | NRSB-ARL6006 | 07/30/2019 |
| VT - PCM, PLM and TEM | AL818603 | 07/29/2018 |
| VT - Asbestos, Metals, Radon in Drinking Water | VT-04006 | 10/03/2018 |
| VT - Lead | LL379642 | 07/26/2018 |
| VA - PCM, PLM and TEM | 3333 000075 | 02/28/2018 |
| VA - Radon | NRSB-ARL6006 | 07/30/2019 |
| VA - NELAC - Asbestos, Lead, Cryptosporidium, Organics, Metals and Inorganics | 460184 | 09/14/2018 |
| WA - Asbestos (PCM, PLM and TEM), Lead, Chemistry, Methamphetamine and PCB in Drinking and Waste Water. | C922 | 07/14/2018 |
| WA - Radon | NRSB-ARL6006 | 07/30/2019 |
| WV - Air and Bulk Asbestos | LT000571 | 07/31/2018 |
| WV - Cryptosporidium | 9967 M | 12/31/2017 |
| WV - Radon | RL000197 | 09/30/2018 |
| WI - Radon | NRSB-ARL6006 | 07/30/2019 |
| WY - Radon | NRSB-ARL6006 | 07/30/2019 |
| WI - Cinnaminson | 121065 | 04/30/2018 |

https://www.emsl.com/Default.aspx

# EXHIBIT C

# UNITED STATES DISTRICT COURT

| WESTERN | DISTRICT OF | NEW YORK |
|---------|-------------|----------|

| | |
|---|---|
| DOUGLAS J. HORN<br><br>V.<br><br>MEDICAL MARIJUANA, INC., ET AL. | **EXHIBIT AND WITNESS LIST**<br><br>Case Number: 15-CV-701 FPG |

| PRESIDING JUDGE<br>Hon. Frank P. Geraci, Jr. | PLAINTIFF'S ATTORNEY<br>Jeffrey Benjamin, Esq. | DEFENDANT'S ATTORNEY<br>Roy A. Mura, Esq. & Jean-Claude Maz |
|---|---|---|
| TRIAL DATE (S) | COURT REPORTER | COURTROOM DEPUTY |

| PLF.<br>NO. | DEF.<br>NO. | DATE<br>OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS* AND WITNESSES |
|---|---|---|---|---|---|
| | 400 | | | | Enterprise Employment Application |
| | 401 | | | | Enterprise Position Description |
| | 402 | | | | Enterprise Illegal & Unauthorized Items Notice |
| | 403 | | | | Enterprise Acknowledgment of Receipt of Driver Safety Rules |
| | 404 | | | | Enterprise Acknowledgment of Receipt of Orientation Manual |
| | 405 | | | | Enterprise Training Delivered |
| | 406 | | | | Enterprise Acknowledgement of Receipt of Disciplinary Policy |
| | 407 | | | | Enterprise and DOT Drug and Alcohol Policy Summary |
| | 408 | | | | Enterprise Personnel Action Request |
| | 409 | | | | Enterprise Personnel Action Request |
| | 410 | | | | Enterprise Drug and Alcohol Plan |
| | 411 | | | | Cindy Horn Social Media Post |
| | 412 | | | | High Times Magazine Cover |
| | 413 | | | | High Times Magazine |
| | 414 | | | | Verizon Wireless Records |
| | 415 | | | | Invoice and Packing Slip |
| | 416 | | | | Discover Card Statement |
| | 417 | | | | Photographs of Bottle |
| | 418 | | | | Metox Laboratories Report |
| | 419 | | | | 2011 Income Tax Returns and Forms |
| | 420 | | | | 2012 Income Tax Returns and Forms |
| | 421 | | | | 2013 Income Tax Returns and Forms |

\* Include a notation as to the location of any exhibit not held with the case file or not available because of size.

✎ AO 187A (Rev. 7/87)    **EXHIBIT AND WITNESS LIST – CONTINUATION**

| | | | | | |
|---|---|---|---|---|---|
| Douglas J. Horn | | | vs. | Medical Marijuana, Inc. et al. | CASE NO. 15-CV-701 FPG |

| PLF. NO. | DEF. NO. | DATE OFFERED | MARKED | ADMITTED | DESCRIPTION OF EXHIBITS AND WITNESSES |
|---|---|---|---|---|---|
| | 422 | | | | 2013 Income Tax Returns and Forms |
| | 423 | | | | 2014 Income Tax Returns and Forms |
| | 424 | | | | 2015 Income Tax Returns and Forms |
| | 425 | | | | 2016 Income Tax Returns and Forms |
| | 426 | | | | Enterprise 401(k) Plan Statement |
| | 427 | | | | Email |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |