UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

DOUGLAS J. HORN and CINDY HARP-HORN,

             Plaintiffs,

-vs -

MEDICAL MARIJUANA, INC., DIXIE ELIXIRS
AND EDIBLES, RED DICE HOLDINGS, LLC, and
DIXIE BOTANICALS,

             Defendants.

---

Case No. 15-cv-701-FPG/MJR

**DECLARATION OF
JEFFREY BENJAMIN, Esq.**

      JEFFREY BENJAMIN, ESQ., declares the following, pursuant to 28 USC § 1746, under penalty of perjury:

    1.    I am the attorney at law licensed to practice in the State of New York and this Western District of New York and represent the plaintiff in the above-captioned matter.

    2.    I submit this Declaration in support of plaintiffs' motion for a court order directing the video transmission of three (3) party officer witnesses' live testimony at the upcoming July 26, 2021 trial of this matter pursuant to FRCP Rule 43 and/or Rule 45.

    3.    The instant motion was determined necessary at the Final Pre-Trial Conference in this matter held on June 29, 2021 due to absence of these critical fact witnesses from the Defendants' Exhibit Lists, and defense counsels' refusal to accept service of Plaintiff's subpoenas on behalf of each of these party officer witnesses.

    4.    Plaintiff has attempted service of Trial Subpoenas on all three requested witnesses, subject to the Order of this Court. To the date of this motion, only Michelle Sides in California has been served personally.  Attempts of service upon Tripp Keber and Chuck Smith in Denver,

1

Colorado is ongoing but has not yet been effected despite diligent efforts.

5. In addition to the attempts at personal service up to now, we also overnight mailed the Subpoenas with checks to the witnesses.

6. Attached respectively hereto as **Exhibits A, B and C** are the three subject Subpoenas. Each of these were accompanied with appearance and travel fees to a local office to each of them. Additionally, these witnesses were disclosed to the Court and defense counsel in Plaintiff's witness list.

7. FRCP 45(c)(1) provides that "[a] subpoena may command a person to attend trial, hearing, or deposition only as follows: (A) within 100 miles of where the person resides, is employed, or regularly transacts business; or (B) within the state where the person resides, is employed, or regularly transacts business in person, if the person (i) is a party or a party's officer; or (ii) is commanded to attend a trial that would not incur substantial expense."

8. All of above identified party officer witnesses who have been subpoenaed for this trial commencing July 26, 2021, reside within the respective states where they have been subpoenaed.

9. Upon information and belief, Mr. Keber and Mr. Smith reside and do business in Denver, Colorado which is within 1 mile of the office location set forth on the Subpoenas. Ms. Sides resides and does business within 5 miles of the office to which she was subpoenaed.

10. Upon information and belief, each of the subpoenaed witnesses are high-level party officers of the corporate defendants. They are key fact witnesses in this case due to their prior testimony. Indeed, two of them (Smith and Sides) have previously given sworn testimony in this case in connection with the Defendants' successful motions for summary judgment. The substance of their respective testimony will elicit essential information bearing upon the Plaintiff's case.

11.     The proof that plaintiff endeavors to elicit from these witnesses at trial is related, at least in part, to their prior sworn testimony and prior public statements and representations as to the product at issue.  A brief summary is as follows.

**<u>Tripp Keber</u>**

12.     Upon information and belief, Tripp Keber, then-current CEO of Dixie and officer of both Medical Marijuana Inc. and Red Dice Holdings, provided video and audio interviews on a radio show on or about August 8 and 23, 2012, respectively, promoting the value, history and launch of the subject product, and made specific representations related to its THC content. These were the particular videos that the Plaintiff and Mrs. Horn testified they navigated to, viewed, listened to, and upon which they relied before purchasing the product. Below are screen shots.



3

13. The YouTube recording of the interview can be viewed at the following website:

https://www.youtube.com/watch?v=Urlwtw_xQ48.

14. Excerpts of Mr. Keber's statements, relevant to the present motion, include the following representations:

- "The product is high yield in CBD, but contains no THC, so they can be distributed just like hemp ice cream and clothing." From 37 minutes, 50 seconds to 37 minutes, 58 seconds;

- "Again, I want to make a clear distinction between that these Dixie X products have no THC." From 38 minutes, six seconds to 38 minutes, 12 seconds;

- "This is all natural. The products are all natural." From 40 minutes, 13 seconds to 40 minutes, 17 seconds

- "Medical Marijuana, Inc., which is the parent company, if you will, which I am an officer and Board Member of." From 47 minutes, 28 seconds to 47 minutes, 34 seconds.

15. In another radio interview on August 23, 2012 with "The Marijuana Report" radio show, Mr. Keber makes several identical representations. Below is a screen shot.



15. The YouTube recording of the interview can be viewed at the following website:

https://www.youtube.com/watch?v=yDjIGXS58ds

16. Mr. Keber's interview begins at 50 seconds into the recording and ends at 1 hour, 1 minute, and 22 seconds.

17. Some of Mr. Keber's additional statements, again relevant to the present motion, include the following:

- He is the managing Director of Dixie Elixirs and Edibles. From 56 seconds to 60 seconds.

- "In June of this past year, we launched a new line of hemp wellness products under the Dixie brand called "Dixie X" and this is what **I would describe as a revolutionary line of products in that they**

5

> **contain no THC**. They are focusing on the cannabidiol that is derived from industrial hemp." [Emphasis added]. From 1 minute, 29 seconds to 1 minute, 51 seconds.

- **"We are able to ship this product across state lines because, again, it is not a medical marijuana or infused product it is a hemp wellness product."** From 2 minutes, 9 seconds to 2 minutes, 15 seconds. [Emphasis added].

- *Host*: "How does [the Dixie X product] differ from the existing product line that you are distributing across Colorado that, obviously, has THC infused into it?

   *Keber*: **"Well, the primary difference is that these Dixie X products contain no THC.** [Emphasis added]. From 2 minutes, 31 seconds to 2 minutes, 42 seconds.

- "So, that is the neat thing, this product [Dixie X] is really **perceived as a dietary supplement and/or a nutraceutical product**. From 4 minutes, 24 seconds to 4 minutes, 33 seconds. [Emphasis added].

- "On September 5 [2012], [Dixie Elixirs] will be launching our national direct consumer platform through a new website, www.dixiex.com. We will have an e-commerce platform established in which consumers can come direct to us and the various products that we'll be about to offer them. Additionally, we'll have third-party distribution outlets, ideally, in all 50 states, that will allow individuals to go to local

6

distribution facilities and gain access to this very important product."

From 5 minutes, 26 seconds to 6 minutes, 9 seconds.

- *Host:* "What type of patient would be using Dixie X? Is this for someone who might be suffering from arthritis? What type of patient do you expect? Who is your end user, I guess.  Keber: "Cannabidiol, specifically derived from hemp, offers incredible benefits. The list is too long to reference."

   *Keber:* "CBD or cannabidiol, again derived from medical hemp, have incredible healing powers, you know. **I would expect that a product like [Dixie X] you want to see on the shelf next to your holistic products and natural type products for people to be able to get their hands one.  And as we learn more and more about, you know, the positive effects that this [Dixie X] has and steering people away from, you know, harsh pharmaceuticals, it seems like a nice fit for somebody's that's look for other options."** From 7 minutes, 35 seconds to 8 minutes, 10 seconds. [Emphasis added]

18.　At the final pretrial conference of this case held on June 29, 2021, Defendants' counsel advised the Court they intended to object to the introduction into evidence of Mr. Keber's videos on every level.  On this basis, Mr. Keber's testimony at trial as to those statements has been rendered a necessity.

19.　Mr. Keber was not deposed during lay discovery in this matter. When I re-entered the case in June, 2017, Plaintiff moved the Court for a short extension of time for lay discovery that was denied by Judge Geraci. As such, there is no deposition transcript to read into the Court

7

record at trial as to the videos and radio interviews, thus necessitating the present motion to order video transmission of Mr. Keber's trial testimony.

### Chuck Smith

20. Party officer witness Chuck Smith, Defendant Dixie Elixirs LLC's Chief Operating Officer, provided a sworn declaration for the Defendant—after the close of discovery—which was attached to Defendants' motion for summary judgment and is attached hereto as **Exhibit D.**

21. In his declaration, Mr. Smith avers, in pertinent part, as follows:

- He is the Chief Operating Officer for the Defendant Dixie Elixirs, LLC. ¶ 1.

- During and prior to October 2012, RDH was engaged in the sale of finished legal hemp and cannabis-based products. ¶4.

- Dixie's involvement with the product at issue in this action, the Dixie X CBD Dew Drops 500 mg Tincture (Dixie X"), was to facilitate the sale of the finished product. ¶ 5.

- Prior to being made available for public consumption, Dixie X was regularly tested to ensure compliance with state and federal laws and regulations.¶ 6.

- At no time was Dixie X ever made available for sale or consumption without meeting those legal standards. ¶7.

- Testing of Dixie X was done at various stages of production to ensure compliance with state and federal laws, including monitoring and measuring levels of tetrahydrocannabinol ("THC") and Cannabidiol

("CBD") Examples of copies of the certificates of testing performed by a laboratory commissioned to perform such testing, CannLabs, [which are listed on Plaintiff's Exhibit List as Exhibit #9]. The CannLabs certificates merely confirmed the THC and CBD levels we believed the products already contained. ¶ 8.

22. Like Mr. Keber, Mr. Smith also was not deposed during discovery in this matter, and his sworn statements were only made part of the record at the time of the motions for summary judgment. The above sworn testimony in addition to other related testimony is critical to Plaintiff's case and necessitated the present motion to order video transmission of Mr. Smith's trial testimony.

### Michelle L. Slides, Esq.

23. Ms. Sides, Defendant Red Dice Holdings, LLC's Chief Operating Officer, provided a sworn declaration for the Defendant—also after the close of discovery—which was attached to Defendants' motion for summary judgment and is attached hereto as **Exhibit E.**

24. In her Declaration, Ms. Sides avers, in pertinent part, as follows:

- I am the chief operating officer ("COO") of defendant Red Dice Holdings, LLC ("RDH"). ¶ 1.

- During and prior to October 2012, RDH was engaged in the sale of finished legal hemp and cannabis-based products. ¶ 4.

- RDH's involvement with the product at issue in this action, the Dixie X CBD Dew Drops 500 mg Tincture ("the product at issue"), was to facilitate the sale of the finished product. ¶ 5.

- Prior to being made available for public consumption, the product at issue was tested to ensure compliance with state and federal laws and regulations.¶ 6.

- At no time was the product at issue ever made available by RDH for sale to or consumption by the public which did not meet these standards. ¶ 7.

- Testing of the product at issue was done at various stages of production to ensure compliance with state and federal laws. Copies of the certificates of testing performed by the laboratory commissioned to perform such testing, CannLabs, [which are collectively Plaintiff's trial Exhibit #9] ¶ 8.

25. Like Messrs. Keber and Smith, Ms. Sides was not deposed during discovery in this matter, and her testimony only came after discovery was closed in support of the Defendants' motions for summary judgment.

26. All of these party officer witnesses also have testimony as to the relative positions and functions of the corporate defendants as they testified to in their Affidavits, and as the Defendants have stated in their court filings.

27. Prior to the Pre-trial Conference, I made a good faith effort to request that Defendant's counsel accept the subpoenas on behalf of these party officer witnesses. These requests were refused.

*Discussion*

*Rule 43 Authorizes the Court to Permit Contemporaneous Video Trial Testimony*

28. Rule 43 governs the taking of testimony at trial. In particular, Rule 43(a) authorizes the Court, "for good cause shown…[to] permit presentation of testimony in open court by contemporaneous transmission from a different location." F.R.C.P. 43(a).

29. Permitting contemporaneous video testimony lies within the discretion of the trial

court. *Argonaut Ins. Co. v. Manetta Enters.*, 2020 U.S. Dist. LEXIS 103625 (E.D.N.Y. June 11, 2020). As indicated by the Eastern District in *Argonaut*, the Court's discretion on this question is supplemented by its 'wide latitude in determining the manner in which evidence is to be presented' under the Federal Rules of Evidence." *In re RFC & ResCap Liquidating Tr. Action*, 444 F. Supp. 3d 967, 2020 U.S. Dist. LEXIS 44607, 2020 WL 1280931, at *2 (D. Minn. Mar. 13, 2020).

30.    Contemporaneous transmission of trial testimony is not novel and there has been an increasing trend by federal courts allowing and by legal commentators advocating for the use of contemporaneous transmission of trial testimony. See, *In re Vioxx Prods. Liab. Litig.*, 439 F. Supp. 2d 640 (E.D. La. June 29, 2006). The district courts have acknowledged the benefits of videoconferencing at trial and supports its use in the appropriate situations. *Id.*

31.    Moreover, all of the factors considered by the *Vioxx* Court are present here:

- Contemporaneous video testimony is sought with respect to three upper level officers of the Defendants;

- Since these critical witnesses are not being produced by the Defendants, there is no other method to compel their physical appearance in Buffalo, New York for trial;

- Plaintiff has paid the travel expenses for all three witnesses and have thus far been rebuffed. It is evident that the Defendants' avoidance in producing these witnesses is for a "purely tactical advantage," as they well know that these witnesses each possess information highly-relevant to the facts of the case and adverse to the Defendants' defenses. It is respectfully submitted that no other legitimate reason exists as to why the Defendants would protest to the testimony of these witnesses;

- The compulsion of this witness testimony via contemporaneous videoconferencing will not result in any true prejudice or surprise. Indeed, the Defendants have long been aware of the Plaintiff's intention to call these witnesses to testify at trial and are well acquainted with the nature of the testimony sought to be elicited. These witnesses have already provided testimony/sworn statements and have been employed by the Defendants throughout.
- With respect to Ms. Sides, Esq. and Mr. Smith, each of these witnesses have availed themselves of the benefit of the jurisdiction of this Court, as the Court (Judge Geraci) ruled favorably upon their sworn Affidavits in the motions for summary judgment. They respectfully cannot not be allowed to avoid jury scrutiny.

*See, id.*

### *Rule 45—The Court's Subpoena Power*

32. Anticipating that the Defendants will take steps to, initially, avoid service of the subpoenas and, ultimately, move to quash same, it is respectfully requested that the Court address to the manner, sufficiency and service of these subpoenas presently in light of the rapidly approaching trial date.

33. While there is no yet pending motion to Quash these subpoenas, Defendants indicated they would so move at the Final Pre-Trial Conference. Under Fed. R. Civ. P. 45, the movants (i.e. the Defendants here) carry the burden of proving that a subpoena imposes an undue burden on a witness. Because the burden is on the party seeking to quash a subpoena, that party cannot merely assert that compliance with the subpoena would be burdensome without setting

forth the manner and extent of the burden and the probable negative consequences of insisting on compliance. *Aristocrat Leisure Ltd. v. Deutsche Bank Trust Co. Ams.*, 262 F.R.D. 293 (S.D.N.Y. September 16, 2009).

34. Motions to quash a subpoena are entrusted to the sound discretion of the district court") (citation and internal quotation marks omitted. *Id.* (internal citation omitted). As discussed there, the Court engages in a balancing test to determine whether undue burden exists—i.e., whether a subpoena subjects a witness to [*300] undue burden within the meaning of Rule 45(c)(3)(A)(iv) usually raises a question of the reasonableness of the subpoena. *Id.* Certainly, purported "[i]nconvenience alone will not justify an order to quash a subpoena that seeks potentially relevant testimony." *Id., citing, Kirschner*, 2005 U.S. Dist. LEXIS 9803, 2005 WL 1214330, at *2.

35. A majority of courts to interpret the interplay between Rule 45(b)(2)(B) and Rule 45(c)(3)(A)(ii) have found that Rule 45(c)(3)(A)(ii) permits service of a subpoena on a party or a party's officer beyond the 100-mile range that otherwise would serve as a bar. See *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, MDL No. 1358, 2009 U.S. Dist. LEXIS 86950, 2009 WL 1840882, at *1 (S.D.N.Y. June 24, 2009); *Younis v. Am. Univ. in Cairo*, 30 F. Supp. 2d 390, 395 n.44 (S.D.N.Y. 1998) (recognizing that officers of a foreign defendant in the action could be compelled to appear and testify in New York); *In re Ames Dep't Stores, Inc.*, No. 01-42217, 2004 Bankr. LEXIS 1027, 2004 WL 1661983, at *1 (Bankr. S.D.N.Y. June 25, 2009) (holding that the majority of courts to address this issue have decided that the 100-mile rule is inapplicable to parties and party officers).

36. The *Aristocrat* Court agreed with the majority position that <u>corporate officers of a party may be subpoenaed and required to travel more than 100 miles from where they reside, are</u>

employed, or regularly transact business.  "Having chosen to avail themselves of the many benefits of this forum, it is disingenuous for the Bondholders and their corporate officers to reverse course now and contend that they are beyond the reach of this Court's subpoena power." *Id.*  This view finds support in the purpose behind the Rule's geographic limitation, which "gives nonparty deponents protection from expending time and money to comply with a subpoena" and is intended to "protect [nonparty] witnesses from being subjected to excessive discovery burdens in litigation in which they have little or no interest." *In re Edelman*, 295 F.3d 171, 178 (2d Cir. 2002).

*Means of Service*

37. More recent cases in the Second Circuit interpret Rule 45's personal service requirement liberally where the type of service used "was calculated to provide timely actual notice." *CareCore*, 2008 U.S. Dist. LEXIS 62376, 2008 WL 3833238, at *2 (noting that "nothing in the word 'delivering' [in Rule 45(b)(1)] indicates personal service, and a personal service requirement can be unduly restrictive"); see also *Cartier v. Geneve Collections, Inc.*, No. CV 2007-0201, 2008 U.S. Dist. LEXIS 14714, 2008 WL 552855, at *1 (E.D.N.Y. Feb. 27, 2008) (agreeing that "'delivery' under Rule 45 means a manner of service reasonably designed to ensure actual receipt of a subpoena by a witness, rather than personal service"); *Cordius Trust v. Kummerfeld*, No. 99 Civ. 3200, 1999 U.S. Dist. LEXIS 19980, 2000 WL 10268, at *2 (S.D.N.Y. Jan. 3, 2000) (holding that because "alternative service by means of certified mail reasonably insures actual receipt of the subpoena by the witness, the 'delivery' requirement of Rule 45 will be met").

38. Here, Plaintiff suspects that Messrs. Keber and Smith have made themselves inaccessible to personal service.  On this basis, the Plaintiff requests that this Court grant leave to Plaintiff to serve the subject subpoenas on these two witnesses by alternative means including substituted service, overnight courier, certified mail, email, social media post and/or any other

method directed by the Court. *Id., see CareCore*, 2008 U.S. Dist. LEXIS 62376, 2008 WL 3833238, at *3.

39. As discussed above, Party Officers are regarded differently under the law. The case law and Rules give much more leeway.

40. Defendants cannot possibly claim prejudice or surprise here. Counsel each are well acquainted with the three witnesses. **Exhibits D and E** are two of their respective sworn Affidavits. Defense counsel clearly conferred with them comprehensively in this case, and uniquely understand the depth and breadth of their proposed testimony.

41. From a direct examination perspective (i.e. cross of these adverse witnesses), and while without limiting the actual time it takes, Plaintiffs do not expect the testimony of any of these witnesses to last more than one hour, thus further reducing the inconvenience for them.

42. Of course, the virtual and live transmission of the witness's testimony would also be at Plaintiff's expense as he is compelled to call them as their witnesses in his case in chief.

Dated: July 5, 2021
      New York, New York

THE LINDEN LAW GROUP, P.C.

*Jeffrey Benjamin*

Jeffrey Benjamin, Esq.,
Attorney for Plaintiff
5 Penn Plaza, 23rd Floor
New York, New York 10001
(212) 835-1532